261511

```
 1                    STATE OF MICHIGAN

 2            9TH CIRCUIT COURT—TRIAL DIVISION

 3

 4   THE PEOPLE OF THE
     STATE OF MICHIGAN
 5
        v                          Files No. C03000897 FC
 6
     PATRICK KEVIN MISHALL,
 7
            Defendant.
 8

 9

10              Jury Trial — Volume I of V

11       Before Hon. George R. Corsiglia P12239, Circuit Judge
        (Visiting Judge from 48th Circuit, Presiding by Assignment)
12
            Kalamazoo, Michigan—Monday, February 7, 2005
13

14

15   APPEARANCES:

16   For the People:        Scott W. Brower P44951
                            Office of the Prosecuting Attorney
17                          227 West Michigan Avenue
                            Kalamazoo, Michigan 49007
18                          (269) 383-8900

19   For the Defendant:     Andis Svikis P36039
                            1803 Whites Road
20                          Kalamazoo, Michigan 49008
                            (269) 349-7692
21

22   Recorded by:          Video recorded

23   Transcribed by:       Brenda K. Foley CER 4956
                            1400 Gull Road
24                          Kalamazoo, Michigan 49048
                            (269) 385-6001
25                            * * * * *

                                 1
```

FILED

JUN 1 3 2005

9TH JUDICIAL CIRCUIT
COUNTY OF KALAMAZOO
KALAMAZOO, MICHIGAN

ENTERED

```
                        TABLE OF CONTENTS

                                                     PAGE

Jury panel sworn    . . . . . . . . . . . . . . . . .  40

Jury sworn . . . . . . . . . . . . . . . . . . . . . 178

Procedural instructions . . . . . . . . . . . . . . 181

Opening statement by Mr. Brower . . . . . . . . . . 189

Opening statement by Mr. Svikis   . . . . . . . . . 192

WITNESSES: People

JOYCE LYNN DEJONG

     Direct examination by Mr. Brower . . . . . . . . . . 201
     Cross-examination by Mr. Svikis   . . . . . . . . . . 214




EXHIBITS: People                      IDENTIFIED    RECEIVED

     X31  photograph                      211
     X32  photograph                      211
     X42  photograph                      204          204
     X44  photograph                      208
     X45  photograph                      209
     X46  photograph                      209
     X47  autopsy report                  203          203
```

2

(Tape No. C2005-021, 2-07-05, 9:28 a.m.)

1.           Kalamazoo, Michigan

2.           Monday, February 7, 2005 - 9:28 a.m.

3.           THE CLERK:   The court calls the case of People

4. versus Patrick Mishall, file C03-0897 FC.

5.           Please state your appearances for the record.

6.           MR. BROWER:   If it please the Court, your Honor,

7. Assistant Prosecuting Attorney Scott Brower for the People of

8. the State of Michigan.

9.           MR. SVIKIS:   Andis Svikis on behalf of Mr. Mishall.

10.           THE COURT:   Gentlemen, are you ready to proceed to

11. trial?

12.           MR. BROWER:   People are ready, your Honor.

13.           MR. SVIKIS:   Yes, your Honor.

14.           THE COURT:   Members of the jury panel, we have set

15. for trial a criminal case this morning that we believe will

16. proceed through this week and into the first part of next week

17. but should be concluded at the very latest—at least with

18. proofs—by the first day of next week.  And we'll be going from

19. Monday through Thursday of this week.

20.           I think it would be appropriate at this time to

21. determine which of you feel that you have a legitimate reason

22. why you cannot or should not serve on the jury in this matter.

23. And I think we'll do that—If you could sort of line up and

24. come up one by one, and then you can address your concerns to

25. the Court; and the Court will make a determination whether or

1    not you have an appropriate reason to be excused at this time.

2             You want to proceed to do that, please.

3             Just—Okay.  You—The rest of you stand to the back

4    there.  Okay.  And you're?

5             JUROR BRASHARES:   Raine Brashares.

6             THE COURT:   Now I lost my—I have an alphabetical

7    list here.  Okay.

8             And why do you think you should be excused?

9             JUROR BRASHARES:   I am a live-in care—

10            MR. BROWER:   I'm sorry?  I didn't catch—

11           JUROR BRASHARES:   Brashares, Raine.

12            I am the live-in caregiver to a multiply handicapped

13    woman.  And when I come in away from the home, I have to get

14    respite services.  And it's, you know, a financial situation.

15    It's also personnel situation to have somebody available for

16    that long of a time would be real hard to do.  Plus, we don't

17    have the monies to have someone.

18            THE COURT:   Is this—Is this a relative, ma'am?

19           JUROR BRASHARES:   No.  I am a live-in—

20           THE COURT:   Okay.

21           JUROR BRASHARES:   —caregiver to this person.

22           THE COURT:   Are you self-employed or—

23           JUROR BRASHARES:   I'm considered self-employed by

24    the tax authorities.

25           THE COURT:   Do you work for an agency is what I—

1        JUROR BRASHARES:   No, I don't.   I am not through an

2   agency, but I'm paid through the State of Michigan in their

3   respite services, I would imagine, department.   I mean—

4        THE COURT:   How do they handle it if you should

5   need time off for—

6        JUROR BRASHARES:   Well, I can get a day off here or

7   some hours there when I need to.   Sometimes they can stay for

8   the weekend, but that's using up all the allotted money.   So

9   then if I have her for the weekend or get myself some time

10  off, then I would not have the monies from respite services to

11  pay her for any other time than that.

12       THE COURT:   All right.   I'll excuse this lady.

13       JUROR BRASHARES:   Thank you very much.

14       THE COURT:   Next person, please.

15       Your name, sir?

16       JUROR MEYLE:   Meyle, Jon—e-y-l-e.

17       THE COURT:   And why do you—

18       JUROR MEYLE:   I work nights, go on call at 5:00,

19  get off at 8:00 in the morning.

20       THE COURT:   Who do you work for, sir?

21       JUROR MEYLE:   Alpha Delivery.   I'm a courier.   I

22  work solid until between 11:00 and 12:00, and then I'm on call

23  the rest of the night; and I sleep most days.

24       THE COURT:   Well, employment alone is not a

25  sufficient reason.   I can't excuse you for that reason.

1          JUROR MEYLE:   Okay.

2          THE COURT:   Yes, sir?

3          JUROR CROCKETT:   My name's William Crockett.

4          MR. SVIKIS:   . . . (inaudible)

5          JUROR CROCKETT:   Yes?

6          MR. SVIKIS:   Speak up a little bit.

7          JUROR CROCKETT:   Okay.  William Crockett.

8          MR. SVIKIS:   Crockett.  Thank you.

9          THE COURT:   Why do you think you should be excused,

10   Mr. Crockett?

11          JUROR CROCKETT:   Well, I have an exam this

12   Wednesday for my pesticide test; and I just can take it this

13   month for renewal at Kalamazoo College.

14          THE COURT:   When is this test?

15          JUROR CROCKETT:   Wednesday.

16          THE COURT:   I know.  But when Wednesday?

17          JUROR CROCKETT:   I don't know exactly.  It's in the

18   morning sometime.

19          THE COURT:   You can't tell me when the test is and

20   you think I ought to excuse you?

21          JUROR CROCKETT:   See, my employer's got that set up

22   for me.  I know I just got to take it on the—

23          THE COURT:   Well, who is your employer, sir?

24          JUROR CROCKETT:   Kalamazoo College.

25          THE COURT:   Well, okay.  They'll have to make some

                                6

1    other arrangements.   I can't excuse you for that reason, sir.

2    Thank you.

3              JUROR CROCKETT:    Thank you.

4              THE COURT:    Good morning

5              JUROR WALBRIDGE:    Julia Walbridge.

6              THE COURT:    Why do you think you should be excused,

7    ma'am?

8              JUROR WALBRIDGE:    I'm a second-year law student at

9    Michigan State University, and I can't—I don't think I can

10   miss that much of school.   Teachers don't allow that many

11   absences from class.

12             THE COURT:    You're a student?

13             JUROR WALBRIDGE:    Yes.

14             THE COURT:    You didn't ask to be excused?

15             JUROR WALBRIDGE:    No.

16             THE COURT:    Students can get an exemption.

17             JUROR WALBRIDGE:    No, I didn't—

18             THE COURT:    You under—

19             JUROR WALBRIDGE:    —know that.

20             THE COURT:    —stand that.

21             JUROR WALBRIDGE:    Okay.   I didn't know that.

22             THE COURT:    They can.   If you're a full-time

23   student.

24             JUROR WALBRIDGE:    Yes, sir.

25             THE COURT:    Okay.   I'll excuse you, ma'am.

7

1       JUROR WALBRIDGE:   Thank you.

2       THE COURT:   Yes, ma'am?

3       JUROR TROXLER:   Mary Troxler.

4       THE COURT:   Ma'am, why do you think you should be

5   excused?

6       JUROR TROXLER:   Because I am a diabetic.  And I

7   have my medication with me now that I have to take

8   10:00 o'clock.  I have insulin.

9       THE COURT:   Uhm-hmm.

10      JUROR TROXLER:   And I'm on—I urinate frequently

11  because I'm on a water pill.  And to sit for—

12      THE COURT:   . . . (inaudible)

13      JUROR TROXLER:   And the medication that I take

14  makes me sleepy.

15      THE COURT:   Okay.  I'll excuse you, ma'am.

16      JUROR TROXLER:   Thank you.

17      THE COURT:   Yes, ma'am?

18      JUROR ESCALERA:   Escalera.

19      THE COURT:   What's your name, please?

20      JUROR ESCALERA:   Moira Escalera.

21      E-s.

22      THE COURT:   Why do you think you should be excused?

23      JUROR ESCALERA:   I have a family court case that's

24  coming up on Wednesday—Wednesday morning.  It's been—The court

25  was slotted back in last October.  So I've had this—It's been

8

1    for a three-month evaluation that I've had through parenting

2    time and whatnot, so I have it coming up Wednesday morning.

3            THE COURT:   Well, they would have to—They would

4    have to excuse you if you're on a jury.

5            JUROR ESCALERA:   Well, I didn't know that; so I

6    didn't know if—

7            THE COURT:   At least I—I would believe they would.

8    But—

9            JUROR ESCALERA:   I don't know the rules with that.

10           THE COURT:   How long have you been waiting for

11   that?

12           JUROR ESCALERA:   I've had it slotted since early

13   November.

14           THE COURT:   Okay.  I'll excuse you for that.

15           JUROR ESCALERA:   Thank you, sir.

16           THE COURT:   Your name, ma'am?

17           JUROR FLETCHER:   Patricia Fletcher.

18           THE COURT:   And why do you think you should be

19   excused, ma'am?

20           JUROR FLETCHER:   I work at a school system, and I

21   do checks every day for officials, games.  I'm the only one

22   that can do them, and it's done on a daily basis.

23           THE COURT:   What school system do you work?

24           JUROR FLETCHER:   Schoolcraft schools.  I do all the

25   internal accounts.

1      THE COURT:   I'm sorry.  I can't excuse you just for

2  employment purposes.  They're going to have to make some other

3  arrangements for that.

4      JUROR FLETCHER:   Okay, sir.  Thank you.

5      THE COURT:  Yes, sir?

6      JUROR KONING:   It's Tom Koning—with a K.

7      THE COURT:   Okay.  Mr. Koning, why do you think you

8  should be excused?

9      JUROR KONING:   Well, I'm a pastor in the area and

10 also a chaplain at the Friendship Village.  And I have a

11 number of programs that I run through the week at both of

12 these places—educational programs where I teach, and also a

13 certain amount of preparation time for that, too.

14     THE COURT:   Well, there's no way that anyone else

15 . . . (inaudible) a substitution for you?  What if you become

16 ill?

17     JUROR KONING:   Well, generally speaking, they don't

18 have substitutes just because these are low budget situations;

19 and, you know, you're there, I mean.

20     THE COURT:   Well, normally I don't excuse for

21 employment purposes.

22     JUROR KONING:   I understand.

23     THE COURT:   This is—This is a duty like going into

24 the military.

25     JUROR KONING:   Well, I understand that.  But it's

1 another way of serving our country this way, working with a

2 lot of the senior adults and so forth, too.

3     THE COURT:   You can make that argument for almost

4 anything anyone does.

5     JUROR KONING:   Well, I imagine you could.

6     THE COURT:   You know, I could give you a valid

7 argument for whatever.

8     All right.   Reluctantly, I'm going to

9 . . . (inaudible)

10     JUROR KONING:   All right.   Thank you, your Honor.

11     THE COURT:   Yes.

12     Yes, ma'am?

13     JUROR FILCEK:   Linda Filcek—F-i-l-c-e-k.   F, as in

14 Frank.

15     THE COURT:   Oh, I'm sorry.   I don't know what I'm

16 thinking.

17     Yes, ma'am?

18     JUROR FILCEK:   I have two preschoolers at home.   I

19 don't think I could get childcare for them for four days.   I

20 mean I take care of them full-time when I stay at home.

21     THE COURT:   You haven't—How long have you known

22 that you're going to be called for jury service?

23     JUROR FILCEK:   Well, I—I have someone for today and

24 tomorrow; but I don't really—I don't have anyone else I could

25 ask for four days—or five days.

1          THE COURT:   Okay.  I'll excuse you, ma'am.

2          JUROR FILCEK:   Okay.  Thank you.

3          JUROR PAGE:   My name is Rhonda Page.

4          THE COURT:   Yes, ma'am?

5          JUROR PAGE:   It would cause a hardship for me to

6  serve on this jury.  I'm a single parent with three children.

7          THE COURT:   Yeah?

8          JUROR PAGE:   And I'm basically the sole support.

9  It would cause me to miss too many days of work.

10          THE COURT:   Where do you work, ma'am?

11          JUROR PAGE:   I'm an LPN at Heartland.  I work a

12  three to 11:00 shift.

13          THE COURT:   And you're the sole support of these

14  three children?

15          JUROR PAGE:   Yes, I am.

16          THE COURT:   And your employer would not compensate

17  you for that time?

18          JUROR PAGE:   I don't know that to be true, but I'm

19  assuming no.

20          THE COURT:   Well, if they compensate you, I can't

21  excuse you.

22          JUROR PAGE:   I don't know if they will or if they

23  will not.  I'd have to call.

24          THE COURT:   You didn't check with them—

25          JUROR PAGE:   No, I didn't.

1    THE COURT:   —and find out?  Do they know you're
2    here today?
3         JUROR PAGE:   No, I did not.
4         THE COURT:   Well, is there some way you can find
5    out whether or not you could—
6         JUROR PAGE:   I can make a phone call.
7         THE COURT:   Well, you'll have to do that before
8    I'll excuse you—
9         JUROR PAGE:   Okay.
10        THE COURT:   —because I can't just release everybody
11   for employment.
12        JUROR PAGE:   Okay.  When would I be able to make
13   that phone call.
14        THE COURT:   Make arrangements for her to make the
15   call this morning yet.
16        JUROR PAGE:   Okay.  Thank you.
17        JUROR TENBRINK:   Cheryl Tenbrink—T-e-n-b-r-i-n-k.
18        THE COURT:   Why do you think you should be excused,
19   ma'am?
20        JUROR TENBRINK:   Your Honor, on Friday I had a test
21   at Bronson Hospital; and Friday afternoon I saw Dr. Blitz
22   (phonetic), and he's recommending surgery.  Today at 4:00 p.m.
23   or 4:10 p.m., I have an appointment with Dr. Feldmeier to
24   discuss the upcoming surgery.  It makes me—It makes it very
25   difficult for me to sit at any length of time.  It's a bladder

                                13

1   problem.

2          THE COURT:   All right.   I'll excuse you.

3          JUROR TENBRINK:   Thank you, your Honor.

4          JUROR CALKINS:   I'm Ned Calkins.

5          THE COURT:   Calkins?

6          JUROR CALKINS:   C-a-l.

7          THE COURT:   Yes, sir?

8          JUROR CALKINS:   I'm a full-time student during the

9   day, and I work full-time at night.

10          THE COURT:   Where are you a student?

11          JUROR CALKINS:   Kalamazoo Valley Community College.

12          THE COURT:   Okay.   Did you read your—Did you

13   request—

14          JUROR CALKINS:   I didn't know we could.   I wasn't

15   informed as to know that we could.

16          THE COURT:   Well, unless they changed the law on

17   me.   At least I—That's the way I thought.

18          MR. BROWER:   We routinely defer jury service for

19   full-time students to a different period when they don't have

20   that conflict.

21          THE COURT:   That's what I thought, at least there

22   was a deferral.

23          You didn't do that?

24          JUROR CALKINS:   No, sir.

25          THE COURT:   What school days—What days do you go to

14

1    school?

2            JUROR CALKINS:   I have school Monday through

3    Thursday, and I work till 2:30 in the morning.

4            THE COURT:   All right.  I'll excuse you, sir.

5            JUROR CALKINS:   Thank you, sir.

6            THE COURT:   Yes, sir?

7            JUROR DERANGO:   Kelly Derango—D-e-r-a-n-g-o.

8            THE COURT:   Why should you be excused, sir?

9            JUROR DERANGO:   Well, we're moving on Thursday to a

10   new house; and I've already taken Wednesday through Friday off

11   from work to assist my wife with moving.  So we've got three

12   young kids, and she really could use my help.

13           THE COURT:   When—Where are you going to move to?

14           JUROR DERANGO:   Just two blocks down the road.

15   It's within the city of Kalamazoo.  And we're closing on

16   Wednesday, and we're vacating our house and moving all of our

17   stuff on Thursday; and the new owners of our current house are

18   moving on Friday, so.

19           THE COURT:   All right.  I'll excuse you.

20           JUROR DERANGO:   Thank you.

21           JUROR SCHUBERT:   Judy Schubert.

22           THE COURT:   Yes, ma'am?

23           JUROR SCHUBERT:   My concern is I'm a teacher—a

24   special education teacher in Parchment.  And for me to be away

25   from the students for that length of time is very difficult

1   for them.

2          THE COURT:   I can't excuse you for that reason.

3   Thank you.

4          Yes, sir?

5          JUROR BROWN:   A. J. Brown.

6          THE COURT:   Brown?

7          JUROR BROWN:   Brown.

8          THE COURT:   Okay.  Found it.

9          JUROR BROWN:   This is embarrassing.  I've got an

10  overactive bladder, and I just run to the restroom too much.

11  I don't think I'd be able to sit through something.

12          THE COURT:   You seek medical attention?

13          JUROR BROWN:   Oh, yes.  I got to go to the

14  VA Hospital out there in Battle Creek; and they gave me some

15  medicine to take, but it hasn't done any good.

16          THE COURT:   All right.  I'll excuse you.

17          JUROR BROWN:   Okay.  Thank you.

18          THE COURT:   Your name, sir?

19          JUROR PHILLIPS:   John Phillips.

20          THE COURT:   Why do you think you should be excused,

21  Mr. Phillips?

22          JUROR PHILLIPS:   I'm self-employed, and I'm very

23  sick on top of that, so—And I'm surprised I'm even here.

24          THE COURT:   You're sick . . . (inaudible)

25          JUROR PHILLIPS:   I have bronchitis here.

1      THE COURT:   Have you sought—Have you been to a

2  physician or a doctor?

3      JUROR PHILLIPS:   No . . . (inaudible) I don't have

4  insurance.

5      THE COURT:   But you don't think—Well, are you

6  working?

7      JUROR PHILLIPS:   A subcontractor.   I'm a courier.

8      THE COURT:   Well, if you can work—

9      JUROR PHILLIPS:   I can't—

10      THE COURT:   —you can certainly sit.

11      JUROR PHILLIPS:   I can't work.   That's why—

12      THE COURT:   So you think you're incapacitated to

13  the extent you couldn't even work?

14      JUROR PHILLIPS:   No.

15      THE COURT:   What'd you say your name was?

16      JUROR PHILLIPS:   John Phillips.

17      THE COURT:   I'll excuse you, Mr. Phillips.

18      JUROR PHILLIPS:   Thank you, your Honor.

19      JUROR DAVIS:   Jennifer Davis.

20      THE COURT:   Okay.   Ma'am, why should

21  . . . (inaudible)

22      JUROR DAVIS:   I have a four-year-old son that I

23  care for every day.   And my husband took today off work.   And

24  I really can't afford for him to take a week off work.   I

25  don't have anyone to take care of my son.

1     THE COURT:   You haven't arranged for childcare or

2 anything?

3     JUROR DAVIS:   No, I don't—Everyone that we know

4 works during the day.  I work nights so that I can take care

5 of him during the day.

6     THE COURT:   And your husband does what?

7     JUROR DAVIS:   He works at a country club.  He

8 works—He works for the mechanic shop.

9     THE COURT:   And what do you do, ma'am?

10     JUROR DAVIS:   I'm sorry?

11     THE COURT:   What do you do at night?

12     JUROR DAVIS:   I work at UPS.  I work in the office

13 at night.

14     I'm also nine weeks pregnant and have morning

15 sickness.

16     THE COURT:   All right.  I'll excuse you.

17     JUROR DAVIS:   Thank you.

18     JUROR STIFLER:   Stifler, Lindsey.

19     THE CLERK:   I'm sorry  . . . (inaudible)

20     JUROR STIFLER:   Stifler.

21     THE COURT:   . . . (inaudible) excused?

22     JUROR STIFLER:   I'm leaving for Australia on

23 Saturday for five months to study abroad for school.

24     THE COURT:   Okay.

25     JUROR STIFLER:   Thank you.

1       THE COURT:   Yes, sir?

2       Why should you be excused?

3       UNIDENTIFIED JUROR:   Because I'm right in the

4  middle of relocation for my job.  I'll be leaving in three

5  weeks, and I've got a lot of stuff I've got to clean up at

6  work.

7       THE COURT:   Who do you work for?

8       UNIDENTIFIED JUROR:   State Farm.

9       THE COURT:   I'm sorry.  They'll have to make

10  . . . (inaudible) some other arrangements.

11       UNIDENTIFIED JUROR:   Okay.  Thank you.

12       THE COURT:   Yes, ma'am?

13       JUROR PATTON:   Amanda Patton.

14       THE COURT:   Why should you be excused, ma'am?

15       JUROR PATTON:   I'm a full-time student, and jury

16  service through next week would require me to miss three

17  sessions.

18       THE COURT:   Where are you a student at?

19       JUROR PATTON:   Western.

20       THE COURT:   And you didn't request to have your

21  service switched so you'd be on the off time?

22       JUROR PATTON:   I wasn't sure how to do that.  This

23  is the first time I've been summoned.

24       THE COURT:   You write to the jury board.

25       JUROR PATTON:   Right.

                    19

1          THE COURT:   That's all you have to do, and they

2    would have switched it for you.

3          All right.  I'll excuse you.

4          JUROR PATTON:   Can I still do that?  Can I still

5    switch now?  'Cause I would like to do it, but—

6          THE COURT:   You can write to them.  I don't know

7    what they would do.

8          JUROR PATTON:   What they'll do.  Okay.

9          THE COURT:   I have no idea.

10         JUROR PATTON:   Thank you.

11         JUROR SCHNAKE:   My name's Nick Schnake—S-c-h-n-a-k-

12   e.

13         THE COURT:   Yes, sir?  Why should you be excused?

14         JUROR SCHNAKE:   I'm a full-time student at Western,

15   but I take increased—I take more than a normal load 'cause I

16   was a transfer student.

17         THE COURT:   Don't you get informed with your jury

18   service letter that you could ask to be—

19         JUROR SCHNAKE:   I sent them a request

20   . . . (inaudible) and they denied it.  I got a letter in the

21   mail that said they wouldn't.

22         THE COURT:   I don't think they have any choice.

23         JUROR SCHNAKE:   I could bring it in for you

24   . . . (inaudible)

25         THE COURT:   No, I'm not saying you didn't get that.

                              20

1    It just surprises me.  That's the first time I've ever heard
2    that.
3              You're a full-time student at Western?
4              JUROR SCHNAKE:   Yes, sir.
5              THE COURT:   How many hours are you taking?
6              JUROR SCHNAKE:   Right now I'm taking 16.
7              THE COURT:   All right.  I'll excuse you.
8              JUROR SCHNAKE:   Thank you.
9              THE COURT:   Yes, sir?
10             JUROR AMAR:   Amar—George Amar.
11             THE COURT:   Why should you be excused, sir?
12             JUROR AMAR:   I have two issues: one is I'm a brand
13   new business owner.  I just started a business in September.
14             And then, secondly, I have airline tickets for
15   Friday; and I'm going to be returning on Monday.
16             THE COURT:   Where are you going?
17             JUROR AMAR:   North Carolina to visit a grandchild.
18   I don't have a problem if it's a short term.  If you want to
19   put me on a list for—to be reassigned, I don't have a problem
20   with that at all.
21             THE COURT:   You wouldn't be returning until when?
22             JUROR AMAR:   Leaving on the 11th; returning on the
23   14th.
24             THE COURT:   All right.  I'll excuse you.
25             JUROR AMAR:   Thank you.

1       MR. SVIKIS:   Safe trip, George.

2       JUROR AMAR:   Pardon?

3       MR. SVIKIS:   Have a safe trip.

4       JUROR ELLIOTT:   Karen Elliott.

5       MR. BROWER:   How do you spell . . . (inaudible)

6       JUROR ELLIOTT:   E-l-l-i-o-t-t.

7       THE COURT:   I don't—What did you say your name was?

8       JUROR ELLIOTT:   Karen Elliott.

9       THE COURT:   Oh, okay.

10      Go ahead.

11      JUROR ELLIOTT:   Sorry.   I'm a full-time student at

12  Western.   I just heard you go through this.   Well, I didn't

13  know what the process—

14      THE COURT:   Apparently students don't read the

15  information—

16      JUROR ELLIOTT:   No, no—

17      THE COURT:   —we give them.

18      JUROR ELLIOTT:   —I swear I read it.   I thought—I

19  wasn't aware of the process.   I thought it was just going to

20  be for the day 'cause Mondays are—I didn't realize it was

21  going to be—

22      THE COURT:   It's rare we have a trial that lasts

23  one day.

24      JUROR ELLIOTT:   Okay.   Obviously I'm not as

25  informed as I should be.

1    I have classes all day on Tuesdays and Thursdays, as

2 well as a field placement at Lincoln Elementary on Wednesdays.

3    THE COURT:   It's getting to the point I'm going to

4 have to—I'm sorry.  You know, if you read the information that

5 you got you wouldn't be here.

6    Please, the next time you get a letter, read it

7 completely.

8    JUROR ELLIOTT:   Okay.  Thank you.

9    THE COURT:   And take whatever action you're

10 supposed to because this creates a real problem for the

11 system.

12    JUROR ELLIOTT:   Okay.  Sorry.

13    THE COURT:   I'll excuse you.

14    JUROR CONNORS:   Connors, Mary.

15    THE COURT:   What was your last name?

16    JUROR CONNORS:   Connors—C-o-n-n-o-r-s.

17    THE COURT:   Go ahead.  Why do you think you should

18 be excused?

19    JUROR CONNORS:   I do own my own business.  My

20 husband is going to be gone for the week.  I have two

21 children.  I also watch a child three days out of the week.

22 And I have a five-month-old and an autistic three-year-old

23 child who requires—

24    THE COURT:   Did you ask for an excuse, ma'am, from

25 the jury . . . (inaudible)

23

1    JUROR CONNORS:   I told—At that time I was

2 breast-feeding, and I asked about that; and she said it

3 doesn't matter—which I was at the time that I called in, but—

4    THE COURT:   You called in.

5    JUROR CONNORS:   Yes, I did.

6    THE COURT:   Don't they have a write-in system where

7 you have to write in and then—

8    JUROR CONNORS:   I'm not aware of that.

9    MR. SVIKIS:   I think you just pick up the phone

10 . . . (inaudible) around here.

11    THE COURT:   Okay.

12    JUROR CONNORS:   But the three-year-old re—he goes

13 to school in the morning and gets off the bus at 12:00 and

14 requires a strict schedule.  If it was next week it would be

15 better.

16    THE COURT:   All right.  I'll excuse you.

17    JUROR CONNORS:   Thank you, sir.

18    JUROR HOLTYN:   My name is August Holtyn.

19    THE COURT:   What's your name, please?

20    JUROR HOLTYN:   August Holtyn—H-o-l-t-y-n.

21    THE COURT:   Holtyn.

22    JUROR HOLTYN:   Uhm-hmm.

23    THE COURT:   Oh, I misunderstood you.

24    JUROR HOLTYN:   Sorry.

25    THE COURT:   Okay.  Why do you think you should be

(Tape No. C2005-021, 2-07-05, 09:54)

1   excused?

2        JUROR HOLTYN:   I'm sorry.  You're going to have to

3   go through the same thing with me.  I'm a full-time student at

4   Western and—

5        THE COURT:   Did you ask to have it transferred?

6        JUROR HOLTYN:   No, I—I'm sorry.  I don't know a lot

7   of the processes of this, so I—

8        THE COURT:   Didn't you get a letter that explained

9   it?

10       JUROR HOLTYN:   I didn't think so.

11       THE COURT:   How'd you get notified you were up for

12  jury service?

13       JUROR HOLTYN:   It was like the—just a letter like

14  saying call in for this date and you're supposed to come in.

15       THE COURT:   But there—Wasn't there a preselection

16  questionnaire you had to file—and you had to file, and it

17  asked you your name and your occupation, your birth date and

18  where you lived?

19       JUROR HOLTYN:   Is this—Would this have been a while

20  ago?

21       THE COURT:   Sure.

22       JUROR HOLTYN:   . . . (inaudible)

23       THE COURT:   And with that you should have gotten

24  instructions as to if you wished to be excused or to have it

25  transferred.

                              25

1          JUROR HOLTYN:   I wasn't aware of any of that.

2          THE COURT:   Well, I'm pretty sure you had to get

3    that 'cause your name wouldn't have been in the pool if you

4    didn't do that.

5          Where do you go to school?

6          JUROR HOLTYN:   Western Michigan.

7          THE COURT:   What days do you go to class?

8          JUROR HOLTYN:   I'm in class every day.   Normally

9    Tuesday/Thursday I start at 9:00.   I'm done at around 3:00.

10   And them Monday/Wednesday I'm in class from noon till about

11   7:00.

12         THE COURT:   All right.   I'll excuse you.

13         JUROR HOLTYN:   Thank you.

14         THE COURT:   Next time when you—if you get one and

15   you're a student, you better take that precaution.   Otherwise,

16   you're going to be—You might get another judge that won't

17   excuse you.

18         JUROR HOLTYN:   I appreciate it.   Thank you.

19         THE COURT:   Yes, ma'am?

20         JUROR HOOGSTRATEN:   Shirley Hoogstraten.

21         THE COURT:   Yes, ma'am?

22         JUROR HOOGSTRATEN:   My husband had a stroke about a

23   week and a half ago; and then last week he took a fall,

24   cracked some ribs.

25         Also, my son is in the military.   He's been

26

1    stationed in Korea.  He's home to the states, but he's

2    scheduled to be home in Michigan on Wednesday.  I haven't seen

3    him.

4              THE COURT:   Well, how long is he going to be home

5    for?

6              JUROR HOOGSTRATEN:   About a week.

7              THE COURT:   . . . (inaudible)

8              JUROR HOOGSTRATEN:   About a week.

9              THE COURT:   All right.  I'll excuse you.

10             JUROR HOOGSTRATEN:   Thank you.

11             THE COURT:   Yes, ma'am?

12             JUROR BAAS:   Sally Baas.

13             THE COURT:   And why should you be excused, ma'am?

14             JUROR BAAS:   I'm a licensed daycare worker, and I

15   have six families depending on me every day.

16             THE COURT:   Did you ask the jury board to be

17   excused?

18             JUROR BAAS:   Thank you.

19             THE COURT:   Did you ask the jury board if you could

20   be excused?

21             JUROR BAAS:   Yes.

22             THE COURT:   I'm sorry.  I can't . . . (inaudible)

23             Yes, ma'am?

24             JUROR FRAZIER:   Do you need to know my name?

25             THE COURT:   Yes.

                              27

1    JUROR FRAZIER:   Sandy Frazier.

2    THE COURT:   And why should you be excused?

3    JUROR FRAZIER:   I couldn't hear what you said—how

4  long this was going to last.  Will it be over by the 22nd of

5  this month?

6    THE COURT:   It should be.

7    JUROR FRAZIER:   Okay.  'Cause my grandson was

8  scheduled for surgery that day, and I—

9    THE COURT:   It'll—It should be—

10    JUROR FRAZIER:   Okay.

11    THE COURT:   —done by the first part of next week.

12    JUROR FRAZIER:   Okay.  All right.  I couldn't hear

13  what you said.

14    THE COURT:   Okay.  I'm sorry.

15    JUROR LOZON:   Anthony Lozon.

16    THE COURT:   And why should you be excused, sir?

17    JUROR LOZON:   What's that?

18    THE COURT:   Why do you think you should be excused?

19    JUROR LOZON:   I have two reasons, your Honor.  I am

20  a college student like the rest of the people.  And I have a

21  legal proceeding happening this coming Thursday.

22    THE COURT:   Civil or criminal?

23    JUROR LOZON:   What's that?

24    THE COURT:   Civil or criminal?

25    JUROR LOZON:   I believe it's criminal.

28

1        THE COURT:   Is it a charge of some sort?

2        JUROR LOZON:   . . . (inaudible)

3        MR. SVIKIS:   What was your last name again?

4        JUROR LOZON:   Lozon.

5        MR. SVIKIS:   Lozon?

6        JUROR LOZON:   Yeah, L-o-z-o-n.

7        THE COURT:   Who's bringing that against you, do you

8    know?

9        JUROR LOZON:   I believe the State of Michigan.  I'm

10   not sure what judge.

11       THE COURT:   County?

12       JUROR LOZON:   Yeah.

13       THE COURT:   You probably got a challenge for cause

14   there, so I'm going to excuse you.

15       JUROR LOZON:   Thank you, sir.

16       THE COURT:   Yes, ma'am?

17       JUROR ELWELL:   My name is Heather Elwell.

18       I work at a nursing home.  I'm a physical therapist

19   assistant.  And mine is the only stable income between my

20   husband and I.  And, to my knowledge—The therapy company's

21   very small, and there's no guarantee that I will be

22   reimbursed.  I'm concerned about wage loss.

23       My husband works for a computer company, and it's

24   job by job.  So we're never sure when we're going to get the

25   next paycheck from him.

1            MR. SVIKIS:    The last name is what?

2            JUROR ELWELL:    Elwell.

3            MR. SVIKIS:    Elwell?

4            JUROR ELWELL:    E-l.

5            MR. SVIKIS:    It's an add-on, your Honor.

6            THE COURT:    Where do you work, ma'am?

7            JUROR ELWELL:    Borgess Nursing Home on Chicago

8    Avenue.

9            THE COURT:    Uhm-hmm.    And you're not reimbursed for

10   jury service?

11           JUROR ELWELL:    Not that I'm aware of.

12           THE COURT:    Did you check?

13           JUROR ELWELL:    No, I did not.

14           THE COURT:    Well, I can't excuse you unless you

15   know one way or the other.

16           JUROR ELWELL:    Okay.

17           THE COURT:    You're telling me it's an economic

18   hardship, and then you tell me you don't know whether or not

19   they'd reimburse you.    So that doesn't sound like a legitimate

20   excuse to me.

21           JUROR ELWELL:    The therapy company only started up

22   a couple years ago.    We have very minimal employees.    I doubt

23   that they would reimburse me for that.

24           THE COURT:    Did you inquire?

25           JUROR ELWELL:    No.

1   THE COURT:   Are you like an independent contractor

2   or—and you're placed in Borgess Nursing Home, or do you work

3   for Borgess Nursing Home?

4   JUROR ELWELL:   I'm an employee for Prime

5   Rehabilitation Network, which is a therapy company that has a

6   contract with Borgess Nursing Home.

7   THE COURT:   Well, unless you can tell me whether or

8   not you're going to get reimbursed, I can't—I can't just let

9   you out of this because you don't think you're going to get

10  paid.

11  JUROR ELWELL:   Okay.

12  THE COURT:   Yes, sir?

13  JUROR BARTHOLOMEW:   My name is Harold Bartholomew.

14  THE COURT:   Yes, sir?  Why should you be excused?

15  JUROR BARTHOLOMEW:   I'm running the Stryker project

16  for A1 Refrigeration.  And I have seven men on the project,

17  working up to 14.  A short term would not be a problem, but

18  we're right in the middle of a huge production project.

19  THE COURT:   I can't excuse you.

20  JUROR BARTHOLOMEW:   Okay.  Thank you.

21  THE COURT:   Yes, ma'am?

22  JUROR OLIVA:   Daria Oliva.

23  THE COURT:   Why should you be excused, ma'am?

24  JUROR OLIVA:   I'm an RN at Lakeview Hospital.  I'm

25  the day shift coordinator.  I'm the day shift coordinator at a

31

1    general psych unit, 15-bed.  We already have one full-time

2    nurse off on surgery leave this week, and we just face

3    staffing shortages.

4            THE COURT:  I—That's—Where is Lakeview?

5            JUROR OLIVA:   In Paw Paw, your Honor.  We typically

6    staff with four RNs on the day shift; and, like I said, one of

7    our day shift nurses is already off.  And when we request time

8    off, we have to have it in a six-weeks written request.

9            THE COURT:   Isn't there any way . . . (inaudible)

10   mechanism where they can get in other nurses if there's an

11   emergency?

12           JUROR OLIVA:   Generally, they'll pull from another

13   unit if they're able to or from PRN source.  And,

14   unfortunately, some of those people are down in Florida.

15           THE COURT:   Well, it's difficult for everybody at

16   this time of year.  I'm sorry.  I can't excuse you for that

17   reason.

18           JUROR OLIVA:   Thank you.

19           THE COURT:   Yes, sir?

20           JUROR AUBE:   Gerald Aube.

21           THE COURT:   Why should you be excused, sir?

22           JUROR AUBE:   I have a double fusion surgery in my

23   neck, and I have three more compression fractures that I found

24   out about last week at a physical.  And I cancelled a doctor's

25   appointment this morning and rescheduled it for next week.

1   I'm in quite a bit of pain.

2          THE COURT:   Okay.   You think you couldn't sit for

3   that period of time?

4          JUROR AUBE:   Sitting bothers me unless I'm in a

5   comfortable chair.   Sitting in those wooden benches is killing

6   me, but I can sit in a comfortable chair.

7          THE COURT:   All right.   I'll excuse you, Mr. Aube.

8          JUROR AUBE:   Thank you.

9          JUROR ECKELBECKER:   Rex Eckelbecker.

10         THE COURT:   And why should you be excused, sir?

11         JUROR ECKELBECKER:   My son's doing two and a half

12  to five years in Marquette.   His birthday's on Wednesday.

13  Every year—I'm the only family member that supports him and

14  goes up.   I think his success at Marquette is because of me.

15  And he's been—I mean he looks forward to me every year coming

16  up.

17         I'm not looking for an excuse.   I'll

18  reschedule—whatever—but this is—I did—

19         THE COURT:   Did you say—

20         JUROR ECKELBECKER:   I did write in.   I don't know

21  if anybody got my write-in, but I did write in.

22         THE COURT:   I can tell you that wouldn't—When did

23  you say this is scheduled for that you wanted to go there?

24         JUROR ECKELBECKER:   I go—It's on Wednesday.   And

25  it's quite a journey, I mean.

                                33

1          THE COURT:  I understand that.  That is not a

2     sufficient reason.  I'm sorry.  I understand your concern, but

3     it's not a good reason.

4          JUROR ECKELBECKER:   Okay.  I'll be a awful bitter

5     jury [sic], though—jurist.

6          THE COURT:   Probably one of these gentlemen, then,

7     will use a peremptory challenge.

8          JUROR PIPER:   Your Honor?

9          THE COURT:   Yes, sir?

10          JUROR PIPER:   I'm Jerrod Piper.  I'm a police

11     officer with St. Joseph County Narcotics Unit.

12          THE COURT:   Uhm-hmm.

13          JUROR PIPER:   I would love to be a part of this

14     procedure as I've never been a juror—a juror before.  However,

15     I'm scheduled for preliminary exam Thursday I just got a

16     subpoena for.  I'm not sure it's even going to go.  I might be

17     able to talk to my prosecutor and see if I can—

18          THE COURT:   If you're on jury duty it won't go.

19          Sorry.

20          JUROR PIPER:   Okay.  Good.

21          MR. BROWER:   What was the name again?

22          THE COURT:   Eric Piper.

23          JUROR PIPER:   So it's okay for me to stay then?

24          THE COURT:   It certainly is.

25          JUROR PIPER:   Okay.

34

1          MR. SVIKIS:   A little while.

2          JUROR DOKEY:   Good morning.

3          THE COURT:   Yes?

4          JUROR DOKEY:   Sherri Dokey.

5          When it was going to be a one or a two-day thing, I

6    didn't really think much of it; but when you announced that it

7    goes through next week, my place of employment doesn't pay me

8    to not work.  And our financial situation—for me to lose five

9    days of work—would be devastating for us to pay our bills.

10          THE COURT:   Who do you work for?

11          JUROR DOKEY:   Antique Kitchen restaurant.  We don't

12   get anything when we're not there.  And seeing's how it was

13   announced it was going to be through next week.

14          THE COURT:   Well, it would be Monday through

15   Thursday and then—

16          JUROR DOKEY:   Right.

17          THE COURT:   —next Monday.  It's not for next week.

18          JUROR DOKEY:   Right.  But I mean that's five days

19   of work that I won't get paid for.

20          THE COURT:   Well, I'm sorry.  That's not—I

21   understand that it would cause some problems, but that's not a

22   sufficient reason to excuse you.  Thank you.

23          JUROR HARDY:   Good morning.  Tracie Hardy.

24          THE COURT:   Yes, ma'am?

25          JUROR HARDY:   I have a doctor's appointment

1   tomorrow to discuss some precancerous treatment that I am

2   going to be needing.  I just found out on Thursday last week.

3   The . . . (inaudible) came back.

4            THE COURT:   All right.  I'll excuse you.

5            JUROR HARDY:   Thank you, sir.

6            MR. SVIKIS:   Your last name again?

7            JUROR HARDY:   Hardy.

8            THE COURT:   Yes, sir?

9            JUROR SAYERS:   Sayers is the name—Don Sayers.

10           THE COURT:   What'd you say your name was?

11           JUROR SAYERS:   Sayers.  Don Sayers.

12           THE COURT:   Okay.  Mr. Sayers?

13           JUROR SAYERS:   My companion fell Friday night and

14  broke her hip.  She had surgery late Saturday night.  The

15  surgeon said he would release her either Wednesday or

16  Thursday, but I have to be home to take care of her.

17           THE COURT:   And who was this?

18           JUROR SAYERS:   My companion—the lady I live with.

19  She fell and broke her hip and had surgery—right hip

20  replacement Friday—or Saturday night.  The surgeon said he

21  would release her probably Wednesday or Thursday if—But I have

22  to be home to take care of her.

23           THE COURT:   You don't—You're not employed

24  otherwise, sir?

25           JUROR SAYERS:   Sir?

36

1  THE COURT:   You're not employed?

2  JUROR SAYERS:   No, I'm retired.

3  THE COURT:   All right.   I'll excuse you.   You're

4  excused.

5  JUROR SAYERS:   Okay.   Thank you.

6  THE COURT:   Counsel?

7  (At 10:09 a.m., bench conference and off record

8  discussion between Court and unknown person)

9  Members of the jury panel, I'm Judge

10  George Corsiglia, and it's my pleasure to welcome you to the

11  circuit court for—Kalamazoo County.

12  And I know that jury service may be a new experience

13  for most, if not all, of you.   But keep in mind that jury duty

14  is one of the most serious duties that members of a free,

15  democratic society such as ours is asked to perform.   Our

16  system of government couldn't exist without citizens such as

17  yourself.

18  The jury is an extremely important part of this—of

19  the court system.   The right to a jury trial is an ancient

20  tradition, and it's part of the heritage of this country.   The

21  law provides that both a person who is accused of a crime and

22  the prosecution have the right to a trial, not by one

23  individual, but by a jury of 12 impartial persons.

24  Jurors must be as free as humanly possible from any

25  bias, prejudice, or sympathy for either side.   Each side in a

1   trial is entitled to jurors who keep open minds until the time

2   comes for the case to be decided.

3          The trial begins with the selection of the jury.

4   The purpose of the jury selection process is to obtain

5   information about you that will help the Court and the

6   attorneys and the parties to the lawsuit choose a fair and

7   impartial jury to hear the case.

8          During jury selection the lawyers and I will be

9   asking you questions.  This is called the voir dire

10  examination.  The questions are meant to find out if you know

11  anything about the case.  Also, we need to find out if you

12  have any opinions or personal experiences that might influence

13  you for or against the prosecution, defendant, or any

14  witnesses that may be called during the trial.  One or more of

15  those things could cause you to be excused in this case, even

16  though you may be otherwise qualified to sit in the—as a juror

17  in another case.

18         The questions may probe deeply into your attitudes,

19  beliefs, and experiences.  They are not meant to be an

20  unreasonable prying into your private life.  The law requires

21  that we get this information so that an impartial jury can be

22  chosen to hear the case.

23         If you do hear or understand a question you should

24  say so or—Excuse me.—if you do not hear or understand a

25  question you should say so.  If you do understand it, you are

38

1   required to answer it truthfully and completely.  We don't

2   want you to hesitate to speak freely about anything that you

3   believe the Court should know that touches upon you being a

4   fair and impartial juror.

5           Now during jury selection you may be excused from

6   serving on the jury in one of two ways.  First, I may excuse

7   you for cause; that is, I may decide that there's a valid

8   reason why you cannot or should not serve in this case.  Or, a

9   lawyer from one side or the other may excuse you without

10  giving any reason for doing so.  This is what's called a

11  peremptory challenge.  The law gives each side the right to

12  excuse a certain number of jurors in this way.  If you are

13  excused, you shouldn't feel bad or take it personally.  As

14  I've explained this is simply a method that has been developed

15  over the years that allows both sides to be assured that a

16  fair and impartial jury has been heard—or selected to hear the

17  case.

18          As I have indicated to you at the beginning, this

19  case is scheduled to go through Thursday of this week.  Then

20  we'll adjourn for the weekend and then continue on Monday.

21  And we believe that it should be concluded at the very latest

22  at that time.

23          The questions that is—that are going to be asked by

24  myself and the lawyers are going to be directed to the

25  individual jurors who've been called to take a seat in the

1   jury box during the voir dire examination.  I'd ask all of you

2   to listen very carefully to the questions I ask and later

3   those that the lawyers ask so that if anyone is excused that

4   was initially called to sit in the jury box and be selected as

5   a juror is excused, you'll know what information is important

6   both to the Court and to the—the lawyers; and, hopefully, we

7   can speed up the questioning process with you if you have some

8   idea or understanding of what the questions and information is

9   that we need before you take a seat there if you replace

10   somebody.

11        At this point the clerk will administer an oath to

12   you.  What that oath requires of you is to answer the

13   questions truthfully that are asked of you touching upon your

14   qualifications as a juror.  If any of you have any religious

15   scruples or beliefs that prohibit you from taking an oath, it

16   is permissible for you to affirm rather than to swear.

17        So if you'll now stand, the clerk will administer

18   that oath.

19        THE CLERK:    Please raise your right hands.  Do you

20   solemnly swear or affirm that you will truthfully and

21   completely answer all questions about your qualifications to

22   serve as jurors in this case?

23        JURY PANEL (in unison):    (Mixed positive responses)

24        THE CLERK:    Thank you.  You may be seated.

25        THE COURT:    Counsel, you want to approach, please.

1           (At 10:20 a.m., bench conference)

2           THE CLERK:  Robert Fooy.

3           MR. BROWER:  I'm sorry?  I didn't catch the last

4 name, your Honor.

5           MR. SVIKIS:  Fooy.

6           THE CLERK:  Fooy—F-o-o-y.

7           Peter Chase;

8           Curtis Bonnema;

9           Roger Schultz;

10           Jon Meyle;

11           Michael Manchester;

12           Elaine Kob;

13           Brian Booth;

14           Dale Cutler;

15           Sherri Dokey;

16           Arthur Wurfel;

17           John Pelto;

18           Carrie Caldwell;

19           Patrick Wellington.

20           THE COURT:  The procedure we'll follow from this

21 point on is that I'm going to make some preliminary comments

22 to the jury.  The questions, as I said, will be directed to

23 the 14 individuals seated in the jury box.  I'd ask the rest

24 of the jury panel to listen carefully to the questions I ask

25 and later those that the lawyers ask so that if anyone now

1    seated in the jury box is excused you will know what

2    information is important both to the—the attorneys and to the

3    Court and, hopefully, we can speed up the questioning process

4    if you're called to replace them.

5           I'm going to ask my questions of you collectively.

6    You don't need to answer if your answer is no.  If your answer

7    to the question I ask is yes, please raise your hand or speak

8    up so that I know that.

9           Members of the jury panel, this is a criminal case.

10   As I indicated, we believe it'll take approximately five days

11   to try—four days this week and then a day next week.

12          There are four charges or four counts that have been

13   made against the defendant.  These are charges that arose

14   quite a few years ago.  They are alleged to have happened in

15   the city of Kalamazoo on or about February 8th of 1991.

16          And those charges or counts that are made in this

17   case state that the defendant Patrick Kevin Mishall, on or

18   about the 8th day of February of 1991 in the city of Kalamazoo,

19   county of Kalamazoo, state of Michigan, did murder

20   Christine Dimmick, contrary to the form of the statute and

21   against the peace and dignity of the People of the State of

22   Michigan.

23          The second charge is that this defendant

24   Patrick Kevin Mitchell—Mishall—Excuse me.—did, while in the

25   perpetration or attempted perpetration of a larceny, murder

                                  42

1   one Christine Dimmick.

2         The third or fourth—The third charge or count

3   alleges that this defendant Patrick Kevin Mishall on or about

4   February 8th of 1991 in the city of Kalamazoo, county of

5   Kalamazoo, did carry or have in his possession a firearm:

6   to-wit, a handgun, at the time he committed or attempted to

7   commit a felony: to-wit, murder.

8         And the last or fourth charge alleges on the same

9   date, time, and place that this defendant did assault a

10  certain person: to-wit, Christine Dimmick, while being armed

11  with a dangerous weapon or an article used or fashioned in a

12  manner to lead the person so assaulted to reasonably believe

13  it to be a dangerous weapon: to-wit, a gun, and did then and

14  there feloniously rob, steal, or take from the person of said

15  victim or in her presence certain property: to-wit, money

16  and/or a videotape, contrary to the form of the statute.  This

17  is what's commonly called armed robbery.

18         MR. BROWER:   Your Honor, there's a count five on

19  the next page.

20         THE COURT:   I'm sorry.  Thank you.

21         And—That is correct.  There is a fifth charge or

22  count.  Again, on the same date, time, and place, it's alleged

23  that this defendant did carry or have in his possession a

24  firearm: to-wit, a handgun, at the time he committed or

25  attempted to commit a felony: to-wit, armed robbery, contrary

                              43

1    to the form of the statute and against the peace and dignity

2    of the People of the State of Michigan.  That's what's

3    commonly referred to as a felony firearm charge.

4          Well, once we get into the case I will explain more

5    fully those charges to you.  But that's sufficient for now

6    that you know those are the five charges against the

7    defendant.

8          The defendant, as I indicated to you, is

9    Patrick Kevin Mishall.  He's seated at the counsel table

10    furthest from you facing you in the dark coat and white shirt

11    and dark tie.

12          And his attorney is Mr. Andis Svikis, who's now

13    standing with the lighter suit—gray suit—and—

14          MR. SVIKIS:    Good morning.

15          THE COURT:   —red tie, white shirt.

16          And the State of Michigan is represented by

17    Assistant Prosecuting Attorney Scott Brower, who's now

18    standing.

19          Do I have an updated witness list?

20          MR. BROWER:   It should be there in several parts,

21    your Honor.  I can read them, otherwise, if the Court's so

22    inclined.

23          THE COURT:   . . . (unintelligible) I'm not sure I

24    see one here, but it may be here.

25          Why don't—Why don't counsel indicate who their

44

1    witnesses will—they anticipate calling at this time.   That way

2    I won't—hopefully, nobody'll be missed.

3                 MR. BROWER:   If it please the Court, your Honor,

4    witnesses that the People may be calling during the course of

5    this trial are these:

6                 Officer Joe Humphries;

7                 Officer Matt Brinkman;

8                 Officer Bruce Labrie;

9                 Dr. Joyce deJung;

10                Michigan State Police technician Michael Burritt;

11                Gunars Vaseris;

12                Robert Petersen;

13                Detective Greg Hatter;

14                Detective Jim Grace;

15                Jim Jilek;

16                Tina Askern;

17                Frank Sila;

18                Sharon Hitchcock;

19                Debbie Brown;

20                Chris Newburry;

21                Tracy Rathke;

22                Carol Sordahl;

23                Bart Munson;

24                James Grubius;

25                Brett Munson;

1          Tina Dahl (phonetic);

2          Sandra Schulz;

3          Dawn Anderson;

4          Ontario Lowery;

5          Carol Didao;

6          Willie Thompson;

7          Lance Handlogten;

8          Rich Matteson;

9          Amerigo Marcelletti.

10         Your Honor, the witness coordinator that will be

11    assisting me—assisting me through the trial is

12    Gloria Swinsick.

13         THE COURT:   Mr. Svikis, do you have any you want to

14    add to that?

15         MR. SVIKIS:   Yes.   Thank you, your Honor.

16         We'd be calling Josette Phillips, who lives in

17    Paw Paw;

18         Chris Harwood, who's in the Paw Paw/Allegan area;

19         Amy Mishall;

20         A Warren Pangburn;

21         And a Betty Pangburn.

22         Those are the witnesses we intend to—on calling in

23    addition to the witnesses already mentioned.   And, of course,

24    Mr. Mishall may or may not take the stand; so if anyone knows

25    him, also.

                              46

1        You want to stand up, Pat.

2        MR. SVIKIS:   Thank you.

3        THE COURT:   Okay.  My first question is: do—does

4 anyone now seated in the jury box know either one of the

5 attorneys?

6        (No audible response)

7        Does anyone know the defendant Mr.—

8        MR. BROWER:   There was a hand, your Honor.

9        MR. SVIKIS:   There's a hand.

10       THE COURT:   Oh, I'm sorry.

11       Mr. Bonnema, who do you know?

12       JUROR BONNEMA:   Not personally, but the assistant

13 prosecutor.

14       THE COURT:   How do you—How are you acquainted with

15 him, sir?

16       JUROR BONNEMA:   I'm employed with the City of

17 Kalamazoo as a public safety officer.

18       THE COURT:   Okay.  Have you had any contact with

19 him?

20       JUROR BONNEMA:   Prior to this case?

21       THE COURT:   Yes.

22       JUROR BONNEMA:   I believe I may have on another

23 criminal matter.

24       THE COURT:   Would that in any way affect how you

25 would evaluate this case?

1    JUROR BONNEMA:   No, sir.

2    THE COURT:   Okay.  Anyone else know anyone—either

3    of the attorneys?

4    (No audible response)

5    Anyone know the defendant?

6    (No audible response)

7    Does anyone know the—any of the witnesses that were

8    called—or named?

9    Mr. Bonnema?

10    JUROR BONNEMA:   Pretty much the police officers for

11    the City of Kalamazoo that would have been employed in the

12    last seven years I would know, one being a supervisor of mine.

13    THE COURT:   Would that—One would be a current

14    supervisor of yours?

15    JUROR BONNEMA:   As of October, no.

16    THE COURT:   Well, he—

17    JUROR BONNEMA:   . . . (inaudible)

18    THE COURT:   —had been.

19    Is the Kalamazoo city the primary agency here?

20    MR. BROWER:   Yes, your Honor.

21    THE COURT:   He's employed by them.

22    MR. BROWER:   Right.

23    THE COURT:   I think we ought to just

24    make—circumvent any prolongation of this.  I think he would be

25    disqualified by virtue of his employment.  So I'm going to

48

1    excuse you, Mr. Bonnema.

2             THE CLERK:   Penelope Harkness.

3             THE COURT:   Ms. Harkness, do you know either of the

4    attorneys, the defendant, or any of the witnesses?

5             JUROR HARKNESS:   . . . (inaudible)

6             THE COURT:   Okay.  Do any of you recall reading or

7    hearing anything about this particular case?

8             (No audible response)

9             Have any of you ever served as a juror before on any

10   case, anyplace?

11            Mr. Schultz, where?

12            JUROR SCHULTZ:   Here.

13            THE COURT:   Okay.

14            JUROR SCHULTZ:   I'm not sure—This is circuit court

15   . . . (inaudible)

16            THE COURT:   It's the circuit court.

17            JUROR SCHULTZ:   We went upstairs to start with.

18   I'm not real sure where we ended up.

19            THE COURT:   Okay.  Was it—

20            JUROR SCHULTZ:   . . . (inaudible)

21            THE COURT:   Okay.  Do you recall what kind of case

22   it was?

23            JUROR SCHULTZ:   It was a mental competency.  It was

24   like a five-man jury.

25            And another one was some sort of criminal thing, but

                                 49

(Tape No. C2005-021, 2-07-05, 10:40)

1   it got dismissed just as we sat down.

2   THE COURT:   Okay.  I'm not sure what kind of cases

3   you were involved in, but do you think the fact that you

4   served on a jury previously that would affect how you view

5   this case?

6   JUROR SCHULTZ:   No.

7   THE COURT:   Who else had served on a jury?

8   Ms. Harkness?  Where have you served, ma'am?

9   JUROR HARKNESS:   It was in South Carolina.  It was

10  a jury—or a traffic violation.

11  THE COURT:   Okay.  How long ago?

12  JUROR HARKNESS:   . . . (inaudible)—

13  THE COURT:   It doesn't matter.

14  JUROR HARKNESS:   —once it was before '91.

15  THE COURT:   Before '91.

16  Anything about that that you feel might cause you to

17  favor one side or the other?

18  JUROR HARKNESS:   No, sir.

19  THE COURT:   Does anyone—We're usually in the

20  courtroom from an hour and a half to two hours at a time.  Do

21  any of you have any health or physical problems that that

22  would interfere with?

23  (No audible response)

24  Now as I told you, members of the jury panel, this

25  is a criminal case.  And the document or paper that's used to

50

1    charge this defendant is called an information. I've read

2    that information to you. Basically there are—Not basically.

3    There are, in fact, five charges or five counts. I'm just

4    going to give them their common name now without reading them

5    again because I have, in fact, read them to you.

6         But the first count's what's commonly referred to as

7    an open charge of homicide or murder, and that relates to

8    Christine Dimmick, dating back to on or about February 8th of

9    1991 in the city of Kalamazoo and the county of Kalamazoo.

10        The second charge is what's commonly referred to as

11   felony murder, and that is a homicide committed while

12   perpetrating or attempting to perpetrate another crime. In

13   this case, it's a larceny; and that's against

14   Christine Dimmick—The—or Christine Dimmick is the victim.

15        The third is what's commonly referred to as a felony

16   firearm violation; that is, that he committed a felony while

17   in the possession of a firearm.

18        The fourth charge is what's commonly referred to as

19   armed robbery, again involving this defendant, same date,

20   time, and place—and the alleged victim being

21   Christine Dimmick.

22        And, again, the fifth or last charge being a felony

23   firearm; that is, that he was armed with a—a gun while

24   committing the armed robbery. Again, this defendant, same

25   date, time, and place.

Now this defendant has pled not guilty to all of these charges, and you should clearly understand that the information that has been read to you is not evidence. We read an information in every criminal trial so that the defendant and the jury can hear each of the charges. And you must not think that it's evidence of the defendant's guilt or that he must be guilty because he's been charged or because there's more than one charge.

Now in this country every person who is accused of a crime is presumed to be innocent. And what that means is that the jury must start with the presumption that the defendant is innocent. This presumption continues throughout the trial and entitles the defendant to a verdict of not guilty unless the jury is satisfied beyond a reasonable doubt that he is guilty.

Every crime is made up of parts called elements. The prosecutor must prove each element of the crime beyond a reasonable doubt.

The defendant isn't required to prove his innocence or to do anything. If you find that the prosecutor hasn't proven every element beyond a reasonable doubt, then the jury must find the defendant not guilty.

A reasonable doubt is a fair, honest doubt that grows out of the evidence or lack of evidence. It's not merely an imaginary or a possible doubt but a doubt that's based on reason and common sense.

A reasonable doubt is just that: a doubt that's reasonable after a careful and considered examination of the facts and circumstances of the case.

Is there anyone in the jury box that feels that they have any disagreements with those principles because you—those are the basic foundation which you must accept and apply in this matter if you are to serve as a juror?

(No audible response)

Is there anyone now seated in the jury box who themselves have in any way been involved with any charges of this nature or had close relatives, friends, or acquaintances involved with charges such as this?

(No audible response)

Can anyone now seated in the jury box think of any reason why they could not be a fair and impartial juror in this matter?

(No audible response)

Mr. Brower?

MR. BROWER:   Thank you, your Honor.

Hello, again.

By now you've heard my name mentioned two or three times; but, if you're like me, you also forgot it already. I'm terrible with names.  I at least have the benefit of having a piece of paper down in front of me with your names on it; so, hopefully, I won't have a problem.  But I am

53

1   Scott Brower.  I'm an assistant prosecuting attorney here in

2   Kalamazoo County and will be presenting the case this week and

3   possibly into next week.

4           I have some questions I'd like to ask you, follow up

5   a little bit on some of the same things that the judge asked

6   you; but I have additional questions as well.

7           The first thing that I'd like to do is ask about any

8   of you that have had any involvement with the system in the

9   past.  By the system, I mean with police officers, with the

10   courts, with prosecutors, with the judicial system in general.

11           And I'm not going—

12           Thank you.  I'll—Let me finish up a second, and I'll

13   get to you.

14           Now I'm not just limiting my question to any

15   involvement with similar type of charges—meaning murder or

16   armed robbery or felony firearm—but just any type of conduct

17   [*sic*]—contact at all.

18           For instance, your garage got broken into and the

19   cops came out and within two hours they found the guy and you

20   got your stuff back and you think those guys are golden, they

21   can't do anything wrong—that kind of positive contact.

22           Or negative contact.  You get stopped on the

23   highway, and that police officer was a real jerk—you know, he

24   didn't have to be that snotty.  There is no way I was going

25   82 miles an hour; I wasn't going one mile-an-hour over 78.

1          Positive or negative contact with police agencies,
2     the prosecutors, et al?
3          Okay.  Sir, right here?
4          JUROR CUTLER:   Last name's Cutler.
5          I have had a truck broken into, and I've had the
6     county take care of that.  I've had a car broken into, and
7     I've had the city take care of that.  And I was a reserve
8     officer back in '83.
9          MR. BROWER:   All right.  A reserve officer with
10    what department?
11         JUROR CUTLER:   Kalamazoo County.
12         MR. BROWER:   The sheriff's department?
13         JUROR CUTLER:   Yeah.
14         MR. BROWER:   As such you would ride along as a
15    second officer in a car; is that correct?
16         JUROR CUTLER:   Yes, sir.
17         MR. BROWER:   All right.  I don't believe there are
18    any sheriff's deputies that are on here.  You don't recognize
19    any of the names then of the police officers?
20         JUROR CUTLER:   The only one I recognize is Tenbrink
21    (phonetic).  I think he was in the same reserve batch as I
22    was.
23         MR. BROWER:   All right.
24         JUROR CUTLER:   I may be wrong.
25         MR. BROWER:   What name did you mention?

                              55

1    JUROR CUTLER:   Tenbrink (phonetic), I think it was.

2    MR. BROWER:   There was no Tenbrink (phonetic).

3    JUROR CUTLER:   . . . (inaudible)

4    MR. BROWER:   No.

5    JUROR CUTLER:   . . . (inaudible)

6    MR. BROWER:   How—And that was '83, so that's a long

7    time ago.

8    JUROR CUTLER:   Yes.

9    MR. BROWER:   All right.  Would that influence your—

10   JUROR CUTLER:   It could.

11   MR. BROWER:   —ability to sit fairly and

12   impartially?

13   JUROR CUTLER:   It could.

14   MR. BROWER:   You mentioned the previous break-ins

15   that you've had yourself.  Would your connection with the

16   system as a victim of a crime affect your ability to sit

17   fairly and impartially?

18   JUROR CUTLER:   Not necessarily.

19   MR. BROWER:   Would you characterize that as

20   positive or negative?

21   JUROR CUTLER:   Positive.

22   MR. BROWER:   Mr. Wurfel, is it?

23   JUROR PELTO:   No, Pelto.

24   MR. BROWER:   I'm sorry.  Next one over.

25   All right.  I want to clarify P-e-l-t-o?

56

1  JUROR PELTO:  That's correct.

2  MR. BROWER:  No N on the end there like it is on my

3  sheet.  All right.

4  Mr. Pelto, you've had some contact with authorities

5  as well?

6  JUROR PELTO:  Yes.  Well, when I was 17 I was

7  convicted of unauthorized use of a motor vehicle.

8  MR. BROWER:  Okay.  Joyriding type thing.  All

9  right.

10  JUROR PELTO:  And I had a DUI about ten—ten years

11  ago.

12  MR. BROWER:  Was that here in Kalamazoo County?

13  JUROR PELTO:  Yes, I was.

14  MR. BROWER:  Sir, I don't mean to pry into your

15  personal life; but would you characterize that as a positive

16  or negative experience for—not a good thing that you would

17  enjoy happening again, but as far as the—the way the police or

18  the prosecutor dealt with it for those cases?

19  JUROR PELTO:  No, I thought I was treated fairly.

20  MR. BROWER:  All right.  Any lingering bitterness

21  at all?

22  JUROR PELTO:  No.

23  MR. BROWER:  Any of the others of you—Okay.  Juror

24  number—in seat five, is it John Meyle?

25  JUROR MEYLE:  Meyle.

57

1    MR. BROWER:   Meyle?

2    JUROR MEYLE:   When I was underage I was arrested

3    and convicted—I don't know if I'm convicted or not 'cause I

4    was underage, but—

5    MR. BROWER:   For—

6    JUROR MEYLE:   —I've had it expunged now.

7    MR. BROWER:   You're—That was a long time ago?

8    JUROR MEYLE:   Yeah.

9    MR. BROWER:   Alcohol-related something or other?

10   JUROR MEYLE:   Yeah, something or other.

11   MR. BROWER:   Was it here in Kalamazoo area?

12   JUROR MEYLE:   . . . (inaudible)

13   THE COURT:   Again, that isn't a pleasant experience

14   that you would choose to go through again—

15   JUROR MEYLE:   No—

16   MR. BROWER:   —but—

17   JUROR MEYLE:   — . . . (inaudible)

18   MR. BROWER:   Is it something that would bring back

19   some real negative feelings about the way that you were dealt

20   with by authorities?

21   JUROR MEYLE:   I wouldn't think so, no.

22   MR. BROWER:   All right.

23   JUROR MEYLE:   Like you say, it wasn't fun; but it

24   was fair.

25   MR. BROWER:   All right.

1          Mr. Schultz?

2          JUROR SCHULTZ:    Yes.  My wife and I have

3  accumulated some commercial property over the years for

4  retirement we're now enjoying, and they're always getting

5  broken into and held up and whatnot.

6          MR. BROWER:    Okay.

7          JUROR SCHULTZ:    . . . (inaudible)

8          MR. BROWER:    Those occurrences, are they here in

9  this county?

10          JUROR SCHULTZ:    . . . (inaudible)

11          MR. BROWER:    Within the city so it'd be department

12  of public safety that would respond to those cases?

13          JUROR SCHULTZ:    City of Kalamazoo, the township—

14          MR. BROWER:    All right.

15          JUROR SCHULTZ:    —and Portage.

16          MR. BROWER:    Were you satisfied with the work that

17  was done—investigation?

18          JUROR SCHULTZ:    . . . (inaudible)

19          MR. BROWER:    No lingering bitterness that they took

20  the report and never looked at it again and—or anything like

21  that?

22          JUROR SCHULTZ:    . . . (inaudible)

23          MR. BROWER:    Okay.  Any others?

24          Juror number three, Ms. Harkness?  Positive or

25  negative contacts with authorities in the past?

1       JUROR HARKNESS:   . . . (inaudible)

2       MR. BROWER:   All right.

3       JUROR HARKNESS:   It was a negative experience—

4       MR. BROWER:   Okay.

5       JUROR HARKNESS:   —as far as what happened, but—

6       MR. BROWER:   The act itself.

7       JUROR HARKNESS:   — . . . (inaudible) Nothing

8 that—I'm not angry at the court or the system because of what

9 happened.

10       MR. BROWER:   Okay.

11       The reason for having contact, would having gone

12 through that experience be difficult or traumatic for you in

13 sitting in a criminal case even if they're not related?

14       JUROR HARKNESS:   . . . (inaudible)

15       MR. BROWER:   All right.

16       I believe the judge asked if any of you had any

17 other law enforcement experience or had somebody close to you

18 that was a police officer, did he not?  I don't recall.  Well,

19 I'll ask it again.

20       Anybody that has—Well, there aren't any more police

21 officers here, I know that.  We have a prior reserve deputy.

22 Any others of you have any past law enforcement experience?

23       (No audible response)

24       What about somebody close to you—maybe not this

25 jurisdiction but someplace else?

1    UNIDENTIFIED JUROR:   I have several in the city.

2    MR. BROWER:   In the city?

3    UNIDENTIFIED JUROR:   Yes.

4    MR. BROWER:   Okay.  Any others?  Your brother's a

5 police officer in Ann Arbor or any other—

6    UNIDENTIFIED JUROR:   . . . (inaudible)

7 Schoolcraft.

8    MR. BROWER:   All right.  And—

9    UNIDENTIFIED JUROR:   She didn't last long, though.

10    MR. BROWER:   All right.  That wouldn't affect your

11 ability to sit in a criminal case where there's police officer

12 testimony?

13    UNIDENTIFIED JUROR:   . . . (inaudible)

14    MR. BROWER:   Finally—And then I'll go on to

15 something else.—any reason why you would be unable to sit

16 fairly and impartially in a—in a criminal case where many of

17 the witnesses would be police officers for whatever

18 reason—positive or negative contact?

19    (No audible response)

20    You're going to hear some testimony about a

21 lifestyle that you might not agree with whatever it

22 be—boyfriends, multiple boyfriends, unfaithfulness, drinking,

23 maybe some references to drugs or something one way—at one

24 time or another; and that's something that's completely

25 foreign to you.  And not only something you're unfamiliar with

but really, really disagree with to the point that you don't know if you can be fair and impartial listening to facts like that—fair to the defendant or fair to the People because of the witnesses and their involvement in similar type of behavior. Do any of you—I've given you a little bit of hint about what you may or may not hear—what you could expect to hear. Do any of you feel strongly about those types of things? And looking deep inside yourself, do you now say, man, I can't listen to that kind of stuff, I wouldn't be able to hear it, and I would be—I'd tune out—I couldn't be fair to either side?

UNIDENTIFIED JUROR:   It's possible.  My ex was involved . . . (inaudible)

MR. BROWER:   All right.

Any of the other—others of you feel that that's a possibility; or would you be able to sit fairly and judge the evidence impartially even though you have some personal feelings—maybe even strong feelings—about that kind of behavior?

Well, let me ask it in a positive way: would you be able to sit fairly and impartially knowing that's the kind of evidence?  Yes?  Anybody that would not raise their hand.

(No audible response)

The judge referred to the burden of proof that would be applied in a criminal case.  That's proof beyond a

1  reasonable doubt.  You've all heard it.  You can't live in

2  America without hearing that term before.  How many of you

3  would agree with me that that's a legal term that applies in

4  the criminal setting, period?

5          (No audible response)

6          Well, let's—let's examine that.

7          Mr. Fooy?

8          JUROR FOOY:   Yes?

9          MR. BROWER:   Do you own a home, sir?

10         JUROR FOOY:   No.

11         MR. BROWER:   I'll forget you then.

12         Who has a mortgage?  All right.

13         Juror number six, Mr. Manchester, unless you own a

14 business, maybe, is it safe to say that the mortgage was

15 probably the biggest financial investment that you ever made

16 in your life?

17         JUROR FOOY:   . . . (inaudible)

18         THE COURT:   And going to the closing and signing

19 those papers, that was a pretty momentous event, wasn't it?

20         JUROR FOOY:   . . . (inaudible)

21         THE COURT:   You were committed now—Okay?—for 20,

22 30 years.  Now when you signed those papers did you know with

23 absolute certainty that your job and your income level would

24 continue uninterrupted and you would never ever have any

25 difficulty paying those mortgage—that mortgage off?

                              63

1          JUROR FOOY:   . . . (inaudible)

2          MR. BROWER:   Did you know that the economy wasn't

3   going to take a downturn or interest rates weren't going to go

4   up so high that you wouldn't be able to afford even the

5   interest anymore?  Did you know that with absolute certainty

6   at that time?

7          JUROR FOOY:   . . . (inaudible)

8          MR. BROWER:   All right.  But based on the—the

9   evidence that you had at that time—your wage level, the

10  security with your job, the interest rates—looking at all of

11  those kinds of things you determined that it was clearly the

12  right decision to sign those papers and commit yourself for

13  the next 25 years, right?

14         JUROR FOOY:   . . . (inaudible)

15         MR. BROWER:   The anxiety you might have had

16  was—were not the same things as reasonable doubt about the

17  ability to pay, were they?  You didn't have reasonable doubts;

18  you believed, in fact, that it was the best thing to do to

19  sign those papers and commit yourself?  That was reasonable in

20  light of the evidence, and you signed those papers.

21         You were one of the persons that raised your hand

22  and said that reasonable doubt thing applied in the legal

23  setting and probably only there, weren't you?  Didn't you

24  raise your hand?

25         JUROR FOOY:   . . . (inaudible)

1       MR. BROWER:   All right.  But now you've just gone
2   through the process in thinking about making important
3   decisions, well, maybe that concept isn't just a legal concept
4   that applies only in the legal setting anyway.  Isn't it true
5   that you went through that thought process and evaluated the
6   evidence and made a decision on what you knew and took action
7   based on the reasonableness—the likelihood that something
8   would be—occur?  Something that you can't—could not
9   anticipate?  Something that wasn't reasonable from the facts
10  that you have and you made the decision?
11      JUROR FOOY:   That's correct.
12      MR. BROWER:   So maybe the decision-making process
13  that's involved here is something that you've done before and
14  not just in a legal setting.  You've made it at least on that
15  occasion and maybe on many other occasions in making important
16  decisions; is that correct?
17      JUROR FOOY:   That's correct.
18      MR. BROWER:   Based on that, do you believe that,
19  yeah, it's not an abstract legal concept after all, I believe
20  that I would be able to go through that process, I would be
21  able to make a decision, render a verdict beyond a reasonable
22  doubt; is that true for you?
23      JUROR FOOY:   Yes, it is.
24      MR. BROWER:   Do the others of you now believe that,
25  yeah, that's not a legal concept, that's not something

1  abstract that I'm going to have to learn how to do when I get

2  back to the jury deliberation room, I've done that myself

3  before, and I can do it again?  Does everybody feel that way?

4        (No audible response)

5        Does anybody feel that they could not, or does

6  anybody believe that I've confused them so badly that they're

7  not sure what to think anymore?

8        (No audible response)

9        I want to talk about a related topic—about making a

10  decision and returning a verdict beyond a reasonable doubt.

11  Well, in order to do that, you have to evaluate the evidence.

12  There are two types of evidence: direct evidence—something you

13  can hear, smell, taste.  It might be physical evidence like

14  DNA that ties somebody to a crime or a eyewitness account that

15  saw it or the videotape of the crime.  You know, direct

16  evidence tying a particular person to a particular crime.

17  That's direct evidence

18        The other kind is circumstantial

19  evidence—Everybody's heard that term before.—circumstances

20  that show that this person did that . . . (inaudible)

21        Anybody believe that circumstantial evidence is

22  inferior or weaker evidence than direct evidence?

23        (No audible response)

24        Now if the judge tells you that that's not the

25  case—If the judge tells you that you can return a verdict

66

1  based on circumstantial evidence alone, what do you think

2  about that?

3         Juror number—in seat number 13, Ms. Caldwell?

4         I'm not fooling you.  The judge will give an

5  instruction like that.  But what is your impression?

6  Circumstantial evidence, I can convict on circumstantial

7  evidence alone; how do you feel about that?

8         JUROR CALDWELL:   . . . (inaudible)

9         MR. BROWER:   It depends on what it is.  Okay.

10  Maybe just one circumstance that seems to suggest this

11  person's involvement wouldn't be enough for you; but if there

12  were several circumstances that you can see yourself coming to

13  that conclusion?

14         JUROR CALDWELL:   . . . (inaudible)

15         MR. BROWER:   Okay.

16         How many of you—Well, do any of you feel even more

17  strongly than Ms. Caldwell does—I know what the judge will

18  say, I heard what Ms. Caldwell had to say; but I'm sorry,

19  circumstantial evidence alone is not going to be enough for me

20  ever, I can't do it, I can't find somebody guilty beyond a

21  reasonable doubt based on circumstantial evidence?  How many

22  of you feel that way?

23         UNIDENTIFIED JUROR:   . . . (inaudible)

24         MR. BROWER:   All right.  Let me ask Ms. Harness a

25  couple of questions.  We're going to see if you can apply this

to things that might have occurred in your life before.

I know that you've probably had kids around at one point or another.  Think of a scenario where you're home with a four-year-old.  Everybody else is gone off to school or work.  You make cookies for the kindergartner for his class the next day.  You have to have 18 of them.  You just had enough to make 18.  There's 18 cookies out there on the—on the counter cooling, and the four-year-old wants one really bad—really bad.

You say can't, you know, it's for your brother's birthday party tomorrow, you got to—can't have any.  I'll make some for you some other time.  You turn around, go into the other room, and minutes later come back.  You know no one else is in the house.  You know that you'd be able to hear the door if it opened and somebody came in.  Yet when you turn around there's the four-year-old with a smile on his face chewing, and there's a cookie gone.  That cookie didn't disappear on its own.  Some human being had to pick it up.

JUROR HARNESS:   There're no pets in the house?

MR. BROWER:   And no pets in the house.  Okay.

Who took that cookie?

JUROR HARNESS:   Isn't that more than circumstantial 'cause he's chewing?  I mean that's more than I think you did it.

UNIDENTIFIED JUROR:    . . . (inaudible)

68

1        MR. BROWER:   Well, circumstances.   You never saw—

2        JUROR HARNESS:   . . . (inaudible)—

3        MR. BROWER:   —him pick up a cookie.

4        JUROR HARNESS:   . . . (inaudible)

5        MR. BROWER:   You didn't see what was in his mouth,

6 right?

7        JUROR HARNESS:   Correct.

8        MR. BROWER:   Who took that cookie?

9        JUROR HARNESS:   . . . (inaudible) took the cookie.

10        MR. BROWER:   Yeah.   Take that one factor away, you

11 know.   You know your house.   You know that the door creaks.

12 The door didn't open.   As a matter of fact, it was locked.

13 Nobody else could have gotten in.   The only person in that

14 room was the four-year-old, and there he is and the cookie's

15 gone.   I mean the time frame is such that—whether the time

16 frame matters or not—time—There wasn't much time that had

17 lapsed.—the kid took the cookie, you know.   You understand

18 that.

19        You say, well, you know, maybe a stranger picked the

20 lock and came in or they, you know rappelled from the roof or

21 maybe, you know, spontaneous combustion.   It just—Is any of

22 that stuff really reasonable though?

23        JUROR HARNESS:   Not at all.

24        MR. BROWER:   None of those other alternatives are

25 reasonable.

1        JUROR HARNESS:    Correct.

2        MR. BROWER:    The only reasonable conclusion is that

3   four-year-old took it.

4        Beyond any reasonable doubt did the four-year-old

5   take the cookie?

6        JUROR HARNESS:    Uhm-hmm.

7        MR. BROWER:    That's just based on circumstances,

8   isn't it?  Nobody saw him get up.  Nobody saw him take the

9   cookie.  Nobody saw him put it in his mouth.  But the crime

10  was committed.  Nobody else had the opportunity to do it.  He

11  had said that he wanted to.  He had motive.  Motive means an

12  opportunity.  The circumstances would establish that crime,

13  wouldn't they?

14       So now I'm going to go back to that question.  Do

15  you think that you would be able to convict based on

16  circumstances?

17       (No audible response)

18       You're nodding your head.

19       JUROR HARNESS:    I wouldn't—Yeah.

20       MR. BROWER:    All right.

21       JUROR HARNESS:    Put that way, absolutely.

22       MR. BROWER:    Okay.

23       JUROR HARNESS:    The child is guilty.

24       MR. BROWER:    All right.  Now, obviously, that's a

25  whole lot different than what we have in this case.  But I

1    will tell you that there will not be an eyewitness.  There

2    won't be physical evidence that ties the defendant to the

3    crime.  There will be circumstances that I will present and I

4    will argue show that the defendant is responsible for this

5    crime.

6              What I want to know from you is having applied it to

7    a situation in your own life much less serious—not serious,

8    but still the decision-making process and evaluation of the

9    evidence is the same—can circumstances be such that you can

10   reach a conclusion beyond a reasonable doubt?  Not beyond any

11   doubt because that's not the standard.

12             Juror number seven, Ms. Kob.  You've heard the judge

13   talk about and I've talked about now about proving someone

14   guilty beyond a reasonable doubt.  You didn't hear the judge

15   say beyond any doubt, did you?

16             JUROR KOB:   . . . (inaudible)

17             MR. BROWER:   Because that's not the standard.

18             Beyond absolute—Behind—Beyond—Excuse me.—any doubt,

19   to an absolute certainty, 100 percent, no doubt whatsoever,

20   that's not it.

21             Under most circumstances would it be safe to say

22   that the only way you can be absolutely certain 100 percent

23   about exactly how it happened and so on is if you witnessed it

24   with your own eyes—generally speaking?

25             JUROR KOB:   . . . (inaudible)

                              71

1       MR. BROWER:   Okay.  Now if that was the standard in

2  this criminal case that I have to prove to you beyond any

3  doubt whatsoever to an absolute certainty, you wouldn't even

4  be hearing the evidence because you'd be one of the people on

5  my list that I'd be calling—Right?—because you'd have to see

6  it in order to be that certain.  And as a witness you can't be

7  a juror, could you?

8       JUROR KOB:   . . . (inaudible)

9       MR. BROWER:   If that were the burden that I'd have

10  to prove it to you beyond any doubt whatsoever, that would

11  actually be impossible for me as the prosecutor to achieve,

12  wouldn't it?  I could not do it—ever—could I?

13       JUROR KOB:   . . . (inaudible)

14       MR. BROWER:   Would you hold me to that impossible

15  burden, ma'am?  Would you hold me to a higher burden—that

16  absolute certainty standard—even though the judge says that's

17  not what it is—that's not the standard that you have to apply?

18       JUROR KOB:   . . . (inaudible)

19       MR. BROWER:   Would you be able to follow the law

20  and apply the judge's standard in this case and not what you

21  think it should be?

22       JUROR KOB:   . . . (inaudible)

23       MR. BROWER:   Okay.  Others of you now have heard

24  about that burden of proof.  Do you feel that that's an

25  appropriate standard or I don't care what the judge says.  To

1    convict somebody of murder, I would have to be absolutely

2    certain beyond any doubt before I could do that.  Reasonable

3    or not, if I had a far-fetched hypothetical doubt, I'm still

4    going to call that a doubt; I don't care what the judge says.

5    Or I'm going to require 100 percent certainty before I can

6    ever return a verdict.

7              Any of you feel that way?

8              (No audible response)

9              Come on, somebody feels close to that anyway.

10   Somebody feels a reluctance at the very least, right?

11             (No audible response)

12             Okay.  Good.  Don't hold me to that impossible

13   burden.  That's not the standard.  Proof beyond a reasonable

14   doubt.  A doubt has to be a reasonable one.  That's the

15   standard.  And I'd ask for your commitment to that standard.

16             Will each of you commit to that standard?

17             (No audible response)

18             Now going back to the circumstantial evidence.  I

19   believe that all of you have indicated that you agree

20   circumstances may—like the example that we gave—could be

21   enough for me to believe that that person did that—that crime.

22   Is that true?  Did I get that sense from each of you?  All of

23   you would—would—be able to return a verdict of guilty based on

24   circumstantial evidence assuming that it wasn't simply

25   something that could be easily explained and in the absence of

1   any other factors?  But depending on what the frequency or the

2   volume of different facts, yes, circumstantial evidence could

3   be enough for me to convict?  Yes?

4          (No audible response)

5          Does anybody feel a reluctance to that?  I

6   understand the conversation.  I still don't know if I could or

7   not.

8          Juror in seat number five, Mr. Meyle?

9          JUROR MEYLE:   There is in my mind—

10          MR. BROWER:   Uhm-hmm.

11          JUROR MEYLE:   —no way you're going to show me

12   anything that clear-cut.  If you can show me that clear-cut,

13   yeah, I can do it.  But, you know, there's that reluctance

14   that in real life it's never that clear.

15          MR. BROWER:   Okay.  Are you telling me, Mr. Meyle,

16   that, yes, I know that's what the judge says, but, personally,

17   that was a burden that I would never be able to overcome and I

18   couldn't follow the judge's instructions then?

19          JUROR MEYLE:   I'm telling you there's a reluctance

20   there—

21          MR. BROWER:   Yeah.

22          JUROR MEYLE:   — . . . (inaudible)

23          MR. BROWER:   Okay.

24          JUROR MEYLE:   . . . (inaudible)

25          MR. BROWER:   Uhm-hmm.  And you're at a disadvantage

74

(Tape No. C2005-021, 2-07-05, 11:17)

1   now because you don't have a clue as to what the evidence is

2   going to be.

3          JUROR MEYLE:   . . . (inaudible)

4          MR. BROWER:   But as you sit right now you still

5   feel that circumstantial evidence is inferior; is that right?

6          JUROR MEYLE:   Yes.

7          MR. BROWER:   And—

8          JUROR MEYLE:   . . . (inaudible)

9          MR. BROWER:   I'm sorry?

10         JUROR MEYLE:   I think it would take multiple pieces

11  of circumstantial to—

12         MR. BROWER:   Over—

13         JUROR MEYLE:   —equal one piece of the direct

14  evidence . . . (inaudible)

15         MR. BROWER:   Uhm-hmm.

16         So I'm starting in a hole as we start this trial,

17  right now?

18         JUROR MEYLE:   . . . (inaudible)

19         MR. BROWER:   Mr. Meyle's being very honest.

20         Mr. Cutler?

21         JUROR CUTLER:   Yes, sir?

22         MR. BROWER:   I already have an indication your—of

23  your feelings regarding that.

24         Any others feel similarly?

25         Mr. Chase, circumstantial evidence to you is—is not

1   likely to be enough?

2           JUROR CHASE:   . . . (inaudible)

3           MR. BROWER:   . . . (inaudible)

4           JUROR CHASE:   As far as that it's not really

5   clear-cut . . . (inaudible)

6           MR. BROWER:   Okay.  You understand that the burden

7   is still not beyond any doubt, not to an absolute certainty?

8   If the evidence says this is the guy that did it and he did

9   this and that there, if the evidence suggesting that to you is

10   circumstantial, the fact that it's circumstantial would be the

11   equivalent of reasonable doubt for you?

12           JUROR CHASE:   I believe so . . . (inaudible) facts

13   and circumstances . . . (inaudible)

14           MR. BROWER:   Okay.  In the scenario where nobody

15   else could have come into the house to take the cookies,

16   now—but nobody saw the child get up from the chair, nobody saw

17   him reach and take the cookie, but the—he was the only one

18   there, the cookie's gone.

19           He's charged with the crime of larceny in a

20   building.  You're sitting here on this jury.  Would those

21   facts—now because it's a criminal case—change your ability to

22   render a verdict?

23           JUROR CHASE:   . . . (inaudible)

24           MR. BROWER:   Pardon me?

25           JUROR CHASE:   No.

1        MR. BROWER:   Okay.   In that scenario, what would

2  your verdict have been?

3        JUROR CHASE:   Probably guilty.

4        MR. BROWER:   You just convicted a four-year-old.

5        All right.   What I need to know from each of you—I

6  don't want to hear about it later.—if you know that you're

7  going to have problems with circumstantial evidence, period,

8  similar to, you know, the comments from a couple of people, I

9  need to hear about it now and not later.   I don't want to hear

10  after the fact that you—as you're deliberating you say, you

11  know, circumstantial evidence, you know, I probably should

12  have told the prosecutor this; but, you know, unless you got

13  DNA or a videotape of the crime—some direct evidence—I'm just

14  not going to be able to sit in judgment on this person and

15  return a verdict of guilty.   I just won't do it with

16  circumstantial evidence, period.   If you feel that way, I need

17  to hear it now.

18        I've had a couple of comments from a couple of

19  people.   I want the rest of you to look inside yourselves and

20  see where you're at.   Evaluate yourself, and then tell me

21  right now.

22        Ms. Dokey?

23        JUROR DOKEY:   If the circumstantial evidence was as

24  powerful as the scenario you gave of the four-year-old, then

25  it's cut and dry.   But I do have a problem—I mean this is a

murder; this is not a cookie.  And so it would have to be extremely powerful circumstantial evidence to make me feel that I could convict someone in a murder.

MR. BROWER:   Let me ask some more questions about that.  For the child taking the cookie, we know there's no direct evidence tying him to it, just circumstances.  We're going to say he was charged with a crime, yeah.  And the burden of proof for that minor offense is the same burden of proof in every criminal trial whether it's a murder or a drunk driving case or a larceny of a cookie—the same burden of proof in every criminal case in this nation.

What it appeared to me that you were saying is that because it's a murder I have a tendency to want to apply a higher burden of proof.

JUROR DOKEY:   I guess I would want more direct evidence because this is a serious charge against this man, and I think—I would hate to think that he could have done it because he could have not done it, also, if there isn't direct evidence.

MR. BROWER:   And were your doubts based on reason?

JUROR DOKEY:   I haven't seen any evidence.  I just—

MR. BROWER:   Right.

JUROR DOKEY:   —saying—

MR. BROWER:   You haven't—

JUROR DOKEY:   —it has to be powerful circumstantial

1    evidence in order for me to feel good about—

2           MR. BROWER:   Okay.

3           JUROR DOKEY:   —convicting someone unless it is cut

4    and dry.

5           MR. BROWER:   It's a very difficult burden that you

6    as jurors have sitting in judgment on another person, and it

7    is clearly a very serious issue.   But what I want to emphasize

8    to you—I'm not going to use the cookie example.   But in every

9    criminal case or an adult is charged with a crime the burden

10   is the same, the instructions are the same, the instruction

11   regarding circumstantial evidence is the same, the burden of

12   proof is the same.   There's not a higher burden because this

13   is a murder case.   It is the—already the highest burden in

14   this nation.   It is not the impossible burden that I have to

15   prove it beyond any doubt whatsoever because I can't ever

16   accomplish that.

17          As we talked I wound up with another person that had

18   just a little bit of question about circumstantial evidence

19   and so on.   Now we've had some time to talk about it even a

20   little bit longer is there anybody else that feels as she

21   does—Ms. Dokey?—concerns about whether or not circumstantial

22   evidence will ever be enough to overcome the burden?

23          (No audible response)

24          Some of you—And I mentioned, you know, direct

25   evidence like DNA and so on.   If you're alive in America you

1   can't help knowing about the existence of shows like *CSI*,

2   right?  The cop shows where they go out with a team and

3   without fail swab a surface and within 15 minutes have the

4   results tying an individual to the crime.  Now we all know

5   that that's a show, but yet there's always a part of us that

6   believes it's at least probably true to some degree that when

7   somebody touches something somebody can go back and prove that

8   they touched that just with a DNA swab.  Is that true?  Do you

9   feel that that's at least a suggestion in the media?

10           UNIDENTIFIED JUROR:   Yes.

11           MR. BROWER:   Now if I were to say that that really

12  is just a show and that isn't realistic at all to believe that

13  that can be done just because somebody touches a surface, are

14  you going to be able to accept that; or are you going to

15  believe Hollywood's version of reality?

16           (No audible response)

17           How many of you say, yeah, I know it's a show and

18  they—they hype all this up, but part of me really does believe

19  that physical evidence should be at every crime scene tying a

20  person there?

21           (No audible response)

22           Come on, raise your hands.  How many of you think

23  that it's probably true.  All right.

24           If there's no physical evidence—I'll go back to

25  Mr. Meyle.  If there's no physical evidence because that's

1  really not the reality, are you going to be able to overcome

2  your preconceived ideas about what should be there and make a

3  decision based on the evidence then—the evidence that is

4  admitted?

5  JUROR MEYLE:   It depends on the evidence.

6  MR. BROWER:   All right.

7  JUROR MEYLE:   I mean if you can put him in a locked

8  room just that cookie and one other person  . . . (inaudible)—

9  MR. BROWER:   All right.

10  JUROR MEYLE:   —yes.  If you're going to put him in

11  a high school auditorium with a thousand other people it's

12  going to have to be pretty good circumstantial evidence.

13  MR. BROWER:   Sure.  But the absence of physical

14  evidence by itself won't mean that I will never be able to

15  meet my burden of proof?

16  JUROR MEYLE:   No, it's just—

17  MR. BROWER:   Okay.

18  JUROR MEYLE:   —going to be harder.

19  MR. BROWER:   All right.  Sure.

20  Your Honor, I have a juror request for a small

21  break.

22  THE COURT:   For what?

23  MR. BROWER:   A break.

24  THE COURT:   Well, all right.  Let's take a—just a

25  short one.  But keep it down to ten minutes, please.

1     (At 11:28 a.m., court recessed)

2     (At 11:53 a.m., proceedings reconvened)

3     . . . (speaker began prior to take starting) a ten-

4  minute recess.

5     But anyhow, let's break for lunch.  It's just a few

6  minutes—There's no sense in starting and stopping.

7     I'd ask everybody be—First of all, those of you

8  seated in the jury box please remember where you're seated

9  because when we come back I want you to take those same seats.

10     All of you come back at—

11     Do they report back to the jury room?

12     UNIDENTIFIED PERSON: . . . (inaudible)

13     THE COURT:   Okay.  Report back there by

14  1:00 o'clock, please.

15     So we'll stand in recess until 1:00 p.m.

16     (At 11:53 a.m., court recessed)

17     (At 1:14 p.m., proceedings reconvened)

18     Okay.  Mr. Brower?

19     MR. BROWER:   Yes, your Honor.

20     Just one final time just to make sure that I've got

21  everybody's response regarding circumstantial evidence.  I've

22  talked with two or three individuals.  Were there any others

23  that based on the discussion and the similarity of feelings

24  with those others that have spoken that want to tell me about

25  their feelings regarding circumstantial evidence?

1        (No audible response)

2        Any problem with the reasonable doubt, burden of

3    proof—that you think it should be something higher than what

4    it really is because this is a murder case?

5        (No audible response)

6        MR. BROWER:    Thank you.

7        THE COURT:   Mr. Svikis?

8        MR. SVIKIS:   Thank you, your Honor.

9        Good afternoon.   What the prosecutor was driving at

10   and what is the very most difficult thing to do is that when

11   we come into the courtroom we bring with us all our

12   prejudices, all our biases, all our preconceptions and our

13   misconceptions.

14       What's trying to do and what I'm going to attempt to

15   do is see how many of those you can share with us 'cause once

16   we know we can deal with it—Okay?—'cause you will get

17   instructions from the judge of what to follow.   And you're

18   going to take an oath that you're going to follow those.

19       But there may be some areas where you're simply

20   candid—And I trust that you will be.   You simply say this

21   isn't the case for me.

22       And let me give you an example what I'm talking

23   about.   You had the charges read to you that it's a homicide

24   or a death of—of Christine Dimmick.   In order to show that—And

25   they've already got it set up.—has anyone here ever attended

83

1    an autopsy?

2           (No audible response)

3           Okay.

4           Has anyone here every looked at autopsy photographs?

5           (No audible response)

6           Okay.

7           Let that sink in for a few moments because you're

8    going to have to be shown photographs of an autopsy—of parts

9    of it.  You're going to have to be shown a—the decedent.

10    You're going to have to be shown not one bullet hole in the

11    back of the head, not two, not one bullet hole in the back but

12    another bullet hole in the back—four.  And I'll stop here.  Is

13    there anyone here that thinks they cannot handle that or

14    process it and look at that in an objective way as it's

15    humanly possible?

16           (No audible response)

17           So we're all onboard?  We're still here?

18           (No audible response)

19           Ms.—Is it Dokey?

20           JUROR DOKEY:   . . . (inaudible)

21           MR. SVIKIS:   Okay.  You're cringing; that's okay.

22    I've seen these a number of times, and the prosecutor has seen

23    probably more.  What do you think?

24           JUROR DOKEY:   Well, I'm not able to even go like

25    horror movies or anything like that because I have a weak

1    stomach.  I just kind of watch it like this.

2           MR. SVIKIS:   All right.

3           JUROR DOKEY:   So . . . (inaudible) this is real.

4           MR. SVIKIS:   But this time you know how you're

5    going to have to watch it—like that.  I'm not—I'm trying to

6    make light, but that's a—that's a serious thing if you've—you

7    know, because that—that's a—that's a part—that's a part of

8    this case.

9           JUROR DOKEY:   I don't like to go to like

10   . . . .(inaudible) movies.

11          MR. SVIKIS:   Okay.

12          JUROR DOKEY:   . . . (inaudible)

13          MR. SVIKIS:   Well, you think about that; and if you

14   think that you cannot keep an open mind, concentrate on the

15   even or be able to—to view that—And I believe if I'm right

16   photographs go to the jury room as exhibits.  And photographs

17   go to the jury room as exhibits and you're required to examine

18   the evidence, discuss it with the fellow jurors whoever they

19   may be.  Anyone besides Mr. Dokey have some second—have some

20   second thoughts on their ability to do that?

21          Yes?

22          UNIDENTIFIED JUROR:   I got a really weak stomach

23   . . . (inaudible)

24          MR. SVIKIS:   Okay.  So what do you think, this case

25   isn't for you?

                              85

1          UNIDENTIFIED JUROR:   Probably not.  If I got to

2    view those, I may be on the floor.

3          MR. SVIKIS:   Are you one of those people who can

4    take a shot or not take a needle, too?

5          UNIDENTIFIED JUROR:   I can take a shot.

6          MR. SVIKIS:   Okay.

7          UNIDENTIFIED JUROR:   It's just watching what's

8    happening . . . (inaudible)

9          MR. SVIKIS:   Now let me—Let me follow this up.

10   This is—This is—This is critical.  One of the very first

11   witnesses, as I understand it, is going to be the pathologist,

12   who is going to describe this in medical terms and terms

13   that—I'm going to say English.—terms that you can also

14   understand.

15         And when you're seated—if you wind up on the

16   jury—we're going to have 14 people.  The reason we do that

17   instead of 12 is somebody gets sick or something like that.  I

18   don't want someone bailing—if they're shown this

19   afternoon—that you wouldn't be able to handle that.

20         Now what you have to be able to do is not convince

21   me that you can't—that you can't do that.  The judge will also

22   ask you questions if you think you cannot—if you cannot handle

23   this—keep an open mind, bias, and follow the instructions.

24   Those are the kind of questions the judge would ask you.  And

25   questions directed by the judge have a lot more force and

                              86

1   effect and suggestion than mine.  So if that's the case,

2   there's 50 more people out there.

3              I just want you—That's the kind of thing I want you

4   to be able to tell me and not hear about it later.  Like the

5   prosecutor said, boy, if you had told me I was going to look

6   at five or six autopsy pictures, you know, I'm outta here.

7   Okay?

8              So it's Mr. Cutler?

9              JUROR CUTLER:   Correct.

10             MR. SVIKIS:   Okay.  Let me give you a few—a few

11  other things.

12             And this is—This goes to your familiarity, if any,

13  with the location of where this occurred 14 years ago.  Go

14  back 14 years.  Okay?  Go back 14 years—1991—in the area of

15  Rambling Road and Stadium Drive.  What's there now is Gales's

16  Hardware, and there's a—It was called a Minute Mart at that

17  time.  I see some nods of the head.  Okay.

18             Maybe—Is there anyone who does not know where the

19  location is?

20             Okay.  All right.  Two.  So everybody else now knows

21  the location.

22             Now is there anyone here that has been inside of the

23  Minute Mart; now it's called the Bronco Mart?

24             (No audible response)

25             JUROR FOOY:   . . . (inaudible)

1    MR. SVIKIS:   Mr. Fooy, when was the last time you
2  were in there?
3    JUROR FOOY:   . . . (inaudible)
4    MR. SVIKIS:   That's long enough.   Okay.   That's
5  long enough.
6    Who else has—
7    Ms. Schultz, when was the last time you were in
8  there?
9    JUROR SCHULTZ:   A long time ago.
10    MR. SVIKIS:   Okay.   That's good enough.
11    Mr.—Is it Meyle?
12    JUROR MEYLE:   Meyle.
13    MR. SVIKIS:   Meyle.
14    JUROR MEYLE:   Probably within the last year.
15    MR. SVIKIS:   In the last year?   Okay.
16    UNIDENTIFIED JUROR:   About three years ago.
17    MR. SVIKIS:   About three years ago.
18    Anybody else?
19    UNIDENTIFIED JUROR:   Probably 20 years since
20  . . . (inaudible)
21    MR. SVIKIS:   Okay.   Good enough.
22    All right.   Well, the point of that is to see what
23  your—what your familiarity is with it because at some point
24  you might have too much familiarity and what you want to take
25  back to the jury room and what you want to take out of here is

1   what you hear from here, what you see on the screen, and

2   what—and what exhibits—what exhibits you're handed.   So for

3   right now we're—we're okay there.

4           I believe the judge read part of it—the charges that

5   Ms. Dimmick was shot with a—with a handgun.   Does anyone here

6   own a handgun?

7           One, two.   Two.   Okay.

8           Is it Pelto?

9           JUROR PELTO:   Yes, sir.

10          MR. SVIKIS:   Do you own more than one handgun?

11          JUROR PELTO:   Yes, sir, two.

12          MR. SVIKIS:   Are you a collector?

13          JUROR PELTO:   No.

14          MR. SVIKIS:   What kind?

15          JUROR PELTO:   .357 revolver and a .22 automatic.

16          MR. SVIKIS:   Okay.   All right.   Now I can tell you

17  now that there will be some testimony about a .357, and there

18  may be some tangential testimony about a .22.   Now you know

19  the difference between the two.

20          JUROR PELTO:   Yes, sir.

21          MR. SVIKIS:   All right.

22          Meyle—Mr. Meyle?   Do you have—Do you have a handgun,

23  also?

24          JUROR MEYLE:   Yes.

25          MR. SVIKIS:   What do you have?

1    JUROR MEYLE:   I've got two .22s, a .38; and that's
2    all I got right now.
3    MR. SVIKIS:   Okay.  Mr. Fooy, do you know the
4    difference between a .22 and a .38?
5    JUROR FOOY:   Just the size of the bullets
6    . . . (inaudible)
7    MR. SVIKIS:   Do you know which one's larger?
8    JUROR FOOY:   Yes, the .38.
9    MR. SVIKIS:   Mr. Chase, do you know the difference
10   between the two?
11   JUROR CHASE:   Yes, sir.
12   MR. SVIKIS:   You ever shot a gun?
13   JUROR CHASE:   Yes, sir.
14   MR. SVIKIS:   You ever shot a .22 handgun?
15   JUROR CHASE:   Yes.
16   MR. SVIKIS:   A .357?
17   JUROR CHASE:   . . . (inaudible)
18   MR. SVIKIS:   Ms. Harness?
19   JUROR HARKNESS:   Harkness.
20   MR. SVIKIS:   Harkness.  What about your familiarity
21   with weapons—handguns?  Zero?  You have some familiarity?
22   JUROR HARKNESS:   I fired, but I don't—I have no
23   idea what it was.  I mean I've gone hunting with my dad, but—
24   MR. SVIKIS:   But not with—But handguns, not rifles.
25   JUROR HARKNESS:   No.

1          MR. SVIKIS:   Okay.

2          JUROR HARKNESS:   Right.

3          MR. SVIKIS:   Okay.  All right.

4          And, Mr. Schultz, you have any familiarity with

5    handguns?

6          JUROR SCHULTZ:   No, I never shot . . . (inaudible)

7          MR. SVIKIS:   So you wouldn't know the difference

8    between a .22 round and a .38 round or a .357?

9          JUROR SCHULTZ:   As much as he said

10   . . . (inaudible)

11         MR. SVIKIS:   As much as—One might be bigger than

12   the other?

13         JUROR SCHULTZ:   . . . (inaudible) bullet.

14         MR. SVIKIS:   Okay.  Mr. Manchester, how about you?

15   What's your—

16         JUROR MANCHESTER:   . . . (inaudible) don't own one

17   or shot . . . (inaudible)

18         MR. SVIKIS:   Okay.  And would—Do you have any

19   particular knowledge even though you don't own one or haven't

20   shot one that between a .22 and .38?  Does that mean anything

21   to you?

22         JUROR MANCHESTER:   . . . (inaudible) as the

23   previous two in terms of . . . (inaudible)

24         MR. SVIKIS:   Is it—Is it Kob?

25         JUROR KOB:   . . . (inaudible)

1          MR. SVIKIS:   Kob?  Okay.

2          And what familiarity do you have with handguns, if

3    any?

4          JUROR KOB:   I used to date a gentleman years ago

5    that collected handguns.

6          MR. SVIKIS:   Okay.

7          JUROR KOB:   And he'd take me out target practicing.

8          MR. SVIKIS:   Okay.

9          JUROR KOB:   . . . (inaudible)

10         MR. SVIKIS:   All right.

11         Mr. Wellington, do you have any particular knowledge

12   of handguns?

13         JUROR WELLINGTON:   I have fired . . . (inaudible)

14         MR. SVIKIS:   All right.

15         And Ms. Caldwell?

16         JUROR CALDWELL:   Very little.

17         MR. SVIKIS:   Have you ever fired—fired a handgun?

18         JUROR CALDWELL:   . . . (inaudible)

19         MR. SVIKIS:   Okay.  Mr. Wurfel, you're—

20         JUROR WURFEL:   I used to own a .22 automatic

21   handgun.

22         MR. SVIKIS:   That—

23         JUROR WURFEL:   I've carried about every caliber

24   there is, I think, at one time or another.

25         MR. SVIKIS:   And that's because of just happened to

1    be around them?

2                   JUROR WURFEL:   . . . (inaudible)

3                   MR. SVIKIS:   Okay.  And I'm sure you have,

4    Mr. Cutler?

5                   JUROR CUTLER:   Yes.

6                   MR. SVIKIS:   And Mr. Booth, you're—

7                   JUROR CUTLER:   I've never owned one or never shot

8    one.

9                   MR. SVIKIS:   Okay.  All right.

10                  Mr. Cutler, you said you're a reserve officer.

11                  JUROR CUTLER:   I was a reserve officer.

12                  MR. SVIKIS:   And how long ago was that?

13                  JUROR CUTLER:   '83.

14                  MR. SVIKIS:   '83?

15                  JUROR CUTLER:   Yes, sir.

16                  MR. SVIKIS:   And in order to be a reserve officer

17   did you have any training?

18                  JUROR CUTLER:   Yes, sir.

19                  MR. SVIKIS:   What kind of training did you have?

20                  JUROR CUTLER:   I had 32 weeks.

21                  MR. SVIKIS:   How many?

22                  JUROR CUTLER:   Thirty-two weeks.

23                  MR. SVIKIS:   Thirty—Over a half a year?

24                  JUROR CUTLER:   Yep.  Classroom and range.

25                  MR. SVIKIS:   And did it involve crime scene

                                  93

1    investigation?

2              JUROR CUTLER:   Through videos.

3              MR. SVIKIS:   Through videos.

4              And what else?  Give me just some idea what it—what

5    kind of background you have on this?

6              JUROR CUTLER:   We used to have the same training as

7    a regular sheriff deputy only it's real condensed.

8              MR. SVIKIS:   Okay.  And the last time you were a

9    reserve office was what year?

10             JUROR CUTLER:   Eighty—I resigned in '84—January of

11   '84.

12             MR. SVIKIS:   Do you keep in contact or in touch

13   with any of the deputies?

14             JUROR CUTLER:   Yes, sir.

15             MR. SVIKIS:   Who do you keep in touch with?

16             JUROR CUTLER:   Lieutenant VanStrean.

17             MR. SVIKIS:   He's up on the food chain, right?

18             JUROR CUTLER:   He was there a long time.

19             Sergeant Sandler—

20             MR. SVIKIS:   Okay.

21             JUROR CUTLER:   —good friend of mine.

22             MR. SVIKIS:   All right.

23             JUROR CUTLER:   There's others, but I can't think of

24   their last names right now.

25             MR. SVIKIS:   All right.  And when is the last time

                                    94

1    you saw either one of those gentlemen?

2            JUROR CUTLER:   Last week I saw Mr. Sandler down in

3    Richland . . . (inaudible)

4            MR. SVIKIS:   How did that—

5            JUROR CUTLER:   Well, there's some . . . (inaudible)

6    rental businesses.   There's a deli in front that I go to for

7    coffee in the morning.   And the back unit had been broken

8    into.

9            MR. SVIKIS:   Okay.  All right.

10           Let me ask you this and see if we have potentially

11   strike two here: if you were to sit on this jury—And I think

12   the prosecutor has in so many ways, if not directly, basically

13   told you that there's no physical evidence, that it's all

14   circumstantial; and he may believe that he puts on enough

15   evidence to ask for—ask for a guilty verdict.   However, after

16   you've deliberated and you say no and then—Is it Sandler?

17           JUROR CUTLER:   Sandler.

18           MR. SVIKIS:   Sandler.—you run into Mr. Sandler and

19   he goes, hear—how'd your trial go; and you go, well, found him

20   not guilty.   You think there'd be any kind of an unusual

21   exchange between the two of you?

22           JUROR CUTLER:   Probably not.

23           MR. SVIKIS:   Probably not.  Okay.

24           And that wouldn't—that wouldn't trouble you—

25           JUROR CUTLER:   No.

                              95

1       MR. SVIKIS:   —to confront—'cause what you're going
2   to hear from is officers that investigated this 14 years ago.
3       JUROR CUTLER:   I know several city officers, too.
4       MR. SVIKIS:   Okay.  I want to find out if anyone
5   has been a crime victim.  But don't raise your hand yet
6   because I found that there rarely is an individual today that
7   hasn't been a crime victim from a mailbox being batted to
8   actually being held up.  Not to minimize those property damage
9   crimes, has anyone here been a victim of a—of a mugging, a
10  holdup, or a robbery?
11      Yes?  What was that?
12      UNIDENTIFIED JUROR:   . . . (inaudible) used to own
13  a store out in Marshall, and we got held up one night.
14      MR. SVIKIS:   How long ago was that about?
15      UNIDENTIFIED JUROR:   Fifteen years.
16      MR. SVIKIS:   Okay.
17      UNIDENTIFIED JUROR:   . . . (inaudible)
18      MR. SVIKIS:   Would 15 years bring it into the time
19  frame of 1991 possibly or not?  This is 14 years ago
20  . . . (inaudible)
21      UNIDENTIFIED JUROR:   Yes.
22      MR. SVIKIS:   Were you in—Were you in the store when
23  that happened?
24      UNIDENTIFIED JUROR:   Yes.
25      MR. SVIKIS:   And—

1　　　　　　　UNIDENTIFIED JUROR:   . . . (inaudible) been longer

2　than that. . . (inaudible)

3　　　　　　　MR. SVIKIS:   Longer than that?

4　　　　　　　UNIDENTIFIED JUROR:   . . . (inaudible)

5　　　　　　　MR. SVIKIS:   Did they ever catch the individual?

6　　　　　　　UNIDENTIFIED JUROR:   Yes.

7　　　　　　　MR. SVIKIS:   Okay.  Did you have to testify, or did

8　he just confess?  Was there a trial?

9　　　　　　　UNIDENTIFIED JUROR:   I assume so.

10　　　　　　　MR. SVIKIS:   Okay.  How old were you—

11　　　　　　　UNIDENTIFIED JUROR:   . . . (inaudible)

12　　　　　　　MR. SVIKIS:   I was eight or nine.

13　　　　　　　UNIDENTIFIED JUROR:   Oh, okay.

14　　　　　　　MR. SVIKIS:   Anyone here have an immediate family

15　member that's—that's an attorney?  Immediate family member?

16　　　　　　　(No audible response)

17　　　　　　　Anyone have an immediate family member that's—And

18　that's an attorney anywhere.

19　　　　　　　(No audible response)

20　　　　　　　Anyone here have an immediate family member that

21　works for the State of Michigan whether it's the prosecutor's

22　office or attorney general?

23　　　　　　　(No audible response)

24　　　　　　　Anybody have a close friend that you socialize

25　with—let's keep it at a monthly—monthly basis or more that's

1  an attorney?  Any of those individuals?  And who—

2          UNIDENTIFIED JUROR:    Trudy Luedecking.

3          MR. SVIKIS:    Okay.  Anyone else?

4          (No audible response)

5          I want to ask some questions about domestic

6  violence.  And I don't know how the Court would handle this if

7  the question that I'm asking becomes so personal—Just mention

8  that, and maybe we'll handle it a different way instead

9  of—instead of everyone here.  It usually comes up in—We do

10  that when it comes up in criminal sexual assault cases where

11  you ask about some personal knowledge or family history.  But

12  I want to ask this about domestic violence.

13          Has anyone here ever been involved in a domestic

14  violence situation where the—where the police were called?

15          (No audible response)

16          Has anyone ever taken any classes about domestic

17  violence?

18          (No audible response)

19          Ms. Dokey, when the prosecutor asked you about the

20  circumstantial evidence was that the cookie example that you

21  had?

22          (No audible response)

23          Okay.  What I—What I was hearing—And tell me if I'm

24  right.—is that it wasn't that you would raise the bar for the

25  prosecutor when he says beyond a reasonable doubt, but it was

more akin to your focus.

　　　　And let me give you an example what I'm trying to get at. There's this program—I don't know if it's on anymore. It's the—It's the millionaire program, and it goes—Are you familiar with that program at all?

　　　　JUROR DOKEY:　 *"Who Wants to Be a Millionaire?"*

　　　　MR. SVIKIS:　 Yes, that's it. You've seen it? Okay. And the first questions are, you know, 1,000, 2,000. I don't remember exact amounts. But there's a point in about the middle way where they ask you a question and whether you get it right or you get it wrong you can almost answer and you still get a ton of money. But when you get beyond that—when we go to one sixty-four or two sixty or a million and you're given those four choices you give it more consideration—Right?—and you think about it long and hard; is that—is that fair to say?

　　　　JUROR DOKEY:　 Uhm-hmm.

　　　　MR. SVIKIS:　 And we're no longer at the $2,000 level; we're no longer at the cookie level. So if it's a cookie, it doesn't matter. I came in with nothing, I'm leaving with nothing. Okay?

　　　　Well, it's that kind of thought process and a right that Mr. Mishall has and the burden that the prosecutor has that—beyond a reasonable doubt—that you give it that kind of consideration. You're not here to solve a crime; you're here

(Tape No. C2005-021, 2-07-05, 01:39)

1  to listen to the evidence.

2          And it gets—And it gets a little easier, but it's a

3  little more difficult to express that Mr. Mishall comes into

4  the courtroom with a presumption of innocence.   I'm going to

5  ask if you can buy into this that he walks into the courtroom

6  where—And this is the key.—his version, so to speak, of the

7  events is already in.   It's already before you.   So—And I know

8  you can't do this now 'cause you haven't been sworn as jurors;

9  but if you were, he would be entitled to not guilty because

10  there's no evidence.

11          Now here's the question: Mr.—Mr. Wellington, you

12  look like you've been around for a couple of years at least.

13  Right?  Fair enough?

14          When you have to make a decision or decide

15  between—whether you've had children or not children or whether

16  you're an employer and have two employees—it makes sense to

17  hear both sides of the story, right?

18          JUROR WELLINGTON:   Correct.

19          MR. SVIKIS:   And that's only fair, correct?  So you

20  want to hear what this person has to say and this person has

21  to say and then you decide.   Okay.

22          Here's what's different in this courtroom, and

23  here's what's different about what the judge will instruct

24  you.  Pat's story is already in.  He does not have to testify.

25  So the presumption of innocence carries all the way through

100