1    until you're charged and go upstairs and deliberate.  It's in.

2            And in order to get beyond that to find what the

3    prosecutor's going to want—guilty beyond a reasonable

4    doubt—every single piece of evidence—right there to there to

5    you.

6            So the one story is in.  The question is can you

7    follow those instructions and set what you would normally

8    do—have done all your life—I want to hear both sides so I can

9    be fair.  Can you do that?

10           JUROR WELLINGTON:    Sure.

11           MR. SVIKIS:    Okay.  Ms. Caldwell, can you—can you

12   do that?  Did you get where I was headed here?

13           (No audible response)

14           If you don't, you know, now is—now is the time to—A

15   lot of other eager people out there want to take your seat if

16   you don't want to be here.  Of course, you'd have to convince

17   the judge of that.

18           Mr. Pelto, can you do that?

19           JUROR PELTO:    Sure.

20           MR. SVIKIS:    Okay.  Mr. Wurfel?

21           (No audible response)

22           Are you still thinking, Ms. Dokey?

23           JUROR DOKEY:    I do want to say something.

24           MR. SVIKIS:    Sure.

25           JUROR DOKEY:    I'm not sure if it was the prosecutor

                              101

1   or the judge have mentioned the names of the defendant and—

2           MR. SVIKIS:   We all did.

3           JUROR DOKEY:   . . . (inaudible)

4           MR. SVIKIS:   Go ahead.

5           JUROR DOKEY:   Okay.—and said did anyone recognize

6   the names or have you read about it.   And I did not recognize

7   the names—

8           MR. SVIKIS:   Okay.

9           JUROR DOKEY:   —but I have read a little bit in the

10  *Gazette* about this after you mentioned where it was.

11          MR. SVIKIS:   Okay.

12          JUROR DOKEY:   . . . (inaudible)

13          MR. SVIKIS:   Let me—Let me stop you there and

14  hold—and hold that thought.   Let me finish with this, and

15  we'll—we'll come—we'll come back—we'll come back to that.

16          Mr. Cutler, can you follow that instruction the

17  judge—the presumption of innocence that you don't even—that

18  you don't even have to hear from Mr. Mishall?

19          JUROR CUTLER:   Yes, sir.

20          MR. SVIKIS:   Mr. Booth?

21          JUROR BOOTH:   Yes.

22          MR. SVIKIS:   Okay.

23          Mr. Fooy?

24          JUROR FOOY:   Yes.

25          MR. SVIKIS:   Okay.   Mr. Chase?

1        JUROR CHASE:   Yes.

2        MR. SVIKIS:   Is it Harkness or Harkner?

3        JUROR HARKNESS:   Harkness.

4        MR. SVIKIS:   Okay.  I'm going to rewrite this.

5        Now would I be—I wouldn't be presumptuous in saying

6   that you'd love to hear from Mr. Mishall, right?  You'd like

7   to hear his story, right?

8        (No audible response)

9        Right?

10       JUROR HARKNESS:   Sure.

11       MR. SVIKIS:   Okay.

12       JUROR HARKNESS:   . . . (inaudible)

13       MR. SVIKIS:   Well, but see, that's—that's—that's

14   exactly my point that when you take the oath of a juror that

15   some things you have to put aside.

16       Mr. Schultz, no problem with that?

17       JUROR SCHULTZ:   What's the question again?

18       MR. SVIKIS:   All right.  I'll try to shorten it up.

19       JUROR SCHULTZ:   Okay.

20       MR. SVIKIS:   In your personal life if you were

21   going to make a decision that you think is fair you want to

22   hear both sides.  All right.  When you come in here and take

23   the juror's oath if that occurs and the judge instructs you,

24   he's going to give you one side, he's going to give you

25   Mr. Mishall's side, and that's a presumption of innocence.

                    103

1   And you would have never heard him say one single word.  Okay?

2   So you have to—So, in effect, that one side of the story is

3   already in.  In order to get beyond that—And this is a

4   tremendous burden, and that's why the prosecutor—You'll hear

5   later on.—actually gets to go twice sometimes.  Okay.

6          And, again, like Ms. Harkness said, you'd love to

7   hear from Mr. Mishall; but if you don't, you don't, right?

8          JUROR SCHULTZ:   . . . (inaudible)

9          MR. SVIKIS:   Okay.  And you can—you can deal with

10  that?

11         JUROR SCHULTZ:   . . . (inaudible)

12         MR. SVIKIS:   All right.

13         And you can deal with that, right?

14         UNIDENTIFIED JUROR:   . . . (inaudible)

15         MR. SVIKIS:   Okay.

16         And down to Mr. Manchester?  Okay.

17         And, Ms. Kob, okay.  No problem there.  All right.

18         Now let's—Before we come back to Ms. Dokey about

19  this—this scene, we're talking about a crime that occurred

20  14 years ago.

21         Can we approach, your Honor?

22         THE COURT:   Sure.

23         (At 1:45 p.m., bench conference)

24         MR. SVIKIS:   Ms. Dokey, you indicated that some of

25  this rang a bell, right?

104

1      JUROR DOKEY:   . . . (inaudible)

2      MR. SVIKIS:   Okay.  Don't tell me what you recall;

3  but as you're processing it now and what you recall or think

4  you recall, can you exclude that from your thinking if you're

5  selected to be a juror in this case?

6      JUROR DOKEY:   What I read?

7      MR. SVIKIS:   Yes.

8      (No audible response)

9      Probably?

10      (No audible response)

11      THE COURT:   Well, you may—I would tell you you

12  can't consider anything you may have read.

13      JUROR DOKEY:   Pardon me?

14      THE COURT:   You cannot consider anything you may

15  have read in making a decision.  First of all, newspapers,

16  news media—whether it be newspaper or radio or TV—are not

17  subject to the same safeguards as what is taking place in

18  court; and they're not subject to, when they print whatever

19  they say, that it be under oath.  And so you can't consider

20  that in any way, shape, or form.  Do you understand that?

21      JUROR DOKEY:   . . . (inaudible)

22      THE COURT:   And could you—whatever it was that you

23  read—or think you read—could you, for purposes if you're on

24  this jury of making a decision, not consider it?

25      JUROR DOKEY:   I didn't make my mind up or anything.

1   I just—When he mentioned the place, I just recalled a few

2   events that I read about happening.

3               THE COURT:   That's fine.

4               MR. SVIKIS:   Thank you.

5               Does anyone on this panel—as you sit here, does

6   anyone know anyone else?

7               UNIDENTIFIED JUROR:   . . . (inaudible)

8               MR. SVIKIS:   Okay.  Mr. Cutler, Mr. Booth, you know

9   each other from—

10              UNIDENTIFIED JUROR:   Eastland Bowl.

11              MR. SVIKIS:   Pardon?

12              UNIDENTIFIED JUROR:   Eastland Bowl.

13              MR. SVIKIS:   Same team or just—

14              UNIDENTIFIED JUROR:   No.

15              MR. SVIKIS:   —hello, goodbye?

16              UNIDENTIFIED JUROR:   — . . . (inaudible) bowling.

17              MR. SVIKIS:   Okay.

18              UNIDENTIFIED JUROR:   It's been—It's been at least

19  15, 20 years since we've seen each other.

20              MR. SVIKIS:   Okay.  I have no further questions.

21              THE COURT:   Does the State have any challenges for

22  cause?

23              MR. BROWER:   No challenges for cause, your Honor.

24              THE COURT:   Does the defense have any challenges

25  for cause?

106

1        MR. SVIKIS:   No, your Honor.

2        THE COURT:   Does the State wish to exercise a

3  peremptory challenge at this time?

4        MR. BROWER:   Yes, your Honor.  The People would

5  thank and excuse juror in seat ten, Ms. Dokey.

6        THE COURT:   Ms. Dokey, you're excused.

7        Anytime you're excused what's the procedure?  I'm

8  not quite sure here.

9        THE BAILIFF:   . . . (inaudible)

10        THE COURT:   They can leave.  Do they have to report

11  to anyone?

12        THE BAILIFF:   No.

13        THE COURT:   Okay.  You're excused.  Thank you,

14  ma'am.

15        Does the defense have any at this time?

16        MR. SVIKIS:   Yes, your Honor.  I would like to

17  thank and excuse Mr. Kob in seat number seven.

18        THE COURT:   Seven.

19        Ms. Kob, you're excused.  Thank you for coming.

20        Why don't you fill seat ten first, please.

21        THE CLERK:   William Adams.

22        JUROR ADAMS:   Where would you have me?

23        THE COURT:   Right here, sir.

24        Seat seven, please.

25        THE CLERK:   Laurel Jefsen.

1          THE COURT:   Okay.   The voir dire examination is

2    going to be limited now to jurors called to replace those

3    excused.

4          Mr. Adams and Ms. Jefsen, did you both hear all the

5    questions asked?

6          JUROR ADAMS:   Yes, sir.

7          THE COURT:   Do either of you know the attorneys or

8    the defendant?

9          JUROR ADAMS:   No, sir.

10         THE COURT:   Have either of you read or heard

11   anything about this case?

12         JUROR ADAMS:   No, sir.

13         THE COURT:   Did you both hear the list of witnesses

14   that the attorneys announced they might be calling?

15         JUROR ADAMS:   No, sir.

16         THE COURT:   Do either of you know any of those

17   attorneys [*sic*] or—Excuse me.—any of—any of those witnesses?

18         JUROR ADAMS:   No, sir.

19         THE COURT:   Have either of you ever sat on a jury

20   before?

21         JUROR ADAMS:   No.

22         THE COURT:   Did you both hear me explain the—the

23   principles that I said would apply in this case, and that is

24   the principles regarding the presumption of innocence, the

25   burden of proof, and proof of guilt beyond a reasonable doubt?

108

1     (No audible response)

2     Would either of you have any difficulty in accepting

3  those principles if you were on this jury?

4     (No audible response)

5     Do either of you have any health or medical problems

6  that would interfere with you being on the jury?

7     (No audible response)

8     Have either of you yourselves personally or had any

9  close relatives, friends, or acquaintances ever involved with

10  criminal matters of this nature that you know of?

11     (No audible response)

12     Based on all of the questions that I've asked up to

13  this point, all of the questions that both attorneys have

14  asked, can either of you think of anything at all that you

15  feel might cause you to favor or disfavor one side or the

16  other?

17     (No audible response)

18     Do either of you disagree with any of the—the

19  various rules that they said—and principles that would be

20  coming up in this case?

21     (No audible response)

22     Mr. Brower, do you have any further questions?

23     MR. BROWER:    Sure.

24     The judge asked, Mr. Adams, about any—whether

25  yourself or somebody close or family members or acquaintances

1    that had been involved witness the criminal justice system in

2    a matter similar to the offenses charged.  I want to ask about

3    any other contacts—positive or negative—that those same

4    parties—yourself, family members, or acquaintances—might have

5    had that would affect your evaluating the credibility of the

6    police officer witnesses?

7            JUROR ADAMS:   Absolutely not.

8            MR. BROWER:   Neither way, positive or negative that

9    would affect your ability to sit fairly and impartially?

10           JUROR ADAMS:   . . . (inaudible)

11           MR. BROWER:   Right.

12           Ms. Jefsen, what about you, any connection with

13   police whether it be for a crime or—somebody that's been

14   charged with a crime or maybe just been victimized by a crime?

15   Any family members, yourself, or close acquaintances that were

16   involved with any of those agencies or departments?

17           JUROR JEFSEN:   I worked with a juvenile court for

18   . . . (inaudible)

19           MR. BROWER:   You deal with a juvenile court.  Did

20   you deal then with members of the prosecutor's office that are

21   representing the State in maybe a delinquency matter or

22   abuse/neglect matter—those kinds of?

23           JUROR JEFSEN:   . . . (inaudible)

24           MR. BROWER:   All right.  When you say a while ago,

25   years?

                              110

1        JUROR JEFSEN:   . . . (inaudible)

2        MR. BROWER:   All right.  Ma'am, you heard the

3   discussion about circumstantial evidence; and by now you can

4   probably infer that there might not be DNA evidence, for

5   instance; but there may, in all likelihood, be circumstantial

6   evidence, which I would propose establishes that this

7   individual did this crime.  Are you one of those that felt

8   circumstantial evidence is really kind of an inferior evidence

9   to direct evidence?

10       JUROR JEFSEN:   I would want to see

11  . . . (inaudible)

12       MR. BROWER:   The context, how it fits together.

13  Would you agree that even physical evidence—for instance DNA

14  evidence establishing that this person was, in fact, at that

15  location that its relevance—that physical evidence—depends on

16  the context?

17       JUROR JEFSEN:   Yes.

18       MR. BROWER:   If somebody's DNA, for instance, was

19  established as being on the edge of the table but the table

20  was in the house that he lives at, it doesn't mean anything

21  then, would it?  So physical evidence by itself isn't

22  necessarily more convincing than circumstantial evidence.

23       If all you heard was circumstantial evidence and you

24  believed that it was of a sufficient nature to establish that

25  this person did this crime during this period of time would

                              111

1   you be able to come back into this courtroom and find the

2   defendant guilty even though it is circumstantial evidence and

3   not direct evidence?

4        JUROR JEFSEN:   I think so.

5        MR. BROWER:   Pardon my additional questions.   I

6   want to clarify that answer.   I think so.   Does that mean that

7   you would have to overcome a reluctance or depending on the

8   context it would be exactly the same as direct evidence?

9   Again, it would depend on the context?

10        JUROR JEFSEN:   Yes . . . (inaudible)

11        MR. BROWER:   So right now is it fifty-fifty for

12   you?   It just depends?

13        JUROR JEFSEN:   Yes.

14        MR. BROWER:   Okay.   I'm not starting off in the

15   same hole as with the other gentleman then; is that right?

16        JUROR JEFSEN:   Yes.

17        MR. BROWER:   Okay.   Mr. Adams, circumstantial

18   evidence, do you have any strong feelings about that one way

19   or the other?

20        JUROR ADAMS:   No.

21        MR. BROWER:   The discussion we had about beyond a

22   reasonable doubt, would that—would you agree that really if

23   you think about it as a thought process or evaluation process

24   that that's probably something I have done in making important

25   decisions in my own life?

                              112

1    JUROR ADAMS:   Yes.

2    MR. BROWER:   And there's been some discussion, too,

3    about this is a—this is a murder case, this isn't a minor

4    larceny.  I know the standard for both is proof beyond a

5    reasonable doubt; but, for me, I think I'd want to impose a

6    higher standard.  Do you think that you would feel that way,

7    or would you follow the law and evaluate the evidence in terms

8    of the law and not impose a higher standard?

9    JUROR ADAMS:   I believe that that's what I'm here

10   to evaluate—as a juror to evaluate the evidence and make a—an

11   impartial decision based upon that.

12   MR. BROWER:   Uhm-hmm.

13   You wouldn't be imposing a higher standard than the

14   law?

15   JUROR ADAMS:   I don't understand the nature of

16   the—higher standard.

17   MR. BROWER:   To convict somebody of a larceny of a

18   bicycle from the front yard, you believe that the evidence

19   showed that that person did it on that date; so you apply

20   proof beyond a reasonable doubt there.  Okay.  I can do that.

21   Next day you come back and try a murder case.  You

22   know the proof beyond a reasonable doubt standard.  Because it

23   is—you're now evaluating a murder standard—or a murder case,

24   would you want to have a higher standard of proof?

25   JUROR ADAMS:   No, I don't believe so, no.

113

1    MR. BROWER:   All right.

2    JUROR ADAMS:   It has to be—It would—should be—you

3    know, should be equally the same.

4    MR. BROWER:   All right.

5    JUROR ADAMS:   The law should prove guilt or

6    innocence . . . (inaudible)

7    MR. BROWER:   Beyond a reasonable doubt but not to

8    an absolute certainty.  You're not going to require that I

9    prove the case beyond any doubt whatsoever to 100 percent

10   sure—surety?

11   JUROR ADAMS:   Oh, no, absolutely not.

12   MR. BROWER:   Okay.  Thank you.

13   I have nothing further.

14   THE COURT:   Mr. Svikis?

15   MR. SVIKIS:   Thank you.

16   Mr. Adams, some time ago—six months ago—you filled

17   out a questionnaire.

18   JUROR ADAMS:   Yes.

19   MR. SVIKIS:   And it said—indicated that you had

20   been a witness before in something; do you recall?

21   JUROR ADAMS:   It probably had something to do with

22   our business.  We were being—We were being sued by someone

23   for—for not pay—or for some services—for back services.

24   MR. SVIKIS:   Oh, okay.  Did it actually go to

25   trial?

114

1       JUROR ADAMS:   No, it was settled out by the

2   lawyers.

3       MR. SVIKIS:   And do you own your own business now?

4       JUROR ADAMS:   No.

5       MR. SVIKIS:   What business did you own?

6       JUROR ADAMS:   I owned Big Joe's here in Kalamazoo.

7       MR. SVIKIS:   And could you hear my questions about

8   a .38 and a .22 and a .357?

9       JUROR ADAMS:   Yes.

10      MR. SVIKIS:   Do you have any—Do you own any

11  weapons?

12      JUROR ADAMS:   I don't own any, no.

13      MR. SVIKIS:   Okay.  Ever shot a gun—handgun?

14      JUROR ADAMS:   Yes, I have fired . . . (inaudible)

15      MR. SVIKIS:   Okay.  And in the context of the

16  military or just—

17      JUROR ADAMS:   Military, yes.

18      MR. SVIKIS:   What was that?  What were you in?

19      JUROR ADAMS:   Reserve.

20      MR. SVIKIS:   Okay.

21      JUROR ADAMS:   Have you had occasion to read your

22  fine print lately?

23      JUROR ADAMS:   I'm sorry?

24      MR. SVIKIS:   Have you had occasion to read your

25  fine print lately?  No?

115

1    JUROR ADAMS:   No.

2    MR. SVIKIS:   You're still here.  That's—

3    JUROR ADAMS:   . . . (inaudible)

4    MR. SVIKIS:   All right.  Any experience with a

5    autopsy?  We're going to show autopsy photos.  Any problem

6    with that?

7    JUROR ADAMS:   No, not at all.

8    MR. SVIKIS:   Okay.  Any police officers in your

9    immediate family or friends?

10   JUROR ADAMS:   No.

11   MR. SVIKIS:   The location on Stadium Drive—I think

12   it's now called Bronco Mart; it was Minute Mart.—next to

13   Gale's Hardware.  You familiar with that area?

14   JUROR ADAMS:   I know the location, yes.

15   MR. SVIKIS:   Okay.  Have you been to that location

16   in the last month?

17   JUROR ADAMS:   No, I haven't been in many years.

18   MR. SVIKIS:   Okay.  And you'll be instructed by the

19   Court not to go there, and you can resist that temptation if

20   it arises?

21   JUROR ADAMS:   Yes.

22   MR. SVIKIS:   Okay.  Ms. Jefsen, do you have any—Is

23   it Jefsen?  Did I get—

24   JUROR JEFSEN:   Yes.

25   MR. SVIKIS:   Do you have any personal knowledge

116

1  with handguns?

2          JUROR JEFSEN:   . . . (inaudible)

3          MR. SVIKIS:   Ever owned one?

4          JUROR JEFSEN:   . . . (inaudible)

5          MR. SVIKIS:   Ever shot one?

6          JUROR JEFSEN:   . . . (inaudible)

7          MR. SVIKIS:   How about any involvement with

8  autopsies—anything like that?

9          JUROR JEFSEN:   . . . (inaudible)

10          MR. SVIKIS:   Okay.   Any police—members of the

11  police force in your family—immediate family or friends?

12          JUROR JEFSEN:   . . . (inaudible)

13          MR. SVIKIS:   The location we're talking about on

14  Stadium Drive, do you know where I'm talking about?

15          JUROR JEFSEN:   . . . (inaudible)

16          MR. SVIKIS:   Have you been there in the last year?

17          JUROR JEFSEN:   Across the street from it.

18          MR. SVIKIS:   Pardon?

19          JUROR JEFSEN:   Across the street.

20          MR. SVIKIS:   At the car dealership there?

21          JUROR JEFSEN:   At Gale's . . . (inaudible)

22          MR. SVIKIS:   At Gale's.

23          JUROR JEFSEN:   . . . (inaudible)

24          MR. SVIKIS:   They're actually now welded together.

25  At the time—You'll see the photographs.—there—there was a gap

117

1  in there.  Okay.

2        When was the last time you were at Gale's?

3        JUROR JEFSEN:   . . . (inaudible)

4        MR. SVIKIS:   Again, I'm looking at your

5  questionnaire that you filled out back in July.  It indicates

6  that you're a school administrator.  I don't know what the

7  acronym RESA means.

8        JUROR JEFSEN:   It's the Regional Educational

9  Service Agency.  It's the ISD—Intermediate School District.

10        MR. SVIKIS:   Okay.

11        JUROR JEFSEN:   Formerly known as the ISD.

12        MR. SVIKIS:   Formerly known as what?

13        JUROR JEFSEN:   As the ISD.  It's now RESA.

14        MR. SVIKIS:   And it says that you were a school

15  social worker.  What were some of those tasks that—Were you

16  located at a school?

17        JUROR JEFSEN:   I was a school social worker for the

18  Kalamazoo Public Schools for about 15 years.  I did primarily

19  special education . . . (inaudible)

20        MR. SVIKIS:   Any of that involve domestic violence?

21        JUROR JEFSEN:   . . . (inaudible)

22        MR. SVIKIS:   Have you had any classes or training

23  in domestic violence?

24        JUROR JEFSEN:   . . . (inaudible)

25        MR. SVIKIS:   Do you want any of the cop shows like

1    *CSI* or any of those on TV?

2              JUROR JEFSEN:   . . . (inaudible)

3              MR. SVIKIS:   All right.   I have no further

4    questions.

5              THE COURT:   If you have challenges for cause from

6    this point forward, please volunteer them.   I'm not going to

7    specifically—

8              MR. SVIKIS:   All right.

9              THE COURT:   —ask.

10             Any challenges—

11             MR. BROWER:   No, your Honor.

12             THE COURT:   —for cause?

13             MR. SVIKIS:   None for cause.

14             THE COURT:   Peremptories are with the State.

15             MR. BROWER:   Your Honor, the People would thank and

16   excuse Mr. Meyle in seat number five.

17             THE COURT:   Mr. Meyle, you're excused.   Thank you

18   for coming today.

19             Do you have any at this time, Mr. Svikis?

20             MR. SVIKIS:   I—I do, your Honor, and I would like

21   to thank and excuse Mr. Cutler in seat nine.

22             THE COURT:   All right.   You're excused, Mr. Cutler.

23   Thank you for coming here today.

24             Seat five, please.

25             THE CLERK:   Carol Campbell.

                              119

1          THE COURT:    Seat nine.

2          THE CLERK:    Randy Overweg.

3          THE COURT:    Ms. Campbell and Mr. Overweg, did you

4    both hear the questions we've asked up to this point?

5          (No audible response)

6          Do either of you know the attorneys involved?

7          (No audible response)

8          Do either of you know the defendant?

9          (No audible response)

10         Have either of you read or heard anything about this

11   case?

12         (No audible response)

13         Did either of you recognize the names of any of the

14   witnesses?

15         (No audible response)

16         Do either of you have any health or medical problems

17   that could interfere with you being on the jury?

18         (No audible response)

19         Have either of you ever sat on a jury before?

20         (No audible response)

21         Did you hear me explain the principles regarding the

22   presumption of innocence, the burden of proof, and proof of

23   guilt beyond a reasonable doubt?

24         (No audible response)

25         Would you have any difficulty in accepting those if

                          120

1    you are on this jury?

2         (No audible response)

3         Is there anything about the nature of this case

4    that's such that you could not be fair?

5         (No audible response)

6         Have either of you personally or had any close

7    relatives, friends, or acquaintances ever involved with

8    charges or criminal matters of this nature that you know of?

9         (No audible response)

10        Can either of you think of anything at all based on

11   other specific questions that have been asked throughout this

12   day by myself or the attorneys that might be important for us

13   to know about your background or experiences?

14        (No audible response)

15        Any close relatives or friends in law enforcement or

16   anything like that?

17        Mrs. Campbell?

18        JUROR CAMPBELL:   We've been close friends with

19   Jim Gregart for ten years.

20        THE COURT:   With Jim who?

21        JUROR CAMPBELL:   Gregart.

22        THE COURT:   I see.  The former prosecutor.  He ever

23   mention this matter?

24        JUROR CAMPBELL:   Not this case.

25        THE COURT:   Was—Was there—Is there anything about

                        121

1   that that you feel that would cause you to favor the

2   prosecution or the defense?

3          JUROR CAMPBELL:   Possibly . . . (inaudible), but

4   possible.

5          THE COURT:   But you understand that this defendant

6   is entitled to a presumption of innocence right now.  If there

7   was no proofs introduced, you'd have to find him innocent or

8   not guilty; do you understand that?

9          JUROR CAMPBELL:   Correct.

10         THE COURT:   Do you understand he doesn't have to

11  produce any evidence whatsoever; do you understand that?

12         JUROR CAMPBELL:   Yes.

13         THE COURT:   And if he doesn't, you can't hold that

14  against him; do you understand that?

15         (No audible response)

16         Would you be able to follow and accept those rules?

17         JUROR CAMPBELL:   Yes.

18         THE COURT:   Would you—Let's say you get through

19  this case and you're on the jury and you felt the prosecutor

20  hadn't proved his case beyond a reasonable doubt and you found

21  the defendant here not guilty, would you be embarrassed to

22  have to face Mr. Gregart or his family again?

23         JUROR CAMPBELL:   No.

24         THE COURT:   Can you think of any reason—either of

25  you—why you couldn't be fair?

                        122

1        (No audible response)

2        Mr. Brower?

3        MR. BROWER:   Mr. Overweg, did you—were you able to

4 hear me in the back there?

5        (No audible response)

6        All right.

7        Did you hear me say at one point, you know, if you

8 feel this or that way I need to know about it now.  Okay?  I

9 can't learn about it later or after the fact.  I'm going to

10 ask you to look deep inside yourself and now tell me how you

11 feel about circumstantial evidence.  Do you feel that

12 circumstantial evidence is inferior, and it's going to be hard

13 for you to overcome that preconceived idea that you have about

14 that?

15        JUROR OVERWEG:   . . . (inaudible)

16        MR. BROWER:   Just like direct evidence—DNA

17 tests—depending on the circumstance DNA tests may or may not

18 be relevant, circumstantial evidence may or may not relevant

19 or be convincing.  It depends on the context and, in

20 particular, in the light of other evidence whether it be

21 direct or circumstantial.  It's all together in the big

22 picture.  Is that the way you feel?

23        JUROR OVERWEG:   . . . (inaudible)

24        MR. BROWER:   The discussion about making a decision

25 and applying that beyond a reasonable doubt standard, would

1    you agree that that's something that you've probably done in

2    your own life, too?

3             JUROR OVERWEG:   . . . (inaudible)

4             MR. BROWER:   You weren't a witness to this crime.

5    You weren't—I didn't read your name.  Okay.  So you can't know

6    from personal experience to be absolutely certain, 100 percent

7    beyond any doubt, right?

8             JUROR OVERWEG:   . . . (inaudible)

9             MR. BROWER:   It would be impossible for me to prove

10   that unless you witnessed it with your own eyes in most

11   circumstances.  That beyond a reasonable doubt standard is

12   less than absolute certainty.  Are you okay with that?

13            JUROR OVERWEG:   . . . (inaudible)

14            MR. BROWER:   This is a murder case, and it's

15   important.  But you'd still be able to follow the law

16   . . . (inaudible)

17            JUROR OVERWEG:   . . . (inaudible)

18            MR. BROWER:   Sir, you had some contact with

19   authorities sometime previously; is that correct?

20            JUROR OVERWEG:   . . . (inaudible)

21            MR. BROWER:   Was that here in Kalamazoo County?

22            JUROR OVERWEG:   . . . (inaudible)

23            MR. BROWER:   Was that something that my office

24   dealt with, do you know?

25            JUROR OVERWEG:   . . . (inaudible)

124

(Tape No. C2005-021, 2-07-05, 02:14)

1   MR. BROWER:   All right.   Was—Again, it wasn't

2   something you would enjoy going through.

3   JUROR OVERWEG:   . . . (inaudible)

4   MR. BROWER:   But was it something that you felt you

5   were treated fairly with?

6   JUROR OVERWEG:   . . . (inaudible)

7   MR. BROWER:   And the police agencies or the

8   prosecuting officials—whoever it would be—that they gave you a

9   fair shake?  You don't have any lingering bad feelings with

10  either of those then?

11  JUROR OVERWEG:   . . . (inaudible)

12  MR. BROWER:   How long ago was that, sir?

13  JUROR OVERWEG:   Six or seven years ago.

14  MR. BROWER:   Teenager then?

15  JUROR OVERWEG:   . . . (inaudible)

16  MR. BROWER:   All right.

17  Ms. Campbell, would you agree with the answers that

18  Mr. Overweg gave?  Do you feel as he does about circumstantial

19  evidence and applying the burden of proof and so on?

20  JUROR CAMPBELL:   . . . (inaudible)

21  MR. BROWER:   Thank you.

22  UNIDENTIFIED JUROR:   Excuse me.

23  MR. SVIKIS:   There's a question.

24  UNIDENTIFIED JUROR:   Earlier you asked us if we

25  knew any of the jurors, and that's before some were dismissed.

1   I don't know if it matters or not, but I do know

2   . . . (inaudible)

3          MR. BROWER:   All right.

4          UNIDENTIFIED JUROR:   . . . (inaudible)

5          MR. BROWER:   Okay.  Ms. Campbell, where would that

6   be from?

7          JUROR CAMPBELL:   . . . (inaudible)

8          MR. BROWER:   You presently work together?

9          JUROR CAMPBELL:   No, . . . (inaudible)—

10          MR. BROWER:   Knew—

11          JUROR CAMPBELL:   —for several years

12   . . . (inaudible)

13          MR. BROWER:   All right.  If it were to be that both

14   of you wind up sitting as jurors in this case would that be

15   difficult for you one way or the other?

16          JUROR CAMPBELL:   No.

17          MR. BROWER:   All right.

18          Can I ask that same question of this juror?

19          THE COURT:   Yeah.

20          MR. BROWER:   Sir—Mr. Fooy—would that be difficult

21   for you to sit as a juror with someone that you worked with

22   previously?

23          JUROR FOOY:   . . . (inaudible)

24          MR. BROWER:   Thank you.

25          Anything else that you'd like to say in light of the

1  questions that were asked previously, ma'am?  Something that

2  popped in your head and said, oh, they probably want to know

3  that but it hasn't been specifically asked now?

4        UNIDENTIFIED JUROR:  It's probably not relevant.

5  You asked about guns.  I don't personally own one, but we have

6  guns in the house.  . . . (inaudible) .357 . . . (inaudible)

7        MR. BROWER:  All right.  Thank you.

8        MR. SVIKIS:  Ms. Campbell, do you still reside in

9  Kalamazoo County?

10        JUROR CAMPBELL:  Yes, sir.

11        MR. SVIKIS:  And tell me what your—what your

12  thoughts are with regard to Mr. Mishall sitting here knowing

13  that he's been arrested for these crimes?

14        (No audible response)

15        Let me ask it another way.  Do you think he's done

16  something wrong by sitting here, knowing he's been arrested

17  for these crimes and charged?

18        JUROR CAMPBELL:  To be honest—

19        MR. SVIKIS:  That's—

20        JUROR CAMPBELL:  —my tendency is yes.

21        MR. SVIKIS:  And I would suspect everyone would say

22  that, right?

23        JUROR CAMPBELL:  Probably.

24        MR. SVIKIS:  Okay.  And do you think it's fair to

25  say that—someone say, well, if he hadn't done anything wrong,

1  he wouldn't be here?  Would that kind of hook into that?

2          JUROR CAMPBELL:   . . . (inaudible)

3          MR. SVIKIS:   It could?

4          JUROR CAMPBELL:   Correct.

5          MR. SVIKIS:   Okay.  Well, that's what—that's what

6  we have to know.  And if everyone thought that here, and

7  everyone thinks that out there, that's—that's not a

8  reason—that's not a reason to be excused, but it helps us in

9  dealing with your candor in such the same way that you advised

10 us that you knew Mr.—Mr. Gregart.

11         Well, let's put these two together now.  You have

12 socialized with Mr. Gregart.

13         JUROR CAMPBELL:   . . . (inaudible)

14         MR. SVIKIS:   Okay.  And when—when was the last time

15 that occurred?  His wife is Linda or something?

16         JUROR CAMPBELL:   Correct.

17         MR. SVIKIS:   Okay.

18         JUROR CAMPBELL:   We worked together, too.

19         MR. SVIKIS:   You worked with?

20         JUROR CAMPBELL:   Linda and I did several years ago.

21         MR. SVIKIS:   Across the street?

22         JUROR CAMPBELL:   No.

23         MR. SVIKIS:   Where at?

24         JUROR CAMPBELL:   Eaton.

25         MR. SVIKIS:   At Eaton.  Okay.

                          128

1          Let's take—Let's take those things and now this

2     gets—this gets a little trickier; but, hopefully, you

3     understand where I'm going.  You know what your thoughts are

4     and your experiences and whatever you bring to the courtroom.

5     Okay.  Would you want that person—you—switching places with

6     Mr. Mishall, and would you be getting a fair shake?  Do you

7     follow where I'm going?

8          JUROR CAMPBELL:    I know where you're going.

9          MR. SVIKIS:    Okay.  Would that be—or this isn't the

10    case for you and I can't take out my thoughts with Mr. Gregart

11    and the natural thought of he must have done something wrong

12    or he wouldn't be here.  But we start coupling these together,

13    what do you think?

14          (No audible response)

15          Here's the—Here's the question the judge would ask

16    you.  Here's what I want you to think about.

17          And bias is a strong word, but it—it can also be,

18    you know, leaning one way or the other.  And if you have a

19    bias for or against either myself or my client that can't be

20    set aside and it's just there because of where you come from,

21    where you've been, and just you.

22          An extreme example would be if you had a family

23    member, ran a store—like a gentleman up here—and those same

24    circumstances was shot.  That's another extreme.  But

25    even—even this would be a cause for you to sit on some other

                              129

1    jury.  And, also—And the question I asked you is about a state

2    of mind, you know, if that was flipped.

3              So that we're back to the—we're back to the

4    question.  Is this—Can Mr. Mishall get a fair shake with you?

5              JUROR CAMPBELL:   Yeah, I think it's possible.

6              MR. SVIKIS:   Possible?

7              JUROR CAMPBELL:   . . . (inaudible)

8              MR. SVIKIS:   Probable?  I don't—I got to do a

9    little dancing around here.  This is—

10             JUROR CAMPBELL:   . . . (inaudible)

11             MR. SVIKIS:   But you understand where I'm headed?

12             JUROR CAMPBELL:   . . . (inaudible)

13             MR. SVIKIS:   Okay.  All right.

14             Do you have any handgun knowledge?

15             JUROR CAMPBELL:   Other than what we've got in the

16   house, but I don't know what they are.

17             MR. SVIKIS:   You don't know what they are.   Okay.

18             The location where—where this was taken place on

19   Stadium Drive next to Gale's Hardware, first of all, do you

20   know where that is?

21             JUROR CAMPBELL:   . . . (inaudible)

22             MR. SVIKIS:   Okay.  Have you been in anytime in the

23   last—

24             JUROR CAMPBELL:   . . . (inaudible)

25             MR. SVIKIS:   No.  Okay.

                              130

1        So I'll just ask, do you want to be—do you want to
2   be considered for staying on this jury, or do you think you
3   should be off this jury because of your thoughts and where you
4   are—where you're coming from?
5        JUROR CAMPBELL:   I would prefer to be off.
6        MR. SVIKIS:   Because of the—Because of what I was
7   saying that you may be biased or show a state of mind that
8   would not be fair to Mr. Mishall?
9        JUROR CAMPBELL:   . . . (inaudible)
10        MR. SVIKIS:   Okay.  Thank you for your honesty.
11        And I would have one for cause this time, your
12   Honor.
13        THE COURT:   And?
14        MR. SVIKIS:   And I would ask that the Court excuse
15   Ms. Campbell as she has been so candid and forthright to
16   indicate that she may be of such a state of mind or bias for a
17   party given her relationship with the recently retired
18   prosecutor.  Thank you.
19        THE COURT:   Well, you know, I've come to the
20   conclusion that any good lawyer could probably talk any juror
21   out of being on the jury for cause if you let him go long
22   enough.
23        Are your feelings such, Ms. Campbell, that you're
24   going to be predisposed to favor the prosecution regardless
25   of—of what I tell you the law is?  Is that what—Because,

1    basically, that's what I have—that's what it has to come down

2    to.

3                I know that's a hard thing to admit, and that's—

4                JUROR CAMPBELL:   I would go by the evidence.

5                THE COURT:   Pardon?

6                JUROR CAMPBELL:   I would—I would go by the

7    evidence, whatever the evidence was.

8                THE COURT:   Do you think at this time you're more

9    predisposed to favor the prosecution or the defense?

10               JUROR CAMPBELL:   Probably yes.

11               THE COURT:   Pardon?

12               JUROR CAMPBELL:   Probably yes.

13               THE COURT:   That's not—You must not have understood

14   my question.   Do you have—Do you have an inclination one way

15   or the other right now to favor one side or the other?

16               JUROR CAMPBELL:   Oh, no, no.

17               THE COURT:   If all things were equal at the end of

18   the case would you favor the prosecution or the defense?

19               JUROR CAMPBELL:   I would—whatever the evidence

20   showed.

21               THE COURT:   Do you understand if you felt the

22   evidence were equal that you'd have to acquit the defendant?

23   Do you understand that?

24               (No audible response)

25               Because then there wouldn't be any proof beyond a

                                    132

1    reasonable doubt.  And even if it slightly favored—not beyond

2    a reasonable doubt but just slightly favored the

3    prosecution—that, again, would require you to find for the

4    defense; do you understand that?

5              JUROR CAMPBELL:   Yes.

6              THE COURT:   Could you do it?  That's the critical

7    question.

8              JUROR CAMPBELL:   Yes, I could.

9              THE COURT:   Your motion's denied.

10             MR. SVIKIS:   Thank you, your Honor.

11             THE COURT:   Challenges for—Peremptory challenges?

12             Mr. Brower?

13             MR. BROWER:   Your Honor, the People would thank

14   Ms. Caldwell in seat number 13.

15             THE COURT:   All right.  You're excused.

16   Ms. Caldwell, thank you for coming.

17             Mr. Svikis?

18             MR. SVIKIS:   Thank you.  I'd like to thank and

19   excuse juror in seat number five, Ms. Campbell.

20             THE COURT:   Ms. Campbell, you're excused.

21             Let's fill seat 13 first.

22             THE CLERK:   Michael Waldschlager.

23             THE COURT:   Seat six, please—No.—seat five.

24             THE CLERK:   Kathryn Ellis.

25             THE COURT:   Okay.  Did you both hear the questions

                              133

1    that we've asked up to this point?

2              (No audible response)

3              Do either of you know the attorneys?

4              (No audible response)

5              Do either of you know the defendant or read or heard

6    anything about this case before coming here?

7              (No audible response)

8              Do either of you know any of the witnesses or

9    recognize any of the witnesses' names?

10              (No audible response)

11              Do either of you have any health or medical problems

12    that could interfere with you being on the jury?

13              (No audible response)

14              Have either of you ever sat on a jury before?

15              (No audible response)

16              Did you both hear me explain the principles

17    regarding the presumption of innocence, the burden of proof,

18    and proof of guilt beyond a reasonable doubt?

19              (No audible response)

20              Any difficulty in accepting those principles?

21              (No audible response)

22              Do either of you have any close relatives, friends,

23    or acquaintances involved in law enforcement?

24              (No audible response)

25              Have either of you had any close relatives, friends,

                                    134

1   or acquaintances ever involved with criminal matters such as

2   this that you know of?

3           (No audible response)

4           Can either of you think of anything at all based on

5   what we've discussed here with the other jurors up to this

6   point regarding this case and the law that might be important

7   for us to know about your background or experiences?

8           (No audible response)

9           Can either of you think of any reason why you could

10  not be fair and impartial in this case?

11          (No audible response)

12          Mr. Brower?

13          MR. BROWER:   Ms. Ellis, your questionnaire

14  indicated that you were a student—at least at the time the

15  questionnaire was completed.  Are you still a student, ma'am?

16          JUROR ELLIS:   . . . (inaudible)

17          MR. BROWER:   Presently in the middle of your

18  semester or the beginning of the semester?

19          JUROR ELLIS:   It is my last semester.

20          MR. BROWER:   All right.  So you do have classes

21  scheduled during this week and so on that you—

22          JUROR ELLIS:   . . . (inaudible)

23          MR. BROWER:   All right.  So this would not create a

24  conflict or cause you to be distracted or anything like that?

25          JUROR ELLIS:   . . . (inaudible)

                                135

1       MR. BROWER:   Okay.

2       Mr. Waldschlager, any—anything going on in your life

3 that would cause you to be distracted now—

4       JUROR WALDSCHLAGER:   No, sir.

5       MR. BROWER:   —in ability to pay attention to the

6 evidence and so on?

7       JUROR WALDSCHLAGER:   . . . (inaudible)

8       MR. BROWER:   Nothing.  All right.

9       Sir, you had some contact with some law enforcement

10 sometime previously; is that correct?  How long ago was that,

11 sir?

12       JUROR WALDSCHLAGER:   I believe it was in 1993.  I

13 was in high school at the time.

14       MR. BROWER:   All right.  A long time ago.

15       JUROR WALDSCHLAGER:   Yes.

16       MR. BROWER:   Okay.  Leave you with any lingering

17 feelings about police at all?

18       JUROR WALDSCHLAGER:   . . . (inaudible)

19       MR. BROWER:   Was that here in the city of

20 Kalamazoo?

21       JUROR WALDSCHLAGER:   That was in the city of

22 Grand Rapids.

23       MR. BROWER:   In Grand Rapids.  All right.

24       So you—That is a non-issue for you.

25       JUROR WALDSCHLAGER:   . . . (inaudible)

MR. BROWER:   All right.

This is for both of you—the questions about circumstantial evidence.  Now assuming that maybe your feelings might have changed in light of the discussions, did you initially—prior to listening to the discussion and the questions—have an idea that circumstantial evidence was inferior?

JUROR WALDSCHLAGER:   . . . (inaudible)

MR. BROWER:   Ms. Ellis, you're reflecting.

JUROR ELLIS:   This is true.

MR. BROWER:   Okay.  Well, it might not be fair.  Let me ask this: in light of the discussions—

JUROR ELLIS:   Right.

MR. BROWER:   —do you now agree that depending on the context and the way it fit with other evidence that circumstantial evidence can be as convincing as physical evidence depending on the scenario and all those other things.  Yes?

JUROR ELLIS:   . . . (inaudible) a better understanding . . . (inaudible)

MR. BROWER:   All right.

Mr. Waldschlager, is the same true for you?

JUROR WALDSCHLAGER:   I didn't come in with any preconceived—

MR. BROWER:   Okay.

137

1    JUROR WALDSCHLAGER:   —notions on that.  So the

2  discussion, while enlightening—

3    MR. BROWER:   Right.

4    JUROR WALDSCHLAGER:   —didn't affect me.

5    MR. BROWER:   There's—There's no mountain that I

6  have to go over before I can get to you then?

7    JUROR WALDSCHLAGER:   No, you're not starting

8  . . . (inaudible)

9    MR. BROWER:   Okay.  Thank you.

10    THE COURT:  Mr. Svikis?

11    MR. SVIKIS:  Waldschlager?

12    JUROR WALDSCHLAGER:   That's correct.

13    MR. SVIKIS:  Do you have any handgun knowledge?

14    JUROR WALDSCHLAGER:   Yes.  Not anymore, but I have

15  fired many different . . . (inaudible)

16    MR. SVIKIS:  Okay.

17    JUROR WALDSCHLAGER:   . . . (inaudible)

18    MR. SVIKIS:  There's not another kind, I guess.

19    We're talking about a Minute Mart that's no longer a

20  Minute Mart and Bronco Mart, Stadium Drive, Gales's Hardware,

21  Rambling Road; are you familiar with that location?

22    JUROR WALDSCHLAGER:   I'm familiar with the area.

23  I've never actually been to the location.

24    MR. SVIKIS:  All right.  Thank you.

25    Ms. Ellis, Stadium Drive, Rambling Road,

138

1    Minute Mart, Bronco Mart, any of that?

2             JUROR ELLIS:   I'm familiar with . . . (inaudible)

3             MR. SVIKIS:   All right.   And did I hear you say

4    you're in your last year of—In what—At what school?

5             JUROR ELLIS:   I go to Ball State University.

6             MR. SVIKIS:   All right.   Are you still a resident

7    of Kalamazoo County?

8             JUROR ELLIS:   This is my permanent address, but I'm

9    not currently living here.   I was informed that

10   . . . (inaudible)—as long as I have a Michigan residency.

11            MR. SVIKIS:   Okay.   But your permanent residence is

12   in Kalamazoo County?

13            JUROR ELLIS:   Correct, yes.

14            MR. SVIKIS:   Okay.

15            JUROR ELLIS:   . . . (inaudible)

16            MR. SVIKIS:   Because if you're not in

17   Kalamazoo County, then you can't sit on a Kalamazoo County—

18            JUROR ELLIS:   Right.

19            MR. SVIKIS:   —jury.

20            JUROR ELLIS:   Right, uhm-hmm.

21            MR. SVIKIS:   Do you have any gun knowledge—handgun

22   knowledge?

23            JUROR ELLIS:   I've shot a handgun once.

24            MR. SVIKIS:   Do you know what it was?

25            JUROR ELLIS:   I think it was a .40 caliber.

1         MR. SVIKIS:   .40 caliber?

2         JUROR ELLIS:   . . . (inaudible)

3         MR. SVIKIS:   Okay.  And any family members that are

4 on a police force?

5         JUROR ELLIS:   . . . (inaudible)

6         MR. SVIKIS:   Close friends?

7         JUROR ELLIS:   . . . (inaudible)

8         MR. SVIKIS:   How about attorneys?

9         JUROR ELLIS:   . . . (inaudible)

10        MR. SVIKIS:   Okay.  That's probably a good thing.

11       Have you ever had any classes or awareness of any—or

12 family involved in domestic violence?

13        JUROR ELLIS:   . . . (inaudible)

14        MR. SVIKIS:   Okay.  I have no further questions.

15        THE COURT:   Peremptories are with the State.

16        MR. BROWER:   People would thank and excuse

17 Mr. Chase in seat two.

18        THE COURT:   Mr. Chase, you're excused.  Thank you

19 for coming today.

20       Does the defense have any at this time?

21        MR. SVIKIS:   Yes, we do, your Honor.  Thank and

22 excuse juror in seat seven, Ms. Jefsen.

23        THE COURT:   Ms. Jefsen, you're excused.  Thank you

24 for coming today.

25       Seat two, please.

1      THE CLERK:   Sophit Lee.

2      THE COURT:   Seat seven.

3      THE CLERK:   Luann Laroy.

4      THE COURT:   Did both of you ladies hear the

5   questions that were asked up to this point?

6      UNIDENTIFIED JUROR:   Yes.

7      THE COURT:   Do either of you know the attorneys or

8   the defendant?

9      (No audible response)

10      Or any of the witnesses?

11      (No audible response)

12      Have either of you ladies read or heard anything

13   about this case?

14      JUROR LAROY:   I believe I have.  I believe I have.

15      THE COURT:   Okay.  Do you remember anything

16   specifically at this time other than you read about—something

17   about it?

18      JUROR LAROY:   . . . (inaudible)

19      THE COURT:   Let me ask you this, Ms. Laroy.  If you

20   are on this jury do you understand you've got to decide the

21   case what you see and hear in this courtroom and not something

22   you read or think you remember from some previous news media

23   report?

24      JUROR LAROY:   I'm sorry.  I didn't understand.

25      THE COURT:   You have to decide the case based on

141

1    what you see and hear in this courtroom and not what you may

2    have read or thought you remembered you read; do you

3    understand that?

4              JUROR LAROY:   Yes, I do.

5              THE COURT:   Any problem doing that?

6              JUROR LAROY:   . . . (inaudible)

7              THE COURT:   Have either of you ladies ever been on

8    a jury before?

9              (No audible response)

10           Did you hear me explain the principles regarding the

11    presumption of innocence, burden of proof, and proof of guilt

12    beyond a reasonable doubt?

13              (No audible response)

14           Would you have any difficulty accepting those?

15              (No audible response)

16           Anything about the nature of this case that's such

17    that you could not be fair?

18              (No audible response)

19           Can you think of anything at all based on anything

20    I've said or either of the lawyers have said that might be

21    important to know about your background or experiences before

22    it's determined whether you sit on the jury?

23              (No audible response)

24           Do you have any close relatives or friends involved

25    in law enforcement or anything of that nature?

1    UNIDENTIFIED JUROR:   . . . (inaudible) close
2  friend.
3    THE COURT:   Pardon?
4    UNIDENTIFIED JUROR:   Close friend that's involved
5  in law enforcement.
6    THE COURT:   Where at, ma'am?
7    UNIDENTIFIED JUROR:    Kalamazoo County.   I'm really
8  not positive.
9    THE COURT:   Not positive.
10    UNIDENTIFIED JUROR:   Just he's a police officer,
11  yes.
12    THE COURT:   Anything about that that would
13  predispose you to this—to view this case one way or the other?
14    UNIDENTIFIED JUROR:   . . . (inaudible)
15    THE COURT:   Have either of you had any close
16  relatives or friends ever involved with criminal matters like
17  this that you know of?
18    (No audible response)
19    Can you think of any reason based on anything that's
20  been said here today as to why you couldn't be fair?
21    (No audible response)
22    Mr. Brower?
23    MR. BROWER:   Ms. Lee, you're a financial planner;
24  is that correct?
25    JUROR LEE:   That's correct.

143

1    MR. BROWER:   With Dosa Financial Services?

2    JUROR LEE:   . . . (inaudible)

3    MR. BROWER:   Is it Steve Dosa?

4    JUROR LEE:   He's not there anymore.

5    MR. BROWER:   All right.

6    JUROR LEE:   . . . (inaudible)

7    MR. BROWER:   Had you worked with Mr. Dosa

8    previously?

9    JUROR LEE:   Yes.

10    MR. BROWER:   How long ago was that?

11    JUROR LEE:   Well, he left last year.

12    MR. BROWER:   All right.

13    JUROR LEE:   But I . . . (inaudible)

14    MR. BROWER:   So you haven't talked with him about

15    your subpoena service?

16    JUROR LEE:   . . . (inaudible)

17    MR. BROWER:   You haven't—Did he talk about his

18    next-door neighbor, by chance?

19    JUROR LEE:   . . . (inaudible)

20    MR. BROWER:   Ms. Laroy, you heard something about

21    the—read something in the paper; is that correct?

22    JUROR LEE:   . . . (inaudible)

23    MR. BROWER:   And you'd be able to set that aside?

24    JUROR LEE:   . . . (inaudible)

25    MR. BROWER:   That's not evidence.   That's not to be

1   considered.   Your determination has to be based on the

2   evidence that's presented and the testimony; is that correct?

3          JUROR LEE:   . . . (inaudible)

4          MR. BROWER:   Pardon me?

5          JUROR LEE:   It would not influence my decision.

6          MR. BROWER:   Okay.   For either of you—Ms. Lee or

7   Ms. Laroy—the circumstantial evidence discussion, do you

8   believe as the others did that circumstantial evidence alone,

9   depending on how it fits with other evidence and the nature of

10  that evidence, that that could be enough for you to believe

11  that someone committed a crime beyond a reasonable doubt.

12         JUROR LEE:   . . . (inaudible)

13         MR. BROWER:   Thank you.   I have nothing further,

14  your Honor.

15         THE COURT:   Mr. Svikis?

16         MR. SVIKIS:   Ms. Laroy, do you have any handgun

17  knowledge?

18         JUROR LAROY:   . . . (inaudible)

19         MR. SVIKIS:   No.   Ever shot one?

20         JUROR LAROY:   . . . (inaudible)

21         MR. SVIKIS:   Okay.

22         The location that we're talking about on

23  Stadium Drive, Gale's Hardware; are you familiar with that

24  area?

25         JUROR LAROY:   Yes.

145

1       MR. SVIKIS:   Have you been in that area recently?

2       JUROR LAROY:   . . . (inaudible)

3       MR. SVIKIS:   Ms. Lee, are you familiar with the

4  Stadium Drive area we're talking about?

5       JUROR LEE:   Yes.

6       MR. SVIKIS:   Have you been in that area lately?

7       JUROR LEE:   . . . (inaudible)

8       MR. SVIKIS:   And what about your handgun knowledge;

9  do you have any of that?

10      JUROR LEE:   . . . (inaudible)

11      THE COURT:   The State have any peremptory

12  challenges?

13      MR. BROWER:   Your Honor, the People would thank

14  excuse—and excuse Ms. Harkness in seat three.

15      THE COURT:   Ms. Harkness, you're excused.   Thank

16  you for coming here today.

17      Do you have any, Mr. Svikis?

18      MR. SVIKIS:   Yes.   Thank and excuse Ms. Laroy in

19  seat seven.

20      THE COURT:   Ms. Laroy, you're excused.   Thank you

21  for coming today.

22      Seat three, please.

23      THE CLERK:   Heather Elwell.

24      THE COURT:   Seat seven.

25      THE CLERK:   James Wilson.

146

1   THE COURT:   Okay.  Mr. Wilson and Ms. Elwell, did

2   you hear all the questions asked up to this point?

3   (No audible response)

4   Do either of you know the attorneys or the

5   defendant?

6   (No audible response)

7   Either of you know any of the witnesses?

8   (No audible response)

9   Have either of you read or heard anything about this

10  case?

11  (No audible response)

12  Have either of you ever sat on a jury?

13  Mr. Elwell—or Mr. Wilson, you have?

14  JUROR WILSON:   Yes.

15  THE COURT:   When, sir?

16  JUROR WILSON:   Three times.  I sat on two DWIs and

17  one manslaughter case.

18  THE COURT:   In this county?

19  JUROR WILSON:   No.  The state of Virginia and the

20  state of Ohio.

21  THE COURT:   Okay.  How long have you lived in

22  Michigan?

23  JUROR WILSON:   Fourteen months.

24  THE COURT:   That's long enough.

25  You're a jury—a juror magnet.

147

1         JUROR WILSON:   . . . (inaudible)

2         THE COURT:   So this is the third state that's

3 tagged you?

4         JUROR WILSON:   Yes.

5         THE COURT:   Out of how many?

6         JUROR WILSON:   Four.

7         THE COURT:   Anything about that previous

8 experience, sir, that you feel might cause you to favor one

9 side or the other?

10         JUROR WILSON:   No.

11         THE COURT:   Did you both hear me explain the

12 principles regarding the presumption of innocence, the burden

13 of proof, and proof of guilt beyond a reasonable doubt?

14         (No audible response)

15         Would either of you have any difficulty accepting

16 those principles if you were on this jury?

17         (No audible response)

18         Is there anything about the nature of this case

19 that's such that you could not be fair?

20         (No audible response)

21         Do any of you—or either of you—have any contacts or

22 relationships or such that might cause you to favor one side

23 or the other such as law enforcement or anything of that

24 nature?  Friends or acquaintances involved?

25         JUROR ELWELL:   I had a friend who's a police

1  officer.  .  .  .  (inaudible) It wouldn't influence me at all.

2  I don't even know his last name.

3           THE COURT:   Okay.  Didn't impress you much?

4           JUROR ELWELL:   What's that?

5           THE COURT:   I take it he didn't—He or she didn't

6  impress you a great deal.

7           Is there anything at all that we brought up here

8  today throughout the day up to this point that might be

9  important for myself or the lawyers to know about your

10 background or experiences?

11          Mr. Wilson?

12          JUROR WILSON:   I have quite a bit of experience in

13 the analysis of ballistics . . . (inaudible) of

14 projectiles—mostly for handguns.

15          THE COURT:   I don't—I'll have to let the lawyers

16 handle that.  I'm not sure whether or not that would in any

17 way impact anything involved in this case.

18          You understand you're going to have to—I don't

19 recall that ballistics was an issue, but I may be wrong.

20          MR. SVIKIS:   It arises as—but that's—

21          THE COURT:   I don't think it's a critical matter if

22 I recall what I know about the case.  I'll let you gentlemen

23 take care of it if you think it is.

24          Anything other than that?

25          (No audible response)

149

(Tape No. C2005-021, 2-07-05, 02:47)

1         Mr. Brower?

2         MR. BROWER:   Well, let me get to it right away.

3         Are you returning [*sic*]—referring to the design of

4 the weapons and the engineering so that the projectile turns

5 and goes in a straight line—that kind of ballistics part of

6 it?

7         JUROR WILSON:   No, I'm a statistician.   We're

8 trained to study the effects . . . (inaudible)—

9         MR. BROWER:   All right.

10         JUROR WILSON:   . . . (inaudible) Basically, it's

11 weapon effectiveness.

12         MR. BROWER:   Okay.   Are you in any way, shape, or

13 form an expert as to gunshot residue or related areas?

14         JUROR WILSON:   Not gunshot residue, no.

15         MR. BROWER:   All right.

16         The lands and grooves or the striations that are

17 left on a projectile after it passes through the bar—the

18 barrel of a gun, is that something that you deal with?

19         JUROR WILSON:   I'm very familiar with it—

20         MR. BROWER:   All right.

21         JUROR WILSON:   —'cause it affects the effectiveness

22 . . . (inaudible)

23         MR. BROWER:   Okay.

24         I want to ask a question, Mr. Wilson, about your

25 prior jury service.   At least—Is my understanding at least

1   three other criminal trials?

2           JUROR WILSON:   . . . (inaudible)

3           MR. BROWER:   That's a yes?

4           JUROR WILSON:   . . . (inaudible)

5           MR. BROWER:   Okay.  So you've had experience

6   applying the burden of proof?

7           JUROR WILSON:   Yes.

8           MR. BROWER:   Those were all criminal cases.  They

9   all had the same burden of proof beyond a reasonable doubt.

10  Now I expect that with the drunk driving cases—You said you

11  had two of those?

12          JUROR WILSON:   . . . (inaudible)

13          MR. BROWER:   Those are based maybe entirely on the

14  testimony of the officer that made these observations

15  . . . (inaudible)

16          JUROR WILSON:   Yes.

17          MR. BROWER:   That's direct evidence.

18          JUROR WILSON:   Right.

19          MR. BROWER:   Did you have an occasion in any of

20  those trials to evaluate circumstantial evidence?

21          JUROR WILSON:   In those two . . . (inaudible)

22          MR. BROWER:   Or any of them—all three of them.

23          JUROR WILSON:   Yes.

24          MR. BROWER:   All right.  Was that something that

25  you—that was compelling for you or you completely disregarded

151

1   because it was circumstantial in nature?  Do you remember

2   how—what, if any, place circumstantial evidence had at all?

3        JUROR WILSON:   I guess my mind is maybe more open

4   than others—

5        MR. BROWER:   Okay.

6        JUROR WILSON:   —because I'm an engineer and

7   scientist—

8        MR. BROWER:   All right.

9        JUROR WILSON:   —it's a little harder to take the

10  direct evidence.

11       MR. BROWER:   I have to ask a question about that.

12  Statisticians—

13       JUROR WILSON:   You're going to take a shot at me,

14  too.

15       MR. BROWER:   Yeah.  Well, you know—Yes.  There's a

16  perception—rightly or wrongly—that persons such as yourself

17  have a difficulty with things that aren't in black and white

18  and proven by science.

19       JUROR WILSON:   That perception exists.

20       MR. BROWER:   All right.  Is there any glimmer of

21  truth in that for yourself?

22       JUROR WILSON:   I guess I definitely have a tendency

23  to lean towards the . . . (inaudible)

24       MR. BROWER:   Okay.  DNA evidence—

25       JUROR WILSON:   DNA evidence—

152

1          MR. BROWER:   —satellite imagery showing the crime

2     in progress.

3          JUROR WILSON:   Yeah.

4          MR. BROWER:   Okay.

5          JUROR WILSON:   . . . (inaudible)

6          MR. BROWER:   All right.

7          And circumstances like mom turning her back and

8     turning around . . . (inaudible) circumstances are things

9     you'd have more difficulty with?

10          JUROR WILSON:   . . . (inaudible) some difficulty,

11    right.

12          MR. BROWER:   Ms. Elwell, you had expressed a

13    hardship previously.  Has that been resolved, or does it

14    remain unresolved?

15          JUROR ELWELL:   . . . (inaudible)

16          MR. BROWER:   Okay.  I'm concerned with that.  I

17    don't want you to feel distracted and say I wish this would

18    get done today because, you know.

19          JUROR ELWELL:   I actually called my boss, and he

20    said that it would be fine.

21          MR. BROWER:   Okay.  So—So being here—whether it

22    takes two days or three days or five days—is not something

23    that—that fact is not going to cause you to be distracted or

24    prevent you from being fair and impartial either to the

25    defendant or to the people of the state whom I represent.

                              153

1    JUROR ELWELL:  No.

2    MR. BROWER:  Thank you.  I have nothing further,

3    your Honor.

4    THE COURT:  Mr. Svikis?

5    MR. SVIKIS:  Mr. Wilson, I didn't—Maybe the judge

6    asked you.  On the cases that you sat on—on the drunk driving

7    cases—were you a foreman in either one of those?

8    JUROR WILSON:  No.

9    MR. SVIKIS:  And what were the verdicts in those;

10   do you remember?

11   JUROR WILSON:  Guilty.

12   MR. SVIKIS:  Both times?

13   JUROR WILSON:  Both times.

14   MR. SVIKIS:  And the third case was a negligent

15   homicide case?

16   JUROR WILSON:  Yes.

17   MR. SVIKIS:  And was a gunshot or automobile

18   involved in that?

19   JUROR WILSON:  Yes.

20   MR. SVIKIS:  Both?

21   JUROR WILSON:  Automobile.

22   MR. SVIKIS:  Automobile.  Okay.

23   And were you a foreman in that?

24   JUROR WILSON:  No.

25   MR. SVIKIS:  And what was the outcome in that?

154

1    JUROR WILSON:   Guilty.

2    MR. SVIKIS:   Do you yourself own firearms then?

3    JUROR WILSON:   I wouldn't have one in the house.

4    MR. SVIKIS:   In your line of work have you had

5  occasion to—to fire a handgun?

6    JUROR WILSON:   Yes.

7    MR. SVIKIS:   Do you have to do that in your line of

8  work?

9    JUROR WILSON:   No.   There's a familiarity training

10  session.

11    MR. SVIKIS:   You've only—You're a resident of

12  Kalamazoo County.   Are you at all familiar with this location

13  on Stadium Drive . . . (inaudible) None?

14    JUROR WILSON:   I know Stadium Drive.

15    MR. SVIKIS:   That's it?

16    JUROR WILSON:   That's about it.

17    MR. SVIKIS:   Okay.   All right.

18    JUROR WILSON:   And I know where . . . (inaudible)

19  is. . . . (inaudible)

20    MR. SVIKIS:   All right.   Thank you.

21    Ms. Elwell, do you have any—do you own a handgun?

22    JUROR ELWELL:   No, my husband does.

23    MR. SVIKIS:   Your husband does.

24    Do you know what—what they are?

25    JUROR ELWELL:   . . . (inaudible) tell you.

155

1      MR. SVIKIS:   Okay.  Have you ever shot it?

2      JUROR ELWELL:   . . . (inaudible)

3      MR. SVIKIS:   And the location on Stadium Drive next

4  to Gale's Hardware, are you familiar with it?

5      JUROR ELWELL:   Stadium, but not—

6      MR. SVIKIS:   Not that one.  Okay.  All right.

7      I have no further questions.

8      THE COURT:   Challenges with the State?

9      MR. BROWER:   People pass, your Honor.

10     MR. SVIKIS:   I'd like to thank and excuse

11  Mr. Wilson.

12     THE COURT:   Mr. Wilson, you're excused.  Thank you

13  for coming today.

14     Let's take a short recess.

15     Those of you seated in the jury box, please recall

16  which—where your seat is located 'cause when we resume I'd

17  like you to take those seats.

18     Let's—Let's see if we can have about a ten or a

19  15-minute recess and then get back here.

20     (At 2:55 p.m., court recessed)

21     (At 3:16 p.m., proceedings reconvened)

22     THE COURT:   . . . (speaker began prior to tape

23  starting) please.

24     THE CLERK:   Julie Weeks.

25     THE COURT:   Ms. Weeks, did you hear all the

156

1    questions we've asked up to now?

2              JUROR WEEKS:   Yes, sir.

3              THE COURT:   Do you know either of the lawyers,

4    ma'am?

5              JUROR WEEKS:   No.

6              THE COURT:   Do you know the defendant or anybody

7    that we said may be called as witnesses?

8              JUROR WEEKS:   . . . (inaudible)

9              THE COURT:   Do you recall reading or hearing

10   anything about this case?

11             JUROR WEEKS:   No.

12             THE COURT:   Have you ever sat on a jury, ma'am?

13             JUROR WEEKS:   No.

14             THE COURT:   Did you hear me explain the principles

15   regarding the presumption of innocence, the burden of proof,

16   and proof of guilt beyond a reasonable doubt?

17             JUROR WEEKS:   . . . (inaudible)

18             THE COURT:   Would you have any difficulty accepting

19   them if you were on this jury?

20             JUROR WEEKS:   . . . (inaudible)

21             THE COURT:   Is there anything about the nature of

22   this case that's such that you could not be fair?

23             JUROR WEEKS:   I don't believe so.

24             THE COURT:   Do you know of any relatives, friends,

25   or acquaintances ever involved with similar matters?

1    JUROR WEEKS:   No.

2    THE COURT:   Are you in any way associated with law

3    enforcement or have any relatives or friends involved in law

4    enforcement or anything like that?

5    JUROR WEEKS:   No.

6    THE COURT:   Is there anything that we brought up

7    here today that you think might be important based on our

8    questions for us to know about your background or experience?

9    JUROR WEEKS:   . . . (inaudible)

10   THE COURT:   Say—Say—

11   JUROR WEEKS:   I own a handgun.

12   THE COURT:   Oh, okay.   Would that affect you one

13   way or the other?

14   JUROR WEEKS:   . . . (inaudible)

15   THE COURT:   Mr. Brower?

16   MR. BROWER:   It seems like in every trial there's

17   at least one hot seat, and right now that one's it.

18   Circumstantial evidence.   When you—Before you heard

19   the discussions, would you have said that I think

20   circumstantial evidence is kind of inferior to the other

21   kind—you know, the direct stuff?

22   JUROR WEEKS:   . . . (inaudible)

23   MR. BROWER:   Okay.   Much in the same way that

24   direct evidence would depend on the circumstances.   The fact

25   that it is classified as DNA evidence or—or something

158

1    similar—some other scientific evidence—means nothing unless

2    you consider the context; is that right?

3            JUROR WEEKS:   . . . (inaudible)

4            MR. BROWER:   The same is true for circumstantial

5    evidence?

6            JUROR WEEKS:   . . . (inaudible)

7            MR. BROWER:   Do you foresee a scenario where you

8    could, in fact, convict based on circumstantial evidence

9    alone?

10            JUROR WEEKS:   . . . (inaudible)

11           MR. BROWER:   Thank you.  Nothing further.

12           THE COURT:  Mr. Svikis?

13           MR. SVIKIS:  Ms. Weeks, I have your questionnaire,

14    and your occupation is RNC.  That's—

15           JUROR WEEKS:   That's certification

16    . . . (inaudible)

17           MR. SVIKIS:   And that certification is out of an

18    Associate's degree?

19           JUROR WEEKS:   Yes.

20           MR. SVIKIS:   And the handgun that you own, what is

21    that?

22           JUROR WEEKS:   Beretta.

23           MR. SVIKIS:   Caliber?

24           JUROR WEEKS:   It's a semiautomatic

25    . . . (inaudible)

1          MR. SVIKIS:   All right.   Have you had—you or anyone

2  in your family—experience with domestic violence?

3          JUROR WEEKS:   No.

4          MR. SVIKIS:   We've talked about a location on

5  Stadium Drive in Kalamazoo.  Do you know where that is?

6          JUROR WEEKS:   Yes.

7          MR. SVIKIS:   Are you familiar with the—what's now

8  Bronco Mart—I think it was Minute Mart.—next to Gale's

9  Hardware?

10         JUROR WEEKS:   . . . (inaudible)

11         MR. SVIKIS:   Never been in there.   Okay.

12         I have no further questions.

13         THE COURT:   State have any peremptory challenges?

14         MR. BROWER:   People pass, your Honor.

15         THE COURT:   Mr. Svikis?

16         MR. SVIKIS:   I'd like to thank and excuse juror in

17  seat number five, Kathryn Ellis.

18         THE COURT:   All right.   Ms. Ellis, you're excused.

19  Thank you for coming.

20         Seat five.

21         THE CLERK:   Wendi Verlin.

22         THE COURT:   Ma'am, did you hear all the questions

23  we've asked?

24         JUROR VERLIN:   Yes.

25         THE COURT:   Do you know either of the lawyers?

1        JUROR VERLIN:   No.

2        THE COURT:   Do you know the defendant or any of the

3 witnesses I said might be called?

4        JUROR VERLIN:   . . . (inaudible)

5        THE COURT:   Have you read or heard anything about

6 this case that you recall?

7        JUROR VERLIN:   I just recall when it happened

8 because when I would drive down Stadium Drive a lot, I

9 remember—I just remember looking and thinking—knowing a place

10 in that area—

11        THE COURT:   A little anxious about it.

12        JUROR VERLIN:   Hmm?

13        THE COURT:   You were a little anxious?

14        JUROR VERLIN:   Yes.

15        THE COURT:   Okay.

16        JUROR VERLIN:   It felt a little strange.

17        THE COURT:   That's natural.

18        Other than that do you recall—Did you ever

19 go—patronize the store or anything like that?

20        JUROR VERLIN:   . . . (inaudible)

21        THE COURT:   So you just recall when it happened?

22 What is—That would be about 15 years ago now.   Anything about

23 that that you feel would cause you to favor one side or the

24 other?

25        JUROR VERLIN:   No.

1    THE COURT:   I don't—If I asked you, I don't recall

2    it.  Have you ever been on a jury?

3        JUROR VERLIN:   . . . (inaudible)

4        THE COURT:   Did you hear me explain the principles

5    that relate to the presumption of innocence, the burden of

6    proof, and proof of guilt beyond a reasonable doubt?

7        JUROR VERLIN:   . . . (inaudible)

8        THE COURT:   Would you have any difficulty accepting

9    those principles?

10       JUROR VERLIN:   . . . (inaudible)

11       THE COURT:   Is there anything about the nature of

12   this case that you could be fair?

13       JUROR VERLIN:   . . . (inaudible)

14       THE COURT:   Do you have any contacts or ties with

15   anybody involved with law enforcement or the legal profession?

16       JUROR VERLIN:   I have an old friend who's a

17   police—Kalamazoo police force—but I don't have any contacts

18   with him.

19       THE COURT:   It's a—an acquaintance of yours from

20   the past?

21       JUROR VERLIN:   . . . (inaudible)

22       THE COURT:   Would that influence you one way or the

23   other in this case?

24       JUROR VERLIN:   No.

25       THE COURT:   Are you aware of any close relatives,

162

1    friends, or acquaintances or yourself personally ever being

2    involved with matters of this nature?

3              JUROR VERLIN:   I don't know if this

4    . . . (inaudible), but a whole family from about nine years

5    ago in Grand Rapids was murdered.

6              THE COURT:   Were you involved in it in any way?

7              JUROR VERLIN:   No . . . (inaudible)

8              THE COURT:   You just knew of it?

9              JUROR VERLIN:   Yeah . . . (inaudible)

10             THE COURT:   Pardon?

11             JUROR VERLIN:   She was an old friend, so we—

12             THE COURT:   Okay.  Are you aware—Was it—Was she in

13   a business when she was—

14             JUROR VERLIN:   No.

15             THE COURT:   —when the homicide occurred or—

16             JUROR VERLIN:   She was living in a halfway house

17   and took a ride from somebody and—

18             THE COURT:   Something happened—She had had some

19   difficulties in her life and then was living at a halfway

20   house for rehabilitation, and it occurred there?

21             JUROR VERLIN:   It occurred when she took a ride

22   with somebody.  And then they found her hours later.

23             THE COURT:   I see.  Would that affect how you would

24   evaluate this case, or could you put that aside?

25             JUROR VERLIN:   I would hope I could.

163

1    THE COURT:   Well, you understand you got to decide
2  this case on what you see and hear in the courtroom and not
3  some experience that my have happened to an acquaintance nine
4  years ago?  You think you could do that?
5    JUROR VERLIN:   . . . (inaudible)
6    THE COURT:   Can you think of any reason why you
7  couldn't be fair based on anything we've said here?
8    JUROR VERLIN:   . . . (inaudible)
9    THE COURT:   Mr. Brower?
10    MR. BROWER:   Ma'am, by now you have probably a
11  fairly good sense that circumstantial evidence may be
12  important in this case.  I need to know when you walked in
13  here would you have said or thought that circumstantial
14  evidence is—that's a second cousin to real evidence.  That's
15  something that I'm not sure that I would be able to convict
16  somebody on.  Is that something that you would have felt
17  before this?
18    JUROR VERLIN:   No.
19    THE COURT:   Can you foresee that depending on what
20  the circumstantial evidence is and its relation to other—other
21  facts, that you could, in fact, return a verdict of guilty
22  based on that circumstantial evidence?
23    JUROR VERLIN:   Yes.
24    MR. BROWER:   Okay.  It's difficult because you
25  don't know yet.  You haven't been able to apply it, right?

164

1    But do you—Would you have the same hesitation if the evidence

2    was direct evidence instead of circumstantial?   would you want

3    to evaluate both kinds of evidence or—

4            JUROR VERLIN:   Well, I think most people would like

5    to evaluate both.

6            MR. BROWER:   Sure.

7            JUROR VERLIN:   . . . (inaudible)—We have to

8    evaluate what we're given.

9            MR. BROWER:   Yes.   You still seem a little bit

10   hesitant to me.

11           JUROR VERLIN:   Well, it's hard.   It's hard when you

12   get up here just to say yes, yes, I would.   I think I would do

13   the job the Court asked—

14           MR. BROWER:   Uhm-hmm.

15           JUROR VERLIN:   —me to do.   And if it's

16   circumstantial evidence that we have, then that's—

17           MR. BROWER:   What I don't want to hear is—when this

18   trial is all through with—that you said I would never be able

19   to convict anybody based on circumstantial evidence just as a

20   general rule.

21           JUROR VERLIN:   . . . (inaudible)

22           MR. BROWER:   Okay.   Thank you.

23           THE COURT:   Mr. Svikis?

24           MR. SVIKIS:   I don't have any questions

25           THE COURT:   Okay.   Peremptories are with you,

                            165

1    Mr. Brower.

2          MR. BROWER:   People pass, your Honor.

3          THE COURT:   Mr. Svikis?

4          MR. SVIKIS:   I'd like to thank and excuse juror in

5    seat seven, Ms. Weeks.

6          THE COURT:   Ms. Weeks, you're excused.

7          Go ahead.

8          THE CLERK:   William Crockett.

9          THE COURT:   Mr. Crockett, did you hear all the

10   questions?

11         JUROR CROCKETT:   Yes, sir.

12         THE COURT:   Do you know either of the lawyers?

13         JUROR CROCKETT:   No.

14         THE COURT:   Do you know the defendant?

15         JUROR CROCKETT:   No.

16         THE COURT:   Have you read or heard anything about

17   this case?

18         JUROR CROCKETT:   . . . (inaudible)

19         THE COURT:   Have you ever served on a jury,

20   Mr. Crockett?

21         JUROR CROCKETT:   No, I haven't.

22         THE COURT:   Did you hear me explain the principles

23   regarding the presumption of innocence, the burden of proof,

24   and proof of guilt beyond a reasonable doubt?

25         JUROR CROCKETT:   Yes, sir.

1    THE COURT:   Would you have any difficulty accepting

2    those if you were on this jury?

3        JUROR CROCKETT:   Not at all.

4        THE COURT:   Do you have any health or medical

5    problems that would interfere with you being on the jury?

6        JUROR CROCKETT:   . . . (inaudible)

7        THE COURT:   Do you have any relationships or

8    affiliations in respect to the legal profession or law

9    enforcement or anything like that?

10       JUROR CROCKETT:   No, sir.

11       THE COURT:   Have you yourself personally or had

12   other relatives, friends, or acquaintances involved with

13   charges similar to this?

14       JUROR CROCKETT:   Well, somewhat.   My brother that's

15   in another state committed murder accidently.

16       THE COURT:   Were you involved in that in any way,

17   sir?

18       JUROR CROCKETT:   No.

19       THE COURT:   Do you know anything about that case?

20       JUROR CROCKETT:   No.

21       THE COURT:   Would you in any way be sympathetic

22   towards one side or the other in this case because of that?

23       JUROR CROCKETT:   . . . (inaudible)

24       THE COURT:   Can you think of any reason why you

25   couldn't be a fair juror?

167

1    JUROR CROCKETT:   Pardon me?

2    THE COURT:   Can you think of any reason why you

3    couldn't be a fair juror?

4    JUROR CROCKETT:   No.

5    THE COURT:   Mr. Brower?

6    MR. BROWER:   Mr. Crocker, you stood in line with

7    many others indicating that you had a hardship.  I think you

8    mentioned it was something that's coming up this week

9    Wednesday; is that correct?

10    JUROR CROCKETT:   Yes.  A pesticide test.

11    MR. BROWER:   Okay.  That was related to your job?

12    JUROR CROCKETT:   Right.

13    MR. BROWER:   Has that conflict been resolved?

14    JUROR CROCKETT:   Yes.

15    MR. BROWER:   It has.  It is not going to be a

16    distraction to you; is that correct?

17    JUROR CROCKETT:   Correct.

18    MR. BROWER:   Okay.  So anything job-related would

19    not be affecting your ability to sit and listen to the

20    evidence and render a decision; is that right?

21    JUROR CROCKETT:   Not at all.

22    MR. BROWER:   Do you feel as the others have

23    indicated that circumstantial evidence by itself

24    . . . (inaudible) but it could be enough for you to return a

25    verdict of guilty?  You don't feel that circumstantial

168

1    evidence is something that you'd never be able to return a

2    verdict of guilty on; is that correct?

3          JUROR CROCKETT:   . . . (inaudible)

4          MR. BROWER:   The case with your brother, was he

5    charged with something?

6          JUROR CROCKETT:   Yes.

7          MR. BROWER:   The police investigation and the

8    prosecuting authority—whoever it might be, district attorney,

9    whatever—do you believe that they were fair in the way they

10   treated him?

11         JUROR CROCKETT:   No, I don't.

12         MR. BROWER:   That—Those feelings, would that result

13   in some—Would that affect the way you would interpret the

14   credibility of officers who testify in this case or—

15         JUROR CROCKETT:   . . . (inaudible)

16         MR. BROWER:   So it's not a general feeling?

17         JUROR CROCKETT:   No.

18         MR. BROWER:   Would the same be true of the

19   prosecuting officials?  Could you set aside the feelings you

20   have for that and evaluate the case here?

21         JUROR CROCKETT:   Right.

22         MR. BROWER:   Thank you.

23         THE COURT:   Mr. Svikis?

24         MR. SVIKIS:   I have no questions.

25         THE COURT:   Mr. Brower?

                              169

1        MR. BROWER:   Your Honor, I'm going to thank and

2   excuse Mr. Crockett in seat number seven.

3        THE COURT:   You're excused, Mr. Crockett.

4        Does the defense have any at this time?

5        MR. SVIKIS:   Yes.  Thank and excuse juror in seat

6   number five, Ms. Verlin.

7        THE COURT:   Okay.  Ms. Verlin, you're excused.

8   Thank you for coming today.

9        Let's see.  Let's do seat five first.

10       THE CLERK:   Patrick Everett.

11       THE COURT:   Seat seven.

12       THE CLERK:   Bruce Rader.

13       THE COURT:   Okay.  Mr. Everett and Mr. Rader, did

14  you hear all the questions?

15       UNIDENTIFIED JUROR:   Yes, sir.

16       THE COURT:   Do either of you know the defendant or

17  any of the attorneys?

18       UNIDENTIFIED JUROR:   No.

19       THE COURT:   Did either of you recognize the names

20  of any of the witnesses?

21       UNIDENTIFIED JUROR:   No.

22       THE COURT:   Have either of you read or heard

23  anything about the case?

24       UNIDENTIFIED JUROR:   I read about it years ago.

25       THE COURT:   Pardon?

                        170

1          UNIDENTIFIED JUROR:    I read about it years ago in

2     the paper.

3          THE COURT:   Okay.  Was that quite a while ago, sir?

4          UNIDENTIFIED JUROR:   . . . (inaudible)

5          THE COURT:   Is there anything about that at this—at

6     this time that you feel might influence how you decide this

7     case?

8          UNIDENTIFIED JUROR:   Not at all.

9          THE COURT:   You understand you got—whatever it is

10    that you may have read—you got to put that aside and decide

11    the case on what's done in this courtroom?

12         UNIDENTIFIED JUROR:   . . . (inaudible)

13         THE COURT:   Have either of you ever been on a jury?

14         JUROR EVERETT:   Yes, sir.

15         THE COURT:   Okay.  Mr. Everett, you have?

16         JUROR EVERETT:   Yes, sir.

17         THE COURT:   Where, sir?

18         JUROR EVERETT:   Here. . . . (inaudible)

19         THE COURT:   Okay.  Circuit court, district court

20    or—

21         JUROR EVERETT:   Both.

22         THE COURT:   Both?  Were they civil cases or

23    criminal cases?

24         JUROR EVERETT:   One was a DUI and . . . (inaudible)

25    was a possession of stolen articles.

                         171

1      THE COURT:   And what?

2      JUROR EVERETT:   Possession of stolen articles.

3      THE COURT:   Okay.  Anything about those cases that

4   you feel would make you sympathetic or predisposed to side

5   with one side or the other in this case?

6      JUROR EVERETT:   No.

7      THE COURT:   Did both of you hear me explain the

8   principles regarding the presumption of innocence, the burden

9   of proof, and proof of guilt beyond a reasonable doubt?

10      UNIDENTIFIED JUROR:   . . . (inaudible)

11      THE COURT:   Any difficulty accepting those

12   principles?

13      UNIDENTIFIED JUROR:   No.

14      THE COURT:   Have either of you had any relatives,

15   friends, or acquaintances or yourself personally ever involved

16   with similar charges as this?

17      UNIDENTIFIED JUROR:   No.

18      THE COURT:   Can either—Do either of you have any

19   relationships or associations with anybody involved in law

20   enforcement or the legal profession or anything like that?

21      UNIDENTIFIED JUROR:   Yes, my niece is a lawyer.

22      THE COURT:   And where does she practice, if she

23   does?

24      UNIDENTIFIED JUROR:   . . . (inaudible)

25      THE COURT:   Pardon?

172

1    UNIDENTIFIED JUROR:   I don't know.

2    THE COURT:   You don't know?   Okay.   Would that

3    affect how you'd evaluate the case?

4    UNIDENTIFIED JUROR:   . . . (inaudible)

5    THE COURT:   Okay.   Can either of you think of

6    anything at all that might be important for myself or the

7    lawyers to know about your background or experiences before we

8    decide whether or not you'd be—you should be seated as a juror

9    based on what we've said up to this point?

10    UNIDENTIFIED JUROR:   No.

11    THE COURT:   Mr. Brower?

12    MR. BROWER:   Mr. Everett, I see that your arm's in

13    a sling.   Are you in any discomfort?

14    JUROR EVERETT:   A little bit, yeah.

15    MR. BROWER:   To the point where the pain would be a

16    distraction or—

17    JUROR EVERETT:   Not today.

18    MR. BROWER:   Not today.

19    JUROR EVERETT:   . . . (inaudible)

20    MR. BROWER:   Are you on any medication as a result?

21    JUROR EVERETT:   . . . (inaudible)

22    MR. BROWER:   If it became so uncomfortable that you

23    needed to—to take medication during the course of this trial,

24    would that cause you to be distracted or unintentionally

25    inattentive?

173

1        JUROR EVERETT:   Possibly.

2        MR. BROWER:   Based on your experience over the

3   last—How long ago did you say—

4        JUROR EVERETT:   . . . (inaudible)

5        MR. BROWER:   —in the last couple of weeks, if you

6   were a criminal defendant would you want to be—have someone

7   such as yourself that's taking that kind of medication sitting

8   in judgment?

9        JUROR EVERETT:   Probably not.

10        MR. BROWER:   Mr. Rader, sometimes—The

11   questionnaires are old and outdated, and sometimes they're

12   misunderstood and so on.  But it appears as though you might

13   have had some contact with the legal authorities sometime

14   previously; is that correct?

15        JUROR RADER:   . . . (inaudible)

16        MR. BROWER:   How long ago was that, sir?

17        JUROR RADER:   . . . (inaudible) about a month ago.

18        MR. BROWER:   Okay.  Was that here in

19   Kalamazoo County?

20        JUROR RADER:   Yes.

21        MR. BROWER:   Was that a criminal matter?

22        JUROR RADER:   A misdemeanor.

23        MR. BROWER:   Was that prosecuted by the

24   . . . (inaudible) Kalamazoo County prosecutor's office?

25        JUROR RADER:   No.

174

(Tape No. C2005-021, 2-07-05, 03:37)

1      MR. BROWER:   It's a different jurisdiction?

2      JUROR RADER:   . . . (inaudible)

3      MR. BROWER:   Okay.   It's still pending?

4      JUROR RADER:   . . . (inaudible)

5      MR. BROWER:   Was that situation something

6  that—Well, what police agency was involved?

7      JUROR RADER:   . . . (inaudible)

8      MR. BROWER:   The city police?

9      JUROR RADER:   Yeah.

10      MR. BROWER:   Same department that's involved

11  in—well, the officers' whose names were . . . (inaudible) from

12  the Kalamazoo Department of Public Safety, that department?

13      JUROR RADER:   Yeah.

14      MR. BROWER:   You didn't recognize any of the names

15  of those individuals?

16      JUROR RADER:   . . . (inaudible)

17      MR. BROWER:   Thank you.

18      THE COURT:   Mr. Svikis?

19      MR. SVIKIS:   Thank you.

20      Mr. Everett, I didn't hear—The questions the judge

21  first asked you, did he ask you about whether you had anyone

22  in law enforcement or a spouse or something?

23      JUROR EVERETT:   I've got a niece that's a lawyer.

24      MR. SVIKIS:   Okay.

25      JUROR EVERETT:   . . . (inaudible)

175

1    MR. SVIKIS:   All right.   That was—That's the part

2    of the answer I heard.   Okay.   I have—

3          Do you have any familiarity with firearms—handguns?

4          JUROR EVERETT:   Yes, sir.

5          MR. SVIKIS:   Do you own any?

6          JUROR EVERETT:   A shotgun.

7          MR. SVIKIS:   A shotgun?   Any handguns?

8          JUROR EVERETT:   No.

9          MR. SVIKIS:   Okay.   I have no further questions.

10          THE COURT:   Any challenges—Let's see.   I believe

11    they're with—with you, Mr. Brower.

12          MR. BROWER:   No challenges for cause, your Honor.

13    Peremptory challenge, I would excuse—thank and excuse

14    Mr. Rader in seat number seven.

15          THE COURT:   Okay.   Mr. Rader, you're excused.

16          Mr. Svikis, do you have any at this time?

17          MR. SVIKIS:   No, your Honor.

18          THE CLERK:   Karla Stone.

19          THE COURT:   Ms. Stone, did you hear all the

20    questions we've asked?

21          JUROR STONE:   . . . (inaudible)

22          THE COURT:   Do you know either of the lawyers?

23          JUROR STONE:   No.

24          THE COURT:   Do you know the defendant?

25          JUROR STONE:   No.

                              176

1    THE COURT:   Did you recognize the names of any of

2    the witnesses that we said would be called?

3    JUROR STONE:   . . . (inaudible)

4    THE COURT:   Have you read or heard anything about

5    this case?

6    JUROR STONE:   . . . (inaudible)

7    THE COURT:   Have you ever been on a jury?

8    JUROR STONE:   No.

9    THE COURT:   Did you hear me explain the principles

10   regarding the presumption of innocence, the burden of proof,

11   and proof of guilt beyond a reasonable doubt?

12   JUROR STONE:   Yes.

13   THE COURT:   Any difficulty accepting those?

14   JUROR STONE:   No.

15   THE COURT:   Do you have any health or medical

16   problems that would interfere with you being on the jury?

17   JUROR STONE:   No.

18   THE COURT:   Is there anything about the nature of

19   this case that's such that you couldn't be fair?

20   JUROR STONE:   No.

21   THE COURT:   Do you have any associations with

22   anybody involved in the legal profession or law enforcement or

23   anything like that?

24   JUROR STONE:   No.

25   THE COURT:   Can you think of anything at all based

1   on other specific questions asked by myself or either of the

2   lawyers that might be important for us to know about your

3   background or experiences before you sit on this jury?

4          JUROR STONE:   No.

5          THE COURT:   Can you think of any reason why you

6   couldn't be a fair juror?

7          JUROR STONE:   . . . (inaudible)

8          THE COURT:   Mr. Brower?

9          MR. BROWER:   No challenges, your Honor.   People

10   pass.

11          MR. SVIKIS:   I have no questions.   We're satisfied.

12          THE COURT:   You're both satisfied?

13          MR. BROWER:   Yes, sir.

14          MR. SVIKIS:   Yes.

15          THE COURT:   You 14 will please stand.   You'll be

16   sworn as the jury.

17          THE CLERK:   Please raise your right hands.   Does

18   each of you solemnly swear or affirm that in this case now

19   before the court you will justly decide the questions

20   submitted to you; that unless you are discharged by the Court

21   from further deliberation you will render a true verdict; and

22   that you will render your verdict only on the evidence

23   introduced and in accordance with the instructions of the

24   Court, so help you God?

25          THE JURY (in unison):   (Mixed positive responses)

178

1          THE CLERK:    Thank you.

2          THE COURT:    The rest of the jury panel's excused.

3          (At 3:43 p.m., balance of jury panel excused)

4          (At 3:43 p.m., off record discussion)

5          Before we get started, we're going to pass out

6   notepads and pens for those of you who wish to take notes.

7   But I want to tell you, you don't have to take notes.  But if

8   you do, you should be careful that it doesn't distract you

9   from paying attention from the evidence.  And then when you go

10  to the jury room you may use those notes to help you remember

11  what happened in the courtroom.

12          So for those of you who do take notes, don't let

13  anyone except other jurors see those notes.  And then anytime

14  you leave here—at the end of the day or during the day when we

15  recess and, you know, break for lunch and you can leave the

16  building—you'll have to leave the notes here with the court

17  officer that is secure—so they may be secured and don't get

18  into the hands of anyone else.

19          Also, I want to forewarn you that you probably—you'd

20  have to be living in so me hermitage if you haven't seen TV

21  where you see all these instant replays and the court produces

22  transcripts miraculously on a ten-second notice.  That doesn't

23  happen in reality.  It is a very tedious process, so that's

24  why it's important to reproduce for you what's occurred—or to

25  produce a transcript because that requires somebody to go over

                              179

the tape and type it up.  And that takes hours.  Or it can take days.

The other alternative that courts have—such as this court which is—where we videotape everything—is to allow the jury to see the videotape.  However, that takes just as long as it took for that person to testify.  So it's a long tedious process.

And we're required by law to not let you just see certain little segments of it; you got to see the whole thing.  You see it all or nothing.  So I ought to tell you that right up-front.  So it's important that you pay close attention to what's being done and what's being said and what's being demonstrated so that—And that's why we let you take the notes so that you don't have to later on say I'm not sure what so-and-so said, can we just see that little part of it 'cause I can't let you see just that little part of it.  You got to see the whole thing—at least as to that witness.  So keep that in mind.

Now before we get started I want to give you some instructions as to the legal principles that you should know at this time and what the procedure is that we're going to follow.

Now for those of you who think you got to write this down, let me just tell you this: you'll be given a printed copy of the Court's final instructions as to the law when you

180

go to the jury room.  So there may be a few things that I tell you at this point that I won't tell you in the final instructions.  Those generally will have to do with procedural issues.  You do have to look at all of my instructions as a connected series which are the law that you're to follow.  But the final instructions, you will receive a printed copy of and have them with you in the jury room when you deliberate.

Now the procedure that's going to be followed in this case is as follows;

First, the prosecutor makes an opening statement where he gives you his theories about the case.  The defendant's lawyer doesn't have to make an opening statement; but he may make an opening statement after the prosecutor makes his or he may wait until later in the trial.  These statements are not evidence.  They're only meant to help you understand how each side views this case.

Next, the prosecutor presents his evidence.  The prosecutor may call witnesses to testify and may show you exhibits like documents or objects.  The defendant's lawyer has the right to cross-examine the prosecutor's witnesses.  After the prosecutor has presented all of his evidence, the defendant's attorney may also offer evidence but doesn't have to.  By law, the defendant does not have to prove his innocence or to produce any evidence whatsoever.

If the defense does call any witnesses, the

181

prosecutor has the right to cross-examine them.  The prosecutor may also call witnesses to contradict the testimony of defense witnesses.  After all of the evidence has been presented, the prosecutor and the defendant's lawyer will make their closing arguments.  Like opening statements, these are not evidence.  They're only meant to help you understand the evidence and the way each side sees this case.  You must base your verdict only on the evidence.

My responsibility as judge in this trial is to make sure that the trial is run fairly and efficiently, to make decisions about the evidence and to instruct you about the law that applies to this case.  You must take the law as I give it to you.  Nothing I say is meant to reflect my own opinions about the facts of the case because, as jurors, you are the ones who will decide this case.

Your responsibility as jurors is to decide what the facts of the case are.  This is your job and no one else's. you must think about all of the evidence and all of the testimony and then decide what each piece of evidence means and how important you think that it is.  This includes how much you believe what each of the witnesses said.  What you decide about any fact in this case is final.

When it's time for you to decide the case, you're only allowed to consider the evidence that was admitted in the case.  Evidence includes only the sworn testimony of witnesses

182

and the exhibits admitted into evidence and anything else I tell you to consider as evidence.  It's your job to decide what the facts of this case are.

You must decide which witnesses you believe and how important you think their testimony is.  You do not have to accept or reject everything a witness says.  You are free to believe all, none, or part of any person's testimony.

In deciding which testimony you believe, you should rely on your own common sense and everyday experience.  However, in deciding whether you believe a witness's testimony you must set aside any bias or prejudice that you may have that's based on race, gender, or national origin of the witness.

There is no fixed set of rules for judging whether you believe a witness, but it may help you to think about these questions:

Was the witness able to see or hear clearly?  How long was the witness watching or listening?  Was there anything else going on that might have distracted the witness?

Does the witness seem to have a good memory?

How does the witness look and act while testifying?  Does the witness seem to be making an honest effort to tell you the truth, or does the witness seem to evade questions or argue with the lawyers?

Does the witness's age or maturity affect how you

183

1    judge his or her testimony?

2          Does the witness have any bias or prejudice or any

3    personal interest in how this case is decided?

4          Have there been any promises, threats, suggestions,

5    or other influences that affect how the witness testifies?

6          In general, does the witness have any special reason

7    to tell you the truth or any special reason to lie?

8          All in all, how reasonable does the witness's

9    testimony seem when you think about all of the other evidence

10    in the case?

11          The questions the lawyers ask of witnesses are not

12    evidence; only the answers are evidence. You should—You

13    should not think that something is true just because one or

14    both of the lawyers asks questions or assumes or suggests that

15    it is.

16          Now it's possible during the course of the trial

17    that I may question some of the witnesses questions myself. If

18    that should happen, these questions are not meant to reflect

19    my opinions about the evidence. If I ask questions, my only

20    reason would be to ask about things which I think might be

21    helpful to you in deciding this case and which have not been

22    fully explored.

23          During the trial the lawyers may object to questions

24    or statements made by the other lawyer or by witnesses. If

25    that happens, I will rule on those objections according to the

1    law.  Excuse me.  My rulings for or against one side or the
2    other are not meant to reflect my opinion about the facts of
3    the case.

4         Sometimes the lawyers and I will have discussions
5    outside of your hearing.  Also, while you're in the jury room
6    I may have to take care of other matters—other cases that have
7    nothing to do with this case.  If that should happen, please
8    pay no attention to such interruptions.  We'll try to take
9    care of them as quickly as possible so as not to inconvenience
10   you.

11        You must not discuss this case with anyone,
12   including your family or friends.  You must not even discuss
13   it with the other jurors until the time comes for you to
14   decide the case.  When it's time for you to decide the case,
15   I'll send you to the jury room for that purpose.  Then you
16   should discuss the case amongst yourselves but only in the
17   jury room and only when all the jurors are there.  When the
18   trial is over, you may, if you wish, discuss the case with
19   anyone you please but not until then.

20        Now during this trial we're going to be calling
21   recesses, and you'll either be sent back to the jury room or
22   you may be allowed to leave the courthouse and go about your
23   business on your own.  During those times you are not to
24   discuss the case with anyone or let anyone discuss it with you
25   or in your presence.  If anyone tries to do that, tell him or

185

1    her to stop, and explain that as a juror you're not allowed to
2    discuss the case.  If that individual continues, leave their
3    presence at once and report that incident to the court officer
4    immediately upon your return to this building.

5         You must not talk to the defendant, the lawyers, or
6    the witnesses about anything at all during this trial, even if
7    it has nothing to do with the case.

8         It's very important that you only get information
9    about this case here in this courtroom when you're acting as
10   the jury and when the defendant and both lawyers and I are
11   present.

12        During this trial should there be any news media
13   reports either on radio, TV, or in the newsprint, do not read,
14   listen to, or watch any news reports about the case.  Under
15   the law, the evidence you consider to decide this case must
16   meet certain criteria or standards.

17        For example, witnesses must swear to tell the truth,
18   and a lawyer must be able to cross-examine them.  Because news
19   reports do not meet these requirements or standards, they
20   could give you an incorrect or misleading information or
21   impression about that case that might unfairly favor one side
22   or the other.  So, to be fair to both sides, you must follow
23   these instruction.

24        Now during this trial do not go to the scene of the
25   alleged crime.  If it's necessary for you to view the scene,

186

1    you'll be taken there as a group under the supervision of the

2    Court.  Do not investigate anything about this case on your

3    own or make any experiments.

4            As I've told you, I'm going to permit you to take

5    notes and they're to be used only as I directed you when those

6    notepads were passed out to you.

7            Now as may have been evident to you by some of our

8    questions, this case has been tried before.  And during this

9    trial you may hear some references to the first trial.

10   Sometimes a case must be retried before a new jury, and you

11   should not pay any attention to the—to the fact that this is

12   the second trial.  Your verdict must be based only on the

13   evidence in this trial.  You must decide the facts only from

14   what you yourself hear and see during the course of this

15   trial.

16           Now we've chosen a jury of 14.  I think one of the

17   lawyers—Maybe both of them did.—alluded to why we do that.

18   This—This trial is going to last over several days, and we try

19   to protect the fact that under the constitution the

20   defendant's entitled to have—and the prosecution—is entitled

21   to have this case decided by a jury of 12.  So to avoid any

22   unforeseen necessity that might make one or more of your

23   numbers absent from the ultimate decision to make sure we have

24   at least 12, we select—as in this case—two alternates.  And

25   what's important is that we don't determine who the alternates

1    are until the very end of the trial.

2            So jurors in seats 13 and 14, don't assume you're

3    the alternate. That'll be determined by lot at the end of the

4    trial. In other words, two names will be withdrawn. It could

5    be juror six and juror one. You don't—You don't know. So

6    it's important that you all pay close attention to everything

7    that happens during the course of the trial.

8            Possible penalties are not to influence your

9    decision. It my duty as judge to fix the penalties within the

10   limits provided for by law.

11           Now, as I told you, I may give you more instructions

12   during this trial; and then at the very end I'm going to give

13   you very detailed instructions about the law in this case.

14   You should consider all of my instructions as a connected

15   series. Taken together, they are the law that you must

16   follow.

17           After all the evidence has been presented to you and

18   the lawyers have made their closing arguments, as I said,

19   you'll get the detailed instructions about the rules of law

20   that apply to this case.

21           You'll then be sent to the jury room to deliberate

22   and decide on a verdict.

23           A verdict must be unanimous. That means that every

24   juror must agree on it, and it must reflect the individual

25   decision of each juror.

188

1     It's important during the course of this trial that

2  you keep an open mind and not make a decision about anything

3  in this case until you go to the jury room to decide that

4  case; that is, until you—at the very end, after closing

5  arguments and final instructions, when you're told to

6  deliberate.

7     Okay.  At this time we'll hear the opening statement

8  from the prosecution.

9     MR. BROWER:   Thank you, your Honor.

10     In the early 90s there were four Minute Markets here

11  in Kalamazoo County, Michigan: one on Sprinkle Road, one on

12  Gull Road, one on South Westnedge, and 2905 Stadium Drive.

13     Christine Dimmick and her live-in boyfriend both

14  worked at Minute Market stores.  Chris worked at the

15  South Westnedge store.  The boyfriend worked at Stadium Drive.

16     An opening came up for a manager position at

17  Stadium Drive, and Chris got the promotion; the boyfriend did

18  not.  He was unceremoniously transferred to the

19  South Westnedge store because people in a relationship cannot

20  work together at the same store.

21     Monday, February 4, 1991, was Chris's first day in

22  her new position as store manager.  Her career and her life

23  would come to a tragic end, however, before that week was out.

24     On Friday, February 8, 1980 [sic]—'91—Excuse me.—the

25  store owner received a call from a customer.  The

189

1    Stadium Drive store, which should have been open at

2    7:00 a.m.—the one that Chris was to have opened—was still

3    locked and dark.  The owner called the police.

4         The police responded, searched the building.

5    Christine Dimmick was found in the back room of the locked

6    building lying face down with two gunshot wounds through the

7    back and two more to the back of her head.

8         At first glance, this appeared to be a routine armed

9    robbery.  The police began their routine investigation.  They

10   contacted people associated with the business; friends, family

11   of the victim and asked questions.  The answers to their

12   questions, however, suggested that this was far from a routine

13   armed robbery.

14        Attention turned to the victim's boyfriend—someone

15   known to have been in the store with Chris that morning before

16   the store was to have opened.

17        Police worked the case for years, but the case

18   eventually went cold.  The case was no longer being actively

19   investigated.  Years went by.  Then in 2002 the case was

20   assigned to a group of police detectives from several area

21   departments known as the cold case homicide team.  These

22   detectives treated the case as a fresh case.  They recontacted

23   and reinterviewed the same witnesses that had been contacted

24   initially.  The other—Contacted and interviewed others

25   that—that had been named but not interviewed, and they looked

190

1    for new witnesses.

2              In May of 2003 the cold case detectives arrested the

3    defendant Patrick Kevin Mishall—Chris's boyfriend at the time

4    of the murder.  This case is about the anger, resentment,

5    jealously, and humiliation Patrick felt because of

6    Christine Dimmick—anger, resentment, jealously and humiliation

7    which drove him to kill her, taking money and other property

8    from the store in the process.

9              During the course of this trial you will hear

10   evidence that Patrick Mishall had a unique familiarity with

11   the crime scene, equipment, and business procedures; that by

12   his own admission he was the last one to see the victim alive;

13   that from witness accounts—and, again, from his own

14   statement—he had to have been at the store during the time

15   period in which the murder occurred.  He had to have been.

16             You'll hear evidence that he made conflicting

17   contradictory statements about his activities that day; that

18   he lied about possessing a gun; that he believed Chris was

19   being unfaithful to him.  You'll hear testimony that he had

20   threatened to kill her if he ever caught her with someone

21   else; and you'll hear testimony that he was upset with her for

22   other reasons as well.

23             In summary, you're going to hear testimony, you'll

24   hear evidence that Patrick Mishall had the means to kill

25   Christine Dimmick; that he had the motive to kill her; and

1   that he had the opportunity to kill her.

2           You'll hear testimony from police officers who

3   responded to the scene on February 8, from a forensic

4   pathologist that reviewed the autopsy report on

5   Christine Dimmick, from Minute Market customers of passers-by,

6   from former friends, acquaintances, and coworkers of the

7   defendant to whom he made incriminating statements and from

8   detectives that spoke with him—meaning Patrick Mishall—both in

9   1991 and again more recently.

10          There is an old saying that goes like this: people

11  give themselves away in small mistakes; it's human nature.

12  That's what Patrick Mishall did in this case.  He revealed his

13  secret.  He gave himself away in bits and pieces—small

14  mistakes over time to the people I just described.

15          When all of the evidence and testimony is in, I'll

16  be asking you to return verdicts of guilty of first-degree

17  premeditated murder and felony murder, armed robbery, and two

18  counts of felony firearms.  Thank you.

19          MR. SVIKIS:   The purpose of the opening statement

20  is for the attorneys to let you know what we intend to prove.

21  Of course you know that Patrick Mishall does not have to prove

22  a thing.  And this is not a game when I say that we don't have

23  to prove anything as if something were hidden.  It's the law,

24  and the Court will instruct you accordingly.

25          Keep in mind as you hear the evidence and the

192

1   testimony there are always two sides to every story.  So keep

2   an open mind.  In this case there are more than two sides.  In

3   some cases there's even shifting stories.  You will hear some

4   miraculous memory enhancements from witnesses from 1991 to the

5   present—14 years later.  And the prosecution must carry the

6   burden with this evidence and with this testimony to prove

7   that Patrick Mishall's guilty beyond a reasonable doubt.

8   You will also hear that the investigation itself

9   created not only reasonable doubt but substantial doubt as to

10  Pat's guilt; that the result of this investigation—And I say

11  investigation such as it is because the investigation, I tell

12  you, is still not complete.  I trust it will never be complete

13  due to the manner, the method of the investigation that

14  focused in on Pat on February 8th, 1991, and every year

15  thereafter and never went elsewhere.

16  First, keep in mind the total lack of physical

17  evidence pointing to Pat, connecting to Pat, touching to Pat.

18  The prosecutor has said they will show you evidence beyond a

19  reasonable doubt that put—that puts Pat as the executioner of

20  his fiancée, that robbed the Minute Market.  Let me tell you

21  something.  He has no such thing.

22  He has no evidence, and that's what you'll hear.

23  And this is a little awkward to say it this way, you will not

24  hear any evidence that Patrick shot his fiancée Christine once

25  in the back of the head, twice in the back of the head, in the

1     back once, and a fourth time in the back, and then robbed the
2     Minute Market.
3               Can that be right, you must be thinking? Can they
4     arrest someone—this execution-style killing—without any
5     physical evidence? We're all here.
6               And when I say there's no physical evidence, except
7     for what Pat tells you—And he's not hiding it, and he will
8     testify.—that there's not a fiber, a fingerprint, a witness,
9     no evidence of a gun, a bullet, a TV recorder that was taken,
10    money, a money bag—nothing.
11              And what evidence would you expect the government to
12    bring you? They talk about a weapon. You'll never see a
13    handgun. They talk about a weapon capable of firing a
14    .38 caliber or a .357 round. You'll never see that weapon.
15              You'll see the rounds that were recovered from
16    Mr. Mishall's fiancée's body. Money was taken—approximately
17    $2200. Money won't be shown to you. There was a money bag
18    that was taken. That won't be shown to you. The person who
19    committed the crime took the money.
20              And the prosecution says Pat was the last person to
21    see her alive. You'll find from the evidence—and, again, the
22    lack of evidence—he's either—he's the second to last person or
23    maybe more.
24              You will hear about other items missing—some keys
25    that are missing. And even though Mr. Mishall says he was in

                                   194

1   the store, there was never any attempt to do fingerprints on a

2   floor safe, a coin box, a VCR cable—'cause the VCR's gone, the

3   camera's gone. The cable's there. No evidence of anyone

4   attempting to find out who else may have been in there. The

5   cash drawers, no fingerprint taken.

6           There's no witness that heard four gunshots of

7   either a .38 caliber or a .357 while there's—and you'll hear—a

8   lot of activity at that store because it's around opening

9   time. And if what the prosecutor says is correct—that it

10  looked like a robbery, felt like a robbery, and it was a

11  robbery that went tragically wrong.

12          There is no blood recovered that was on Pat. And

13  I've got to tell you this now that they are at

14  Patrick Mishall's house within 45 minutes of discovering his

15  fiancée on the floor. They both lived together. There is no

16  gunshot residue—hands, clothing, on his vehicle. They take

17  his vehicle. He gives it to them, gives them all his clothes.

18  Have access to the house. They don't find any extra money on

19  him hour and a half—or 45 minutes after this.

20          However, I do intend to show you as the trial

21  progresses that what the government has told you is simply not

22  the way things happened. I will show there are reasonable

23  doubts, that they haven't met their burden of proof. They've

24  had 14 years.

25          And usually as the defense we center in on the

                            195

1    interpretation of physical evidence. Again—And I can't stress

2    this enough.—there's no evidence to challenge out of what was

3    collected. And you'll see a laundry list of everything that

4    was collected within—virtually within minutes from

5    Mr. Mishall.

6         And you'll see opportunities that are missed for

7    investigation from the entry of the doorway, floor safe number

8    one—no fingerprints—safe number two, no eyewitnesses—And

9    you'll hear the people coming and going.

10        And, also, you'll hear about investigation of

11   looking for blood, and there'll be testimony that there was

12   blood in a sink that the police were advised of, that the

13   owner advised of, and the person that worked there advised of.

14   No one ever looked at that blood. No one ever checked it. In

15   fact, they never found it, and they never recovered it.

16   There's no blood spatter.

17        They also pick up cigarette butts, Styrofoam cups;

18   and there was a coffee pot that was made and some was drank.

19   Didn't do anything with that either.

20        When they go to Pat's house they wake him up 'cause

21   this is at 7:00 o'clock in the morning, and you'll—In a moment

22   I'll tell you the sequence of events. They take the

23   sweatshirt he was wearing, the T-shirt, the blue sweatpants,

24   the shoes, his car.

25        And on top of all of that—through this thing—motive,

                            196

1   motive, motive.  They live together.  It's his fiancée.

2   They're going to get married.  Not there.

3       You'll hear from the pathologist—And this is a

4   little unusual.—that the initial pathologist that did the

5   autopsy report—a Harvey Wilkes—He has since passed away.  And

6   I expect maybe the first witness or—and even today—there'll be

7   another pathologist—Dr. deJong.  She will testify and confirm

8   what Mr. Wilkes found, that there was no evidence of physical

9   altercation, that there are no defensive wounds.

10      There're probably 100 photographs taken.  I think

11  you'll be shown about 40.  And in those photographs you'll

12  notice that there is no disturbance in the front of the store

13  or behind the counter or in back of the store.  This is not an

14  assault.  This is not a domestic violence.  This is not anger.

15  All that's missing.

16      There would be no evidence of heat of passion to

17  go—to tie in what the prosecutor tells you about the anger and

18  resentment.  And the resentment—And what's the resentment for?

19  And I think you'll hear that—you'll hear this testimony

20  between manager and assistant manager—not to belittle anyone's

21  job and the amount of money that you can make—but to execute

22  your fiancée when you live together—And you'll hear

23  that.—because you didn't get a promotion, I would suggest that

24  that anger is from—would be directed elsewhere.

25      I know what they witnesses are going to say.  I'm

1    not afraid of it. Pat's not afraid of it. What the
2    government has said is simply wrong as it relates to Pat's
3    involvement.
4         You'll hear testimony that Christine Dimmick and
5    Pat Mishall had some rocky times. They had arguments.
6         And, in particular, on this—on this day you'll hear
7    from Pat that on February 8th of 1991—14 years ago—that they
8    lived together in the Oakwood area on Springmont, which is
9    about three miles—if that—from Springmont to Broadway, across
10   to Winchell—across to Winchell area/Rambling Road, and right
11   around the corner to the store; that on that particular day
12   they woke up. This was the day that Chris was going to
13   work—Pat was not, but he went there to help her open the
14   store; that from 2415 Springmont they arrived at the
15   Minute Mart—And this is going to be Pat's testimony.
16        And there'll be a—what was then Sonatrol—employee
17   testifying when it was keyed in—There's a—the pad for keying
18   in.—and I believe that's going to come out to about 6:10 a.m.
19   at—It was then the Minute Mart.—and the store was supposed to
20   open around 7:00 a.m. on Stadium Drive.
21        And then Pat will tell you that he left at 7:35
22   [sic]. And between that time no one sees or hears anything
23   that would evidence this crime—whether it relates to Pat or
24   anyone else—so that we know there's four .38 or .357 gunshots
25   that take place. So the doors remain locked, and now it's—now

198

1   it's 7:00 o'clock.

2            At 7:00 o'clock two police officers drive by—a

3   Joe Hampton and Joe Barada—and they see nothing unusual. And

4   then along comes—There's other people will be rattling the

5   door from time to time, and you'll hear from these other

6   people.

7            And a Susan McFarlane comes by, and she notices the

8   store's open. By chance, she happens to know Jim Jilek, who's

9   the owner of these Minute Marts, and says your store's not

10  open.

11           So now the clock is running. Pat has left at 6:35.

12  Door is not open. The calls go out, and Officer Hampton and

13  Barada now return at 8:20 and secure the building, but they

14  don't go in. They wait for the owner Jim Jilek. He calls

15  another manager who has a key—Wayne Tiller—so all three enter.

16           And then the crowd of people starts coming through

17  there and, essentially—And this is—I think will show part of

18  the problem—by the testimony—that once the area is secured at

19  least 21 other persons march through there.

20           So now same day—9:15 a.m.—the usual

21  suspects—boyfriend/fiancée. They lived together. Police

22  arrive at Pat's house at 9:15. They wake him up. They don't

23  answer his questions, what's going on. Voluntarily goes with

24  them. He's polite. They search their home, confiscate his

25  car, his clothes, go through his closets. And you will hear

(Tape No. C2005-021, 2-07-05, 04:25)

1    that some special security equipment is taken from the store—a

2    tape machine and the video machine and a set of keys.

3         So they interview Pat—I believe all day—and

4    immediately investigation turns cold. Pat that year—His

5    fiancée is dead, doesn't have family here—has family in

6    Wisconsin—He moves up to Wisconsin.—remarries in 1998.

7         And then in 1992 [sic], or thereabouts, we have a

8    cold case team formed, and they go through everything. And

9    they pick up at the same place without any more physical

10   evidence. Contact ex-girlfriends, who'll make statements—And

11   you'll hear those statements.—and you'll hear that there'll be

12   conflicting statements. And what—what you'll notice is the

13   statements that change—And some are interviewed in '92—a year

14   later—but the real press is put on in 2002. They do not find

15   a motive.

16        They find—They find nothing. The police searched

17   the area afterwards.

18        When you've heard all the testimony and had an

19   opportunity to consider and evaluate, I will ask you to return

20   a verdict in this case. I will ask you to return a verdict

21   based upon the evidence of what you've heard—and, more

22   importantly, what you've not heard—and that you'll return a

23   verdict that will be consistent with logic, common sense, and

24   justice; and no amount of desire to close a case will make it

25   so.

200

1      The law of this country presumes that the innocent

2   are accused, and it's that presumption upon—and your oath—that

3   we rely upon you to return a verdict of not guilty.  Thank

4   you.

5            THE COURT:   Do you have a witness you can present?

6            MR. BROWER:   Yes, your Honor.

7            THE COURT:   Go ahead.  Call that witness.

8            MR. BROWER:   Your Honor, the People call

9   Dr. Joyce deJong to the stand.

10           THE COURT:   You do solemnly swear or affirm the

11  testimony you're about to give shall be the truth, the whole

12  truth, and nothing but the truth?

13           MS. DEJONG:   I do.

14           THE COURT:   Be seated.

15                   JOYCE LYNN DEJONG,

16  called at 4:28 p.m., and sworn by the Court, testified:

17                   DIRECT EXAMINATION

18  BY MR. BROWER:

19  Q   Doctor, would you please state your name and spell your last

20      name for the record.

21  A   My name is Joyce Lynn deJong.  My last name is spelled d-e-

22      capital j-o-n-g.

23  Q   Doctor, could you please state your occupation, where you're

24      employed?

25  A   I am the medical director of forensic pathology at

                           201

1    Sparrow Hospital in Lansing, Michigan.

2  Q   Director of forensic pathology?

3  A   Yes.

4  Q   Would you tell us what forensic pathology is, please.

5  A   Forensic pathology is a subspecialty of medicine.  To become a

6      forensic pathologist, one first must become a physician; so I

7      went through undergraduate training and then medical school

8      followed by general pathology training, which was five years

9      long, and then another year of forensic pathology training.

10          In—In forensic pathology, primarily what we do is

11     investigate death and, as a part of that, determine cause and

12     manner of death and make other determinations about what

13     happened and what caused the death.

14 Q   Doctor, approximately how many autopsies have you performed?

15 A   How many autopsies.  I perform about 200 to—between two and

16     300 per year, and I've been practicing forensic pathology

17     since 1996.  So maybe someone else could do the math.

18 Q   All right.  Thank you.

19          Have you been previously qualified as an expert in

20     forensic pathology?

21 A   Yes.

22 Q   And have you testified previously in other courts of

23     law—whether this county or other counties?

24 A   Yes, I have.

25 Q   Approximately how many times?

202

1   A    I would say approximately 100 to 125 times.

2                  MR. BROWER:   Your Honor, I'd ask that Dr. deJong be

3        qualified as an expert in the area of forensic pathology.

4                  MR. SVIKIS:   No objection.

5                  THE COURT:   She's so recognized.

6   BY MR. BROWER:

7   Q    Doctor, routinely when you render an opinion regarding cause

8        or manner of death, it was you that performed the autopsy; is

9        that correct?

10  A    That's the most common situation.

11  Q    Is it also the case that on occasion you're called to render

12       an opinion regarding cause and manner of death based on the

13       report of another forensic pathologist—a report dictating his

14       findings at the time of an autopsy?

15  A    I have done that on a number of occasions.

16  Q    You're familiar with Dr. Harvey Wilkes; is that correct?

17  A    Yes, sir.

18  Q    At my request did you review a report regarding the autopsy of

19       Chris Dimmick, an autopsy performed by Dr.—Dr. Wilkes in 1991?

20  A    Yes.   The autopsy was performed in 1991.   Your request came

21       many years later.

22  Q    Just 2003 as a matter of fact; is that right?

23  A    I believe so, June, yes.

24  Q    Doctor, I'm going to hand you what has been marked as People's

25       exhibit 47 and will be admitted by stipulation of the parties.

203

1              MR. BROWER:   Is that correct?

2              MR. SVIKIS:   That's correct.

3  BY MR. BROWER:

4  Q   This is a report from Dr. Wilkes regarding Chris Dimmick that

5      you reviewed; is that right?

6  A   Yes, it is.

7  Q   Also, you reviewed several photographs from the scene or the

8      autopsy in preparation for your testimony today; is that

9      correct?

10 A   Yes.

11             MR. BROWER:   If you would please, Ms. Frary, put up

12     exhibit number 42.

13             (At 4:31 p.m., off record discussion between

14             Mr. Brower and Ms. Frary)

15             Your Honor, I might clarify.  In order for

16     Dr. deJong to be able to testify today—She's leaving for

17     out-of-state tomorrow morning and would be unavailable.—we're

18     taking this testimony out of order.  I would ask for its

19     conditional admission under MRE 104(b), relevancy conditioned

20     on additional facts.

21             MR. SVIKIS:   No objection.

22             THE COURT:   All right.  It's received.

23             MR. BROWER:   Exhibit number 42, please.

24 BY MR. BROWER:

25 Q   Ma'am, based on your review of the report, have you developed

                            204

1     an opinion regarding cause and manner of death of

2     Chris Dimmick?

3  A   Yes.

4  Q   And what is that?

5  A   The cause of death is multiple gunshot wounds, and the manner

6     of death is homicide.

7  Q   Doctor, I'd direct your attention to exhibit number 42 and ask

8     if you could please describe the significance of what you

9     observed in this photograph.

10  A   Certainly. I don't know if it's easier for me to step down

11     and—

12  Q   Yes, if it would be easier for you to view or to explain

13     things.

14             Doctor, here's a wand, too.

15  A   This is a photograph of Chris Dimmick's back showing two of

16     the—two of four gunshot wounds that she sustained. This is

17     just for reference. I think you can tell that this would be

18     up, closer to the head, and down, in that direction.

19             There are two gunshot wounds in this area. One of

20     them was about 17 inches from the top of the head, and I think

21     the other one was 21 inches from the top of the head.

22             Do you want me to go on about the gunshot wounds and

23     what Dr. Wilkes found or—

24  Q   Yes, please.

25  A   Okay. You can see both of these gunshot wounds.

1  . . . (inaudible) The dark area in the center is actually the
2  hole or the defect that enters the body. Both of them are
3  surrounded by a ring of what we call soot, which is black
4  material that comes out of the barrel of the gun when the
5  weapon is fired. Other things other than just the bullet exit
6  the—exit the body.

7  Because there's soot surrounding these wounds, we
8  can get an idea about the range of fire meaning that how
9  far—when I talk about of fire, I mean how far away the end of
10 the barrel was from the skin itself. Because there's soot
11 around there, I can say that the—that the barrel of the gun
12 was very close to the body, probably within about an inch.

13 And, in fact, one of them Dr. Wilkes describes—And
14 you can see a little bit. I believe it was the
15 . . . (inaudible), and we have another photo of that.

16 But there's even a little muzzle abrasion, meaning
17 that the skin actually hit the end of the barrel but it wasn't
18 tightly up against there. Because if the barrel of the gun
19 was tightly up against the skin, there would be—there would be
20 no soot surrounding there. So there was enough space for some
21 of this dark soot to escape. But these are both very close
22 range gunshot wounds in the back.

23 The one that—

24 Q  Doctor, we do have exhibit number 43, if that shows that—

25 A  Okay.

206

1   Q    —phenomena.

2   A    You can actually see a little barrel abrasion surrounding that

3        in addition to the black soot. And I think . . . (inaudible)

4        probably some of the soot has been cleaned off. It looked

5        like it was more pronounced in the previous image.

6             Nonetheless, in the one—

7   Q    Hang on. I'm sorry. I just wanted to make sure she doesn't

8        advance it before you're ready.

9             Would you prefer this photograph now, Doctor, or the

10       previous one?

11  A    If you can back up to the one just prior to that I can

12       explain.

13            In exhibit 42 here, the gunshot wound that's a bit

14       more superior, just knowing the path of that that Dr. Wilkes

15       describes is that it entered the body. It did—It struck the

16       tenth thoracic vertebrae, which would be the bone itself. And

17       he says it nicks that area. It then passes through the aorta,

18       which is the main blood vessel coming off of the heart that

19       supplies blood to a good portion of the body. So it nicks the

20       aorta—or it strikes the aorta, and the bullet was found in the

21       lower lobe of the left lung.

22            The other significant factors that it caused is a

23       large amount of bleeding. There was 1500 milliliters of blood

24       in the left chest cavity associated with this wound, primarily

25       from the—from the damage done to the aorta.

1          And if—We're not a very metric savvy country; but if

2     you think about a two-liter or a liter bottle of pop or

3     something, it's a liter and a half of blood.  So a large

4     amount of blood associated with this wound.

5          The lower wound entered—or the lower gunshot wound

6     enters the back.  It strikes the third lumbar vertebrae, which

7     is farther down on the back.  It doesn't mention that it hits

8     the cord.  And then the bullet is recovered from soft tissue

9     or from muscle near that area.

10    Q    Doctor, additional findings regarding gunshot wounds were two

11         gunshot wounds to the head; is that correct?

12    A    That's correct.

13              MR. BROWER:    If you'll please put up exhibit 44.

14    BY MR. BROWER:

15    Q    If you could describe what your findings are here, ma'am.

16    A    Okay.  This is a photo of the back of the head.  And, again,

17         there are two gunshot wounds in the right at the nape of the

18         neck or at the back of the head.  There were two gunshot

19         wounds.  Again, they—both of them—both of them had soot

20         surrounding them, so they're very close.  The gun is very

21         close to the skin when these are fired, and so there's soot

22         around both of those entry wounds.

23              They both entered the—through a hole—a single hole

24         in the back of the skull—the occipital bone.  There was a

25         single hole in that area.  One of the bullets passed all the

1   way through and was found in the frontal bone, and the other
2   bullet was found in the brain near the front of the—of the
3   head.

4            MR. BROWER:    Exhibit number 45, please.

5            THE WITNESS:    This is just an example of—This is a
6   photograph of an X ray, and it shows the two bullets.   This
7   one is the one that's up in the frontal bone; the other one is
8   found in the—in the brain itself.

9            MR. BROWER:    Exhibit number 46.

10           THE WITNESS:    This is—It's a little hard to orient,
11  but you're looking at the forehead here.    Okay?   So over there
12  is the left earlobe, probably the left eyebrow.    And there is
13  an abrasion and a bruise and a little—almost a little break in
14  the skin right there on the forehead.    It's right beneath this
15  is where one of the bullets is recovered from—from the frontal
16  bone.

17  BY MR. BROWER:

18  Q   What is the significance of this injury as it relates to the
19      bullet wound that you described or was found just under the
20      surface in the forehead area?

21  A   In order for that injury to occur where there's actually skin
22      scraped off of the forehead, the forehead would have had to
23      have been in contact with something, such as in this
24      case—based on the other information I saw from the scene—from
25      the floor.   So she would have been face down when this wound

                            209

1   was inflicted.

2   Q   And there would have been some movement of the head then as

3       the shot was fired that caused this type of injury—impact with

4       the floor; is that correct?

5   A   There's that, or it could have been that the head was right on

6       the floor, but—

7   Q   Right.

8   A   —because there's an abrasion or a scrape, I guess one other

9       possibility is that when she fell she hit that area; but I

10      don't really believe that's the case because that's not the

11      typical pattern of injury that we see when somebody falls and

12      strikes their face.

13  Q   Are you indicating, then, that in your opinion that second

14      shot was fired as she was on the ground with her head on

15      the—on the floor and not that that injury was a result of

16      having fallen while she was standing?

17              MR. SVIKIS:   Your Honor, I'm going to object that

18      this presumes that the second shot—I don't think we have any

19      sequence—

20              MR. BROWER:   Right.

21              MR. SVIKIS:   —of shots.

22              MR. BROWER:   I'll rephrase that, your Honor.

23              THE COURT:   Rephrase.

24  BY MR. BROWER:

25  Q   The head shots—whatever sequence they occurred—that the head

                                    210

1  shots occurred while she was lying face down as opposed to
2  standing?

3  A  At least one of them did.

4  Q  Doctor, you've also previously seen a couple of scene
5  photographs.

6  MR. BROWER:  Exhibit number 31 and 32, please.  And
7  then 32 as well.

8  BY MR. BROWER:

9  Q  Doctor, you see the blood pooling—what appears to be blood
10  pooling at the head of the victim.  Is there any significance
11  to the blood as you find it right there?  Or what
12  significance, if any, do you attach to this?

13  A  Well, with the blood pooling in this area, that's compatible
14  with the gunshot wounds with her being in this position and
15  blood draining from the entry wounds on the back of her neck.
16  That would be expected.  There's also some blood on the back
17  that's being caught in the clothing, which I think is a bit
18  more visible—

19  Q  And—

20  A  —in the other image.

21  Q  —Doctor, the—Do you have an opinion based on the photographs
22  that you've observed and the findings at the time of autopsy
23  whether the shots—any or all the shots—occurred as she's found
24  in this position or if they could have occurred elsewhere?

25  A  If you're saying they could have occurred elsewhere in the

211

1  convenience store, if they occurred elsewhere—the ones—the

2  shots that she sustained to her head—

3          Actually, can I sit—I think I can sit down—

4 Q  Yes.  Go ahead.

5 A  — . . . (inaudible)

6 Q  Sure.

7 A  The shots that she sustained to her head, both of them passed

8  through a part of the brain called the midbrain.  She's—When

9  those shots occurred, she's going to—if she's not already down

10  on the ground—which I believe for one of them she was.  But,

11  if not, she's going to drop right there because of the area

12  that this—that these pass through.  It's a very critical area.

13  It's higher even than the spinal cord; and through this area,

14  if you sustain a gunshot wound through there, the person's

15  going to drop right there.

16          The two other gunshot wounds, although they could

17  have been sustained elsewhere and the body moved—possibly she

18  could have moved herself—but there's going to be a significant

19  amount of bleeding associated with them.

20 Q  The back wound that severed or damaged the aorta that led to

21  the blood in the chest cavity that you've described

22  previously—this pint and a half—would that have resulted in

23  immediate blood loss in the back area as well?

24 A  Yes.

25 Q  Outside externally of the body, not just internally?

212

1  A   Correct.

2  Q   Would you expect that there would be sign of that blood loss

3       in the area where that injury was inflicted if someplace other

4       than where her body was found?

5  A   Yes.  She would have bled wherever that occurred.

6  Q   Whether she walked or whether she was carried there, you would

7       expect to see blood loss?

8  A   Yes.

9  Q   Are you talking microscopic blood particles that you need

10      special equipment, or are you going to see—are you saying that

11      this would be copious amounts that would be clearly visible to

12      the naked eye?

13  A   There would be blood dripping out from this.  There also may

14      be microscopic type particles that occurred right at the time

15      of the injury inflicted—right at the time of the gunshot

16      wound.  But within a second there's going to be blood that's

17      dripping out onto—onto the floor or whatever other area that

18      you're on with wounds in the back that travel through those

19      really vascular areas.

20  Q   In light of that and assuming that there was testimony that

21      there was no indication of—of bloods—blood in any other area

22      of the building other than where the body was found, do you

23      have an opinion as to where, then, at least the three

24      shots—that penetrated back injury and the two head shots—had

25      to have occurred?

1  A  The—If there's no bleeding anywhere else in the—in the

2     building, the shots occurred where she is found.

3  Q  And at least the last two in the position she was found with

4     head down on the ground, face down?

5  A  At least one of the last two. She might have been on

6     all fours or something with one of them. But the one that

7     strikes the forehead would have—her face was on the ground

8     when that happened.

9               MR. BROWER:    Thank you.

10              I have nothing further of this witness.

11              THE COURT:    Mr. Svikis?

12              MR. SVIKIS:    Thank you.

13                    CROSS-EXAMINATION

14  BY MR. SVIKIS:

15  Q  Doctor, you've examined and based your opinion on Dr. Wilkes'

16     pathology report, and it's correct?

17  A  Yes.  And the photographs and—

18  Q  Everything else that you've seen so far?

19  A  Right.

20  Q  Okay.  And Dr. Wilkes found no evidence of any physical

21     alteration [sic] between the victim and whoever the assailant

22     may have been, and that's—you concur with that?

23  A  If you say there's no physical altercation, I think if I can

24     just explain what I believe—to the best of my ability what I

25     believe Dr. Wilkes meant is that—

                           214

1  Q  Let me—Okay. Let's answer my—Let's answer my question first.

2      Okay?

3  A  Right. Right. But I can't answer it with a yes or no.

4  Q  Well, let's try.

5  A  I wouldn't—

6  Q  I'll ask it again.

7           In Dr. Wilkes' report he states there's no evidence

8      of physical alteration [sic] between the victim and the

9      assailant. As noted, the manner of death is homicide. You

10     would significantly agree with that statement?

11  A  I'll agree as long as I can explain my answer.

12  Q  All right.

13  A  The—No evidence of physical altercation, meaning that there

14     was no other evidence of—of a fight like defense-type wounds

15     or broken fingernails or whatever. I mean if you're shot four

16     times at close range, there's certainly some type of physical

17     altercation there that—that went on, but there was no evidence

18     of a battle. She didn't appear to have other—other bruises or

19     injuries that you might get from a fistfight or something.

20  Q  All right. And there are four gunshot wounds, and three of

21     these would be fatal and one would necessarily not be fatal;

22     isn't that correct?

23  A  Right. One wouldn't be immediately fatal.

24  Q  All right. And the—And the prosecution has indicated to you

25     if—if no blood is found elsewhere and if testimony were to

1      come out that—that blood is—is found elsewhere, given what

2      you've examined and the autopsy report and the photographs,

3      it's possible that—that she could have been shot the first

4      time somewhere else?

5 A   If there's blood elsewhere—a dripping pattern or whatever the

6      pattern is—that is—that is possible that she could have been

7      shot elsewhere. And I think my comment was that she would

8      have bled—

9 Q   Sure.

10 A   —from those.

11 Q   And also on the—on the blood, if someone is shot at a contact

12      range—And I know you'll correct me 'cause you'll have the

13      terms.—whether it's an inch away or pressing, it's not unusual

14      to find some microscopic blood blowback either, is there?

15 A   That would not be unusual.

16 Q   And if there was a weapon, it would not be unusual to find

17      that blowback on the weapon?

18 A   That's correct.

19 Q   And given these four shots, there's also no way to tell

20      the—tell the sequence of the shots either, is there? The

21      sequence.

22 A   No, there is not. Just given the four shots in isolation, no.

23 Q   And—This is probably obvious. But the first exhibits that

24      were shown she was undressed and still had—I'm going to call

25      them powder burns. But she was, as far as you know, the

1    shooting occurred through her clothing?

2 A  That's correct.  If I can clarify.  At least—At least of the

3    back it was.  I don't believe of the head.

4 Q  There was no clothing on the head.

5 A  Right.

6              MR. SVIKIS:   I have no further questions.

7              THE COURT:   Anything else, Mr. Brower?

8              MR. BROWER:   No redirect, your Honor.

9              THE COURT:   You may step down.

10             Does that about take care of what we can cover

11   today?

12             MR. BROWER:   Probably.

13             THE COURT:   Okay.  I think, then, we'll recess.

14   I'd like you to be back here tomorrow morning.  Please report

15   in no later than 9:00 o'clock so—

16             Can everybody be ready at that time?  You have your

17   witnesses ready?

18             MR. BROWER:   At what time, your Honor?

19             THE COURT:   Nine.

20             MR. BROWER:   Yes.

21             THE COURT:   Okay.  I'd like to make a full day of

22   it tomorrow.

23             MR. BROWER:   Yes.

24             THE COURT:   Okay.  So then we'll—Please report in

25   at the very latest by 9:00 o'clock, members of the jury.

                              217

1            UNIDENTIFIED FEMALE:    . . . (inaudible)

2            THE COURT:   I'm not—Where did—

3            THE BAILIFF:   . . . (inaudible)

4            THE COURT:   Oh, okay.   Where do they report?

5            THE BAILIFF:   They will report upstairs where they

6       were earlier today.

7            THE COURT:   Okay.

8            And that takes—That takes a couple of minutes to get

9       you down here.   So please be there at least by 9:00 o'clock so

10      that we can get down here in as short a time as possible after

11      that.   And then we'll be ready to go at that time.

12           So we'll stand in recess, then, until tomorrow

13      morning at 9:00 o'clock.

14           (At 4:52 p.m., proceedings adjourned)

15

16

17

18

19

20

21

22

23

24

25