261511

1               STATE OF MICHIGAN

2          9TH CIRCUIT COURT—TRIAL DIVISION

3

4   THE PEOPLE OF THE
    STATE OF MICHIGAN

5                                    Files No. C03000897 FC
          v
6
    PATRICK KEVIN MISHALL,
7
              Defendant.
8

9

10              Jury Trial — Volume II of V

11       Before Hon. George R. Corsiglia P12239, Circuit Judge
       (Visiting Judge from 48th Circuit, Presiding by Assignment)
12
          Kalamazoo, Michigan—Tuesday, February 8, 2005
13

14

15  APPEARANCES:

16  For the People:        Scott W. Brower P44951
                           Office of the Prosecuting Attorney
17                         227 West Michigan Avenue
                           Kalamazoo, Michigan 49007
18                         (269) 383-8900

19  For the Defendant:     Andis Svikis P36039
                           1803 Whites Road
20                         Kalamazoo, Michigan 49008
                           (269) 349-7692

21

22  Recorded by:           Video recorded

23  Transcribed by:        Brenda K. Foley CER 4956
                           1400 Gull Road
24                         Kalamazoo, Michigan 49048
                           (269) 385-6001
25                              * * * * *

                              219

FILED
JUN 1 3 2005
9th JUDICIAL CIRCUIT
COUNTY OF KALAMAZOO
KALAMAZOO, MICHIGAN

ENTERED

TABLE OF CONTENTS

WITNESSES: <u>People</u>                                        PAGE

MATTHEW BRINKMAN

    Direct examination by Mr. Brower . . . . . . . . . . 223
    Cross-examination by Mr. Svikis . . . . . . . . . . 236
    Redirect examination by Mr. Brower . . . . . . . . . 245

JOE HUMPHRIES

    Direct examination by Mr. Brower . . . . . . . . . . 248
    Cross-examination by Mr. Svikis . . . . . . . . . . 255
    Redirect examination by Mr. Brower . . . . . . . . . 256

BRUCE LABRIE

    Direct examination by Mr. Brower  . . . . . . . . . 257
    Voir dire examination by Mr. Svikis . . . . . . . . 260
    Direct examination (cont.) by Mr. Brower . . . . . . 261
    Cross-examination by Mr. Svikis . . . . . . . . . . 284
    Redirect examination by Mr. Brower . . . . . . . . . 293
    Recross-examination by Mr. Svikis . . . . . . . . . 300

STUART MICHAEL BURRITT

    Direct examination by Mr. Brower . . . . . . . . . . 301
    Cross-examination by Mr. Svikis . . . . . . . . . . 318
    Redirect examination by Mr. Brower . . . . . . . . . 323
    Recross-examination by Mr. Svikis . . . . . . . . . 325

GUNARS VASERIS

    Direct examination by Mr. Brower . . . . . . . . . . 327
    Cross-examination by Mr. Svikis . . . . . . . . . . 333
    Redirect examination by Mr. Brower . . . . . . . . . 334
    Recross-examination by Mr. Svikis . . . . . . . . . 336

ROBERT PETERSEN

    Direct examination by Mr. Brower . . . . . . . . . . 337

JAMES GRACE

    Direct examination by Mr. Brower . . . . . . . . . . 344
    Cross-examination by Mr. Svikis . . . . . . . . . . 358

1

TABLE OF CONTENTS (cont.)

2   WITNESSES: <u>People</u>                                              PAGE

3   BRETT MUNSON

4          Direct examination by Mr. Brower . . . . . . . . . . . 362
           Cross-examination by Mr. Svikis  . . . . . . . . . . . 367
5          Redirect examination by Mr. Brower . . . . . . . . . . 369
           Recross-examination by Mr. Svikis  . . . . . . . . . . 370
6          Reredirect examination by Mr. Brower . . . . . . . . . 371

7   JAMES JILEK

8          Direct examination by Mr. Brower . . . . . . . . . . . 372
           Cross-examination by Mr. Svikis  . . . . . . . . . . . 387
9          Redirect examination by Mr. Brower . . . . . . . . . . 393
           Recross-examination by Mr. Svikis  . . . . . . . . . . 396

10  TINA LOUISE ASKREN

11
           Direct examination by Mr. Brower  . . . . . . . . . . 398
12         Cross-examination by Mr. Svikis . . . . . . . . . . . 418
           Redirect examination by Mr. Brower . . . . . . . . . . 427
13         Recross-examination by Mr. Svikis  . . . . . . . . . . 430
           Reredirect examination by Mr. Brower . . . . . . . . . 433

14  FRANK SILA

15
           Direct examination by Mr. Brower . . . . . . . . . . . 433
16         Cross-examination by Mr. Svikis  . . . . . . . . . . . 439

17  SHARON LOUISE HITCHCOCK

18         Direct examination by Mr. Brower . . . . . . . . . . . 441
           Cross-examination by Mr. Svikis  . . . . . . . . . . . 449

19  JAMES D. GRUBIUS

20
           Direct examination by Mr. Brower . . . . . . . . . . . 451
21         Cross-examination by Mr. Svikis  . . . . . . . . . . . 457
           Redirect examination by Mr. Brower . . . . . . . . . . 460
22         Recross-examination by Mr. Svikis  . . . . . . . . . . 461

23

24

25

220a

```
1                        TABLE OF CONTENTS (cont.)

2       EXHIBITS  ITEM                          IDENTIFIED        RECEIVED

3           X1   sketch of floor plan of Minute Market  227           227
            X2   photograph                    262             258
4           X3   photograph                    263             258
            X4   photograph                    264             258
5           X5   photograph                    264             258
            X6   photograph                    264             258
6           X7   photograph                    265             258
            X8   photograph                    265             258
7           X9   photograph                    265             258
            X10  photograph                    267             258
8           X11  photograph                    267             258
            X12  photograph                    268             258
9           X13  photograph                    268             258
            X14  photograph                    269             258
10          X15  photograph                    269             258
            X16  photograph                    269             258
11          X17  photograph                    270             258
            X18  photograph                    270             258
12          X19  photograph                    271             258
            X20  photograph                    271             258
13          X21  photograph                    271             258
            X22  photograph                    271             258
14          X23  photograph                    272             258
            X24  photograph                    272             258
15          X25  photograph                    272             258
            X26  photograph                    272             258
16          X27  photograph                    272             258
            X28  photograph                    273             258
17          X29  photograph                    273             258
            X30  photograph                    273             258
18          X31  photograph                    274             258
            X32  photograph                    274             258
19          X33  photograph                    278             258
            X34  photograph                    279             258
20          X35  photograph                    279             258
            X36  photograph                    280             258
21          X37  photograph                    280             258
            X38  photograph                    280             258
22          X39  photograph                    281             258
            X40  photograph                    281             258
23          X41  photograph                    281             258
            X42  photograph                    233             233
24          X43  photograph                    233             234
            X44  photograph                    234             234
25          X45  photograph                    235             234

                          220b
```

TABLE OF CONTENTS (cont.)

| EXHIBITS | ITEM | IDENTIFIED | RECEIVED |
|---|---|---|---|
| X46 | photograph | 235 | 234 |
| X47 | photograph | 235 | 234 |
| X48 | photograph | | 258 |
| X49 | photograph | | 258 |
| X50 | photograph | | 234 |
| X51 | clothing | | 317 |
| X52 | clothing | | 317 |
| X53 | clothing | | 317 |
| X54 | clothing | | 317 |
| X55 | photograph | | 234 |

220c

(Tape No. C2005-022, 2-08-05, 09:08)

1    Kalamazoo, Michigan

2    Tuesday, February 8, 2005 - 9:08 a.m.

3    THE CLERK:   The court calls the case of People

4    versus Patrick Mishall, file C03-0897 FC.

5    Please state your appearances for the record.

6    MR. BROWER:   If it please the Court, your Honor,

7    Assistant Prosecuting Attorney Scott Brower for the People of

8    the State of Michigan.

9    MR. SVIKIS:   Andis Svikis on behalf of Mr. Mishall.

10    THE COURT:   You ready to proceed with your next

11    witness, Mr. Brower?

12    MR. BROWER:   Yes, your Honor.

13    Your Honor, the People call Sergeant Matt Brinkman

14    to the stand.

15    UNIDENTIFIED JUROR:   . . . (inaudible)

16    THE COURT:   Yes, ma'am?

17    UNIDENTIFIED JUROR:   I think it's imperative that

18    I make the Court aware I was—talked to my husband last night.

19    I told him how long I was going to have to be on the court.

20    He made me aware that that's going to be very financially hard

21    for us.  I wanted to make you aware that—

22    THE COURT:   I cannot release you at this time,

23    ma'am.  You were specifically asked that yesterday if I recall

24    correctly.

25    UNIDENTIFIED JUROR:   I was given new information

221

1   last night and I thought it important to let you know.

2          THE COURT:   Counsel, I—you know, I don't—

3          MR. SVIKIS:   Your Honor, I guess—

4          THE COURT:   I don't feel that I have the ability

5   for that reason and that reason alone to just release this

6   lady unless—

7          MR. SVIKIS:   Right, your Honor.  She was saying

8   something else.  If it's more than—If there's something more

9   than financial, I'd just like the Court to inquire a little

10  further.  If that—If that's what it was, then—

11         UNIDENTIFIED JUROR:   I also have . . . (inaudible)

12  I'm a therapist assistant, and I have a very important duty to

13  my residents, and I was made aware that they will not—most

14  likely will not let me give them treatment the treatment they

15  normally get.  This will be very distracting for me and—

16         THE COURT:   I'm sorry.  I don't hear any sufficient

17  reason.  We all as citizens of this country at time to time

18  have to—to contribute, and this is one of the ways that you do

19  that as a citizen of a democratic society—

20         UNIDENTIFIED JUROR:   I—

21         THE COURT:   —just as—just as some of us got drafted

22  and went into the military for two years and got shot at and

23  some got wounded and killed.  You know, it's the same type of

24  thing.  So I'm sorry.  I understand your concerns, but it's

25  not grave enough for the Court to excuse you.

1           Raise your right hand, sir.  You do solemnly swear

2      or affirm the testimony you're about to give shall be the

3      truth, the whole truth, and nothing but the truth?

4           MR. BRINKMAN:   I do.

5           THE COURT:   Take a seat in the witness chair.

6                MATTHEW BRINKMAN,

7      called at 9:11 a.m., and sworn by the Court, testified:

8                DIRECT EXAMINATION

9 BY MR. BROWER:

10 Q    Sir, would you give your full name and spell your last name

11      for the record.

12 A    My name is Matthew Brinkman.  Brinkman is B-r-i-n-k-m-a-n.

13 Q    It's Sergeant Brinkman, is that correct?

14 A    Yes.

15 Q    You're a police sergeant with the Kalamazoo Department of

16      Public Safety?

17 A    Yes, I am.

18 Q    How long have you been employed as a police officer, sir?

19 A    Nearly 15 years.

20 Q    Back—Were you working and on duty on February 8 of 1991?

21 A    Yes, I was.

22 Q    A fairly new officer at that time?

23 A    Yeah, I'd been on the street about eight months at that point.

24 Q    Do you recall that morning—February 8, 1991—approximately

25      8:20 a.m. being called to 2905 Stadium Drive?

223

1   A   Yes, I was dispatched; and it was reported as a suspicious

2       occurrence that the business wasn't open when it was supposed

3       to be at that time.

4   Q   The business at that address was called the Minute Market at

5       that time; is that correct?

6   A   That's correct.

7   Q   Presently under new ownership, changed the name, and is known

8       as Bronco Mart?

9   A   I believe that's what it is now.

10  Q   That address—2905 Stadium Drive—is that in the city and county

11      of Kalamazoo, state of Michigan?

12  A   Yes, it is.

13  Q   Did you go to that address yourself or with others?

14  A   I—I went myself.  We were in one-man patrol cars—

15  Q   Right.

16  A   —and I was the first officer to arrive after the dispatch.

17  Q   There was another officer that was sent or went to that

18      location in addition to yourself?

19  A   Yes, Officer John Bravata arrived approximately six minutes

20      after I did.

21  Q   When you pulled up at the address did you find anyone there?

22  A   Yes, I met with Carlton Tiller, who was the manager of—There

23      was another Minute Market on South Westnedge.  He was the

24      manager of that store.

25  Q   Do you—What is your understanding as to why he was there?

224

(Tape No. C2005-022, 2-08-05, 09:14)

1   A    I believe he received a call from someone also noting that the

2        store should have been open, and so he had come over to find

3        out what the problem was.

4   Q    Did he have a key to allow for access into the building?

5   A    He did not.  He in turn then got a hold of the store chain

6        owner, Jim Jilek, who then responded; and he arrived at about

7        8:40 a.m. with the set of keys that allowed us to enter the

8        store.

9   Q    So Jim Jilek, Mr. Tiller, and yourself and Officer Bravata

10       were now at the store outside; is that right?

11  A    Yeah, that's correct.

12  Q    Did you check the exterior of the building?

13  A    I believe that we did, yes.

14  Q    And weren't able to gain access, apparently?

15  A    Right.  Yeah, it was all locked up.

16  Q    How did—Did you eventually gain entry into the building?

17  A    Yes, we did with the keys that Mr. Jilek provided.

18  Q    Which doors did you enter?

19  A    We went in the front doors—the ones that the public most

20       commonly would use that face Stadium Drive.

21  Q    At the time that you were there and outside of the building,

22       was there any indication that anybody was inside of the

23       building—that an employee had, in fact, arrived and must be

24       inside or anything like that?

25  A    Well, as I recall, most of the interior of the store appeared

225

1       to be dark, so it was obviously not open for business.   It

2       wasn't until we opened the doors that we saw a set of keys

3       inside the lock from the inside hanging there; and then it

4       became readily apparent that, obviously, someone was in the

5       store.

6   Q   Let's just clarify that a minute.   There's a key slot on the

7       outside of the door that would allow for a key to be placed in

8       and the doors unlocked; is that right?

9   A   Yes.

10  Q   And there's a similar key slot on the inside of the door that

11      would allow for the doors to be unlocked or locked from the

12      inside?

13  A   Yes.

14  Q   And it is that inside-the-door key slot where the keys were

15      hanging?

16  A   Exactly.   They were actually in the door lock on the inside.

17  Q   But the door was, in fact, locked?

18  A   Yes.

19  Q   When the door was unlocked for you, what did you and

20      Officer Bravata do?

21  A   When we went into the store, Officer Bravata walked to the

22      south along the purchasing counter.   I went to the right

23      immediately to go to the other side of the store, so I would

24      have been walking west along the wall down the first aisle.

25      As I walked down that aisle, I noticed a shopping cart that

                                    226

1 appeared full of pop in front of the coolers.  It appeared to

2 me that somebody had likely been stocking the coolers at some

3 point that morning.

4 Q Officer, I'm going to stop you just for a second.  It may be

5 helpful as you explain this to show on a diagram the route you

6 took and what you found and at what location.

7     MR. BROWER:  If you could please put up

8 exhibit number one, please.

9 BY MR. BROWER:

10 Q Officer, do you recognize this exhibit—exhibit number one?

11 A Yes.

12 Q This is a sketch of the floor plan, if you will, of the

13 Minute Market; is that correct?

14 A Yes.

15 Q Does it accurately depict the layout of the store?

16 A As best I can remember from that long ago, yes, it does.

17     MR. BROWER:  Move for admission of People's exhibit

18 number one?

19     THE COURT:  Any objection?

20     MR. SVIKIS:  No objection.

21     THE COURT:  Received.

22 BY MR. BROWER:

23 Q Officer, I have here an aid to help in explaining this—just a

24 laser . . . (inaudible)

25 A Oh, okay.

1  Q    Can you see from there well?

2  A    Yeah, I can see, yeah.

3  Q    Explain where it is that—

4           THE COURT:   Can the jurors on the end see?

5           UNIDENTIFIED JUROR:   Yes.

6           UNIDENTIFIED JURORS:   I can, yes.

7           THE COURT:   Can you see all right?  All right.

8           Go ahead.

9  BY MR. BROWER:

10 Q    Explain where you entered and what route you took, what you

11      found at what location, and so on.

12 A    Okay.  These are the doors that we initially

13      entered—Officer Bravata and I.  Officer Bravata would have

14      went this way along this counter to the south.  I immediately

15      turned right and went west along this wall here.  It was back

16      in here—I think it was right in here where I saw the shopping

17      cart with the pop.

18           Once I reached the end of this aisle I then turned

19      left and walked up this way looking down each of these aisles

20      as I went.

21           When I got to this corner here and I could see there

22      was nothing down here, I then turned right to look into this

23      bottle room here.  When I looked inside the lights—I noticed

24      that the lights were on.  And there was another cooler back in

25      here, and I noticed that the door was standing open to that as

                              228

1    well.

2            It was at that point that I heard Officer Bravata

3    call my name, and then I heard him over the radio tell

4    dispatch that he had found a dead body.  So I then immediately

5    went up this aisle here and met with John Bravata over here,

6    which is the last place I had seen him before I started

7    clearing this side of the building.

8  Q   Did you go into the—the area where Mr.—or Officer Bravata was

9    then?

10  A   Yeah, I—I believe I met him right about here, and then he

11    walked me back here and showed me where the body was.

12  Q   Could you indicate with the laser pointer the area where the

13    body was found?

14  A   As best I can recall I believe it was right about in here.

15  Q   After observing the body there, what action did you take?

16    Well, let me—Let me ask the question differently.

17           You had originally left Mr. Jilek and Mr. Tiller

18    outside as you and Officer Bravata entered; is that right?

19  A   That's correct.

20  Q   Did they remain outside as you—the two of you searched the

21    interior?

22  A   No, they did not.  Unbeknownst to us they had stepped in these

23    front doors, I believe, and at some point while we were

24    clearing the building—There was a phone right in this area

25    that started ringing, and one of them answered the phone.  I

1        can't remember if it was Tiller or Jilek.  One of them picked

2        up the phone.

3  Q   Immediately upon discovering the body what did you do then as

4        far as Mr. Jilek and Mr. Tiller's concerned?

5  A   As soon as we discovered the body we—it was readily apparent

6        that she was deceased.  We knew we had a crime scene, so I had

7        them get out of the store immediately; and we secured the

8        building as a crime scene.

9  Q   When you secure it as a crime scene—You can have a seat then,

10       Officer.  When you secure it as a crime scene, what exactly

11       does that mean?  What did you do?

12  A   That means I posted myself at the entrance doors—the only

13       entrance to the building at that time and allowed no

14       one—allowed no one in that wasn't authorized to come in—that

15       wasn't either somebody involved in the—that would be involved

16       in the investigation.

17  Q   Homicide protocol at that point involves contact with

18       supervisors in the detective unit; would that be correct?

19  A   Yes.

20  Q   Were those individuals, in fact, contacted on this occasion?

21  A   Yes, our—our sergeant responded out to the scene; and he

22       started making assignments.  My assignment specifically was

23       essentially to stand at the front door and note the name of

24       every person that entered that crime scene.

25  Q   Eventually as officers or detectives or crime scene personnel

1   arrived on the scene were you given other responsibilities?

2 A   Yes.  Once the—Once a sufficient number of investigators

3   was—arrived at the scene and began the investigation,

4   Officer Bravata and I were later assigned to—to go see if we

5   could find some VCR equipment that had been taken from the

6   store.

7 Q   Your understanding was is that that was a device that recorded

8   activity within the retail area of the store; is that right?

9 A   Yes, a surveillance system for the interior of the store.

10 Q   Specifically the interior of the store—the retail area where

11   these cameras covered, that would be this area

12   . . . (inaudible); is that correct?

13 A   I couldn't tell you exactly what the cameras covered.

14 Q   So you were given this assignment to look for that kind of

15   equipment.  Where did you go then to look for that?

16 A   We went—We initially went down Rambling Road, and we began

17   checking all the dumpsters that happened to be out—that people

18   had put out along the road, thinking that perhaps the person

19   who had taken the equipment may have discarded it at some

20   point.  We went all the way down Rambling Road to Springmont.

21   We also checked the streets of Applelane, Ferdale [*sic*],

22   several other side streets.  We then checked the entire length

23   of Winchell, checking more dumpsters, obviously.

24       There's a—We checked the apartment complex at the—at

25   the end of Winchell Road—Winchell Terrace Apartments, I

1   believe—went through that entire complex, checked all their

2   dumpsters.

3           From that point we then went on to Drake Road,

4   checked every—checked everything—Well, we went to Parkview,

5   checked the Asylum Lake and Woods Lake area, checked the

6   overpass on Parkview where it goes over Asylum Lake.

7           From that point we then went up Drake Road, again

8   looking in any dumpsters or receptacles of like manner.

9           From that point on we went out to Stadium Drive and

10  then we began checking all the dumpsters for all the

11  businesses on Stadium Drive, then eastbound to where

12  Random [*sic*] Road and the Minute Market lie.

13          And then, finally, we went to Oakwood Plaza at

14  Oakland and Parkview and checked the dumpsters behind all the

15  businesses there.

16  Q   Now you had spoken specifically about this recording

17      equipment.  Was your search limited to those items, or were

18      you open and looking for anything that you felt might have

19      evidentiary value in a crime scene such as this?

20  A   No, we were also looking for any weapon that may have been

21      involved—probably a gun—you know, mask, whatever might be

22      involved in a robbery of this type.

23  Q   And you found nothing; is that correct?

24  A   That's correct.

25  Q   The next morning you were sent to observe the autopsy of the

232

1     victim Christine Dimmick; is that right?

2  A   That's correct.

3  Q   And were you present for the autopsy and present when

4     photographs were taken?

5  A   Yes.

6            MR. BROWER:   Exhibit 42, please.

7  BY MR. BROWER:

8  Q   Officer, have you seen this photograph before?

9  A   Yes, I have.

10           MR. BROWER:   Forty-three.

11           Your Honor, maybe we can speed this up.

12           Will there be a stipulation to these specific

13    photographs?

14           MR. SVIKIS:   Yes.

15           MR. BROWER:   Your Honor, pursuant to the

16    stipulation, exhibits number 42 through—42, 43, 44, 45, 46,

17    47.

18           And then 50 and 55 would be admitted by stipulation;

19    is that correct?

20           MR. SVIKIS:   Yes.   I'm sorry.   Yes.

21           THE COURT:   What was that—Well, I've already

22    admitted some, so—

23           MR. BROWER:   All right.

24           THE COURT:   That's all right.   Just so we're clear

25    again.   Forty—

                              233

1      MR. BROWER: Forty-two through 47—

2      THE COURT: Okay.

3      MR. BROWER: —and then 50 and 55.

4      THE COURT: All right. They're all received.

5      MR. BROWER: Okay.

6 BY MR. BROWER:

7 Q Officer—

8      MR. BROWER: Exhibit number 42 again, please.

9 BY MR. BROWER:

10 Q —this is a photograph of the injuries to the back of the

11  victim; is that correct?

12 A Yes.

13      MR. BROWER: Exhibit number 43.

14 BY MR. BROWER:

15 Q If you could please describe these photographs. I believe

16  there's been some testimony from the doctor that they're a

17  closeup of those two back wounds. Would that be consistent,

18  also?

19 A . . . (inaudible)

20      MR. BROWER: Exhibit number 44.

21 BY MR. BROWER:

22 Q This would be the entrance wounds to the back of the head of

23  the victim; is that correct?

24 A Yes.

25      MR. BROWER: Forty-five.

        234

1  BY MR. BROWER:

2  Q    Photograph of the X rays of the victim?

3  A    Yes.

4              MR. BROWER:    Forty-six.

5  BY MR. BROWER:

6  Q    Injuries to the forehead of the victim, yes?

7  A    Correct.

8              MR. BROWER:    And 47.

9  BY MR. BROWER:

10 Q    Forty-seven—Okay.   I'm sorry.   The autopsy report would be

11      number 47.

12            Officer, in addition you wound up with taking some

13      of Christine Dimmick's clothing, did you not—

14 A    Yes.

15 Q    —and logged that into evidence?

16 A    Yes.

17 Q    Clothing showing the entrance wounds in the back; is that

18      correct?

19 A    Correct.

20 Q    At the time of the autopsy certain items were collected,

21      specifically, the spent bullets that were recovered from

22      Ms. Dimmick's body; is that correct?

23 A    That's correct.

24 Q    Did you take possession of them, log them into evidence

25      expecting that they would eventually be forwarded to

                            235

1    laboratory for analysis or examination?

2  A    Yes, that's normal procedure.

3              MR. BROWER:   Thank you.  I have no further

4    questions of this witness.

5              THE COURT:   Mr. Svikis?

6              MR. SVIKIS:   Thank you.

7                    CROSS-EXAMINATION

8  BY MR. SVIKIS:

9  Q    Officer, you arrived at what you believed to be a secure store

10    about—was it 8:20?

11  A    I would have arrived at 8:24.  I received the dispatch at

12    8:20.

13  Q    All right.  And you indicated that it was readily apparent

14    that someone was inside because you entered through the front

15    doors with the key still on the inside?

16  A    Right.

17  Q    And that's what brought you to that conclusion?

18  A    Yes.

19  Q    Okay.  After you were in the store for a while, you found out

20    that you could actually go through the store, through some

21    solid swinging double doors where the office was and just exit

22    out that other door, also, right?

23  A    I'm not sure—

24  Q    And it wasn't locked.

25  A    I'm not sure what you're—exactly what portion of the building

                         236

1    you're referring to.

2  Q    Sure.

3         MR. SVIKIS:   Can you put on one of the—Do you have

4    that pointer or something?

5         THE WITNESS:   Here it is.

6         MR. SVIKIS:   Thanks.

7  BY MR. SVIKIS:

8  Q    This is the main entrance where the red dot is right now in

9    exhibit one?

10  A    Correct.

11  Q    And you're standing at that yourself with yourself,

12    Mr. Jilek—the owner—and Mr. Tiller—a manager from another

13    store—correct?

14  A    And Officer Bravata, yes.

15  Q    And Officer Bravata.

16         And because there's a key on the inside of this door

17    and you had to enter through keys that were provided by

18    Mr. Tiller—

19  A    Jilek.

20  Q    —Jilek, and once you entered you came to the conclusion that

21    it was readily apparent that someone was inside?  That's a

22    conclusion you formed, right?

23  A    Yes.

24  Q    All right.  And that's because of the locked door in front; is

25    that correct?

237

1   A   With the keys—

2   Q   Yes.

3   A   —on the inside.

4   Q   And then these are two solid double swinging doors that go to

5       the rear, and this is where you found Ms. Dimmick, correct?

6   A   Yes.

7   Q   All right.  My question then is this—there's a door—there's

8       the back door here that's solid that is not locked from the

9       inside, you can just open it and go out.

10  A   I don't recall the locking mechanism for that particular door.

11  Q   Okay.  This is nice.

12          After you were in the store you did not note any

13      disturbance of any kind from what you could tell?

14  A   What do you mean by disturbance?

15  Q   Sure.  Were things knocked down or trashed or strewn about?

16  A   It didn't appear that way, no.

17  Q   All right.  And although you would have preferred that

18      Mr. Jilek and Mr. Tiller not enter, they were, in fact, in the

19      store and as far as you know were fully aware that Ms. Dimmick

20      was in back and that she was, in fact, dead, right?

21  A   I don't know when exactly they became—exactly when they became

22      aware of that.  I don't think they would have known that

23      before we told them and had them leave the store.

24  Q   All right.  But at some point before they leave the store they

25      both know she's in there in the back room dead?

238

1   A   Yes.

2   Q   Yes.  Okay.

3            Now you're the new officer on the beat so you're

4       assigned to secure the store, in effect, right?

5   A   Yes.

6   Q   And what's the purpose for securing the crime scene?

7   A   To maintain the integrity of the evidence that may be there.

8   Q   All right.  And you, of course, have to keep a list of the

9       people entering, right?

10  A   That's right.

11  Q   Okay.  And you maintained such a list, also, right?

12  A   Yes, I did.

13  Q   All right.  And as it—as it turns out you, in fact, allowed

14      about 21 people to go through the crime scene; isn't that

15      correct?

16  A   Yes.  I don't know the exact number.  I have them written down

17      here, but—

18  Q   You have it—You have it, also?

19  A   Yeah.

20  Q   All right.

21  A   Right.  I didn't count them, but—So I'll take your word for it

22      it's 21.

23  Q   On the—On the list that—that you made, do you list them in the

24      order that they entered the store?

25  A   I believe I did.

                          239

1  Q   All right.  So you have yourself—Officer Brink man—Bravata,

2      Captain Spencer, Detective Fazier, Sergeant Mueller,

3      Sergeant Sykes, Detective Grace, Lieutenant Pearce,

4      Detective Vaughan, John Spiker—a photographer—and then

5      Bruce Labrie—lab tech.  Would that be fairly accurate then?

6  A   Yes.

7  Q   And then after that you have ten or—about ten other

8      individuals from the police department that come in along

9      with—And there's an individual by the name of George Brandon,

10     he also comes in; do you know who he is?

11 A   I don't recall.

12 Q   And then you also allow in Tina Telpely; do you know who she

13     is?

14 A   I don't recall who she is.  It looks like—looking at my

15     report—she was the night manager—

16 Q   Okay.

17 A   —of that store.

18 Q   So by looking at your notes you find out that Tina Telpely was

19     the—the night manager—

20 A   Of that particular Minute Market, yes.

21 Q   Then you're sent out to—You search around the scene—the crime

22     scene?

23 A   Yes.

24 Q   Do you recall what you, in fact, do recover?

25 A   We didn't recover anything of evidentiary value outside the

                                240

1   scene.

2  Q   And if I can reference you to a evidence by case number, and

3     it indicates that there are 33 pieces of evidence that were

4     collected—

5          MR. BROWER:   Objection.  Unless he can testify from

6     personal knowledge, he can't—And he's already testified he

7     didn't collect anything.

8          THE COURT:   I think there's merit, at least at this

9     point.  There's no foundation.

10         MR. SVIKIS:   All right.

11 BY MR. SVIKIS:

12  Q   Before coming in to testify today, did you review anything?

13  A   I reviewed my report—

14  Q   All right.

15  A   —and my—

16  Q   Did you review—Does your report contain an evidence log?

17         MR. BROWER:   Objection.  Unless he can testify from

18     personal knowledge, what is or is not in his police report is

19     irrelative [*sic*].  It's hearsay.

20         MR. SVIKIS:   Well, your Honor, I'm going to see if—

21         THE COURT:   Well—

22         MR. SVIKIS:   —I can refresh—

23         THE COURT:   —it may be—

24         MR. SVIKIS:   —his reco—

25         THE COURT:   —but it might be an exception to the

1    hearsay—

2             MR. SVIKIS:   I can see if—

3             THE COURT:   —rule, also, Mr. Brower.

4             MR. SVIKIS:   I can see if I can refresh his

5    recollection.

6             MR. BROWER:   He hasn't indicated that he doesn't

7    recall.

8             THE COURT:   I'll let him proceed, and if he—Then if

9    he does indicate that after Mr. Svikis has tried to refresh

10    his memory, I'll—

11             MR. SVIKIS:   Sure.

12             THE COURT:   —I'll deal with it at that time.

13             MR. SVIKIS:   Thank you, your Honor.

14  BY MR. SVIKIS:

15  Q    Now I want to be clear about this.  You—You leave the—your

16      station at the front door identifying who enters the crime

17      scene at some point in time, correct?

18  A    I'm sorry?  Identifying what?

19  Q    You're posted at the front door?

20  A    Right.

21  Q    You write down everybody who comes in?

22  A    Right.

23  Q    At some point you're relieved?

24  A    Yes.

25  Q    What time was that?

1  A   I don't recall exactly.

2  Q   But at some point you are relieved?

3  A   Yes.

4  Q   And you're relieved with instructions to do—look for anything

5      of evidentiary value?

6  A   Yes.

7  Q   And does that involve anything that you believe has

8      evidentiary value inside the store?

9  A   No, we were sent to look outside the store for anything of

10     evidentiary value.  There were already other officers inside

11     processing the interior of the store for evidence.

12 Q   And then who went with you on—to look for anything of

13     evidentiary value?

14 A   That was Officer Bravata.

15 Q   All right.  So do you go by car or by foot?

16 A   We traveled by car, but we also got out on foot.

17 Q   So you leave your scene, you get in the squad car—And stop me

18     if I have the sequence wrong.  You get in the squad car and

19     you drive—you drive off?

20 A   We drive down Rambling—Rambling Road.  And as we come to

21     dumpsters or anything else that looks like it may have a

22     likely place for the suspect to have discarded weapons or the

23     video equipment, we would stop, get out and look around and

24     see what we could find.

25 Q   All right.  And how many dumpsters did you find on

                              243

1      Rambling Road?

2  A   I didn't record the exact number.

3  Q   But there were dumpsters on Rambling Road?

4  A   Yes.

5  Q   Now when I use the term dumpster I'm talking about the metal

6      things that are about the size of the judge's desk that open

7      up on the top.

8  A   Yes.

9  Q   All right.  And then you proceed up what road?

10  A   We went—We took Rambling Road down to Springmont; and, in

11      addition, we checked side roads of Applelane—I'm sorry.  There

12      were several.—Applelane, Ferdon, Parkview, Barnard, and

13      Springmont.

14  Q   All right.  And on these streets you testify that you observed

15      dumpsters?

16  A   Yes.

17  Q   And you have no recollection how many dumpsters you observed?

18  A   No.

19  Q   And you have no recollection how many dumpsters you actually

20      checked?

21  A   No, I do not.

22  Q   And this search of dumpsters took about how long?

23  A   We probably spent a good couple hours at least searching the

24      quite large area.

25  Q   And, if you know, who checked the dumpsters behind the

1     building at the then Minute Mart?

2   A   I don't know who checked those exactly.

3   Q   And you don't know if they were checked either, do you?

4   A   No, I don't.

5   Q   Now you found Ms. Dimmick in the back room, correct?

6   A   Officer Bravata found her, but then—

7   Q   You observed?

8   A   —he called me over.  Yeah, I did see her.

9             MR. SVIKIS:   I have no further questions.

10            THE COURT:   Any redirect, Mr. Brower?

11            MR. BROWER:   Yes, your Honor.

12                 REDIRECT EXAMINATION

13  BY MR. BROWER:

14  Q   Officer, defense counsel used the term allowed in—that you

15      allowed in certain people—and then there was that list that

16      you referred to.  As a rookie police officer were you in

17      control as to whether or not your supervisors, detectives, or

18      laboratory personnel would be allowed in or not?

19  A   No, I was not.  I was not in charge of the crime scene,

20      per se.  I was merely—Essentially, I was a scribe at the door

21      just recording who came in.

22  Q   Who it was that entered?

23  A   Exactly.

24  Q   If, however, a civilian were to pull up in front and attempt

25      to gain entry thinking that the business was still open for

                            245

1        some reason or other, was it your responsibility then to stop

2        that individual?

3    A   Yes, indeed.

4    Q   Now if there were civilians that were permitted into the store

5        during the time the investigation was going on while the

6        detectives and crime scene personnel were there, were those

7        civilians that you simply opened the door and said come on in,

8        or was there a different reason for their entry?

9    A   I would have had to have cleared it with my command officer

10       before I would have allowed anyone—

11   Q   And actually—

12   A   —else to go in.

13   Q   —allow them to enter with the detective to clarify a specific

14       question inside the building—that type of thing?

15   A   Yes.  They wouldn't have been allowed in if there weren't a

16       specific reason for them to be brought in.

17   Q   To be brought in, escorted in—

18   A   Right.

19   Q   —and then escorted back out?

20   A   Correct.

21   Q   And is that true for all of those civilians listed on the—on

22       your list of people that were permitted in?

23   A   It—It would have been following procedure.  I can't speak

24       specifically from specific memory because it's been 15 years.

25   Q   Simply for a civilian to make the request to go in would not

246

1    be sufficient; it would be—

2  A    That's correct.

3  Q    —somebody—a detective, for instance—inside requesting

4     that—bringing that person in for a specific purpose?

5  A    Correct.  It would have had to have been cleared with somebody

6     inside—a detective or a command officer.

7  Q    Now as far as the keys on the inside is concerned—the keys in

8     the lock—

9  A    Yes.

10  Q    —hanging on the inside of the door, you reached the conclusion

11     that someone must have been in the building at some point,

12     otherwise, why would there be keys hanging there; is that

13     basically what you're saying?

14  A    That's correct.

15  Q    But did you see anyone inside—

16  A    From—

17  Q    —from the door?

18  A    From the perspective of looking in the front door, we couldn't

19     see anybody inside, no.

20  Q    Did you have reason to believe that that was a robbery or a

21     murder and that there was a crime that was soon to be

22     discovered in the back?

23  A    Not necessarily.  There could have been any number of innocent

24     reasons, but it was certainly—it was certainly a factor to

25     take in—to take into consideration when we went in the front

1    door.

2  Q    Which is why you entered and looked to evaluate and determine

3       what was going on?

4  A    Exactly.

5            MR. BROWER:   I have nothing further of this

6       witness.

7            THE COURT:   Anything else, Mr. Svikis?

8            MR. SVIKIS:   No, your Honor.

9            THE COURT:   You can step down, sir.   Thank you.

10            THE WITNESS:   Thank you.

11            MR. BROWER:   Your Honor, the People call

12       Sergeant Joe Humphries to the stand.

13            THE COURT:   Do you solemnly swear or affirm the

14       testimony you're about to give shall be the truth, the whole

15       truth, and nothing but the truth?

16            MR. HUMPHRIES:   Yes, sir.

17            THE COURT:   . . . (inaudible) be seated.

18                 JOE HUMPHRIES,

19       called at 9:47 a.m., and sworn by the Court, testified:

20                 DIRECT EXAMINATION

21  BY MR. BROWER:

22  Q    Sir, would you please state your full name and spell your last

23       name for the record.

24  A    Sergeant Joe Humphries—H-u-m-p-h-r-i-e-s.

25  Q    Officer—or Sergeant Humphries, you're presently a sergeant

                         248

1     with the Kalamazoo Department of Public Safety; is that

2     correct?

3  A  Yes, I am.

4  Q  Were you employed back in February of 1991 with the Kalamazoo

5     Department of Public Safety?

6  A  Yes, I was.

7  Q  In what capacity, sir?

8  A  I was a patrol officer at that time.

9  Q  How long had you been so employed?

10  A  About a year.

11  Q  As of that date in February of '91 you had been on about a

12     year?

13  A  Yes, sir.

14  Q  Do you recall responding to the Minute Market on Stadium Drive

15     regarding an incident that had occurred there?

16  A  Yes, I do.

17  Q  Do you recall the dispatch information?

18  A  Yes.  Well, I had been there, actually, twice.

19  Q  All right.

20  A  I had been there prior to that on my own accord, and then we

21     got dispatched back to that location.

22  Q  Let's talk about the second—or the time when you were actually

23     dispatched to that location or that you went to assist

24     officers.  Do you remember the nature of the information at

25     that time?

(Tape No. C2005-022, 2-08-05, 09:49)

1  A   Yes, there was a homicide.

2  Q   Do you remember approximately what time that was?

3  A   It was like 8:30.

4  Q   You went there and actually arrived to assist, correct?

5  A   Yes, sir.

6  Q   Who was on scene when you got there?

7  A   Officer Bravata and Officer Brinkman at the time.

8  Q   Were there any other individuals there upon your arrival, if

9      you recall?

10  A   No, sir, there wasn't.

11  Q   You—Were you given any responsibilities at that crime scene?

12  A   Yes, shortly after I arrived—about a minute after I

13      arrived—Sergeant Mueller arrived, and he gave out assignments

14      to us at that point.  I was assigned to a perimeter point to

15      secure the—the scene.

16  Q   What did that involve?

17  A   It involved not allowing anyone to come and go from the area

18      of the crime scene and to search for any possible evidence or

19      anything that may have been discarded from the crime itself.

20  Q   We've heard similar terminology from Sergeant Brinkman just

21      moments ago.  As far as securing the scene, were you talking

22      about the building or the parking lot?

23  A   I was assigned to the parking lot.

24  Q   So you physically blocked access into the parking lot of the

25      Minute Market?

                              250

1  A    Correct.

2  Q    At some point were you redirected and asked to search for any

3       evidence?

4  A    Yes, sir.

5  Q    Specifically what were you looking for—the type of thing were

6       you looking for, and where did you look?

7  A    Any weapons, any bloodstained clothing, tools that may have

8       been used to get in and out of the store—anything of that

9       nature.  I was actually assigned to do that on the perimeter

10       itself—the area I was to protect—which is the exterior of the

11       building.  I never was assigned to anything inside the

12       building.

13  Q    So you're talking basically the area immediately adjacent to

14       the crime scene and not throughout the neighborhood?

15  A    Correct.

16  Q    Now you had mentioned moments ago that you had actually been

17       at the Minute Market previous to your callback at 8:30.

18  A    Yes, sir.

19  Q    Would you please describe what occurred or why you were there.

20  A    Sure.  Our shifts are 7:00 a.m. to 7:00 p.m. and vice versa,

21       and I was working the 7:00 a.m. to 7:00 p.m. shift at that

22       time.  Frequently—We start at 7:00, so frequently it's a half

23       hour or so into the shift some hunger, and I stop

24       to—frequently along the Stadium Drive area to get like

25       something to drink—an orange juice—or something to eat.  And

251

1    I'd stop along—I'd stop times before at the Minute Market, and

2    that morning I had pulled into the Minute Market parking lot

3    and realized the business was closed.

4         I'm familiar with the business, and it's normally

5    open at that time; it was not.  So Officer Bravata and I

6    checked there.  Officer Bravata actually checked the doors to

7    the business, which were locked; but I did observe that the

8    lights were off.

9         At that point I thought it was kind of strange that

10   the business had not been open.  I got into my—back into my

11   patrol car and drove around the west or—I'm sorry.—the east

12   side of the building—the south and east corner of the building

13   in back.  The employees usually park there.  There was not a

14   car there.

15        MR. BROWER:   Could you please put up exhibit number

16   one, please.

17   BY MR. BROWER:

18   Q   Do you recognize this diagram, sir?  It makes sense?

19   A   Yes, I do.  Uhm-hmm.

20   Q   Stadium Drive would be along the bottom of the slide.  It's

21       been described that Gales's Hardware would be off to the left

22       of the slide.  It would be east of the Minute Market store; is

23       that accurate?

24   A   Yes, sir.

25   Q   Sir, here's a laser pointer.  You just push that button right

                                  252

1     there.  Would you please tell us where it was that you had—Did

2     you testify that you had gone up to the doors yourself?

3 A    No, Officer Bravata went up—

4 Q    Right.

5 A    —to the door.

6 Q    And then you in your cruiser drove around the side of the

7     building?

8 A    Yes, sir.  We were parked alongside each other at the business

9     talking about it not being open.  He exited his vehicle,

10    walked up and to make sure as the lights—We both could see the

11    lights were off.  He walked up, pulled the door handle, the

12    business was locked.

13          At that point when he said the business was locked I

14    said, let me see if I see any employees here.  I just drove

15    around in my car, and I drove from the front of the business

16    here around back to here, noticed no cars, and back up to

17    here, and said the employees—it doesn't appear there's

18    employees here 'cause usually the employees park over here in

19    this back corner.  That's where—

20 Q   All right.

21 A    —the employees' car usually was.

22 Q   You have just pointed with the pointer on the top left corner

23    of the building along the east side of the building; is that

24    correct?

25 A    Yes, sir.

253

1  Q   And it is in that area that you expected or would have

2      expected to see an employee's car?

3  A   Yes, sir.

4  Q   Is that because of your stops there and seeing that employee's

5      car on other occasions?

6  A   Correct.

7  Q   When the vehicle—an employee's car is parked there, could you

8      describe how it's positioned in relation to the vehicle?

9  A   It's just parked alongside—

10 Q   —or—Excuse me.—in relation to the—

11 A   I'm sorry.

12 Q   —building.

13 A   Yeah, it's just parked alongside of the building.  I can't be

14     actually specific.  It's diagonal parked—angle parked.  But

15     they were always parked in this—along this

16     . . . (unintelligible) it didn't interfere with any delivery

17     trucks or anything.

18          That is open along the back there.  You can actually

19     access—There's an access road that goes into the opposite

20     business, and their delivery trucks and their beer trucks and

21     stuff will come in there.

22          They would normally park along this side of the

23     building and, I think, enter that door there.  I'm not

24     positive where they would enter, but that would make sense.

25     And that—They're usually along this area.  And when I didn't

                              254

1     see one, I just—Officer Bravata and I thought, you know, it

2     was kind of unusual but it's not out of the question that

3     somebody doesn't come to work on time so we feel—felt that

4     nobody had just arrived for work yet as their car wasn't

5     there.

6  Q   And, again, the time of that whole scenario that you just

7     described was about what?

8  A   Seven thirty-five in the morning.

9          MR. BROWER:   Thank you.

10         I have nothing further of this witness.

11         THE COURT:   Mr. Svikis?

12                CROSS-EXAMINATION

13 BY MR. SVIKIS:

14 Q   Now, Officer, you said you stopped there on—on an number of

15    occasions?

16 A   Yes, sir, on occasion.

17 Q   And then you would also know that Chris Dimmick, who opens the

18    store, did not own a car, too; do you know that?

19 A   No, sir, I did not.

20 Q   Were you sent back to the scene to look for anything of

21    evidentiary value?

22 A   Yes, sir.

23 Q   And did you find what you believed to be of some evidentiary

24    value—something?

25 A   No, sir.  I found nothing.

                    255

1  Q    Okay.  Didn't you find a ten-speed bike?

2  A    No, sir.

3  Q    Do you know if Officer Bravata found a ten-speed bike?

4  A    I know an officer did; I have no idea which one it was.

5  Q    So the first time that you stopped was around—Tell me

6       again.—7:00—

7  A    Seven thirty-five in the morning.

8  Q    And then you—And you were sent back to help secure it before

9       others entered; is that—or not?

10 A    I was sent back to secure the exterior—

11 Q    Right.

12 A    —of the business.

13 Q    And at what time was that?

14 A    Approximately 8:30—about an hour later.

15              MR. SVIKIS:   Thank you.

16              I have no further questions.

17                   REDIRECT EXAMINATION

18 BY MR. BROWER:

19 Q    Officer, the—what other officers may or may not have found,

20      you don't know from personal observation; is that correct?

21 A    Correct.

22 Q    You don't have any idea where it was found or any of the

23      significance regarding that bicycle?

24 A    No, sir.  When we're given our specific area to stay at, we

25      don't leave the area for secure reasons.

                              256

1        MR. BROWER:   Thank you.

2        I have nothing further.

3        MR. SVIKIS:   Nothing further, your Honor.

4        THE COURT:   You can step down, sir.   Thank you.

5        MR. BROWER:   People call Officer Bruce Labrie to

6  the stand.

7        THE COURT:   You do solemnly swear or affirm the

8  testimony you're about to give shall be the truth, the whole

9  truth, and nothing but the truth?

10       MR. Labrie:   I do.

11       THE COURT:   Be seated.

12            BRUCE LABRIE,

13  called at 9:58 a.m., and sworn by the Court, testified:

14           DIRECT EXAMINATION

15  BY MR. BROWER:

16  Q  Officer, would you please state your full name and spell your

17    last name for the record.

18  A  It's Bruce Labrie—L-a-b-r-i-e.

19       MR. BROWER:   Your Honor, if I may inquire of

20  defense counsel if there'll be a stipulation to

21  exhibits—photographs two through 41, as well as exhibits 48

22  and 49?

23       THE COURT:   Two through what?

24       MR. BROWER:   Forty-eight—No—Excuse me.—two through

25  41 and then exhibits 48 and 49.

1              MR. SVIKIS:    Yes.

2              THE COURT:    Forty-eight and forty-nine.

3              All right.  They're received.

4   BY MR. BROWER:

5   Q    Officer, could you please tell us how you were employed or

6        where you were employed back in February of 1991?

7   A    I was a laboratory specialist for the department of public

8        safety in Kalamazoo.

9   Q    Would you explain for the jury what a laboratory specialist

10       did.

11  A    I did controlled substance analysis.

12             I had four technicians who were working the mobile

13       lab part who did crime scenes that I supervised, and then I

14       assisted them on crime scenes.

15             I also taught crime scene investigation, bloodstain

16       pattern analysis, and controlled substance analysis.

17  Q    How many crime scenes have you investigated over the course of

18       your year [sic]; and then, secondarily, how many of those

19       crime scenes were homicide scenes?

20  A    Crime scenes, probably between three and 5,000 and over a

21       hundred in homicide scenes that I've worked.

22  Q    Have you previously been qualified as an expert in the area of

23       crime scene investigation and blood spatter analysis?

24  A    Yes, sir, I have.

25  Q    Approximately how many times and in what courts?

258

1   A   Probably at least 25 times.

2   Q   Tell us what is involved—or the types of things that you would

3       routinely do at a homicide crime scene?

4   A   Normally photographs, video, checking for any evidence, be it

5       fingerprints, looking at bloodstain patterns—

6               MR. SVIKIS:   Your Honor, I would object to further

7       testimony here.  The prosecutor asked what he normally does.

8       In this particular case we're interested what he did or did

9       not do in this particular case.  I don't want it to be

10      confused that what he would normally—should or may have done

11      that was not done in this case when he gives this kind of

12      testimony.

13              MR. BROWER:   Habit or routine is admissible, your

14      Honor, and that he acted in conformity with that habit or

15      routine on this occasion is also relevant.

16              MR. SVIKIS:   Your Honor, he hasn't testified he

17      doesn't recall and that he's relying on habit and routine.

18              THE COURT:   Yeah, I think at this point we're

19      getting ahead of ourselves and you're assuming facts not into

20      evidence; so—

21  BY MR. BROWER:

22  Q   Officer, when you—you were called to this scene you, in fact,

23      did arrive to process the scene; is that correct?

24  A   Yes, sir, I did.

25  Q   Were there other officers that were involved in—as part of

259

1    this crime scene investigation?

2  A  Yes, sir, there were.

3  Q  Who would that be?

4  A  That was John Spiker.  He assisted me at the scene.

5  Q  What types of—

6         MR. BROWER:   Well, I might be getting a head of

7    myself for just a moment.

8         Based on the officer's testimony, your Honor, I'd

9    like to have the—ask that the witness be qualified as an

10   expert in crime scene investigation and blood spatter

11   analysis.

12        MR. SVIKIS:   Your Honor, I would inquire on the

13   blood spatter—foundation on blood spatter.

14        THE COURT:   Go ahead.

15              VOIR DIRE EXAMINATION

16 BY MR. SVIKIS:

17  Q  Officer, you're retired right now?

18  A  Yes, sir, I am.

19  Q  And what year did you retire?

20  A  1999.

21  Q  And was 1999 the last time you conducted any technical work

22   for the city of Kalamazoo?

23  A  For the city of Kalamazoo, yes, sir, that's correct.

24  Q  All right.  And the prosecution wants to qualify you as a

25   blood spatter expert.  What—When was the first class that you

                              260

1       took on blood spatter?

2   A   That was in 1988 in Minnesota.

3   Q   All right.  And how long was that class?

4   A   That was a one-week class that was about 60 hours long.

5   Q   All right.  Did you get a certificate after that?

6   A   Yes, sir, I did.

7   Q   All right.  And that was—And that class ended when?

8   A   It would have been in May of 1988.

9   Q   All right.  And in order to conduct blood spatter analysis do

10      you need certain tools and techniques?

11  A   Yes, sir, you do.

12              MR. SVIKIS:   All right.  I have no further

13      questions.

14              I'll allow—I have no objection.

15              THE COURT:   All right.  He's so recognized then.

16                  DIRECT EXAMINATION (cont.)

17  BY MR. BROWER:

18  Q   Officer, after your arrival and the arrival of the crime scene

19      team, what investigative procedures did you go through upon

20      your arrival.  Could you just lead us through your steps that

21      took place on this occasion.

22  A   First thing that I do is I talk with the officers that are at

23      the scene—And, in this particular case, Jim Grace, who was a

24      detective, was there, also.—to get any information that I can

25      on background information or anything like that that may at

                        261

1    some point become relevant to the investigation.

2         The next thing we'll do after we get that

3    information is we'll do a walk through the crime scene to see

4    what is there, what evidence possibly is located there, and

5    what equipment we're going to need.

6         And then after that's done, then we begin our

7    initial investigation.

8  Q   That initial investigation involves what steps?

9  A   First thing that's done is that you document the crime scene

10    with photographs. The first photographs that are taken are

11    the exterior of the building so that you cover all areas of

12    the exterior of the building. Then you come into the

13    building. And your photographs are taken much as if you're

14    walking through looking at something from all directions so

15    that your photographs, when they're laid out, you can look at

16    those and they're in sequential order so that you're

17    establishing from the front of the building and up through

18    where the victim's located and then out of the building.

19  Q   Did that—That's what occurred here as well; is that correct?

20  A   That's correct.

21  Q   I'll take you through the photographs that have been admitted

22    by stipulation now, Officer, beginning with exhibit number

23    two. You recognize this photograph, sir?

24  A   Yes, sir, I do.

25  Q   If you would then please describe for the jury what's depicted

1    in this photograph.

2  A   This is the rear portion of the store on the morning of the

3    incident.

4           MR. BROWER:   I have the copy for you if that would

5    help you, Officer.   I don't know how well you can see from

6    that position.

7  BY MR. BROWER:

8  Q   So this would be—There's an arrow on the top left corner on

9    the diagram of the floor plan indicating the direction of the

10    person taking the photograph—the view from the photographer

11    who's taking this photograph; is that right?

12  A   Yes, sir, that's correct.

13           MR. BROWER:   Exhibit number two or—Excuse

14    me.—three.

15  BY MR. BROWER:

16  Q   If you could describe what's depicted here, sir.

17  A   This would be the side of the building which would be the

18    closest—Stadium Drive out there does not run east and west or

19    north and south.   It's a little bit of a

20    northeasterly/southeasterly direction—or southwesterly

21    direction.   And it would be the side of the building—

22  Q   The—

23  A   —towards the—

24  Q   All right.   The Gale's Hardware, then, would be off to the

25    left of this photograph?

1    A    Yes, it would be.

2    Q    Presently Gale's Hardware fills that space and alleyway.  It

3         goes almost right up to the edge of this—the building what is

4         now Bronco Mart; is that correct?

5    A    Yes, it does.

6              MR. BROWER:   Exhibit number four.

7              THE WITNESS:   This is another view of the last

8         photograph, but it's looking from a different direction out

9         towards Stadium Drive.

10   BY MR. BROWER:

11   Q    I believe that's a cruiser off to the bottom edge in an area

12        which would have blocked access to this area during the

13        investigation?

14   A    Yes, sir, that's correct.

15             MR. BROWER:   Exhibit number five.

16             THE WITNESS:   This is just a little more specific

17        of the corner of the side of the building looking out towards

18        Stadium Drive—just a little tighter shot.

19   BY MR. BROWER:

20   Q    Nearing the front of the store in a front view?

21   A    That's correct.

22             MR. BROWER:   Exhibit number six, please.

23             THE WITNESS:   This is the front of the building,

24        and it's looking at it in a—almost a southwesterly direction.

25             MR. BROWER:   Sir, I have a pointer for you.  If you

                              264

1      care to use this, push that button to get the laser going.

2  BY MR. BROWER:

3  Q    If you could just point out the front doors on this

4       photograph.

5  A    . . . (inaudible) The front doors would be right here.

6           MR. BROWER:   All right.   Exhibit number seven.

7           THE WITNESS:   This would be the front doors looking

8       out towards Stadium Drive.

9  BY MR. BROWER:

10 Q    And there appears to be some keys in the lock on the inside,

11      correct?

12 A    That's correct.

13          MR. BROWER:   Exhibit number eight.

14          THE WITNESS:   This is the interior of the store.

15      The front doors would be in this position right here, and this

16      is the counter where the cash registers are located.

17 BY MR. BROWER:

18 Q    There appears to be an officer at the front door?

19 A    That is correct.

20          MR. BROWER:   Exhibit number nine.

21          THE WITNESS:   This is looking at the front counter

22      of the store.

23 BY MR. BROWER:

24 Q    A little bit different angle than the immediately preceding

25      photograph?

                        265

```
 1  A    Yes, it is.

 2  Q    All right.  The cash registers are where, then?

 3  A    They would be in this area—

 4  Q    Okay.

 5  A    —down along here.

 6  Q    There's actually a walkway just on the other side—

 7            MR. SVIKIS:    Your Honor—

 8            MR. BROWER:    —of that shelf that was—

 9            MR. SVIKIS:    Your Honor, I'm going to object.  This

10       would be the third time that, in essence, the prosecutor is

11       leading this officer and, in fact, testifying.

12            The first time that he injected isn't this a squad

13       car in the corner that's blocking traffic.

14            The—

15            THE COURT:    Well, it's too late.  You know, once—

16            MR. SVIKIS:    But—

17            THE COURT:    —it's in and you don't make an

18       objection, I can't do anything about it.

19            MR. SVIKIS:    Right.  But this is the—this is the

20       third time.  I thought it was by mistake, but now he's leading

21       the officer and explaining to him what's behind the counter.

22       It's this officer who's supposed to be testifying what these

23       scenes are, where they are—

24            THE COURT:    What's your—

25            MR. SVIKIS:    —and what they are.
```

1    THE COURT:   —objection, Counsel?

2    MR. SVIKIS:   That's my objection.

3    THE COURT:   Leading?

4    MR. SVIKIS:   Yes, that he's—

5    THE COURT:   Sustained.

6    MR. SVIKIS:   —leading and he's, in fact,

7 testifying.

8    THE COURT:   Let's get on with it.   Sustained.

9 BY MR. BROWER:

10 Q   Officer, could you point out the area where the cash registers

11 were in . . . (inaudible).

12 A   This area down through here on the counter.

13    MR. BROWER:   Thank you.

14    Exhibit number ten, please.

15    THE WITNESS:   As you come into the store and as you

16 walk along the counter—This would be the counter, lottery

17 machine and cash registers would be back in this area along

18 the counter, and this is the doors into the back room.

19 BY MR. BROWER:

20 Q   Could you show on the diagram where those back doors would be.

21 A   . . . (inaudible)

22    MR. BROWER:   All right.

23    Exhibit number 11, please.

24    THE WITNESS:   This is the rear of the counter.   The

25 counter's here.   This is the area behind the counter.

267

1  BY MR. BROWER:

2  Q    This photograph would have been from the view of a

3       photographer standing where?

4  A    Photographer on this one would have been standing right here

5       where the arrow starts.

6            MR. BROWER:   Exhibit number 12.

7  BY MR. BROWER:

8  Q    What's depicted here, sir?

9  A    This is a trash can behind the counter.

10 Q    If you could—What's that on the bottom—there on the bottom

11      edge?

12 A    This right here, I believe, is where one of the four safes

13      laid.

14            MR. BROWER:   If you can go back one

15      exhibit—number 11.

16 BY MR. BROWER:

17 Q    The trash can in exhibit 12 is where?

18 A    It's right in this location.

19            MR. BROWER:   Exhibit 13.

20            THE WITNESS:   This would be the floor safe

21      underneath the waste can that's depicted in the previous

22      photograph.

23 BY MR. BROWER:

24 Q    Officer, are you aware whether or not there were—was another

25      floor safe in this building?

                              268

1    A    I believe there was.

2    Q    This is the front floor safe in the—behind the cash register;

3         is that what you just testified to—or in that area?

4    A    . . . (inaudible)

5    Q    All right.  Continue on to number 14, please.

6    A    This would be the cover removed from that floor safe showing

7         the combination lock.

8    Q    There appears to be a slot of some side [sic]—sort on the

9         side?

10   A    That's correct.

11   Q    And that would be for what purpose?

12   A    That would be for dropping money or envelopes into.

13              MR. BROWER:   Exhibit number 15.

14              THE WITNESS:   This would be the safe open showing

15         the interior of it, that there is nothing inside of it.

16   BY MR. BROWER:

17   Q    Just for clarification.  This was the—the front floor safe?

18   A    Yes, sir.

19   Q    Just a succession of photographs; is that right?

20   A    Yes, sir.

21   Q    Was this the condition of that safe upon your arrival?

22   A    Yes, sir.

23              MR. BROWER:   Exhibit number 16.

24   BY MR. BROWER:

25   Q    What's depicted in this photograph, sir?

269

1  A    This would be a—from register number one—would be the receipt

2       2/8 of '91 showing the time of 6:32.

3  Q    The significance of that time being what?

4  A    As we were able to ascertain that that is the time and the

5       date that that register was activated.

6  Q    I believe that you indicated it had a date of 2/8.  That was

7       the date of this crime, correct?

8  A    That's correct.

9  Q    Six thirty-two—0632 is on the bottom right-hand corner

10      indicating 6:32 a.m. that day?

11 A    Yes, sir.

12            MR. BROWER:   All right.

13            Exhibit number 17.

14            THE WITNESS:   This would be from the register

15      number one or—I'm sorry.—register number two at 6:31 2/8 of

16      '91 would be an activation for that register.

17 BY MR. BROWER:

18 Q    How many cash registers did you find, sir, there?

19 A    There were two.

20 Q    And so you now have tapes—one from each—is that correct?

21 A    Yes, sir, that's correct.

22            MR. BROWER:   Exhibit number 18, please.

23            THE WITNESS:   Cash register showing cash and change

24      in the cash register.

25

                          270

1  BY MR. BROWER:

2  Q    From one of the registers?

3  A    Yes, sir.

4          MR. BROWER:    Exhibit number 19.

5          THE WITNESS:    And I'm not sure if this is the same

6  cash register from a different angle or if it is the—the

7  separate—the second cash register.

8          MR. BROWER:    Exhibit number 20.

9          THE WITNESS:    As you would come in the door through

10  the front doors right here—We're now looking right down this

11  first aisle towards the cooler, and then there's pop coolers

12  on the side.

13  BY MR. BROWER:

14  Q    I'm sorry?    You said there're pop coolers—

15  A    Right here.

16  Q    Okay.

17  A    And then an open cooler down at this end.

18          MR. BROWER:    Exhibit number 21.

19          THE WITNESS:    What we've done now is we've come in

20  the front door; we've gone past the first aisle to the second,

21  we're looking down the second aisle at this point.

22          MR. BROWER:    Exhibit 22.

23          THE WITNESS:    This would be the coffee pot inside

24  the store which is—if I'm not mistaken—is on one of the end

25  displays.

271

1       MR. BROWER:    Exhibit 23.

2       THE WITNESS:    This would be looking down what would

3   be the third aisle . . . (inaudible)—third aisle down looking

4   down that aisle.

5       MR. BROWER:    Exhibit 24.

6       THE WITNESS:    This would be the final aisle inside

7   the store.  Doors here that go into this rear bottle room.

8   And this would be taken approximately from the location of

9   these doors right here.

10      MR. BROWER:    Exhibit 25.

11      THE WITNESS:    Our last show was showing down this

12  aisle.  If you were to come down to the end of the aisle and

13  then take the shot looking back towards Stadium Drive, that is

14  what this photo depicts.

15      MR. BROWER:    Exhibit 26.

16      THE WITNESS:    The doors that you could see when you

17  looked down the final aisle, if you were to go through those

18  doors and look to the left, this would be the shot that you

19  could see.

20      MR. BROWER:    Exhibit 27.

21      THE WITNESS:    This would be just the opposite

22  direction of the previous shot.

23  BY MR. BROWER:

24  Q   Now you're—the view is—is that towards Westnedge or—Excuse

25      me.—towards Stadium Drive?

272

1  A     Yes, sir, it would be.

2             MR. BROWER:   Exhibit 28.

3             THE WITNESS:   This is showing the doors open into

4      the back room and showing the back door.

5  BY MR. BROWER:

6  Q     The door in the center of the—the photograph, is that the rear

7      door on the south side of the building?

8  A     Yes, it is.

9  Q     Sir, there appears to be a protrusion on the east wall—a small

10     box sticking out somewhat.  Do you recall—just to the south of

11     the door.  Do you recall what that is?

12 A     I'm sorry?

13 Q     Let me point that out for you.  Right here.  Do you recall

14     what that object is?

15 A     No, sir, I do not.

16 Q     Okay.  Do you know that this building was equipped with a

17     Sonatrol system—protection system?

18 A     Yes, sir, I did.

19             MR. BROWER:   Okay.  Exhibit number 30—I'm

20     sorry.—29.

21             THE WITNESS:   This would be the alarm keypad.

22             MR. BROWER:   Exhibit 30, please.

23             THE WITNESS:   Come in the back doors and there's a

24     hallway that leads back to the rear portion of the storage

25     area in here.  That is looking down that rear storage area

                                273

1     from the area coming in the back door or coming through these

2     doors here by the office.

3  BY MR. BROWER:

4  Q   Officer, would this be an area that is not part of the retail

5     sales area?

6  A   This would not be.  This would be totally in the back room

7     that the public would not be in.

8  Q   There appears to be an object near the far end of this

9     hallway, sir; is that correct?

10  A   This location right here.

11  Q   And what is that?

12  A   That's the victim.

13          MR. BROWER:   Exhibit 31.

14          THE WITNESS:   This is the location that when we

15     arrived that the victim was in and nothing's been disturbed at

16     this point.

17          MR. BROWER:   Exhibit 32.

18          THE WITNESS:   Again, the victim.  This is just a

19     different view—would be from the feet.  This was from the

20     head—would be the opposite direction.

21  BY MR. BROWER:

22  Q   Officer, you've been qualified as an expert in blood spatter

23     analysis.  Could you at this point please briefly describe

24     what you, as an expert in that area, can determine from blood

25     found at a scene, the types of things that you would look for

(Tape No. C2005-022, 2-08-05, 10:20)

1     and significance.

2  A  From this location looking at it, what you're going to notice,

3     you're going to notice blood that seems to be pooling right

4     here and that seems to be running out.  This would be due to

5     what we call passive bleeding.  This is where someone—Their

6     heart is beating, they're bleeding, they're not moving.

7     Nothing is acting upon that blood other than just gravity.

8     And here would be the different drops on the floor.  The floor

9     is probably at this point not perfectly flat, so the blood's

10    going to go to the lowest level.

11  Q  You've used the term passive bleeding.  Are there descriptions

12    that you would use for different types of blood pattern?

13  A  Yes.  There's things like castoff, which is something where

14    you would have blood on your hand, for example, or even on

15    some type of a weapon that someone's been struck with that has

16    blood on it.  And when that's moved like this what happens is

17    the blood that's on it will cast off and cause some patterns.

18         You can also have a wiping pattern where some other

19    force has wiped through the blood or, perhaps, the person has

20    even moved their own hand through blood.

21         Or in the case of someone who is immobile and is

22    injured and bleeding, you'll have patterns where they're

23    indicative of someone moving while they're bleeding.  And

24    those cause—Each of those causes a unique type of pattern.

25  Q  At some point did you go through the interior of this building

1    and during your search for evidence also look for evidence of

2    blood?

3  A  Yes, sir, I did.

4  Q  What areas of the building did you look for blood?

5  A  I looked for—The first place I looked for any blood was in

6    this area right in here around the body to see if there was

7    anything.  When I see the type of wounds that were received

8    and when I see the type of pattern that I see in this location

9    right here, I will look for anything else—even

10    microscopic—that could give me any idea as to possibly what

11    may have occurred.

12  Q  Did you find any blood droplets or any other evidence of blood

13    at any location other than the passive bleeding that you've

14    already described?

15  A  No, sir, I did not.

16  Q  You talked about first checking the area immediately around

17    the body.  Did your search progress to include other areas of

18    the building?

19  A  Yes, sir, it did.

20  Q  Specifically where?

21  A  In the area of the counters, the office.  A lot of times blood

22    patterns can be extremely small.  Blood, when it's acted upon,

23    in different types of impact has different characteristics.

24    If you take blood that's on a table and you hit that with your

25    hand it's going to cause a relatively large pattern of

1   spatter.  If you then hit that with something like a baseball
2   bat, it's going to be—It's got more force.—it's going to be a
3   little bit smaller droplets.  If you hit something like that
4   with a gunshot, it's almost going to atomize it and cause
5   almost like a mist.

6           So what I look for is I look for any patterns like
7   that.  But with the evidence that I was seeing just in this
8   area right here, I knew that I probably was not going to find
9   anything else other than the blood evidence that was right
10  here.

11  Q   Your search for blood, among other things, that include—did
12      that include the—the retail store area or the bottle area as
13      well?

14  A   Yes, sir.

15  Q   Tell us how it is or what you do to look for evidence of
16      blood.

17  A   The biggest thing is if you have—One of the things you've got
18      going for you in a store like this is that if there is any
19      blood the contrast is going to be pretty good so you can see
20      pretty much if you've got something 'cause you got, you know,
21      light color and then you've got the color of blood, unlike you
22      would something with dark carpet, which would be extremely
23      difficult to do.

24          This I looked for with a rechargeable
25  100,000 candlepower Streamlight flashlight just using oblique

                                    277

1    lighting on angles looking at that.

2         One of the other things at crime scenes that you're

3    concerned with are fingerprints, footwear evidence—things of

4    that type.  With fingerprints, if you go in and you

5    fingerprint something, you're going to obliterate blood

6    evidence.  And so the first thing you're going to do is you're

7    going to look for your blood evidence first so that you don't

8    take any chances of covering that fingerprint up.

9  Q  So that—Was that done, then, prior to fingerprinting on this

10   occasion during this investigation?

11 A  Yes, sir, it was.

12 Q  So we're clear, as a result of your checking in each of those

13   areas using the high intensity light that you described, did

14   you find any indication of any blood at any other location?

15 A  No, sir, I did not.

16 Q  Based on your training and experience, your observations at

17   the scene, did you reach a conclusion or do you have an

18   opinion as to where the injuries to the victim occurred—in

19   what part of the building?

20 A  They occurred right here.

21 Q  As she's found in this back room?

22 A  Yes, sir, that's correct.

23         MR. BROWER:  Exhibit number 33, please.

24         THE WITNESS:  You're going to observe two entrance

25   wounds here.  You can see how the material is folded as—You

278

1    can see on your own shirts how when you sit or something like

2    that where your shirts will bunch up is what has happened.

3            The blood in here—Had this person been bleeding in a

4    position of standing at the time that there was blood

5    emanating from these bullet wounds, it would have ripped more

6    down and it would have been in more of a—almost a pattern

7    coming straight down.

8            What this is is this is blood accumulating at the

9    surface.  It's wicking into the clothing and staying much in

10   this area where it is.  This indicates to me that this person

11   was bleeding in this position and was not moved.

12           MR. BROWER:  Exhibit number 34, please.

13           THE WITNESS:  We're—Our victim is here.  We're now

14   looking back towards this back corner and this doorway.

15   BY MR. BROWER:

16   Q   Immediately through that door—through that door that's in the

17       center of the photograph—and then immediately to the left

18       would be what?

19   A   Would be out into the store.

20   Q   All right.  You had previously talked about some double doors

21       in the bottle room; is that right?

22   A   Yes, sir, this location right here.

23           MR. BROWER:  Okay.  Exhibit number 35.

24           THE WITNESS:  We're now looking—The back door's

25   here.—the double doors coming in, and we're looking at an

279

1    angle into the door where the office is located.  This photo

2    is taken in this location because there's such—It's very

3    confined in there, and you don't have enough room to take this

4    straight on and include this much—as much of the door as you

5    have.

6              MR. BROWER:   Exhibit number 36.

7              THE WITNESS:   We're now looking at the rear wall in

8    the office.  And from this wall the photo's taken looking to

9    this back wall.

10   BY MR. BROWER:

11   Q    There appears to be a desk of some sort in the lower

12        right-hand corner of that photograph; is that correct?

13   A    Yes, sir, that's correct.

14             MR. BROWER:   Exhibit number 37.

15             THE WITNESS:   This is under the desk, this is off

16   to the side of the desk.

17   BY MR. BROWER:

18   Q    Appears to be a purse of some sort; is that—

19   A    Yes, sir.

20   Q    —accurate?  Okay.

21             MR. BROWER:   Exhibit number 38.

22             THE WITNESS:   Inside the office looking towards

23   Stadium Drive from the back of the office.

24   BY MR. BROWER:

25   Q    Sir, were you aware of some information that recording

1   equipment—security equipment—had been taken or a portion of
2   it?
3 A   I believe that I was.
4 Q   There appears to be some cords and some equipment on that
5   middle shelf; is that right?
6 A   Yes.
7       MR. BROWER:   Exhibit number 39.
8       THE WITNESS:   We're now looking back towards the
9   back corner of the office in this location.
10 BY MR. BROWER:
11 Q   Those objects on that counter—or on that shelf, you know what
12   they are?  All right.  On the very bottom one or the third one
13   from the bottom.
14 A   They look like cash drawers.
15       MR. BROWER:   Exhibit number 40.
16       THE WITNESS:   In the office—This is the floor safe
17   located in the office, which would be at the base of the—where
18   the previous photograph was taken, the shelf.
19       MR. BROWER:   Exhibit 41.
20       THE WITNESS:   The safe has been opened now, and
21   that's just showing the contents.
22       MR. BROWER:   Thank you.
23       Officer, you can return to your seat.
24       THE WITNESS:   Thank you.
25

281

1  BY MR. BROWER:

2  Q    Officer, is it your understanding that the keys that were

3       found in the door that you photographed and spoke about, as

4       well as the—I'll call it a receipt.—the paper printout showing

5       the time that cash registers were activated, that those were

6       collected as evidence?

7  A    Yes, sir, they were.

8  Q    Officer, you have testified that procedure calls for checking

9       for blood spatter evidence before fingerprints are taken and

10      you gave the reason for that.

11 A    Yes, sir.

12 Q    I would like to then ask following the inspection for other

13      blood evidence is that the time that—or whether or not

14      fingerprints were taken on this occasion as well?  Or—Excuse

15      me.—that might be the wrong terminology.  Looking for latent

16      fingerprints, examining the premises for signs of

17      fingerprints.

18 A    Yes.  After the photographs, the examination for the blood,

19      and evidence that we were going to transport had been located,

20      then we began to fingerprint items that could not be moved

21      from the store.

22 Q    The kinds of things that were printed are what, sir?

23 A    You're looking at the doors, the point of entries, the point

24      of exits—the—anything—anything that would not be mobile and be

25      able to be taken to the station to be done.

                              282

1  Q   Would that have included the cash machines, items that you

2      believe might have been touched inside the office area, and so

3      on, and so on?

4  A   Yes, sir, that's correct.

5  Q   Now items that could not be moved, then, were taken to the

6      police station?  I made that assumption, I guess.

7  A   Yes.

8  Q   If they could not be moved, it's because you took them with

9      them [*sic*]; is that right?

10 A   Well, items that could not be moved, such as things that are

11     stationary in the building—doors and things like that—anything

12     of a mobile or a smaller scale was taken and then printed

13     using different types of processes.

14 Q   Those items—the smaller, movable items—were brought back to

15     your station?

16 A   That's correct.

17 Q   Were those items then examined for any evidence of

18     fingerprints that might have been left on them?

19 A   Yes, sir, they were.

20         MR. BROWER:   I have no further questions of this

21     witness.

22         THE COURT:   Why don't we take the recess before we

23     proceed with cross-exam.

24         (At 10:34 a.m., court recessed)

25         (At 10:50 a.m., proceedings reconvened)

                       283

1        THE COURT:   Cross-examination, Mr. Svikis.

2        MR. SVIKIS:   Thank you.

3                    CROSS-EXAMINATION

4  BY MR. SVIKIS:

5  Q    Officer Labrie, what time did you arrive at the scene?

6  A    It would have been a little after 9:00 a.m.

7  Q    And by the time that you arrived, there were a number of other

8       officers already there, correct?

9  A    Yes, sir, that's correct.

10 Q    And they had been walking through the store, isn't that

11      correct?

12 A    Yes, sir, they had.

13 Q    And these photos that you were describing, you didn't take any

14      of those photos, did you?

15 A    No, sir, I did not.

16 Q    But you testified that you did visit with all the other

17      officers to get a sense of what—what was going on before you

18      started your investigation, correct?

19 A    Yes, sir, I did.

20 Q    All right.  And do you know why there were no photographs

21      taken of the blood in the sink?

22 A    I don't recall any blood in the sink, sir.

23 Q    All right.  So if Officer Hatter and Grace received that

24      information they did not pass it on to you?

25 A    That's correct.

                    284

1   Q   And with regard to latent prints, on exhibit seven would you

2       have taken latent prints off of anything that's shown in

3       exhibit seven?

4   A   Yes, sir, the entire door would have been processed for

5       fingerprints.

6   Q   And who would do that processing?

7   A   That would have either been John Spiker or myself.

8   Q   You don't remember if you did it or not?

9   A   I don't believe that I did.  I believe that he did all the

10      fingerprinting.

11  Q   But you know that you didn't do it?

12  A   Yes, sir.

13  Q   And how would you look for fingerprints all around the door?

14  A   On that particular door, what you would have used is silver

15      fingerprint powder and just looked for the prints to develop

16      with a light shining on an angle on those.

17  Q   All right.  Now that photograph there—exhibit seven—doesn't

18      show any of that residue, right?

19  A   No.  The photographs would all be taken prior to any

20      processing being done.  And the only photos that would show

21      any fingerprint powder would be if there were actually

22      fingerprints lifted, then that would show the number of the

23      fingerprint and so that you have the location exactly where

24      that print was lifted from.

25  Q   And as far as you know, no fingerprints were lifted from

                                285

1      number seven, isn't that correct?

2  A    I—

3  Q    As far—

4  A    — . . . (inaudible)

5  Q    —as you know.

6  A    I don't believe any were.

7           MR. SVIKIS:  All right.  Let's look at

8      exhibit number 12.

9  BY MR. SVIKIS:

10 Q    And this is what you described as barely being able to see the

11     edge of the floor safe.  You didn't take any fingerprints off

12     of the—the trash barrel, did you?

13 A    No, sir, I did not.

14 Q    And you don't know if there are, in fact, any prints that were

15     ever taken off of that?

16 A    No, I don't know if there were any lifted off of that.

17           MR. SVIKIS:  And let's go to exhibit number 13.

18 BY MR. SVIKIS:

19 Q    You didn't take any fingerprints off of 13 either, did you?

20 A    No, sir, I did not.

21 Q    And exhibit 14, you didn't take—you didn't take any

22     fingerprints off exhibit 14 either, did you?

23 A    No, sir, I did not.

24 Q    And exhibit 15, you didn't take any fingerprints off that

25     either, did you?

                    286

1   A      No, sir.

2                   MR. SVIKIS:    And let's look at exhibit 16.

3   BY MR. SVIKIS:

4   Q      That's the slip.  Now in that case would that slip have been

5          taken back to the shop or left right there?

6   A      That was secured as evidence.  I don't know if that was

7          printed because that was something that was printed out after

8          we had been at the scene.

9   Q      Your testimony was that it was 6:32—Can you see it better than

10         I can?  Does that say 6:32 or something like that?

11  A      Yes, sir, it does.

12  Q      You just said it was printed after you arrived at the scene?

13  A      Yes.  Those were printed by—And I'm not sure who.  Someone

14         from the store printed those to show the time that the

15         registers had been activated.

16  Q      And on your investigation you could then alter the time?

17  A      There was no altering.  What had happened was the register—the

18         code that was punched in was punched in to show what time the

19         register had been activated.

20  Q      As—As opposed to—

21  A      The time of the sale, yes.

22  Q      Getting the time of sale.

23  A      Yes.

24                  MR. SVIKIS:    And let's look at number 18.

25                  Please.

                                287

1   BY MR. SVIKIS:

2   Q    Eighteen, you testified was a cash drawer.  You didn't take

3        any prints off that either, did you?

4   A    I did not, no.

5   Q    All right.  And you're the—You're the lab tech, and who was

6        your assistant?

7   A    John Spiker.

8   Q    And as far as—As far as you know, you have no copies of any

9        records of any prints taken off of any exhibit we've talked

10       about so far, do you?

11  A    That's prints that were lifted.  The items were printed, but I

12       don't believe there were any fingerprints located on those.

13  Q    Okay.  Of anybody's?

14  A    Yes, sir.

15  Q    And would the same be true for 18?  I just asked you 18.

16            MR. SVIKIS:   Let's go—Let's go to nine—Let's go to

17       19.

18  BY MR. SVIKIS:

19  Q    Now we're not certain whether 18 and 19 are the same cash

20       drawer, are we?

21            (No audible response)

22            It's not a trick question.  We just don't know.

23  A    I'm sure the photos here will—

24  Q    Let me say there are actually two cash registers with two cash

25       drawers that were—

288

1   A   That's correct.

2   Q   —eventually photographed?

3            All right.

4            Now you didn't take any prints off of—off of 19

5   either?

6   A   No, sir, I did not.

7   Q   And you're not aware of any record of any prints from 19

8   either, are you?

9   A   No, sir, I'm not.

10            MR. SVIKIS:   Let's go to 22.

11  BY MR. SVIKIS:

12  Q   This is the coffee pot.  And you didn't take any prints off of

13  that?

14  A   No, sir.

15  Q   And you're not aware of any prints being taken off of that, or

16  do you have any record or that; isn't that correct?

17  A   That's correct.  I know they were printed, but I don't believe

18  there were any latents developed.

19  Q   That's the best of your recollection from 14 years ago?

20  A   Sometimes certain things stick out.  A coffee pot with

21  fingerprint powder on it for some reason sticks out in my

22  mind.

23  Q   All right.  But, again, no—no prints of anyone's and no record

24  in your report as being the head lab tech; isn't that correct?

25  A   That's correct.

                                289

1  Q      In fact, in—

2                  MR. SVIKIS:   Let's go to 28, please.

3                  And then flip over to 29, please.

4  BY MR. SVIKIS:

5  Q      And this is the keypad.  Again, you took no prints off of this

6         either.

7  A      That's correct.

8  Q      And, again, you have another record of if prints were taken

9         that they showed anyone's prints at all, right?

10 A      That's correct.

11 Q      And you don't even have a record that prints were taken, they

12        were smudged, or nothing came up either, do you?

13 A      No, sir.

14 Q      Now as a lab tech did you ever determine whether there's one

15        floor safe or two floor safes?

16 A      There were two.

17 Q      All right.  And you took no fingerprints off of any of those

18        either, did you?

19 A      No, sir, I did not.

20 Q      And to sum up, from your knowledge and from your experience as

21        a lab tech, in this particular crime scene there's not a—one

22        single fingerprint—Correct?—that you know of or that you have

23        or that you've seen?

24 A      There could be.  I'm—I'm not 100 percent sure, but I don't

25        believe there were any fingerprints identified.

290

1  Q   All right.  You would have—You have a copy of your report

2       there, too, don't you?  You've reviewed your report?

3  A   Yes, I have.

4  Q   All right.  You didn't find anything in there, did you?

5  A   No, not at the scene.  One of the—One of the things we do at—

6  Q   You answered my question.  Thank you.

7           Let's talk about the blood.  You're not the first

8       officer on the scene, that's clear.  You've testified there's

9       a number of other officers on the scene by the time you get

10      there?

11  A   Yes, sir.

12  Q   And—if I have this right—because of your experience and where

13      you located the decedent, your search for blood based on your

14      experience was very cursory.  In fact, it was with a

15      flashlight; isn't that correct?

16  A   Yes, sir, that would be the only means we'd have to locate

17      something like that.

18  Q   Okay.  So you would have—What your testimony is you would have

19      no other way to locate blood at that crime scene except with a

20      flashlight?

21  A   In a manner that would not destroy any evidence, yes.

22  Q   All right.  And you also testified that it would be

23      microscopic.  Doesn't that imply that you need a microscope or

24      some other device besides a flashlight to see microscopic

25      evidence of blood?

1   A   There is—To find microscopic blood, one means you could use

2       would be to spray with luminol if you had an indication that

3       there may be some other blood.  All indications led that there

4       was no other blood present at the location; so, for that

5       reason, it was done with a flashlight to locate, which is an

6       acceptable practice.

7   Q   All right.  Now I know you'll—you'll tell me if I don't have

8       this quite right.  Is luminol the light, or is luminol

9       something you spray?

10  A   Luminol is the spray.

11  Q   Okay.  And you spray it 'cause you can't see it with your

12      naked eye, correct?

13  A   Correct.

14  Q   All right.  And there is also—Is there some magic light that

15      you use also to locate bodily fluids whether it's blood or

16      otherwise?

17  A   You can use a black light, yes.

18  Q   You didn't use any of—any of those two pieces of equipment,

19      did you?

20  A   No, I did not.

21  Q   So in viewing some of the exhibits and as they appeared on the

22      decedent and being the blood expert, you can tell that some of

23      these wounds were probably contact wounds; isn't that correct?

24  A   If not, at very close proximity.

25  Q   All right.  And your experience as an expert and 25 years of

292

1    crime scene investigation it is not unusual that in that kind

2    of a wound you would have a blowback of—of blood and/or

3    gunshot residue?

4  A    Yes, sir.

5  Q    And as the lab tech in charge, there was never any physical

6    evidence that connected Mr. Mishall to this crime scene, was

7    there?

8  A    Not that I know of.

9  Q    You'd know, wouldn't you?

10  A    I should.  Not that I—Not that I'm aware of.

11  Q    You arrived at the scene around 9:00 o'clock, and what time

12    did you leave?

13  A    A little after 1:00 o'clock.

14            MR. SVIKIS:   I have no questions.

15            THE COURT:   Do you have any redirect, Mr. Brower?

16            MR. BROWER:   Yes, your Honor.

17                 REDIRECT EXAMINATION

18  BY MR. BROWER:

19  Q    Officer, in searching a homicide crime scene, are examination

20    of sinks—in particular a homicide scene—examination of the

21    sinks part of the routine in examining the area for signs of

22    blood?

23  A    Yes, sir, they are.

24  Q    Did you examine the sink—the dry sink in the back of this back

25    area of this crime scene for evidence of blood?

1  A    I looked through the scene.  I'm sure that I did.  Now that

2       could have been something that John Spiker also may have

3       checked 'cause we were working together on this.  But

4       everything in the building would have been checked for

5       any—anything of a, you know—

6  Q    Would that be—

7  A    — . . . (inaudible)

8  Q    Would that be part of your habit and routine in a crime

9       scene—homicide crime scene investigation?

10 A    Yes, sir, it would.

11 Q    Is there anything to suggest that that did not occur on this

12      occasion?

13 A    No, sir.

14 Q    Defense counsel asked several times about your taking of

15      prints.  You didn't take this print, you didn't take this

16      print, you didn't check this item for prints.  Why is that?

17      Why is it that you didn't examine that item—those particular

18      items—for prints?

19 A    What was done at the scene—And it's how you—One person can—So

20      that you don't have two people doing the same job, what you do

21      is you delegate.  The photos were taken by John Spiker.  I

22      checked for the blood evidence and any other evidence that may

23      be needed to be taken.  While he was doing the fingerprints, I

24      was measuring the crime scene, measuring the locations of

25      everything inside the building and then putting that onto

                              294

1     paper so that we could at a later date do a drawing and put

2     everything back together.

3  Q  When defense counsel asked the question you didn't check this

4     item for prints and you acknowledged that's correct, I didn't,

5     are you saying I personally did not, or are you saying those

6     items didn't get checked at all?

7  A  I did not check those.

8  Q  Did I hear correctly, Officer, that—Did—Was this your

9     response: I didn't take the prints, but I know they were

10    printed?  Is that what I heard you say?

11  A  Yes, sir.  Items were fingerprinted, but I did not do that.

12  Q  So the things that defense counsel listed were checked, just

13    by somebody else?

14  A  That's correct.

15  Q  Now let's talk about latent prints or dusting an object in

16    attempt to see if a latent print or a hidden print is there.

17    You've been doing this for how long, sir?

18  A  I did crime scenes about 20 years.

19  Q  We've talked previously about preconceived ideas and opinions

20    that the general lay public has regarding crime scene

21    investigation and so on.  Can you explain a perception as to

22    whether or not when somebody touches something there will be a

23    latent print there that should be found.

24  A  The optimum surface for fingerprinting is glass.  If you take

25    your fingernails and run them across a piece of glass you

1    don't hear anything.  If you take your fingernails and run

2    across the wood on this desk, you'll hear that there are

3    surface disruptions.

4            An item like that is very difficult to fingerprint.

5    So what we look for, we look for surfaces similar to glass

6    because glass has the best fingerprint—they adhere the best to

7    that.

8            One of the other problems everyone runs into is in

9    the wintertime.  Fingerprints are about 99 percent water.  And

10   in the summertime your hands always seem to be fairly moist.

11   In the wintertime people's hands dry out.  What we noticed

12   over the years is that in the wintertime we get less latent

13   fingerprints than we do in the summertime, and the reason

14   being is that your hands dry out and you don't leave those.

15           That's one of the reasons why we try to bring things

16   into the station to process, such as paper items.  Those are

17   sprayed with a substance called ninhydrin, which works on

18   amino acids, and we're able to get fingerprints.  Even though

19   you can't see them on the paper, when they're sprayed the

20   amino acids that are present will leave the ridge structure.

21           So fingerprints a lot of times are real hit and miss

22   if you've got good smooth surfaces that are clean and it's

23   fairly warm.  The cold weather also affects the leaving of

24   fingerprints.  So there's a lot of variables that come into

25   play.

                                296

1   Q   Is it unusual, sir, then to process a crime scene, check for

2       prints, and find nothing?

3   A   It's not unusual at all.

4   Q   You used the term at one point, found no identifiable prints.

5       Identifiable prints as opposed to what?

6   A   A lot of times you'll find smudges.  And if you look at your

7       fingerprints and you see the ridge structure on your fingers,

8       there's—You've got to have a lot of ridge structure in order

9       to make an identification.  And a lot of times if you touch

10      something, you're not touching something and keeping your

11      hands in contact with it; you're touching it and just picking

12      it up or your fingers are sliding across something.

13              When they do that, what that does is that causes

14      smudges and also it causes where you'll have just very minute

15      amount of ridge structure that's not identifiable.

16  Q   So when you—you indicated that there were no prints found, are

17      you referring to no smudges and non-identifiable prints; or

18      are you referring specifically to identifiable prints?

19  A   Identifiable prints.

20  Q   In response to one of the defense counsel's questions, you

21      began to answer stating one of the things we do there and then

22      were stopped.  Did you have an explanation for that question,

23      sir?

24  A   Yes, sir.  And that was one that—with the delegation where we

25      split the duties up where one person does the evidence and

                                297

1  the—for example, would do the evidence and the photographs or

2  it could be doing the fingerprints and the photographs.

3 Q Defense counsel was asking about your search for blood

4  evidence and use of the high intensity light and used the word

5  cursory examination.  Some might interpret the word cursory to

6  mean inferior or quick and easy examination.  Is that the

7  connotation you wish to agree with?

8 A No, sir.

9 Q How would you characterize that examination?

10 A It was done with a flashlight on my knees searching the area

11  to see if there was anything that would be consistent.

12 Q There was some reference to this chemical spray luminol

13  that—specifically, what does that do that helps you see

14  whether or not blood is there, do you know?

15 A Luminol is a liquid that—It's a powder that you mix with

16  distilled water and then it's sprayed.  It's very sensitive.

17  It'll pick up one part in five million of new blood, one part

18  in ten million of old blood.

19    If you have surfaces where it's extremely difficult

20  to see—dark colored carpet—and you think you may have blood

21  evidence that may be present, you can use luminol to get

22  yourself a track to see what you've got.  The problem with

23  luminol is once you spray it you destroy all the evidence that

24  you have.

25 Q In a situation where you've used it is when there has been a

298

1    dark surface when it's hard to see the blood; is that right?

2  A   Yes, sir.

3  Q   The surfaces that you were examining in that store on that

4    occasion, were they such that you would have been able to

5    observe blood had it been there?

6  A   I should have been able to, yes, with oblique lighting.

7  Q   Based on the location of the wounds on the victim and the

8    amount of blood that you saw there on the scene, do you have

9    an opinion as to whether it would be expected to see blood in

10    other locations—droplets of blood, for instance, had the

11    victim been shot in some other area of this building?

12  A   Yes.  I—Based on the evidence—what was present at the victim

13    and the location—there was—I had no expectation of finding any

14    other blood anywhere inside the building.

15  Q   In fact, copious amounts of blood?

16  A   Any amount because everything was consistent with having

17    occurred exactly where the victim was.  And I found nothing

18    else in the search of the immediate area that would lead me to

19    any other conclusion.

20  Q   Immediate area, including the retail area?

21  A   Yes.  Especially—But, especially, in the area around the

22    victim.  It's just not—It's just not possible by the physical

23    evidence to have traveled any distance.

24  Q   Without what?

25

299

(Tape No. C2005-022, 2-08-05, 11:16)

1  A    Without having a completely different pattern on the back of

2       the clothing and also there would have been something else on

3       the floor.  There would have been other things to locate

4       someone, say, who's injured and stumbling.  I mean the

5       patterns that you get are very, very distinct.

6  Q    Defense counsel asked about your awareness as to whether or

7       not there was anything to connect Patrick Mishall to the scene

8       or something similar to that.  You were involved in the

9       processing of the scene but not witness interviews; is that

10      correct?

11 A    That is correct, yes.

12 Q    If there were statements or discoveries showing his presence

13      at the store, that would have been something that you were not

14      involved with—that interview?

15 A    That's correct.  I would not have been involved with that.

16 Q    Or any history of the relationship or anything else?

17 A    No, sir, I would not.

18              MR. BROWER:  I have nothing further, your Honor.

19              THE COURT:  Anything else, Mr. Svikis?

20                   RECROSS-EXAMINATION

21 BY MR. SVIKIS:

22 Q    Officer, you knew you were going to testify today?

23 A    Yes, sir.

24 Q    And the jury's been advised that this is the second trial and

25      you testified once before.

                              300

1  A    Yes, sir.

2  Q    To sum up with regard to these—these fingerprints, you cannot

3       produce any record of the fingerprints that I inquired about

4       that may or may not have been taken whether smudged, nothing

5       shows up, or prints; there is absolutely no record of any of

6       that, is there?

7  A    I cannot produce that, no, sir.

8              MR. SVIKIS:   Thank you.

9              MR. BROWER:   No redirect, your Honor.

10             THE COURT:   You may step down, sir.

11             MR. BROWER:   Michael Burritt, your Honor.

12             THE COURT:   You do solemnly swear or affirm the

13      testimony you're about to give shall be the truth, the whole

14      truth, and nothing but the truth?

15             MR. BURRITT:   Yes, I do.

16                  STUART MICHAEL BURRITT,

17      called at 11:18 a.m., and sworn by the Court, testified:

18                  DIRECT EXAMINATION

19 BY MR. BROWER:

20 Q    Sir, would you please state your full name and spell your last

21      name for the record.

22 A    My name is Stuart Michael Burritt.   The first name spelling is

23      S-t-u-a-r-t; last name spelling is B-u-r-r-i-t-t.

24 Q    Mr. Burritt, you're presently retired; is that correct?

25 A    That is correct.   I'm also employed, though.

                         301

1  Q   All right.  Retired from the Michigan State Police?

2  A   That is correct.

3  Q   How long did you work with them and in what capacity?

4  A   I worked for the Michigan Department of State Police for

5      25 years and approximately three months.  And during the major

6      portion of my career—over 22 years—I spent working for the

7      forensic science division in a number of different capacities.

8  Q   What was your title in the forensic science division?

9  A   The last title that I had I was the assistant division

10     commander, meaning that I was in charge of the laboratory

11     system.  But through the time period that I was with the state

12     police, I was—I was also a laboratory specialist working as a

13     bench analyst.

14 Q   Working as what?  I'm sorry.

15 A   A bench analyst.

16 Q   What types of things or examinations would you conduct in your

17     labs—in the lab work that you did?

18 A   Well, specifically, I was assigned to the firearms, toolmark,

19     and explosive unit both at—or, actually, at Bridgeport,

20     Grand Rapids, and also at Lansing.  And in that capacity I was

21     responsible for the examination of fired bullets, fired

22     cartridge cases, test-firing weapons to determine their

23     operational capacity; also, examining the fired bullets and

24     cartridge cases and comparing to test shots from firearms.

25          In addition to that, I was involved in the process

                                302

1   of restoring serial numbers.  That would be numbers on

2   firearms that were obliterated or removed.

3           In addition to that, I was also responsible for

4   examining clothing for gunshot residue.

5           And, finally, with respect to analytical work, I

6   also was involved in toolmark examinations, which was the

7   comparison of—of tools that made marks on doors and locks, for

8   example, when they were being jimmied or broke into.

9   Q   I want to inquire about two specific areas, sir, reference to

10  ballistics examination and then the gunshot residue

11  examination.  First, the ballistics.

12          Could you tell us what's involved in ballistics

13  examination—what types of things, specifically, you're looking

14  for.

15  A   Sure.  With respect to fired bullets, essentially bullets are

16  recovered—oftentimes from crime scenes.  They can be recovered

17  from bodies.—and they are submitted to the laboratory for,

18  essentially, the purpose of classifying; that is, to

19  determine, essentially, what size they are—caliber reference

20  to the size—and also make a determination of their quality for

21  comparison purposes.

22          And then, ultimately, if a suspect weapon is

23  recovered for comparison purposes, to test-fire the suspect

24  weapon and compare the samples from that bullet to the

25  recovered bullets from either a crime scene or a body.  And

1    that was one of the types of analysis that was commonly done

2    in the firearms unit.

3  Q   Just very briefly, sir, if you could explain how that

4    comparison is done between a known bullet and a bullet

5    recovered from a crime scene.

6  A   I think it's probably easiest to help you understand how a

7    bullet is marked in the process of being first; and that, in

8    essence, allows us to make this comparison that the prosecutor

9    is asking me to talk about.

10           Essentially when a bullet is fired down the barrel

11   of a weapon, there are microscopic marks that are placed on

12   that bullet as it travels down the barrel in the form of

13   scratch marks.  We refer to those scratch marks on a bullet as

14   striated marked.

15           When a barrel is machined at the factory,

16   these—these imperfections are cut into the barrel, and they're

17   unique, and they are the signature of that barrel.  That means

18   that every barrel that's manufactured in a weapon is different

19   from the next barrel that's manufactured.  This uniqueness

20   allows us to identify a bullet as having been fired from a

21   specific firearm.

22           When bullets are recovered from a crime scene or a

23   body, these marks are left on that bullet due to going through

24   that process of being fired down the barrel of a weapon.  When

25   a suspect weapon is recovered—when an agency—law enforcement

304

1    agency recovers a weapon through investigative process, they

2    submit the weapon to the laboratory.   The weapon is

3    test-fired.

4            And, basically, we have a very, very large water

5    tank; and we shoot similar types of ammunition through that

6    firearm that we have as evidence and recover them from the

7    water tank.  And the reason that we use water is that it does

8    not destroy those very small microscopic markings on the

9    bullet.

10            Once we remove the bullets from the water tank, we

11   use what is known as a comparative microscope.  And a

12   comparative microscope at our laboratory basically is two

13   microscopes that are connected together which has an optical

14   bridge between them which allows us to view two items

15   simultaneously.

16            We place the test bullets on both sides of the

17   stages—That's where we mount the bullets.—and begin to examine

18   those bullets for the unique markings on them.  If we can

19   identify the two test bullets to each other, having—knowing

20   that they have been fired from that weapon, then we can say

21   that those are of quality to start the comparison process with

22   the evidence bullet that's recovered from a scene or a body.

23            The next step, then, is to mount the suspect bullet

24   or the evidence bullet on one stage, the test bullet from the

25   weapon on the other stage, and then begin a microscopic

                                   305

1    comparison of those two bullets looking for the same signature

2    or the same striated marks that would come up in agreement.

3  Q    You referred to gunshot residue.  Would you please describe

4    what that is and how you would look for it.

5  A    Sure.  Gunshot residue is often referred to as a trace type

6    evidence that is discharged from the barrel of a weapon.

7    Essentially, this—this type of residue comes in the form of

8    nitrates, particulate lead, and vaporous lead.  And it—And it

9    depends upon the range at which a weapon is fired at a target

10    that these types of items are deposited on the target.

11        At close range one would find a number of

12    different—a number of these different types of elements on the

13    target.  So, basically, the type of examination that's

14    conducted at the laboratory for gunshot residue is, first, a

15    microscopic examination of the—of the clothing.

16        Essentially, what the law enforcement agency will do

17    will be to collect the clothing from a person who has been

18    generally shot because our examinations are—are solely for the

19    purpose of examining clothing that has damage associated with

20    it.

21        In this process we—we begin looking with a

22    microscope for some of the elements of partially burned

23    gunpowder.  Obviously, you would have a hole.  And then we

24    begin a chemical process using a number of different tests

25    for—for gunshot residues to determine if there actually is any

                              306

1    residue.

2          Once we have located residue, we begin to test-fire

3    into targets at known distances and then compare those test

4    shot targets with the residue on those targets to the evidence

5    clothing to help us to evaluate at what distance we think that

6    the clothing was discharged upon by the firearm.

7          And that's, in essence and in a nutshell, what the

8    gunshot residue test examination is.

9  Q   Sir, have you been previously qualified as an expert in the

10    areas of forensic examination, including the areas that you

11    testified to today?

12 A   Yes, I have, sir.

13 Q   How many times have you previously testified, sir?

14          MR. SVIKIS:   I can stipulate if you want me to.

15          MR. BROWER:   All right.

16          MR. SVIKIS:   Your Honor, I can stipulate to his

17    expertise.

18          THE COURT:   All right.

19 BY MR. BROWER:

20 Q   Sir, in 1991 you were working at which lab?

21 A   I was at the laboratory located in Grand Rapids.

22 Q   Were certain items forwarded to you for examination by the

23    Kalamazoo Department of Public Safety regarding a homicide

24    that had occurred at the Minute Market store in the city?

25 A   Sir, I don't know what the location of it was; but, yes, I did

                          307

1     receive some evidence from the Kalamazoo police department at

2     that time.

3  Q   I'm going to show you what has now been admitted as exhibit

4     number 55 and ask if you recognize this exhibit.

5  A   Yes, sir, I do recognize this exhibit—People's

6     exhibit number 55.

7  Q   This—Inside of this—this exhibit under the plastic is

8     a—appears to be an evidence tag with a report number and an

9     offense number.  That would be information that was completed

10    by the investigating agency; is that correct?

11  A  Yes, sir.  There's a red tag that depicts the name of

12    Kalamazoo Public Safety, and on that tag has a date as well as

13    the offense number.

14  Q  The fired lead bullets that are included in this exhibit, were

15    those examined by you to determine—let's start with

16    classification.

17  A  Yes, sir, they were.  And I can identify those based on the

18    outside markings that contain my laboratory numbers and my

19    initials on them.

20  Q  Regarding classification, what, if able [sic]—anything were

21    you able to determine?

22  A  Specifically with those fired bullets I was able to determine

23    the caliber of them, that being approximately what size they

24    were.

25  Q  Caliber meaning what?

1  A   Caliber meaning the nominal size of the bullet or the nominal

2      size of the firearm that discharged those bullets.

3  Q   What specifically were you able to determine regarding that

4      classification then?

5  A   Classification of those bullets were that they were

6      .38 Special or .357 Magnum caliber fired lead bullets.

7  Q   .38 Special or .357.  Why the or between them?

8  A   The—The caliber designation of .38 and .357 is used in

9      combination with one another because the size of the bullet is

10     exactly the same between a .38 Special and a .357 Magnum

11     caliber handgun.

12 Q   Difference between them being what?

13 A   Difference being that the cartridge case that holds the bullet

14     is larger in a .357 Magnum than a .38 Special.

15 Q   Holds more powder?

16 A   That's correct.

17 Q   All right.  Based on the condition, then you were able to

18     reach that classification—at least as to the diameter or the

19     caliber.  Were you able to go the next step and—and—Were they

20     of sufficient quality for comparison purposes?

21 A   In the examination process we always go through the comparison

22     process.  However, these specific bullets lacked—or had

23     significant damage to them, the bearing surface of the

24     bullet—That means the outside surface of the bullet.—was

25     damaged to the point that I was unable to identify them to

                                309

1    each other.  So there was a comparison made, but they did lack

2    significant—sufficient individual characteristics or detail to

3    them.

4              However, I was also—I was able to continue the

5    examination process from the standpoint of making a

6    determination of what type of a twist that the weapon that

7    fired those bullets—And that was a left-hand twist, which is

8    another part of the classification of a—of a bullet.

9  Q  And that refers to the spiraling inside of the barrel; is that

10     right?

11 A  That's correct.

12 Q  Okay.  Why is that significant whether it's a right twist or a

13     left twist or whatever?

14 A  The—The federal government—The Federal Bureau of Investigation

15     has maintained for many, many, many years essentially an

16     encyclopedia or a reference, if you will, for a number—just

17     thousands and thousands—of firearms that have been

18     manufactured over a very long time frame.  And within

19     this—this data that the federal government collects, it

20     basically gives us the measurements of the size of the lands

21     and grooves that are cut into the barrel of weapons; and it

22     also will give us the direction of twist.

23              And the reason that that is important is that when

24     we're in the process of classifying a fired bullet, we're

25     measuring the size of the lands and grooves that are impressed

                              310

1    upon the bullet, as well as attempting to determine what the

2    direction of twist is; and then we will reference this catalog

3    to make an attempt to determine what type of firearm might

4    have discharged the bullets and give the investigators a

5    possibility of what—what firearm they would be looking for in

6    the investigative process if a firearm has not been recovered.

7  Q  You've testified about examining clothing with damage for

8     evidence of gunshot in order to determine distances and so on.

9  A  That's correct.

10 Q  I believe that you testified that that's what you do, you

11    examine clothing with damage, meaning victims' clothing?

12 A  Generally it will—it will be victims' clothings, yes.

13 Q  Generally speaking, would you examine a suspect's clothing?

14 A  We have in the past based on request from law enforcement

15    agencies; but, essentially, we tell them that the type of

16    chemical processes that we have available at the state

17    laboratories cannot and generally will not find gunshot

18    residue on shooters' clothing.

19 Q  Why is that?

20 A  The type of evidence that you would be looking for on a

21    shooter's hand or a shooter's clothing, if you will, is very,

22    very small and microscopic.  Essentially, we are looking for

23    barium and antimony.  These are two elements that are found

24    often in the primers of cartridges.  And the state laboratory

25    just does not have the capability of looking for those types

                              311

1    of minute chemicals or elements.

2  Q  Officer, we've all watched television before where the lab

3     tech has a piece of white pad and he touches a surface and

4     takes a look at it and says, yep, gunshot residue.  Is that

5     real?

6  A  Well, it can be if there is some actual black sooting on a

7     person's hand.  The type of elements that are unique and

8     common to the primers of cartridges would be microscopic.  So

9     unless they actually saw some type of dark residue on

10    someone's hands, I would say other—you probably would never

11    see any other type of residue.

12 Q  Not visible.

13 A  Not visible, yes.

14 Q  As far as—Let me talk about that residue on the shooter's

15    hand.  If residue is found at all on the shooter, could you

16    explain how it would have gotten there in that position?

17 A  Sure.  When firearms are—are discharged, the process of firing

18    a bullet through them—depending on the type of firearm is also

19    going to depend on where some gunshot residue would be

20    deposited on the hand.  So, for example, if we're talking

21    about a handgun, that would be different than if it were a

22    rifle or a long gun.  So, generally speaking, if you're firing

23    a long gun you actually might find some residue on a person's

24    face if they were shouldering the weapon.

25         With a handgun is also dependent on what type of

312

1   handgun.  So if we're referring to a revolver—in which this

2   case in the process of going through the classification I

3   determined that it was quite possible and most probability

4   would be a revolver that discharged these bullets.

5       A person is going to hold the weapon somewhat in

6   this fashion.  It could be single-handed; it could be

7   double-handed where they're using a two-hand grip.  And

8   because of where the gases erupt and come out of the cylinder

9   of a weapon, they will be deposited generally around the thumb

10  and the top of the forefinger area of the hand if it's fired

11  in the way that a handgun is designed.

12      With a semiautomatic, the blowback or the amount of

13  discharge isn't quite as great as a revolver, but it still

14  would probably be deposited on the top portion of the hand or

15  the left hand.

16  Q  Now this residue, is that something that would stain and

17  remain there for extended periods of times, or is it

18  vulnerable to being wiped off and disappearing?

19  A  That evidence is extremely fragile.  The FBI—because they

20  happen to be an agency that used to examine gunshot residue

21  kits for hands, required very limited time frames that—that

22  they could actually do anything with gunshot residue if

23  someone had done a gunshot residue kit on a person's hands

24  that they suspected of handling a weapon.

25      Some of the—the problems associated with examining

313

1   gunshot residue on hands is that someone who does the

2   analytical tests and ends up sitting in this same suit

3   [*sic*]—seat, if you will, testifying about the types of results

4   can only, in essence, talk about that there was residue

5   present.  They couldn't tell you how that residue got there.

6       For example, if any one of you were to handle a

7   weapon and someone were to do a gunshot residue test on your

8   hands, the chances are that there would be gunshot residue on

9   your hands.  And so, consequently—

10      Now I don't know what the current state of the FBI

11  is now with respect to their analysis.  But the FBI actually

12  discontinued doing gunshot residues on hands, in part, because

13  of the frailty of the evidence; in part, because they can only

14  tell you that the gunshot residue is present.

15      And then the third leg of that is that not all

16  primers contained in firearms had barium and antimony in them.

17  So if a person were to fire a weapon and it happened to be a

18  cartridge case that didn't have barium or antimony in it, then

19  there would not be any gunshot residue present because those

20  are the two elements that they're looking for in the process.

21      So if they didn't find it, it didn't mean that

22  someone didn't shoot it; and if they did find it, they

23  couldn't necessarily say that the person did shoot it.  They

24  could only say that they were in contact with the weapon at

25  some point in time during the test.

1  Q   You talked about—I think you used the term fragile before when

2      you were referring to this type of evidence.  What kinds of

3      things would allow for transferal or removal of that residue

4      from the surface of the hand, for instance?

5  A   Well, the very first thing would be—Even the placement of your

6      hands into your pockets could remove significant amounts of

7      that residue.  Probably the most common would be washing your

8      hands at some point in time.  And then—

9  Q   Going home and taking a shower?

10 A   Excuse me?

11 Q   Going home and taking a shower?

12 A   Going and taking a shower or just washing your hands, period.

13     It would remove the gunshot residue.

14 Q   As far as the presence of gunshot residue on the clothing of

15     the shooter—I believe you testified that that's not a routine

16     examination.  Just remind us once more why that would be—why

17     you weren't checking the shooter's clothing.

18 A   Again, when we talk about the normal process of firing a

19     weapon—And that's the thing that you have to keep in mind.

20     As I—As we discuss this, I'm going to qualify that.  And

21     normal, meaning that you're going to have a weapon that's

22     out—stretched like this.

23         If you keep a firearm in close contact to your body,

24     it would be my expectation that you would see gunshot

25     residue—not visually with your eyes; but if you were to test

315

1   the entire clothing area at some point in time, you might find

2   some gunshot residue from someone firing a weapon.  But if

3   we're going to talk about a weapon being fired in this manner

4   with one hand out or like this, again, the gunshot residue is

5   not going to spray backwards on back on top of you or back

6   over the top of your—your clothing.

7           The federal government—or the FBI—has done numerous,

8   numerous tests of actually slow motion photography where they

9   watch this plume of cloud, if you will, that comes back from

10  when a—when a weapon is fired.  And it really doesn't travel

11  that far because the particulate matter that's coming out

12  is—is—is—First of all, it begins to be—It's dense initially

13  when the weapon is fired; but, because it's gases, they just

14  end up going out into the air.

15          So they'll come back a little ways, and they may

16  land on a person's arm if they have a long-sleeve shirt or a

17  jacket or that, if you will.  And, again, if you kept it

18  closer to your body, then maybe you would expect to see some

19  gunshot residue through thorough testing of that clothing.

20          But, again, the frailty of that evidence, too, on

21  someone's clothing can be knocked off and worn off in the

22  process of just wearing that or, again, if the clothing is

23  laundered that also would remove the gunshot residue.

24 Q  In spite of the fact that you routinely would not check a

25  suspect's clothing, in the case of the murder of

                              316

1       Christine Dimmick in 1991 was suspect clothing forwarded to

2       you by the department of public safety to examine for, among

3       those things, gunshot residue?

4    A  Yes, they were.

5    Q  I hand you exhibit 51 through 54 and ask if these are the

6       items that you examined.

7    A  Yes, sir.  These all were the items that I examined, and they

8       all have my laboratory number and my initials

9       . . . (inaudible)

10              MR. BROWER:    Move for admission of exhibits 51

11      through 54, your Honor.

12              MR. SVIKIS:   No objection.

13              THE COURT:    Received.

14   BY MR. BROWER:

15   Q  Officer, in examining these items, did you find any sign of

16      gunshot residue?

17   A  No, sir, I did not.

18   Q  Is that necessarily surprising to you based on the types of

19      things that you've already testified to?

20   A  No, it is not surprising.  And it doesn't mean that there

21      wasn't any present; it's just with my limited search

22      capabilities—the limited capabilities at that laboratory—that

23      would be my expected result.

24   Q  Whether or not you found gunshot residue would also be

25      dependent on the truthfulness of the suspect who maintained

                                  317

1    that those were the clothes he wore at the time; is that also

2    correct?

3  A    That would also be a variable.

4          MR. BROWER:   I have nothing further of this

5    witness.

6          THE COURT:   Cross-examination.

7          MR. SVIKIS:   Thank you.

8                    CROSS-EXAMINATION

9  BY MR. SVIKIS:

10 Q    Mr. Burritt, the last 15 or 20 minutes you've been explaining

11   why possibly no residue would appear.  And you've examined

12   items 51 through 54, and the prosecutor asked you about the

13   truthfulness whether those were the persons who may have worn

14   them.  When you received those items did you write a letter

15   back to the police and say how do we know these are the items

16   that the accused wore?

17 A    No, sir, I did not.

18 Q    All right.  So the police deliver it to you and you take the

19   police at their word for it?  You rely on some investigation

20   that they did?

21 A    Yes, sir.  I don't—As far as establishing whose property they

22   are or—

23 Q    You don't—

24 A    —whether or not they were worn, I don't know.

25 Q    You don't—

                              318

1  A    I was just asked to make—

2  Q    You don't—

3  A    —an exam.

4  Q    —question it?

5  A    No, I do not.

6  Q    All right.  And you're the department of state police, and

7       there isn't much higher in Michigan, is there?

8  A    As far as a laboratory goes, no, there is not.

9  Q    All right.  And back in 19—back in 1991, you were the

10      specialist firearms, toolmarks, and explosives subunit

11      detective sergeant?

12  A   That's correct, I was.

13  Q   All right.  And these items, along with other items, were sent

14      to you and you accepted them, correct?

15  A   That is—The laboratory accepted them and then—

16  Q   All right.

17  A   —consequently I did examinations.

18  Q   All right.  You did an examination.  And the examination was

19      on a JC Penney long-sleeve sweatshirt which was that of the

20      defendant's Mr. Mishall's?

21  A   Sir, I really don't have any knowledge of who—

22  Q   All right.

23  A   —whose it was; but, yes, that was the—

24  Q   And—

25  A   —that was one of the items.

319

1   Q   Okay.  And then along with a—a T-shirt purported to be the

2       same, along with Nike shoes purported to be the same,

3       sweatpants the same; and those you examined?

4   A   Yes, sir, I did.

5   Q   All right.  And on that examination back in 1991 there was

6       simply one line there, and it said failed to reveal the

7       presence of firearms related damage or residue; is that

8       correct?

9   A   That is correct.

10  Q   All right.  And no further correspondence went back to the

11      prosecutor then explaining what you were explaining to the

12      jury today how difficult that is, how unlikely that is, and

13      some stuff about the FBI doesn't even do it anymore?

14  A   That is correct.

15  Q   All right.  Well, back in 1991 isn't it true that the FBI was

16      ever so much involved in gunshot residue as opposed to in

17      2004/2005?

18  A   I'm sorry?  Could you restate that question?

19  Q   Back in 1991 these gun—there was gunshot residue kits provided

20      by the FBI; is that correct?

21  A   I—They're available.  I don't know if it was the FBI; but,

22      yes, gunshot residue kits were available.  And the FBI was

23      conducting that type of an examination—

24  Q   All right.

25  A   —at that time.

320

1   Q   But today that's changed because of cost, time, or a whole

2       host of other reasons?

3   A   If it was the same as in 2003, then I—that was my last

4       knowledge of what they were doing, and I would have to agree

5       with that statement.

6   A   All right.

7   Q   So had there been evidence of residue, your examination was

8       eyeball?

9   A   Eyeball and with a microscope, yes.

10  Q   All right.

11  A   Visual examination.

12  Q   Visual.  Okay.  And that revealed no residue, correct?

13  A   That is correct.

14  Q   And on these—I never know whether to call it a bullet or a

15      round.  Which is the lead part?

16  A   A round is okay, but we'll refer to it as a bullet—a fired

17      bullet.

18  Q   Bullet.  Okay.  So this is either consistent with a .38 or a

19      .357?

20  A   Yes, sir, that's correct.

21  Q   From potentially two separate weapons?

22  A   Potentially?

23  Q   Yes.

24  A   Yes.

25  Q   Okay.  So your examination cannot tell us whether these four

                                    321

1    rounds came from one weapon or two; is that correct?

2  A  Absolutely correct.

3  Q  And when you were demonstrating or explaining the blowback,

4    we're talking about handguns in all likelihood?

5  A  I was probably directing that more towards a handgun, yes.

6  Q  And that handgun is either a—I know you'll have a different

7    word.—a revolver, single or double action?

8  A  That's correct.

9  Q  Okay.  The casing or the shell, the—what doesn't go out stays

10    in the chamber?

11  A  That would be correct.

12  Q  All right.  And that would have some blowback; whether you can

13    find it or not, it would still have some chemistry that can be

14    analyzed going backwards?

15  A  Yes.  Unless—Unless the weapon was covered up physically with

16    some type of an item—

17  Q  Sure.

18  A  —you would not be able to restrict the—the discharge or

19    blowback of the gunshot residue from that weapon.

20  Q  All right.  And the other general category would be an

21    automatic—

22  A  Semiautomatic.

23  Q  —semi—semiautomatic.  That would discharge the metal—the

24    brass, right?

25  A  That's correct, it would.

                          322

1  Q   And no brass was provided to you in this instance, was there?

2  A   No, there was not.

3          MR. SVIKIS:   I have no further questions.

4          THE COURT:   Any redirect?

5          MR. BROWER:   Yes, your Honor.

6                  REDIRECT EXAMINATION

7  BY MR. BROWER:

8  Q   Sir, when asked the question whether or not you could

9      determine there was one weapon or two, I believe your

10     testimony was is that you could not determine that; is that

11     right?

12 A   Yes, I cannot determine whether there was one or two guns.

13     And I was referring to that based on caliber whether it could

14     be a .38 Special or a .357.

15 Q   You were unable to make a comparison because of the quality of

16     the fired lead bullets, correct?

17 A   That is correct.

18 Q   They were—Were they all consistent as to caliber?

19 A   They were consistent in caliber.  They were consistent in the

20     measurement of the lands and groves, and they were consistent

21     with the direction of twist, so that being all six—all of the

22     bullets had six lands and grooves with a left-hand twist.

23 Q   Short of being able to make a conclusive comparison because of

24     the quality of those rounds, the other characteristics that

25     you were able to identify were, however, consistent with one

                        323

1 gun?  Well, let me—let me change the—

2     Is it possible that because of those circumstances

3 one gun was used?

4 A When one sees six lands and grooves, a left-hand twist on all

5  of the evidence bullets, it means that all of the bullets were

6  fired from a weapon or weapons that have six lands and grooves

7  with a left-hand twist.  It doesn't exclude the possibility

8  that more than one gun could be used, but that gun would have

9  to have the same dimensional information on it—that being the

10  barrel would have to have six lands and grooves with a

11  left-hand twist.

12     So the answer would be that, yes, you essentially

13  could have two weapons, but they'd have to be identical from

14  the standpoint of lands and grooves and twist of the barrel.

15 Q Different types of manufacturers have different number of

16  lands and grooves?

17 A That is correct.

18 Q And then differing manufacturers have either a right twist or

19  a left twist?

20 A They have number of different lands and grooves, and they have

21  both a difference in the direction of twist to them, yes.

22 Q You pick one of several options on the number of lands and

23  grooves and options as to right or left-hand twist, there

24  seems to me to be quite a variety of different combinations

25  then.  That would be inconsistent with the rounds that you

(Tape No. C2005-022, 2-08-05, 11:54)

1   found?

2 A   Yes, there are.

3            MR. BROWER:   Thank you.

4            I have nothing further.

5            THE COURT:   Do you have anything?

6                    RECROSS-EXAMINATION

7 BY MR. SVIKIS:

8 Q   With regard to these particular rounds that you're able to

9     back figures, so to speak, that there's six—Tell me, six

10    grounds, six lands and grooves—

11 A   Grooves.

12 Q   —and a right-hand; is that what it was?

13 A   This was six lands and grooves with a left-hand twist.

14 Q   To the left hand.

15            When you just make that description of a—of a

16    firearm, that is not a rare generic description, is it?

17 A   It's not a rare generic description.   One of the most common

18    weapons that one would find in that caliber with those

19    dimensional markings on the bullet is also not a very rare

20    weapon either.

21            MR. SVIKIS:   All right.   Thank you.

22            MR. BROWER:   No redirect, your Honor.

23            THE COURT:   You can step down.

24            Oh, I was—

25            When did you retire from the state police?

1   THE WITNESS:   I retired October of 2003.

2   THE COURT:   Okay.  You can step down.

3   THE WITNESS:   Thank you, sir.

4   Okay.  It's almost noon, so why don't we recess.

5   I'd ask everybody to be back here no later than
6   1:15.  That should give you enough time to get out and get
7   lunch and get back here.

8   Keep in mind what I've told you.  Don't discuss this
9   case with anyone or allow anyone to discuss it with you.

10  Have no contact with anybody involved in the case.
11  That includes the defendant, the attorneys, or any of the
12  witnesses who have or may testify.

13  Please remember that you are not to discuss it
14  amongst yourselves.

15  So we'll stand in recess, then, until 1:15.

16  (At 11:57 a.m., court recessed)

17  (At 1:20 p.m., proceedings reconvened)

18  You want to call your next witness, please.

19  MR. BROWER:   Yes, your Honor.  The people call
20  Gunars Vaseris to the stand.

21  THE COURT:   Raise your right hand, sir.  You do
22  solemnly swear or affirm the testimony you're about to give
23  shall be the truth, the whole truth, and nothing but the
24  truth?

25  MR. VASERIS:   I do.

326

```
 1                        GUNARS VASERIS,
 2       called at 1:21 p.m., and sworn by the Court, testified:
 3                       DIRECT EXAMINATION
 4  BY MR. BROWER:
 5  Q    Sir, would you please state your name and spell both your
 6       first and last name for the record.
 7  A    Gunars Vaseris, G-u-n-a-r-s V-a-s-e-r-i-s.
 8  Q    Sir, where are you employed?
 9  A    Century Buick GMC Truck.
10  Q    How long have you been there?
11  A    Twenty-four years.
12  Q    What do you do there?
13  A    I'm the manager of the service department.
14  Q    What hours do you work?
15  A    Oh, generally I'm there from 7:00 in the morning till 5:30,
16       6:00 o'clock at night.
17  Q    What route do you take to work?
18  A    I go through Kalamazoo, out Stadium Drive heading west.
19  Q    Pardon me?
20  A    West out Stadium Drive.
21  Q    Would that route take you past what was in 1991 the
22       Minute Market store?
23  A    Yes.
24  Q    Immediately adjacent to Gale's hardware?
25  A    Correct.
```

1  Q   On February 8 of 1991—that Friday—do you recall that day, sir?

2  A   Yes.

3  Q   Were you aware that there was a murder that occurred at that

4      Minute Market store?

5  A   I'm sorry?

6  Q   Were you aware that there was a murder that had occurred there

7      at that Minute Market store?

8  A   Not at that time.

9  Q   Not in the morning of that [sic] 8th, but at some point during

10     that day did you learn that a murder had occurred?

11 A   Yes.

12 Q   All right.  On that date had you traveled past the

13     Minute Market store on your way to work?

14 A   Yes.

15 Q   Did you notice anything unusual about the store or the

16     condition of the lights or anything else as you passed by?

17 A   The store was not lit up; it was dark.

18 Q   Was it your understanding that the store opened for business

19     at 7:00 a.m.?

20 A   Most mornings there was lights on in the store when I went by.

21 Q   In preparation for that day's business?

22 A   I assume so, yes.

23 Q   When you say the lights weren't on, specifically what are you

24     referring to?  Which lights?

25 A   The store was dark.

328

1 Q   The interior?

2 A   Yes.

3 Q   In order for you to observe that the lights inside that

4     building were not on, obviously, you had to have been looking

5     away from the direction of travel and looking at the building.

6     Did you notice anything else in that area?

7 A   There was one car parked between the two buildings.

8 Q   The two—Between the two buildings meaning which two buildings?

9 A   Minute Market and the hardware store.

10              MR. BROWER:   Could you please put up exhibit number

11    one.

12 BY MR. BROWER:

13 Q   Sir, there—This exhibit has been admitted into evidence.  The

14    floor plan of the Minute Market store as it's been described

15    to us—this area right where the pointer is indicating right

16    now as being the front doors or the main glass doors into the

17    business, Stadium Drive being along the bottom portion in this

18    slide, Gale's Hardware off this side in that direction of the

19    arrow.  Does that make sense to you, sir?

20 A   Yes.

21 Q   With that in mind, could you please describe where it was that

22    you saw this vehicle?

23 A   The car was parked between the two buildings.

24 Q   On this side of the building?

25 A   Right there, yes.

1   Q   Okay.  Was the—Now this time of the morning in early February

2       I would assume to say that it was dark?

3   A   Yes.

4   Q   Did that vehicle have any lights on?

5   A   No.

6   Q   You witnessed that vehicle parked on that side of the building

7       as you were driving by?

8   A   Yes.

9   Q   Would it be safe to say that you didn't have much of a look at

10      that car?

11  A   Not much.

12  Q   Simply aware of its presence as you drove by?

13  A   Yes.

14  Q   Could you describe for us how the vehicle was positioned in

15      relation to the side of the building?

16  A   It was parked facing south.

17  Q   South being towards the top of this diagram?

18  A   Yes.

19  Q   All right.  Was it parked—Okay.  Was it then parallel—Based on

20      your description, was it parallel to the side of the building?

21  A   Yes.

22  Q   Can you say whether or not it was near the front of the

23      building or near the back of the building?

24  A   I think it was more towards the front.

25  Q   Okay.  But not in front of the building?

                                330

1  A    No.

2  Q    All right.  Something in this area right here?

3  A    I would say so.

4  Q    Do you recall for sure?

5  A    It was in that area, yes.

6  Q    All right.  Sir, there's what has been described as a

7       photograph of the east side of the building taken in the

8       direction of the red arrow on that diagram.

9  A    Okay.

10 Q    Does that help orient you—

11 A    Yeah, the—

12 Q    —a little bit?

13 A    —the car was in that area there, probably by those pillars—the

14      ones . . . (inaudible)

15 Q    Right in here?

16 A    Maybe a little more to the front; but in that area, I'd say.

17 Q    Right—Okay.

18 A    Yeah.

19 Q    This general area right there?

20 A    Yes.

21 Q    All right.  And the street is someplace out here—

22 A    Yes.

23 Q    —is that correct?

24 A    Yes.

25 Q    And immediately in front it was tree-lined or whatever?

331

1  A    (No audible response)

2  Q    But Stadium Drive is out in front?

3  A    (No audible response)

4  Q    All right.  Can you give any kind of description of this

5       vehicle?

6  A    It was a dark vehicle.

7  Q    Can you say whether it was a small compact or if it was a

8       larger vehicle?

9  A    It was a larger.

10  Q   Do you know what time it was that you were driving by?

11  A   Maybe four—three, four, five minutes before 7:00.

12  Q   Are you a customer—a frequent customer of—of that business, or

13       were you then?

14  A   Yeah, I went over there periodically.

15  Q   Are you familiar with where employees would park their

16       vehicles?

17  A   No.

18  Q   If I understand you correctly, sir, before—prior to

19       7:00 o'clock already the business interior lights would

20       normally be on; is that right?

21  A   Most mornings, yes.

22            MR. BROWER:   I have no further questions of this

23       witness.

24            THE COURT:   Mr. Svikis?

25

                              332

1                          CROSS-EXAMINATION

2    BY MR. SVIKIS:

3    Q     Mr. Vaseris, on your way to work you're heading westbound?

4    A     Yes.

5    Q     And the speed limit on that road's about 45 or so?

6    A     Forty.

7    Q     Forty.

8              And there's at least two lanes traveling in the

9    eastbound direction, also?

10   A     Yes.

11   Q     And there's other traffic that morning; is that correct?

12   A     There's some traffic, yes.

13   Q     All right.  And you're paying attention to your driving

14   because you don't have any idea that a crime has been

15   committed at the Minute Market, do you?

16   A     No idea.

17   Q     No idea.

18              So it's fair to say that looking across at least two

19   lanes—maybe three—with other traffic, you see out of the

20   corner of your eye that a vehicle is parked between the party

21   store and the hardware store; and that's correct, right?

22   A     Yes.

23   Q     Okay.  And that's exactly what you tell the officer when they

24   interviewed you back on February 8th of 1991; is that correct?

25   A     Yes.

                                  333

1  Q   All right.  And at that time you do not tell the officer that

2      interviewed you that this is a large car or a small car, you

3      just simply say vehicle, dark, the lights are turned off,

4      correct?

5  A   Yes.

6  Q   Okay.  So after you find out that a crime has been committed

7      and find out that it's a homicide, you don't go back to the

8      police or call the police or write them that, in fact, it was

9      a—a large vehicle?  You don't—You don't call them back and say

10     now I remember it was a large vehicle?

11 A   No, I didn't.

12 Q   Okay.  But that's how you're testifying now 14 years later,

13     correct?

14 A   Yes.

15 Q   And you don't tell them whether it's parked front ways or

16     backwards or the angle either, do you?

17 A   No, I didn't.

18 Q   So, in fact, 14 years later you're giving more detailed

19     testimony today than you did when you were interviewed within

20     hours of the event, right?

21 A   Yes.

22             MR. SVIKIS:   Thank you.

23             REDIRECT EXAMINATION

24 BY MR. BROWER:

25 Q   Mr. Vaseris, if you didn't provide certain details, was that

                        334

1  because the officers asked that specific question and you

2  chose not to answer them?

3  A  I answered the question as they asked it.

4  Q  You weren't a police officer.  You assumed—Did you assume that

5  the officers must determine what's relevant and what's not?

6  A  Yeah, I assumed.  That's what I did, yes.

7  Q  The things that you've testified today, are those details that

8  you, in fact, recall about that day?

9  A  That's correct.

10 Q  If any of us were to drive down the vehicle [*sic*]—or drive our

11 vehicle and make a similar observation, I think many of us

12 would feel that maybe later that same day—or certainly the

13 next day—we wouldn't even recall that we'd made that

14 observation.  Why did you recall that fact on that date?

15 A  Probably in questioning from your office and people, maybe I

16 thought about it more—

17 Q  Well—

18 A  —maybe things I didn't—

19 Q  Normally our routine observations are not connected with a

20 violent act; would that be safe to say?

21 A  Yes.

22 Q  Something that would otherwise be insignificant, importance is

23 attached to it because of the other significant event and,

24 therefore, we recall.  Would that same be true for you?

25 A  Yes.