1  Q    Learning on that day that there had, in fact, been a murder

2       there, did that result in those otherwise insignificant

3       observations becoming embedded in your memory?

4  A    Yeah.

5  Q    Did anybody tell you that this is what you should say when you

6       testify?

7  A    No.

8  Q    Anybody suggest to you that when this question is asked you

9       should answer in this way?

10  A   No.

11  Q   Is your testimony here today what it is because that's truly

12      the memory that you have regarding that event?

13  A   Yes, it is.

14           MR. BROWER:    Thank you.

15           I have nothing further.

16                RECROSS-EXAMINATION

17  BY MR. SVIKIS:

18  Q   Mr. Vaseris, now that your memory is all clear about

19      14—14 years ago, this officer approaches you and you're

20      advised or learn that there's been a robbery/homicide next

21      door.  And he must have asked you a question that caused you

22      to answer there was a vehicle there, right?

23  A   Yes.

24  Q   Okay.  Did he say something like did you see any cars there,

25      and you said yes?  That make sense?  You remember that?

1   A    (No audible response)

2   Q    And then after—

3   A    Yes.

4   Q    —he asked did you see any cars there and you said yes, then he

5        probably asked you what—well, what kind of car it was.

6   A    Yeah.

7   Q    You're asked that, and your response would have been dark?

8   A    Yes.

9              MR. SVIKIS:    Thank you.

10             MR. BROWER:    No further questions, your Honor.

11             THE COURT:    You can step down, sir.  Thank you.

12             MR. BROWER:    Robert Petersen, your Honor.

13             THE COURT:    You do solemnly swear or affirm the

14       testimony you're about to give shall be the truth, the whole

15       truth, and nothing but the truth?

16             MR. PETERSEN:    I do.

17                     ROBERT PETERSEN,

18       called at 1:36 p.m., and sworn by the Court, testified:

19                     DIRECT EXAMINATION

20  BY MR. BROWER:

21  Q    Mr. Petersen, would you please state your full name and spell

22       your last name for the record.

23  A    Robert Petersen—R-o-b-e-r-t P-e-t-e-r-s-e-n.

24  Q    Sir, where are you employed?

25  A    Century Buick GMC on Stadium Drive.

337

1   Q    Same place as Mr. Vaseris, the previous witness?

2   A    Yes.

3   Q    How long have you worked there?

4   A    I've worked there since 1972.

5   Q    What is your position there—your title?

6   A    New car/used car prep manager.

7   Q    Working there since 1972, obviously, would include, then, the

8       period of February 8 of 1991?

9   A    Yes.

10   Q    What time do you go to work, sir?

11   A    Seven o'clock.  I'm there by 7:00 o'clock.

12   Q    Did you have a routine that you would go through as far as

13       your departure from home and travel to work?

14   A    Yes.

15   Q    Would you make any stops along the way?

16   A    Yes.  Every morning I'd stop at the Minute Market and get

17       coffee.

18   Q    Would that be the Minute Market at 2905 Stadium Drive?

19   A    Yes.

20   Q    Now known as the Bronco Mart?

21   A    Right.

22   Q    You would stop there and get coffee and bring it on to work?

23   A    Right.

24   Q    Did you stop there on this day, February 8 of 1991?

25   A    Yes.

1  Q    Could you please tell us what time it was that you stopped

2       there?

3  A    It was around 7:00 o'clock or a few minutes before—somewhere

4       in there.

5  Q    When you arrived at the business, what did you observe, if

6       anything?

7  A    I seen the light was on in the back and around the office

8       area.  Then there was just a back set of lights on.

9            MR. BROWER:   If you could please put up

10      exhibit number one.

11 BY MR. BROWER:

12 Q    Sir, this has been described as a floor plan of the—the

13      Minute Market store.  When you indicate lights on in the back

14      by the office area, are you indicating this area back here?

15 A    Right.  And just outside the office row.

16 Q    By phrasing it the way you did, are we to infer that there

17      were other lights that were not on?

18 A    Yeah, it was like it wasn't opened up all the way.

19 Q    Okay.  Were the major interior lights in the retail area, were

20      they on?

21 A    No.

22 Q    Would it have been your experience that they should have been

23      on at that time of the morning?

24 A    Right.

25 Q    Did you try the door?

                          339

```
1   A    Yes, it was locked.

2   Q    Are you talking about the glass doors—main entry doors?

3   A    The front doors, yeah.

4   Q    Did you do any checking to see whether or not someone might be

5        at that store at that time?

6   A    Yeah, I walked to the east corner of the building and looked

7        to see if—if the employee's car was there.

8             MR. BROWER:   Exhibit number five, please.

9   BY MR. BROWER:

10  Q    When you're talking about the corner, are you referring to

11       this corner right there?

12  A    No, it would be towards the rear—more towards the rear of the

13       building 'cause that's where they usually went into.

14            MR. BROWER:   Okay.  Now exhibit number two, please.

15  BY MR. BROWER:

16  Q    The rear of the building being right—

17  A    Right in there.

18  Q    —in here?

19  A    Yeah.

20  Q    Okay.  You came around the front of the building and looked

21       down the side.  That would be the east side of the building?

22  A    Yes.

23  Q    Specifically what were you looking for when you went down that

24       area or looked in that area?

25  A    Well, it looked like that they were just starting to open up,
```

340

1      and I thought I'd wait a minute or so and then—for them to

2      open.

3   Q  Okay.  But when you—You were looking for an employee then?

4   A  No, just to see if their car was there, if the employee was

5      there or not.

6          MR. BROWER:   Exhibit number four, please.

7   BY MR. BROWER:

8   Q  This is a photograph of the side of the building with a view

9      towards Stadium Drive, sir.  Are you oriented here?

10  A  Yeah.

11  Q  Okay.  Does this area show where the employees would normally

12     park?

13  A  Right.  Usually whoever opened up would park at the rear of

14     the building right there.

15  Q  Now I can't see the back corner—

16  A  Right in there.

17  Q  —but it would be somewhere in this area?

18  A  Yes.

19  Q  Where the stylus is pointing right now?

20  A  Yeah.

21  Q  Was there a vehicle there?

22  A  No.

23  Q  Was that—the fact that there wasn't a vehicle there—was that

24     consistent with the fact that the doors were still locked and

25     you felt nobody was there yet?

                              341

1   A   Right.

2   Q   Did you remain there at the business?

3   A   No, I got in my truck; and then I drove through this area here

4       around the back of the building, and that'll go up to our

5       dealership.

6               MR. BROWER:   Exhibit number two.

7   BY MR. BROWER:

8   Q   When you say drove along the side, you're referring to right

9       here and then—

10  A   Yes.

11  Q   —going—

12  A   Up that way.

13  Q   All right.—back towards the west?

14  A   Right.

15  Q   Is there access to your business—

16  A   Yes.

17  Q   —through this back alley?

18  A   Yes.

19  Q   Were there any vehicles around there?

20  A   No.

21  Q   See anybody on foot?

22  A   No.

23  Q   Was there any activity anywhere in that area?

24  A   No.

25  Q   Did you eventually return to the business?

                            342

1  A  Yeah, I went down about 8:00 o'clock—walked down there—and the

2     door was still locked.

3  Q  Did you walk to the front of the building then, and is that

4     the door that you tried?

5  A  Yeah.  I come down through the back and then on the west side

6     of the building around to the front.

7  Q  Rather than coming back through this way and going to the

8     front along the east side, you went to the alley and then you

9     went to the front from the west side of the building?

10 A  Right.

11 Q  All right.  See anybody in the area then?

12 A  No.

13 Q  Were the lights still in the same condition or—

14 A  Right.

15 Q  —position?

16 A  Yes.

17        MR. BROWER:   Nothing further, your Honor.

18        MR. SVIKIS:   No questions, your Honor.

19        THE COURT:   You can step down.  Thanks.

20        THE WITNESS:   Okay.  Thank you.

21        MR. BROWER:   Detective Jim Grace, your Honor.

22        THE COURT:   You do solemnly swear or affirm the

23     testimony you're about to give shall be the truth, the whole

24     truth, and nothing but the truth?

25        MR. GRACE:   I do.

343

1                          JAMES GRACE,
2        called at 1:44 p.m., and sworn by the Court, testified:
3                        DIRECT EXAMINATION
4    BY MR. BROWER:
5    Q    Officer, would you please state your name and spell your last
6         name for the record.
7    A    James Grace—G-r-a-c-e.
8    Q    Sir, you're presently retired from the Kalamazoo Department of
9         Public Safety; is that correct?
10   A    That's correct.
11   Q    What capacity—What was your position that you held when you
12        retired, sir?
13   A    When I retired, I was an inspector.
14   Q    Other positions that you held during the course of your
15        employment?
16   A    I started as a patrol officer.  Then I was a detective for
17        15 years, went back on the street as a sergeant for three, and
18        then I was inspector for the remainder of my career.
19   Q    In February of 1991 what position did you have?
20   A    I was a detective.
21   Q    Part of your duties include homicide investigation?
22   A    Yes, that's correct.
23   Q    On February 8 of 1991 did you receive information about a
24        homicide that occurred at 2905 Stadium Drive?
25   A    Yes.  At 8:30 that morning I was directed to respond to the

                              344

1    Minute Market, and then I was assigned to investigate the

2    homicide and robbery there.

3  Q   Did you, in fact, go to that location and begin your

4    investigation there?

5  A   Yes.  Detective Fazier went with me.  We went down there.  We

6    met Sergeant Mueller.  He gave us a general summary of what he

7    had, and then we proceeded from there.

8  Q   Were there—Is it safe to say there were other officers

9    involved in the investigation—other detectives on scene and so

10   forth?

11 A   Yes, there were other detectives and officers on the scene.

12 Q   There's been some reference to young officers and so on and

13   taking direction from superior officers, including

14   detectives—the assignment of duties and responsibilities and

15   so on.  One of those persons making assignments or making sure

16   that certain things were done, would that have been you, sir?

17 A   Yes, that's correct.

18 Q   Sometimes the term primary has been used for—or a lead

19   investigator.  Was that the position you held at least at that

20   point in time or initially on the scene?

21 A   Under current terminology it wasn't; at my time, yes.  But

22   that's what it would have been today.

23 Q   Okay.  Subject, of course, to your supervisors and—

24 A   Most definitely.

25 Q   All right.  During your time there did that include a

345

1    walk-through of the premises and making visual observations
2    regarding the condition of different items, including the
3    doors, points—possible points of entry, that type of thing?
4  A  Yes.  When I get to a scene I make sure that the crime scene
5    investigator who's going to process the scene walks me through
6    so that I don't interrupt any evidence that he's found at the
7    time.
8  Q  Sir, I'm going to show you what has now been admitted as
9    exhibit number 28 and direct your attention to the—the back
10   door that's been—the door in the center of that photograph
11   that's been described as the back door leading to the south
12   side of the building.  Does that help orient you with that
13   photograph?
14 A  Yes, that's taken from the front of the building toward the
15   back of it.
16 Q  Did you make any observations regarding that door and the
17   locking mechanism and so on?
18 A  The door opened from the inside just by opening it; and when
19   you closed it, it locked.  In order to get in from the
20   outside, you had to have a key.  So once the door closed, it
21   was locked.
22 Q  All right.  Let me see if I understand.
23            MR. BROWER:   Why don't we show exhibit number two,
24   please.
25

                              346

1  BY MR. BROWER:

2  Q    There appears to be knobs on the outside and the inside—Is

3       that correct?—standard round doorknobs?

4  A    That's correct.

5            MR. BROWER:   And back to exhibit number 28, please.

6  BY MR. BROWER:

7  Q    It's more clearly visible here, but there appears to be a

8       plate of some sort that incorporates that knob; is that right?

9  A    That's correct.

10 Q    The—Is there a locking mechanism or a key slot of any type?

11 A    There's a lock on the outside.  The doorknob would not open

12      it.  You had to use the key from the outside.  The inside you

13      did not need the key; you could just turn the knob and walk

14      out.

15 Q    Are you saying, then, that there was no action required in

16      order to lock it if somebody opened the door?

17 A    From the inside.

18 Q    Correct.

19 A    That's correct.

20 Q    During your inspection was this door locked and closed upon

21      your arrival?

22 A    I'm sorry?  Could you repeat that?

23 Q    This particular door—this rear exit door—was that locked and

24      closed?

25 A    Was it locked during the investigation?

347

1  Q    Yes.

2  A    Well, it was open for—at certain times for processing.

3  Q    All right.

4  A    But, generally, it was kept closed so it helped secure the

5       scene.

6  Q    Okay.  Did you inspect this to determine that this door was

7       functioning properly, in fact, closed and not remained ajar or

8       anything of that nature?

9  A    It worked as I was told by the owner it was intended to work,

10       that you couldn't open it from the outside.

11  Q    As part of your investigation, sir, did you interview various

12       people?

13  A    Yes, I did.

14  Q    Did one of those people include Patrick Mishall?

15  A    Yes, it did.

16  Q    Where did your contact with him occur?

17  A    It occurred at the police department at 215 West Lovell.

18  Q    Were you responsible for bringing Mr. Mishall to the police

19       department for an interview, or was that the responsibility of

20       others?

21  A    I'd asked Detective Hatter and Bombich to go over to Chris's

22       house and if Pat was there and/or—and the vehicle, to ask him

23       to please come down to impound the vehicle.

24  Q    You weren't there to hear his response; but you do know,

25       however, that he later was at your police department?

348

1   A   I knew he was at the police department, and at 12:35 he asked

2       to see me.

3   Q   His request to see you?

4   A   That's correct.  He wanted to see the person in charge of the

5       investigation.

6   Q   Did you speak with him at that time?

7   A   I walked in.  I explained to Pat that I didn't have time at

8       the moment because of the investigation; that I would be back

9       shortly to talk to him and answer any questions that he had.

10      And then I talked to him about what occurred, what I had; and

11      that at the moment what would be helpful is if he were

12      cooperative with the detectives and—and my understanding was

13      is that he would give a consent to search his house and the

14      vehicle.

15              He said, yes, he was going to give a consent to

16      search the house and the vehicle.  He stated he would stay

17      there as long as we needed to talk with him so we could figure

18      out what did happen.  And then just before leaving he said

19      what happened, I just left, someone must have been hiding

20      inside, I went home to take a shower.

21              I said I'll be back, and I left.  I left the

22      interrogation room at that time and went about what I was

23      doing.

24  Q   Did he make any statements about what time that it was that he

25      arrived at the Minute Market store that day?

                                349

(Tape No. C2005-022, 2-08-05, 01:52)

1  A  Not at that time.  When I went back at 12:00—about 12:56,

2  1:00 o'clock that afternoon when I went back to talk to him,

3  then he did at that time.

4  Q  This is then a second contact by you with him?

5  A  That's correct.

6  Q  All right.  At that time did he exhibit a willingness to speak

7  with you about this?

8  A  Yes.  At that time he asked a question about the door being

9  locked.  I explained it was locked because we had weapons in

10  the office and that we needed to keep the door secure.  But if

11  he wanted—And he asked if he could leave.

12  I said, yes, he could leave at anytime that he

13  wanted.  We went through that two or three different times

14  because at one point he says am I a suspect; and I said, yes,

15  you are.

16  Another time during the discussion he said, so you

17  consider I'm the first suspect; and I said, yes, you are.

18  At that time he still agreed to stay and talk to me

19  the whole time.

20  At the time that we talked he said that they got

21  there at around 6:00 o'clock—

22  Q  He, meaning—They, meaning who?

23  A  Meaning Pat and Chris.

24  Q  All right.  Go ahead.

25  A  That he parked on the—which would be the east side of the

1  Minute Market.  They got out of the car, went to the back
2  door.  Chris unlocked the back door.  They went in.  He said
3  Chris hung up—hung her coat by the back door.  Then she went
4  in, unlocked the office, went into the office; and she asked
5  if he would go up and take care of the papers.
6          He said that he went up, checked both registers to
7  see if they'd been cashed out; and he picked up the papers,
8  counted them, and then went back and asked her for the keys so
9  that he could get the new papers that were for the day from
10  the front outside of the store.
11          He used her keys, which had a Kaluha emblem of
12  some—Kaluha emblem of some sort on it, and he opened the north
13  doors, which would have been the west door of the two doors
14  that were there.  He said he bent down, grabbed the new
15  papers, he brought them in and relocked the door, leaving the
16  keys in the door.
17          He put—
18  Q  Let's stop right there for a second.  I want to show a
19  photograph.
20          MR. BROWER:   Exhibit number—
21          MS. FRARY:   Seven?
22          MR. BROWER:   Yes, seven.
23  BY MR. BROWER:
24  Q  Sir, this has been described as the front double doors with
25  keys in the lock.  Is this—Are you oriented as to—

351

1    A    Yes, I'm aware—

2    Q    —this?

3    A    —of that, yeah.

4    Q    Please describe, then, where it was that he is acknowledging

5         being or what he was doing for the papers that morning.

6    A    Well, the key—If I were facing the door as I am now, the

7         counter and everything is on your right-hand side.  So what he

8         did is he came from there up the hallway and then he unlocked

9         the door, just bent down—He said he did not go outside at

10        all.—just bent down, picked up the papers, brought them back

11        in, relocked the door and basically turned to his right and

12        put the papers back on the counter so that he could fill out

13        the sheet he needed to fill out for—to account for the papers

14        that were coming and going.

15   Q    After doing that—Continue, then.

16   A    After he put the papers up there, he went and made a pot of

17        coffee.  When I walked through, I noticed there was a fresh

18        pot of coffee made.  It appeared that one cup was—of coffee

19        was missing or a full pot wasn't made.  There was about that

20        much missing.

21             He said after he made the coffee, then he went and

22        asked Chris something; and then he went and counted the

23        papers, filled out the paper sheet, and then put the new

24        papers out.

25             When he was done with that—

                          352

1  Q   Are you referring to the newspapers that are for sale?

2  A   I don't know if they were *Gazette* or whatever, but newspapers

3      that they sell.

4  Q   Okay.  Continue.

5  A   From there he was walking back and he found some empties that

6      were there—some beer bottle empties.  So he told Chris that he

7      saw them, that if he—if she wanted he would go ahead and put

8      them away for her.  She said go ahead, so he put them away.

9      Then he said he walked in, gave her a kiss, and said goodbye

10     and left the store.

11 Q   At some point did he ask you about what had happened there or

12     did he—did he offer an explanation as to how that might have

13     occurred?

14 A   Well, initially—That was during the first interview at 12:35

15     when he said what happened.—he said, I just left, someone must

16     have been hiding inside.

17 Q   He's offering this theory?

18 A   That was the only explanation he had at the moment; and,

19     again, I did not talk to him in any depth.  That was probably

20     a minute to two-minute conversation at most.

21 Q   Did he ever acknowledge being outside of the store through the

22     front of the store?

23 A   He did later in the second interview.  After denying twice

24     that he was ever in the front of the store, I confronted him

25     with the fact that we had a witness that saw him in the front

1    of the store and if we showed a photographic lineup would he

2    be picked; and he said, yes, he would be, that, in fact, he

3    was to the front of the store.  He said that he had taken a

4    video called *Celebrity Sluts* or *Celebrity Stars*—one of those

5    two—and put it out on, I believe it was a woodpile that they

6    have there.  And then when he left from the back he ran around

7    to the front, grabbed the video, and then went back, got in

8    his car, and then he said he—At one point he said he drove

9    away slowly.  When I mentioned that witnesses said that they

10   saw the car leaving quickly, he said, well, maybe I was a

11   little quicker than I thought.

12           MR. BROWER:   Exhibit number six, please.

13   BY MR. BROWER:

14   Q   Does this picture show the—the area where this alleged

15       woodpile was, sir?

16   A   I think there's the woodpile right on the other side of those

17       four black poles.  I think there's woods there right now, but

18       there was water—

19   Q   Right—

20   A   Yes, right there.

21   Q   Right in that area?

22   A   That area right there.

23   Q   All right.

24   A   That's correct.  And, again, he had it outside.  Whether it

25       was right on that woodpile or what, I don't know.

                              354

1   Q   His comment to you was he retrieved this—this item—this tape

2       after doing what?  After leaving at what point?

3   A   After he gave Chris a kiss and said goodbye and he was going

4       to go home to take a shower.

5   Q   And he left out which door?

6   A   He left out the back door.

7   Q   Out the back door.  And his statement was that he then came

8       along the—the side to the front?

9   A   Along the east side of the building to the front, that's

10      correct.

11  Q   And then returned to his vehicle?

12  A   That's correct.

13  Q   Did he indicate where his vehicle was parked?

14  A   It was parked—He drew a map.  It was on the east side of the

15      building there.

16  Q   On the east side—

17  A   Face—

18  Q   —of the building—

19  A   Yeah, facing—

20  Q   —over here?

21  A   —facing to the north.

22  Q   Over here in this direction?

23  A   That's—That's correct.

24  Q   Did he make any statements about being upset with Chris or

25      why?

                            355

1    A    We talked about two different incidences and—and two different

2         reasons.  He said they'd been in a dispute the day after she

3         had been involved in an accident where someone else was

4         in—where another male was in the car with her.  And they got

5         into about a—I think he said a ten to 15-minute fight.  He

6         said, but then I left.  He says I tend to lose my temper.  I

7         get physical.  I know I have to leave.  I have emotional

8         problems, I've got to leave.  So he said that one was over; it

9         was done.

10             I asked if that was because she got the job as

11        manager of the store; and he said, no, that the company policy

12        was is that she should get it.  However, he had been the

13        manager there before, so he thought he should get it; that it

14        did upset him but not like the possibility of someone else

15        being with her.

16             Then he said two weeks prior to this incident he had

17        been out and he had, I think it was, six or seven beers at the

18        Sugar Bowl and came home and had talked to her about her

19        possibly having an affair with someone.  And he said if I

20        caught you with someone I could probably kill you.

21   Q    He's volunteering this information to you?

22   A    Yes, he did.

23   Q    Did he make any statements whether he was aware that she was,

24        in fact, seeing someone else?

25   A    No.  He didn't know if she was, and he said that even—that

                                    356

1    even if she was seeing someone, he didn't know if they were

2    actually having an affair—if there's anything involved with

3    it.

4  Q   At some point did he make a statement acknowledging that

5    Christine was shot as opposed to having been killed by some

6    other means?

7  A   Yes.  During the second interview that started around

8    1:00 o'clock.  At one point he says, well, she was shot; and I

9    kind of was taken aback 'cause I had never mentioned how she

10    had died.

11           And I said, how do you know that?

12           And he said, well, the other two detectives told me

13    that she was shot.

14           And I said, well—

15           And he said, I don't even own a gun.  And if you

16    find a gun, my prints won't be on it.

17  Q   The information allegedly came from the two detectives that he

18    had had contact with previously?

19  A   From what he said, I would assume the only two detectives he

20    had contact with would be Hatter or Bombich.

21  Q   At least that's what his claim was, correct?

22  A   That would be my assumption when he said the other detectives.

23  Q   Did you continue by asking him about whether or not he had a

24    gun or had access to a gun?

25  A   He said he did not own a gun.

357

1   Q   After making the statement if he ever caught her with someone
2       that he would kill her, did he then make any statements as to
3       whether or not he would be considered a suspect?
4   A   Yes.  He asked twice if he was considered a suspect; and I
5       answered yes, he was, both times
6   Q   And was that as a result of or in conjunction with his
7       statement acknowledging a threat to kill her?
8   A   There were a lot of variables that would put him as a suspect;
9       and at that point, I wouldn't have ruled him out.
10  Q   The statement that—about him going home and taking a shower
11      that you've testified to, when was that statement made?
12  A   I believe that was at the ten—at the 12:35 interview.
13  Q   All right.  The first contact?
14  A   The first contact, I believe.  It could have been at the end
15      when he asked for coffee and cigarettes and his dad to bring
16      clothes, too.  Again, I'm not sure.
17              MR. BROWER:   Thank you.
18              I have nothing further of this witness.
19              THE COURT:   Mr. Svikis?
20              MR. SVIKIS:   Thank you.
21                      CROSS-EXAMINATION
22  BY MR. SVIKIS:
23  Q   Mr. Grace, your interview with Pat came after he had been
24      interviewed by Detective Hatter, as far as you know?
25  A   I'm sure there were questions at the house that they made.

                          358

1      What interview they had, I don't know.

2  Q   Are you aware if Mr. Mishall was brought to the station for an

3      interview by a Mr. Hatter that morning?

4  A   Yes.

5  Q   And are you aware that when the store was first entered, in

6      addition to police officers entering a—a Wayne Tiller—a

7      manager of another store—and Mr. Jilek entered the store with

8      him?

9  A   I wasn't there.  I can't say if that's true or not.

10  Q   Now you're doing this investigation right on the day that this

11      occurred on 2/8 of '91?

12  A   I'm sorry?

13  Q   You're doing this investigation and interviewing people on

14      February 8th of 1991, right?

15  A   That's correct.

16  Q   All right.  And you receive information that there is blood on

17      certain items, do you not?

18  A   There were blood—There was blood in the store and on her

19      clothing.  I don't know what items you're referring to.

20  Q   Other than where she was found.

21  A   I really don't recall.  I didn't review my—

22  Q   Do you have your report with you?

23  A   No, I do not.

24  Q   I'm going to direct you to—

25  A   My supplemental report.

1   Q   It's a number of pages.

2   A   Okay.

3   Q   Does that look like your report?

4   A   It does.

5   Q   All right.  And I'm going to direct you to, under general

6       investigation, that on 2/8/91 1538 hours did you receive

7       information about some blood that was not around the body?

8   A   Yes, he did.

9   Q   All right.

10  A   Mr. Jilek said he found some blood.

11  Q   All right.  And—And also advised you that there were other

12      items missing, right?

13  A   That's correct.

14  Q   And brown paper towels with brown print?

15  A   With brown print on it, yes.

16  Q   And then you directed Technician—or Detective Spiker to go

17      back to the scene, right?

18  A   To go process the evidence and the blood, correct.

19  Q   And then what was the outcome of that—of that blood evidence?

20  A   I don't know.

21  Q   At all—At all times Mr. Mishall cooperated with you?

22  A   Yes, he was very cooperative.

23  Q   And early on in your testimony you said something about

24      Chris's house.  Did you, in fact, find out that this was Pat's

25      house and they were living there together?

                            360

1  A    Yes.  I didn't know that at the time.

2  Q    And in addition to interviewing individuals, you also went

3       through the scene, correct?

4  A    That's correct.

5  Q    And on your investigation you didn't note any evidence of any

6       struggle; isn't that correct?

7  A    That's correct.  I saw no signs of any struggle.

8             MR. SVIKIS:   I have no further questions.

9             THE COURT:   Do you have any other questions,

10      Counsel?

11            MR. BROWER:   No redirect, your Honor.

12            THE COURT:   You can step down, sir.

13            THE WITNESS:   Thank you, your Honor.

14            MR. BROWER:   Brett Munson.

15            THE COURT:   You do solemnly swear or affirm the

16      statements you're about to make shall be the truth, the whole

17      truth, and nothing but the truth?

18            MR. MUNSON:   Yes, your Honor.

19                    BRETT MUNSON,

20      called at 2:09 p.m., and sworn by the Court, testified:

21                 DIRECT EXAMINATION

22 BY MR. BROWER:

23 Q    Sir, would you please state your full name and spell your last

24      name for the record.

25 A    Brett Munson—M-u-n-s-o-n.

                        361

1  Q   Sir, where were you living back in 1991?

2  A   I resided with my mother at Alamo Park apartments.

3  Q   Are you familiar with a person by the name of Patrick Mishall?

4  A   I'm aware of who he is, yes.

5  Q   Did you know him back in February of '91?

6  A   I knew who he was.

7  Q   How did you know him?  How is it that you were acquainted with

8      him?

9  A   He was friends with my brother and my brother's friends.

10 Q   Your brother's name is what?

11 A   Bart Munson.

12 Q   So you knew Patrick Mishall only because of his relationship

13     with your brother and his friends; is that right?

14 A   Yes.

15 Q   Was it such that you knew each other then?

16 A   We knew who each other was, yes.

17 Q   Were you familiar with Christine Dimmick as well?

18 A   I just knew who—that they lived together, that they were

19     boyfriend and girlfriend.  That was it.  And I never met her

20     personally.

21 Q   You knew a person by that name was living with

22     Patrick Mishall?

23 A   Yes.

24 Q   Did you hear about Christine Dimmick's murder on February 8th

25     of 1991?

362

1  A   I don't recall the date, but I remember hearing about the

2      murder, yes.

3  Q   Although you don't recall the date, do you recall that it was

4      the date that she was murdered that you heard about it?

5  A   I don't remember if it was the exact day or if it was the next

6      day, but it was right shortly after it happened.

7  Q   Some days after the murder did you have contact with

8      Patrick Mishall?

9  A   Yes.

10 Q   Where was that?

11 A   At his home on Springmont.

12 Q   Do you recall any particular event that had occurred earlier

13     in that day before you contacted him?

14 A   All I know is it was the day of the funeral.

15 Q   Christine Dimmick's funeral?

16 A   Right.

17 Q   On that day—the day of the funeral—where was it that you had

18     contact with Patrick?

19 A   It was at his house.

20 Q   You were at his house?

21 A   Correct.

22 Q   How did you happen to be there?

23 A   I happened to be in the neighborhood and ran into some friends

24     that was—that had attended the funeral and was going to his

25     house.

1 Q   That were going to his house?

2 A   Yeah.

3 Q   Okay.  The friends were going to his house; is that—

4 A   Right.

5 Q   Okay.  So they're going to his house.  How is it then that you

6     also, then, wound up there?

7 A   They asked me if I wanted to head over there with them 'cause

8     they were going over there to hang out and party.

9 Q   So you went over there along with these other friends that

10    you'd run into?

11 A   Well, they—Yeah, I mean where I ran into these friends was

12    only about a block from his house; so they continued in the

13    vehicle and I just walked.

14 Q   Walked the rest of the way?

15 A   Yeah.

16 Q   Were there—In addition to the two friends that you just talked

17    about, were there other people that were there as well?

18 A   There were other people, yes.

19 Q   Does this party take place, then, inside or outside the

20    residence?

21 A   We were inside and outside.

22 Q   Did you have a conversation with Patrick while you were there?

23 A   He approached me when we were outside, yes.

24 Q   When we were outside; we, meaning who?

25 A   Hisself [*sic*], myself, and there was a few other people

                              364

1     hanging around outside in the front yard.

2  Q  As he spoke to you was there someone else right there standing

3     with you?

4  A  No.

5  Q  Did he make a request of you at that time?

6  A  Yes.

7  Q  What did he ask you to do?

8  A  He asked if I'd do him a favor.

9  Q  I'm sorry?  I can't hear you.

10  A  He asked if I would do him a favor.

11  Q  What was your answer?

12  A  I asked him what the favor was.

13  Q  And his response was?

14  A  He wanted me to get rid of a gun 'cause he was afraid he'd

15     hurt himself with it.

16  Q  He wanted to get—you to get rid of a gun?

17  A  Correct.

18  Q  Did he show you this gun?

19  A  No.

20  Q  Did he tell you where the gun was?

21  A  No.

22  Q  Did he describe the gun?

23  A  Not at all.

24  Q  After he made this request, what did you say?

25  A  I told him I wasn't going to mess with the gun; if he was

365

1   worried about hurting himself, he should take it to the

2   police.

3 Q   Did he respond to that?

4 A   He just told me to forget that I—that he even asked me that

5   question.

6 Q   Did you, in fact, forget about it then?

7 A   Well, I didn't think nothing of it after that, no.

8 Q   You just dropped it; you didn't pursue it?

9 A   Right.

10 Q   Is Patrick Mishall in the courtroom today?

11 A   Yes.

12 Q   Can you tell us where he's sitting and what he's wearing.

13 A   He's sitting right over there by his lawyer.

14 Q   And what is he wearing?

15 A   He has a suit on.

16        MR. BROWER:   If the written record can reflect the

17   identification of the defendant, your Honor?

18        THE COURT:   It may so indicate.

19        MR. BROWER:   I have nothing further of this

20   witness.

21                CROSS-EXAMINATION

22 BY MR. SVIKIS:

23 Q   So this conversation about a gun took place at the funeral or

24   right about the funeral?

25 A   It was the day of the funeral.

366

1  Q   All right.  And you knew that his fiancée was robbed and

2      murdered?

3  A   I didn't realize she was robbed and murdered; I just knew she

4      was murdered.

5  Q   All right.  And so here is someone you don't really know—a

6      friend of your brother's—and he's talking about wanting to get

7      rid of a weapon; that's your testimony?

8  A   Correct.

9  Q   And you understood that to mean that he might hurt himself,

10     right?

11 A   That's what he said.

12 Q   All right.  All right.  So the funeral takes place—What?—about

13     a week or so after the—after—

14 A   Yeah, probably right around there, yeah.

15 Q   All right.  So now that you have this information and Pat's no

16     friend of yours, so you go to the police and tell them about

17     the—tell them about this conversation?

18 A   I never went to the police about it.

19 Q   All right.  So the first time this information about the gun

20     comes up is in 2002—almost 12 or 13 years later—when you're

21     interviewed by the cold case team; isn't that correct?

22 A   It wasn't 2002, it was last spring.

23 Q   All right, 2004 or '03?

24 A   2004.

25 Q   But ten—But at least 12 or 13 years later?

367

1    A    Right.

2    Q    And that's when this memory comes back to you is when you're

3         approached by the cold case team?

4    A    Well, it wasn't like that.  I mean I never forgot about it.

5         But I know why—the reason why I never thought anything about

6         it was because the rumor around the neighborhood was he was—

7                   MR. BROWER:   Objection.

8                   THE WITNESS:   —cleared.

9    BY MR. SVIKIS:

10   Q    All right.  You say it wasn't like that; but that, in fact, is

11        the way it happened.  After you're interviewed—You pick the

12        year.  It's at least 12 or 13 years later.—that's when the gun

13        story comes up, right?

14   A    Yeah, that's right.

15                  MR. SVIKIS:   All right.   Thanks.

16             I have no further questions.

17                      REDIRECT EXAMINATION

18   BY MR. BROWER:

19   Q    Sir, did police ever come and talk with you back in 1991?

20   A    No.

21   Q    Did they ever come to your house and leave messages that they

22        wanted to speak with you?

23   A    No.

24   Q    To the best of your knowledge did they—were they even aware

25        that there was a person by the name of Brett Munson?

                                368

1  A   To my knowledge, no.

2  Q   Did you intentionally withhold information that you knew to be

3       relevant to a murder?

4  A   No.

5  Q   When contacted by the cold case detectives, did they ask

6       questions about your familiarity with Patrick Mishall?

7  A   Yes.

8  Q   Did you answer those questions truthfully?

9  A   Yes, I did.

10  Q   Did—When they asked these specific questions did you still at

11      that time have—recognize the significance of what had happened

12      or whether or not it was relevant at all?

13  A   I understood what they were asking; but at the time I

14      didn't—you know, I just told them what I knew.

15  Q   Did they in any way plant answers with you as to what you

16      should say or what they wanted to hear?

17  A   No, they just asked me what they had heard, and I told

18      them—you know, I told them what I remembered.

19  Q   Mr. Munson, I'm going to assume that a murder in the

20      neighborhood or somebody connected with one of the family

21      members that—your brother, somebody associated with him—that's

22      probably much closer connection than murders that you would

23      read about in the paper that you had no idea or no involvement

24      with or no connection with; is that right?

25  A   Yeah, that's correct.

1   Q   Is that, in part, why you recall that particular detail is

2      because there is a landmark with which to attach it?

3   A   That's right.

4   Q   Did anybody coach you and tell you what to say about your

5      recall regarding that message or that conversation?

6   A   No.

7   Q   In fact, the request of you regarding your testimony was what?

8      To simply tell the truth; is that right?

9   A   That's correct.

10   Q   And did you do that today?

11   A   To the best of my knowledge, yes.

12          MR. BROWER:   Thank you.

13             RECROSS-EXAMINATION

14 BY MR. SVIKIS:

15   Q   Mr. Munson, is this correct?  When the prosecutor asked you

16      some questions when you were approached by the cold case team

17      you said that they told you what they had heard?

18   A   Yes.

19   Q   So they—they explained the situation to you, right?

20   A   Yes, they asked me—they told—

21   Q   . . . (inaudible)

22   A   —me what they had heard, and I explained to them—

23   Q   So—

24   A   I answered the questions that they asked me.

25   Q   So by the time they got done it all fit together nice and

1    neat, right?

2  A    I don't know if it fit nice and neat, but—

3              MR. SVIKIS:   Nothing further.

4                    REREDIRECT EXAMINATION

5  BY MR. BROWER:

6  Q    Mr. Munson, you told your brother Bart about the conversation

7       with—with the defendant Patrick Mishall; is that correct?

8  A    That's correct.

9  Q    Are you aware that Bart told the officers what you had said?

10 A    Yes.

11 Q    When you say the officers informed you about they'd heard, are

12      you referring to that statement—the statement that Bart had

13      made to them?

14 A    That's correct.

15 Q    So they say to you, Bart told us you had a conversation with

16      him about a gun; is that right?

17 A    That's right.

18 Q    Is it something of that nature?

19 A    . . . (inaudible)

20 Q    And that's what you were referring to in response to defense

21      counsel's question?

22 A    Correct.

23             MR. BROWER:    Thank you.

24             MR. SVIKIS:   No further questions.

25             THE COURT:    You can step down.   Thank you.

                              371

1    MR. BROWER:   Your Honor, the People would call
2    James Jilek to the stand.
3    THE COURT:   Raise your right hand, sir.   You do
4    solemnly swear or affirm the testimony you're about to give
5    shall be the truth, the whole truth, and nothing but the
6    truth?
7    MR. JILEK:   I do.
8                        JAMES JILEK,
9    called at 2:22 p.m., and sworn by the Court, testified:
10                   DIRECT EXAMINATION
11   BY MR. BROWER:
12   Q    Mr. Jilek, if you could please state your full name and spell
13        your last name for the record.
14   A    James Jilek—J-i-l-e-k.
15   Q    Mr. Jilek, back in the early 90s you owned a chain of
16        Minute Market stores; is that correct?
17   A    Yes.
18   Q    There's been some—some testimony about several different
19        stores that you owned in this area; is that also correct?
20   A    Yes, four.
21   Q    Which—What were the locations of those various stores?
22   A    Gull Road, Stadium Drive, Sprinkle Road, and South Westnedge.
23   Q    Specifically, the address of the Stadium Drive store was 2905?
24   A    Yes.
25   Q    Are you familiar with Christine Dimmick?

                              372

1    A    Yes.

2    Q    How do you know her?

3    A    She was an employee.

4    Q    What store did she work at prior to February of '91?

5    A    On the West—At the Westnedge store.

6    Q    Are you also familiar with Patrick Mishall?

7    A    Yes.

8    Q    And how did you know him?

9    A    He was an employee.

10   Q    At which store?

11   A    Stadium Drive.

12   Q    Were you aware in February of 1991 that the two of them had a

13        romantic relationship?

14   A    I knew they were boyfriend and girlfriend, yes.

15   Q    Is there a general policy regarding people involved in a

16        relationship like that working together at the same store?

17   A    Yes.  We would not allow couples to work at the same store.

18   Q    Sometime late January or early February Christine Dimmick was

19        promoted, was she not?

20   A    Yes, she was.

21   Q    What had been her position and to what position was she

22        promoted?

23   A    She was assistant manager at Westnedge, and she was promoted

24        to store manager at Stadium Drive.

25   Q    From assistant to full manager?

                              373

(Tape No. C2005-022, 2-08-05, 02:26)

1  A   Yes.

2  Q   Could you please just real briefly describe the difference in

3      responsibilities from the assistant to the full manager?

4  A   Well, the manager was in full charge of the store, worked

5      mainly daytime hours and was in charge of doing all the book

6      work necessary, ordering that was necessary—basically ran the

7      store.

8          The assistant was—typically would work in the

9      evening and did many of the jobs that the manager would do but

10     not—of course would not have as much authority as the manager.

11 Q   The assistant's boss would be the full store manager?

12 A   That's correct.

13 Q   Were all managers and the assistant managers training in

14     operating the safes and money handling procedures and the

15     like?

16 A   Yes.

17 Q   When did Chris Dimmick begin her responsibilities as the

18     manager at the Stadium Drive store?

19 A   I believe it was February 3rd or 4th.

20 Q   The beginning of the week in which she was killed; is that

21     correct?

22 A   The Monday of that week, yes.

23 Q   Okay.  With a change in personnel and movement of managers or

24     assistant managers from store to store, is there an

25     accompanying change in log-in records or, for that matter, the

374

1    keys and the locks at the different facilities?

2  A  Yes.  When we change managers we would change the locks; and,

3    also, we had what was known as Sonatrol—which is an alarm

4    company—and we would change the—have them change the codes for

5    the people who were switching around.

6  Q  The reason for that changing the codes and the keys and so on

7    is what?

8  A  Security, so that—especially for the keys so that no

9    one—someone who had a key, they may have copied a key or

10   something like that—would not be able to enter the store

11   thereafter, of course, after we changed the locks.  And then

12   for the Sonatrol to know who was going in and out of the store

13   at various times.

14 Q  So the code that was assigned then was something unique to

15   that employee?

16 A  Yes.

17 Q  If several employees had access to the building and were given

18   an access code, would each of those employees then have a

19   different code which could activate or deactivate the alarm

20   system?

21 A  Yes.

22 Q  Employees that were presently working at a location would have

23   keys for the building and access code, employees that used to

24   work there but no longer worked there would not have a key and

25   would not have an access code; is that right?

375

1  A   That's correct.

2  Q   With Christine's promotion, did that change of locks and

3       change of access codes take place?

4  A   Yes.

5  Q   Adding her to the permitted list?

6  A   Correct.

7  Q   Then was—Well, I didn't—I don't think I asked that question.

8       When she was promoted and began working at the Stadium Drive

9       store, was there a change made for Mr. Miscall?

10  A   Yes, I believe Patrick went to our South Westnedge store as

11      assistant manager there.

12  Q   He was—At Stadium Drive he was an assistant manager?

13  A   Correct.

14  Q   So he was transferred to another building, but there was no

15      promotion associated with that?

16  A   No.

17  Q   Was his access to that building then removed?  In other words,

18      he didn't have a key any longer that worked and his access

19      code was changed or deleted for that building; is that right?

20  A   That would be the procedure, yes.

21  Q   What time did the Stadium Drive store open?

22  A   Seven a.m.

23  Q   At sometime after 7:00 a.m. on February 8 of 1991 did you

24      receive a phone call indicating the store had not opened as

25      expected?

1  A    Yes.

2  Q    Now this was the fifth day after Christine had begun her new

3       job; is that right?

4  A    Yes.

5  Q    After receiving this phone call—Well, let me ask this: do you

6       know the name of the person that called you?

7  A    I do not.  It was some woman—woman's voice called and said

8       that she was surprised the store wasn't open approximately

9       7:30 or quarter to 8:00, I believe, and—

10 Q    As a result of that phone call, what action did you take?

11 A    Well, I called the store to see if—what was going on and

12      received no answer.  I continued to call a number of times and

13      received no answer; then called Sonatrol to find out if

14      the—the alarm had been deactivated, and they told me it had

15      been at approximately 6:25 or 6:30 a.m., and Chris had been

16      the one to punch in or there—

17 Q    I'm sorry?  I couldn't hear the last.

18 A    That Chris Dimmick had been the one that punched in the—at

19      least her access code was punched in.  And so I tried—I

20      believe I tried to call another couple times and then thought,

21      well, something is—is wrong here.  And I called the Kalamazoo

22      police; and I called Wayne Tiller, who was at our

23      South Westnedge store because it's just a few minutes away to

24      ask him to go over there and check and see if the—the door was

25      open or what.  Then I went over—got in my car and went over to

377

1     the Stadium Drive store from our office on Sprinkle.

2  Q   Wayne Tiller also have a given name maybe of Carlton Tiller;

3     is that right?

4  A   Yes.

5  Q   All right.  Goes by the name Wayne?

6  A   Correct.

7  Q   Let me stop just for a moment and ask you to describe the

8     security system—the Sonatrol system that you have there.  What

9     types of hazards would that system protect against or be

10    designed to protect against?

11  A   We had fire protection, we had panic buttons for robbery, and

12    we had breaking and entering protection.

13  Q   Magnetic contacts on the door that would activate an alarm if

14    there was an unlawful entry of some sort; is that right?

15  A   Yes.  As well as Sonatrol had a system whereby they had

16    speakers in the locations that they could turn on and listen.

17  Q   In addition to—Well, let me ask this: you've talked about the

18    keypad and deactivating.  Do you remember where the keypad was

19    in this particular building?

20  A   No, I'm sorry, I can't remember where it was.  It may have

21    been up front by the front door, but I'm not positive about

22    that.

23  Q   You didn't have to be the one to open and close the buildings

24    or activate or deactivate the alarm system?

25  A   No.

1  Q    That was the managers that you'd hired?

2  A    That's correct.

3  Q    All right.  In addition to the Sonatrol system, did you also

4       have cameras?  I'll call them surveillance cameras.

5  A    Yes.  We had a—We videotaped activity in and around the

6       registers 24 hours a day.

7            MR. BROWER:   Exhibit number one, please.

8  BY MR. BROWER:

9  Q    Sir, the—this has been admitted as an exhibit showing the

10      floor plan of the Minute Market store back in 1991.  Is this

11      consistent with your recollection as well, sir?

12 A    Yes.

13 Q    Front door being right here, back door going out the back of

14      the building being right there with the office just inside and

15      to the right as you enter through the back door; is that your

16      recollection?

17 A    Yes.

18 Q    All right.  The cameras that you've referred to, what areas of

19      the store did they monitor?

20 A    They monitored the—around the counter area, the cash registers

21      and the—you could see some of the front door but not all of

22      it, I believe, and—

23 Q    . . . (unintelligible)

24 A    —it's mainly around the counter.

25 Q    Can we call this the retail area—

                               379

```
 1   A    Yes.

 2   Q    —as opposed to the back area or bottle room or office?

 3   A    Correct.

 4   Q    Were there any cameras in the office?

 5   A    No.

 6   Q    Any in this back room area—the hallway going from the office

 7        back to the west side of the building?

 8   A    No.

 9   Q    And nothing in the bottle room either?

10   A    No.

11   Q    After calling Mr. Tiller and the police, did you drive over to

12        the Stadium Drive—

13   A    Yes.

14   Q    —store?  Okay.

15             What did you discover about the exterior security?

16   A    The doors were locked and—That was it, the doors were locked.

17   Q    Okay.  Were lights on as expected?  Do you remember if the

18        lights were off at all?

19   A    Well, part of the lights were on.  The—

20   Q    What—

21   A    —lights that would have been all night.

22   Q    Okay.

23   A    We left probably 25—20, 25 percent of the lights on all night.

24   Q    The lights you would have expected to be on in preparation for

25        the business day, were those lights on?
```

1   A    No.

2   Q    Who had the key that allowed for entry into the building?

3   A    I did.

4   Q    Did you unlock the doors and then allow the police in to

5        conduct a search?

6   A    Yes.

7   Q    Do you remember those officers' names by chance?

8   A    I do not.

9   Q    A couple of uniformed city officers?

10  A    Yes.

11  Q    In addition to the uniformed officers, you were there with it

12       appears to be Mr. Tiller; is that right?

13  A    Yes.

14  Q    Once they went in—they, meaning the officers—went inside, what

15       did you and Mr. Tiller do?

16  A    Well, we stepped inside the door and looked around and—for

17       maybe a minute or so; and then the officer had gone in the

18       back and he said—or yelled at us—there's been a robbery, exit

19       or leave the building; and Wayne and I left the building.

20  Q    When you say that you initially stepped inside the building,

21       is that through the—the main entrance doors?

22  A    Yes.

23  Q    How far into the interior did you go?

24  A    Not very far.  I don't believe very far.

25  Q    Did you stay basically right there near the door?

381

1  A   Yes.

2  Q   Did Mr. Tiller as well?

3  A   Yes.

4  Q   Did—Once you were informed of some type of discovery by the

5      officer searching the back, what did you and Mr. Tiller do

6      then after leaving through the front doors?

7  A   I believe we just stood out in the front of the store.

8  Q   At some point were you asked to come back inside the building

9      to—and attempt to identify the body that was found?

10 A   Yes.

11 Q   Did you, in fact, go to the back storeroom area or storage

12     area?

13 A   Yes.

14 Q   Well, what did you discover when you went back there, sir?

15 A   We discovered Christine Dimmick.

16 Q   That was in the back area near the bathrooms?

17 A   Yes.

18 Q   That'd be approximately in this area?

19 A   Correct.

20 Q   After entering to make this identification, did you then—were

21     you then escorted back out of the building?

22 A   Yes.

23 Q   At some point were you asked also to check for any items that

24     could be missing from the interior?

25 A   Yes, I was.

382

1   Q   Did you find that items were missing?

2   A   Yes, we found that money was missing; and we found later—not

3       much later, but somewhat later—that the video camera had

4       been—or not the video camera, the video recorder had been

5       removed.

6   Q   The money that you're referring to, would this have been a

7       deposit of some type or receipts from the business?

8   A   It's receipts from the prior day and monies that were kept on

9       premise to pay winning lottery tickets and supplies that would

10      come into the store.

11  Q   The person collecting these receipts and—Where would they

12      normally have been placed?

13  A   Normally would have been in the drop—the drop-safe.

14  Q   And maybe later then also transferred to another safe in that

15      same—in your—

16  A   Yes.

17  Q   —in the office area; is that right?

18  A   In the—Yeah, there are two drop-safes, one by the cash

19      registers and one in the office.

20  Q   Who is the person responsible for placing the day's receipts

21      in—into the safes?

22  A   Well, the evening's receipts would have been the evening

23      manager or the person who was working in the evening.

24  Q   On this particular date the person that had worked the

25      previous night until closing in the early morning hours of the

383

1    8th of February, who would that person have been?

2  A  Tina Telpely she was known at that time.  Tina Telpely.

3  Q  Her name—last name at that time was Telpely?

4  A  Yes.

5  Q  You mentioned the recording equipment.  Is that the equipment

6     that would record activity picked up on the cameras in the

7     retail area that you described previously?

8  A  Yes.

9  Q  What part of the building was that equipment stored in?

10 A  It was in the office.

11 Q  Right in this area over here?

12 A  Yes.

13 Q  Okay.  Sir, the activity in the store is recorded over an

14    extended period of time; is that correct?

15 A  That's correct.

16 Q  Could you please tell us the practice or the procedures that

17    were followed in the store regarding tapes of the activity?

18 A  Well, the tapes were exchanged every Monday, Wednesday, and

19    Friday.  The machine will run for approximately 72 hours.

20 Q  This, obviously, has to be something far different than what

21    many of us might have in our homes then—

22 A  Yes.

23 Q  —extremely long extended play?

24 A  That's correct.

25 Q  All right.  Are you indicating that a tape could actually

384

1    record the activity for up to 72 hours?

2  A  Yes.

3  Q  What happened with those tapes every 20 or—Excuse me.—48 or

4    72 hours then?

5  A  The manager would unlock the machine, take the tape out and

6    have it sent over to the office and then replace it and start

7    a new tape.

8  Q  That would happen what time of the day?

9  A  Typically early morning between 6:00 and 7:00 o'clock.

10 Q  Would that be the responsibility of the day person—the person

11   opening for business?

12 A  Yes.

13 Q  I believe you already testified previously that it'd be the

14   full manager that would typically work days.  Would it be that

15   person, then, that would be responsible for changing the

16   tapes?

17 A  Yes.

18 Q  The tapes then eventually would get sent to the main office

19   where you were?

20 A  That's correct.

21 Q  And then where's that?

22 A  On Stadium Drive or—Excuse me.—on Sprinkle Road.

23 Q  Sprinkle Road is where the main office was.  Okay.

24           At some point did you discover that tapes for that

25   week's activity were, in fact, missing?

                                385

1   A   Yes, the tape for—the last tape we had was Monday, Tuesday,

2       and early Wednesday morning.  After that the tapes were

3       not—they were gone.

4   Q   Disappeared?

5   A   Yes.

6   Q   Did you ever see them since then?

7   A   (No audible response)

8   Q   So there's at least one other tape that was missing prior to

9       this particular date?

10  A   Yes.

11  Q   At some point later on—either that day or immediately—days

12      immediately following—did you determine that there was a

13      videotape that was missing from the store as well?  I mean a

14      rental tape, not a surveillance tape.

15  A   Sometime later, yes.

16  Q   Was your understanding that Mr. Mishall had acknowledged

17      taking that tape?

18  A   Yes.

19  Q   The closing of the store, what time would that routinely

20      occur?

21  A   The time would be about approximately 2:00 a.m.

22          MR. BROWER:   I have no further questions of this

23      witness.

24          THE COURT:   Mr. Svikis?

25

386

                        CROSS-EXAMINATION

BY MR. SVIKIS:

Q    Good afternoon, Mr. Jilek.

A    Good afternoon.

Q    How long had Christine Dimmick been working for you—plus or
     minus?

A    Year and a half.

Q    All right.  And how long had Patrick Mishall been working for
     you?

A    I believe a year.

Q    Less time than Christine Dimmick?

A    Yes.

Q    And so because of your policy that you shouldn't have a
     boyfriend/girlfriend at the same place Christine, who ran the
     South Westnedge store, was made the manager of the
     Stadium Drive, correct?  She was moved over there?

A    She was moved there.  She was assistant manager at—

Q    And so she—

A    —Westnedge.

Q    —got a promotion and Patrick Mishall was there and he was
     moved over to Westnedge?

A    Correct.

Q    All right.  And Tina Telpely or Askren—And I've lost track of
     what her last name was at the time, but I'll use Tina.
     Okay?—she was the one that would have closed the store up the

                              387

1      night before?

2   A   Yes.

3   Q   Okay.  And she did not get a promotion, correct?  'Cause you

4       moved the manager—'cause you moved Christine Dimmick in there,

5       right?

6   A   Well, no—

7   Q   No.

8   A   —she was not, no.  She was not.

9   Q   Okay.  How was that?

10  A   All right.  She was not promoted, no.

11  Q   The person that was there was not promoted, correct?

12  A   That's correct.

13  Q   All right.  Did you have a standing order from Sonatrol that

14      if the store had not locked up at night—This is after

15      2:00 a.m.—that you were to be called?

16  A   Yes.

17  Q   And that time period was about a half hour?

18  A   I believe so.

19  Q   Okay.  And the store was to close at 2:00, and then it takes

20      some time to do whatever a person has to do, right?  And what

21      were some of the duties that had to be done to close the

22      store?

23  A   Clean up the—Clean up the area inside the store, sweep, get

24      the coffee ready for the morning if they possibly could, make

25      sure that all the money was in the drop-safes, take—take the

                                388

1    cash register drawers and put them in the—back into the

2    office.  That would be about it.

3  Q  All right.  And that—that would take about a half hour?

4  A  It could.  Many times it was done in less time, of course,

5    because sometimes it wasn't that busy between 1:00 and 2:00

6    and people could get their work done.

7  Q  Okay.  And the—So when a person left the—There were two cash

8    registers, and they're both left open so they wouldn't be

9    destroyed if someone came in, right?

10 A  Correct.

11 Q  And then all the other cash or lottery tickets or whatever

12    would go into the floor safes?

13 A  Correct.

14 Q  When you were asked to make a report about how much money was

15    taken, would this be correct that you said $2,238 and only

16    currency appeared to be taken; would that be accurate?

17 A  I believe so.

18 Q  And also when you're being interviewed on the same day, you

19    advised one of the investigators that you had found some blood

20    that should be checked out, right?

21 A  I'm sorry?

22 Q  That you had found some blood in areas that should be checked

23    out?

24 A  I—I don't recall that.

25 Q  All right.  Well, at the same time did you advise

                              389

1    . . . (inaudible) that there was a roll of white paper towels

2    with brown print on it, also?  Does any of that ring a bell?

3  A  No.

4  Q  But that could very well have—have happened?

5  A  I just don't recall that, no.

6  Q  Okay.  Now when you're unlocking the store on that particular

7    day and your—Mr. Tiller is with you when you're advised

8    that—advised and/or identify that Christine Dimmick has been

9    shot and robbed, right?  He was there when that occurred?

10 A  Yes.

11 Q  And these other surveillance tapes that you had in a series,

12   did those ever—did you ever get those back?  Those ever show

13   up again?

14 A  No.

15 Q  Ever seen them again anywhere?

16 A  No.

17 Q  The sheets for calculating the sales of the day and the money,

18   would those be made up at the closing or in the morning?

19 A  In the morning.

20 Q  In the morning?

21 A  Yes.

22 Q  Okay.  And then the—the machine that actually recorded what

23   was on the surveillance cameras, that was missing?

24 A  Yes.

25 Q  And there are a number of other cash drawers that are put in

                              390

1    the—I'm going to say back room, but they're empty, right?  Is

2    that—The cash register drawers?

3  A  Right.  Yes, they are.

4  Q  All right.  So any cash that's in the store is in the cash

5    register drawers and the drop-safes when someone leaves at

6    night, right?

7  A  Yeah, there'd be a small amount in the cash register

8    drawers—various pennies and nickels, possibly—and then there

9    was a small amount of money in the cash or—Excuse me.—in the

10    change drawer—which would be quarters, dimes, nickels,

11    pennies—just being used for change that was not put in the

12    drop-safe.

13  Q  All right.  And in order to find out how much money was

14    missing, you opened that up when you came in?

15  A  The drop-safe, I believe, I—yes, I had to open.

16  Q  But you're the only one that could—there was no one else there

17    that could open that, was there?

18  A  No.

19  Q  No.

20  A  No.

21  Q  And then you would—then you would close it back up or leave it

22    open?

23  A  Probably just left it open.  You just pull it out and put it

24    on the side—

25  Q  All right.

391

1  A    —and looked.

2  Q    And is there anything else described as a—a cash or a coin

3       box?

4  A    I don't believe so.

5  Q    So there was no cash or coin box that you found that was open

6       or locked, right?

7  A    I don't—I guess I didn't understand the question.

8  Q    All right.  When you go in, at some point you have to find out

9       how much money should have been there and how much money is

10      missing.

11 A    Yes.

12 Q    And you do this by looking in the cash register drawers and

13      the drop-safes?

14 A    Yes, that's correct.  Pull all the money out of there, put it

15      on the—the manager's desk, count the money, and look at the

16      tapes from the—the cash register tapes from the previous day

17      as to what was taken in and what should be there and how much

18      was there, and the difference would be what was—

19 Q    Okay.

20 A    — . . . (inaudible)

21 Q    And then when you open up the coin or cash box, that contains

22      some rolled quarters and things?

23 A    Correct.

24 Q    And those were plus or minus in your calculation?

25 A    Yes.

1    Q    It's still money but not as significant as the currency—the

2         folding money, right?

3    A    Correct.

4              MR. SVIKIS:   I have no further questions.

5                       REDIRECT EXAMINATION

6    BY MR. BROWER:

7    Q    Sir, the position that Christine Dimmick filled—the manager's

8         position at Stadium Drive—I'm assuming that that was a

9         position held by sometime [sic]—somebody previous to that; it

10        wasn't a created position; is that right?

11   A    That's correct.

12   Q    Who—What was the name of the individual that had—held that

13        position?

14   A    George Brandon.

15   Q    After George—Was there a gap between when George Brandon left

16        and when Christine began to work as a—as a full manager there?

17   A    No.

18   Q    Was there a period where Patrick Mishall was temporary or

19        acting manager there at that facility?

20   A    No, I don't believe so.

21   Q    You don't believe so, but you don't know for sure any longer?

22   A    I don't recall; but, no, I don't believe so.

23   Q    Sir, regarding the opening of the safe or inspecting it and so

24        on, I believe it was in that context you made the statement

25        about probably left it open.   Is that what you're referring to

                              393

1   is when you opened it at the request of the police officers?

2   A   Yes.

3   Q   You say probably.  That seems to have some ambiguity there.

4   Do you know for sure there?

5   A   I don't recall, but that would be what we would do normally is

6   open the safe, leave it open because there's nothing in there

7   anyway—

8   Q   All right.

9   A   —and take the money to the—to the manager's office.

10  Q   Okay.  So you're talking about the procedure when the person

11  was opening it to count the money as you've described and do

12  the ledger sheets and compare it with the cash register

13  documentation and so on?

14  A   Yes.

15  Q   All right.  Were you there at the store when Tina Telpely was

16  there that morning?

17  A   I don't remember.

18  Q   All right.  Sir, you owned these various stores, correct?

19  A   Correct.

20  Q   You didn't manage them yourself?  I mean you were involved in

21  the day-to-day taking transactions, making—physically making

22  the drops yourself, and stocking shelves—that kind of thing?

23  A   No, I was not.

24  Q   You were the executive in a business and had employees that

25  did that for you; is that correct?

394

1   A   That's correct.

2   Q   Regarding the actual workings within any of those particular

3       stores, who would be better able to testify about what

4       actually occurred in the store, the person that is there

5       working and doing that work or the owner sitting at his office

6       on a different location?

7   A   It would be the person that actually worked in the store.

8   Q   Regarding the—the amount of money, for instance, that might

9       have been taken or the procedures that they actually used to

10      make change.  Let's direct it particularly to that day, the

11      evening of the 7th and the morning of the hour [*sic*]—the

12      morning hours of the 8th.  Would that have been somebody other

13      than yourself that could best testify as to those things best?

14  A   Yes.

15  Q   And that would be Tina Telpely?

16  A   Who worked that evening.

17  Q   All right.  Would that also include she being the better

18      person to testify as to what had been in this box with the

19      coins used for change and what was not there later on?

20  A   Yes.

21  Q   The managers and the assistant managers you had testified

22      previously were involved in the opening the safes,

23      money-handling procedures, and so on.  Would that include

24      access to this coin box to determine—or to make change as

25      needed and so on?

395

1   A     Yes, it would.

2   Q     And the defendant was a person that had that authority and

3         responsibility, was he not?

4   A     Yes.

5   Q     He had been familiar, then, with the location and how to

6         access the coin box to make change, both where the key was

7         kept, where—how it was unlocked, how to make change, and how

8         to secure it again?

9   A     Yes.

10                MR. BROWER:    Thank you.

11                I have nothing further.

12                     RECROSS-EXAMINATION

13  BY MR. SVIKIS:

14  Q     I just want to clarify this.   When you were called to the

15        store, it was you and an officer and Tiller that entered;

16        Tina Telpely wasn't there, right?

17  A     Correct.

18  Q     And you made the first go-around in regard to the money even

19        though—That's the important part of the business—Right?—the

20        money?   Setting aside the fact the death occurred.

21  A     Yes.

22  Q     But you're the one that's going to decide how much money's

23        gone?

24  A     Yes.   And—

25  Q     All right.

                         396

1  A    But, however, what I did at that point is brought our office

2       secretary, who knew how to do the cash—We called it cash-out.

3  Q    Okay.

4  A    So that she actually did the cash-out while—

5  Q    All right.  So that—

6  A    —we were there.

7  Q    So that wasn't Tina Telpely, though?

8  A    That was not Tina Telpely.

9              MR. SVIKIS:   All right.  Thank you.

10             MR. BROWER:   No redirect.

11             THE COURT:   All right.  You may step down.

12             Why don't we take a recess at this time.

13             (At 3:03 p.m., court recessed)

14             (At 3:20 p.m., proceedings reconvened)

15             Call your next witness, please.

16             MR. BROWER:   People call Tina Askren to the stand.

17             THE COURT:   You do solemnly swear or affirm the

18      testimony you're about to give shall be the truth, the whole

19      truth, and nothing but the truth?

20             MS. ASKREN:   I do.

21                   TINA LOUISE ASKREN,

22      called at 3:20 p.m., and sworn by the Court, testified:

23                   DIRECT EXAMINATION

24  BY MR. BROWER:

25  Q    Ma'am, would you please state your full name and spell your

                          397

1    last name for the record.

2  A  Tina Louise Askren—And it used to be Telpely.—A-s-k-r-e-n T-e-

3    p—T-e-l-p-e-l-y.

4  Q  Ma'am, back in 1991 where were you employed?

5  A  The Minute Market on Stadium Drive.

6  Q  What was your position there?

7  A  Assistant manager—night manager at the time.

8  Q  As night manager it was you that was responsible for closing

9    and locking the building and closing procedures; is that

10    correct?

11  A  That is correct.

12  Q  What time did the store close back then?

13  A  Two o'clock.

14  Q  Do you recall approximately what time it was that you were

15    actually able to leave the building?

16  A  About 2:20.

17  Q  As part of your close-up procedures would you take money from

18    the front drop-safe and the cash registers and secure that

19    money in some location?

20  A  In the office drop floor safe.

21  Q  Do you recall doing that on this occasion, the early morning

22    hours of February 2, 1991?

23  A  Yes.

24  Q  Do you recall approximately how much money was there that you

25    secured?

(Tape No. C2005-022, 2-08-05, 03:23)

1   A   No, not exact.

2   Q   Not exactly, but can you give an approximate at all?

3   A   Between 2,000 and 2500.

4   Q   Now that money—That included the money taken from the cash

5       registers—money taken for product that was purchased.  Was

6       there also some lottery money involved?

7   A   Yeah, there were a lottery drawer, yes.

8   Q   Did that money then include the lottery money as well?

9   A   I do not recall.

10  Q   Where did—What did you do with the money once it was taken

11      from the front drop-safe and the registers?

12  A   It would be cashed out at night to show what our daily sales

13      were and what the profit was, and it would be put into a bank

14      deposit bag and then put into the floor so that it could be

15      deposited at a later date.

16  Q   Could you describe what these deposit bags looked

17      like—approximate size, at least?

18  A   Probably about that big.  I mean—What?—four by six, maybe.

19  Q   All right.  And then put into the floor safe.

20  A   Yeah, they had a lock and a key on them.

21  Q   The bags had a lock and a key?

22  A   Yeah, I'm pretty sure they did, yes.

23  Q   All right.  Now had that day's receipts—2,000 to 2500, in that

24      range—to the best of your memory was that an exceptionally

25      large deposit as opposed to any other day?

399

1   A   Not that I recall, no.

2   Q   Nothing to cause you to say, yeah, that's a huge amount or—

3   A   No, unh-unh.

4   Q   Did you—As you closed that night in the early morning hours,

5       did you make a phone call to Chris Dimmick about that day's

6       deposits being exceptionally large and—

7   A   No, I don't recall doing that, no.

8   Q   Would you recall something like that, making a phone call to—

9   A   Yeah, I—

10  Q   —the day person?

11  A   —had no reason to call Chris, no.

12  Q   So are you saying you don't remember or I did not call?

13  A   I did not call.

14  Q   You became aware at some point on the 8th that there—that

15      Christine Dimmick had been killed at that—at the store; is

16      that right?

17  A   Correct, I received a call that morning.

18  Q   Did you go to the store at the request of detectives and look

19      through the store to see what might be missing?

20  A   Yes, I did.

21  Q   What did you discover about what was no longer there, items

22      that had been there when you closed at 2:18 or 2:20,

23      thereabouts?

24  A   Cash was missing.  Certain paperwork was gone.  The money out

25      of the cash box was gone.  A light was turned off.  A bathroom

400

1    door was closed.

2  Q   You—Okay.  Let's take that one by time [*sic*]—one at—one by

3      one.  You mentioned cash was gone.  What cash are you

4      referring to?

5  A   There was no nightly receipts.  The deposit bag was gone.

6  Q   The 2,000 to 2500 that you'd referred to before?

7  A   That is correct.

8          MR. BROWER:   Exhibit number 40, please.

9          THE WITNESS:   That's the floor safe in the office.

10 BY MR. BROWER:

11 Q   All right.

12         MR. BROWER:   Exhibit number 41.

13 BY MR. BROWER:

14 Q   The contents of that minus the cash; is that correct?

15 A   That's correct.

16 Q   Did you inspect the contents of the safe and the cash box that

17     you've talked about now—

18 A   Yeah, they—

19 Q   —yourself?

20 A   They had me look, yes.

21 Q   All right.  You actually looked through what was there and

22     could say this isn't the same stuff that I put in here?

23 A   That is correct.

24 Q   The stuff that I put in there was?

25 A   Gone.  The deposit slip and the money was gone.

                        401

1  Q  Now the deposit slip, what exactly do you mean by deposit

2     slip?

3  A  A deposit slip indicates what your currency is, your number of

4     checks, and what your coins were that you were depositing for

5     the night—your nightly deposit?

6  Q  Deposit slip as in bank deposit slip?

7  A  Bank deposit slip, yes.

8  Q  All right.  That would accompany the money to the bank?

9  A  Correct.  It indicates what bank it goes to.

10 Q  That money was gone.  Did you see the—the bags that the money

11    had been in initially; do you remember?

12 A  I don't recall.  I don't remember seeing them, no.

13 Q  It's just gone?  It wasn't there in the office, period?

14 A  Correct.

15 Q  You mentioned a cash box.  What do you mean by that?  What is

16    that?

17 A  It's a metal box that—probably a hundred pounds or more.  It

18    keeps coins in and cash to make change throughout the day—the

19    exchange of a roll of quarters for a ten-dollar bill for our

20    drawers.

21 Q  This coin box, where was it kept?

22 A  On the—As you were sitting at the desk, on the right-hand

23    side?

24         MR. BROWER:   Exhibit number 36, please.

25

                          402

1  BY MR. BROWER:

2  Q    You mentioned a desk.  Would this be the desk in the office

3       area?

4  A    That is correct.

5  Q    Do you see the cash box in this particular photograph?

6  A    It's—I do believe it's the gray box on the middle shelf with

7       the yellow clip on the front of it or close to it, yeah.

8  Q    But in that area?

9  A    I do believe so.

10 Q    That's the area where the cash box would be?

11 A    Right.  I do believe so, yes.

12 Q    Now how was this cash box secured?

13 A    With a key lock that you have to unlock and then lock back

14      with the same key.

15 Q    Where was this key kept?

16 A    It was kept in a large ring inside the drawer.  There were

17      multiple rings—keys on this ring.

18 Q    In what drawer?

19 A    In the desk drawer about where the desk chair is.  Yeah, in

20      there.

21 Q    In this area—

22 A    Yeah.

23 Q    —there's a drawer?

24 A    A thin drawer right there.  And the keys were in there.

25 Q    Okay.  How large a ring?

                                403

1  A    Probably about that ring.

2  Q    About a three-inch—

3  A    Four or five—

4  Q    —diameter—

5  A    —yeah.

6  Q    —thereabouts?

7  A    Three or four inches diameter, yeah.

8  Q    Approximately how many different keys on here?

9  A    Maybe 50.

10 Q    One of them being a key for access to the cash box or coin

11       box?

12 A    Correct.  Yes.

13 Q    Was it identified in any way, like a piece of tape—

14 A    No.

15 Q    —on it that says coin box, cash box, or—

16 A    No, it was not.

17 Q    All right.  When you left sometime after 2:00 o'clock, do you

18       know what was in that cash box?

19 A    Not the exact amount, no.  It had coins in it and cash, yes.

20 Q    Oh, this was more than just simply—

21 A    This was—

22 Q    —coins as needed?

23 A    Correct.  Any—Any cash you had during the day that you

24       exchanged for coins, you—you had to balance out that cash coin

25       box.

                              404

1   Q   Were coins and currency in that box then when you left after

2       2:00 o'clock?

3   A   Yes, there was.

4   Q   When you returned to the store after the—at the request of

5       detectives, did you then go back and look inside of that cash

6       box?

7   A   Yes, I did.

8   Q   What, if anything, did you discover?

9   A   There was no coins in there or cash.

10  Q   Obviously, a much different condition than earlier at

11      2:00 o'clock?

12  A   That is correct, yes.

13  Q   In order to access—Well, when you went to look, was that box

14      locked?

15  A   Yes, it was.

16  Q   Where was the key that you—when you went to unlock it?

17  A   In the drawer.  The officer asked me how to open it, and it

18      was in the drawer.

19  Q   The keys were in the same spot that you would expect to find

20      them, but the contents weren't?

21  A   Correct.

22  Q   So the cash was missing—coins and cash from the coin or cash

23      box were missing.  Did you discover anything else missing?

24  A   The—The extra drawers that are made up that are on the

25      Canadian Dry rack that was just a minute ago show.  There were

                                    405

1    four extra drawers.  All the cash was missing from there.

2  Q  This exhibit show the shelf that you're referring to?

3  A  Correct.

4  Q  And the boxes are the drawers you referred to—these items; is

5     that correct?

6  A  That is correct.

7  Q  Okay.

8  A  They're made up to be $100, and the cash was missing.

9  Q  There should have been money in there as well?

10 A  That's correct.  The only thing that was in there was change.

11 Q  These are the ready-to-go drawers?

12 A  Ready-to-go.  Walk in in the morning, grab a drawer, verify

13    that it's $100, put it in the cash register, and ready for

14    sales.

15 Q  I want to ask some questions about your closing procedures,

16    Ms. Askren.  I believe you've already testified that the store

17    closed at 2:00 a.m.

18 A  Correct.

19 Q  Were there certain things that had to be done as part of

20    closing?

21 A  Correct.

22 Q  Could you tell us the kinds of things that you would do?

23 A  Taking care of the bottle—the bottles returns, sweeping the

24    floors, mopping, cleaning the bathrooms, stocking.  That's the

25    procedures we do at night.

                                406

1  Q    Did you also have to do some cleaning, and so on—

2  A    Yeah.

3  Q    —the bathrooms?

4  A    We cleaned the bathrooms.  I cleaned the back rooms.  I mopped

5       the floors.

6  Q    Those—All those things had to be done, then, before you left

7       for the day?

8  A    That is correct.

9  Q    Did you wait until 2:00 a.m. to begin doing those things?

10 A    No, 'cause I'd like to get out of there as quick as possible.

11      So I start the procedure of emptying the bottles returns,

12      cleaning the bottle return room, clean the bathrooms, stock

13      the shelves as you can.

14 Q    As you can meaning if there wasn't a customer that needed

15      attention?

16 A    We waited on the customers, yeah.

17 Q    Okay.  Working that shift—particularly late evening and early

18      morning hours—being alone in a convenience store, was security

19      an issue for you?

20 A    Security was a big issue.  I did not like working alone.

21 Q    Did you take certain precautions to make sure that somebody

22      didn't slip in and remain inside the building?

23 A    There were a bell to indicate that you were in the building,

24      and there were also mirrors posted in different corners.

25      After midnight I would really pay attention to how many came

                                    407

1    in, how many left—you know, that type of thing—so that I knew

2    that I wasn't in the building alone.  That was an issue.  I

3    didn't want to be left with anybody in the building.

4  Q  If two people came in and only one left and you didn't see

5    them, you—

6  A  It was—

7  Q  —were aware of that?

8  A  —to be concerned to.

9  Q  As you were preparing to—to close, did you do an—I'll call it

10    a search or an inspection to determine that, in fact—

11  A  Periodically—

12  Q  —nobody was there?

13  A  —yes, I would.

14  Q  Exactly what did you do prior to closing in this

15    . . . (inaudible)

16  A  Start on the north side of the wall closest to the door and

17    proceed down to the end of it, walking around the corners.

18    The Stadium Drive wall, start walking that.  Walked—

19  Q  This right here?

20  A  —down to the bottle room.  Yep.  There's—There are mirrors on

21    the corner of the wall so you can see through the store as

22    you're walking if there's anybody.  Look down the aisles, look

23    into the bottle room.  You can peer into the bathrooms 'cause

24    the doors were always left open.

25  Q  The doors—These are the bathrooms right here, are they?

408

1   A   Correct.

2   Q   Go ahead.

3   A   And they were always left—the doors were always left open.

4   Q   All right.

5   A   That was another security issue just because, you know, I

6       don't want a door locked shut and not know that I have to open

7       it, you know, and meet somebody.  I leave them open to give

8       myself a little more security.

9   Q   So you walked through it and made a visual inspection to make

10      sure that the doors were open and that there was nobody in

11      there—

12  A   Correct.

13  Q   —and then what?

14  A   Just proceeded either down the back room or down the center

15      aisle or down that aisle right there.

16  Q   This right here?

17  A   Yep.

18  Q   Go ahead.

19  A   The office door was the only thing that was locked, you know,

20      as soon as you went—

21  Q   This—

22  A   Yeah.

23  Q   When I say this right here you're referring to the—

24  A   This—

25  Q   —the southern-most—

409

```
 1   A   —that aisle right there.  That aisle or—

 2   Q   —southern-most aisle—

 3   A   —behind it, yeah.

 4   Q   Southern-most aisle inside the retail store area?

 5   A   Yeah.

 6   Q   Okay.  And then what?

 7   A   The office door was always locked.  You know, we'd go in, lock

 8       it when we were down.

 9   Q   Was that a practice that you did regularly?

10   A   Yes.

11   Q   Did you do it on this—

12   A   Yes—

13   Q   —occasion as well—

14   A   —I did.

15   Q   —in the morning hours of February 8 of 1991?

16   A   I did.

17   Q   When you locked the doors—the front doors—at 2:20,

18       thereabouts—

19   A   About 2:00 o'clock I locked the doors.

20   Q   All right.  But then you left later?

21   A   . . . (inaudible)

22   Q   All right.  When you locked the doors at 2:00 o'clock was

23       there anyone there?

24   A   No, there was not.

25   Q   When you left the building at 2:18 was anybody left beside
```

410

1        [*sic*]—in—

2   A    No, there wasn't; there wasn't anybody in or out.

3   Q    You're confident of that?

4   A    Yes, I am.

5   Q    How would you character your level of conscientiousness when

6        it came to keeping track of people coming and going during

7        that time frame?

8   A    I was very conscience.  I was very aware.  I did not want to

9        be left in the building alone.

10  Q    Are you familiar with Chris Dimmick and Patrick Miscall?

11  A    Yes, I am.

12  Q    Were you aware that they had a romantic relationship?

13  A    Romantic, yes.

14  Q    In fact, you had worked with Patrick Miscall; is that correct?

15  A    Correct.

16  Q    Was that there at this store?

17  A    At the Stadium Drive store, yes.

18  Q    You were working during the period in which Chris was

19       promoted, were you not?

20  A    That is correct.

21  Q    Were you in a position to witness Patrick's reaction to

22       Christine's promotion?

23  A    Yes.

24  Q    What did you observe?

25  A    He was angry.  He didn't understand why he didn't get

                              411

1    promoted.  Chris was ahead of him.  Even though she was at a

2    different store, she was ahead of him; so she, of course, got

3    the promotion, but he was not at all happy.  He was kind of

4    angry about it.

5  Q  How did he express that to you?  What did you observe?

6  A  After he found out, he was sick for a couple days.  He came

7    back.  He was hostile and still didn't understand why he

8    didn't get the promotion.

9  Q  Now you said that he was sick a couple days.  Are you talking

10   about immediately after the promotion was announced?

11 A  The next day he didn't come in, yes.

12 Q  And then when he did return you characterized it as hostile;

13   is that right?

14 A  Yeah, angry, hostile, yeah.

15 Q  Was there a time when you—after that promotion when you

16   overheard a discussion between Patrick Mishall and

17   Chris Dimmick about a key—a work key for the Stadium Drive

18   store?

19 A  Yeah.  They were back by the office, and I was at the counter.

20   There's no doors—They indicate there's doors right there, but

21   there aren't.  That was all open.  And they were just talking

22   about keys.  We get new keys when new managers come, new codes

23   and everything; and he had wanted a key for the office, and

24   she said there was no need for him to have a key to the store.

25   And it was a little heated.  She'd tell—

412

1    Q    On one—

2    A    She had said—

3    Q    —party's part or both?

4    A    She was—She was pretty calm, but she was pretty stern to say

5         that she didn't believe he needed a key; that Jim, I, and her

6         had a key, and that was all that was necessary.

7    Q    Did he indicate what he wanted a key for or why he needed it?

8    A    No; I don't believe so, no.

9    Q    Were there other arguments that you witnessed between the two

10        of them?

11   A    Occasionally they argued over various things.

12   Q    When you left the building on that night what lights were left

13        on?

14   A    The office light, the light behind the counter, and there's

15        a—I think they were the cooler lights were left on.

16   Q    This is the cooler?

17   A    Cooler lights right there, yeah.  And the counter—Behind the

18        counter is a light, and in the office—

19   Q    Right—

20   A    —in there, yeah.

21   Q    When you returned at the request of the police, did you notice

22        any difference in those lights?

23   A    The light behind the counter was off.

24   Q    Where's the switch for that light?

25   A    On the north wall down on Stadium Drive—that corner.

                                413

1  Q    Over here?

2  A    Yep.

3             MR. BROWER:    Exhibit number nine, please.

4             Or try number 11.

5  BY MR. BROWER:

6  Q    Do you recognize this view, ma'am?

7  A    Yes, it's the back of the counter at the far wall.

8  Q    And this wall being the—

9  A    Yep, the switch is right to the left—right there.   Nope, it's—

10  Q    Right where the pointer is right now?

11  A    No, towards the right—right there.

12  Q    All right.

13  A    It's not covered at the moment, but that is the switch.

14       Usually there was hangers and odds and ends hanging there.

15  Q    Okay.

16  A    It's not a very good picture—

17  Q    Is that—

18  A    — . . . (inaudible)

19  Q    —switch accessible from the—

20  A    Counter, no.

21  Q    —far side of the counter?

22  A    If you go back to the other picture you can see it's not.

23  Q    All right.   Is that—

24  A    You'd have to knock everything over.

25  Q    Is that switch normally left on or always left on?

                          414

1  A   It's always left on.

2  Q   How is it identified as being a light that should remain on?

3  A   It's not.

4  Q   Okay.

5  A   It's just nothing that we've never—You don't touch it.  You

6      don't have any reason to touch it.

7  Q   All right.  The parties that work there know that—

8  A   It's a switch—

9  Q   —this light—

10 A   —but we don't—

11 Q   —stays on?

12 A   —turn it on—

13 Q   All right.

14 A   —or off.

15 Q   At some point did—During your working with Patrick Miscall did

16     he acknowledge having a gun?

17 A   Yes, on one occasion.

18 Q   When was that—Do you recall?—in relation to the murder?

19 A   Before.  Before the murder.

20 Q   Are you talking days before the murder or weeks, months; do

21     you know?

22 A   It was in—probably within a week or so, maybe, talking about

23     robberies and we're supposed to just give the—you know, the

24     people the money when they come for it.  And he was telling

25     about, oh, I could use a sword or I could use this, I have a

                              415

```
 1       gun, you know, and he—
 2   Q   Did he—
 3   A   —walked out of the store.
 4   Q   Pardon me?
 5   A   I said you're not supposed to have a gun in the store is what
 6       was said.
 7   Q   Did he make any statements about bringing the gun to the
 8       store?
 9   A   He had said he had a gun and he could used [sic] it—he
10       would—he could use it.
11   Q   All right.
12   A   And we're not allowed to have guns.  I'll put it in the back
13       underneath something and they won't see it, you know, that
14       type of thing.
15   Q   They, meaning whom?
16   A   The robber.
17   Q   All right.  They wouldn't know that I have a gun here—
18   A   Right.
19   Q   —in the store?  All right.
20           Did you ever see him with a gun, however?
21   A   No.
22   Q   Did he tell you what kind of gun it was?
23   A   No.
24   Q   Ma'am, the—In your position as assistant manager, you would be
25       one of those that would have access; the other—meaning the
```

416

1    full manager—would have access to the coin box to make change

2    as needed during the course of the evening; is that correct?

3  A    Correct.

4  Q    As assistant manager, then, you would have to know how to

5    access that [sic] coins; in other words, you'd have to know

6    where the key was—

7  A    Correct.

8  Q    —which key it was and where the key ring was kept?

9  A    Correct.

10  Q    Would that be true for everybody working there as assistant

11    manager or manager that they would have—as part of their

12    responsibilities they would also have to do the same types of

13    things?

14  A    Correct.

15  Q    Would that then be true of this defendant as

16    well—Patrick Mishall—

17  A    Correct.

18  Q    —would he have to—as assistant manager and having worked at

19    the Stadium Drive store, he would know about the key to the

20    location and how to access that coin box?

21  A    Correct.  Yes, he would.

22        MR. BROWER:   I have no further questions of this

23    witness.

24        THE COURT:   Mr. Svikis?

25        MR. SVIKIS:   Thank you.

417

```
 1                    CROSS-EXAMINATION
 2   BY MR. SVIKIS:
 3   Q    Is it Telpely or Askren now?
 4   A    Askren.
 5   Q    Ms. Askren, when you—Well, you came to the store on
 6        February 8th of '91, right?
 7   A    Correct.
 8   Q    All right.  And when you got there Mr. Jilek was there, the
 9        police were there, Tiller may or may not have been there,
10        right?
11   A    Correct.
12   Q    So they were there before you, right?
13   A    Yes.
14             MR. SVIKIS:   And if we could have exhibit 36.
15   BY MR. SVIKIS:
16   Q    And you identified that to be the cash or coin box?
17   A    No, the other one; the bigger one.
18   Q    Where am I going, here?
19   A    No.  Go back up to the black box that you were pointing at and
20        go behind it.  The other one behind it.  That one.
21   Q    You mean there?
22   A    Yes.
23   Q    And what's that?
24   A    I'm not sure.
25   Q    Now when you got there you're saying that it was—that it was
```

1    locked, right?

2  A  That's correct.

3  Q  All right.  Would you be surprised to find out that Mr. Jilek

4    was there before you and had gone into the box?

5  A  I would not know.

6  Q  Okay.  And also that the person who did the counting was a

7    secretary from the home office along with Mr. Jilek to

8    determine how much money was taken?

9  A  I don't know anything about that.

10  Q  All right.  And they were there before you?

11  A  I don't know anything about that.

12  Q  Now you do recall being interviewed by officers on that

13    particular day, right?

14  A  Yes.

15  Q  And you described a situation about Mr. Mishall's hostility,

16    and I think you said something like this: he was sick on

17    Tuesday and Wednesday; he came back on Thursday.  So far so

18    good?  That sound about right?

19  A   . . . (inaudible)

20  Q  And you state that he was rude.  That sound about right?

21  A  (No audible response)

22  Q  And that he upset you and that you did not want to go near him

23    the way he was acting; is that about right?

24  A  Correct.

25  Q  Okay.  And at that same time you also told the detective that

                                419

1      he came to work and that he told you he was sorry?

2   A   That's correct.

3   Q   Okay.  And he didn't mean to worry you, right?

4   A   That's what he said.

5   Q   And, in fact, it was a complete reversal by him is what you

6      told the detective, right?

7   A   That's correct.

8   Q   And, in fact, he even did work for you and suggested you go

9      home early that night so he could do some work for you?

10  A   That's what he said.

11  Q   Is that what happened?

12  A   I don't recall.

13  Q   Now you also indicated something about no—that there wasn't

14     any phone call between you and Chris Dimmick; is that correct?

15  A   That night, yes.

16  Q   Okay.  But didn't you tell the detective that the night before

17     you talked to her about three hours—with Chris Dimmick?  Could

18     that be—

19  A   The night prior, yes.

20  Q   Yes.  All right.  Now it wasn't three hours the night before

21     on 2/7, you told Detective Hatter that you talked for a few

22     minutes; recall that now?

23  A   It was earlier, yes—

24  Q   Okay.

25  A   —like at 5:30 or something.

                            420

```
 1  Q   So, in fact, you—you had a phone call and a conversation with
 2      Chris Dimmick the night before?
 3  A   Yes.
 4  Q   All right.  So that's different than how you testified a
 5      little while ago, right?
 6  A   I guess so; I'm not sure.
 7  Q   Okay.  Is this helping going over what you actually said at
 8      the time this occurred versus what you said when the cold case
 9      team interviewed you?
10  A   I'm not certain.  The question is?
11  Q   I'll ask it.
12          On this particular night you were in a hurry to get
13      out of the store, were you not?
14  A   Not in a hurry, no.
15  Q   Not in a hurry.  Wasn't your husband waiting for you?
16  A   Most nights he did, yes.
17  Q   All right.  Probably on this night?
18  A   Yep.
19  Q   And right before you closed up you were so security conscious
20      that you even noticed a 14—You had this number that,
21      apparently, you told the detective that 14 people came into
22      the store?
23  A   Yes.
24  Q   Okay.  That's right; is that correct?
25  A   Twelve, 14—I'm not exactly sure of the number.
```

1   Q   All right.  So this was not a night that you could close up

2       early, was it?

3   A   We don't close up early.

4   Q   Okay.  So 2:00 o'clock or as soon thereafter as you can get

5       people out and they finish making their purchases, would that

6       be a fair representation of what would take place?

7   A   We lock the doors at 2:00 o'clock, yes.

8   Q   You don't lock people in, do you?

9   A   No.

10  Q   No.  Okay.  And then you have to start all of these tasks,

11      correct?

12  A   The tasks are done beforehand.  The only thing that's done at

13      night is the cashing the daily deposit out.

14  Q   Oh.  Well, I thought you testified on—on the close-up

15      procedures you secured the money, cash register, the lottery,

16      bank bag—the deposit bag—floor safe, you lock everything up.

17  A   That's what—Yes.

18  Q   That's what—That's what you duo.  All right.

19              And then are you aware that your—You have a keypad

20      there.—that your checkout time was about 2:15?

21  A   I'm—

22  Q   Exactly 2:15.

23  A   —sure that I was aware, yes.

24  Q   All right.

25  A   I don't know the exact time, no.

                        422

1  Q  So when you say that the cash was missing, you have no idea

2      whether Mr. Jilek or the secretary took it and they may, in

3      fact, made a deposit 'cause they were there ahead of you;

4      isn't that correct?

5  A  I have no knowledge.

6  Q  So you don't know—You know that you left about twenty-two or

7      $2500, right?

8  A  That's correct.

9  Q  And as far as you know, you don't know who took the money?

10  A  I don't know.  I'm not aware of any of that.

11  Q  Okay.  And how long had you been working at that store?

12  A  About two years.

13  Q  And how long had Chris Dimmick been working at that store?

14  A  The Stadium Drive store?  A week I think.

15  Q  All right.  And then Pat was brought in and he'd worked there

16      for how long?

17  A  I do not know.

18  Q  But you were there when he was fired, right?

19  A  Yes.

20  Q  And that was a few days after this occurred?

21  A  I don't know what date it was.

22  Q  Okay.  Now let's go back to 1991 and your interviews.  Would

23      you be at all surprised to find that in all your interviews

24      with the detectives that there is no mention of Pat and a gun?

25  A  I could not answer—

(Tape No. C2005-022, 2-08-05, 03:56)

1  Q   Possible?

2  A   —that one.

3  Q   Pardon?

4  A   I don't have the testimony in front of me.

5  Q   Well, you're testifying today to something that happened

6      14 years ago; and it appears that you left the impression that

7      Mr. Mishall had spoken to you about a gun for security and

8      could hide it somewhere.

9  A   Yeah.

10 Q   All right.  That's how you testified?

11 A   Yep.

12 Q   But immediately after the robbery and homicide in all your

13     conversations with the detectives, at no time do you mention

14     any of that information about Pat that he spoke about a gun?

15 A   I don't recall.

16 Q   So that's possible you could have forgotten about that in

17     1991?

18 A   . . . (inaudible) think it possible.

19 Q   All right.  Now when you're visited by the cold case team in

20     2003 is that the first time you mention what you testified to

21     about—

22 A   I don't recall.

23 Q   Can I finish the question?

24          So in 2003 when you're visited by the members of the

25     cold case team, is that the first time you mention that Pat

                              424

1  said he has a gun, I know how to use it?

2 A I don't recall.

3 Q Okay.  Let's see if you recall this—This is closer to

4  1991.—that you advised Detective Hatter that you noted there

5  was some paperwork that had been moved off the top of the desk

6  in the office and that you noticed there was a red substance

7  on the paper and that the bathroom sink was—

8    MR. BROWER:  I'm going to—

9 BY MR. SVIKIS:

10 Q —all bloody.

11    MR. BROWER:  —object, your Honor.  The defen—or

12  defense counsel's testifying.  If he wishes to impeach this

13  witness with an improper or an inconsistent statement, he can

14  do so; but that's not what he appears to be doing at this

15  . . . (inaudible)

16    THE COURT:  She has a right to take a look at it.

17  It's not appropriate to do that in that manner

18  . . . (inaudible).  The objection's sustained.

19    MR. SVIKIS:  I'll get a clean copy.

20    MR. BROWER:  Your Honor, I'm going to renew my

21  objection.  It doesn't appear as though he's showing this

22  witness her statement but a statement by another person, in

23  this case a detective.

24    THE COURT:  Why would that be admissible?

25    MR. BROWER:  Why wouldn't it be, or why would it?

1       THE COURT:   No, I'm asking Mr. Svikis.

2       MR. SVIKIS:   All right.

3       Your Honor, I'll rephrase the question if she

4   recalls making that—

5       THE COURT:   Okay.  You can ask that, but—

6       MR. SVIKIS:   Okay.  I'll ask—I'll ask her that

7   question.

8       THE COURT:   —that isn't what you were doing.

9       MR. SVIKIS:   I'll ask her that question.

10  BY MR. SVIKIS:

11  Q    Do you recall making a statement to the detective that

12       interviewed you that you noticed there was a red substance on

13       paper and that the bathroom sink was all bloody?  Do you

14       recall making that statement to the detective?

15  A    Yes, I do.

16  Q    And the night before you had testified you had cleaned the

17       sink—Right?—the bathroom?

18  A    That's correct.

19       MR. SVIKIS:   All right.

20       I have no further questions.

21       THE COURT:   Mr. Brower?

22              REDIRECT EXAMINATION

23  BY MR. BROWER:

24  Q    Ma'am, after the announcement was—Well, before Chris Dimmick

25       started as manager, was it commonly known that—Was there an

426

1      announcement, for instance?—that she had received the

2      promotion, that announcement occurring sometime before the day

3      she started?

4  A   Correct, about a week.

5  Q   Now defense counsel asked about the defendant being gone

6      Tuesday or calling in sick Tuesday and Wednesday, the

7      inference being that it was the Tuesday and Wednesday after

8      she started work on Monday.

9  A   On—It was after the announcement, I do . . . (inaudible)

10  Q   It was after the announcement, and that was sometime

11      previous—a week or so previous?

12  A   A week, yeah.

13  Q   All right.  So he was not gone—to the best of your knowledge

14      anyway—after she started work, he was gone after the

15      announcement was made?

16  A   Correct.

17  Q   All right.  I believe I asked you if you made a phone call to

18      Chris in the early morning hours of February 8 to tell her

19      that there was an unusually large deposit—

20  A   Right.

21  Q   —is that right?

22  A   Correct.

23  Q   And your answer was no?

24  A   No.

25  Q   Defense counsel then asks you about a phone call that you'd

1        made to Chris the previous evening.  I think your answer was

2        5:30 or thereabouts.

3    A   It was—It was early in the evening.

4    Q   All right.  Are both of those statements true?

5    A   That's correct.

6    Q   You made the call at 5:30; you did not make a call in the

7        early morning hours to warn her about an unusually large

8        deposit?

9    A   That's correct.

10   Q   When you said no to my question that isn't necessarily

11       different than your—than your answer to his question, is it?

12       Both are true?

13   A   Correct.

14   Q   They weren't inconsistent?

15   A   Correct.

16   Q   Depending on the—the—how many customers are in during a

17       particular time of the evening, that could determine when you

18       are actually able to leave the building; is that right?

19   A   Correct.

20   Q   If there are a steady stream of customers right up until

21       2:00 a.m., when would you have to do your cleanup?

22   A   When I closed.

23   Q   After 2:00 o'clock after the doors are locked?

24   A   Correct.

25   Q   If there's breaks between customers and you're able to get

                                    428

1     some of the work done before 2:00 o'clock—

2  A   . . . (inaudible)—

3  Q   —are you able to punch out earlier?

4  A   Yes.

5  Q   This figure that defense counsel mentioned is 14.   Does that

6      suggest to you that all your cleaning had to be done after

7      2:00 o'clock?

8  A   No.

9  Q   When you were interviewed back in 1991 do you recall whether

10     any detective specifically asked you the question do you know

11     if Patrick Mishall owned a gun?

12 A   I don't recall them asking me that question.

13 Q   When the cold case detectives, however, approached you, did

14     they ask that specific question?

15 A   Yes, they did.

16 Q   And is that why you related the story that you did here today?

17 A   Yes.

18 Q   In response to that direct question from the cold case

19     detectives 14 years later?

20 A   Correct.

21 Q   Did you make up the story of the gun?

22 A   No, I did not.

23 Q   Did you—Did they tell you we're going to ask this question and

24     this should be your answer?

25 A   No, they did not.

1  Q   Did they say it would really help our case if you would

2      acknowledge knowing that he had a gun; anything similar to

3      that?

4  A   No, they did not.

5  Q   What you told the detectives in 2003 or 2004, is that because

6      that's what happened?

7  A   That's what happened.

8  Q   Had you forgotten that fact for 14 years, or was it there and

9      just wasn't an answer that you gave because the question

10     wasn't asked?

11 A   The question wasn't asked.  I didn't know it was relevant.

12     And they asked me, and I answered the question.

13            MR. BROWER:    Thank you.

14            I have nothing further.

15            THE COURT:   Any other questions?

16                  RECROSS-EXAMINATION

17 BY MR. SVIKIS:

18 Q   You didn't believe those questions were relevant to a

19     robbery/homicide?

20 A   I didn't know what the particulars of the case was.  I wasn't

21     told.

22 Q   Oh.  So what did you know about Chris Dimmick?

23 A   I knew she was murdered.

24 Q   Okay.  And but through your interviews with the detectives as

25     being the last person potentially to see her alive as far as

                            430

1   you knew—the gun—you never thought to volunteer the

2   information about the gun?

3  A   It was a very terrible crime that occurred—

4  Q   All right.

5  A   —and under a lot of stress.

6  Q   Sure.  Well, did it clear your mind when you realized that you

7   were a suspect?

8           MR. BROWER:   Objection.

9           MR. SVIKIS:   Your Honor, if I can follow up the

10   question.

11  BY MR. SVIKIS:

12  Q   You were asked by—by the officers, did you—did you murder

13   Chris?

14           THE COURT:   When, sir?  When?  Otherwise, I'm going

15   to rule on the objection.

16           MR. SVIKIS:   Okay.

17           THE COURT:   I don't know what—You're saying you

18   were asked and didn't let me rule.  I don't know when you're

19   asking were you asked.

20           MR. SVIKIS:   All right.

21           THE COURT:   Otherwise, I sustain the objection.

22           MR. SVIKIS:   Okay.

23  BY MR. SVIKIS:

24  Q   You were asked by the detective—

25           THE COURT:   Clarify when, sir.

                    431

1           MR. SVIKIS:   Okay.

2   BY MR. SVIKIS:

3   Q   —on or about the date of—within four days of the

4       robbery/homicide.  Do you recall being asked by the detective

5       did you kill her—referring to Dimmick?  Do you recall being

6       asked that question?

7   A   Yes.

8   Q   All right.  And it continued.  Do you recall this question?

9       Did you have anything to do with the murder of

10      Christine Dimmick?  Do you remember that question?

11  A   Correct.

12  Q   Okay.  So even after those questions you did not volunteer

13      that Patrick Mishall—who wasn't your best friend—talked about

14      a gun?

15  A   No.

16          MR. SVIKIS:   Thank you.

17          No further questions.

18

19              REREDIRECT EXAMINATION

20  BY MR. BROWER:

21  Q   Ma'am, did you—do you have any idea how many witnesses the

22      detective asked that same set of questions to?

23  A   No.

24  Q   Whether it was five, ten, 15, 30?

25  A   Could have been a thousand.  I have no idea.

                        432

1   Q    Anybody that was associated with the business or with

2        Patrick Mishall or with Christine Dimmick or in any way, you

3        have no way of knowing, do you?

4   A    That's correct.

5                 MR. BROWER:   Thank you.

6                 THE COURT:   You can step down, ma'am.

7                 THE WITNESS:   Step down?   Thank you.

8                 MR. BROWER:   Frank Sila, your Honor.

9                 THE COURT:   You do solemnly swear or affirm the

10       testimony you're about to give shall be the truth, the whole

11       truth, and nothing but the truth?

12                MR. SILA:   . . . (inaudible)

13                          FRANK SILA,

14       called at 4:09 p.m., and sworn by the Court, testified:

15                     DIRECT EXAMINATION

16  BY MR. BROWER:

17  Q    Sir, would you please state your full name and spell your last

18       name for the record.

19  A    Frank Sila—S-i-l-a.

20  Q    Mr. Sila, back in February of 1991 where were you employed?

21  A    Sonatrol Security Systems.

22  Q    What was your title there or position?

23  A    I was the operations manager.

24  Q    What responsibilities did you have as operations manager?

25  A    I oversaw the monitoring and technical departments.

                              433

1   Q    Monitoring, would that include monitoring of personnel and the

2        dispatch center?

3   A    That is correct.

4   Q    Are you familiar with the system that was installed in the

5        Minute Market—what was then the Minute Market store at

6        2905 Stadium Drive?

7   A    Yes.

8   Q    Could you tell us what kind of system was installed there—what

9        types of hazards were designed to protect against or alert you

10       to?

11  A    It was an electronic intrusion detection system that consisted

12       of microphones placed strategically throughout the interior of

13       the facility.  It's based upon the principle that you cannot

14       break into a building with a pillow but you need some type of

15       physical instrument like a hammer to come through a barrier, a

16       roof, a wall; and, in doing so, that will generate some noise

17       and that, in turn was transmitted back into the monitoring

18       center.

19  Q    Microphones.

20  A    Correct.

21  Q    All right.  Were there also some sort of device attached to or

22       on the doors that would alert to an unlawful entry?

23  A    Yes, there were magnetic door switches on all perimeter doors.

24  Q    Are there different kinds of switch depending on what that

25       door is used for?

                              434

1    A    (No audible response)

2    Q    For instance, some doors that are always to remain locked, all

3         the other doors are to be used by the public on a routine

4         basis?

5    A    The doors could be programmed as entry/exit doors.  Those are

6         doors that would specifically be used when coming in in the

7         morning to disarm the alarm system.

8              Other doors during the—when the alarm system is

9         armed are hot 24 hours a day, so to speak, so that when

10        somebody would come through that door it would immediately

11        generate an alarm different from an entry/exit door.

12   Q    When you say armed or disarmed, how was that accomplished?

13   A    Through entry of a code into a touchpad or a command center.

14   Q    Who would be responsible for doing that routinely at the—the

15        different locations—or in this store in particular?

16   A    Routinely the last person to leave at night would arm the

17        alarm system by entering their code and, conversely, in the

18        morning, the first person entering would enter their code.

19   Q    This information—the alarm activation by the person closing

20        and the alarm deactivation by the person opening later that

21        same morning—would that information be documented by Sonatrol?

22        Is there a means of recording that information?

23   A    Yes.

24   Q    In addition to the sound sensitive devices that you talked to

25        in a door context, were there other devices installed to—panic

435

1    alarms—that type of thing—for a holdup?

2  A  There was a holdup alarm located—a holdup button that was

3     located at the front desk or front counter in proximity of the

4     cash register, and there were also some fire detection

5     devices.

6  Q  In case of fire the—Sonatrol would be able to receive that

7     alarm and then take appropriate action?

8  A  That is correct.

9  Q  I believe that you already testified that activation and

10    deactivation times were able to be recorded by Sonatrol.   Were

11    those times, in fact, recorded for the Minute Market on

12    February 8 of 1991?

13 A  Yes.

14 Q  What was the alarm activation time on that date, February 8?

15 A  It was activated at 2:15 in the morning of the 8th.

16 Q  What was the time?

17 A  Two-fifteen.

18 Q  Two—fifteen in the morning of the 8th.

19           And do your records indicate the name of the

20    employee that had entered that activation code?

21 A  That would have been Tina Epley [sic].

22 Q  Do your records then further indicate what time on that day

23    that the alarm was deactivated?

24 A  At 6:25 the same morning.

25 Q  By whom?

                                436

```
 1   A    Christine Dimmick.
 2   Q    Would those times be consistent with the 2:15 time?  Let's go
 3        with that one first.  The person closing up and then leaving
 4        for the night?
 5   A    Would it be consistent with—
 6   Q    Yes.
 7              Pardon me?
 8   A    Consistent with what?
 9   Q    The person closing up the store and then deactivating the
10        alarm before she left the building for the night.
11   A    Yes.
12   Q    And then the 6:20 time—6:25 a.m. time—would that be consistent
13        with the morning employee arriving at the store, deactivating
14        the alarm, and opening—or preparing for the opening of
15        business?
16   A    In my notes I show that the normal opening and closing times
17        was—The normal opening time was 7:00 o'clock in the morning,
18        so the 6:25 time would be early.
19   Q    Would be—I'm sorry?
20   A    Early.
21   Q    Prior to this—Prior to the opening—
22   A    Yes.
23   Q    —but if there's preparations that had to be done and
24        procedures to be done, you wouldn't know that; is that right?
25   A    Correct.
```

1  Q    Okay.  So arrival before a 7:00 a.m. opening is consistent?

2  A    Based on the material that I have here, yes.

3  Q    Was this system checked or calibrated—serviced at anytime

4       immediately preceding this February date?

5  A    It had—There was a preventative maintenance check that was

6       done December 12th, 1990.

7  Q    The system was operating properly; is that right?

8  A    That is correct.

9  Q    Sir, if there's an audio activation—Let's say after the

10      employees have left and the alarm has been activated, a loud

11      sound of some sort is detected or heard by the person in

12      the—the dispatch center; did I use the right terminology?

13 A    Yes.

14 Q    All right.   Would it be that dispatcher, then, that would be

15      responsible for hearing that sound, identifying it, and then

16      deciding on appropriate action?

17 A    That is correct.

18 Q    Who was working and on duty then—Who would have been

19      monitoring different buildings, including this one, during

20      that time period?

21 A    That would have been Sharon Hitchcock.

22              MR. BROWER:   I have nothing further of this

23      witness.

24

25

                        438

1                    CROSS-EXAMINATION

2    BY MR. SVIKIS:

3    Q    Mr. Sila, the maintenance check that was done on December 12th

4         of 1990, do your records indicate when the next check was

5         done?

6    A    No.

7    Q    And you were not asked to do a check on February 9th?

8    A    Not that I can recall.

9    Q    You have the records, right?

10   A    I have very limited records.  That company no longer exists.

11        It's been absorbed.

12   Q    So for January and February and then following to know whether

13        those times are actually correct, they were never verified

14        again, were they?

15   A    What times?

16   Q    Your testimony is the system was operating properly on

17        December 12th of 1990, correct?

18   A    Correct.

19   Q    Then on February 8th we have a tragic occurrence at that

20        location and you were asked to verify check-in times and

21        check-out times, correct?

22   A    Correct.

23   Q    All right.  And it's your testimony that no verification was

24        done at that time to find out whether those times are actually

25        correct?

                              439

1  A   There was certainly no reason to suspect that those times
2      reflecting the opening and closing were anything but accurate.
3      The alarm system that was in place there employed
4      self-diagnostics that if, in fact, there was an issue in the
5      operation of the system, it would actually call in and report
6      to us that there was some type of an error or malfunction.  So
7      there's built in self-diagnostics, and that certainly was not
8      evident.
9  Q   So it can check itself?
10 A   Yes.
11 Q   And on December 12th it checked itself and found it to be in
12     error; is that right?
13 A   No.
14 Q   But work was done on December 12th, 1990?
15 A   A preventative maintenance check was done to inspect the
16     wiring and the door switches and to make sure that nothing had
17     been physically damaged at the—
18 Q   So it—
19 A   — . . . (inaudible)
20
21 Q   —doesn't completely fix itself?
22 A   I'm sorry?
23 Q   It does not completely fix itself—the system?
24 A   Correct.
25             MR. SVIKIS:    Thank you.

1    THE COURT:   Any other questions?

2    MR. BROWER:   No, your Honor.

3    THE COURT:   You can step down, sir.   Thank you.

4    MR. BROWER:   Sharon Hitchcock, your Honor.

5    THE COURT:   You do solemnly swear or affirm the

6    testimony you're about to give shall be the truth, the whole

7    truth, and nothing but the truth?

8    MS. HITCHCOCK:   I do.

9    SHARON LOUISE HITCHCOCK,

10   called at 4:22 p.m., and sworn by the Court, testified:

11   DIRECT EXAMINATION

12   BY MR. BROWER:

13   Q    Ma'am, would you please state your full name and spell your

14   last name for the record.

15   A    Sharon Louise Hitchcock.   Last name is spelled H-i-t-c-h-c-o-

16   c-k.

17   Q    Ma'am, where were you employed back in February of 1991?

18   A    Sonatrol Security.

19   Q    What did you do there?

20   A    I was a central station operator/dispatcher.

21   Q    What types of things did you do as a dispatcher?

22   A    Actually, there was a computer in front of me; and the alarm

23   systems dial into the computer.   And what I would do is I

24   would take the activation that dialed in to me, I would

25   analyze it, and then I would respond to it, take the action

441

1    that was needed at that time.

2  Q  Was there also an audio component to your job?

3  A  Yes, sometimes when the activation comes in—such as Burg and

4     there's no audio—but with Sonatrol it always comes in with

5     audio; Sonatrol is an audio activation.  And then you would

6     listen to see what you were hearing and respond appropriately

7     whether it would be—depending on what had activated it—If it

8     was a motor from a fan—or what the activation was—you would

9     reset it; otherwise, if it was something that was like a

10    broken window that you would hear breaking, you would respond

11    by sending PD.

12 Q  Ma'am, it would be safe to say that in that capacity you would

13    monitor accounts for any activations of any type, whether it

14    be audible or otherwise, and then send the appropriate

15    response, whether it be police or fire—that type of thing?

16 A  That is correct.

17 Q  Does that system also then alert you if there is an entry by

18    use of the keypad and so on?

19 A  Yes, it also—It notifies me if someone goes through a front or

20    a back door—any of the doors—it'll send me a symbol up there.

21    Along with the audio turning on, you will see a DP—which means

22    a delay door—depending on which door they use.  One gives you

23    time to get to the keypad, which is your delay door.  The

24    front door didn't give you time to get to the keypad.  If it

25    did not, it would just send you a regular PE for a regular

                              442

1    door alarm.  So it would also send you a door alarm; and, of

2    course, your audio would turn on and you could hear them come

3    in, correct.

4            And then the keypad where they would punch their

5    numbers in, I would also get then a response from the keypad.

6    They would send me an opening or closing or—

7  Q  And if the proper code was—was entered, that would affect your

8    evaluation as to whether or not that was an entry that

9    required a response or not?

10 A  Exactly.

11 Q  Now you said you could actually hear them come in.  Do you

12   literally mean that, you could hear them inside?

13 A  Yes, that's what Sonatrol's about.  You can hear them.  You

14   can hear them turn the key in the lock.  And then you can hear

15   them—the door go open and the door go closed.  You can hear

16   them actually walking through the business to the keypad.

17           The keypad beeps.  When they touch the different

18   numbers on the keypad, every number goes beep, beep, and you

19   actually can hear them code in; and then on your screen comes

20   a little open, which means the person in there has just taken

21   the system down—It opened it up.—and it also tells you—if you

22   want to look back in history—can tell you who opened it.

23 Q  Are you personally familiar with the audio portion of the

24   system at 29—What is it?—2905 Stadium Drive—the Minute Market

25   store?

443

1  A    Yes.

2  Q    Tell us about the sensitivity of the instrumentation there—

3  A    I could—

4  Q    —and the types of things that you would be able to hear.

5  A    I could hear the blower turn on.  It had a heater.

6       I could hear the refrigeration come on.  It's just

7       like a soft buzz.  You start recognizing sounds after a while.

8       They had an ice machine that presented a problem.

9       When the ice machine would drop its ice, we could hear it drop

10      ice.

11      You could hear people come in the front door.  As

12      they left, you could hear them leave; and then you'd see the

13      door alarm.

14      You could hear them out front start their car.

15      That's how sensitive it was.

16  Q   Okay.  So you're talking about—You can hear sounds outside the

17      building?

18  A   Yes, you can.

19  Q   All right.

20  A   Yes, you could.

21  Q   Was there an occasion where you heard some sort of popping

22      noise and sent a response?

23  A   Yes.  And just a soft pop or pop.  And I listened.  Nothing

24      further.  I really wasn't consider about—wasn't considering a

25      window.  Didn't know the noise I did hear.  Did call a

                                444

1    contact.  When they got down there, someone had set a bottle

2    of wine in the freezer and it had exploded is basically what

3    actually had happened down there.

4  Q   Resulting in the soft pop—

5  A   Yeah.

6  Q   —or noise . . . (inaudible)

7  A   Yes, it shattered is what it did.  Tish (phonetic), you know.

8  Q   What—Were you working and on duty on a shift that covered 2:15

9    and 8:00 or—Excuse me.—6:00 something in the morning—

10  A   Yes, I was.

11  Q   —on the 8th of February?

12  A   I worked 11:45 to 7:45.

13  Q   Were you there, then, at your desk when the alarm was

14    activated after the employee closed up for the evening?

15  A   Yes, I was.

16  Q   I believe that's been—there's been testimony that that's been

17    about 2:15; is that also your—

18  A   That's correct.

19  Q   —understanding?

20  A   That's correct.

21  Q   Were you then also there when the alarm was deactivated when

22    the employee arrived to open the store for that day?

23  A   Yes, I was.

24  Q   Is it your understanding that that occurred about 6:25 a.m.?

25  A   That's correct.

1  Q  Was there any type of activation at the Minute Market during

2      those hours?

3  A  I did have some audio activations from a blower turning on.  I

4      did have activations from like the motor starting up and for

5      the freezer to start the cooler over again.  Nothing unusual

6      as far as any movement; no doors, no walking, nothing unusual

7      at all that way, just the normal every night sounds at

8      Minute Market.

9  Q  Tell us about your identification of the various types of

10     sounds that you're talking about.  Would it be safe to say

11     that the coolers going on and off, ice dropping, and so on,

12     that those are common and regular occurrences?

13  A  Yes.  Yeah, they even go in cycles.  You can almost time them.

14     When they drop ice, they drop every like hour like that.  You

15     can—You can hear them.  You can hear—Sometimes you hear the

16     time clock there, too.

17           Sometimes we don't know what the sounds were when we

18     first put systems in, and then we figure them out.  We send a

19     technician over to find out exactly what the sounds are, so

20     the operators are very aware of what sounds are expected or we

21     will hear throughout the night there.

22  Q  This was not a new system for Minute Market?

23  A  No, not at that time, no.  I'm just saying we definitely know

24     what the different sounds are in the building that we expect

25     to hear during the night.

1  Q   Were the sounds that you heard the natural sounds that you
2      expected—
3  A   Yes—
4  Q   —to hear?
5  A   —normal, every night sounds.
6  Q   Tell us about the experience that you have in identifying
7      human generated noise inside.
8  A   Oh, you can hear them talking; you can hear them coughing; you
9      can hear them sneeze; you can actually hear them
10     walking—taking—You can actually just close your eyes and if
11     someone would walk in front of you, you could hear the
12     rustling.  If they would open a drawer, you hear them pull the
13     drawer open.
14 Q   Turn a faucet on?
15 A   Turn a faucet on, flush the toilet even.  You can hear it all
16     if it's activated.
17 Q   Have you had experience with someone that's been locked inside
18     of a building or—
19 A   Many, many—
20 Q   —tried to—
21 A   —times.
22 Q   —hide inside a building?
23 A   Not at this one.  But Sonatrol is—is not one—the system there
24     was very, very clear.  Okay.  It's not like you'd have to
25     wonder what they're saying or what the noise you heard; it's

447

1    there.  It's just like it was right in front of you.  Okay.

2    The speakers give you the sound perfect—very clear.  You would

3    hear someone say—You could repeat what they said back to you.

4    I mean it's that clear.  The sounds are very clear.  You could

5    hear them talk; you could hear them walk; you could hear them

6    at the door.

7              We've got a lot of them—and even from Minute Market

8    there where kids were fooling around in the front of the

9    building and bumped into the building—Okay.—and you have that

10   noise and you dispatch on it and you find that it was kids

11   loitering around the front of the building—

12 Q  During—

13 A  . . . (inaudible)

14 Q  —the hours of 2:15 and 6:25 were there any hostile signs—any

15   sound or—Excuse me.—sounds.  Anything other than the normal

16   mechanical sounds that you would expect?

17 A  Not on that evening, no.

18 Q  Based on your familiarity with the system, is there any

19   likelihood that anyone had—could have been inside the building

20   during that period of time?

21 A  No.  You would have heard—No.  There could not have been

22   somebody.  You would have heard something, even a—even a

23   (demonstrates by sliding hand across witness box) you hear it.

24   You know, there is—there is no way that someone could have

25   been inside that building all night.

                          448

(Tape No. C2005-022, 2-08-05, 04:32)

1        MR. BROWER:   Thank you.

2        I have no further questions of this witness.

3              CROSS-EXAMINATION

4 BY MR. SVIKIS:

5 Q  I'm curious.  All of these examples that you gave, were you

6    talking about this particular Minute Market?

7 A  Yes, I am.

8 Q  All right.  So you monitor more than one location, don't you?

9 A  There were three.

10 Q  I mean there were—Okay.  I'm visualizing you sitting at a—at a

11    computer and a desk, and there are more than three

12    voice-activated systems that Sonatrol has when you're working,

13    correct?

14 A  Yes.  We had a lot more systems than three.  Is that what

15    you're asking me?

16 Q  Right.  Well, what I'm trying to understand is you're—you're

17    monitoring a whole host of systems.  Do you have all these

18    speakers on at the same time?

19 A  No, no.

20 Q  Oh.

21 A  When they activate—When it activates or you have a noise in a

22    certain account, it'll pop to your screen.  It'll tell you

23    what account—Okay.—an audio or an audio and a door alarm, and

24    then you decide if you need to take action and then you reset

25    it.  It pops up one at a time so you have time to analyze.

449

1  Q    Okay.  So it—Excuse me.  But if you fell asleep and someone

2       tipped over the ice chest, you—you wouldn't hear it because

3       you haven't hit the buttons?

4  A    Oh, you don't have to hit any buttons.  Noise comes

5       automatically.  It comes to you automatically.  Plus, if

6       there's a question at all what was on that account, all you

7       hit is replay.  You can play that same noise over and over

8       back to you.

9  Q    The actual sound or once you—once you allow that actual sound

10      to come in there's a—You said there's a sound that says

11      there's a un—activates the system.  You're saying that sound

12      immediately comes through?

13 A    The sound that comes through is the first eight seconds of the

14      actual sound, like if a glass window would be smashed—

15 Q    Okay.

16 A    —you'd actually hear the glass window smash.

17             MR. SVIKIS:   You've answered my question

18      . . . (inaudible).

19             I have no further questions.

20             MR. BROWER:   Nothing further.

21             THE COURT:   You can step down.

22             THE WITNESS:   Thank you.

23             MR. BROWER:   James Grubius, your Honor.

24             THE COURT:   You do solemnly swear or affirm the

25      testimony you're about to give shall be the truth, the whole

                              450

1   truth, and nothing but the truth?

2            MR. GRUBIUS:   Yes, sir.

3                    JAMES D. GRUBIUS,

4   called at 4:34 p.m., and sworn by the Court, testified:

5                 DIRECT EXAMINATION

6   BY MR. BROWER:

7   Q    Mr. Grubius, would you please state your full name and spell

8        your last name for the record.

9   A    James D. Grubius—G-r-u-b-i-u-s.

10  Q    Mr. Grubius, are you familiar with Patrick Miscall?

11  A    Yes, sir.

12  Q    How do you know him?

13  A    I used to play lottery at the gas station that he was employed

14       at.

15  Q    That was Total gas station?

16  A    Yes, on Parkview.

17  Q    On Parkview Street.  All right.

18            He used to work there part-time; is that right?

19  A    I'm sorry?

20  Q    He used to work there part-time?

21  A    Yes.

22  Q    Are you familiar with the fact that he also used to work at

23       the Minute Market store?

24  A    Yes, sir.

25  Q    Tell us about the nature of your contact with him.  I believe

                              451

```
 1        you said you played lottery, but—
 2   A    I would go in maybe three, four times a week on minimum and on
 3        his shift and play lottery numbers and/or check the numbers to
 4        see what came out.  And we became customer/worker relation,
 5        you know.  He would be—We'd be talking and from then I learned
 6        that he was also working at Minute Mart and he knew Christine
 7        and I knew her.
 8   Q    Wait, let me ask about that.  How'd you know Christine?
 9        Which—Are you referring to Christine Dimmick?
10   A    Yes.
11   Q    How did you know her then?
12   A    I used to have a bad habit of playing lottery at two or three
13        different places—very superstitious—and I would play at
14        South Westnedge where she worked—
15   Q    Okay.
16   A    —and became familiar with her, also.
17   Q    South Westnedge Minute Market?
18   A    Yes.
19   Q    Oh, so that's how you became—you came to know her?
20   A    Yes.
21   Q    Did you learn that the two of them had a relationship?
22   A    Yes, I did.  Patrick brought it—Well, I told him that I played
23        at Minute Market; and he said, well, you know Christine.
24   Q    And then you learned that they had a romantic—Excuse
25        me.—romantic relationship?
```

452

1    A    Yes.  He said he was dating her at the time.

2    Q    Okay.  At some point, sir, did you learn of the murder of

3         Christine Dimmick?

4    A    Yes.  I learned—

5    Q    Pardon me?

6    A    —maybe about two or three weeks after the fact.

7    Q    Sir, do you recall a conversation that you had prior to

8         Christine's murder—conversations with Patrick Mishall about

9         Christine?

10   A    Yes, sir.  At one time right after we became aware that both

11        of us—that I played at both stores and I knew Christine, he

12        said that—confirmed that it was his girlfriend.  And then he

13        asked me if I ever saw her messing around, and I told him no.

14        And then he said, well, he thought he [*sic*]—she was.  And then

15        he—he said, if I ever catch her, I'm going to kill her.  And

16        that was one occasion.

17               Then about two or three weeks before the incident

18        happened, I was in there—It was right around 3:00 p.m.—That's

19        when I usually play.—might have been a little later.—he seemed

20        a little upset.  And I asked him how things are going.  He

21        says, I know she has a boyfriend.  If I catch her, I'm going

22        to kill her.

23   Q    Was the demeanor this time any different than what you

24        observed the first time?

25   A    Yes.  He—He meant it.  I mean I could tell there was trouble

                                   453

1    here for Christina [sic].  It really sent a shiver.  He had a

2    look to him that there was no joking.  I mean I could tell or

3    I thought I could tell the seriousness.  I mean it wasn't just

4    joking like you would say I'm going to kill my wife because

5    she did this.  It was I'm going to kill her if I catch her

6    and—

7  Q  Tell us what you observed about his physical actions as he was

8    saying this to you.

9  A  Well, he was just moving around and just making motions

10   like—He wasn't there.  I mean it looked like he was very upset

11   over something and very serious and very upset.  And to this

12   day I—it bothers me that I didn't make any contact with the

13   police.

14  Q  Let me go back and ask some questions about this first

15   time—this first statement that he made if he saw her messing

16   around he would kill her.  How much before Christine's murder

17   did that conversation occur?

18  A  Probably two or three weeks—three weeks, maybe; could even

19   have been four.  It's been a long time.

20  Q  Was there—How much period then after that did this second

21   statement take place?

22  A  Probably a couple weeks at the most.

23  Q  And then that would have been a couple weeks prior to her

24   murder?

25  A  Right.  I didn't have any contact with him after he made that

                                    454

1    comment to me the last time due to the fact that I was housed

2    at the county jail.  I was—

3  Q  You had a probation violation; is that right?

4  A  Probation violation for embezzlement.

5  Q  Did you—After learn—At the time that you learned about

6     Christine's murder, did you recall that statement?

7  A  Yes.

8  Q  That state—Those statements, then—both of them—were they, in

9     fact, significant to you?

10 A  Yes, very much so.

11 Q  Did you go to the police with that information?

12 A  No.  If you're on probation—and which I was and trying to get

13    off—the probation officers will tell you no contact with the

14    police.  And if you're trying to straighten your life out, you

15    go by them.  And I—I never did, no, sir.  I believe I

16    mentioned it to someone, but I—I don't know who I mentioned it

17    to.

18 Q  The concern about abiding by the probation officer's

19    directions, sir, I think is probably understandable to most

20    folks; but yet we're talking about a statement about somebody

21    that threatened to kill someone.  You learn about the murder

22    and still take no action.  Some might wonder why regardless to

23    the probation.  Sir, during that period of time who were you

24    more concerned about?  You were concerned for your own

25    welfare?

                                    455

1   A   By all means.  You know, to this day I regret it; but, you

2       know, we all—I made a mistake.  It's simple as that.

3   Q   And the mistake being not?

4   A   Not going forward and—and letting people know what I—what I

5       knew.

6   Q   After that second statement that was obviously before

7       Christine's murder, you knew who Christine was—

8   A   Right.

9   Q   —did you have the same type of relationship with her as you've

10      talked about now with the defendant Patrick Mishall?

11  A   Pretty much so.  We would—I would go in there, and it was

12      always hi and—She was a very friendly lady, very friendly.

13      She—And it just wasn't just me; anybody would come in there,

14      she was very friendly and you could sit and talk.  And we're

15      talking like either place.  You're in there only ten minutes,

16      maybe 15 at the most; and, you know, she was—Yeah.  She just—

17  Q   Had you warned her, however?  After the second statement, did

18      you go and—

19  A   No.

20  Q   —tell her?

21  A   No, I did not.  But I think I mentioned one time at the first

22      statement that, hey, he's—Pat's upset with you.  And it was

23      just a laugh-off.  You know, yeah, okay, he's always upset

24      with me.

25  Q   All right.  Do you see Patrick Mishall in the courtroom today,

                                456

1    sir?

2  A  Yes, I do.

3  Q  Where is he sitting, and what is he wearing?

4  A  He's—He's at the far right.  He's wearing a blue coat—or a

5     blazer and a blue tie.

6            MR. BROWER:   The written record can reflect the

7     identification of the defendant, your Honor?

8            THE COURT:   It may so.

9            MR. BROWER:   Nothing further of this witness.

10           THE COURT:   Mr. Svikis?

11                   CROSS-EXAMINATION

12 BY MR. SVIKIS:

13 Q  Mr. Grubius, the—these statements that you—that you say Pat

14    made, that occurred in 1991?

15 A  I believe so, sir.

16 Q  All right.  But the first time these are reported is in 1994,

17    correct?

18 A  Yes, sir.

19 Q  All right.  Let me see if I can set the scene a little

20    further.  You're a regular customer of Christine's and you

21    like her?  You see her once a week at the store?

22 A  I saw her more than that.

23 Q  A couple times a week?

24 A  About the same as Pat.  When I would play one store, I'd play

25    the other.

                          457

1    Q    Okay.  So when you heard this in 1991 from Pat and you knew

2         all this about Christine, and now you're—now you're telling us

3         that—how serious it was, you did not warn her that Pat's going

4         to kill you if you're messing around?  You did not tell her

5         that, did you?

6    A    No, I—

7    Q    All right.  And you're in county jail, you're on probation for

8         a crime that has to do with truthfulness and honesty, right?

9    A    I wrote a bad check.

10   Q    All right.  Okay.  And you did something else to put you back

11        on a probation violation, too, right?  I mean they put you

12        back in jail, right?

13   A    Well, there was two checks; and the second one came after.

14   Q    Okay.  You don't think enough to warn a nice warm friendly

15        person; and then you don't go to the police 'cause you're not

16        supposed to have contact with the police, and that's what the

17        probation tells you, right?

18   A    Yes, sir.

19   Q    All right.  But you have a probation agent, also, right?

20   A    Yes.

21   Q    All right.  And the idea of probation is to get yourself

22        straightened around and do good things and not do bad things,

23        right?

24   A    That's true.

25   Q    All right.  So it comes to your attention in 1991 that there's

                              458

1       a—a death threat that you take—what you're telling us today

2       based upon how you described Pat—extremely serious, correct?

3   A   That's correct.

4   Q   You don't warn her, you don't go to the police, and you don't

5       go to a probation officer, right?

6   A   That's true.

7   Q   All right.  And isn't the real reason you don't go to warn

8       Christine or the police or the probation officer that this is

9       just one of those blow-off things, I'm going to kill you if

10      you this or do that?

11  A   Okay.  The first time I did tell her.

12  Q   Oh, you did tell her?

13  A   Yeah, that's—I told her that he was upset with her.

14  Q   Upset is different than I'm going to kill you if you're

15      messing around, isn't it?

16  A   Yeah, but it's still . . . (unintelligible).

17             Second time, I don't think I saw her after that.  I

18      can't be—I can't be truthful and say I did or I didn't, but I

19      don't believe I did.

20  Q   Well, we want you to be truthful.

21  A   I don't believe I did.

22  Q   But at some point you find out she's been murdered, right?

23  A   Yes.

24  Q   Okay.  And you do nothing at that time either?

25  A   No, I did not.

                              459

1  Q    All right.  And that's putting together the person that

2       threatened it, that you believed it, and now we have Christine

3       deceased.  All the dots are connected.  You sit on your hands,

4       so to speak?  You do nothing with the probation, do nothing

5       with the police, and you don't go anywhere else to tell

6       anybody?

7  A    That's correct.

8  Q    Till you're approached in 1994?

9  A    That's correct.

10 Q    And then in 2005 today testifying?

11 A    That's correct.

12              MR. SVIKIS:   All right.  Thank you.

13              THE COURT:   Any other questions, Mr. Brower?

14                    REDIRECT EXAMINATION

15 BY MR. BROWER:

16 Q    You testified in this matter not just in 2005; is that

17      correct?  You've testified to this matter previously?

18 A    That is correct.

19 Q    In fact, twice?

20 A    Yes.

21 Q    You told the truth on each occasion?

22 A    Yes, sir.

23 Q    Told the truth in 1994?

24 A    Yes, sir.

25              MR. BROWER:   I have nothing further.

                        460

```
1                        RECROSS-EXAMINATION
2   BY MR. SVIKIS:
3   Q    So it's your testimony the first time you told the truth and
4        when you're testifying—You've told the truth today, you
5        testified under oath in June of 2003?
6   A    That's true.
7   Q    And maybe six to eight months earlier in 2002 under oath,
8        right?
9   A    Yes, sir.
10            MR. SVIKIS:    All right.  Thank you.
11            THE COURT:    You can step down, sir.
12            Why don't we recess for the evening.  It's nearly
13       5:00 o'clock.
14            I'd ask all the jurors to be back here at
15       9:00 o'clock, and we'll try and get started promptly after you
16       all arrive.
17            Keep in mind what I've told you previously.  You're
18       not to discuss the case amongst yourselves or with anyone
19       else.
20            You're not to look at any news media reports or
21       anything that may be in the—on TV, radio, or the newsprint.
22            You're to have no contact with anybody involved in
23       this case, including the attorneys, the defendant, or anybody
24       who has been or may be a witness.
25            So please report back then at 9:00 o'clock tomorrow
```

461

1      morning.   We'll stand in recess until then.

2              (At 4:51 p.m., proceedings adjourned)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

462