26151

1        STATE OF MICHIGAN

2     9TH CIRCUIT COURT—TRIAL DIVISION

3

4    THE PEOPLE OF THE
     STATE OF MICHIGAN
5
          v                                  Files No. C03000897 FC
6
     PATRICK KEVIN MISHALL,
7
               Defendant.
8

9

10
                    Jury Trial — Volume III of V
11
          Before Hon. George R. Corsiglia P12239, Circuit Judge
12     (Visiting Judge from 48th Circuit, Presiding by Assignment)
            Kalamazoo, Michigan—Wednesday, February 9, 2005
13

14
     APPEARANCES:
15
     For the People:            Scott W. Brower P44951
16                              Office of the Prosecuting Attorney
                                227 West Michigan Avenue
17                              Kalamazoo, Michigan 49007
                                (269) 383-8900
18
     For the Defendant:         Andis Svikis P36039
19                              1803 Whites Road
                                Kalamazoo, Michigan 49008
20                              (269) 349-7692

21

22   Recorded by:              Video recorded

23   Transcribed by:           Brenda K. Foley CER 4956
                                1400 Gull Road
24                              Kalamazoo, Michigan 49048
                                (269) 385-6001
25                                  * * * * *

                              463

FILED

JUN 1 3 2005

8TH JUDICIAL CIRCUIT
COUNTY OF KALAMAZOO
KALAMAZOO, MICHIGAN

1                          TABLE OF CONTENTS

2   WITNESSES: People                                          PAGE

3   BART A. MUNSON (testimony read by Michael Kanaby)

4       Direct examination by Mr. Brower (1st proceeding)  . . . . 466
        Cross-examination by Mr. Svikis   . . . . . . . . . . . . . 470
5       Redirect examination by Mr. Brower . . . . . . . . . . . . 475
        Direct examination by Mr. Brower (2nd proceeding)  . . . . 476
6       Cross-examination by Mr. Svikis   . . . . . . . . . . . . . 481
        Redirect examination by Mr. Brower . . . . . . . . . . . . 484

7

8   CHRISTINE NEWBURRY

        Direct examination by Mr. Brower . . . . . . . . . . . . . 485
9       Cross-examination by Mr. Svikis   . . . . . . . . . . . . . 492

10  TRACY LYNN RATHKE

11      Direct examination by Mr. Brower . . . . . . . . . . . . . 496
        Cross-examination by Mr. Svikis   . . . . . . . . . . . . . 501
12      Redirect examination by Mr. Brower . . . . . . . . . . . . 502

13  CAROL JEAN SORDAHL

14      Direct examination by Mr. Brower . . . . . . . . . . . . . 503
        Cross-examination by Mr. Svikis   . . . . . . . . . . . . . 507

15
    TINA DAHL (phonetic)

16

        Direct examination by Mr. Brower . . . . . . . . . . . . . 508
17      Cross-examination by Mr. Svikis   . . . . . . . . . . . . . 515
        Redirect examination by Mr. Brower . . . . . . . . . . . . 516
18      Recross-examination by Mr. Svikis   . . . . . . . . . . . . 517

19  SANDRA KAY SCHULZ

20      Direct examination by Mr. Brower . . . . . . . . . . . . . 518
        Cross-examination by Mr. Svikis   . . . . . . . . . . . . . 525

21
    DAWN HALLER

22

        Direct examination by Mr. Brower   . . . . . . . . . . . . 527
23      Cross-examination by Mr. Svikis   . . . . . . . . . . . . . 532
        Redirect examination by Mr. Brower . . . . . . . . . . . . 535
24      Recross-examination by Mr. Svikis   . . . . . . . . . . . . 538

25

1                    TABLE OF CONTENTS (cont.)

2  WITNESSES: People                                    PAGE

3  ONTARIO LOWERY

4      Direct examination by Mr. Brower . . . . . . . . . . . . 540
       Cross-examination by Mr. Svikis  . . . . . . . . . . . . 544
5      Redirect examination by Mr. Brower . . . . . . . . . . . 550

6  GREGORY ALAN HATTER

7      Direct examination by Mr. Brower . . . . . . . . . . . . 551
       Cross-examination by Mr. Svikis  . . . . . . . . . . . . 564
8      Redirect examination by Mr. Brower . . . . . . . . . . . 569
       Recross-examination by Mr. Svikis  . . . . . . . . . . . 571

9
10 LANCE ELLIOTT HANDLOGTEN

11     Direct examination by Mr. Brower . . . . . . . . . . . . 573

12 Motion for directed verdict by Mr. Svikis   . . . . . . . . . 590

13 Response by Mr. Brower  . . . . . . . . . . . . . . . . . . . 591

14 Court's ruling on motion for summary disposition  . . . . . . 591

15 WITNESSES: Defense

16 CHRISTINE HARWOOD

17     Direct examination by Mr. Svikis . . . . . . . . . . . . 594
       Cross-examination by Mr. Brower  . . . . . . . . . . . . 597

18 JOSETTE PHILLIPS

19     Direct examination by Mr. Svikis . . . . . . . . . . . . 598
       Cross-examination by Mr. Brower  . . . . . . . . . . . . 600
20     Redirect examination by Mr. Svikis . . . . . . . . . . . 602

21 WARREN PANGBURN

22     Direct examination by Mr. Svikis . . . . . . . . . . . . 602
       Cross-examination by Mr. Brower  . . . . . . . . . . . . 604

23 BETTY PANGBURN

24
25     Direct examination by Mr. Svikis . . . . . . . . . . . . 606
       Cross-examination by Mr. Brower  . . . . . . . . . . . . 608

                              464a

1                    TABLE OF CONTENTS (cont.)

2  WITNESSES: Defense

3  AMY LYNN MISHALL

4        Direct examination by Mr. Svikis . . . . . . . . . . . . . 610
         Cross-examination by Mr. Brower  . . . . . . . . . . . . . 611
5
   PATRICK KEVIN MISHALL
6
         Direct examination by Mr. Svikis . . . . . . . . . . . . . 614
7        Cross-examination by Mr. Brower  . . . . . . . . . . . . . 619

8

9
   EXHIBITS: People                     IDENTIFIED              RECEIVED
10
         X56  diagram                       583                    583
11       X57  copies of slides             589                    589
         X58  photograph                   491                    492
12

13

14

15

16

17

18

19

20

21

22

23

24

25

                              464b

(Tape No. C2005-023, 2-09-05, 09:15)

1      Kalamazoo, Michigan

2      Wednesday, February 9, 2005 - 9:15 a.m.

3          THE CLERK:    The court calls the case of People

4   versus Patrick Mishall, file C03-0897 FC.

5          Please state your appearances for the record.

6          MR. BROWER:    If it please the Court, your Honor,

7   Assistant Prosecuting Attorney Scott Brower for the People of

8   the State of Michigan.

9          MR. SVIKIS:    Andis Svikis on behalf of Mr. Mishall.

10         THE COURT:    Thank you, gentlemen.

11         All right.  As I understand it, the next witness is

12  Mr. Bart Munson; is that correct?

13         MR. BROWER:    That's correct, your Honor.

14         THE COURT:    Members of the jury, the next witness

15  will not be here in person.  His name is Bart Munson.  His

16  testimony has been taken from previous proceedings.  And

17  because of his physical condition, it's not possible for him

18  to be here and to give this testimony to you in person.

19  However, he was placed under oath.  He was examined and

20  cross-examined.  All the parties had the right to be there and

21  to ask him such questions as they thought were appropriate,

22  and you should give his testimony the same consideration as if

23  he were here personally to give you that testimony.

24         You may proceed, sir.

25         MR. BROWER:    Your Honor, Mr. Michael Kanaby from my

465

1  office will be reading the answers of Mr. Bart Munson at both

2  proceedings.

3          THE COURT:  And, you know, as indicated, somebody

4  will read it.  This young gentleman here is going to read the

5  testimony that Mr. Munson gave, and then the attorneys will be

6  asking the questions or read the questions that they actually

7  asked of Mr. Munson at that time.

8          Go ahead.

9          MR. BROWER:  In proceeding number one, Bart Munson

10  was sworn by the Court and testified:

11                  BART A. MUNSON,

12      (read by Michael Kanaby at 9:17 a.m.)

13              DIRECT EXAMINATION

14  BY MR. BROWER:

15  Q  Mr. Munson, do you know an individual by the name of

16    Patrick Mishall?

17  A  Yes.

18          MR. BROWER:  Is there a stipulation regarding the

19    identity, Mr. Svikis?

20          MR. SVIKIS:  Yes.

21          THE COURT:  The Court indicated that the record

22    will so reflect.

23  BY MR. BROWER:

24  Q  Did you—How long did you or—Excuse me.  Were you aware of

25    the—the murder of Christine Dimmick at the Minute Market store

466

1       in February of 1991?

2   A   I heard about it, yes.

3   Q   Did you know Patrick Mishall before that incident?

4   A   Yes.

5   Q   About how long, if you recall?

6   A   Maybe a year.

7   Q   After her death at the Minute Market in February, did you move

8       in with Patrick Mishall?

9   A   Just for a short time.

10  Q   How much after the February 8th murder did you move in with

11      Patrick?

12  A   I think it was around April.

13  Q   At some point shortly thereafter Patrick left and moved to

14      Wisconsin; is that right?

15  A   Yes.

16  Q   Do you recall how long after the February murder was that he

17      left for Wisconsin?

18  A   I don't recall exactly how long it was.  It didn't seem like

19      it was a real time afterwards.

20  Q   It was or was not?

21  A   It was not.

22  Q   Are you talking just a matter of months?

23  A   Probably within four to six months, I would say.

24  Q   Did you and Patrick have a discussion about Patrick's

25      activities on the morning of the murder?

467

1  A   I don't really remember a discussion about it.

2  Q   Right.  Did he tell you what he had done and where?

3  A   He always went and helped Christian [sic] open the store and

4      set up things; and then he would come home, and I would go up

5      to his house and have coffee with him around 7:00 o'clock in

6      the morning.

7  Q   Did he tell that that's what he had done on this morning was

8      go to the store—take Chris to the store?

9  A   Yes.

10 Q   Did he tell you what he did at the store?

11 A   Make coffee, got newspapers out, just stuff like that.

12 Q   During this discussion or this statement that he made to you,

13     did he mention a porno tape?

14 A   He said something about he had one and he wanted to exchange

15     it for another one.

16 Q   And did he mention what Chris thought about that or said to

17     him about that?

18 A   He really—He didn't really say too much about anything other

19     than that.

20 Q   Did Chris' name come up during the discussion about that tape?

21     You don't remember the exact—

22 A   I don't really remember exactly.

23 Q   Now you had a practice of going to Mishall's house in the

24     morning for coffee, did you not?

25 A   Yes.

1  Q  Was—Do you know what he was driving at that time?

2  A  He always owned a black Ford car. I don't recall of anything

3      else he owned.

4  Q  Is it your recollection this was a Ford LTD?

5  A  Yeah, it was an LTD.

6  Q  Do you know whether or not he and Chris had more than one

7      vehicle?

8  A  I never seen more than one, just the black Ford LTD is all I

9      ever seen Patrick have.

10  Q  Did you stop at Patrick Mishall's house on the morning of

11      February 8th, the day this incident happened at Minute Market?

12  A  Yes.

13  Q  What time were you at Patrick's house?

14  A  Right around 7:00, about the usual time. I would always go up

15      and have coffee with him.

16  Q  You talking like a couple minutes either way but pretty close

17      to 7:00 o'clock?

18  A  Yes.

19  Q  All right. Was Patrick home when you got there?

20  A  No, he wasn't home that day. I didn't know where he was

21      because usually he would go help Christian [sic] set up and

22      then he would come home, and I would go up there. He would

23      open the door and take a shower and have coffee ready; and we

24      would have our cups of coffee, then go about our business

25      throughout the day.

469

1    Q    But not this day?

2    A    No.

3    Q    This was different than other days?

4    A    Yes.

5    Q    You say that he wasn't home, but do you recall whether or not

6         the car was there?

7    A    I didn't see the car there.

8    Q    Is that part of the reason why you concluded he wasn't home?

9    A    Exactly.  His car wasn't there.  I knocked on the door.  There

10        was no answer, so I figured he was gone doing other things.

11                   MR. BROWER:    Thank you.

12                   I have nothing further of this witness.

13                   MR. SVIKIS:    Thank you.

14                        CROSS-EXAMINATION

15   BY MR. SVIKIS:

16   Q    Mr. Munson, is your—what's your full first name?

17   A    Bart A. Munson.

18   Q    Is there a Brett Munson around, also?

19   A    Brett Munson, that's my oldest brother.

20   Q    Brett is an older brother?

21   A    Yes.

22   Q    Okay.  When did you first meet Mr. Mishall?

23   A    Like I said, I only known him for about a year, and that was

24        about it.  I don't really recall exactly when I met him.

25   Q    How did you meet him?

1   A   Through the neighborhood.  He always walked through the

2       neighborhood.  He would talk to people, and he made friends

3       with lots of people in our neighborhood.

4   Q   And what neighborhood is this?

5   A   Oakwood.

6   Q   That's in Kalamazoo?

7   A   Yes.

8   Q   Now did you say you were his roommate?

9   A   I stayed with him for a short period of time because the place

10      that I was staying at—The gal that I was staying with, she had

11      kicked me out of the house; and Pat said it would be all right

12      to come and stay with him for a little bit.  So he took me in

13      and let me stay at his house.

14  Q   Two or three days?

15  A   I don't know.  A couple of weeks, maybe.

16  Q   You don't recall?

17  A   No, I don't recall exactly how long.

18  Q   And who threw you out of their house, the girlfriend—What's

19      her name?

20  A   Stacy Roberts is who I stayed with.

21  Q   And then did Pat leave his place, or did you leave his place

22      after you stayed with him for a while?

23  A   I left his place.  I ended up going back to Stacy's.

24  Q   Now is it your testimony that for the time that you knew

25      him—being—What?—a year—that you went over there every morning

471

| 1 | | at 7:00 a.m. to his place to have coffee? |
|---|---|---|
| 2 | A | I went over there in the mornings most of the time and had |
| 3 | | coffee with him, and I became—when him and I became friends, |
| 4 | | yes. |
| 5 | Q | Is this for a period of a year? |
| 6 | A | No, no, it was only a short period of time, maybe a month or |
| 7 | | two. |
| 8 | Q | So this pattern of going to Pat's house, the most it would |
| 9 | | have been was—would it have been two months? |
| 10 | A | Yes. |
| 11 | Q | But at least one month? |
| 12 | A | At least. |
| 13 | Q | Okay. |
| 14 | A | Yes. |
| 15 | Q | And how far away before you moved in with Pat did you live |
| 16 | | from his house? |
| 17 | A | How far away did I live? |
| 18 | Q | Yes, his house. |
| 19 | A | Did I live from him? |
| 20 | Q | Yes. |
| 21 | A | Maybe five blocks. |
| 22 | Q | Did you walk or drive? |
| 23 | A | I always walked. |
| 24 | Q | Okay. And did you have a job that you were up at 6:00 or 7:00 |
| 25 | | in the morning? |

1  A   No, I was just a young dumb kid and didn't hold a job.

2  Q   And you just would wake up at that time in the morning?

3  A   Usually.

4  Q   Okay. And then you would walk in the middle of winter over to

5      Pat's house. This is February now, right?

6  A   It was probably more closer to spring when I started going to

7      his house to have coffee with him.

8  Q   Okay.

9  A   Because I don't recall any snow being on the ground.

10 Q   And based on your recollection, that's when this pattern

11     started of going over to his house, right?

12 A   Yes.

13 Q   And what month would you consider being spring?

14 A   March, April, right around in there.

15 Q   So you have not seen Pat on this particular day. It was

16     sometime in March or April?

17 A   Well, that particular day would have been in February.

18 Q   Well, right. But I thought you hadn't started this drinking

19     coffee with him until the spring. Did I miss something here?

20 A   It might have been spring. February, March, April—somewhere

21     in there.

22 Q   Okay. You don't really recall, do you?

23 A   No, it's been 12 years. I don't remember a whole lot from

24     12 years ago. I have been through a lot.

25 Q   Okay. What have you been through?

1  A   A kidney transplant, dialysis. I am on 47 pills a day now. I

2       don't have a very good memory, for one. I'm about ready to

3       lose my job because of my health, so I'm not really in the

4       best of health right now.

5  Q   Okay. And these problems started back in '91?

6  A   I have had these problems all my life—when I was born.

7  Q   Okay. The pills and the medications?

8  A   The medication and that, I had the kidney transplant back in

9       2000. I have been on the medication for three years almost

10      now, and a couple of the—I say a couple of them. There is one

11      specific one that is a mood and mind-altering drug as well as

12      a anti-rejection, and that's called protozoon (phonetic). And

13      it's affected me all the way around in my whole daily

14      activities.

15  Q   And this was back in '91, also?

16  A   No, I didn't have that stuff in '91.

17  Q   You had—You had nothing in '91? No problems in '91, right?

18  A   No, I always had kidney problems all my life. I had probably

19      30, 40 different surgeries since I was born.

20  Q   Okay. Are the kidney problems in any way related to any kind

21      of drug or alc [sic] abuse—alcohol abuse or not?

22  A   No, it was a birth defect.

23  Q   There's a word for that. I didn't hear you.

24  A   He said it was—I'm sorry.—birth defect.

25  Q   Before coming into the courtroom today were you given anything

(Tape No. C2005-023, 2-09-05, 09:29)

1    to look at to read?

2  A   I went over my statement from 12 years to see if it refreshed

3    my mind on anything. But it doesn't really help. I don't—

4  Q   Because you don't remember anything?

5  A   I don't remember a whole lot of anything from 12 years ago,

6    let alone last week.

7             MR. BROWER:   Then on redirect examination.

8                   REDIRECT EXAMINATION

9  BY MR. BROWER:

10  Q   Mr. Munson, when you were—You reviewed your statement made

11    back in the early 90s and what you remembered and what you did

12    not remember; is that right?

13  A   Yes.

14  Q   Okay. And the things that were included in the report that

15    you no longer remember are things that I didn't even ask

16    about; is that right?

17  A   Right.

18  Q   The things that you did testify to were the things that you

19    did remember?

20  A   Exactly.

21             MR. BROWER:   All right. Thank you.

22             MR. SVIKIS:   Nothing further.

23             Your Honor, that concludes the first reading.

24             THE COURT:   All right.

25             MR. BROWER:   The second proceeding Mr. Munson was

1      called by the People and sworn by the Court and testified:

2                          DIRECT EXAMINATION

3   BY MR. BROWER:

4   Q   Mr. Munson, could you please state your full name and spell

5       your last name for the record.

6   A   Bart A. Munson.  Last name is M-u-n-s-o-n.

7   Q   Mr. Munson, are you familiar with Patrick Mishall?

8   A   Yes.

9   Q   How did you know him?

10  A   Friend in the neighborhood.

11  Q   Do you know where he was living back in 1991?

12  A   He lived in Oakwood.

13  Q   That's a neighborhood?

14  A   That's the name of the neighborhood, yes.

15  Q   All right.  He lived in the same neighborhood as you did?

16  A   Yes.

17  Q   Did you know who he was living with back in early 1991 in

18      February area—January, February?

19  A   Christine Dimmick.

20  Q   Approximately how far away did you live from where Patrick and

21      Chris were living?

22  A   Three to five blocks.

23  Q   Did you have a job back then?

24  A   No, I didn't.

25  Q   How old would you have been in early '91 approximately?

                              476

1   A   About 22, 23 years old.

2   Q   Do you know what kind of vehicle Patrick drove?

3   A   At that time he had a black Ford LTD.

4   Q   Do you see Patrick Mishall in the courtroom today?

5   A   Yes, I do.

6   Q   Where is he seated?

7   A   Off to my left.

8   Q   And what is he wearing?

9   A   A greenish-colored shirt.

10  Q   Sitting at the table marked defendant; is that correct?

11  A   Yes, sir.

12          MR. BROWER:    The record reflected that defendant

13      was identified.

14  BY MR. BROWER:

15  Q   Did you have an early morning practice—a routine that you

16      followed back in early '91?

17  A   Yeah, I used to go to his house off and on for coffee every

18      now and then.

19  Q   What time of the morning would you do that?  What was your

20      routine like?

21  A   Around 7:00 o'clock or so, give or take a few minutes.

22  Q   Get up in the morning, get ready, and go over to his house—

23  A   Yes.

24  Q   —for coffee?

25  A   Yes.

477

1  Q   When you talked around 7:00 o'clock either way, was that the
2      time you would normally be at his house?
3  A   Yes.
4  Q   How often did you do that?  Well, let me ask this first: at
5      the time of—On February 8 or immediately thereafter, did you
6      learn that Christine Dimmick had been murdered?
7  A   Yes, I did.
8  Q   This going to Pat's house for coffee in the morning, was that
9      something that you had been doing prior to the murder?
10 A   Probably ten or 15 different times prior to that.
11 Q   At that time was it an everyday thing?
12 A   No.
13 Q   Did this practice increase with frequency, though, after the
14     murder?
15 A   Yes.
16 Q   What would routinely happen when you arrived at his house in
17     the morning right around 7:00 o'clock?
18 A   He'd let me in, he'd have coffee made.  And then he'd get
19     around and get dressed and all that.  We'd sit down and have a
20     talk.  We'd talk just about whatever, you know, and have our
21     coffee.  And then he'd go on about his business—about his
22     daily routine stuff, whatever he did then—and I'd go about my
23     business.  We'd probably have coffee for maybe an hour.
24 Q   He had a job; you didn't at that point?
25 A   Correct.

1  Q   All right. On the morning of February 8 did you go to Chris's
2      house for coffee as you had done?
3  A   Yes.
4  Q   Did you have your coffee that day there?
5  A   No.
6  Q   Why not?
7  A   There was no answer at the door, and his car wasn't there in
8      the morning—or there that morning.
9  Q   Was that unusual?
10 A   I'm not going to say it was unusual because—
11 Q   There was other times where he wasn't there?
12 A   There was other times that he wasn't at home at that point in
13     time either. So it didn't really surprise me that he wasn't
14     home.
15 Q   When the car's gone, he's gone?
16 A   Correct.
17 Q   When you walked up to the house, was the car there?
18 A   No.
19 Q   But in spite of that you still went to the door anyway?
20 A   Yes.
21 Q   Any response at the door?
22 A   No.
23 Q   Some point later did you have a conversation with Patrick
24     about the murder and what he had done that day?
25 A   He had mentioned to me that he'd taken Christine to work that

479

1      morning and helped her get the coffee going and set newspapers

2      out like he usually did, and so that wasn't anything unusual.

3  Q   Did he mention a VHS rental tape or anything?

4  A   He said he had a tape that he wanted to trade in for some

5      other tape.

6  Q   That's his explanation, that he had a tape that he wanted to

7      exchange?

8  A   Yes.

9  Q   All right. After the murder there was a period of time when

10     you—where you actually moved in with Patrick, was there not?

11 A   For a short period of time, yes.

12 Q   When was that? Well, let me ask it this way: was it days,

13     weeks, or months after the murder?

14 A   It was probably a couple months after that, probably around

15     April.

16 Q   You needed a place to stay because you got—you and your

17     girlfriend had separated for a short time?

18 A   Well, she wasn't my girlfriend. We were just friends; but,

19     yeah, she asked me to leave, so Patrick let me come and stay

20     with him for a little while.

21             MR. BROWER:    I have nothing further of this

22     witness.

23             Cross-examination.

24

25

                                480

1                         CROSS-EXAMINATION

2 BY MR. SVIKIS:

3 Q    Mr. Munson, you were aware of Christine's murder at the

4       Minute Mart, isn't that correct?

5 A    Pardon me?

6 Q    Were you aware of Christine's murder at the Minute Mart?

7 A    Later that—that day of the murder, yes.

8 Q    What time—When did you become aware of that?

9 A    I can't be for sure exactly what time it was. I don't

10       remember that far back.

11 Q    So you—Are you saying you don't remember anything about Feb—

12 A    No, I just can't recall the exact time.

13 Q    Okay. How did you learn about it; do you recall that?

14 A    It—A gal I was staying with, here [sic] sister called the

15       house and told her sister that Christine had been found dead

16       at the Minute Market, and that's how I found out.

17 Q    Okay. How long did you know Mr. Mishall before—before—before

18       February 8th?

19 A    About a year.

20 Q    And at anytime did you ever live with Mr. Miscall?

21 A    Just shortly after the murder had taken place?

22 Q    And you—And you moved in with him?

23 A    Pardon me?

24 Q    And you moved in with him?

25 A    Yes.

1  Q  And at that—At no time did he—didn't tell you that he killed
2     Christine, did he?
3  A  No.
4  Q  And that at some point Mr. Mishall moved out and moves to
5     Wisconsin, isn't that correct?
6  A  Yes.
7  Q  And then where did you go?
8  A  I went back with Stacy Roberts.
9  Q  And that's who you were living with at the time?
10 A  Yes.
11 Q  Now how far away did you live from Mr. Mishall on this
12    particular morning that you said you walked to his house?
13 A  Three to five blocks.
14 Q  And what time—what month was this?
15 A  February.
16 Q  And so it was winter?
17 A  There was no snow on the ground; but, yes.
18 Q  It was cold?
19 A  Yeah.
20 Q  All right.  And what time would you leave to go to his house
21    from your house?
22 A  Oh, about a quarter to ten to 7:00.
23 Q  So it's dark out?
24 A  Yes.
25 Q  And you're going over to his house because you know that he's

1   awake at this time?

2   A   Yes.

3   Q   And you do this every day?

4   A   Not every day.

5   Q   But you remember this particular day?

6   A   Yes.

7   Q   And you don't know if he was sleeping or not when you knocked

8       on the door, right?

9   A   That's correct.

10  Q   And then you turned around and went back home, right?

11  A   That's correct.

12  Q   Now also at this particular time you were on medication; is

13      that correct?

14  A   At what particular time?

15  Q   February 8th.

16  A   No.

17  Q   You're not on any medication?

18  A   Not at that time, no.

19  Q   The day before?

20  A   No.

21  Q   Day after?

22  A   No.

23  Q   Where were you working on February 8th?

24  A   I wasn't working; I had no job at that time.

25  Q   Are you on any medication now?

483

1  A   Yes, sir.

2  Q   What medication are you on now?

3  A   Quite a few to be honest with you. I don't recall all the

4      names of them. It's for a kidney transplant.

5  Q   What medications are you taking that you do recall?

6  A   I take Neoral, which is an antirejection and a steroid.

7          I take Prednisone, which is an antirejection

8      steroid.

9          CellCept, that's an antirejection and a steroid.

10         Bactorum (phonetic), that's an antibiotic.

11         And I don't remember the rest of the names of them.

12     I have quite a few others that I have to take right now, too.

13 Q   And before testifying today, did you review anything?

14 A   No.

15         MR. SVIKIS:   I have no further questions.

16         MR. BROWER:   Redirect exam.

17                    REDIRECT EXAMINATION

18 BY MR. BROWER:

19 Q   Sir, was your testimony that when Patrick's car was gone

20     Patrick was gone, he wasn't there?

21 A   That was the case most of the time, yes.

22 Q   And you got no response at the door and that was unusual, but

23     it was consistent with—Let me start over.

24         And you got no response at the door and that was

25     unusual, but it was consistent with what you knew about his

                              484

1    car being gone, right?

2 A    Yes, sir.

3              MR. BROWER:   I have nothing further.

4              MR. SVIKIS:   Nothing further.

5              (Reading of testimony of BART A. MUNSON concluded at

6              9:41 a.m.)

7              THE COURT:   Call the next witness, please.

8              MR. BROWER:   People call Christine Newburry to the

9    stand.

10             THE COURT:   Excuse me.

11             You do solemnly swear or affirm the testimony you're

12   about to give shall be the truth, the whole truth, and nothing

13   but the truth?

14             MS. NEWBURRY:   Yes.

15             THE COURT:   Have a seat, please.

16                  CHRISTINE NEWBURRY,

17   called at 9:41 a.m., and sworn by the Court, testified:

18                  DIRECT EXAMINATION

19 BY MR. BROWER:

20 Q    Ma'am, would you please state your name and spell your last

21   name for the record.

22 A    Christine Newburry—N-e-w-b-u-r-r-y.

23 Q    Ma'am, back in the late 80s or early 90s, were you familiar

24   with both Patrick Mishall and Christine Dimmick?

25 A    Yes, I was.

                        485

1  Q   How did you know them?

2  A   Through old acquaintances.

3  Q   Did you, in fact, socialize with them at different times?

4  A   I did, yes.

5  Q   You were aware of Christine's murder in February of 1991; is

6      that correct?

7  A   Yes, I was.

8  Q   At some point after the murder did you and Patrick Mishall

9      have a relationship?

10 A   In the summer of '91, yes.

11 Q   This was prior to him leaving the state of Michigan and going

12     to Wisconsin, then; is that right?

13 A   Correct.

14 Q   During that period of time do you recall having a—an argument

15     or were present when there was a disturbance of some sort at a

16     bar?

17 A   Yes, I do.

18 Q   Do you recall when that was?

19 A   The summer of '91.

20 Q   Was there some event that you can connect it to to help narrow

21     down the time frame?

22 A   June or July.  The Kalamazoo air show was going on at the

23     time.  And we worked for Daane's Catering.  A bunch of us got

24     together for that.

25          And after that we went to Walt's Lounge on Portage

                              486

1    Road. A bunch of us proceeded to get drunk, and I confronted
2    Patrick about possibly killing Chris; and—
3  Q  Okay. You confronted him about possibly killing Chris.
4    Exactly how did that confrontation take place?
5  A  I was curious. I wanted to know.
6  Q  And what did—How did you confront him?
7  A  Asked him did he kill Chris.
8  Q  What—Was there something that had happened, or was there some
9    sort of discussion that precipitated that question—that caused
10   you to ask that question at that particular time?
11 A  It had been on my mind for months, and just different—
12 Q  How did—
13 A  —things—
14 Q  —he react when you asked that question?
15 A  He went off. He went off as in—He lost it. He went just
16   berserko [sic]. The police had to be called, and he had to be
17   escorted out of the bar.
18 Q  Is it your understanding that the police took him to his home?
19 A  I believe so. I'm not sure.
20 Q  And later that same night or early the next morning—whatever
21   it was during that same time frame or immediately
22   thereafter—did you then go to his home?
23 A  Later on that evening I did.
24 Q  Now were the two of you living together?
25 A  God sakes, no.

487

1   Q   Okay.  You were—had—Would it be characterized as simply a

2       dating relationship?  How would you characterize—

3   A   We only had sex two times, so I don't even consider it a

4       relationship.

5   Q   After this disturbance at the bar you went to his home.  And

6       do you remember where that was?

7   A   His home?

8   Q   Yes.

9   A   Yes, on Springmont.  I lived on Adams; he lives on—he lived on

10      Springmont—

11  Q   Okay.

12  A   —in the Oakwood neighborhood.

13  Q   That was in June or July of 1991?

14  A   Correct.  After the air show.

15  Q   This—When you got to his home, did you have contact with him

16      there?

17  A   Yes, I did.  I knocked on the door, and he answered and let me

18      in.

19  Q   What was your purpose of going there?

20  A   To ask him again did he kill Chris.

21  Q   You were going to press him for an answer?

22  A   I wanted to know the truth, yes.

23  Q   Did you, in fact, ask him or confront him in the terms that

24      you used previously again at his home?

25  A   Yes.

488

1  Q  Specifically, what did you say?

2  A  Did you kill Chris.

3  Q  What was his response?

4  A  It wasn't good. He once again went berserko [sic]; and he got

5     this awful demon look in his eyes, grabbed me by my throat,

6     threw me up against the door, and told me that he should do to

7     me what he did to Chris as he's choking me.

8  Q  As you're relating that verbally, you used your hand and put

9     it up across your neck. Is—Is that what he did, put his hands

10    on your neck?

11  A  He had his hand against my neck up against the door choking me

12    telling me he should do to me what he did to Chris. My left

13    hand was reaching for the doorknob so I could get out of

14    there.

15  Q  When you say he had his hand on your neck and up against the

16    door, you were against the door—pushed against the door?

17  A  Correct, with his hand up against my—I was pinned. I was

18    pinned up against the door.

19  Q  What did you observe about his facial mannerisms and the look

20    in his eye or his demeanor?

21  A  From day to night. It's like he just (snaps fingers) like

22    that, just switched; and his eyes got dark, and he just—like

23    an evil. It was scarey.

24  Q  Had you seen that kind of look in him before—

25  A  Not as—

1    Q    . . . (inaudible)

2    A    —intense. I've seen him switch from day to night prior but

3       not as intense as that night.

4    Q    That caused you particular alarm?

5    A    Very much. I was scared for my life.

6    Q    Were you able to leave?

7    A    Yes, I was.

8    Q    Did you call the police?

9    A    I—Yes, I did.

10    Q    When he did this and put his hands on you, you described what

11       he did and what he appeared like. What did he say?

12    A    When he had me up against the door—

13    Q    Yes.

14    A    —with his hand around my neck?

15    Q    Yes.

16    A    That he should do to me what he did to Chris, but it was in

17       a—I should do to you what I did to Chris—one of those

18       real—just scarey—I just wanted out of there.

19    Q    And that statement I should do to you what I did to Chris was

20       immediately after your question did you kill Chris?

21    A    Exactly, yes.

22    Q    Ma'am, does—do you see Patrick Mishall in the courtroom today?

23    A    Yes.

24    Q    Where is he seated, and what is he wearing?

25    A    Seated right there with a suit on.

490

1  Q    At the table marked defendant?

2  A    Next to his attorney—to the right, right there.

3              MR. BROWER:    If the written record can reflect the

4       identification of the defendant, your Honor?

5              THE COURT:    It may so indicate.

6  BY MR. BROWER:

7  Q    Does his appearance look significantly different than what it

8       did back in 1991?

9  A    Yes.

10             MR. BROWER:    Exhibit number 58.

11 BY MR. BROWER:

12 Q    Do you recognize the people in that photograph, ma'am?

13 A    Yes.

14 Q    Who are they?

15 A    Christine Dimmick and Patrick Mishall.

16 Q    On the slide it's difficult to actually see the length of the

17      hair or the—

18 A    He had long, dark, curly hair; and she was beautiful.

19 Q    Is the photograph actually a little bit better?

20 A    Yes.

21 Q    Does it show longer, much curlier hair—

22 A    Yes, that's—

23 Q    —on Patrick?

24 A    Yes.    And that's Christine.

25             MR. BROWER:    Move for admission of People's

491

1    exhibit 58, your Honor.

2              THE COURT:   Any objection?

3              MR. SVIKIS:   No objection.

4              THE COURT:   Received.

5              MR. BROWER:   I have nothing further of this

6    witness.

7              THE COURT:   Mr. Svikis?

8              MR. SVIKIS:   Thank you.

9                        CROSS-EXAMINATION

10   BY MR. SVIKIS:

11   Q   On this particular day did you say you were at the air show—

12   A   Yes, correct.

13   Q   —catering?

14             Been drinking that day?

15   A   Not at the air show.

16   Q   Later at the bar?

17   A   After, when we went to Walt's Lounge.

18   Q   Okay.  Smoking marijuana?

19   A   Correct.

20   Q   All right.  Now these are quite dramatic statements that

21       you're attributing to Mr. Mishall.  You told that to the cold

22       case team when you were interviewed in 2003, correct?

23   A   I believe so.

24   Q   All right.  But you also made statements back in 19—1991,

25       also, to investigators when this—near when this time happened,

                              492

1    didn't you?

2  A  Could you rephrase that—

3  Q  Sure.

4  A  —please.

5  Q  A few months after her death in 1991 you were also interviewed

6     by the police; isn't that correct?

7  A  Correct.

8  Q  All right.  And at that time did you say this—

9        First, let me back up.  Back in '90—back in '91 you

10     were—last name was Powell?

11  A  Uhm-hmm.

12  Q  Is that yes?

13  A  Correct, yes.

14  Q  And then it went to Williams?

15  A  Yes.

16  Q  And then back to Newburry?

17  A  Yes.

18  Q  Okay.  So in 1991 did you make this statement to the police:

19     he threw me up against the wall, called me numerous vulgar

20     names—That sound about right?

21  A  Yes.

22  Q  —and while throwing me up against the wall stated—Listen

23     carefully.  See if you said this.—I should do to you like

24     everybody thinks I did to Chris?

25  A  That's incorrect.

493

1  Q  That's incorrect.  So when Detective Hatter comes in here to
2     testify and whether he remembers it or reviews it from his
3     report, he will not be telling the truth?
4  A  I'm not saying that.  I'm saying maybe—maybe it was wrote down
5     differently than what I stated.
6  Q  Okay.  And that's back in 1991 a few months after the event,
7     he would write down I should do to you like everybody thinks I
8     did to Chris.  That's different than—If you said that, that
9     would be just the opposite of what you're saying today,
10    wouldn't it?
11 A  I know what he said to me the night that it happened.  What I
12    should—What everyone thinks I should do to Chris, I don't know
13    where that came from.
14 Q  Okay.  But it's not your statement?
15 A  No.  My statement was that he threatened to do to me what he
16    did to Chris.
17 Q  And that's the statement you gave in 2003 when you were
18    interviewed by the cold case team?
19 A  Correct.
20 Q  So if I understand this correctly, you were taunting
21    Mr. Mishall the first time at the bar insinuating that he
22    killed Christine Dimmick, correct?
23 A  Taunting?
24 Q  Yeah.
25 A  Could you explain that?

494

1    Q    Sure. You're saying did you kill her.

2    A    I confronted him and asked him did he kill Chris. I don't

3    Q    Sure. A nice—

4    A    —consider that—

5    Q    —in a nice pleasant way—

6    A    —taunting.

7    Q    —right? Okay.

8    A    (No audible response)

9    Q    Then you follow—Then after that—after you've been drinking,

10       smoking dope—he goes home—'cause the police take him out of

11       there 'cause he's angry—and you go up to him and confront him

12       again?

13    A    Correct.

14    Q    And he blows up?

15    A    Again.

16    Q    Okay. And at that time in that year he says I should do to

17       you like everyone thinks I did to Chris?

18    A    No, he said to me with his hand on my throat up against the

19       door, I should do to you what I did to Chris.

20                MR. SVIKIS: Okay.

21                I have no further questions.

22                MR. BROWER: No redirect, your Honor.

23                THE COURT: You may step down. Thank you, ma'am.

24                THE WITNESS: Thank you.

25                MR. BROWER: Tracy Rathke.

1          THE COURT:    You do solemnly swear or affirm the

2     testimony you're about to give shall be the truth, the whole

3     truth, and nothing but the truth?

4          MS. RATHKE:    I do.

5          THE COURT:    You may be seated.

6                    TRACY LYNN RATHKE,

7     called at 9:56 a.m., and sworn by the Court, testified:

8                    DIRECT EXAMINATION

9  BY MR. BROWER:

10 Q    Ma'am, would you please state your full name and spell your

11     last name for the record.

12 A    Tracy Lynn Rathke—capital r-a-t, as in Tom—h-k-e.

13 Q    Ms. Rathke, you live in Wisconsin; is that correct?

14 A    Correct.

15 Q    Are you familiar with Patrick Mishall?

16 A    Yes, I am.

17 Q    How do you know him?

18 A    We dated in '92/'93.

19 Q    Were you aware that he had lived in Michigan but moved to

20     Wisconsin?

21 A    Yes, I was.

22 Q    When did you first meet him if you can approximate?

23 A    I think it was late '91/early '92.

24 Q    At some point after you had met did the two of you begin

25     dating?

                              496

1    A    Yes, we did.

2    Q    As the two of you got to know each other, did he speak to you

3        about a murder in Kalamazoo?

4    A    After a while.

5    Q    Okay. What was your understanding of the murder that he was

6        telling you about?

7    A    That his girlfriend Christine had been robbed and murdered at

8        the convenience store she worked at.

9    Q    As time went on during your relationship did he tell more and

10       more bits and pieces about that incident?

11    A    Yes, he did.

12    Q    In addition to a dating relationship, the two of you actually

13       moved in together for a period of time?

14    A    Well, we didn't actually live at the same residence; but we—I

15       was either at his house or he was at my house.

16    Q    On one particular evening prior to retiring for the night was

17       there a conversation between you about that murder?

18    A    Yes, there was.

19    Q    At some point that same evening after this discussion about

20       the murder did you go to him in the bedroom and begin to wake

21       him up for some reason?

22    A    Yes, I did.

23    Q    As he was arousing and becoming conscious and so on, did he

24       make any statements?

25    A    Yes, he did.

1  Q  What statement was that?

2  A  He said, I told her not to go out with them niggers that

3     night.

4  Q  I told her not to go out with those niggers that night.

5  A  Uhm-hmm.

6  Q  From the context of your earlier conversation with him, did

7     that statement make sense to you?

8  A  Yes, it did.

9  Q  Who was the her that he was referring to?

10 A  He was talking about Christine.

11 Q  And when he says that night, what does—what was he referring

12    to?

13 A  The night before she was murdered.

14 Q  Sometime after that did the two of you have an argument that

15    led to a breakup?

16 A  Yes, we did.

17 Q  Initially where did this argument take place?

18 A  It started at my home—my residence.

19 Q  Did you make a decision to go—return to some location and

20    remove certain items?

21 A  Correct.  I decided to go to his apartment to remove some

22    items of mine.

23 Q  I'm sorry?  I couldn't hear the last . . . (inaudible)

24 A  I decided to go to his apartment and take some items of mine

25    from there.

1 Q Okay. Did the two of you end up at that apartment together,

2   however?

3 A Yes, we did.

4 Q Now you've already talked about an argument. Was there—As you

5   were together at the apartment was there still an

6   argumentative tone between the two of you?

7 A Yes, there was.

8 Q As—Because of what you had seen and heard and so on—the

9   experiences with him—did you ask him a very specific question

10   about the murder in Kalamazoo at that time?

11 A Yes, I did.

12 Q What was that question?

13 A I looked at him and I said you did kill Christine, didn't you.

14 Q Repeat that for me one more time a little louder, please.

15 A Okay. I looked at him and I said you did kill Christine,

16   didn't you.

17 Q Ma'am, your voice is very soft, and there's high ceilings and

18   an lot of noise here; so we want to make sure the jurors are

19   able to hear.

20 A Okay. I'm sorry.

21 Q Describe what you observed about his demeanor after asking

22   that question.

23 A It didn't look like him anymore. He looked very upset,

24   glossed over eyes.

25 Q What about his—his mannerisms and gestures and so on? Was

(Tape No. C2005-023, 2-09-05, 10:02)

1   he—Well, let me ask this: had you seen that look before—a look
2   like that?
3 A  No, I hadn't.
4 Q  Did that—the look and his reaction cause you alarm?
5 A  Great alarm.
6 Q  Specifically, what were you feeling?
7 A  I was very scared I wasn't going to get out of the apartment.
8 Q  Is that because of the—his reaction to that question?
9 A  Correct.
10 Q  Your last—The last part of your previous answer was that you
11   wanted to get out of the apartment; did I hear that correctly?
12 A  Correct.
13 Q  Were you able to get out of the apartment?
14 A  Eventually.
15 Q  Tell me what you—you did as you ran from the apartment.
16 A  What I did?
17 Q  Well, did you—
18         You have to speak up just a little bit louder.
19 A  Oh, I'm sorry.
20 Q  That's all right.
21         Did you summon help?
22 A  Yes, I did.  I was yelling for help.
23 Q  And did that incident then end at that point?
24 A  When I got out of the apartment and in my car, it did.
25 Q  Describe what you observed about his face and eyes as you

500

1    asked that question.

2  A    His eyes got really big, and they were glossed over; and it

3       was like I wasn't—There was nothing but anger in his eyes.  It

4       was like it wasn't him anymore kind of.  I can't explain it

5       other than that really.

6              MR. BROWER:   Thank you.

7              I have no further questions of this witness.

8                        CROSS-EXAMINATION

9  BY MR. SVIKIS:

10 Q    Now this apartment, whose apartment was this?

11 A    This was Patrick's apartment.

12 Q    Okay.  You had a key to it?

13 A    Yes, I did.

14 Q    All right.  And you can come and go as you pleased?

15 A    Yep.

16 Q    All right.  And you—Even after this incident you did return?

17 A    To that apartment?

18 Q    Yes.

19 A    Yes.

20 Q    Okay.  So if I understand your—your testimony, you accuse him

21      of murder and he got upset; is that about it?

22 A    Correct.

23 Q    Okay.  And then you say you've never seen a look like that on

24      him before.  Ever accuse anyone else of murder?

25 A    Nope, I don't think so.

                        501

1  Q   Okay.  And if someone were to accuse you of murder, you'd have

2      a look on your face, too, wouldn't you?

3  A   I'd be like what, yeah.  I'd have a—

4  Q   Okay.

5  A   —confused look on my face.

6  Q   Yeah.  Okay.  And just like now you said what or a look on

7      your face and you didn't say I didn't kill anybody, did you?

8  A   No, I didn't.

9  Q   All right.  And that was exactly Pat's reaction.  He didn't

10     say anything, did he?

11 A   Not with what led up to that, no.

12 Q   All right.  And then he got out of the relationship, right?

13 A   The relationship was broken off.

14             MR. SVIKIS:   All right.

15             I have no further questions.

16             THE COURT:   Anything else, Mr. Brower?

17                     REDIRECT EXAMINATION

18 BY MR. BROWER:

19 Q   Ma'am—

20 A   Uhm-hmm?

21 Q   —you didn't make an accusatory statement, I know you killed

22     Christine; that—that is a declaratory statement.  That's not

23     what you did, though, right?

24 A   No, I said—

25 Q   You asked a question, didn't you?

1  A    Right.

2  Q    And did you believe that his reaction was in answer to that

3       question?

4  A    Yes, I did.

5  Q    And that answer was what?

6  A    Yes.

7              MR. BROWER:   Thank you.

8              I have nothing further.

9              THE COURT:   Anything else, Mr. Svikis?

10             MR. SVIKIS:   No, your Honor.

11             THE COURT:   You can step down.  Thank you.

12             THE WITNESS:   Thank you.

13             MR. BROWER:   People call Carol Sordahl to the

14       stand.

15             THE COURT:   You do solemnly swear or affirm the

16       testimony you're about to give shall be the truth, the whole

17       truth, and nothing but the truth?

18             MS. SORDAHL:   Yes, sir.

19             THE COURT:   You may be seated.

20                      CAROL JEAN SORDAHL,

21       called at 10:07 a.m., and sworn by the Court, testified:

22                      DIRECT EXAMINATION

23  BY MR. BROWER:

24  Q    Ma'am, could you please state your full name and spell your

25       last name for the record.

                          503

1 A Carol Jean Sordahl—S-o-r-d-a-h-l.

2 Q Ma'am, you're from Wisconsin, correct?

3 A Yes, sir.

4 Q Are you familiar with Patrick Mishall?

5 A Yes, sir.

6 Q How do you know him?

7 A From working at the Road Star Inn.  He stayed there.

8 Q Lone—What was the name of the inn?

9 A Road Star Inn.

10 Q It's a motel?

11 A Yes, sir.

12 Q When did you first meet him?

13 A I believe it was in 1991.

14 Q Are you aware that he was originally from Michigan but had

15  just recently moved to Wisconsin?

16 A Yes, sir.

17 Q Are you aware of a connection between Mr. Mishall and the

18  owner of that motel?

19 A Yes.

20 Q What is that?

21 A It was his aunt and uncle that was managers.

22 Q Do you remember the uncle's name?

23 A Warren Betty.

24 Q And the last name?

25 A Betty.  B-e-t-t-y, I believe.

504

1    Q    Okay. At some point did the two of you begin dating?

2    A    Yes.

3    Q    Approximately when was that? Was it immediately upon his

4       entry into—

5    A    I believe—

6    Q    —Wisconsin or—

7    A    I believe it was like a week—

8    Q    Okay.

9    A    —to two weeks after—

10    Q    All right.

11    A    —he got there.

12    Q    But, obviously, after he moved to Wisconsin?

13    A    Yes.

14    Q    All right. Would that have been in '91 yet?

15    A    Yes.

16    Q    Did he ever mention to you that he had a gun?

17    A    Yes.

18    Q    Was that mentioned in the context of him wanting something

19       from you?

20    A    Yes.

21    Q    And then he mentioned the fact that he had this gun?

22    A    Yes.

23    Q    After that interaction—him wanting something from you—and what

24       was your response to that question?

25    A    No.

1   Q   That you wouldn't—

2   A   I would not—

3   Q   All right.

4   A   —give him what he wanted.

5   Q   That—After your response is when he mentioned the gun?

6   A   Yes.

7   Q   How did you respond to that scenario?

8   A   I just said that I didn't want nothing to do with him.

9   Q   Did you break off—

10  A   Yes.

11  Q   —the relationship?

12  A   Yes.

13  Q   During the course of your association with Mr. Mishall, did he

14      mention a murder of a girlfriend of his at the—in Kalamazoo

15      back in Michigan?

16  A   Yes.

17  Q   What details did he provide you with about that murder?

18  A   That she got killed at a convenience store in the morning and

19      that they already caught the person.

20  Q   I'm sorry?

21  A   That they already caught the person.

22  Q   I'm still having difficulty.  I couldn't catch the middle

23      phrase—part of your phrase.  That who—somebody caught the

24      person?

25  A   Yes.  They already caught the person.

506

1  Q   They already caught the person.  Okay.  They meaning the

2      authorities?

3  A   Yes.

4  Q   Okay.  Did he indicate to you what connection the person that

5      was caught—what person—the connection that person had with the

6      girlfriend that was murdered?

7  A   It was someone that she used to date.

8  Q   The murderer was someone that his former girlfriend used to

9      date?

10 A   Yes.

11             MR. BROWER:   I have nothing further of this

12     witness.

13                        CROSS-EXAMINATION

14 BY MR. SVIKIS:

15 Q   You did have sexual relations with Mr. Mishall, right?

16 A   Yes, I did.

17 Q   Okay.  And that had nothing to do with a gun, did it?

18 A   No.

19 Q   And you never saw a gun, did you?

20 A   No.

21 Q   All right.  And this Road—Road Star Inn, this Road Star Inn is

22     owned by his aunt and uncle?

23 A   Yes—No, it was man—they were managers.

24 Q   Managers.  Okay.  And he lived in one of the rooms?

25 A   Yes.

1  Q  Okay.  So it was like a regular motel room?

2  A  Yes.

3  Q  All right.  And whatever relationship you two had was carried

4     on in that room, right?

5  A  Once in a while.

6  Q  Pardon?

7  A  Once in a while—

8  Q  All right.

9  A  —yes.

10               MR. SVIKIS:   I have no further questions.

11               THE COURT:   Anything else, Mr. Brower?

12               MR. BROWER:   No redirect.

13               THE COURT:   You can step down.  Thank you, ma'am.

14               THE WITNESS:   Thank you.

15               MR. BROWER:   Tina Dahl (phonetic), your Honor.

16               THE COURT:   You do solemnly swear or affirm the

17     statement you're about to make shall be the truth, the whole

18     truth, and nothing but the truth?

19               MS. DAHL (phonetic):   I do.

20               THE COURT:   You may be seated.

21                    TINA DAHL (phonetic),

22     called at 10:13 a.m., and sworn by the Court, testified:

23                    DIRECT EXAMINATION

24  BY MR. BROWER:

25  Q  Ma'am, what state are you from?

                      508

1   A   Wisconsin.

2   Q   Were you living in Wisconsin in '91 and the year subsequent?

3   A   Yes, I was, my whole life.

4   Q   Are you familiar with Patrick Mishall?

5   A   Yes, I am.

6   Q   How do you know him?

7   A   He worked at La Crosse Civic Center, and my mother worked

8       there as a supervisor and my ex-husband as well.

9   Q   Okay.  So you have relatives working at the Civic Center, but

10      Patrick did.  How does that translate into you knowing

11      Patrick?

12  A   He and my ex-husband kind of started hanging out, and he would

13      come over to our house.  I still lived at the time with my

14      ex-husband.  We would have work parties, Christmas parties,

15      gatherings afer work.

16  Q   During what period of time are we talking about your

17      association?

18  A   I want to say late '91 I probably met him, and I really

19      started probably hanging around him '92—

20  Q   Okay.

21  A   —start—you know, start of '92.

22  Q   Okay.  Early 90s?

23  A   Yeah, early 90s.

24  Q   Did you socialize—him and your husband and he?

25  A   Actually, it kind of got to be where I probably started

509

1      hanging around him more than my ex-husband.

2  Q   During the course of your contact with Patrick Miscall, did he

3      talk about a girlfriend being killed back in Michigan?

4  A   Yes, he did.

5  Q   Did he mention anything about what happened to her?

6  A   He just told me that she was shot and she'd worked at, like a

7      convenience store.

8  Q   Did he talk about how this murder was discovered?

9  A   He told me that he had went there at 10:00, 10:30 at

10     night—somewhere around there—to pick her up after work.

11 Q   Okay.  He had gone to pick her up, but then what?

12 A   And then he had found her laying on the floor dead.

13 Q   He—

14 A   Patrick did.

15 Q   —personally—

16 A   Personally.

17 Q   —found her?

18 A   Right.

19 Q   Had you ever been to Patrick Miscall's apartment in Wisconsin?

20 A   Yes, quite a few times.

21 Q   Did you see some photographs of children in his apartment?

22 A   Yeah, that's about all he had was—hanging on his wall was two

23     pictures of a boy and a girl.

24 Q   Did you ask about those children?

25 A   I did, and he told me that they were his children.

510

1   Q   With whom?

2   A   Christine.

3   Q   Meaning the girlfriend that was killed?

4   A   That was shot, right; that was killed.

5   Q   At some other time did he give you another scenario about the

6       murder—what had took place and where?

7   A   I know he at one time mentioned that the police had found her,

8       but he didn't really go into that as much.

9   Q   Did he make—offer an explanation about going to the store or

10      why he had gone to the store on the particular occasion?

11  A   Well, he told me that they had broken up—that they weren't

12      really dating when she was murdered—but he had went there to

13      talk to her about the children.

14  Q   Did he give an explanation as to why they had broken up?

15  A   Yeah, because she had left him for another woman.

16  Q   At the time of the murder they were broken up because he had

17      what?

18  A   Left her—Or she had left him for another woman.  I'm sorry.

19  Q   This relationship with another woman, as he's relating this

20      information to you, what did you observe about his demeanor?

21  A   I got the—I got the impression that he was more or less glad

22      that they were broken up and more or less glad that she was

23      gone.

24  Q   Do you—As he's talking about this other woman, did you notice

25      anything about his being just kind of noncommittal, or did you

511

1    see an agitated state, or just how would you characterize it?

2  A  He—He was like hyper, rushed.  His voice would talk faster.

3    He would—Like he was racing with his voice and just—

4  Q  Did you get—

5  A  —loud.

6  Q  —an impression as to whether or not this upset him?

7  A  Yeah, by—by the way he talked and—

8  Q  Okay.

9  A  —he was moving around and fidgeting.

10  Q  The way he was saying things and the tone of his voice, did

11    you have an impression as to whether or not he was just mildly

12    concerned or very upset or something between those continuums?

13  A  As—I'm sorry?

14  Q  Just mildly irritated or extremely angry?

15  A  I would say angry—extremely angry.

16  Q  Was that because of the mannerisms and the speech and—

17  A  Yeah.  He—I mean he didn't act like it bothered him that she

18    was gone—the impression I got.

19  Q  So when you say it didn't matter—When you said previously that

20    it didn't matter to him, you're talking about the fact that

21    she was dead?

22  A  Right.

23  Q  When you talked specifically about her being with a woman,

24    however, what was his reaction?

25  A  That he was angry about that.

512

1  Q  Did you ever see him with a gun?

2  A  One time I did.

3  Q  Approximately when was that?

4  A  I want to say early in '92.

5  Q  Where was this? Inside, outside, business, residence?

6  A  Inside his apartment. It was on his dresser.

7  Q  Dresser in a bedroom?

8  A  In a bedroom.

9  Q  Okay. How is it that you happened to see this gun in his
10     bedroom?

11  A  He had like an after bar type party; and he called me back to
12     his bedroom, and it was just laying out on the dresser.

13  Q  Did you ask him anything about the gun?

14  A  No, I didn't.

15  Q  Did he tell you what he had it for?

16  A  For protection.

17  Q  For protection. Did he offer an explanation?

18  A  Well, he always told us that he could never come back to
19     Michigan because there were people after him here.

20  Q  Could you describe this gun?

21  A  It was a handgun. I don't know what type of gun it was.

22  Q  Okay. It was a handgun, so it's not a rifle or a shotgun or
23     something?

24  A  Right.

25  Q  Could you give an example of where you've seen a gun in

1      similar size?

2 | A    A detective that I had talked to.  It basically was, in

3      length-wise, a gun like that.

4 | Q    All right.  Similar in size to a gun that a police officer

5      could carry?

6 | A    Right.

7 | Q    Was this then something small, easily concerned in a hand and

8      put in a pocket?

9 | A    I wouldn't think so, no.  It was bigger than something that

10     could fit into a coat pocket or—

11 | Q   Okay.  Did he give any indication about how long he had had

12     this gun?

13 | A   No.  I just assumed that he had it with him—

14 | Q   Well, why'd you make that assumption?

15 | A   Because when he came to Wisconsin in '91 he was staying at his

16     aunt and uncle's motel that they were managing, and he was

17     kicked out of there because the maid had found a gun in his

18     night stand.

19 | Q   Did he tell you that?

20 | A   Yes, he told me that.

21 | Q   So upon arrival in Wisconsin from Michigan he stayed at the

22     motel, right?

23 | A   Right.

24 | Q   And the maid found the gun, and he wound up getting kicked

25     out?

514

1   A   Right.

2              MR. BROWER:   I have nothing further of this

3        witness.

4                          CROSS-EXAMINATION

5   BY MR. SVIKIS:

6   Q   Is it Dahl (phonetic) or Pavella (phonetic) now?

7   A   Dahl (phonetic).

8   Q   It was Pavella (phonetic) back in '91/'92?

9   A   Yes.

10  Q   All right.  So at this same time you're also talking with

11       detectives that came up to Wisconsin to visit about a half a

12       year to a year after the murder, right?

13  A   Yes.

14  Q   All right.  And you're talking to them and you tell them about

15       the gun?

16  A   Yes.

17  Q   You tell them that you saw it at—in his dresser on

18       the—everything, right?

19  A   Yeah.

20  Q   Okay.  Did they go over and get the gun?

21  A   Did the detectives?

22  Q   Yeah.

23  A   No.

24  Q   Okay.  As far as you know, they never picked up a gun?

25  A   No.

                              515

1  Q   All right.  Also, you were willing to work with the detectives

2      to try to trap Mr. Mishall, too, right?

3  A   Right.

4  Q   Okay.  And that came about because they wired you up for—with

5      a body microphone, right?

6  A   Right.

7  Q   All right.  Did they, in fact, wire you up with a body

8      microphone?

9  A   Yes, they did.

10  Q  All right.  And nothing came of that either, did it?

11  A  No.

12  Q  All right.  So the end result of all this is that detectives

13     are in Wisconsin, you're telling about a gun that's in his

14     bedroom, they wire you with a mike, you try everything—no gun,

15     right?

16  A  Right.

17                 MR. SVIKIS:   Okay.   Thank you.

18                      REDIRECT EXAMINATION

19  BY MR. BROWER:

20  Q  Ma'am, defense counsel used the word trap.  You were engaged

21     in a conversation with him?

22  A  With?

23  Q  With Patrick Miscall.

24  A  Yes.

25  Q  You were asking questions, just engaged in normal

                              516

1    conversation; and his responses to your questions was being

2    picked up by the microphone, apparently?

3  A  Are you talking about when I was wired?

4  Q  Well, whatever Mr. Svikis is referring to here?

5  A  I never really got into his apartment.

6  Q  Okay. So when you say try anything, you did nothing more than

7    try to talk to him?

8  A  Yeah. I stood at the door, and he—Patrick got really angry

9    and was like what are you doing here. And he, basically—I

10   said I had a—I told him I came here to pick up some jelly jars

11   that I left—

12  Q  The—

13  A  —he basically threw the jars at me and threw me out of the

14   apartment, so—

15  Q  The characterization about trapping and trying everything,

16   really, is nothing more than attempt to engage him in a

17   conversation?

18  A  Yes.

19            MR. BROWER:   All right.   Thank you.

20            I have nothing further.

21                     RECROSS-EXAMINATION

22  BY MR. SVIKIS:

23  Q  But for the police you would not have gone over there and

24   asked for jelly jars, would have you?

25  A  No.

                           517

1   Q   All right.  And you didn't tell Pat you were wearing a
2       microphone, did you?
3   A   No.
4               MR. SVIKIS:   All right.
5               MR. BROWER:   Nothing further.
6               THE COURT:   You can step down.
7               MR. BROWER:   Sandra Schulz.
8               THE COURT:   You do solemnly swear or affirm the
9       testimony you're about to give shall be the truth, the whole
10      truth, and nothing but the truth?
11              MS. SCHULZ:   I do.
12              THE COURT:   You may be seated.
13                       SANDRA KAY SCHULZ,
14      called at 10:26 a.m., and sworn by the Court, testified:
15                       DIRECT EXAMINATION
16  BY MR. BROWER:
17  Q   Ma'am, would you please state your full name and spell your
18      last name for the record.
19  A   Sandra Kay Schulz—S-c-h-u-l-z.
20  Q   Ma'am, you're from Wisconsin, correct?
21  A   Correct.
22  Q   You owned a bar in Wisconsin?
23  A   Yes.
24  Q   What was the name of that bar?
25  A   The Mug Tavern.

                        518

1  Q  The Mug?

2  A  Yeah, m-u-g.

3  Q  Are you familiar with Patrick Mishall?

4  A  Yes, I am.

5  Q  How'd you know him?

6  A  Patrick worked for me for six years cleaning.

7  Q  And when did you first meet him?

8  A  I met Patrick, if I'm not mistaken, a week right after he got

9     into town—give or take a day or two—right when he arrived in

10    La Crosse.

11 Q  La Crosse.  Okay.

12 A  Right.

13 Q  All right.  That's where your bar was?

14 A  My bar is in La Crosse County on French Island.

15 Q  At some point did he—did you hire him to work at—at The Mug?

16 A  Yes, I did.

17 Q  Did you see him regularly for a period of time—years in fact?

18 A  Yes.

19 Q  When did you stop seeing him on a regular basis?

20 A  I would say it was probably six to seven years ago—in that

21    approximation time, six or seven years ago, eight years ago.

22 Q  All right.  So you had known him from his first arrival for a

23    number of years anyway, right?

24 A  Correct.

25 Q  Okay.  Over the—the course of your association or contact with

1  Patrick Mishall did he make any statements to you—provide

2  accounts of a girlfriend's death here in Michigan in

3  Kalamazoo?

4  A  Yes, he did.

5  Q  Was there more than one account that he gave?

6  A  Yes.

7  Q  How many?

8  A  Three.

9  Q  Let's—Let's talk about them. We'll start with—I'll call it

10  number one.

11  A  All right.

12  Q  Did he—Well, why don't you just tell me what he said about

13  that crime or his connection with Christine . . . (inaudible)

14  A  All right. Pee Wee had told me that—

15  Q  You used the name Pee Wee. What do you mean by that?

16  A  That was Patrick's nickname, Pee Wee.

17  Q  Okay. All right.

18  A  That's what I really used to call him all the time, so—

19  Q  Okay. All right. Go ahead then.

20  A  Pee Wee had told me—Patrick—that—The one version—I guess we're

21  calling number one.—is when he and her went to work the one

22  morning. He dropped her off. As a rule he used to always go

23  in and help her open the store, but this morning he did not.

24  And so he dropped her off at her job and went to his video

25  shop—

520

1  Q  Okay.—

2  A  . . . (inaudible)

3  Q  Let me stop you there before you continue. They both worked
4     at a similar type of establishment?

5  A  Correct. Is what I—

6  Q  What kind of establishment was that?

7  A  A video rental shop.

8  Q  All right. Go on. So he drops her off and then continues on
9     to work and then what?

10  A  To his shop.

11  Q  Okay.

12  A  All right. And when he reached his shop and went in and
13     unlocked it, he recalled that he forgot to tell her something;
14     so he called on the phone back to her shop. And when he
15     called back to the phone at her shop she did not answer, so he
16     became alarmed; and he locked up his shop and took the keys
17     and went to her shop and opened the shop. And when he went
18     in, he found her sitting in a chair bound by the legs and the
19     arms and shot, he told me.

20  Q  He personally found her; is that correct?

21  A  (No audible response)

22  Q  Was there a time after that that he gave a different account?

23  A  Yes.

24  Q  What did he say to you about the murder on the second
25     occasion?

1  A    The second time he told me that he was at his store and when

2       he was working he got a phone call. Someone called him—I

3       don't know who.—and told him that she was dead in her store.

4  Q    So on this occasion somebody called him and said she was dead.

5       The first version that—was that he had found her dead?

6  A    Correct.

7  Q    Did that appear to be inconsistent to you?

8  A    Yes, it did.

9  Q    And did you ask him about that apparent inconsistency?

10 A    Yes, I did.

11 Q    What explanation did he give?

12 A    He told me that I misunderstood him.

13 Q    That you misunderstood what he had said on the prior occasion?

14 A    He told me that I misunderstood his story the first time—his

15      story he had given me the first time and that this was the

16      story.

17 Q    Ma'am, you had been a bar owner for a number of years?

18 A    Yes, I have been in my business for over 20 years.

19 Q    And do you have regular customers?

20 A    Yes, I do.   That's what keeps my doors open.

21 Q    Now how do you make sure that you wind up getting customers to

22      return on a regular basis?

23 A    Well, I'm not shy and I'm very personable. So when I receive

24      a new customer through my door, I make sure to welcome them,

25      visit with them, get to know who their family is—if they want

                                522

1    to give me this information. But I do ask questions, you

2    know, what they do for a job, their name, you know; and I

3    really visit with them so that I can—when they come back in

4    the next time I can know them by name. I also can know what

5    they're drinking and go from there. You entertain your

6    customers is what you do to keep them.

7  Q  You remember their name and the personal things that you

8    discussed over time and so on?

9  A  Correct.

10  Q  You, apparently, are a whole lot better with names than I am,

11    then?

12  A  Yeah.

13  Q  But you were able to recall those details, then, because of

14    this ability that you have. Were you, therefore, confident

15    that you hadn't heard incorrectly or remembered incorrectly

16    regarding that first conversation?

17  A  Yes, I was.

18  Q  Was there a third explanation about what had occurred at the

19    time of the murder?

20  A  Yes.

21  Q  And just so we're clear, Patrick gave a third—another account

22    of what happened with the murder of his girlfriend; is that

23    right?

24  A  Correct.

25  Q  Are you okay, ma'am?

523

1  A  Yeah, my back hurts a little.  That's why I move in the chair.

2  Q  What did he tell you on this third occasion?

3  A  On the third occasion he had told me at the time of her

4  death—Christine—that there was stores being robbed up here in

5  the area but the police up here were doing absolutely nothing

6  about it.  So on the third story that I received about this

7  was that supposedly the store was being robbed that morning;

8  and when Christine went in to open the store, the robbers were

9  waiting in there—the people were waiting in the store—that

10  when she went in and then they killed her.

11  Q  He's offering an explanation that the people were waiting

12  inside the store?

13  A  Inside the store.

14  Q  Stating it as fact?

15  A  Right.

16  Q  Did he give a different explanation about the kind of business

17  that this involved on this third occasion as compared with the

18  other two?

19  A  Yes, he did.

20  Q  And what was the difference there?

21  A  Well, when he moved to town he told me that.  And after we got

22  visiting and talking, he told me that he managed a video

23  rental like VHSes that you rent and that she did.  When this

24  story come out, it was that it was a stereo equipment store

25  that they managed and video equipment.

(Tape No. C2005-023, 2-09-05, 10:35)

1  Q  Different—Different type of business—

2  A  Much—

3  Q  —completely?

4  A  —different.

5  Q  Okay.  Did you confront him about that inconsistency with his

6     statements?

7  A  Yes, I did.

8  Q  And, again, what was his response?

9  A  I misunderstood his stories he had told me.

10  Q  You under—misunderstood once again?

11  A  I misunderstood what he had explained to me that he done for a

12     job.

13            MR. BROWER:  I have nothing further of this

14     witness.

15            THE COURT:  Mr. Svikis?

16            MR. SVIKIS:  Thank you.

17                   CROSS-EXAMINATION

18  BY MR. SVIKIS:

19  Q  Ms. Schulz, Mr. Mishall worked with you for a number of

20     years—five or six years?

21  A  Correct.

22  Q  All right.  And he had this nickname of—of Pee Wee?

23  A  Correct.

24  Q  Okay.  And that's—You got to know him over this period of time

25     and he just acted like kind of a doofus, right?

1    A    Like Pee Wee Herman and play air drums.

2    Q    Okay.  And all these stories—It's not unusual to hear

3        different stories in a bar, is it?

4    A    (No audible response)

5    Q    It's not unusual to hear different stories in a bar, is it?

6    A    No, it's not; but I don't think about human life, that's a

7        difference in telling a joke.

8    Q    All right.  But you weren't concerned that he actually

9        murdered anyone in Michigan, were you?

10    A    I did not know.

11    Q    Okay.  And he's not a real clever guy, is he?

12    A    I think Pee Wee is shrewd.

13    Q    Do you?  Okay.  What kind of work did he do for you?

14    A    Maintenance, cleaning.

15                MR. SVIKIS:   Thank you.

16                I have no further questions.

17                MR. BROWER:   No redirect, your Honor.

18                THE COURT:   Why don't we take a midmorning recess

19        at this time.

20                (At 10:38 a.m., court recessed)

21                (At 10:54 a.m., proceedings reconvened)

22                THE COURT:   Call your next witness.

23                MR. BROWER:   People call Dawn Haller to the stand.

24                THE COURT:   You do solemnly swear or affirm the

25        testimony you're about to give shall be the truth, the whole

1     truth, and nothing but the truth?

2                    MS. HALLER:   . . . (inaudible)

3                    THE COURT:   You may be seated.

4                          DAWN HALLER,

5     called at 10:55 a.m., and sworn by the Court, testified:

6                       DIRECT EXAMINATION

7  BY MR. BROWER:

8  Q   Ma'am, would you please state your name and spell your last

9      name for the record.

10 A   Dawn Haller—H-a-l-l-e-r.

11 Q   Ms. Haller, you're from Wisconsin; is that correct?

12 A   Originally, yes.

13 Q   Back in 1991 were you living in Wisconsin?

14 A   Yes, I was.

15 Q   Are you familiar with a person by the name of Patrick Mishall?

16 A   Yes, I am.

17 Q   Tell us how you met him and where.

18 A   I had moved—Well, actually, I was living on the east side of

19     Wisconsin at the time.  I went to La Crosse to look for a job.

20     And while I was there, I had stayed at a hotel that his aunt

21     and uncle had owned; and he was working there.

22 Q   Was it your understanding that he had also just recently moved

23     but from Michigan to Wisconsin?

24 A   Right.  He—Right.  Exactly.  He was there working and just had

25     recently moved.

                           527

1  Q  And this was soon after his move to Wisconsin, though?

2  A  Right.

3  Q  Okay.  After you met him, did the two of you begin to date?

4  A  Yes.  It was about two weeks or so after I—When I first met

5     him, we would go and do things as friends; and then it turned

6     into dating probably about two to three weeks later.

7  Q  Okay.  How long did that relationship or that type of

8     relationship last?

9  A  The dating?

10 Q  Yes.

11 A  We—About a year and a half.

12 Q  At some point during that period did the two of you actually

13    move in together?

14 A  Uhm-hmm.  We—I had an apartment; and after he moved out of the

15    hotel and when he decided to be back in La Crosse—after he

16    came like back here and back again—he decided—He wanted to

17    have a place to live until he found another place, so he moved

18    in with me.

19 Q  Okay.

20 A  So about—

21 Q  You just—

22 A  —a month later.

23 Q  You just mentioned the phrase back here and then back to

24    La Crosse.  By—When you say back here, where did you mean?

25 A  Kalamazoo.

1  Q   Oh.  Did you come back to Kalamazoo with him?

2  A   I didn't come back with him to Kalamazoo; I came to visit him

3      one weekend—

4  Q   All right.

5  A   —when he had returned back to Kalamazoo

6  Q   Okay.  He was back in Kalamazoo for what purpose, remember?

7  A   I think he just wanted—I'm not really sure.  I think it was to

8      do with getting stuff out of his house, getting stuff situated

9      there so he could officially move everything and be totally

10     over in La Crosse because he wasn't totally moved to La Crosse

11     when I first met him.  He was basically staying at his aunt

12     and uncle's hotel—

13 Q   So his—

14 A   —and working.

15 Q   —return to Michigan was for a very specific purpose?  He

16     didn't move back here?

17 A   Correct.  Well, he never actually moved out until he moved

18     everything out from his house.  Does that make sense?

19 Q   All right.  During your association with him did he speak

20     about the murder of a girlfriend in Kalamazoo?

21 A   Yes, he did.

22 Q   What did he tell you about that crime?

23 A   He told me that one day—that they both worked at a same

24     convenience store type place—not at the exact same

25     one—basically, two different locations but for the same

                           529

1  company—and that he had gone to see her one day. He left his
2  job, went to go see her at her job, and when he got there she
3  was dead.

4  Q  That he is the one that found her?

5  A  Correct.

6  Q  Did you ever seeing [*sic*] him with a gun?

7  A  Yes, I did.

8  Q  Where was that?

9  A  In our bedroom.

10 Q  What period of time would this observation have occurred?

11 A  Relatively early on in the relationship, so probably May of
12    '91.  I mean it was soon after we were moved in together.

13 Q  He had moved from Michigan to Wisconsin, was living at the
14    motel for a period of time, and then after that the two of you
15    were together someplace; is that right?

16 A  Basically—

17 Q  Okay.

18 A  —yeah.

19 Q  So this observation in the bedroom, was that at the motel; or
20    was that at someplace else where you were at?

21 A  Oh, no, it was at my apartment when he moved in with me.

22 Q  All right.

23 A  Right.

24 Q  Can you describe this gun?

25 A  I don't know much about guns, but it was—It was a handgun.

1   Q   Now you're gesturing with your hands holding them apart

2       approximately—What?—eight inches or so?

3   A   Yeah.

4   Q   Have you—Well, you don't know much about guns at all—

5   A   I'd say—

6   Q   —is that right?

7   A   —it's like a regular handgun, but I don't know if there's—

8   Q   It wasn't a small gun that could be easily concealed in a hand

9       or in a pocket?

10  A   No, it wasn't like anything little.  It wasn't

11      . . . (inaudible)

12  Q   Have you seen other guns that are of a similar size or at

13      least approximately?

14  A   Yeah, I guess like law enforcement would carry or—

15  Q   Okay.

16  A   I—I—Sorry.  I don't know much.

17  Q   But approximately that size?

18  A   Yeah, just—

19  Q   Okay.  Did you ask him why he had the gun?

20  A   Uhm-hmm.

21  Q   Was that a yes?

22  A   Oh.  Yes.

23  Q   Okay.  Did he give you an answer?

24  A   Yes.  He told me that in Kalamazoo he needed it for protection

25      because they didn't live in a real good neighborhood and he

531

1     needed it for protection, so it was like out of habit that he

2     would still have it. Because I said you don't need it in

3     La Crosse. You really don't even need to lock your doors in

4     most places in La Crosse, you know. I thought it was really

5     strange. But when he told me that I just, okay. You know, I

6     mean I thought it was weird. I did ask him to get rid of it.

7   Q   Was he indicating that he already had the gun when he was

8     still living here in Kalamazoo?

9   A   It was something that was brought over with him.

10                MR. BROWER:  Thank you.

11                I have nothing further of this witness.

12                THE COURT:  Okay.

13                       CROSS-EXAMINATION

14  BY MR. SVIKIS:

15  Q   You were interviewed by the cold case team in 2003,

16    right—thereabouts?

17  A   Yes.

18  Q   All right. And when you lived with Patrick Mishall that was

19    back in—What?—'91/'92, that time frame?

20  A   '91 through about '93.

21  Q   Okay. And the first time that you mentioned to any police

22    officers that Patrick had a gun was when you were interviewed

23    by the cold case team in 2003; isn't that correct?

24  A   Could you repeat that?

25  Q   Sure. The first time that you tell anyone about the gun is

1   when you're interviewed by the cold case team in 2003; isn't

2   that correct?

3 A I don't remember.

4 Q Well, you were also interviewed in 1993, also?

5 A Yeah.

6 Q Okay.

7 A Yes.

8 Q Do you remember making this statement?  And you were Anderson

9   then?

10 A Uhm-hmm.

11 Q Is that yes?

12 A Yes.

13 Q Okay.  And now you're Haller or—You're Haller; is that

14   correct?

15 A (No audible response)

16 Q Okay.  And this—Do you remember telling this to the

17   detectives?  I never saw him with a handgun nor does she

18   remember Patrick Mishall saying anything about guns.  Remember

19   that statement back in 1993?  You don't recall?

20 A I don't recall it, no.

21 Q Did you make that statement in 1993?

22 A I don't remember.

23 Q Okay.

24 A I may have.  I don't know.

25 Q And that—

1  A    I don't remember too much of that meeting.

2  Q    Okay.  You didn't take any notes, did you?

3  A    No.

4  Q    Detectives took notes, didn't they?

5  A    I would assume so, sure.

6  Q    Right.  And they would write down what you say, wouldn't they?

7  A    Yeah.  Probably, yeah.

8  Q    Murder pretty serious business, right?

9  A    Right.

10  Q    Looking for a gun, right?

11  A    If that's what they were looking for, correct.

12  Q    You think they might have been looking for a gun?

13              MR. BROWER:   Calls for speculation, your Honor.

14              THE WITNESS:   I don't know.

15  BY MR. SVIKIS:

16  Q    Okay.  Well, you knew enough about it to tell them in 2003

17       that you remember seeing Patrick with a gun, right?

18  A    I don't remember if that's what I talked to them about.  Like

19       I said, it was a long time ago; and it was not something—

20  Q    Okay.

21  A    —I really remember us discussing.

22  Q    So now we're in—So now we're in 2005 and you're testifying

23       that you saw Patrick Mishall with a gun back in '92 and '93,

24       right?  That's your testimony today?

25  A    In '91 I saw it, correct.

1  Q    Okay.  But you didn't tell anyone that in '91 or '92 or '93,

2       right?

3  A    Like who?

4  Q    Like the detectives that interviewed you at that time?

5  A    I don't remember.

6                 MR. SVIKIS:   Okay.

7                 I have no further questions.

8                 THE COURT:   Any other questions?

9                      REDIRECT EXAMINATION

10  BY MR. BROWER:

11  Q    Ma'am, when you were—the detectives showed up in—La Crosse?—in

12       '93; is that where you were?

13  A    '93 it was La Crosse, correct.

14  Q    Did you have any indication or forewarning that they were

15       going to come to talk with you or what they were going to come

16       to talk to you about?

17  A    No, actually I got a call while I was at my job—

18  Q    A cold call?

19  A    —and just said—

20  Q    All right.

21  A    —you need to come in and we need to talk to you.  And I said

22       you're kidding, right, you know.  And, yeah, you need to come

23       in; we need to discuss stuff with you.

24  Q    So no advance warning, no attempt to prepare yourself or

25       change your—your mind or your thinking or think back to

                             535

1    ancient history—none of that—

2  A  Right.

3  Q  —at the time of the interview?  Okay.

4             In 2003 the officers indicated that they would like

5    to talk with you and told you the nature of the conversation—

6  A  Uhm-hmm—Yes.

7  Q  —and then later came and talked with you; is that right?

8  A  Yes.

9  Q  And you had a chance to reflect—think back about your

10   relationship with him for a period of time before they

11   actually began asking you questions?

12 A  Yes.

13 Q  And was it during that reflection—now that you could think

14   about it and had time to think about it—that you recalled that

15   particular incident that you just testified to about seeing

16   the gun?

17 A  That's probably what happened.  You know, it was a different

18   time, you know, where I—Yeah, it was like—like you said, had

19   to just go back and start actually thinking about it.  The

20   other one I was caught off-guard and they told me so many

21   things, and I just sat there in awe of things that they had

22   told me, and I—you know.

23 Q  The act—The actual seeing of a gun by itself—simply somebody

24   having a gun in a—in a bedroom—that isn't necessarily a

25   traumatic event; is that correct?

536

```
 1  A   Right.

 2  Q   All right.

 3  A   A lot of people have them in their homes.

 4  Q   Okay.  Is that a possible explanation as far as why you might

 5      not have remembered it on one occasion when being confronted

 6      cold about it—

 7  A   Right.

 8  Q   —years later?

 9  A   And especially because I had seen where he lived—

10  Q   All right.

11  A   —and so I knew it was not—you know, it was probably pretty

12      legit.

13  Q   Did the cold case detectives in 2003 tell you it would be

14      really important for us if you could—would say that you saw

15      him with a gun at this location?

16  A   No.

17  Q   Did they—

18  A   They didn't—

19  Q   —suggest—

20  A   —even tell me—

21  Q   —in any way—

22  A   —anything.

23  Q   —that you were to answer or that it would be helpful if you

24      said this—mentioned him—seeing him with a gun and describe the

25      gun, that kind of thing?
```

1  A    No.

2  Q    Your testimony today, is that based on your memory regarding

3       that observation in the bedroom?

4  A    Correct.

5                 MR. BROWER:    Thank you.

6                 I have nothing further.

7                      RECROSS-EXAMINATION

8  BY MR. SVIKIS:

9  Q    You're not testifying today that you had no idea what the

10      detectives were inquiring about, are you?  Did you know what

11      they were going to be talking about?

12 A    They did bring me in and tell me that they were checking into

13      this and asking questions for a possible murder—Well, not

14      possible murder; the murder happened.—for a possible suspect.

15 Q    All right.  So this—

16 A    They didn't tell me anything about it, though.

17 Q    Okay.  Well, do you recall making this statement to them?

18      Patrick Mishall was not capable of committing the crime of

19      murder, that she felt he was not involved with his—

20                MR. BROWER:    Objection—

21                MR. SVIKIS:    —girlfriend's death?

22                MR. BROWER:    —your Honor, to what this witness may

23      or may have felt about anybody's involvement.  That's a issue

24      for the trier of fact.

25                MR. SVIKIS:    Your—

                          538

1         THE COURT:    It may be; but, you know, you've gone

2    into it about what she told them and when.    Overruled.

3  BY MR. SVIKIS:

4  Q    Let me ask the question.    We're back in 1993.    And let me set

5       the scene for you and see if this helps you remember.    This is

6       the same time that I asked you about the questions whether or

7       not Patrick had been with a gun and you said no.    Do you

8       recall making this statement to them in that same

9       conversation?    That you went on to state that based on your

10      knowledge that you felt that Patrick Mishall was not capable

11      of committing the crime of murder and that you felt he was not

12      involved with the girlfriend's death.    Do you remember making

13      that statement back then?

14 A    (No audible response)

15         MR. SVIKIS:    Okay.    Thank you.

16         MR. BROWER:    No redirect.

17         THE COURT:    You may step down.

18         MR. BROWER:    Your Honor, the People call

19      Ontario Lowery to the stand.

20         THE COURT:    You do solemnly swear or affirm the

21      testimony you're about to give shall be the truth, the whole

22      truth, and nothing but the truth?

23         MR. LOWERY:    Yes.

24         THE COURT:    You may be seated.

25

539

1                          ONTARIO LOWERY,

2        called at 11:11 a.m., and sworn by the Court, testified:

3                          DIRECT EXAMINATION

4    BY MR. BROWER:

5    Q    Mr. Lowery, would you please state your name and spell your

6         last name for the record.

7    A    Ontario Lowery—L-o-w-e-r-y.

8    Q    Mr. Lowery, the sound really gets lost real easy in this

9         big—big room; so I'd ask you to speak up a little bit if you

10        can to make sure that the jurors can hear you over here.

11        Okay?

12   A    Ontario Lowery—L-o-w-e-r-y.

13   Q    Thank you.

14             Sir, you're presently an inmate with the Wisconsin

15        Department of Corrections; is that correct?

16   A    Correct.

17   Q    Were you in the La Crosse County Jail on May 21 of 2003?

18   A    I believe so, yes.

19   Q    Were you in the holding facility there at the same time of a

20        man that was arrested for a murder in Michigan named

21        Patrick Mishall?

22   A    Yes.

23   Q    Now had you known that individual before seeing him in

24        the—that holding cell?

25   A    Nope.

                              540

1  Q  While you were in this cell, did you have a conversation with

2     that person—Mr. Miscall?

3  A  Yep—Yes.

4  Q  Did he explain to you why it was that he was there?

5  A  Yes.

6  Q  What did he tell you?

7  A  He was saying that they can't arrest him 'cause they said he

8     killed his girlfriend.

9  Q  All right.  If you would speak up just a little bit more.

10    Maybe if you lean towards the mike it'll pick it up a little

11    better.

12 A  He said they can't arrest him 'cause they said he

13    killed—'cause they said he killed his girlfriend.

14 Q  Did he express any questions about how they were able to do

15    this?

16 A  What you mean?

17 Q  Did he express any doubt about why they were able to do it at

18    this time as opposed to any time in the past?

19 A  By him saying that they couldn't prove what he done?

20 Q  Couldn't prove he'd done it when, now or back then?

21 A  He said they couldn't even prove what I done back then.

22 Q  They can't prove what I done back then?

23 A  Yeah.

24 Q  What was your understanding as to when the murder occurred?

25 A  Some years ago.

541

1  Q  Okay. Did he say whether they would be able to prove it now?

2  A  I just said he said they couldn't prove it back then.

3  Q  Okay. Did he say couldn't prove the murder back then or

4     couldn't prove what he did back then, or what exactly did he

5     say; do you remember?

6  A  He just said they couldn't prove what I done back then.

7  Q  What I done back then. When you heard him say that, what were

8     you thinking about that statement?

9  A  Stupid for saying it. I mean if you done something, man, why

10    are you going to say something about it. That's my opinion on

11    what he—what you saying it for.

12  Q  Were you in the facility with him much longer after that?

13  A  Nope.

14  Q  Did detectives from Kalamazoo talk to you about a conversation

15    that you might have had with him afterwards?

16  A  Yes.

17  Q  All right. And you told them what you've just told us now?

18  A  Yes.

19  Q  Mr. Lowery, you do not want to be here today, do you?

20  A  Hell, no.

21  Q  Do you have a problem with giving testimony about somebody

22    else—snitching on them?

23  A  Hell, yeah, 'cause that's against my codes. I'm forced here

24    right now.

25  Q  You're here and testifying against your will; is that right?

1  A   It's against—Yeah, I don't want to be here.  I want to be back

2        in prison where I—where you all came and got me from.

3  Q   Is there—You mentioned against your code.  Is that a code

4        common within the prison system?

5  A   It's the code I live by.  I'm in prison for people telling on

6        me.

7  Q   Why is it that you are, in fact, testifying then?

8  A   Because I'm forced to be testifying right now.

9  Q   You're brought into the courtroom and you took an oath so,

10       you're going to say what you heard; is that right?

11  A   Yeah, I don't want to be held in contempt or perjury.

12  Q   Was there any promises of leniency or a promise that you'd get

13       out of prison or any other accommodation or benefit that you

14       had with the prosecutor's office?

15  A   No, not from you all.

16  Q   Cold case detectives indicated—

17  A   (No audible response)

18  Q   You're shaking your head no.

19  A   Yeah, you all didn't—You all didn't promise me nothing.

20  Q   You all meaning the prosecutor's office and the cold case team

21       detectives; nobody promised you nothing?

22  A   (No audible response)

23  Q   All right.  So there's no benefit, no promise, nothing to

24       entice you to give testimony.  The only reason you're

25       testifying is because you're subpoenaed and brought in here,

1      even against your will?

2 A    Yeah.

3            MR. BROWER:   I have nothing further of this

4      witness.

5            THE COURT:   Mr. Svikis?

6            MR. SVIKIS:   Thank you.

7                   CROSS-EXAMINATION

8 BY MR. SVIKIS:

9 Q    Mr. Lowery, let's go back to probably 2003; is that when you

10      first came in contact with the person you're testifying about?

11 A    . . . (inaudible)

12 Q    Okay. And you had been arrested?

13 A    Yes.

14 Q    And what were the charges?

15 A    Stabbing—stabbed somebody. That's what they arrested me for.

16 Q    All right. And then you had a case that was pending appeal on

17      a drug case?

18 A    No, I had a drug case conviction in 2001. They overturned my

19      case. And when they overturned my case, they gave me four

20      years probation instead of going to trial again. So by doing

21      that I was on probation for ten months. A bogus stabbing

22      charge came about to where they locked me up since I was on

23      probation. The detective said, well, I could just put you

24      back on probation. Tell me about what you heard in the

25      holding thing or whatever. So that's where—That's when I say

1       here didn't promise me anything; it was Wisconsin.

2  Q   And what did Wisconsin promise you?

3  A   That I'd be put back on probation.

4  Q   Okay.  And—But you're in prison now in Wisconsin?

5  A   Yeah.

6  Q   Okay.

7  A   They bogus all the way around.  I beat all of them charges,

8       and they still locked me up just 'cause I was on probation—

9  Q   When's your—

10  A   — . . . (inaudible)

11  Q   —first out date?  When's your first out date?

12  A   My out date now?

13  Q   Yeah.

14  A   It's seven months from now.

15  Q   Okay.  And when's the max?

16  A   We don't—We don't have no thing like that.  It's truth in

17       sentence.  Whatever they give you, that's what you do.

18  Q   Straight seven months?

19  A   No, I had—It's a total of 31 months.

20  Q   Okay.  But your first out date is?

21  A   Seven months from now.

22  Q   Seven months from now.  Okay.

23  A   They give you ankle monitors.

24  Q   Pardon?

25  A   They give you ankle monitors so you get out a couple months

1    earlier.

2  Q  And so whether you get out in that first out date or not

3     depends how you do in the system, right?

4  A  No, 'cause I'm under truth in sentence. I can do—I mean—

5              THE COURT:   They have a different system.

6  BY MR. SVIKIS:

7  Q  I—

8  A  I mean their system crazy. If the judge give you 31 months,

9     you do 31 months; and you don't have to do no programs or

10    nothing like that. You just do your time.

11 Q  Okay. When—When you testified that you have to testify,

12    that's not really true, is it? You don't have to testify

13    today, do you?

14 A  Pretty much, I do.

15 Q  Pretty much?

16 A  They served a writ to come and get me from prison.

17 Q  All right. But in 2003 they also came and got you, too,

18    didn't they? They brought you right to this building and they

19    brought you downstairs, didn't they?

20 A  That was last year.

21 Q  That was last year. Well—All right. And that was for this

22    same trial, right?

23 A  (No audible response)

24 Q  And you were going to say the same things, right?

25 A  Yes.

546

1    Q    Okay. But you didn't say those same things because you wanted

2         the deal in writing, didn't you?

3    A    No, it wasn't about that. It was about they decided not to

4         use me as a—as a witness anyway.

5    Q    You never came upstairs from holding to testify in 2003, did

6         you?

7    A    Say it again?

8    Q    In 2003 you're in either the prison system or in custody of

9         the county jail, right?

10   A    Yeah, I been locked up since then.

11   Q    Okay.

12   A    Two years already.

13   Q    And they do some special paperwork to get you out of

14        Wisconsin, to drive—Did they drive or fly over here?

15   A    Drove.

16   Q    Drove you over here, right? And drove you over to this

17        building, right?

18   A    (No audible response)

19   Q    This same building, right?

20   A    (No audible response)

21   Q    Is that yes?

22   A    Yes.

23   Q    And they took you downstairs, right?

24   A    (No audible response)

25   Q    And you knew the trial was going on upstairs, right?

547

1  A   (No audible response)

2  Q   And you did not come up to testify because you wanted the deal

3       in writing, right?

4  A   Yes.

5  Q   Okay.  So today you're testifying because—What's the deal you

6       got?

7  A   I don't have no deal.

8  Q   Okay.

9  A   But it's the fact that I don't want to get contempt of court.

10  Q   But you weren't worried about contempt in court last year,

11       right?

12  A   It was a little different then.

13  Q   Do you have to go before some kind of a hearing board before

14       they let you out?

15  A   Nope, they just let me out.

16  Q   Just let you out.  And then you're on parole or probation or—

17  A   Parole.

18  Q   Parole?  All right.

19              And you're going to make sure that the—your parole

20       agent knows that you came over here and cooperated with the

21       Kalamazoo County prosecutor, right?

22  A   Why am I tell them that?

23  Q   Yeah, you—

24  A   Why would I tell him that?  Why?

25  Q   I'm asking.  Are you going to tell him that?

1    A    What?

2    Q    My question is are you going to tell him that you came over

3         here and cooperated with the Kalamazoo County prosecutor?

4    A    I mean you all put shit in my file anyway.  Excuse me.  You

5         all put things in my file anyway.

6    Q    Let me ask the—

7    A    Law enforce—Law enforcement people put things in my file as it

8         is anyway.  So I mean I don't have to say nothing.  They know

9         about me already looking on paper.  So I don't have to say I

10        cooperated with nothing.

11   Q    Okay.  So let me ask the question again: are you going to tell

12        your probation officer that you came over to Kalamazoo County,

13        Michigan, to help the prosecutor?

14   A    No.

15   Q    How are they going to find out that you were over here?

16   A    I told you, man, they write stuff in my file anyway.  See,

17        last year I would have wanted to be able to get a deal to get

18        out over there 'cause I have a son out there that I haven't

19        been out there with, you know; but it's like I got seven

20        months left, so I don't care about it now.

21   Q    So being here won't help you a bit?

22   A    No, not at all.

23                   MR. SVIKIS:    I have no further questions.

24                   THE COURT:    Anything else, Mr. Brower?

25

                              549

(Tape No. C2005-023, 2-09-05, 11:26)

REDIRECT EXAMINATION

1

2 BY MR. BROWER:

3 Q  Mr. Lowery, back last year when you were in this building, you

4    demanded that you wanted something from the Wisconsin

5    authorities—

6 A  Yeah.

7 Q  —a promise from them; is that correct?  There was no deal with

8    Kalamazoo at all, was there?

9 A  Unh-unh.

10 Q  And there was no deal with the Wisconsin DA; is that right?

11 A  Yes.

12 Q  You were soliciting or you were inquiring or you were

13    demanding that a deal take place, but there wasn't even any

14    discussion or agreement at all at the point where you made

15    that statement I want something from the Wisconsin DA?

16 A  Yeah, I wanted them to let me go 'cause I mean I felt it was

17    bogus for being in prison for no charges, just because they—I

18    beat their charges, and they wanted to put me in jail anyway.

19    So that's why I was saying it.  They could have just let me

20    go, but I had to do my whole 31 months now.  So I—I mean I

21    really don't—don't care.

22              MR. BROWER:  Thank you.

23              I have nothing further.

24              MR. SVIKIS:  I have no further questions.

25              THE COURT:  You can step down, sir.  Thank you.

1     MR. BROWER:   Officer Greg Hatter, your Honor.

2          THE COURT:   You do solemnly swear or affirm the

3     testimony you're about to give shall be the truth, the whole

4     truth, and nothing but the truth?

5          MR. HATTER:   I do.

6                     GREGORY ALAN HATTER,

7     called at 11:27 a.m., and sworn by the Court, testified:

8                     DIRECT EXAMINATION

9  BY MR. BROWER:

10 Q   Sir, would you please state your full name and spell your last

11     name for the record.

12 A   It's Gregory Alan Hatter—H-a-t-t-e-r.

13 Q   It's Detective Hatter; is that correct?

14 A   That is correct.

15 Q   You're a detective with the Kalamazoo Department of Public

16     Safety?

17 A   Yes.

18 Q   How long have you been employed with that agency?

19 A   I'm in my 28th year.

20 Q   How long have you been in the detective unit?

21 A   Fourteen—Well, actually 15 years now.

22 Q   In February of 1991 what capacity were you working?

23 A   I was a detective at that time.

24 Q   A fairly new detective at that time?

25 A   Yes, just one—one year in the detective bureau.

                           551

1 Q On that date were you called to inves—to assist in the
2   investigation of the homicide at the Minute Market store on
3   Stadium Drive?
4 A Yes, I was.
5 Q During the course of that initial investigation, did
6   Patrick Mishall's name come up?
7 A Yes, I did.
8 Q Were you aware that he was alleged to be the boyfriend of the
9   victim Christine Dimmick?
10 A That is correct.
11 Q Were you given an assignment to locate and interview him?
12 A Yes, I was. That was given to me by Detective Grace.
13 Q Do you remember approximately what time it was that you
14   were—you arrived at the Minute Market store?
15 A I believe it was around five minutes till 9:00 a.m., so
16   8:55 a.m.
17 Q Did you learn where Patrick Mishall lived?
18 A Yes.
19 Q Did you go there then?
20 A Yes, I did.
21 Q What was the address there?
22 A 2415 Springmont.
23 Q In the city of Kalamazoo?
24 A Yes. It's in the Oakwood neighborhood in Kalamazoo, Michigan.
25 Q Did you go alone, or were you with another officer?

1 A   Myself and Detective Greg Bombich accompanied me to that

2     address.

3 Q   About what time of the day was that then?

4 A   We arrived there at 9:44 is what my report reflected.

5 Q   About 45 minutes after initially arriving on the scene?

6 A   Yes.

7 Q   When you pulled up to the residence did you observe a vehicle?

8 A   Yes.  We were also instructed to look for a black Ford, which

9     was the vehicle owned by Mr. Mishall, utilized to drive back

10    and forth to work with Chris Dimmick, the victim.

11 Q  Was that the vehicle that was there?

12 A  Yes, I was.

13 Q  Was that a black—'85 black Ford LTD?  Does that—

14 A  Yes.

15 Q  —ring a bell?

16            Okay.  Did it have some damage to the vehicle that

17    you observed?

18 A  If I remember right, it had some collision damage on the

19    vehicle.  I don't remember the exact location.

20 Q  When you knocked on the door what response, if any, did you

21    get?

22 A  It was about three minutes, I believe, before Mr. Mishall

23    answered the door after we initially arrived and started

24    knocking.

25 Q  Did you inform him that Christine Dimmick had died?

553

1  A    Yes. We explained that we were there investigating her death,

2         and we asked if he would allow us to come in and—and speak

3         with him with hopes of obtaining some background information

4         about her and their activities that morning.

5  Q    What did you explain to him regarding the circumstances of her

6         death?

7  A    Only that she had been killed and at the store, and we gave no

8         specifics as far as manner of death or anything at that point

9         in time at all.

10  Q    During this initial—Excuse me. During this initial contact

11        what was your intent in contacting this known associate then

12        of Christine Dimmick?

13  A    It was to interview him and to find out what his activities

14        were leading up to the discovery of Ms. Dimmick, believing at

15        that point in time that he was the last person with her up

16        until the time she was discovered.

17  Q    Did you also obtain or attempt to obtain background

18        information regarding their relationship or activities during

19        the preceding hours or days—

20  A    Yes—

21  Q    —prior to this incident?

22  A    —he explained their relationship, how long they had been

23        together. I believe he even indicated that they were

24        intending on getting married later that year. We asked what

25        activities he did that morning and the night before leading up

1    to the time that we initiated the investigation as far as

2    times, where he was, what time he got up, what time they

3    arrived at the store, and so forth.

4  Q  And did this—You obtained some of that information while still

5    at the residence?

6  A  That is correct.

7  Q  What did he tell you about his activities the prior evening

8    and early morning hours?

9  A  Well, he advised that he worked the night before.  He worked—I

10   believe it was at the South Westnedge Minute Market at that

11   time.—got off work around 2:00 o'clock a.m., which would be on

12   the date of the incident—the 8th—left the store at 2:15,

13   came—came home—directly home.  He indicated that Christine was

14   in bed at that time and that he watched a movie.  The movie

15   was entitled *Flashback,* I believe, and—or *Flashdance.*  I don't

16   recall exactly the title on that.

17        And then he went to bed at a quarter till 4:00 a.m.,

18   got back up at 5:30.  Chris Dimmick was in the shower,

19   according to Mr. Mishall.  When they got ready, they—he drove

20   her to work that morning.  And he indicated that they

21   punched—they entered the business and the alarm code was

22   punched at 6:05.  And he went in the store with Chris, helped

23   her open up, got newspapers ready, counted out the newspapers

24   from the previous day.  He said he was in the store with Chris

25   for approximately 20 minutes, and—

1  Q  Which would—

2  A  —he left—

3  Q  —mean that he left at 6:25?

4  A  That is correct. That's what—That's the time that he

5     indicated on the first interview.

6  Q  And from there where did he go?

7  A  He said he went directly home. And he said he checked the

8     store at that time before leaving, didn't find anything out of

9     place and didn't notice anybody around the outside of the

10    store or other vehicles at the time that he left.

11 Q  He entered the store and then immediately checked the interior

12    to see if anybody was inside? Is that what you said?

13 A  I don't recall that he said he immediately checked it—

14 Q  Okay.

15 A  —he just indicated during our conversation that he had

16    checked—

17 Q  Okay.

18 A  —the store.

19 Q  While he was there.

20 A  While he was there.

21 Q  Okay. Did he ask about your investigation, in particular

22    whether this was one of your initial or first steps in the

23    investigation?

24 A  Yeah, I remember he asked us if coming to his home was the

25    first step of the investigation that we were conducting and

556

1    why.  I don't recall what response we gave him to—to that
2    question.
3  Q  Did you ask him whether or not he owned guns?
4  A  Yes, I did.  I remember we specifically asked if he owned any
5    guns.  He said he did not and that he was a musician and that
6    he played the drums.
7  Q  You asked about guns and he tells you about drums?
8  A  That is correct.  That was his response to that question.
9  Q  Did he make any statements about the safe?
10 A  He said that he had to help Christine with the opening of the
11   safe because her memory wasn't very good.  I remember that
12   being said.  And he also at the time we were at the house gave
13   us consent to search his home there and his vehicle.
14 Q  Did you ask him if he would be willing to go to headquarters
15   for a further interview?
16 A  Yes, and he readily agreed to do that.  In fact, he rode in
17   the front seat of our vehicle at that time when we left the
18   house to go back to headquarters.  And we waited until the
19   wrecker came to impound the vehicle, which was standard
20   procedure if we were going to search a vehicle in a situation
21   like this with this type of investigation.  We would have the
22   vehicle brought down to our station for our lab personnel to
23   thoroughly check the vehicle out.
24 Q  Was there another interview then that you had with him at the
25   headquarters building?

557

1  A    Yes, there was.  Detective Grace was still at the scene at

2         that time with anticipation of him also speaking with

3         Mr. Mishall.  Bombich and I spoke with Mr. Mishall again at

4         the station, went back over his sequence of events that

5         morning—

6  Q    Is there—

7  A    —. . . (inaudible)—

8  Q    —a reason why you would again ask him about the same types of

9         things that were asked previously?

10  A    Just to make sure that we had it correct and if there was any

11        additional detail that he had to offer after having time to

12        think.

13  Q    Were you also looking for discrepancies in statements?

14  A    Yes.

15  Q    This interview at headquarters, what time did you say it

16        started in or resumed?

17  A    That was at 11:10 the second interview started.

18  Q    Was he under arrest or confined in any way?

19  A    No, he wasn't.  In fact, I remember offering and giving

20        several cups of coffee to him while he was there.  He also

21        wanted to talk to his boss.  We allowed him to call.

22        Wayne Tiller was the person that he chose to call there from

23        the station, so we provided a phone to him at one of the desks

24        in the criminal investigations division.

25  Q    During the second interview did he make, then, additional

1       statements or make different statements about his activities

2       that day—that morning?

3   A   The times changed somewhat. He indicated that he punched out

4       of work at 2:14 and that he went to bed at 4:05 and that the

5       alarm at their home went off at 5:00 o'clock and that he got

6       Chris up to take a shower and then drove her to work. He said

7       he left the house at 6:10 and arrived there at the

8       Minute Market at 17 minutes after 6:00.

9                    He gave some more information as far as how they

10      arrived, said that they approached from the back alley

11      area—which there is an alley between the hardware and the

12      Minute Market—and parallel parked along the building where the

13      beer coolers are.

14                   MR. BROWER:    Put up exhibit number one, please.

15  BY MR. BROWER:

16  Q   Those—Along the—If Stadium Drive is facing north—That arrow is

17      actually pointing—Are you oriented as to the side?

18  A   Yeah, I see.

19  Q   All right. It'd be somewhere off would be the east side or to

20      the left of this diagram; is that right?

21  A   That would be my understanding towards the back.

22  Q   You didn't have a diagram that you had him draw?

23  A   I did not.

24  Q   What did he do then after arrival there?

25  A   Then he entered the store via the back door. Chris had the

559

1    keys and opened up the door. He said he shut the door behind

2    him. Chris punched the alarm code at that time. And then he

3    went to the front of the store to check the register readings.

4    He had to ask Chris for the keys to open up the front door and

5    unlock it to get the newspapers in—the new ones that had been

6    delivered for that day—and he counted them, put them in place.

7    And then he took some empty beer shelves to the back room and

8    then turned the light on at that time. He said he checked out

9    the store—again, indicated that he checked out the store.

10  Q   All right. Second time he mentioned that?

11  A   Yes.

12  Q   Did he indicate during the second interview when it was that

13      he left the building—

14  A   At—

15  Q   —to return home?

16  A   —6:35, it was that time.

17  Q   Ten minutes difference but—Okay.—just after 6:30?

18  A   Yes.

19  Q   Okay. Did he tell you what he did once he left the store?

20  A   He said he went directly home each time.

21  Q   And upon his arrival there what did he do?

22  A   At home?

23  Q   Yeah.

24  A   I don't recall exactly what he said.

25  Q   Did you ask him about Chris's promotion?