1  A   Yeah, I remember we asked if he was upset about Chris's

2       promotion. He indicated that he didn't understand it at

3       first, but then later worked it out in his mind. He didn't

4       really give any further information.

5  Q   Did he characterize his own—or his impression of himself and

6       the job that he had done for the two weeks that he was in

7       charge?

8  A   And this is from memory without looking at my report. But I

9       believe that he felt that he did an adequate and good job in

10      the job that he did prior to her promotion.

11  Q   As an explanation as to why he thought he should have gotten

12      the job?

13  A   Yes.

14  Q   Did he offer an explanation as how the perpetrators would have

15      been able to access the interior of the store to—

16  A   We—

17  Q   —murder Christine Dimmick?

18  A   Yes, we asked if there was—if he had any suspicions of who or

19      how someone may have accomplished this in the store. And

20      he—he indicated to us that someone could have hidden in the

21      men's bathroom throughout the night leading up to her arrival

22      there at the store without triggering the alarm system and

23      that there would have been no reason for the previous

24      manager—I believe her name was Tina Telpely.—to have checked

25      the men's room before closing. He said he didn't check the

1  men's room when he checked the store that morning, so that was

2  one location that he indicated that he didn't check that

3  morning when he was there with Chris before leaving.

4 Q Did you ever during the—your contact with him inform her [sic]

5  that she—inform him, meaning Patrick Mishall—that

6  Christine Dimmick had been shot or shot repeatedly?

7 A No, Detective Bombich nor I ever gave that bit of information

8  thinking that that was peak information at that point in time.

9  So we withheld that and left that up to the discretion of

10  anyone else that was involved in the investigation.

11 Q You've testified that he agreed to allow the—his house and

12  vehicle to be searched; is that correct?

13 A That is correct.

14 Q Did he—The clothing that he had on at the time of the

15  interview, was that also collected and sent for analysis to

16  the Michigan State Police?

17 A I believe it was.  I don't—I did not do that personally

18  though.

19 Q Was that because he had indicated that those were the clothes

20  he was wearing that morning while he was at the store?  That

21  was the significance; otherwise there'd be no reason to do

22  that?

23 A I don't recall.  I know those were the clothes that he was

24  wearing—a dark sweatshirt, I believe, and sweatpants—at the

25  time of our contact; but I don't know if those were the

562

1   clothes that he was wearing at the time that he drove Chris to
2   the store.
3   Q   When you—Did you go to the house and search it yourself?
4   A   Yes. Well, actually, myself, Detective Bombich,
5       Detective Stilany (phonetic) searched the garage, the
6       dumpster, an outbuilding, basement, attic, living room; and I
7       didn't—we didn't find anything relevant to the case. And the
8       vehicle was also searched and nothing was found relevant to
9       . . . (inaudible)
10  Q   At least nothing you—
11  A   . . . (inaudible)
12  Q   —that was immediately obvious to you as being relevant; is
13      that correct?
14  A   That is correct. At that time.
15  Q   Are you aware that eventually what's been characterized as a
16      porno tape or a video rental tape of some sort that was taken
17      from the building was, in fact, later found there?
18  A   Yes, I do remember that now.
19  Q   The person that you spoke with and interviewed on those two
20      occasions, is that person present in the courtroom today?
21  A   Yes, he is today. He's seated at the defendant's table
22      wearing a dark blue suit, white shirt, and tie.
23                  MR. BROWER:   If the written record can reflect the
24      identification of the defendant, your Honor?
25                  THE COURT:   It may so.

563

1    MR. BROWER: I have no further questions of this

2    witness.

3    THE COURT: Mr. Svikis?

4    CROSS-EXAMINATION

5    BY MR. SVIKIS:

6  Q  Detective Hatter, when you stated you found no evidence

7    related to this crime, you were referring to the homicide and

8    robbery, correct?

9  A  Correct.

10 Q  And not the investigation of a porno tape, right?

11 A  That is correct.

12 Q  Mishall spent, to the best of your recollection, most of that

13   day cooperating with the police at the station as far as you

14   recall?

15 A  Yes.

16 Q  And you picked him up first?

17 A  Yes, I did.

18 Q  And as you stated you were courteous to him, allowed him

19   coffee, you even let him make a call to—And you happen to know

20   the name. It was Mr. Tiller, right?

21 A  That is correct.

22 Q  Okay. And at that time you probably were not aware—or you may

23   have been—that Mr. Tiller was one of the first ones in the

24   building that knew about the shooting of Ms. Dimmick?

25 A  Now that you mention that, I recall it, yes, he was.

564

1 Q Okay. And at all times Mr. Mishall cooperated with turning

2 over his car, his clothes, his house and everything else?

3 A That is correct.

4 Q You also did some follow-up investigation and—on or about

5 August of 1992—you and Detective Bombich went up to Wisconsin

6 to interview people, right?

7 A Yeah, that's correct.

8 Q And do you have your police report there?

9 A Not related to the Wisconsin follow-up.

10 Q All right. Well, let me ask you this question: a—a

11 Dawn Haller or Anderson—both last names. At that time it

12 would have been Anderson; today it was Haller.—testified that

13 she does recall being interviewed by you and she's testified

14 today that in—that she recalls Patrick Mishall having a

15 handgun. Do you recall interviewing Ms. Anderson, now Haller,

16 at that time in '93?

17 A No, I don't remember. I talked to so many people at that time

18 I don't recall.

19 Q I'm going to show you part of a police report and see if you

20 can—There's some different number systems here. I'll see if I

21 can clue you in.

22 A Okay.

23 Q The Magic Marker numbering is a police report that was turned

24 over to me, and this is—The printed number is my numbering

25 system. So if you—Do you have this page 247 by chance?

1  A   No, I don't. I've only got 94 through—looks like 101.

2  Q   Would you take a look at this and see if this refreshes your

3      memory with regard to the interview with Dawn Anderson, now

4      Haller. There's a number of pages here. In particular I

5      would refer you to the 249 page and the first paragraph, and

6      I'm going to ask some questions about a weapon.

7              MR. BROWER:  Your Honor, I'm going to object. May

8      we approach?

9              THE COURT:  Sure.

10             (At 11:49 a.m., bench conference)

11 BY MR. SVIKIS:

12 Q   Okay.

13 A   I don't remember it, but I'm looking at what is highlighted

14     here. I see Detective Bombich actually wrote that report.

15 Q   But you were—You were there, also, right?

16 A   Yes.

17 Q   And at that time in '93, isn't it true that Ms. Anderson, now

18     Haller, made a statement that as long as she knew Patrick—had

19     been seeing—she never saw a handgun nor does she remember

20     seeing—saying anything about guns; is that—And if that's what

21     she said, that's what would have been written down?

22 A   That is correct.

23 Q   And there was another individual that testified today. Today

24     she testified under the name of Newburry. I believe at the

25     time you interviewed her she was also Newburry and went

                                566

1     through Powell and Williams—went through two other names.  Do

2     you have a—Let me ask you this: you have you police report

3     here that's numbered 137.  Do you have that page?

4  A   No, I don't.

5  Q   All right.  And would—I direct you to your numbering one—136

6     and through 137.  And if you would—This is part of your report

7     interviewing her?

8  A   Yes, that is correct.

9  Q   When you interviewed her regarding an altercation she had with

10    Mr. Mishall, did she say that—And let me get the words right

11    here.—I should do to you like everyone thinks I did to Chris?

12    If that's what she would have said, that's what you would have

13    written down?

14  A   That is correct.

15  Q   And that would be different than I should do to you like I did

16    to Chris, right?  Big difference between those two.

17  A   There would be a difference, yes.

18  Q   I want to move back to the scene in 1991 and ask some

19    questions about someone else who testified during this matter.

20    She testified as either—Excuse me.  I get the names mixed up.

21    She was an Askern or a Telpely, and I don't—I think she was a

22    Telpely at the time.  She was the person that closed

23    the—closed the store up the night before.  Do you recall

24    that—any of that?  Do you have any of those reports?  It would

25    be 140—143.  Do you have that page?

1 A No. The only reports I have with me today were the reports

2   that basically encompassed the initial contact with

3   Mr. Mishall.

4 Q Okay. I guess her name then was Telpely back in 2/12 of 1991.

5   Let me show these and see if you recognize this. I'll go from

6   the first page to what I believe is your signature page.

7 A That is correct.

8 Q All right. I want to direct you to what would be marked as

9   your page 143 in the high—in the highlighted area. From

10   Ms. Telpely or Askern, did you receive information from her

11   regarding a bloody sink?

12 A A bloody sink?

13 Q Sink.

14 A Yes, that is reflected in my report.

15 Q Now you were a new officer at this time?

16 A New detective.

17 Q New detective. And you made a note of that, and you would

18   have passed that on to someone else?

19 A Yes. The—At that time—And I'm looking for the date here.—I

20   believe Detective Grace was still in charge of the case at

21   that time.

22 Q Do you have any idea what—what became of that information?

23 A No, I don't; and I know—I can only—Well, I shouldn't assume;

24   but I know that the laboratory that processed the scene there

25   should have uncovered that, also, and made note of it.

1          MR. SVIKIS:    Thank you.

2          I have no further questions.

3                    REDIRECT EXAMINATION

4    BY MR. BROWER:

5    Q   Detective, starting with the last area of questions regarding

6        Ms. Askren.   This information regarding the sink, that came

7        days later after the initial scene—

8    A   That is correct.

9    Q   —investigation; is that correct?

10   A   That would be correct.

11   Q   After the body had been removed, after the scene had been

12       cleaned, if you will, and after the business was back open?

13   A   I believe so, yes.

14   Q   It would be reasonable to conclude that during the course of

15       the cleanup of the scene where there's blood that a sink in

16       the workroom area might be used to rinse the items used to

17       clean the scene?

18   A   That is possible, yes.

19   Q   Was that your understanding is that is where the blood or some

20       sort of residue was found?

21   A   Yeah, in the report it reflected that she, I believe, saw

22       some—there was some paperwork moved off the desk with a red

23       substance on it and blood in the sink.

24   Q   And you don't—You weren't responsible for examining the scene

25       at the time or monitoring the investigator or—Excuse me.—the

                         569

1    crime scene techs that—that did that work—

2  A  No.

3  Q  —is that right?

4  A  No, I was not.  That's correct.

5  Q  You don't have any independent knowledge of what they did,

6     what they checked for, what they looked for, where they found

7     blood, where they didn't find blood?

8  A  No.

9  Q  Sir, when you write a police report, is that based on a

10    tape recording that you have with you so that everything that

11    is said is recorded in the report?

12 A  No, at that time I don't recall that we recorded the

13    interviews that we did, and the content of the interview would

14    be a summary of what was told to us by the individual.  If

15    I—If I put it in a quotation, then that would be a specific

16    remark that was made by them.  If I didn't, then it would be a

17    general summary.  If one of you and I talked, what you told me

18    I would write it out in summary form.

19 Q  A verbatim account of everything that was asked and everything

20    that was said would take a lot of work and a lot of manpower

21    to record and keep the recording, transcribe the recording,

22    your summary, as you described it, would be huge; is that

23    correct?

24 A  If we did it verbatim and by recording, yes, it would—it would

25    be phenomenally long and lengthy—time-consuming.

570

1    Q    But that isn't the purpose of the report, then, is to keep a

2        verbatim account of everything that everybody says precisely?

3    A    Correct. The purpose of the report would be to take the facts

4        and pick the key facts out of the interview and then

5        transcribe that to report form in summary. And if there's

6        anything of great magnitude, then put in quotations. And then

7        if—if it needed to be recorded verbatim, then—then we would do

8        that.

9              And then quite often during an investigation

10        sometimes we'll have a witness give a written statement and

11        leave them in a room with forms that we provide by the

12        department and then they can write it out in their own words

13        and sign it and we will witness it and sign it, but in this

14        case that wasn't done on the witnesses.

15              MR. BROWER: All right. Thank you.

16              I have nothing further.

17                   RECROSS-EXAMINATION

18 BY MR. SVIKIS:

19    Q    Detective Hatter, back to Tina Askern or Tina Telpely with

20        regard to the bathroom sink that was bloody. It's true that

21        this report was written—according to the date here—on 3/2/92

22        at sometime afterwards, correct?

23    A    That is correct.

24    Q    That's the date on there. But what she is describing—You can

25        look at this again. What she's describing is what she saw

1 when she entered the store the following day, right?

2 A That, I'd have to refer to the report again on the date—the

3 actual date that she indicated. That is correct. It would be

4 the—

5 Q All right.

6 A —the date following.

7 Q She's not telling you about things that happened much later?

8 She's doing her best to—Or she's describing to you and you're

9 taking down when she walked into the store, right?

10 A That is correct.

11     MR. SVIKIS: All right. Thank you.

12     MR. BROWER: No redirect.

13     THE COURT: You may step down, sir.

14     THE WITNESS: Thank you.

15     THE COURT: All right. Let's break for lunch now.

16 I'd ask—Let's try to get back here by quarter after 1:00.

17 Okay? So we'll stay in recess until 1:15.

18     Keep in mind what I've told you, jury. Don't

19 discuss the case amongst yourselves or let anyone else discuss

20 it with you. Have no contact with anyone involved in the

21 case.

22     We'll return at 1:15.

23     (At 12:04 p.m., court recessed)

24     (At 1:25 p.m., proceedings reconvened)

25     Call your next witness, please.

1      MR. BROWER:   Your Honor, the People call

2   Detective Lance Handlogten to the stand.

3      THE COURT:   You do solemnly swear or affirm the

4   testimony you're about to give shall be the truth, the whole

5   truth, and nothing but the truth?

6      MR. HANDLOGTEN:   I do.

7      THE COURT:   You may be seated.

8                LANCE ELLIOTT HANDLOGTEN,

9   called at 1:25 p.m., and sworn by the Court, testified:

10                DIRECT EXAMINATION

11  BY MR. BROWER:

12  Q   Sir, would you please state your full name and spell your last

13      name for the record.

14  A   Lance Elliott Handlogten—H-a-n-d-l-o-g-t-e-n.

15  Q   It's Detective Handlogten; is that correct?

16  A   Yes, sir.

17  Q   You're employed with the Kalamazoo Department of Public

18      Safety?

19  A   Yes, sir.

20  Q   How long have you been a police officer, sir?

21  A   A little over 12 years now.

22  Q   How long have you been working as a detective?

23  A   About six.

24  Q   Present assignment is with what unit, sir?

25  A   With our detective bureau.

1   Q   And, first—You're just recently back in the detective bureau

2       but had done a stint with the cold case homicide team; is that

3       correct?

4   A   Yes, sir.  Approximately four years.

5   Q   Now that unit is not limited to officers from the Kalamazoo

6       Department of Public Safety; is that correct, also?

7   A   That is correct.

8   Q   Does that unit prosecute crimes anywhere in the county and not

9       limited to those within the city?

10   A   Yes, sir, that's correct.

11   Q   Was one of the cases that that unit investigated—or

12       reinvestigated—the case of the murder of Christine Dimmick?

13   A   Yes, sir.

14   Q   When you began to investigate that case, did you simply pick

15       up where that original investigation had left off; or did you

16       treat it as a fresh or a new case?

17   A   The second choice.  We treat it as more of a fresh

18       investigation.  We go over all the old reports and everything

19       and talk to the previous investigators and, essentially,

20       reinvestigate the entire case.

21   Q   Old witnesses, new witnesses, and so on?

22   A   Yes, sir.

23   Q   Now the Minute Market store on Stadium Drive is within the

24       city of Kalamazoo?

25   A   Yes, sir.

(Tape No. C2005-023, 2-09-05, 01:28)

1  Q   Because of that and because of the makeup of that cold case

2      team, were you given a specific assignment regarding contact

3      with a suspect?

4  A   Yes, sir.

5  Q   You were told to—or asked to interview Patrick Mishall; is

6      that correct?

7  A   That is correct.

8  Q   It's a city case, you're a city detective, you got that

9      responsibility?

10 A   That's generally how it works, yes.

11 Q   Were you in charge of the case, if you will, and overseeing

12     everything that was done in the case?

13 A   No, sir, it doesn't really work that way.  We have a team of

14     investigators, and it's sort of a democratic process within

15     the—within the team itself.  One person generally will be

16     charged with making sure that they keep an accurate record of

17     the case—meaning that all the reports are kept in one specific

18     binder so that we can provide them to the prosecutor and to

19     the defense if the case ultimately goes to court.

20          But, I guess, to—to put one person in charge of a

21     case—Our cases generally end up being several hundred pages.

22     There's not really one person in charge of that case.  There's

23     a supervisor who is ultimately responsible for the activities

24     of the unit, but no one person is really in charge of the

25     case.

1  Q  Among your responsibilities or assignments or acts of this

2      investigation, you made contact with Patrick Mishall; is he—is

3      that correct?

4  A  That is correct.

5  Q  Is Patrick Mishall in the courtroom today?

6  A  Yes, sir, he is.

7  Q  Where is he seated, and what is he wearing?

8  A  He's sitting at the defendant's table wearing a—looks like a

9      blue blazer and a blue tie and a white shirt.

10  Q  Next to—

11  A  Mr. Svikis.

12  Q  —Mr. Svikis?

13  A  Mr. Svikis, yes.

14          MR. BROWER:  If the written record can reflect the

15      identification of the defendant, your Honor?

16          THE COURT:  It may so indicate.

17  BY MR. BROWER:

18  Q  Where did you make this contact with Patrick Mishall?

19  A  It was at his home in Onalaska, Wisconsin.

20  Q  When was it?

21  A  May 20th of '03, I believe.

22  Q  When you went to the door were you greeted by Mr. Miscall?

23  A  Yes, sir.

24  Q  Were you invited into his home?

25  A  Yes, sir.

1 Q  During the initial conversation did you ask whether he would
2    accompany you to the district attorney's office?
3 A  Yes, I did.
4 Q  And where is that located?
5 A  Right downtown La Crosse.  It would be kind of akin to the
6    prosecutor's office here in Kalamazoo, but they call them
7    district attorneys there.  So there's a building similar to
8    where the prosecutor is here but in the downtown La Crosse.
9 Q  Do they have space available there, and that was a good
10   neutral location?
11 A Right.  It was just determined that that would be the most
12   conducive for an interview.
13 Q  Did you—Did he agree to go with you?
14 A  Yes, sir.
15 Q  Voluntarily?
16 A  Yes, sir.
17 Q  Did you place him under arrest?
18 A  No.
19 Q  Now you had, in fact, arrived in Wisconsin armed with an
20   arrest warrant; is that correct?
21 A  You know, I can't remember if we had the warrant when we got
22   to Wisconsin or if we got it when we were there; but at the
23   time we made contact with Mr. Mishall we did have an arrest
24   warrant for him.
25 Q  But, in spite of that, you did not take him into custody on

577

1    that warrant?

2  A  That's correct.

3  Q  Was he free to make phone calls and, in fact, did he make some

4     phone calls at his request?

5  A  That's correct. I can't remember—When we were at his house, I

6     know he made one to his wife. I don't remember if he made any

7     other ones, but he was given full access to our cellphones or

8     his phone.

9  Q  Food, smoke breaks as needed—

10 A  Yes, sir—

11 Q  —that sort of thing?

12 A  —that's correct.

13 Q  Did you ask him questions related to the homicide

14    investigation—the homicide of Christine Dimmick?

15 A  Yes, sir.

16 Q  Did he offer a theory as to how some other person may have

17    been able to commit this crime inside this locked building?

18 A  He had two specific theories on what he thought may have

19    happened. The first was that he thought maybe somebody had

20    been hiding inside the store overnight and then had murdered

21    Chris when—after he had left.

22         His second theory was that somebody may have come to

23    the back door and knocked on the back door and was allowed

24    entry by Chris thinking that it maybe was—was him.

25 Q  Did Mr. Mishall at some point later dispute that second theory

578

1  in some manner?

2 A Did he dispute the theory?

3 Q Or say something that would suggest that that was not likely

4  because of the training and so on?

5 A Well, a couple things about it didn't really jive, one being

6  that he said he heard the deadbolt being thrown; and I don't

7  think there was ever any indication that there was a deadbolt

8  on the back door.

9    But he also said that when he left he saw nobody.

10  There was nobody in the area. There was no other vehicles in

11  the area; and according to Mr.—what Mr. Mishall told us about

12  his route of travel, he would have gone from the back of the

13  building, driven between the—the Minute Market and the

14  hardware that was next-door and come around into the front; so

15  he would have had a full view of both the back and the front

16  of the building.

17 Q Did he at some point tell you that Chris would never let

18  somebody in that she didn't know and that that was the way

19  that she, in fact, had trained him?

20 A That's correct.

21 Q So someone knocking on the back door, he later indicated, was

22  not, in fact, a likely scenario then?

23 A Well, you know, we specifically talked to him about that—about

24  what her—you know, what she had told him about her—how she

25  operated. And, again, as you said, she had trained him on how

579

1  to deal with the store—openings and closings—and that was one

2  thing that she specifically told him is to never open the door

3  for anybody unless you knew who they were.

4 Q Did he make any statements about being in the very

5  back—whether or not he had gone into the very back room or

6  hallway—specifically, the bathroom areas?

7 A What he said initially was that he had been throughout the

8  entire store to include the customer area, the back bottle

9  room, the area by the back door and the hallway that leads

10  from the back door to the customer area; but that he had not

11  gone down the hallway that would lead back towards the

12  bathrooms.

13 Q Okay. And so then had not been there to check the bathrooms

14  either?

15 A That's correct. That's what he said.

16 Q Now did he make any statements regarding coffee—whether or not

17  he had made coffee that day?

18 A Yes, sir. We asked him about what his activities at the store

19  were that morning, and one thing he specifically said is that

20  he had made the coffee for the store. So follow-up question,

21  where did you get the—the coffee from, and he said he'd gotten

22  it from the slop sink in the back area down the hallway—was

23  located down the hallway where he said he hadn't been.

24 Q In fact, right next to the bathrooms; is that right?

25 A That is correct.

1  Q   Do you consider that a contradiction?

2  A   Well, he was pretty clear that he hadn't gone down that

3      hallway at all; so, yes.

4  Q   What'd he say about how long he had been at the store with

5      Chris before he left?

6  A   That was something that we covered with him pretty

7      extensively. Obviously, it was kind of important for us to

8      find out, you know, what the time line looked like. And he

9      said numerous times during the interview—It was clarified with

10     him over and over.—that he had been there for approximately

11     45 minutes.

12 Q   Did he provide times when he had gotten to the store and when

13     he had left the store and was back at home?

14 A   He did, but they didn't—they didn't make much sense at the

15     time.  He was talking about very early in the morning, like

16     3:00, 4:00 o'clock in the morning getting to the store and

17     being back home by like 5:00 and—We knew that the store opened

18     at 7:00 and that the investigation to that point had shown

19     that they coded in on the alarm 20—around 25 after 6:00.  So—I

20     mean those times didn't really jive.  And he thought—At the

21     time he expressed to us that he was thinking that the store

22     had opened at 6:00 a.m. and not 7:00.

23 Q   Did he offer an explanation—still, you know, thinking the

24     store was open at 6:00—and he was there, you know, at

25     4:00 o'clock, back home by 5:00—why—did he offer an

                                581

1      explanation as to why he would have arrived at the store two

2      hours before opening?

3 A   Well, he said that they had gotten a call from the previous

4      evening. I think it was supposedly around midnight or maybe a

5      little before that from an unknown female—

6 Q   He didn't—

7 A   —that called—

8 Q   —recall the name? When you say unknown, what do you mean by

9      that?

10 A   Yeah, he didn't provide a name.

11 Q   All right.

12 A   He didn't know who it was. That's what he said at the

13      time.—telling Chris that there was a large amount of lottery

14      proceeds from the previous day. Apparently, the Lotto had

15      been high at that point or something. A lot of people had

16      been buying tickets; therefore, there was a lot of money at

17      the store and that they were going to have to come in early

18      that day to straighten out the financial end of that.

19 Q   Did he make any statements about how often he had helped Chris

20      open this store?

21 A   I believe it was like a couple of times is what he said. And,

22      in fact, he'd done it, I think maybe the day before she was

23      actually murdered and helped her.

24 Q   Did he tell you where he had parked his vehicle when he

25      arrived at the store to drop her off?

1  A  Yes, sir, he did. He indicated that he parked his vehicle on

2      the southeast corner—which would be to the rear—the rear

3      corner of the store.

4  Q  In fact, did he draw a diagram indicating where it was that he

5      had parked?

6  A  Yes, sir, he did.

7  Q  I show you what has been marked as People's exhibit 56 and ask

8      you if you recognize this item.

9  A  Yes, sir, I do. This is the drawing that Mr. Mishall and I

10     both did at the time of his interview.

11  Q  Does that accurately depict—is in the same condition as the

12     time it was created?

13  A  Yes, sir, it is.

14          MR. BROWER: Move for admission of People's

15     exhibit 56, your Honor.

16          MR. SVIKIS: No objection.

17          THE COURT: Received.

18  BY MR. BROWER:

19  Q  There's a larger box towards the center of this diagram, sir,

20     and then what appears to be two smaller boxes in the upper

21     right-hand corner; is that correct?

22  A  Yes, sir.

23  Q  Sir, maybe if you could—If you need to stand, maybe, sir—

24  A  Okay.

25  Q  —and just push this button—the laser—and explain the

1    significance of this diagram.

2  A  Okay. This portion of the diagram here—I had asked
3     Mr. Mishall to draw me a diagram showing where he had parked
4     on that morning. And this portion right here is what he had
5     drawn. I wasn't real clear on how every—what everything
6     meant, so what I did then is drew a box here with an M
7     signifying the convenience store where Chris was killed and
8     the adjacent hardware store with this being sort of a service
9     road that runs between Rambling Road and the car dealerships.
10    I think it's Century Buick or something that's over here. And
11    then Stadium Drive will be up in this area.

12              I then asked Mr. Mishall to indicate on this drawing
13    where he had parked on that morning. He then drew this line
14    terminating in an arrow or an X showing where he had parked
15    the vehicle.

16 Q  Thank you. Did you ask about or did he make any statements
17    about other vehicles in the area either as he arrived or when
18    he left?

19 A  As I said previously, he said that he didn't see anybody at
20    all when he left; but he had also indicated prior to that that
21    there was nobody around when he arrived either.

22 Q  When you say nobody, you're talking about nobody on foot,
23    nobody walking, and nobody—

24 A  No vehicles, no pedestrians, no people.

25 Q  Nobody?

584

1    A    Nobody.

2    Q    You also made some statement indicating that he was aware that

3         the door was, in fact, locked when he left?

4    A    Which door, sir?

5    Q    The rear door that he—

6    A    The rear door? That's correct, he did.

7    Q    Did he say anything about the safe in the office area?

8    A    Yes, he did.

9    Q    What did he say about that?

10   A    He said that he wasn't really familiar with that safe and that

11        he'd only been in the back office a couple times, which seemed

12        odd.

13   Q    Were you aware that he had been filling day shift while

14        another employee was gone for a period of time—

15   A    Well, in fact—

16   Q    — . . . (inaudible)

17   A    —my understanding was that he had been the assistant manager

18        at that store. And then what he told was—us was that Chris

19        was training him to run the store, and that was the

20        explanation for him helping her open and close—or open the

21        store.

22   Q    What did he have to say, if anything, about the security

23        system?

24   A    Well, I asked him what he knew about the security system, and

25        he initially said, again, that he wasn't very familiar with

585

1     it; but he later went on to describe all the cameras that

2     covered the—the customer area of the store, the VCR that did

3     the recording, the tapes that they used to do the recording

4     and when they—tapes that had to be switched out and how many

5     tapes there were.

6  Q  All those kind of details?

7  A  Yes, sir.

8  Q  After initially claiming he didn't know much about it?

9  A  That's correct.

10  Q  Any statements about what type of vehicle he had?

11  A  Black Ford LTD.

12  Q  Okay.

13  A  I don't recall what year if he said a—said a year on it, but

14     he said it was a black Ford LTD.

15  Q  Did he address whether or not there were any regular customers

16     that were often at the door when the store was ready to open

17     at 7:00?

18  A  Yeah, he basically said, you know, it wasn't unusual to have

19     customers arriving right at opening or just before; and those

20     were typically people that were there on a regular basis.

21  Q  I addressed this up to a point previously, but did—was he

22     asked specifically whether or not Chris was likely to open the

23     door for somebody she did not know?

24  A  Yeah, again, he said specifically that she had trained him to

25     never open the doors for somebody that he did not know.

1  Q  Did you ask questions regarding his possession or ownership of
2      any weapons?

3  A  Yeah, that was covered extensively—almost to the point of
4      being ridiculous. I mean we literally asked him every way we
5      could think of about him ever having possessed or had a gun or
6      owning a gun in both Michigan and Wisconsin, and he denied
7      ever having a gun and later said that the only thing he may
8      have ever had was a BB gun when he was a kid.

9  Q  Did you make inquiries about whether he was aware of any
10     affairs that Christine Dimmick may have had while involved in
11     a relationship with him?

12  A  He said that he became aware later of an affair—I believe it
13     was with a gentleman named Craig Mann.—but at the time he
14     wasn't aware of any affairs. At the time of her death he
15     wasn't aware of any affairs that she'd had.

16  Q  That was his statement in 2003?

17  A  That's correct.

18  Q  Did you ask specifically about whether he had thought or had
19     reason to think that Christine was involved with another
20     woman?

21  A  Yeah, we asked him that specifically; and he said he—he didn't
22     know of any—any relationship like that.

23  Q  He denied that as well—

24  A  Yes, sir.

25  Q  —even hearing that rumor?

1  A  I believe what he said was he'd never heard of anything like
2     that.
3  Q  At the conclusion of your interview what action did you take?
4  A  We arrested him.
5  Q  And was he then lodged at a particular location in preparation
6     for transport back to Michigan?
7  A  Yes. And I—I guess it was the police department holding area
8     there—maybe the county.
9  Q  It was in La Crosse?
10 A  Yes, it was.
11 Q  All right. Thank you.
12    Did I already ask you to identify Pat—Okay.
13 A  Yes, you did.
14    MR. BROWER: I'm through, your Honor. No further
15    questions.
16    MR. SVIKIS: No questions, your Honor.
17    THE COURT: You can step down.
18    MR. BROWER: Your Honor, may I inquire as to
19    whether or not the People's exhibits one through 58—Excuse me.
20    I have one additional item that has not been offered, and that
21    would simply be copies of the slides that the—for the jurors
22    to bring back. That would be an exhibit. It simply is
23    demonstrative to help them orient the photographs with the—the
24    interior, which they had previously.
25    MR. SVIKIS: No problem.

1    THE COURT: What—

2    MR. SVIKIS: The actual photo—

3    THE COURT: Did you assign a number to it?

4    MR. BROWER: Yes, I—I put a number on the group of

5    pages with three of the slides on each one of the pages.

6    There's several of them. That would be a copy of the slide

7    containing the small diagram with the red arrow showing the

8    direction of the photograph.

9        With the photographs themselves, there wouldn't be

10   anything to orient them. That particular document might be of

11   assistance though.

12   THE COURT: How did you designate them? That's

13   what I'm trying to determine. Did you assign a number to

14   them?

15   MR. BROWER: Oh, I didn't say that? Fifty-seven,

16   your Honor; exhibit number 57.

17   THE COURT: That's all I'm trying—

18   MR. BROWER: Okay.

19   THE COURT: —to find out. I wasn't—

20   MR. BROWER: That being the case, your Honor, if

21   all exhibits one through 58 have not been admitted I'd

22   . . . (inaudible)

23   MR. SVIKIS: No problem.

24   THE COURT: All right. Exhibits one through 58, I

25   think—I'm not positive every one of them have been admitted,

589

1    but I know for the most part they have.  But, at any rate,

2    exhibits one through 58 are received.

3            MR. BROWER:   People rest, your Honor.

4            THE COURT:   Mr. Svikis?

5            MR. SVIKIS:   We have a motion, your Honor.

6            THE COURT:   All right.  Would you . . . (inaudible)

7    with the clerk, please.

8            We'll have to excuse the jury.

9            We'll have to excuse the jury.  There's a motion.

10   So let's take a brief recess while the jury . . . (inaudible)

11           (At 1:51 p.m., jury exits courtroom)

12           Your motion, Mr. Svikis?

13           MR. SVIKIS:   Thank you, your Honor.

14           Your Honor, at this time I'd like to bring a motion

15   for directed verdict for acquittal in favor of

16   Patrick Mishall.  This is on all five counts.

17           The evidence presented is insufficient to warrant a

18   conviction, even taking the evidence in the light most

19   favorable for the prosecution because there's simply no

20   evidence from which a jury could infer the requisite elements,

21   in particular, the intent—specific intent of the open murder,

22   felony murder, the weapon, and any kind of armed robbery.

23           As the Court has heard that there is absolutely no

24   physical evidence connecting Mr. Mishall to any of the crimes.

25   Therefore, there's nothing the jury can consider.

                                  590

1    And as the Court is aware, even if it's a—evidence

2    is such that even if ever so slight the Court can still find

3    that the matter should not be submitted to the jury; and,

4    therefore, I ask the motion of directed verdict of acquittal

5    in favor of Mr. Mishall. Thank you.

6              THE COURT:  Mr. Brower?

7              MR. BROWER:  Your Honor, the People disagree and

8    would argue that under the applicable standard the People

9    have, in fact, met their burden regarding the intent element.

10   Intent can be inferred from the nature and location of the

11   wounds and the weapon.  Intent can clearly be inferred from

12   the fact that there was four gunshots—that they were

13   gunshots—and the location of those gunshots in the mid—middle

14   of the back and to the base of the head.

15             The lack of physical evidence is not the determining

16   criteria in this motion.  Circumstantial can establish the

17   necessary elements and has.

18             THE COURT:  Any rebuttal, Mr. Svikis?

19             MR. SVIKIS:  No, your Honor.

20             THE COURT:  At this point what the Court has to do

21   is view the evidence in the light most favorable to the

22   prosecution and determine whether a reasonable juror could

23   conclude beyond a reasonable doubt that all of the elements of

24   the various charges have been met.

25             In respect to the specific intent—that is, the

591

1    premeditation and deliberation for murder in the first

2    degree—as pointed out you can look at the number of wounds,

3    where those wounds were placed. Here, we have this lady

4    having been shot four times, twice in the nape of the neck and

5    one—or twice in the back, both potentially lethal.

6            Based on the testimony of the—the medical examiner

7    that—And the fact that these wounds appeared to—based—at least

8    circumstantially—on the evidence that's before the Court, that

9    they were inflicted most likely in the place in which the

10   victim's body was found.—would indicate to this Court that

11   this was a thought-out act; that it was deliberated and

12   premeditated; that it was thought out beforehand to have the

13   victim to be in that position.

14           While it's true there's no direct evidence as to

15   this defendant, there certainly is circumstantial evidence in

16   respect to the statements he made just prior to the act

17   regarding this—this victim—I can't think of the person's name

18   now—the man—the man that was—played the lottery.—and how he

19   said it to him.

20           Also the testimony of the co-employees as to

21   Mr. Mishall's demeanor after it was announced the victim had

22   been promoted to manager.

23           The fact—the statements he made regarding guns.

24   There is conflicting testimony about what may have been

25   observed in Wisconsin, but certainly the testimony that he

1    made to one of the Munson brothers on the date of the—the

2    funeral err [sic] in this Court's—are in this Court's mind

3    sufficient to—to establish circumstantially that he's the

4    perpetrator of the homicide.

5         Also, the—the access that he had to the defendant

6    and the place of the homicide on the morning in question and

7    the time—the time frames all satisfy this Court that the

8    evidence is sufficient to establish both of the homicides and

9    that this defendant committed those as charged.

10        And certainly there's the missing money would

11   establish the robbery and the motive in that respect and the

12   intent and the fact the store was in the control of the

13   deceased, along with how she was killed and that establishing

14   the elements for the felony firearm.

15        So for all those reasons, the Court's satisfied that

16   the evidence is sufficient for this matter to be determined by

17   the jury; and the motion is denied.

18             MR. SVIKIS:   Thank you, your Honor.

19             We'd call our—

20             THE COURT:    Wait a minute.  We got to get a jury

21   here.  I assume you want a jury—

22             MR. SVIKIS:   Yes.

23             THE COURT:    —to hear this.

24             MR. SVIKIS:   We'll continue with the jury, your

25   Honor.

                              593

```
 1                    THE COURT:   Okay.

 2                    MR. BROWER:   Will we be a few minutes, your Honor?

 3                    THE COURT:   Well, it's going to take—Do you need

 4          a—If you want a couple minutes.

 5                    MR. BROWER:   I have to run upstairs to grab a

 6          notebook a minute.

 7                    THE COURT:   Okay.  Let's take a—Let's try and be

 8          back here in about ten minutes—ten, 15 minutes.  Okay.

 9                    (At 2:01 p.m., court recessed)

10                    (At 2:14 p.m., proceedings reconvened)

11                    Raise your right hand, please.  You do solemnly

12          swear or affirm the testimony you're about to give shall be

13          the truth, the whole truth, and nothing but the truth?

14                    MS. :   I do.

15                    THE COURT:   You may be seated.

16                              CHRISTINE HARWOOD,

17          called at 2:14 p.m., and sworn by the Court, testified:

18                              DIRECT EXAMINATION

19     BY MR. SVIKIS:

20     Q   Good afternoon, Ms. Harwood.

21     A   Good afternoon.

22     Q   Would you please state and spell your last name for the

23          record.

24     A   Harwood—H-a-r-w-o-o-d.

25     Q   And your first name?
```

594

1   A   Christine—C-h-r-i-s-t-i-n-e.

2   Q   And where do you reside?

3   A   In Allegan.

4   Q   Now, Ms. Harwood, do you know Patrick Mishall?

5   A   Yes, I do.

6   Q   And how do you know him?

7   A   I was about 13 when I met him, so I've known him for about

8       23 years.  And we used to hang around a lot, and we'd—he'd

9       come out to my mom's house and we'd watch movies and hang out

10      and laugh and giggle.

11             And after I graduated from school we started to

12      date.  And about a year later I became pregnant with Patrick's

13      twins.  And about—They were born in August of '89.  And in

14      October of '89 we split up, and we still remained friends

15      throughout the years.

16  Q   So over this period of time—Plus or minus, about how many

17      years is this from the time that you split up and after the

18      children were born?

19  A   Well, we split up for good in October of 1989, so I guess

20      we've been split up for—Well, I know we've been split up for a

21      long time.

22  Q   Okay.  And you said you also remained in contact from '89 to

23      the present?

24  A   Yeah, and as a matter of fact, my husband and I and the twins

25      go up to Wisconsin to visit Pat and Amy at least once a year

595

1    whether it's the Wisconsin Dells or in La Crosse or Onalaska.

2  Q  During the time that you were growing up as children and young

3    adults, did you ever know Pat to own a handgun?

4  A  No, never.  He was always scared of guns.

5  Q  And after your relationship changed to dating, did there ever

6    come a time when you lived together?

7  A  We lived together from August of '89 when the kids were born

8    until October of '89.

9  Q  And during this time did you ever know Pat to own a handgun?

10 A  No, I never did.

11 Q  And when I say own, I want to make sure that I included

12   that—did you ever see him with a handgun?

13 A  I've never seen him with a handgun.  Whenever we talked he

14   was—he was just always scared of guns.  He didn't like

15   hunting.  He didn't even like fishing or any of that kind of

16   stuff.

17 Q  So taking that forward through today, again, you've never seen

18   him with a handgun or known that he's possessed one or has he

19   ever spoken about a handgun?

20 A  I've—The only thing that he's ever spoke of with a handgun is

21   just that he didn't like them and he was scared of them.  And

22   I've never seen him with a gun.  I've never seen him own a

23   gun.  I've never seen a gun in his home.

24          MR. SVIKIS:  I have no further questions.

25          THE COURT:  Do you have any questions?

596

1                           CROSS-EXAMINATION

2   BY MR. BROWER:

3   Q   Ma'am, you don't know for a fact that he didn't own a gun, do

4       you?  You never saw one, you never heard him mention it—

5   A   I never saw a gun.  I've never heard it mentioned.  I lived in

6       his house for a few months.  I've known him for—

7   Q   For a few months.

8   A   —years and years and years, and I've never seen a gun in the

9       whole entire time I've known him.

10  Q   You lived with him for two months?

11  A   Yeah, but I've known him since I was 13; and I've been to his

12      house, and he's been to mine and—

13  Q   You don't—

14  A   —throughout all those years.

15  Q   You don't know for a fact that he might not—whether or not he

16      did have a gun or at any point in his life, do you?

17  A   Well, I—It's not like I ever searched through every single

18      nook and cranny of his house, but I know how he felt about

19      guns.

20  Q   Is that answer yes, then, ma'am?  You don't know from personal

21      experience?

22  A   I don't think 100 percent is for anything, but he was

23      definitely scared of guns and he—I knew he never owned one or

24      talked of owning one.

25  Q   You don't know if he owned a gun or not.  All you can relate

                                597

1    is what he told you; is that right?

2  A   What he told me and what I saw with my own eyes.

3              MR. BROWER:   Thank you.

4              I have nothing further.

5              MR. SVIKIS:   I have no further questions of this

6    witness, your Honor.

7              THE COURT:   You can step down.   Thank you.

8              MR. SVIKIS:   I have another witness being brought

9    in, your Honor.

10             THE COURT:   All right.

11             MR. SVIKIS:   Ms. Josette Phillips.   Would you

12   please come up here, please.

13             THE COURT:   Raise your right hand, please.   You do

14   solemnly swear or affirm the testimony you're about to give

15   shall be the truth, the whole truth, and nothing but the

16   truth?

17             MS. PHILLIPS:   I do.

18                      JOSETTE PHILLIPS,

19   called at 2:19 p.m., and sworn by the Court, testified:

20                      DIRECT EXAMINATION

21 BY MR. SVIKIS:

22  Q   Good afternoon, Ms. Phillips.

23  A   Good afternoon.

24  Q   Would you spell your first and last name for the record,

25   please.

1  A    It's Josette Phillips—J-o-s-e-t-t-e P-h-i-l-l-i-p-s.

2  Q    And where do you reside, Ms. Phillips?

3  A    Paw Paw, Michigan.

4  Q    Ms. Phillips, do you know Patrick Mishall?

5  A    Yes, I do.  He's my brother.

6  Q    So how long have you known him?

7  A    All of his life.  I basically raised the boy.

8  Q    And so you lived together for quite some time?

9  A    Yes, we did.

10 Q    All right.  And did there come a time when he moved out?

11 A    Well, I moved out first because, of course, I'm older.  And

12      after I moved out, he did come and live with us in my marriage

13      for a while.

14 Q    And then what year would that have been that he lived with you

15      when you were married?

16 A    I was married in 1967.  He lived with us in 1968/'69.

17 Q    And during this period did you ever know your brother to own,

18      possess, or talk about a handgun?

19 A    No, he did not ever own or possess a handgun.  He had a fear

20      of guns.

21 Q    Okay.  In other words, you never—you never saw it, right?

22 A    (No audible response)

23 Q    Okay.  And is this also for the time that he lived with you

24      when you were married?

25 A    Yes.

(Tape No. C2005-023, 2-09-05, 02:21)

1  Q   And after he moved out from when you were married, did he live

2      in this area?

3  A   Yes, he did.

4  Q   Did you—

5  A   He went back and lived with his—with our mother.

6  Q   Okay.  Did you have occasion to visit the home?

7  A   Always was there—in and out of my mother's house, always, yes.

8  Q   All right.  During the times you were at your mother's house

9      did you ever see or hear of a gun that Patrick owned or talked

10     about?

11 A   No, as I said before, he had a fear of weapons.

12 Q   So at some—at some point he moves to Wisconsin, right?

13 A   Yes, he did.

14 Q   And you don't follow him to Wisconsin, do you?

15 A   No, I didn't.

16 Q   So you have no idea what he had in Wisconsin or didn't have,

17     right?

18 A   No, I do not.

19              MR. SVIKIS:   I have no further questions.

20              THE COURT:   Mr. Brower?

21                      CROSS-EXAMINATION

22 BY MR. BROWER:

23 Q   Ma'am, you had no idea of what he did or did not have in

24     Wisconsin; that was your response to defense counsel's

25     question, yes?

1    A    That's correct.

2    Q    All right. The reality is you really don't have any idea of

3         what he may or may not have had here in Michigan either. All

4         you know is what he told you, right?

5    A    Well, I was—I was in his home in—

6    Q    Is that a yes, ma'am? That's true that you really can't know—

7    A    I can't testify—

8    Q    —other than—

9    A    —that I—

10   Q    —what he says?

11   A    —know; no, I cannot.

12   Q    He had a fear of guns, though?

13   A    Yes, he did.

14   Q    Was he in the military for a period of time?

15   A    Yes, he was.

16   Q    He enlisted in the military?

17   A    Yes, he did.

18                    MR. BROWER:    Thank you.

19                    Nothing further.

20                    THE COURT:    You can step—

21                    Do you have any other questions?

22                    MR. SVIKIS:    Yes.

23                    THE COURT:    Okay.

24

25

601

1                    REDIRECT EXAMINATION

2  BY MR. SVIKIS:

3  Q    Are you aware that he was a cook in the military?

4  A    Yes, he was, yes.

5  Q    He didn't—He didn't complete his term, did he?

6  A    No, he did not.

7                    MR. SVIKIS:   All right.

8                    I have no further questions.

9                    MR. BROWER:   No recross.

10                    THE COURT:   You may step down.   Thank you.

11                    MR. SVIKIS:   I'm bringing in another witness, your

12        Honor.

13                    MR. SVIKIS:   Your Honor, this is Warren Pangburn.

14                    THE COURT:   Raise your right hand, sir.   You do

15        solemnly swear or affirm the statements you're about to make

16        shall be the truth, the whole truth, and nothing but the

17        truth?

18                    MR. PANGBURN:   Yes, sir.

19                    THE COURT:   You may be seated.

20                         WARREN PANGBURN,

21        called at 2:25 p.m., and sworn by the Court, testified:

22                    DIRECT EXAMINATION

23  BY MR. SVIKIS:

24  Q    Mr. Pangburn, would you please state your name and spell it

25        for the record.

602

1 A Warren Earl Pangburn—P-a-n-g-b-u-r-n.

2 Q And where do you reside?

3 A Right now I reside in Palmyra, Wisconsin.

4 Q And do you know Patrick Mishall?

5 A I've known Patrick Mishall since he was born.

6 Q All right.  At some point in time do you recall that he came

7  to Wisconsin?

8 A Yes.

9 Q Do you recall about what year that was?

10 A Not really.  Specifically mid 90s, I believe.

11 Q Okay.  And did he move in with you?

12 A Yes.

13 Q And where was that?

14 A My wife and I managed the Road Star Motel in La Crosse,

15  Wisconsin—

16 Q And—

17 A —and he came and lived with us there for a short time.

18 Q All right.  And the Road Star—Is it Red Star or Road Star?

19 A Road Star.

20 Q Road Star.

21     And he had a room there?

22 A Yes.

23 Q All right.  And he had a room and you had—you had certain

24  rules, correct?

25 A Yes.

1  Q    And you know that Pat drank, right?

2  A    Yes.

3  Q    Was there a rule about drinking?

4  A    Yes.

5  Q    What was that rule?

6  A    Rule that he was not to drink on premises in my motel.

7  Q    Okay.  Did he break that rule?

8  A    Yes.

9  Q    You toss him out?

10 A    Yes.

11 Q    Okay.  And you had occasion to go in that room because you

12      managed the motel, right?

13 A    Yes.

14 Q    Okay.  During the times that you were in that room did you

15      ever observe a handgun?

16 A    Never.

17 Q    Did you ever hear Pat talk about a handgun?

18 A    Never.

19 Q    Did you ever know him to own a handgun?

20 A    Never.

21            MR. SVIKIS:   I have no further questions.    The

22      prosecutor may have some questions for you.

23                       CROSS-EXAMINATION

24 BY MR. BROWER:

25 Q    Mr. Pangburn, did you catch Patrick drinking?

604

1  A   Not, you know, with a drink in his hand; but I found empty

2      beer cans in his room.

3  Q   He was sneaking it knowing what your rules were and doing it

4      anyway?

5  A   Evidently, yes, sir.

6            I am Patrick's uncle.

7  Q   So he knew what the rules were but was doing that anyway

8      behind your back?

9  A   Yes.

10  Q   Might as well had a handgun without your knowing it—hiding

11      that behind your back as well?

12  A   There is a possibility of that, yes.

13            MR. BROWER:   I have nothing further of this

14      witness, your Honor.

15            MR. SVIKIS:   No further questions, your Honor.

16            THE COURT:   You can step down, sir.  Thank you.

17            MR. SVIKIS:   I have another witness coming, your

18      Honor.

19            THE COURT:   Okay.

20            MR. SVIKIS:   At this time I'd like to call

21      Betty Pangburn.

22            THE COURT:   Raise your right hand, please.  You do

23      solemnly swear or affirm the testimony you're about to give

24      shall be the truth, the whole truth, and nothing but the

25      truth?

1                 MS. PANGBURN:  I do.

2               THE COURT:  You may be seated.

3                  BETTY PANGBURN,

4    called at 2:29 p.m., and sworn by the Court, testified:

5               DIRECT EXAMINATION

6  BY MR. SVIKIS:

7  Q  Ms. Pangburn, would you please state your name for the record

8     and spell it.

9  A  Betty Lee Pangburn.

10  Q  And spell your last name, please.

11  A  P, like in Paul-a-n-g-b-u-r-n.

12  Q  And where do you reside?

13  A  We reside in Palmyra, Wisconsin.

14  Q  Do you know Patrick Mishall?

15  A  Yes.

16  Q  How do you know him?

17  A  He's my nephew.

18  Q  At some point in time did he come and live with you at your

19     motel?

20  A  Yes, for a short period of time.

21  Q  All right.  And what did he have at that motel?  Was it a

22     room, an apartment, or—

23  A  He—No, he had his own room.

24  Q  And during this time did you ever know Patrick to have a

25     handgun?

1   A   Never.

2   Q   Ever hear of a handgun?

3   A   Never

4   Q   Ever see any evidence of a handgun like bullets or anything
5       like that?

6   A   No.

7   Q   Did you ever have an occasion to go in the room that he
8       resided in?

9   A   Almost daily.

10  Q   And why was that?

11  A   Well, because we managed the motel, and it was my duty to make
12      sure all the rooms were clean. And although Patrick kept up
13      his own room, I would go in and change the linen and gather up
14      his laundry and take it and do the laundry, fold it, and put
15      it back in his room.

16  Q   When you put it back in his room did you put it in the drawers
17      or chest of drawers?

18  A   Yes, I did.

19  Q   Okay. Do you feel that . . . (inaudible) recollection that
20      you probably went in every single location of that room?

21  A   I would say yes.

22  Q   And you never saw any evidence of a handgun?

23  A   No, I did not.

24  Q   All right. Now you also had some rules at the hotel, too,
25      right?

607

1  A  Yes, we did.

2  Q  All right.  Did he ever break any rules?

3  A  Yes, he did.

4  Q  What'd he break?

5  A  He was told when he came to stay with us that there would be

6     no drinking in his room, and he broke that rule.  And my

7     husband gave him the ultimatum you got a week to find another

8     place.

9  Q  And he went out?

10 A  And my husband helped him find another place.

11                MR. SVIKIS:   Okay.  I have no further questions.

12                THE COURT:   Mr. Brower?

13                          CROSS-EXAMINATION

14 BY MR. BROWER:

15 Q  Ma'am, was the drinking in the—in his room—

16 A  Uhm-hmm.

17 Q  —was that discovered by yourself?  Did you find evidence of

18    that?

19 A  I didn't.  Well, yeah, the cans.

20 Q  Okay.  And they were in a trash can or something?

21 A  Yes.

22 Q  Was that your belief that that was the first time he had ever

23    tried to drink in that room?

24 A  I didn't even think about it.  I just knew that he had drank

25    in there and that was a rule, and you go by my husband's rules

                              608

1   or you go by the highway.

2 Q  So you found evidence of that violation of the rules; but you

3   have no idea if he'd been violating those rules before, do

4   you?

5 A  He wasn't there that long.  And in my opinion, no, he hadn't;

6   but I couldn't swear to it.  That's the first time I'd ever

7   found any evidence.

8   MR. BROWER:  Thank you.

9   I have nothing further.

10   MR. SVIKIS:  No further questions of Ms. Pangburn.

11   You can . . . (inaudible) here.

12   I have another witness coming, your Honor.

13   THE COURT:  Okay.

14   MR. SVIKIS:  Your Honor, at this time I'll call

15   Amy Mishall.

16   THE COURT:  Raise your right hand, please.  You do

17   solemnly swear or affirm the testimony you're about to give

18   shall be the truth, the whole truth, and nothing but the

19   truth?

20   MS. MISHALL:  I do.

21   THE COURT:  You may be seated.

22

23

24

25

609

1  A    No, I asked him at one point if he hunted—My family hunts

2        deer.—and he said, no, 'cause he does not like guns.

3  Q    So he's not a hunter?

4  A    No.

5  Q    You never lived with Patrick back in Kalamazoo?

6  A    No.

7  Q    So you have no idea what—what he may or may not have owned in

8        Kalamazoo?

9  A    Correct.

10               MR. SVIKIS:   I have no further questions.

11                      CROSS-EXAMINATION

12  BY MR. BROWER:

13  Q    Ma'am, in addition to not knowing what he may or may not have

14        had in Kalamazoo, you don't know what he may or may not have

15        had in Wisconsin either prior to your relationship with him;

16        is that correct?

17  A    I guess I'm not—

18  Q    You weren't there to see what he may have had—

19  A    When he—

20  Q    —in Wisconsin?

21  A    When he moved—first moved to Wisconsin?

22  Q    Right.  Before you met him.

23  A    Right.

24  Q    Yes, during that period of time.

25  A    No, I wouldn't know what he brought over to Wisconsin.

1                         AMY LYNN MISHALL,

2        called at 2:33 p.m., and sworn by the Court, testified:

3                         DIRECT EXAMINATION

4    BY MR. SVIKIS:

5    Q    Would you state your complete name for the record and spell

6         it.

7    A    Amy Lynn Mishall—M-i-s-h-a-l-l.

8    Q    And where do you reside?

9    A    In the central part of Wisconsin—western Wisconsin.

10   Q    Okay.  And do you know Patrick?

11   A    Yes, I do.

12   Q    And how's that?

13   A    I met him down in La Crosse, Wisconsin, approximately ten or

14        11 years ago; and now we reside in Wisconsin.

15   Q    And long have you been married?  Well, let me—You're married,

16        right?

17   A    Yes.  Yes.

18   Q    Okay.  And how long have you been married?

19   A    Approximately six and a half years.

20   Q    All right.  During this time that you've resided with Patrick,

21        at any time did you ever see Patrick with a handgun?

22   A    No.

23   Q    Have you ever heard him talk about a handgun?

24   A    No.

25   Q    Possess one, shoot one?

                              610

1  A    Yeah, almost a year ago or so.

2  Q    Prior to his arrest or at the time of his arrest?

3  A    The day of his arrest.

4  Q    Was there—Did you block something out, ma'am; or were you

5       concerned that maybe you had blocked something out—something

6       about what he'd said about the murder, that you'd blocked that

7       from your memory?

8  A    Yes, 'cause I—you know, I was upset to what they were telling

9       me; and to try and—when you're upset and to try and think of

10      everything that he had told you how long ago, you feel that

11      you forget things.

12 Q    So when the police officers were talking with you and asking

13      you about what did Patrick say about the murder, you related

14      some things and said I think I might be blocking other stuff

15      out—something like that?

16 A    Yes.

17 Q    Do you have any recall now about things that you weren't able

18      to remember then?

19 A    No.

20                  MR. BROWER:    Thank you.

21                  I have nothing further of this witness.

22                  MR. SVIKIS:    I have no further—

23                  THE COURT:    Pardon?

24                  MR. SVIKIS:    I have no further questions.

25                  THE COURT:    You can step down.    Thank you.

                                 613

1  Q  Have you talked with your husband about this crime?

2  A  Yes.

3  Q  Did he—You know from talking with him that he doesn't like

4     guns, that's what—

5  A  Correct.

6  Q  —you testified to?

7  A  Right.

8  Q  Did you talk with him specifically about the crime?

9  A  He talked about it—what had happened.  That's all I know.

10 Q  Meaning Christine Dimmick's murder in Kalamazoo back in 1991?

11 A  Right.  Right.

12 Q  What did he tell you about that?

13 A  That he was dating her, he was trying to help her get out of a

14    bad situation; and that one day he—someone came to his door

15    and he was sleeping and they searched his car and his clothing

16    for any—I'm assuming—evidence.

17 Q  Did he tell you about what had happened to Christine?

18 A  No.

19 Q  But you knew that she had been murdered, right?  I mean you

20    knew that much?

21 A  I believe so, yes.

22 Q  Okay.  Did detectives talk with you some time ago in the year

23    2003 about this crime?

24 A  I—When he—When they came to the house for him, yes.

25 Q  You talked with detectives personally, though, correct?

612

1          MR. SVIKIS:   Your Honor, at this time I'd like to

2     call Patrick Mishall.

3          THE COURT:   Raise your right hand.  You do solemnly

4     swear or affirm the testimony you're about to give shall be

5     the truth, the whole truth, and nothing but the truth?

6          THE DEFENDANT:   I do.

7                    PATRICK KEVIN MISHALL,

8     called at 2:39 p.m., and sworn by the Court, testified:

9                       DIRECT EXAMINATION

10   BY MR. SVIKIS:

11   Q   Good afternoon, Patrick.

12   A   Afternoon.

13   Q   Let's get right to it.  Did you shoot Chris Dimmick?

14   A   No, I did not.

15   Q   Did you rob the Minute Market?

16   A   No, I did not.

17   Q   Have you ever owned a handgun?

18   A   No, I have not.

19   Q   Possessed a handgun?

20   A   Never.

21   Q   Borrowed a handgun?

22   A   No.  I don't like guns.

23   Q   You did know Chris Dimmick, though, right?

24   A   Yes, I did.

25   Q   And what was your relationship with her?

                          614

1  A   She was my fiancée.

2  Q   And did—Where did you live at that time?

3  A   2415 Springmont, Oakwood, Michigan.

4  Q   And how long you been living together on Springmont?

5  A   Approximately two and a half years.

6  Q   And was that your house that she moved into?

7  A   Yes, I was.

8  Q   And did you share your expenses?

9  A   Yes, we did.

10  Q   And your financial affairs were in order at that time?

11  A   At that time.

12  Q   So you didn't need to rob any convenience store to get money,

13      right?

14  A   No.

15  Q   Now how long had you been working at the Minute Market on

16      Stadium Drive?

17  A   I'd been working there approximately two and a half weeks at

18      that particular location.

19  Q   Within the—You worked at another Minute Market, also, right?

20  A   Yes, sir.

21  Q   And it's—That was on—

22  A   South Westnedge.

23  Q   And how long had you been there?

24  A   Almost a year.

25  Q   And Chris Dimmick was moved over to that store on

1  Stadium Drive from Westnedge; is that correct?

2  A  Yes, sir.

3  Q  And how many days had she been at that Stadium Drive store?

4  A  Approximately four.

5  Q  And let's go to February 8th of 1991; do you recall that day?

6  A  Yes, sir.

7  Q  Tell me what—what you did that particular day, starting with

8     the morning.

9  A  Starting when I woke up?

10  Q  In the morning, yes.

11  A  Woke up.  Christine was in the shower already.  She was kind

12     of poky at times, so I had to like get her going sometimes.

13     We were already running late, and she knew she had to have the

14     store open by 7:00 o'clock.

15            We got in the car, drove to the Minute Market.  I

16     parked exactly where everybody says I parked—right to the east

17     side of the building, or whatever.  We went in the back door.

18     She opened the back door.  She immediately went into the

19     office.  She coded in when we went in the back door.  Again,

20     this was a long time ago; so I can't remember exactly the

21     order that she did it in.  I think she took the code off first

22     and then she went into the office and then she came back out

23     and coded in.  I'm not quite sure.

24            But there was stuff to be done out in front in the

25     customer area, which I asked her if she wanted me to do that

616

1    for her while she was getting the cash drawers and everything

2    ready. And she said, yes, so I proceeded to—I brought in the

3    newspapers, which I used her keys to open up the front door;

4    went out and brought the old news—old new—I went out and

5    brought the new newspapers in, bundled up the old ones and put

6    them outside because they come out and get them later, locked

7    the door.

8         Usually we had coffee and hot water for the

9    customers ready. I made a pot of coffee. I noticed there

10   were some empty bottles and some boxes that we kept bottles in

11   in a cart, so I took that to the back room and got that taken

12   care of.

13        She had the drawers ready. I took the drawers, got

14   them into the register, got those ready, run those up, got

15   those on—got those ready to go.

16        I got the lottery machine ready. I got that turned

17   on.

18        And I think I did a little bit of sweeping up behind

19   the counter and then put everything away where it was supposed

20   to go. And I says to her, is there anything else you need me

21   to do because she was pretty much all set. And she said, no.

22        And she met me at the back door. We said goodbye,

23   and she let me out the back door. She shut the door. I went

24   around and got in my car, and I went home.

25   Q  When you got home did you go to bed?

617

1  A   Yes.

2  Q   And what did you ask him?

3  A   I told him I was going to be late. I told him I was at the

4      police station—which he, obviously, already knew—and I says,

5      do you know what happened; and he had told me that Christine

6      had been shot.

7  Q   And the detectives asked to take the clothing that you wore

8      that morning?

9  A   Yes, sir.

10  Q   And you gave them the clothing. And that was a sweatshirt,

11      sweatpants, T-shirt, and shoes?

12  A   Yes, sir.

13  Q   And you cooperated with that?

14  A   Yes, sir.

15  Q   They asked to take your car?

16  A   Yes, sir.

17  Q   They asked to search your home?

18  A   Yes, they did.

19             MR. SVIKIS:   I have no further questions.

20                  CROSS-EXAMINATION

21  BY MR. BROWER:

22  Q   Mr. Mishall, you and Christine were living together back in

23      February of 1991; is that right?

24  A   Yes, sir.

25  Q   About how long had you been together?

1  A   I think I might have had a cup of coffee and relaxed for a

2       little bit; but, yeah, I—I laid down because I wanted to get

3       some rest because I had to be at work at the South Westnedge

4       store at 11:30.

5  Q   And then there's a knock on the door, right?

6  A   Yes, sir.

7  Q   And did it wake you up?

8  A   Yep.

9  Q   And that was the police, right?

10  A   Yep.

11  Q   All right. And they told you something had happened and asked

12       to interview you, right?

13  A   Like I said, they came in the door. They had said there was

14       something that happened at the Minute Market. I wasn't

15       particularly aware of what had happened because they had not

16       told me what had happened at that moment. They asked me if

17       they could take me downtown to ask me a few questions. And I

18       said, yes, there's no problem; and they took me downtown.

19  Q   And when you're downtown they're still—they're still

20       questioning you, right?

21  A   Yes.

22  Q   And you asked to make a phone call in the morning, right?

23  A   Right. Because I had to be to work at the Westnedge store at

24       11:30, so I asked if I could call my boss Wayne Tiller.

25  Q   And that was Mr. Tiller?

1  A  At one time.

2  Q  All right. So when you said you didn't know, you really did

3      know?

4  A  I didn't know at that time, not until she told me. That's not

5      what you asked.

6  Q  So you knew that she had cheated on you before and you

7      suspected it on other occasions as well?

8  A  Yes.

9  Q  After the admission she had made to you, the suspicions that

10      followed that she was again cheating on you must have made you

11      even more angry; is that right?

12  A  No, no more angry than I was before. More hurt than angry, I

13      would say.

14  Q  Had you heard the rumor about her being with another woman?

15  A  That's total speculation. I had heard that; but, again—

16  Q  You did hear that?

17  A  I heard it, yes.

18  Q  Okay. You heard testimony regarding that—your statements

19      about that—her seeing another woman, right?

20  A  I never saw her with another woman personally, no.

21  Q  But you heard the testimony regarding that today from one of

22      the—

23  A  I heard the testimony, yes.

24  Q  And testimony about you being angry as you discussed that?

25  A  No.

621

1  A   Approximately two years.  Together together or living

2       together?

3  Q   Pardon me?

4  A   Together together or—

5  Q   Living together, yes.

6  A   Approximately two years.

7  Q   In February of 1991 you suspected that she was seeing other

8       people; is that right?

9  A   I didn't know if she was or not.

10  Q   But you suspected it?

11  A   I heard of accusations.

12  Q   Would that be, yes, then, you did suspect her?

13  A   I—Yes.

14  Q   Did that make you feel angry?

15  A   I believe that would make anyone angry.

16  Q   Again, that was a yes then?

17  A   Yes.

18  Q   In fact, she had been cheating on you before, right?

19  A   I don't know.

20  Q   Well, didn't you testify—

21  A   I didn't—

22  Q   —previously—

23  A   —actually—I didn't actually catch her doing anything of the

24       nature, but there was accusations.

25  Q   Didn't she admit to you that she was seeing somebody else?

1  Q  That's not your recollection?

2  A  No.

3  Q  You admitted to Detective Grace that you had threatened to

4     kill Christine—

5  A  No.

6  Q  —because of seeing someone else, didn't you?

7  A  No.

8  Q  You heard him testify to that in court, did you not?

9  A  Detective Grace?

10  Q  Yes.

11  A  No.  I didn't—

12  Q  You didn't—

13  A  —hear Detective—

14  Q  —hear that?

15  A  —Grace say that, no.

16  Q  You didn't hear him testify about the fact that you had

17     threatened her before and—

18  A  You're talking about Detective Grace?

19  Q  Yes.

20  A  The detective that I talked to the day of the interrogation?

21  Q  Yes.

22  A  Not to my recognition [sic], no.  This came from someone else

23     in testimony in this trial.

24  Q  All right.  And who would that be that you recall?

25  A  That—The lottery guy, as the judge would put it.  I can't

1  A   The manager that I was filling in for?

2  Q   That you were filling for.

3  A   I believe his first name was George.

4  Q   Okay. So the manager's gone and you're filling in for him?

5  A   Yes, sir.

6  Q   And fulfilling the responsibilities of that manager while he's

7      gone?

8  A   Yes, sir.

9  Q   Acting as a manager, in effect, without the title or the extra

10     pay that went along with it—

11 A   Yes, sir.

12 Q   —is that right?

13 A   Yes, sir. But not working first shift; I was working second

14     shift. I was only working first shift that last week before

15     Christine got to the store. That would have been the acting

16     manager's position that you're referring to.

17 Q   Do you believe that you did a good job during that period you

18     were filling in for the manager?

19 A   I never had any complaints.

20 Q   What does that mean, that you were doing a good job—you

21     thought you were doing a good job—or you thought—

22 A   That means—

23 Q   —you weren't?

24 A   That means I never had any complaints from the fellow workers

25     or from the customers.

624

1     remember his name—James something.

2  Q  You don't remember—

3  A  He was—

4  Q  —Detective Grace?

5  A  —the one that said that.

6         Excuse me?

7  Q  You don't remember Detective Grace testifying to that

8     statement?

9  A  I don't remember, no.

10  Q  Okay.  Did you make a statement like that to him?

11  A  Not to Detective Grace, I don't believe I did.

12  Q  Did you make a statement like that to any other police

13     officer?

14  A  Not to my knowledge, no.  Like I said, that was a long time

15     ago.

16  Q  So it's possible you may have said something like that to an

17     officer?

18  A  Yes.

19  Q  You just don't remember that today?

20  A  Yes.

21  Q  You were working at the Minute Market store on Stadium Drive

22     filling for the manager that was gone for a period of time; is

23     that right?

24  A  Yes, sir.

25  Q  What was that person's name; do you remember?

1      so your question again?

2 Q  It just seems inconsistent. You're either hurt by it because

3      you wanted it or you don't care if you got it or not.

4 A  I'm still not understanding the question.

5 Q  Were you angry at the business for not giving you the

6      promotion?

7 A  At who?

8 Q  The business?

9 A  No.

10 Q  You're angry at Mr. Jilek for not giving you the—

11 A  No.

12 Q  —position? Not even a little bit?

13 A  No.

14 Q  Did you call in sick the next two days afterwards—after the

15      announcement was made about who did get the promotion?

16 A  I don't remember that myself. I don't—

17 Q  It may well—

18 A  —recall.

19 Q  —have happened?

20 A  I might have gotten a little intoxicated. I don't quite

21      remember. I don't believe it was two days, though. That

22      would—

23 Q  Just completely un—

24 A  —hurt me financially.

25 Q  Completely unrelated to the announcement, however?

(Tape No. C2005-023, 2-09-05, 02:53)

1  Q  Well, I guess we can infer that you thought you were doing a
2     good job then. Did you feel that you deserved the promotion?
3  A  I had never considered myself for the promotion.
4  Q  You never considered yourself for the promotion? Didn't you
5     testify previously that you were honored by the fact that—
6  A  I was honored—
7  Q  —you were even considered?
8  A  —for the fact that I was up for the promotion, yes; but it
9     didn't matter to me whether I got it or not, no.
10 Q  Didn't you previously also testify that although you were
11    honored you were being considered, when the—when you heard
12    that you didn't get the promotion you were upset about that?
13 A  I said I was hurt.
14 Q  You were hurt.
15 A  I didn't say I was upset.
16 Q  Okay.
17 A  I said I was hurt.
18 Q  You were hurt?
19 A  Yes.
20 Q  Okay. But you get hurt about things that you don't care about
21    one way or the other?
22 A  I don't understand the question.
23 Q  I thought just a few moments ago you didn't—basically you
24    didn't care if you go the promotion or not.
25 A  So I didn't get the promotion so I was a little hurt about it,

625

1  A    Yes.

2  Q    In fact, you were upset that you didn't get the promotion and

3       you resented Chris because she got it?

4  A    No.

5  Q    You wanted to get back at the store, didn't you?

6  A    No.

7  Q    Isn't that why you wanted the key from Chris?

8  A    No, there was a discrepancy about the key chain situation.

9       She had certain key chains; I had certain key chains. I just

10      thought it'd be easier to have a key to the store at that time

11      while I was helping her—still training, more or less—make it

12      easier for access to the store. But then it became a problem

13      so I just resolved that—

14 Q    You thought it—

15 A    —and she just kept the key.

16 Q    You thought it would be easier if you had a key, also, as you

17      helped her train?

18 A    Well, I didn't know if I'd be needed at that store anymore or

19      not.

20 Q    So you wanted a key and you wanted it from Chris?

21 A    If I was to be at that store. Not from Chris, no, from the

22      business.

23 Q    Didn't you ask Chris to give you a key to the store?

24 A    I said wouldn't it be easier for both of us to have a key, not

25      for her to give me her key, no.

1   Q   You wanted a key to the business?

2   A   I thought it'd be easier for both of us to have a key to the

3       store.

4   Q   Is that—

5   A   I did not—

6   Q   —a yes then?

7   A   —actually want a key to the store.

8   Q   There might be a distinction there, but I don't see a

9       difference, sir.

10  A   I thought—

11  Q   Bottom line is you wanted a key to that store; is that right?

12  A   Yes.

13  Q   And she didn't agree to that, did she?

14  A   No.

15  Q   You wanted something from her and she rebuffed you?

16  A   That's what you say, yes.

17  Q   And you, in fact, argued about it at the store?

18  A   I don't recall that either.  I believe that was over the phone

19      at the store.

20  Q   Did she catch you stealing from the store on that day,

21      February 8?

22  A   No.

23  Q   Did she see you bring the videotape outside and go around the

24      front and stash it?

25  A   Did she confront you in the front of the store about

                            628

1      that—about what you were doing?

2 Q   Did you have an argument with her in the retail area—the

3      customer area?

4 A   No.

5 Q   You knew all about that security system, didn't you?

6 A   Yes.

7 Q   Where the cameras were placed, where the recording equipment

8      is, the tape rotation and all that kind of stuff?

9 A   Right.

10 Q   Sir, is that why you had to take the security tape; it showed

11      you in the front of the store much to close in time to the

12      murder?

13 A   I'm not understanding the question.

14 Q   Did you take the tape because it showed you in the store close

15      to the time of the murder?

16 A   I'm not sure of what tape you're referring to.

17 Q   The surveillance tape that's been missing that's been the

18      object of this—

19 A   No, that wasn't a surveillance tape; it was a porno tape.

20 Q   Did you take the surveillance tape from the office area?

21 A   No, I did not.

22 Q   Did you take that tape because it documented when you were in

23      the store?

24 A   No, I did not.

25 Q   When you argued with her, all the anger you felt with her

629

1       about messing around kept welling up inside of you, didn't it?

2   A   No.

3   Q   That just wasn't seething inside of you this whole time?

4   A   No.

5   Q   Is that when you decided to kill her?

6   A   I didn't kill Chris Dimmick.

7   Q   Was the gun already in the store—

8   A   I never—

9   Q   —like you suggested to Tina Telpely?

10  A   I never owned a gun.  I never had a gun, so I don't know what

11      you're talking about.

12  Q   You heard Tina Telpely's—

13  A   Yes.

14  Q   —testimony, yes?

15  A   Yes.

16  Q   About you had a gun, you knew how to use it, and you could put

17      it in there and nobody would find it?

18  A   I may have said that.  I don't remember.

19  Q   You may have said that?

20  A   I may have said that.  I don't remember.

21  Q   So her testimony regarding your statement that you had a gun

22      and could hide it here and it wouldn't be seen may, in fact,

23      have been something you told her?

24  A   It may have, yes.

25  Q   But if you told her that, it wasn't true because you didn't

                              630

1      have a gun?

2  A   My recognition [*sic*] of that conversation was, you know, all

3      we would have to do for protection if we were to get robbed

4      was to have a gun underneath the counter. They would never

5      know we had a gun. And if they were to draw a gun, we'd have

6      a gun to draw back. I believe that was the conversation—

7  Q   Did you—

8  A   —if I can recollect correctly.

9  Q   Did you hide a gun in the store?

10 A   No, I did not.

11 Q   Did you have a gun with you when you went to the store?

12 A   No, I did not.

13 Q   You owned a large, dark car, correct?

14 A   Yep, a 1985 Ford LTD, which isn't large; it's considered

15     midsize.

16 Q   You told the initial detectives back in '91—'91 that you got

17     to the store as early as 6:05 and left 20 minutes later,

18     right?

19 A   I believe we rolled in about 6:00; and I was at the store,

20     yes, approximately 20, 25 minutes.

21 Q   But that couldn't be—Could it?—if the alarm was deactivated at

22     6:25 when you entered the store to begin opening procedures?

23     You couldn't have been there 20 minutes before and left at the

24     same time of the log-in; is that right?

25 A   I didn't log in the code to the alarm; she did, I didn't.

631

1  Q  And she did that—

2  A  She didn't—

3  Q  —immediately—

4  A  —do it—

5  Q  —upon entering the store; isn't that what your—what you

6     testified to previously?

7  A  I'm sorry?  Can you ask that again?

8  Q  And she punched in the alarm code immediately upon entering

9     the store; isn't that what you testified to previously?

10  A  No.  I believe that I said she went and took her coat off,

11     went in the office and then came back out and coded in.  I

12     believe that's what I said.

13  Q  You didn't know Sonatrol kept a record of the activation or

14     deactivation times, did you?

15  A  No.

16  Q  So when you gave the 6:05 arrive at the store time, you

17     wouldn't know that the police would be able to disprove that,

18     did you?

19  A  (No audible response)

20  Q  But giving that early deactivation time—

21  A  I'm sorry.

22  Q  Giving that early deactivation time and then early departure

23     time to go back home, that would certainly put distance

24     between you and the 7:00 o'clock opening when—a period when

25     somebody else would have been able to murder her?

632

1  A   I gave the times—Those are the times that I gave.  Those are

2      approximate.  Like I said, it was a long time ago.  I don't

3      exactly quite remember the time.  Those are approximate times

4      that I gave.

5  Q   When you left did you go straight home?

6  A   Yes, I did.

7  Q   Did you make any stops anywhere?

8  A   No, I did not.

9  Q   It's only about a mile and a half away, right?

10 A   Approximately.

11 Q   Just a matter of a few minutes to get home?

12 A   Seven minutes, to be exact.

13 Q   Seven minutes?

14 A   Approximately.

15 Q   About four.

16 A   That's what you say.

17 Q   You told every detective you spoke with that you left the

18     store well before 7:00 a.m., didn't you?

19 A   Yes.

20 Q   But then you should have been home well before 7:00 a.m. as

21     well, right?

22 A   Yes.

23 Q   But the fact is, you weren't home at 7:00 o'clock as you

24     should have been; isn't that right?

25 A   No.  I was home well before 7:00 o'clock.

633

1  Q  You were home well before 7:00 o'clock.

2  A  I believe so.

3  Q  Bart Munson was there at 7:00 o'clock, but you didn't see him

4     because you weren't there; isn't that the truth?

5  A  I don't recall anyone knocking on the door at 7:00 o'clock.

6  Q  If you were there, your car should have been there, right?

7  A  Yes, sir, parked in the garage.

8  Q  Did you go home and take a shower?

9  A  No.

10 Q  You told Detective Grace that that was your intent, wasn't it?

11    Didn't you?

12 A  That was my intent—

13 Q  Yeah.

14 A  —I wanted to take a shower, and then I figured I'd take a nap

15    and then take a shower before I went to work 'cause I had to

16    be to work at 11:30 at the other store.

17 Q  So in spite of what you told Detective Grace you didn't

18    actually do that?

19 A  No, I didn't take a shower that morning.  I wasn't thinking

20    about taking a shower, but I didn't take one.

21 Q  Taking a shower—

22 A  I was too tired.

23 Q  —would have provided you with an opportunity to remove any

24    trace evidence that might have been left on your person or

25    clothing; is that right?

634

1  A    Correct.

2  Q    Did you tell Jim Grubius that you would kill Chris if you

3       caught her with someone else?

4  A    That's the conversation I don't remember having with that man,

5       no.

6  Q    Do you remember telling him, or are you saying you didn't say

7       it?  Excuse me.  Let me rephrase that.

8  A    I don't remember—

9  Q    You don't remember—

10 A    —having that conversation with that guy, period, to tell you

11      the truth.  He says he knew me previous from me working at a

12      gas station before I started working at the Minute Market, but

13      I don't remember that guy.  I really don't, to tell you the

14      truth.  He says he knows me from the South Westnedge store.

15 Q    I'll ask the question again, sir.

16 A    I don't remember that guy.

17 Q    Do you remember telling Jim Grubius that if you caught her

18      with someone else you would kill her?

19 A    No.

20 Q    Did you tell Jim Grubius if I catch her with somebody I'll

21      kill her?

22 A    I might have said that.  I don't recall.

23 Q    Might have said that and said it while you were very angry

24      about your suspicions regarding Chris and another—another man?

25 A    Yes.

635

1  Q  And the time you said it you had a present suspicion that she
2     was seeing someone else, which is why you were so agitated,
3     why you said it in the first place, right?
4  A  Yes.
5  Q  When you add that suspicion to what you—she had already done
6     in your mind—cheated on you before, you weren't angry about
7     that?
8  A  I think anybody would be angry, like I said before, if anybody
9     knew that someone was cheating on them.
10 Q  So you were angry?
11 A  I think anybody would be angry . . . (inaudible)
12 Q  In fact, very angry?
13 A  Angry as angry can get, I guess.
14 Q  Is that a yes then, you were very angry?
15 A  I was angry.
16 Q  Did you tell Tina Dahl (phonetic) you were separated from
17    Chris at the time of the murder because you had caught her
18    with someone else?
19 A  No, I don't recall that.
20 Q  You might have said it; you just don't remember?
21 A  I don't think I said that. I don't remember.
22 Q  May have.
23 A  I don't believe I said that, no.
24 Q  In fact, you told Tina Dahl (phonetic) that you were separated
25    from Chris because you caught her with another woman?

636

1   A   No.

2   Q   You didn't say that?

3   A   No. I don't know why she would say something like that to put
4       me in that position anyway.

5   Q   Thinking she was with another man and then later believing
6       that she may have been with a woman—at least that was your
7       statement—that must have just compounded the anger; is that
8       true?

9   A   No.

10  Q   That didn't make you even more angry? Wasn't that, in fact,
11      the straw that broke the camel's back?

12  A   That was pure hearsay, to tell you the truth. That's what I
13      think.

14  Q   You told detectives over and over and over again that you
15      never had a gun, never owned a gun, never possessed a gun; is
16      that right?

17  A   Correct.

18  Q   But you also had told officers that you only left the store
19      going to the front of the store for one reason, to bring the
20      papers in—

21  A   Right.

22  Q   —and that you did not go out to the front of the store for any
23      other reason? That's what you told the detectives, right?

24  A   Right.

25  Q   That was a lie, though, wasn't it?

637

1  A    Yes.  I was embarrassed to say something about the porno tape.

2  Q    So taking a porno tape was something that you wanted to avoid

3       the consequences for?

4  A    Yes.

5  Q    And you were willing to lie to the police—

6  A    I was—

7  Q    —to do it?

8  A    I was embarrassed.

9  Q    You lied to avoid the consequences?

10 A    Yes, you could say that.

11 Q    You only admitted it when you were confronted with the story

12      that someone had seen you go out to the front?

13 A    Yeah.

14 Q    When you were caught cold, you admitted it thinking you didn't

15      have any other recourse?  Is that bottom line?

16 A    (No audible response)

17 Q    Yes?

18 A    Yes.

19 Q    Did you ask Brett Munsun to get rid of a gun for you?

20 A    No, I did not.

21 Q    In fact—

22 A    How can I have somebody—

23 Q    —you—

24 A    —get rid of—

25 Q    you—

638

1  A  —a gun that I never had. I don't understand that.

2  Q  Was that the murder weapon?

3  A  How could it be a murder weapon if I didn't have a weapon in

4     the first place? I don't understand—

5  Q  Did you tell—

6  A  —that either.

7  Q  —Tina Telpely that you had a gun and knew how to use it?

8  A  No.

9  Q  We talked about that before, about hiding it in the store.

10    You may have said something like that.

11 A  I believe we had a conversation at one time about what I had

12    said before. Exactly.

13 Q  Did—

14 A  If we had a gun in the store and someone was to rob us at

15    gunpoint that we could have a gun under the counter—that

16    conversation, which we just had maybe five minutes ago.

17 Q  Did you tell Carol Sordahl you had a gun?

18 A  No.

19 Q  Did Tina Dahl (phonetic) see you with a gun?

20 A  No.

21 Q  A large handgun—

22 A  No.

23 Q  —maybe a .38 or a .357?

24 A  No.

25 Q  Did you tell her—that meaning Tina Dahl (phonetic)—about the

639

1    maid at the motel finding it just before—just after you moved

2    to Wisconsin from Michigan?

3  A  No.

4  Q  She's got some of the details right there, though, doesn't

5    she?

6  A  No.

7  Q  You moved from Michigan to Wisconsin, yes?

8  A  Yeah, I moved from—

9  Q  When you—

10  A  —Michigan to—

11  Q  —arrived—

12  A  —Wisconsin.

13  Q  —in—

14  A  That's obvious.

15  Q  When you arrived in Wisconsin you stayed at the motel, yes?

16  A  Yes.

17  Q  And you got kicked out of the motel—

18  A  Yeah.

19  Q  —yes?

20  A  I was asked to move.

21  Q  So she got some of the facts right, as a matter of fact,

22    didn't she?

23  A  Yes.

24  Q  So if she's making this up, she guessed the right facts with

25    exception of one; it wasn't alcohol, it was a gun?

640

1   A   No.

2   Q   Dawn Anderson saw you with a gun, too, didn't she?

3   A   No, she did not.

4   Q   Chris Newburry came up to you and asked you a question about

5        Chris's murder—a very pointed question, wasn't it?

6   A   Yes.

7   Q   She said you killed Christine, didn't you?

8   A   She asked if I killed her, yes.

9   Q   And you responded by grabbing her by the neck and saying I

10       ought to do to you what I did to Chris?

11  A   I don't know if those were the exact words; but it was

12       something like that, yes.

13  Q   I ought to do to you what I did to Chris.

14  A   I believe the words were I should do to you what I—what they

15      say I said—what they said I did to Chris.  I believe those

16      were the words.  I don't remember.  It was—She had been

17      badgering me all day long about this, and I was pretty upset

18      at that time.

19  Q   Do you remember testifying in a prior proceeding?

20  A   Well, yeah.

21  Q   Do you remember being asked a very specific question to

22      respond to the comment I ought to do to you what I did to

23      Chris?  I asked that question of you at that time.  Do you

24      remember that?

25  A   Yes, I do.

1  Q  And do you remember your statement?

2  A  No, I don't.

3  Q  Do you remember saying I only meant to fight with her like

4     Christine and I fought—physically fight. That's what I was

5     talking about then.

6  A  That's what I was talking about—

7  Q  All right.

8  A  —physically fighting.

9  Q  So when—

10 A  Yeah.

11 Q  —you said I ought to do to you what I did for Chris, your

12    response was I meant physically fight, not kill her.

13 A  Correct.

14 Q  Your answer wouldn't make any sense if what she had said was I

15    ought to do to you what they think I did to Chris because that

16    was murder. Your statement wouldn't make any sense—

17 A  I—

18 Q  —if that's what Christine had asked you, would it?

19 A  If you think of it that way, I think both those statements

20    refer to that same purpose, don't they?

21 Q  I can't give my opinion, sir.

22        You grabbed her by the neck and put her up against

23    the wall; is that right?

24 A  Yeah.

25 Q  Tracy Rathke—Rathke—confronted you in a similar manner to

642

1    Christine Dimmick [sic]—Excuse me.—Christine Newburry.  She

2    approached you much like Christine did and said you killed

3    her, didn't you; is that right?

4  A   Yes.

5  Q   The look in your eyes and your demeanor at that time was such

6    that she ran running from the house; is that right?

7  A   From what I remember, yeah.

8              MR. BROWER:   I have nothing further of this

9    witness.

10             MR. SVIKIS:   No further questions, your Honor.

11             THE COURT:   You can step down, sir.

12             MR. SVIKIS:   Defense rests.

13             THE COURT:   Any rebuttal?

14             MR. BROWER:   No, your Honor, but there is a

15   stipulation that could be read into the record.

16             THE COURT:   All right.

17             MR. BROWER:   Your Honor, how would the Court have

18   me do this, just read it myself in the record?

19             THE COURT:   That's fine—

20             MR. BROWER:   Okay.

21             THE COURT:   —unless you'd like it done some other

22   way.

23             MR. BROWER:   Whatever you prefer.

24             THE COURT:   That's fine.

25             MR. BROWER:   Okay.  Your Honor, the parties

643

1  stipulate to the following facts:

2          Christine Dimmick was murdered at the Minute Market,

3  2905 Stadium Drive, in the city and county of Kalamazoo,

4  Michigan, on Friday, February 8th, 1991.

5          Her body was transported from the scene to the

6  county morgue by Mall City Ambulance personnel and secured at

7  that location. Dr. Harvey S. Wilkes, forensic pathologist,

8  conducted an autopsy on the body of Ms. Dimmick on February 9,

9  1991. He determined that she died as a result of four gunshot

10  wounds and ruled the death a homicide. The chain of custody

11  on the body was properly maintained from the time the body was

12  taken from the scene until the time of the autopsy by

13  Dr. Wilkes.

14          The fired lead bullets or fragments recovered from

15  the body of Ms. Dimmick were taken by police at the time of

16  the autopsy, secured as evidence, and later taken to the

17  Michigan State Police laboratory for examination. The chain

18  of custody on the bullets and fragments was properly

19  maintained from the time they were recovered at the autopsy

20  until the time of the examination at the Michigan State Police

21  lab and at all times thereafter.

22          Clothing turned over to detectives by the defendant

23  was secured as evidence and later turned over to the Michigan

24  State Police laboratory for examination. The chain of custody

25  on the clothing was properly maintained from the time the

644

1    clothing was collected until the time of the examination at

2    the Michigan State Police lab and all times thereafter.

3         The chain of custody for any additional items

4    collected by the police as described in the police report was

5    properly maintained from the time the items were collected

6    until they were presented in court whether offered as evidence

7    by the People or the defendant.

8         The parties agree to admission of the following:

9         The autopsy report from 2/9/91 by

10   Dr. Harvey S. Wilkes.

11        And that's the extent of the stipulations, your

12   Honor.

13        MR. SVIKIS:   That's correct.

14        THE COURT:   All right.

15        Members of the jury, the parties—that is, the

16   prosecution and defense—have agreed that those are the facts

17   so that you may consider them as part of the evidence in this

18   case.

19        Is there anything other than that?

20        MR. BROWER:   No, your Honor.

21        THE COURT:   What remains to be done, then, members

22   of the jury, is for the attorneys to make closing arguments to

23   you; for me to instruct you as to the law that applies to this

24   case; and then for you to deliberate and decide on the

25   verdict.

645

1    I am required by law to address with the lawyers
2    very specifically all of the instructions that I intend to
3    give you, and that usually takes about an hour in a matter
4    like this.  So since it's 20 after 3:00 we wouldn't be able to
5    get to closing arguments till late—after 4:00 o'clock.  And I
6    think it would be appropriate, rather than to do that, to
7    recess for your purposes.  I'll discuss the instructions with
8    the attorneys yet tonight.  And then I'll be ready to instruct
9    you immediately after closing arguments tomorrow.  So we'll
10   recess for that purpose at this time.

11   Keep in mind what I've told you previously.  You're
12   not to discuss this case amongst yourselves or with anyone
13   else.

14   You're to read—or avoid all news media reports
15   regarding this matter.

16   You're not to have any contact with anybody that's
17   been involved in this case.

18   And make sure before you leave tonight that, those
19   of you who are taking notes, that those are left secured with
20   the court officer.

21   So for purposes of the jury, we'll stand in recess
22   until tomorrow morning at 9:00 o'clock.

23   I'll see counsel in chambers, and we'll discuss the
24   instructions tonight.

25   (At 3:21 p.m., proceedings adjourned)

646