26|51|

1            STATE OF MICHIGAN

2        9TH CIRCUIT COURT—TRIAL DIVISION

3

4   THE PEOPLE OF THE
    STATE OF MICHIGAN

5
        v                            Files No. C03000897 FC

6   PATRICK KEVIN MISHALL,

7           Defendant.

8

9            Jury Trial — Volume IV of V

10
      Before Hon. George R. Corsiglia P12239, Circuit Judge

11   (Visiting Judge from 48th Circuit, Presiding by Assignment)

12       Kalamazoo, Michigan—Thursday, February 10, 2005

13

14

15
    APPEARANCES:
16
    For the People:        Scott W. Brower P44951
17                         Office of the Prosecuting Attorney
                           227 West Michigan Avenue
18                         Kalamazoo, Michigan 49007
                           (269) 383-8900
19
    For the Defendant:     Andis Svikis P36039
20                         1803 Whites Road
                           Kalamazoo, Michigan 49008
21                         (269) 349-7692

22   Recorded by:          Video recorded

23   Transcribed by:       Brenda K. Foley CER 4956
                           1400 Gull Road
24                         Kalamazoo, Michigan 49048
                           (269) 385-6001
25                           * * * * *

                           647

FILED

JUN 1 3 2005

9th JUDICIAL CIRCUIT
COUNTY OF KALAMAZOO
KALAMAZOO, MICHIGAN

ENTERED

1                        TABLE OF CONTENTS

2                                                              PAGE

3   Closing argument by Mr. Brower  . . . . . . . . . . . . . . 649

4   Closing argument by Mr. Svikis  . . . . . . . . . . . . . . 662

5   Rebuttal argument by Mr. Brower   . . . . . . . . . . . . . 678

6   Jury instructions . . . . . . . . . . . . . . . . . . . .  688

7

8   EXHIBITS

9        None

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

(Tape No. C2005-024, 2-10-05, 09:07)

1    Kalamazoo, Michigan

2    Thursday, February 10, 2005 - 9:07 a.m.

3    THE CLERK: The court calls the case of People

4    versus Patrick Mishall, file C03-0897 FC.

5    Please state your appearances for the record.

6    MR. BROWER: If it please the Court, your Honor,

7    Assistant Prosecuting Attorney Scott Brower for the People of

8    the State of Michigan.

9    MR. SVIKIS: Andis Svikis on behalf of Mr. Mishall.

10    THE COURT: We're to proceed, gentlemen.

11    MR. BROWER: Yes, your Honor.

12    THE COURT: Members of the jury, what remains to be

13    done in this case is for you to hear the closing arguments—All

14    the proofs are in now.—for me to instruct you as to the law.

15    And, as I told you at the beginning of the case, I'm going to

16    give you a written or printed copy of the Court's final

17    instructions so that you may have them with you in the jury

18    room. And then after the arguments and the Court's

19    instructions, you will then commence your deliberations.

20    Mr. Brower?

21    MR. BROWER: Thank you, your Honor.

22    Beyond any reasonable doubt Patrick Mishall is

23    guilty of the crimes he's charged with.

24    The evidence: the testimony that you heard in this

25    courtroom tells us that. As you may have expected from

649

1    voir dire, there is a great deal of circumstantial evidence.

2    But it is not inferior evidence because it is circumstantial;

3    it is compelling evidence that happens to be circumstantial.

4    Let's take a closer look at the testimony, the

5    reasonable inferences that you can make and the logical

6    conclusions.

7    I've broken it down into six different areas: facts

8    which show Patrick Mishall's opportunity to commit the crime;

9    facts showing that entry was given voluntarily; facts showing

10   Mishall's familiarity with the crime scene, equipment, and

11   procedures; that Patrick Mishall had the means to commit the

12   crime; that Patrick Mishall had the motive to commit the

13   crime; and, finally, other actions and statements by

14   Patrick Mishall which, together, prove his guilt.

15   Let's look at the first area, Mishall's opportunity

16   to commit the crime. Here is the evidence. This business

17   opened at 7:00 a.m. every day. Regular customers were coming

18   by at 7:00 a.m. For the perpetrator of this crime, the chance

19   of being seen after 7:00 a.m. greatly increased. This crime

20   was not in progress after 7:00 a.m. It was over with by

21   7:00 a.m.

22   Stealing the security tapes and recorder, stealing

23   the money—both the coins and the deposit—and the murder of

24   Chris Dimmick took some time. It didn't all happen in the

25   blink of an eye. So if it was all over with by 7:00 a.m., the

1    incident must have begun before 7:00 a.m.

2         Someone taking all this bulky stuff—the VCR, the

3    money, the coins, the tapes—could not have been on foot but

4    must have had a vehicle nearby.

5         Minute Market employees parallel parked their cars

6    along the east side of the store.  A large dark vehicle was

7    seen parked parallel to the east side of the store

8    approximately five minutes before 7:00 a.m. and was gone

9    minutes later.

10         Patrick Mishall drove a black Ford LTD.  Mishall

11    admits that he parked along the east side of the building.

12         Mishall was not home as he said—as he should have

13    been—if he had left the business when he said he did and drove

14    straight home as he said he did.  One and a half miles, three

15    or four-minute drive.

16         The startup tasks were not completed before

17    7:00 a.m.  Remember the officer that talks about the cart that

18    was still in the aisle way and the bundle of papers still on

19    the floor?  That evidence leads to these conclusions:

20         Before 7:00 a.m. something happened that prevented

21    Chris from completing the startup tasks.

22         The robbery/murder was committed before 7:00 a.m.

23         The person responsible had a car nearby.  It was

24    Patrick Miscall's car that was seen parallel parked along the

25    east side of the building before 7:00 o'clock.

651

1   Patrick Mishall's car was there when the robbery/murder was

2   occurring; and so, too, was Patrick Mishall.

3           There was no window of opportunity for anyone else

4   to drive up or near the business, gain entry, commit the

5   robbery and murder, load up the stolen property, and drive

6   off—only Patrick Kevin Mishall.

7           Consider this time line.  Defendant's

8   statement—initial statement to Detective Hatter.  Told

9   Detective Hatter that he had arrived at 6:05 and was there for

10  25 minutes—or 20 minutes, leaving at 6:25—this area—the

11  darkened area on the chart, bar graph number one.  If he had

12  left at 6:25 that left a window of opportunity from 6:25 to

13  7:00 o'clock for someone else to have committed the robbery.

14          Story number two: he arrived at approximately 6:17,

15  was there for approximately 20 minutes—a little bit closer in

16  time to 7:00 o'clock—still leaving a considerable period—an

17  opportunity for someone else to have committed the crime,

18  according to him.

19          Statement to Detective Grace: he arrived at about

20  6:00 o'clock, didn't indicate how long he was there.  But if

21  consistent with what he had told Detective

22  Hatter—approximately 20 minutes—leaves, again, a considerable

23  time for someone else to have committed the crime.

24          But what do we know?  The alarm deactivation was, in

25  fact, at 6:25.  We know his car was there until 7:00 o'clock

652

1     or shortly before. There is no opportunity for anyone else to
2     have committed this crime.

3          Second area I'd like to talk about is entry into the
4     store was given voluntarily by Chris. Here's the evidence:
5     Chris Dimmick was found murdered inside a secure, locked
6     building prior to opening for business.

7          Just how did the perpetrator get in? There was no
8     sign of forced entry. The assailant did not accost the victim
9     as she walked up to the building after arriving there, force
10    her to unlock the door, force her to enter the store, force
11    her to deactivate the alarm, or force her to unlock the floor
12    safe. You know this from the defendant himself. The murderer
13    didn't get in there that way.

14         Before the store opened Chris would not have let in
15    anybody she didn't know. This fact came from Patrick Mishall
16    himself to Detective Handlogten. He says that's what Chris
17    taught him. She wouldn't have done that. So that scenario is
18    out, too.

19         Finally, the assailant was not hiding inside the
20    store overnight. The testimony of Frank Sila and
21    Sharon Hitchcock from Sonatrol and Tina Askern—the night
22    clerk—are very clear about that. It just wasn't possible.

23         The conclusions are these: the robbery/murder was an
24    inside job by someone that was not a stranger to the store;
25    someone that Chris Dimmick knew and was comfortable with;

1  someone that she would let into the store voluntarily—someone
2  like Patrick Mishall.
3      Let me backtrack to the someone was hiding inside
4  the building idea. It makes absolutely no sense. Why would a
5  stranger intent on robbery conceal himself in the store the
6  previous evening, bypass the opportunity to rob the clerk
7  after she locked the front doors at 2:00 a.m. when there were
8  no customers expected and little chance of being seen and,
9  instead, wait silently all night to rob the day clerk after
10 she entered the store but before she unlocked the doors when
11 the streets were coming to life and the chance of being seen
12 was far greater? It doesn't make sense.
13      Yet Patrick Mishall offered this illogical someone
14 must have been in—hiding inside scenario time and again over
15 the years as an alternative to the only logical scenario, that
16 he was the perpetrator.
17      Third area, Mishall's familiarity with the crime
18 scene equipment and procedures. There may be many things in
19 this particular area that you could pick out from the
20 testimony which point to Mishall's involvement in the robbery
21 and murder. I'm going to point out just one: the coin box.
22 Here is the evidence. The coin box or change box was locked
23 but empty when police arrived that morning. It had not been
24 empty, however, when Tina Askern closed 2:15 a.m. that
25 morning.

654

1            The coin box key was kept on a ring in the desk

2    drawer.  The key was back in the desk drawer when police

3    arrived.  What does that tell you?  The person who stole from

4    the coin box had to be an insider.  This person knew where the

5    key was, opened the key [sic] box, removed the money—coins and

6    some currency—and relocked the box and replaced the key.

7    Patrick Mishall would have had knowledge of the coin box and

8    the key location.

9            It is not reasonable to think that Chris would have

10   unlocked the box for some unknown robber at his direction,

11   then relocked the empty box and put the key away.  It is

12   reasonable, however, to believe that Patrick Mishall wasn't at

13   the store to help Chris open at all.  Instead, angry and upset

14   with the company owners and decision makers for passing him up

15   for a promotion he felt he deserved, he was trying to get back

16   at them using Chris to gain access to the building.

17           Remember his access code had been changed.  The

18   locks were changed.  He couldn't get into the building alone

19   without Chris—without her cooperation—and she wasn't

20   cooperating.  She refused to give him his key—a key that he

21   wanted anyway.

22           From the evidence it's reasonable to believe that he

23   was trying to steal from his employer right under Chris's nose

24   only to get caught by Chris with his hand in the coin box or

25   rental tapes as he tried to hide the tape by the wood pile,

1   which led to a confrontation, to an immediate escalation, and,

2   ultimately—because of all the other issues Patrick Mishall had

3   with Chris Dimmick which were unrelated to the business—to

4   murder.

5           It's also reasonable to believe that after shooting

6   Chris to death he went back and took the rest of the deposit

7   money and the surveillance tape recorder.  While he would have

8   known that the murder itself could not have been on a tape

9   because the cameras were in the front area only and not in the

10  back room, whatever may have occurred in the customer area

11  would have been on tape—like an animated argument near the

12  front doors or his presence in the store later than he would

13  tell police if asked.  That evidence had to go.

14          Fourth area: Mishall had the means to commit the

15  crime.  Chris was killed with a .38 or .357 handgun.  Time and

16  time again over several years Mishall denied ever owning or

17  possessing a gun of any kind.

18          Yet before the murder he told coworker Tina Askern

19  he had a gun and knew how to use it.  Just days after the

20  murder he asked Brett Munson to get rid of a gun for him.

21  Within months after the murder he spoke about having a gun

22  with Carol Sordahl.

23          Also, within months of the murder, Dawn Haller

24  Anderson saw him with a handgun—saw him with a handgun—as did

25  Tina Dahl (phonetic) a year or two later.  She saw him with a

656

1   large handgun, and he told her the story about the maid

2   finding the gun in his room while living at his uncle's motel

3   where he was living after he moved from Michigan to Wisconsin.

4           The conclusions are these: contrary to his repeated

5   denials, Mishall did own a large handgun at the time of the

6   murders; and that is extremely significant.  He did have the

7   means to commit this crime.

8           People, his denials that he even had a gun and his

9   attempt to have someone get rid of a gun for him so soon after

10  the murder is evidence of a consciousness of guilt.  It makes

11  no sense for an innocent man to choose not to turn over a gun

12  that he knew was not the murder weapon.  But he knew he

13  couldn't admit owning a gun.  He'd be pressed by the police to

14  turn it over.

15          The ability of the police to do ballistics

16  comparison is commonly known.  If he turned his gun over, he

17  knew it would convict him.  He had to lie.  Wherever it was

18  that he his the gun and property after the murder but before

19  he returned home, he couldn't take the chance of going back to

20  the location and permanently disposing of it himself.  He

21  couldn't take the chance of getting caught with it, so he

22  approached Brett Munson.

23          But more and more days went by.  Nothing developed.

24  Nothing developed with the case that he could see.  The police

25  left him alone.  No arrest.  Nothing.

1        Eventually he packs up and moves to Wisconsin,
2   taking his gun with him, abandoning his home in Kalamazoo,
3   only returning briefly months later.
4        With all of the compelling evidence we've summarized
5   thus far, there is more.
6        Fifth area, his motive to commit the crime.  Mishall
7   was angry about Chris recently wrecking his car with another
8   man with her.  He was, in spite of his denials, angry about
9   the promotion.  Chris refused to cooperate with him, and he
10  argued with Chris about her refusal to give him a key.  She
11  wouldn't cooperate.
12       To Detective Grace he admitted threatening to kill
13  Chris if he caught her with someone else, and he did suspect
14  her of seeing someone else.  He knew she was seeing someone
15  else.  And this.
16       To James Grubius—within weeks before the murder—he
17  twice said he would kill her if he caught her messing around,
18  once saying this while agitated, irate—You remember the
19  description Mr. Grubius gave about his facial features and his
20  demeanor and the look in his eyes.  Remember that.
21       To Tina Dahl (phonetic) he spoke about finding his
22  girlfriend Chris with another woman.  He was angry, agitated,
23  and upset years later as he related that.
24       The conclusion to be reached is this:
25  Patrick Mishall did have motive to kill Christine Dimmick.

658

1    You may have difficulty making sense of it. Why
2    would someone kill someone else for no reason? Why would he
3    kill her for any reason? Why would he kill her for those
4    reasons? But you'll never be able to make sense of it because
5    it's senseless. But you don't have to know why he did it to
6    know that he did.

7    Six—final area—defendant's other actions and
8    statements. Consider these facts. In accounts to detectives
9    in 1991 Patrick Mishall gives different times for when he
10   arrived at the store with Chris—We've already talked about
11   that.—6:00, 6:05, 6:17.

12   He gives different times for leaving the store to
13   return home—6:25, 6:35—but he told Detective Handlogten he was
14   pretty sure he was at the store for 45 minutes before heading
15   home.

16   Sonatrol shows an alarm deactivation time of 6:25.
17   And the cash registers were activated at 6:31 and 6:32, which
18   is consistent with the deactivation time. What does this tell
19   you? By giving those early arrival and early departure times,
20   he was intentionally attempting to distance himself from the
21   crime and increase the window of opportunity for someone else
22   to have committed this crime after he left but before the
23   store opened.

24   And, finally—last, but certainly not least—his
25   statements to Chris Newbury, Tracy Rathke, and

1    Ontario Lowery—statements with striking similarities.

2    Remember the testimony of Chris Newbury? She asked if he

3    killed Chris. He responded I ought to do to you what I did to

4    Chris. Remember how she described the look in his eyes and

5    his demeanor with his hand to her throat?

6         Tracy Rathke asked, you did kill Christine, didn't

7    you? Remember how she describes the look in his eyes and his

8    demeanor? Notice the similarities?

9         Ontario Lowery, they can't prove what I done back

10   then.

11        Conclusions: Patrick Kevin Mishall's statements are

12   nothing less than confessions—multiple confessions to the

13   murder of Chris Dimmick.

14        I could actually add another area—a seventh

15   category, if you will—after defendant's testimony

16   yesterday—testimony that you heard yesterday afternoon.

17   Consider his demeanor. Consider his remarkable admissions

18   substantiating the testimony of other prosecution witnesses.

19   Consider his implausible denials and his explanations.

20   Consider whether they make any sense at all in light of the

21   other evidence.

22        I could go on for another 20 minutes on his

23   testimony yesterday alone. That testimony is so recent I'm

24   not going to do that. You have your notes; you heard it.

25   Enough is enough.

660

1        The bottom line is this: he threatened to kill her;

2   he killed her; and he told people he killed her.

3        In my opening statement I quoted the saying people

4   give themselves away in small mistakes; it's human nature.

5        Here's another one.  Outward actions are a clue to

6   hidden secrets.  Well, that's what Patrick Mishall has done in

7   the days, weeks, months, and years since Chris Dimmick was

8   murdered.  He has been giving himself away, giving his secret

9   away in bits and pieces—small mistakes over time—by what he

10  did and what he said.

11       Now go back and deliberate.  Take as long as you

12  need to understand the evidence—the evidence you've heard over

13  the last several days.  If you take the time you will

14  understand its significance.

15       To paraphrase Andrew Jackson, take time to

16  deliberate but when the time for action comes, stop thinking

17  and do it.  Come back into the courtroom.  Look

18  Patrick Mishall in the face and tell him that he is guilty of

19  first-degree premeditated murder.  Nothing could be more

20  deliberate, more premeditated than this cold-blooded

21  execution.

22       Tell him that he is guilty of first-degree felony

23  murder for killing Chris during the commission of this armed

24  robbery.

25       Tell him that he is guilty of armed robbery and

661

1     felony firearms.  Tell him.

2            MR. SVIKIS:  Thank you for your patience.

3            The prosecution starts off by telling you about this

4     opportunity time from—that ends at 7:00 a.m.  That's not true.

5     You know it's not true.  When everyone enters the store, the

6     lights are out.  When is that store secure?  We have people

7     coming by rattling the door.  We have officers driving by and

8     not until 8:20—8:20—is that store secure.  Did someone flee

9     out the back door at 8:19?  I don't think so.  But from the

10     time that Patrick left—whatever time that is—And you get to

11     decide the facts—very single fact.  You get to decide it.

12     Nobody else.  You decide the facts.—so this window—this is an

13     hour of opportunity almost.

14            This robbery/homicide can be solved in about

15     13 minutes.  Approaches the door, it's unlocked.  Weapon.

16     Locked.  Give me the money.  Into the back.  Sees the cameras,

17     grabs it.  Get down.  . . . (inaudible) the photographs,

18     submissive position.  I'll come back to that.  Out the back

19     door.

20            The police thought it was a robbery/homicide.  Every

21     investigation leads to that.  And nothing from 1991 to 2005

22     ever changes that.

23            Find the gun.  No gun, not guilty.  It's over.

24            Before 1991 if you're going to believe and create

25     the facts the prosecution wants you to create, where does this

1  gun come from?  Go to a shore?  Okay.  Go to a friend?  They

2  interviewed everybody he ever met.  1990 [sic]—14 years—a gun

3  just does not fall out of the sky.  You're either a gun guy or

4  you're not a gun guy.  Pat is not a gun guy.  No gun, not

5  guilty.

6       Take as long as you want.  Give the prosecution

7  consideration.  Go through every single scrap of what he

8  believes is evidence.  No gun, not guilty.

9       So the first time this weapon—Well, we know there's

10  a gun.  Well, now we don't even know if there's one gun or two

11  guns.  State of Michigan, lab guy, top guy—14 years they've

12  had this stuff.  Yeah, two guns; it would be consistent with

13  two guns.

14       Where does the gun go?  Well, it doesn't go anywhere

15  with Pat 'cause he doesn't have it.  So where do they search?

16  The dumpsters, up and down the roads.  I don't know how long

17  they drive around.  Nothing.

18       At the same time you may have said, well, some do

19  keep a gun, they'll throw it in the lake or something.  Well,

20  they won't find a money bag.  Why would you hang on to that?

21  They don't—They don't find the—the recorder.  They don't find

22  anything.  So you throw away $2200, also?  I think Jim Jilek

23  said there was twenty, twenty-two, $2300.  Well, I'm not

24  keeping this evidence.  If he had the money, it would have

25  been in the house, in the car, under a mattress—somewhere.

1    And you know why they didn't find it?  And this is a fact you

2    can decide.  Because Pat didn't take it.

3         So now this gun comes from nowhere in 1991,

4    February 8th.  We can't find it.  So now this gun reappears.

5    Where does it reappear?  Well, it reappears in Wisconsin.  And

6    it appears in one spot—You wrote this down.  One of the

7    witnesses.—under a pillow.  That's from test—recollection of

8    testimony given in 2003 when they're touched by the cold case

9    team.  Fortunately—Fortunately, when we examined the police

10   officers who were there in 1991, '92, and '93, there was never

11   a mention of a gun under the pillow.

12        They're investigating a robbery/homicide in 1992,

13   1993, and you're going to forget that, oh, by the way, yes, I

14   saw a gun under the pillow.  No, you're not going to forget

15   that.  But help us solve the crime in 2002, 2003—We're the

16   cold case team.—well, you know, I do remember a gun, don't

17   know what it was, never saw it again, got rid of it—another

18   disappearing gun.  No gun, not guilty.

19        Not because I prove that, but because the

20   prosecution doesn't bring it to you—doesn't bring you any fact

21   or evidence to you.  It's not even.  It's not—It's not a

22   fifty-fifty who gets over—who gets 51 percent.  They have to

23   bring it to you.

24        Well, this magical gun appears again.  Where does it

25   appear again?  In Wisconsin.  It appears on a dresser.  I saw

664

1    it in his room. Well, I didn't see it in 1992 or 1993. But

2    when the cold case team is there, I saw it on the dresser.

3    And they're in town, and this is in two-o—2001, 2002, or 2003.

4    They are in town talking to the woman that says I saw it on

5    the dresser.

6            Ever heard of a search warrant? Go in and get the

7    darn gun. No. You know why? They wanted the whole loaf.

8    They wanted a confession.

9            So what did they do? They wire her up. I forgot my

10   jelly jars. Can I come in and get them? Get out of here. Go

11   get your warrant. Get inside the house. Grab the weapon.

12   Ain't no weapon. Ain't no weapon to grab.

13           The gun reappears again. Where does it reappear?

14   Road Star or Red Star Motel run by Patrick's aunt and uncle.

15   You heard them. Are those people going to cover for him?

16   They threw him out for alcohol. You heard them.

17           You heard about a maid cleaning his room. Who

18   cleaned the room? Betty Pangburn. It's a room. It's not a

19   house. It's not an apartment.

20           Leaving Michigan, he goes to Wisconsin. His aunt

21   and uncle are nice enough to give him a room, give him some

22   rules. She's so nice she does—She's so nice she does his

23   laundry and puts it away. No trace of any gun or anything

24   else. And the fact is there isn't any because there is no

25   gun.

1          Now they're at Pat's house 2002/2003.  The warrant's

2     in their back pocket.  Search the house.  No gun, no evidence

3     of guns.

4          Well, if we don't have a handgun there must be

5     some—something else.  How about residue?  Contact shot—at

6     least two, maybe three.  Listen to it.  A .38, a .357.  No one

7     heard.  Bang, bang, bang, bang.  Residue.  We don't know if

8     it's a revolver.  We don't know if it's semiautomatic.

9          Sweatshirt.  It's here.  The sweatshirt Pat was

10    wearing.  The state of Michigan lab guy, no residue.  Where do

11    they get Pat's clothes?  They wake him up.  Here is the genius

12    that's going to—going to plan ahead of time, knowing the store

13    opens at 7:00, he's leaving before 7:00.  I'm going to go

14    home, lay down and be asleep.  No.

15         Well, we paraded Pat's family in here.  And we did,

16    one after another.  Who else are you going to ask if they had

17    a gun?  Sister Josette grew up with him.  Ever had a gun?  No,

18    never saw a gun.  Never talked about it.

19         If there was ever a gun that testimony would be,

20    well, yeah, I think he had one, but I never saw it, he wasn't

21    interested.

22         Chris Harwell—lived with him, the mother of two of

23    his children—you know, I think he might have had a gun.  I

24    never saw it.  That's what—That's what you'd be hearing, not

25    witness after witness after witness after witness, this is not

1       a gun guy.  This is a in-your-face guy.

2               And his wife of ten years, no gun.  Wisconsin.

3       Hunting family.  Doesn't even hunt.  What an easy way out if I

4       had guns.  Well, I'm just a hunter.  You didn't hear that.

5       You didn't hear it because he's not a gun guy.

6               Thank goodness for old police reports.  Let's talk

7       about what the prosecution wants to sell you on a confession.

8       And, remember, you get to decide if it's a confession or

9       confusion, or other nonsense.  You get to decide that.  And

10      where does it come from?  It's Newbury— . . . (inaudible) she

11      went through a couple names like Newbury, Williams, back—back

12      to Newbury.

13              You got to show—His face was . . . (inaudible), he

14      choked me and threw me up against the wall.  That's the kind

15      of guy Pat is—in-your-face kind of guy.  We don't like it.

16      We'd just as soon he wasn't that way.  He'll respond to you.

17      You say, Pat, you killed Christine; I'm angry, I'm angry.  And

18      if he hadn't been angry, you know what you'd hear?  Well, a

19      normal person would have responded with some anger.

20              But what does she tell you in 2005 72 hours

21      ago—48—whatever it was?  She says, I should do to you what I

22      did to Chris.  Well, thank goodness when Detective Hatter was

23      here, somebody had the old police reports.  He didn't even

24      bring . . . (inaudible).  And what did Newbury say in 2002 or

25      2003?  I should do to you like everybody thinks—thinks I did

1     to Chris. One word. One word.

2           So you had the 2005 version, and you have the 1993

3     or '92 version when the crime was committed a year earlier.

4     And you can decide the fact of that. You can say, hogwash,

5     I'm going to believe the 2005 version. You can do that. You

6     can decide that fact. You can also decide that what she said

7     in 2003 what makes more sense and what tracks with this entire

8     event.

9           I don't know what to say about Ontario Lowery. He

10     was the con that was up here. And there's a reason they call

11     him a con. It's not because a convict. He was here in 2003.

12     He wanted a deal. He wouldn't come up and testify.

13           Oh, I gots [sic] to testify now. He doesn't gots

14     [sic] to do nothing. And he wasn't guilty of any crimes that

15     he committed, and that's why he's in prison. And I'll bet the

16     week doesn't go out that someone doesn't know he was here

17     doing his public service. That's who the prosecution brought

18     you. That's who they have to bring to you from Wisconsin.

19           This is a robbery/homicide, not a homicide/robbery.

20     Enter, lock the door, get the deposits, go in the back room,

21     lights—Remember the lights are going to be out when everybody

22     else shows up.—out the back, door closes.

23           You've heard about Pat. You've seen Pat. What you

24     see is what you get with Pat. He's a face-to-face guy. And

25     even all the things that nobody wants to hear about

1   yourself—Did he ever punch anybody out for calling him a
2   murder? No. Did he ever take a bat—anything—punch them out?
3   No. He grabbed Newbury after she followed him home and
4   accused him of murder again, threw her up against the wall.
5   He did that. In-your-face.

6         And all of the things that no one wants to hear
7   about themselves—least of all in the courtroom—over a 14-year
8   period were compressed into 72 hours. If you sprinkle this
9   out over 14 years—and even before 1991 all the way through
10  2005—Pat's not the guy.

11        The crime scene. You don't have to watch *CSI* that
12  when you secure a crime scene you let 21 people in through the
13  Minute Mart to tromp around in there. Because somewhere in
14  there and somewhere out there is evidence who actually
15  committed this crime.

16        We heard a lot about looking for fingerprints. And
17  by the time the officer finished you—not only did you not see
18  one fingerprint, if Pat hadn't said he'd been in the store
19  trying to help the investigation, who would know Pat was ever
20  in there? My gosh, they're on the ground—You'll see—You'll
21  see the photos. There's no fingerprints. There's not a
22  smudge.

23        And if you believe they tried to take prints and
24  they didn't come out and they didn't prepare a report from the
25  windowsills, the cash registers, the front door, the back

669

1   door, the keys, the frame—all this elaborate stuff—it never

2   happened. Looks like a robbery. We think it's a robbery.

3   Let's walk in—walk around. No one around here. Put an ad in

4   the paper, nothing happens.

5           On the witness stand there were two detectives early

6   on: Hatter and Grace. Grace was the first one to testify

7   about the day they had Pat in the cop shop. And he was there

8   in the afternoon; but, in the morning, it was Hatter who was

9   treating Pat with kid gloves, being nice to him—coffee,

10  cigarettes, and—and—you can use—use the phone.

11          Who'd he call? Tiller. Pat: Chris has been shot.

12  Tiller walks in with Jilek when they unlock the store at 8:20

13  with the other two officers. That's how when Grace, the first

14  detective who actually interviewed Pat in the afternoon and

15  the prosecutor asked, did you—did you ever tell Pat that she

16  was shot. Oh, no, he wouldn't know that. We wouldn't tell

17  him that. The police didn't know that in the morning they

18  were giving him cigarettes and coffee and letting him use the

19  phone and he called Tiller, the first person in the store.

20  But you didn't hear that at the closing because that's how it

21  would have come out.

22          Let's look at the killing. This is an

23  execution-style killing. And you have to apply your life

24  experiences in this manner. The prosecution says there's a

25  motive: anger, resentment, jealousy and all that stuff. The

(Tape No. C2005-024, 2-10-05, 10:01)

1  flip side of all that is confrontation.

2       And this is why it's consistent with a

3  robbery/homicide and not a homicide/robbery. You're unlocking

4  the door or knock on the door and you let someone in or let

5  two someones in. Out comes a .357. Whoa! Robbery. Give me

6  the money. I'm not making a false move, I'm not doing

7  anything. I do exactly what they're going to tell me to do.

8       Grab the money, go in back, lay down. Knees. I

9  don't know the sequence of the shots. Pathologist deJong

10  didn't know it or the first pathologist know it. Enough to

11  say there was no struggle. There's no evidence of struggle

12  from any of the photographs you'll see. No disturbance of

13  anything. You are going to follow those instructions to the

14  letter.

15       And look at the way the body's found: on the ground,

16  submissive. And then it happens. Bang, bang, bang, bang; and

17  no one hears it. Okay. That's consistent with the manner of

18  death.

19       Now let's walk Pat in there. So at 6:20 he's got

20  this seething anger—lesbianism, affairs—give it the laundry

21  list; give it any list you want. Is he going to sneak up

22  behind her? Not this Pat. Not this Pat. Not what you heard

23  from all his old girlfriends. Not the interaction you saw

24  with the prosecutor. If it was Pat and Christine was dead,

25  there'd be a mess in that store. Because what would she have

671

1    done? Because she knows Pat. You pull out every single

2    communication skill you ever had or thought of having. And

3    it's not this way, it's this way. Turn around. I'm not

4    turning around. What's going on, Pat? What's up?

5           That's why the manner of death is inconsistent with

6    the motive the prosecution is trying to sell you. And if you

7    buy into that, then you got to buy into that Pat's one of the

8    smartest, most clever, and conniving individuals you've ever

9    met. It's not the Pat you heard here. It's not the Pat you

10   heard from his girlfriends. It doesn't fit. There is no

11   struggle. It would have been a nightmare in there on

12   everything you know about Pat. And you've heard about Pat and

13   his life for a 14-year period. Chris, turn around. Not

14   likely.

15          Now I'll touch upon a couple of the individuals.

16   Joe Humphries—police officer—looks like a robbery, so we'll

17   just call it robbery. Well, it looked like a robbery 'cause a

18   robbery/homicide, not a homicide/robbery. This is not a

19   domestic violence case gone bad. Domestic violence cases are

20   not sneak attacks. They're confrontational; they're

21   in-your-face.

22          . . . (inaudible) the investigation.

23   Officer Labrie—excellent testifier—could have everyone eating

24   out of hand, spoke pleasantly, turned to you, described all

25   the processes, his expertise with regard to blood work, blood

672

1    spatter, explained to you . . . (inaudible) slap on blood it
2    spatters, gave you all kinds of nice things, told you that he
3    had equipment available.

4         But what's he do?  Click.  A flashlight.  A
5    flashlight.  Pathologist tells you there could be blowback.
6    Even says microscopic.  A flashlight.  And then later you find
7    out that Telpely, the individual who closed the store, tells
8    Detective Hatter there was blood in the sink.  Jilek goes back
9    and said there's blood.  That's it.  You never hear any more
10   about it.

11        I mentioned this before, and it bears rementioning.
12   They package up sweatshirt, sweatpants, shoes, T-shirt; and
13   they get it from Pat and have access to everything else in his
14   house.  Send it to the Michigan state lab.  And, again, you
15   heard about a half hour of how it's so difficult and why we
16   can never find anything.  Well, is that why they send it to
17   the lab?  No, one liner.  No gunshot residue.  Did they ever
18   come back it's very hard to find, send it to the FBI lab and
19   we need to do such-and-such?  No.

20        The prosecution wants this fact to be determined.
21   It's not even dispositive that it was Pat's vehicle on the
22   side.  So who do they bring in to try to make you believe it's
23   Pat's vehicle?  Pat says he's there, too.  But just follow
24   this through.

25        Gunars Vaseris—25 years next door—it's in the

673

1     service department. He drives by, says lights are out and

2     dark car. That's what he says the first time. Then they go

3     back and ask him again, and by the time he gets here in 2005

4     now we got the car in certain directions, now we have a large

5     car. He's a car guy. Well, I think the first time was

6     probably right, lights out and car.

7           I would have hoped the prosecutor would have left

8     this alone or updated his notes. The coin box, the lockbox,

9     the money box. Tepeley, a lock that there was money in, came

10     in next morning it was locked, there was no money, key was in

11     a drawer with 50 other keys and you'd have to know.

12     Devastating evidence.

13           Mr. Jilek: I was in there first, I counted the

14     money, brought my secretary along, we counted it and took it,

15     locked her back up.

16           That was the coin box. Telpely doesn't even—She's

17     doesn't even get—She's not there first. The owner goes

18     through and the owner, you know, what's missing. Let's look

19     at everything. We make the calculations. Secretary knew how

20     to fill out the—out the forms, 2200 bucks currency. This is

21     currency, from Jilek, the owner. He might not know what the

22     minute operation is; he knows the money. That's why the box

23     is locked.

24           This is the same Tina—Askern or Telpely, I do—I do

25     get them confused.—that locks the box, forgets about the fact

1   that she was there hours after Jilek had already been there

2   and taken the money out and calculated it out.  This is the

3   same one that in—at the time—'91/'92, whenever she's

4   interviewed initially—doesn't mention anything about bringing

5   a gun in.  I have a gun, I can bring it in, we can hide it.

6   If somebody comes in, what are we going to do, shoot them?

7           But when you hear it in 2005 from interviews in 2002

8   or 2003, then you hear about Pat bringing in this handgun but

9   we don't know where it came from, it's never been produced,

10  and we don't know where it went; but it keeps reappearing and

11  disappearing Kalamazoo to Wisconsin.

12          Bart Munson: by way of reference there's Bart and

13  Bret.  Bart is the individual where we had a person in the

14  prosecutor's office, I read and Mr. Brower read.  To sum up

15  his initial testimony—This is a person that doesn't work.  I

16  think he said he's just a young punk or something like that—a

17  young guy—that gets up at 6:30 in the morning in the winter to

18  talk blocks away to have coffee with Pat.  That in itself was

19  a little weird.  But then he says—to cover all that up—I can't

20  remember last week, much less 13 years ago, being on

21  42 medications.  That's what they gave.

22          So what was the point of all that?  Well, Pat wasn't

23  home.  I remember this day, February 8th.  I remember it was

24  7:00 o'clock, and he wasn't there.

25          It gets better.  James Grubius—This is the lottery

1  ticket purchaser. This is the one that feels so bad in 2005
2  and 2003—And Pat can't remember. We know he's hanging around
3  the store. We know he likes Christine Dimmick—And not in a
4  boyfriend/girlfriend.—likes her. The lottery guy goes from
5  place to place. And he wants you to believe that Pat said it
6  in a serious way and doesn't even tell her.

7      And this is an individual that is absolutely in the
8  system. He said he was in jail and on probation. He even
9  knows where to get a hold of the police. So then he says,
10 well, I'm on probation and was told that I'm not to have
11 contact with the police. Okay. How about your probation
12 agent? That's bogus stuff.

13     But you can decide. Here's what you can decide.
14 You can decide that Pat said if I catch her with someone else
15 I'll kill her. You can decide that. And where does it get
16 you? It doesn't explain the manner of death—the execution.
17 It doesn't—It doesn't change what you know about Pat, what you
18 heard about Pat, and what you saw about Pat. So that—You can
19 believe that.

20     The prosecutor has said that he will show you
21 evidence beyond a reasonable doubt that Pat executed his
22 fiancée and robbed the Minute Market. Let me tell you
23 something: he showed you no such thing. He has no physical
24 evidence that put Pat as the person who shot Christine Dimmick
25 without a struggle; not once, not twice, not three times, but

1    four times in the back and the head.

2          Can that be right, you're thinking, that the State

3    of Michigan can arrest and charge Pat with this

4    execution-style killing without any physical evidence—simply

5    tie nothing to the crime?  That's a very good question.  The

6    pure fact is that the prosecution has not so much as a single

7    fingerprint of Pat's—any evidence on the handgun, bullets,

8    tape recorder, money, money bag.

9          This is simply remarkable.  This man is innocent,

10   completely innocent except for drawing the attention of the

11   cold case team and as Chris's fiancée.  That should cause you

12   great concern and reasonable doubt because physical evidence

13   cuts both ways.  It inculpates—It points to you—and it

14   exculpates—and it points away from you.  And if they would

15   look for the evidence that points to the person that did this

16   crime, Pat wouldn't be here.

17         I said a minute ago there's no physical evidence

18   tying Pat to this crime, but there's more than that.  There's

19   no circumstantial evidence—convincing or otherwise—that Pat is

20   guilty of these charges.  The critical prosecution witnesses

21   are inconsistent and contradict one another and themselves—And

22   that's the important part.—and themselves from their initial

23   statements in '91/'92, to 14 years later to when they came in

24   here and testified.

25         With some misguided sense of justice of wanting to

677

1   help solve a crime, don't you do the prosecution's work for

2   them.

3           And this is the hardest part about the oath that you

4   took, that you swore—And you might get to this point. I don't

5   think you should be able to, but you might. Oh, it kind of

6   looks like he did it. I suspect he did it. Boy, he must have

7   done it. That's a civil case; that's not a criminal case.

8   And you can come back and you can say that when we speak to

9   you if you want to speak to anyone after this case is over.

10  Boy, we had a lot of hunches; and we had a lot of suspicions;

11  but we swore an oath. We followed the law the judge gave us.

12  Just didn't deliver the goods. You come back with a verdict

13  of not guilty. Thank you.

14          MR. BROWER: I want to start by saying be clear

15  that what I say is not evidence. What Mr. Svikis says is not

16  evidence. We try to relate the facts and suggest to you what

17  the facts show. But maybe we're wrong. We might have

18  misheard or remember it incorrectly. So our characterization

19  of what the evidence was is not what should control. Your

20  memory controls on that issue. Keep that in mind. But I want

21  you to critically analyze some of the things from defense

22  counsel's argument.

23          I'm going to start with whether or not there was one

24  or two guns suggesting multiple offenders. Is that really

25  reasonable in light of what you've heard from the testimony?

1    Although the rounds taken were not of sufficient—in good

2    enough condition to be able to make a positive comparison,

3    they were of the same caliber; they were of the same number of

4    twists—markings on it; they were of the same direction,

5    indicative of rounds coming from the same weapon.

6            Is it conclusive?  No.  It could have been another

7    gun of the same caliber with the same right twist and the same

8    number of grooves, but is that realistic?  It would suggest

9    one gun.  It's consistent with one gun.

10           Defense counsel suggests that the evidence—the gun

11   or the VCR so—and so on—and money—would have been in the house

12   or car when the defendant—when it was searched by police

13   sometime that morning.  What's reasonable about that

14   inference?  If he had reason to believe that the police may

15   come to him for some reason or other because of what had just

16   happened there—that he's the boyfriend, the cops might come

17   now, what am I going to do, you know—isn't it just as

18   reasonable—and maybe more so—to think that I better not leave

19   it here, I better stop and drop it off somewhere so they don't

20   find it when they come knocking.

21           Defense counsel several times inferred what can only

22   be construed as misconduct or some improper motive by either

23   the police or the witnesses to give the statements that they

24   did.  Why is that?  What motive would they have to fabricate

25   something that did not happen?  Do you really think that they

1    would make something up, perjure themselves for somebody that
2    was long out of their lives; that they would come here and
3    testify to that knowing that it was not true?

4         If it were not accurate, these—All the witnesses
5    that talk about the gun, if it's not true that those
6    statements were not made, they didn't see what they say they
7    did, how is it that so many of them have similar statements
8    then? They're all of the same mind. I'm going to lie or
9    perjure myself, and they all just happen to come up with a
10   similar statement. Isn't that incredible? Yes, it's
11   incredible. It's not credible.

12        You would also have to believe if they didn't come
13   up with the idea themselves it was planted in their mind by
14   the police—you need to say this. Is that reasonable at all?
15   Is there any suggestion that that's what happened?

16        Remember the statement about the Road Star Inn, for
17   instance—the witness that testified about seeing the gun and
18   becoming aware that he actually had the gun for some period of
19   time? And she related the story about how the defendant said
20   he arrived to Wisconsin—in Wisconsin from Michigan. When he
21   arrived he stayed at his uncle's hotel. He was staying there
22   for a while and then he got kicked out because the maid found
23   a gun. Did she make up this story? Well, she made up a
24   pretty fantastic one because everything was directly on point
25   except, according to the defendant's statement, the one point

1   that she was wrong on, it wasn't a gun, it was alcohol. The

2   one fact that would incriminate him.

3           Defense counsel points out that the police took

4   sweatshirt he was wearing. There was no residue found on

5   the—on his clothing. But what do we have to rely on? That's

6   what the defendant said he was wearing. You don't actually

7   even know what he was wearing. The police simply had to rely

8   on the fact that he said that's what he had on earlier that

9   morning. When he's at the police department they take the

10  clothes he had on.

11          If it had been the clothing he was wearing, from the

12  testimony you can conclude that it's reasonable to believe

13  that there wouldn't be any residue anyway; but, nevertheless,

14  you don't even know if those were the clothes that he truly

15  was wearing.

16          Defense counsel says witness after witness never saw

17  a gun, never heard him talk about a gun. There was a cartoon

18  I read once with the defendant standing in front of the judge;

19  and the judge says to him, three people saw you steal the

20  watch. Defendant responds, but I could call 50 people that

21  didn't see me steal it. Well, the 50 people that didn't see

22  him steal it doesn't mean he didn't steal it. They just

23  didn't see it. The people that never saw him with a gun, that

24  never heard him talking about a gun, doesn't mean the people

25  that did aren't being truthful.

681

1    Talk about Christine Newbury's statement a minute.

2    Thank goodness for the police reports and Detective Hatter's

3    testimony about her prior inconsistent statement.  The

4    statement, of course, is this: did Patrick Mishall respond to

5    her question, you killed Christine, didn't you?  Did he

6    respond with I ought to do to you what I did to Christine; or

7    did he instead say I ought to do to you what they say or they

8    think I did to Christine?  That's the inconsistency he wants

9    to point out.

10    But, here, I want to direct you to one of the

11    remarkable admissions I referred to in my initial closing—one

12    of the remarkable admissions that the defendant himself made

13    yesterday afternoon.  He acknowledged—here, sitting in that

14    seat right there, yesterday—that when asked by me at a prior

15    proceeding, I asked you about that statement I should do to

16    you what I did to Chris, and what was your answer.  I was

17    referring to a physical confrontation, you know, a fight.

18    That's what I mean when I said that.  Defendant yesterday

19    admitted that what he had said to Chris Newbury was I ought to

20    do to you what I did to Chris.  He admitted it yesterday.

21    What's all this inconsistent statement with the

22    police officers report from 13 years ago?  It's insignificant.

23    Chris Newbury took the stand.  She said that's his response, I

24    ought to do what—to you what I did to Chris; and the defendant

25    himself admitted it yesterday.  There's no inconsistency.

682

1    It's something, however, to divert your attention away.  Don't

2    look away.  Focus your attention where it belongs, right there

3    on the defendant and his actions.

4         The crime scene: 21 people tramp around inside,

5    inferring that there was a mismanagement of the scene and

6    evidence was contaminated.  Is that really the impression that

7    you got?  Or did you see the cruisers blocking the driveway

8    and the officer standing in front of the door and keeping

9    track of exactly who went in?

10        You heard the testimony about the tech—the

11   technician that was going through and what they do at a crime

12   scene and how they do it.  You heard also about the civilians

13   that were let in—not just, oh, hello, sir, open the door, come

14   on in.  If a civilian went in, it was for a specific purpose

15   to direct them to an area to make an identification of the

16   body, for instance, or to go in and look at the—see what was

17   missing.

18        But what you—And who did you hear that happen for?

19   Wayne Tiller, Jim Jilek, Tina Telpely.  There is no secretary

20   that went in with Mr. Jilek to count the money or take the

21   money out.  There's no testimony about that.  You can

22   reasonably infer that that did happen at some point; but it

23   was after the crime scene investigation, after the police were

24   gone and Mr. Jilek goes back.  Tina Telpely was there while

25   the police were there, and she's the one that looked in—in the

683

1    coin box and knew what was there.

2          Remember, also, Jim Jilek's testimony about that

3    coin box? Yep, I'm the white-collar guy. I'm the business

4    guy. Who is actually in the trenches and doing this stuff?

5    Well, that would be Tina Telpely. Who would more likely be

6    the one to know what was in there and what was not, you or

7    her? Well, that'd be her. And you heard her.

8          About the phone call that the defendant made from

9    the police with the permission of the nice detective. Called

10   Wayne Tiller, alleges that Wayne Tiller is the one that told

11   him that she had been shot. But what did the defendant say to

12   Detective Grace? He didn't say to Detective Grace I used the

13   phone and talked with Wayne Tiller and he told me she had been

14   shot. What did he say? He said the other detectives told

15   him.

16         Defense talks about execution killing and asks you

17   to apply your life's experiences. Well, I would says the same

18   thing. What do your life's experiences tell you about

19   overkill and what kind of situation that would occur? Where

20   one to the middle of the chest or one shot to the base of the

21   skull would be more than sufficient to cause death for any for

22   robber. What happened here? Not one shot, boom, we're done,

23   let's get out of here; one, two, three, four—overkill. What

24   kind of relationship would you expect to see overkill in?

25   Domestic relationship?

684

1    What about the position of the body? Defense

2    counsel mentions that, too. Face down. What do your life

3    experiences tell you about that? The perpetrator of the

4    homicide that can't face the person looking at him. They have

5    to do it from behind. Four of them from behind—overkill, but

6    nevertheless, can't bear to look at them while I'm doing this.

7    What do your experiences and common sense tell you

8    about that? Domestic relationship? Yeah.

9    Mentioned Labrie in his search with a flashlight

10   because there could have been microscopic blood. Isn't it

11   clear from the facts that with those injuries there would have

12   been bleeding, copious bleeding, immediate bleeding? Wherever

13   she was shot there would be blood. It would be visible.

14   Might there, also, in addition to the blood pooling and blood

15   drops, might there also be microscopic blood? Yes. But

16   there's not going to be this type of blood pattern in the back

17   room and microscopic blood elsewhere. If there was going to

18   be microscopic blood particles it was going to be in that area

19   where her body was found. Don't be misled by it.

20   Bart Munson makes the comment through his—the

21   transcript that he couldn't remember. You took notes. You

22   remember what was said. You reviewed your report, yes? The

23   things that you've testified to were those things that you

24   did, in fact, remember? Yes. Other things you read in the

25   report you did not remember? That's correct. And those

685

1    questions weren't even asked today; is that right?  Right.

2            So maybe he does have a memory—a loss of memory

3    regarding certain details.  He acknowledged that.  But he also

4    said what I testified to is what I remember.  And he testified

5    to it twice, and you heard testimony from two proceedings.

6    It's consistent.  Not remembering some details is not the same

7    as fabricating details.  He testified to what he remembered.

8            Jim Grubius.  Pat couldn't even remember—or so he

9    said.  What'd he say a few minutes later?  A few minutes—This

10   is another one of those remarkable admissions.  After saying

11   that I'm not sure—I don't remember the guy, he acknowledges

12   that he may, in fact, have made that statement.  I'm going to

13   kill her if I find somebody.  Well, it can't be both ways,

14   folks.  You either remember the guy and you didn't make the

15   statement, or you don't remember the guy and would have—would

16   have to say I never made the statement.  You can't not

17   remember him and then remember that he made the statement at

18   the same time.  It's inconsistent; it can't be.

19           Finally, defense counsel talks about no physical

20   evidence.  He emphasizes no physical evidence over and over

21   again.  And why?  Because that's what he wants you to base

22   your decision on.  He wants you to find the defendant not

23   guilty because there's no physical evidence.  He doesn't want

24   you to base your decision on circumstantial evidence.

25           We talked about that at length in voir dire.  And

686

1    each of you said that—wait to see what the facts are; but if
2    it's circumstantial, I can convict somebody without physical
3    evidence.  Physical evidence is not the criteria.  He said
4    over and over and over again, no gun, not guilty; no gun, not
5    guilty.  If you don't have that physical evidence, you have to
6    find him not guilty.  He wants you to disregard the
7    circumstantial evidence.  Don't do it.

8             No physical evidence, no gun, no bag, no money.
9    Who's in control of that?  Are the police in control of that,
10   or is the person responsible in control for that?  That man is
11   the one that determined whether that stuff was ever going to
12   get found—that man.  Because he's successful in getting rid of
13   the stuff or hiding it from the police he should be found not
14   guilty for that reason alone?  Don't fall for it.

15            The People have proven the elements beyond a
16   reasonable doubt based on compelling circumstantial evidence.
17   Take your time.  Do what you need to.  Make your list.
18   Compare your notes.  But then come back here and tell the
19   defendant he's guilty of the offenses for which he's charged.
20   Thank you.

21            Before I give instructions, I think we'll take a
22   recess.  Let's try and get here—back here within about
23   15 minutes, please.  So let's stand in recess.

24            Counsel, could I see you in chambers a minute.

25            (At 10:41 a.m., court recessed)

                              687

1    (At 10:59 a.m., proceedings reconvened)

2    Hopefully, my voice will hold out. I've got what

3    everybody else—or most other people have with the sore throat.

4    And the flu season is upon us, and it's struck me. But I

5    think we—If you can't hear me, raise your hand, speak up

6    'cause it's important that you hear everything I say. I will

7    be giving you a printed copy of these instructions so that

8    you'll have them with you in the jury room.

9    Members of the jury, the evidence and arguments in

10   this case are finished, and I will now instruct you on the

11   law. That is, I will explain the law that applies to this

12   case.

13   Remember that you've taken an oath to return a true

14   and just verdict based only on the evidence and my

15   instructions on the law. You must not let sympathy or

16   prejudice influence your decision.

17   As jurors, you must decide what the facts of this

18   case are. This is your job and nobody else's. You must think

19   about all of the evidence and the testimony and then decide

20   what each piece of evidence means and how important you think

21   that it is. This includes whether you believe what each of

22   the witnesses said. What you decide about any fact in this

23   case is final.

24   It's my duty to instruct you on the law. You must

25   take the law as I give it to you. If a lawyer said something

688

1   different about the law, follow what I say.  At various times,
2   I have already given you some instructions about the law.  You
3   must take my instructions—all of my instructions together as
4   the law that you're to follow in this case.  You should not
5   pay attention to some instructions and ignore others.

6          To sum up, it's your job to decide what the facts of
7   the case are, to apply the law as I give it to you, and, in
8   that way, decide this case.

9          A person who is accused of a crime is presumed
10  innocent.  This means that you must start with the presumption
11  that the defendant is innocent.  This presumption continues
12  throughout the trial and entitles the defendant to a verdict
13  of not guilty unless you're satisfied beyond a reasonable
14  doubt that he is guilty.

15         Every crime is made up of parts called elements.
16  The prosecutor must prove each element of the crime beyond a
17  reasonable doubt.  The defendant is not required to prove his
18  innocence or to do anything.  If you find that the prosecutor
19  has not proven every element beyond a reasonable doubt, then
20  you must find the defendant not guilty.

21         A reasonable doubt is a fair, honest doubt growing
22  out of the evidence or lack of evidence.  It is not merely an
23  imaginary or possible doubt but a doubt that's based on reason
24  and common sense.  A reasonable doubt is just that—a doubt
25  that's reasonable, after careful and considered examination of

689

1   the facts and circumstances of this case.

2          When you discuss the case and decide on your verdict

3   you may only consider the evidence that has been properly

4   admitted in this case. Therefore, it's important for you to

5   understand what is evidence and what is not evidence.

6          Evidence includes only the sworn testimony of

7   witnesses, the exhibits that were admitted into evidence, and

8   anything else I told you to consider as evidence.

9          Now many things are not evidence, and you must be

10  careful not to consider them as such. I will now describe

11  some of the things that are not evidence.

12         The fact the defendant is charged with a crime and

13  is on trial is not evidence. Likewise, the fact that he is

14  charged with more than one crime is not evidence.

15         The lawyers' statements and arguments are not

16  evidence. They're only meant to help you understand the

17  evidence and each side's legal theories. The lawyers'

18  questions to witnesses are also not evidence. You should

19  consider these questions only as they give meaning to the

20  witnesses' answers. You should only accept things the lawyers

21  say that are supported by the evidence or by your own common

22  sense and general knowledge.

23         My comments, rulings, questions, and instructions

24  are also not evidence. It's my duty to see that the trial is

25  conducted according to the law and to tell you the law that

690

1   applies to this case. However, when I make a comment or give
2   an instruction I am not trying to influence your vote or
3   express a personal opinion about the case. If you believe I
4   have an opinion about how you should decide this case you must
5   pay no attention to that opinion. You are the only judges of
6   the facts, and you should decide this case from the evidence.

7           Now at times during the trial I've excluded evidence
8   that was offered or stricken testimony that you already heard.
9   Don't consider those things in deciding the case. Make your
10  decision only on the evidence that I let in and nothing else.

11          Your decision should be based on all of the
12  evidence, regardless of which party produced it.

13          You should use your own common sense and general
14  knowledge in weighing and judging the evidence, but you should
15  not use any personal knowledge that you may have about a
16  place, person, or event. To repeat once more, you must decide
17  this case based only on the evidence admitted during this
18  trial.

19          The prosecution has introduced evidence of
20  statements that it claims the defendant made. Before you may
21  consider such out-of-court statements against the defendant
22  you must first find that the defendant actually made the
23  statements as they were given to you. If you find that the
24  defendant did make the statements you may give the statement
25  whatever weight you think it deserves. In deciding this, you

691

1   should once again think about how and when the statement was
2   made, and about all of the other evidence in the case.  You
3   may consider the statement in deciding the facts of the case
4   and deciding if you believe the defendant's testimony in
5   court.

6         Now facts can be proved by direct evidence from
7   which a witness or an exhibit—what you get from—from a witness
8   or an exhibit.  Direct evidence is evidence about what we
9   actually see or hear.  For example, if you were to look
10  outside and see rain falling, that is direct evidence that
11  it's raining.

12        Now facts can also be proved by indirect, or
13  circumstantial, evidence.  Circumstantial evidence is evidence
14  that normal—normally or reasonably leads to other facts.  So,
15  for example, if you see a person come in from the outside
16  wearing a raincoat covered with small drops of water, that
17  would be circumstantial evidence that it's raining.

18        You may consider circumstantial evidence.
19  Circumstantial evidence by itself, or a combination of
20  circumstantial evidence and direct evidence, can be used to
21  prove the elements of a crime.  In other words, you should
22  consider all the evidence that you believe.

23        You may consider whether the defendant had a reason
24  to commit the alleged crime; but a reason, by itself, is not
25  enough to find a person guilty of a crime.  The prosecutor

1   does not have to prove that the defendant had a reason to

2   commit the alleged crime. He only has to show that the

3   defendant actually committed the crime.

4   During the trial the testimony of Bart Munson was

5   read into the record as part of this trial because Mr. Munson

6   was not available because of some physical infirmities. This

7   testimony was taken under oath and at an earlier hearing. You

8   should consider this testimony in the same way you consider

9   any other testimony that you heard here in court during the

10  course of this trial.

11  Now you heard evidence that was introduced to show

12  the defendant committed other crimes or improper acts for

13  which he's not on trial. If you believe this evidence, you

14  may—you must be very careful only to consider it for certain

15  purposes. You may only think about whether this evidence

16  tends to show the circumstances surrounding the alleged

17  admissions made to certain witnesses by the defendant here.

18  You must not consider this evidence for any other purpose.

19  For example, you must not decide that it shows the defendant

20  is a bad person or that he's likely to commit crimes. You

21  must not convict the defendant here because you think he is

22  guilty of other bad conduct. All the evidence must convince

23  you beyond a reasonable doubt that the defendant committed the

24  alleged crime or you must find him not guilty.

25  During this trial you heard the attorneys read into

693

1    the record what was called a stipulation.  When the lawyers

2    agree on a statement of facts, these are called stipulated

3    facts.  You may regard such stipulated facts as true, but you

4    are not required to do so.

5         As I said on several occasions it's your job to

6    decide what the facts of this case are.  You must decide which

7    witnesses you believe and how important you think their

8    testimony is.  You do not have to accept or reject everything

9    a witness said.  You're free to believe all, none, or part of

10   any person's testimony.  In deciding which testimony you

11   believe you should rely on your own common sense and everyday

12   experience.  However, in deciding whether you believe a

13   witness's testimony you must set aside any bias or prejudice

14   that you may have that's based on the race, gender, or

15   national origin of the witness.

16        Excuse me.

17        There is no fixed set of rules for judging whether

18   you believe a witness, but it might help you to think about

19   these questions:

20        Was the witness able to see or hear clearly?  How

21   long was the witness watching or listening?  Was anything else

22   going on that might have distracted the witness?

23        Did the witness seem to have a good memory?

24        How did the witness look and act while testifying?

25   Did the witness seem to be making an honest effort to tell you

694

1  the truth, or did the witness seem to evade the questions or

2  argue with the lawyers?

3          Does the witness's age and maturity affect how you

4  judge his or her testimony?

5          Does the witness have any bias, prejudice, or

6  personal interest in how this case is decided?

7          Have there been any promises, threats, suggestions,

8  or other influences that affected how the witness testified?

9          In general, does the witness have any special reason

10 to tell you the truth or any special reason to lie?

11         All in all, how reasonable does the witness's

12 testimony seem when you think about all of the other evidence

13 in the case?

14         Sometimes the testimony of different witnesses will

15 not agree, and you must then decide which testimony you

16 accept.  You should think about whether the disagreement

17 involves something important or not or whether—and whether you

18 think someone is lying or simply mistaken.  People see and

19 hear things differently, and witnesses may testify honestly

20 but simply be wrong about what they thought they saw or

21 remember.  It's also a good idea to think about which

22 testimony agrees best with the other evidence in the case.

23         However, you may conclude that a witness

24 deliberately lied about something that is important to how you

25 decide the case.  If so, you may choose not to accept anything

695

(Tape No. C2005-024, 2-10-05, 11:16)

1   that witness said. On the other hand, if you think that the

2   witness lied about some things and told the truth about

3   others, you may simply accept the part you think is true and

4   ignore the rest.

5          You should not decide this case based on which side

6   presented more witnesses. Instead, you should think about

7   each witness and each piece of evidence and whether you

8   believe them. Then you must decide whether the testimony and

9   the evidence you believe proves beyond a reasonable doubt that

10  the—that the defendant is guilty.

11         You have heard testimony from witness

12  Dr. Joyce deJong, who has given you her opinion as an expert

13  in the field of forensic pathology; Specialist Bruce Labrie,

14  who has give you his opinion in the area of crime scene

15  investigation and blood spatter evidence; and Michael Barrick,

16  who has given you his opinion in the area of forensic

17  firearms.

18         Experts are allowed to give opinion in court about

19  matters they are expert on. However, you do not have to

20  believe an expert's opinion. Instead, you should decide

21  whether you believe it and how important you think that it is.

22  When you decide whether to—you believe the expert's opinion,

23  think carefully about the reasons and facts that that expert

24  gave for the opinion and whether those facts are true. You

25  should also think about the expert's qualifications and

1  whether the opinion made sense to you when you think about all
2  of the other evidence in the case.

3          You heard testimony from witnesses who are police
4  officers.  That testimony is to be judged by the same
5  standards you use to evaluate the testimony of any other
6  witness.

7          In count one, the defendant is charged with the
8  crime of open murder.  Therefore, you will be instructed on
9  the elements of both first-degree premeditated murder and
10 second-degree murder.

11         To prove the first-degree premeditated murder
12 alternative, the prosecutor must prove each of the following
13 elements beyond a reasonable doubt:

14         First, that the defendant caused the death of
15 Christine Dimmick; that is, that Ms. Dimmick died as a result
16 of gunshot wounds to the head and back.

17         Second, that the defendant intended to kill
18 Ms. Dimmick.

19         Third, that this intent to kill was premeditated;
20 that is, thought out beforehand.

21         And, fourth, that the killing was deliberate, which
22 means that the defendant considered the pros and cons of the
23 killing and thought out—and thought about and chose his
24 actions before he did it.  There must have been real and
25 substantial reflection for long enough to give a reasonable

697

1    person a chance to think twice about the intent to kill.

2         Now the law doesn't say how much time is needed.

3    That is for you to decide—it is for you to decide if enough

4    time passed under the circumstances of this case.  The killing

5    cannot be the result of a sudden impulse without thought or

6    reflection.

7         Now the crime of first-degree premeditated murder

8    requires proof of a specific intent.  And what this means is

9    that the prosecution must prove not only that the defendant

10   did certain acts but that he did the acts with the intent to

11   cause a particular result.

12        For the crime of first-degree premeditated murder

13   this means that the prosecution must prove that the defendant

14   intended to kill Ms. Dimmick.

15        The defendant's intent may be proved by what he

16   said, what he did, how he did it, and any other facts and

17   circumstances in evidence.

18        Now in count two the defendant is charged with

19   first-degree felony murder.  To prove this charge, the

20   prosecution must prove each of the following elements beyond a

21   reasonable doubt:

22        First, that the defendant caused the death of

23   Christine Dimmick; that is, that Ms. Dimmick died as a result

24   of gunshot wounds to the head and back.

25        Second, that the defendant had one of these three

698

1  states of mind, and those are: he intended to kill, or he
2  intended to do great bodily harm to Ms. Dimmick, or he
3  knowingly created a very high risk of death or great bodily
4  harm knowing that death or such harm would be likely to result
5  from his actions.

6        The third element is that when he did the acts that
7  caused the death of Ms. Dimmick the defendant was committing
8  the crime of larceny.  For the crime of larceny, the
9  prosecutor must prove the following beyond a reasonable doubt:

10        First, that the defendant took somebody else's
11  property.

12        Third [sic], that the property was taken without
13  their consent.  Or that's second.  Excuse me.

14        Third, that the property was taken in a store.

15        Fourth, that there was some movement of the
16  property; and it doesn't matter whether the defendant actually
17  kept the property or whether the property was taken off the
18  premises.

19        Next, that the property was worth something at the
20  time it was taken.

21        And, lastly, that at the time the property was taken
22  the defendant intended to permanently deprive the owner of
23  this property.

24        Now in relation to the charges in counts one and
25  two—that is, first-degree premeditated murder or first-degree

1  felony murder—you may also consider the lesser charge of

2  second-degree murder.  To prove this charge, the prosecutor

3  must prove each of the following elements beyond a reasonable

4  doubt:

5  First, that the defendant caused the death of

6  Christine Dimmick; that is, that is that Ms. Dimmick died as a

7  result of gunshot wounds to the head and back.

8  Second, that the defendant had one of these three

9  states of minds at the time of the—the killing:

10  That, one, he intended to kill Ms. Dimmick, or

11  Two, he intended to do great bodily harm to her; or

12  Thirdly, he knowingly created a very high risk of

13  death or great bodily harm knowing that death or such harm

14  would be likely—would be the likely result of his actions.

15  You must think about all of the evidence in deciding

16  what the defendant's state of mind was at the time of the

17  alleged killing.  The defendant's state of mind may be

18  inferred from the kind of weapon used, the type of wounds

19  inflicted, the acts and words that the defendant—or any other

20  circumstances surrounding the alleged killing.  You may infer

21  that the defendant intended to kill if he used a dangerous

22  weapon in a way that was likely to cause death.

23  Likewise, you may infer that the defendant intended

24  the usual results that follow from the use of a dangerous

25  weapon.  A gun is a dangerous weapon.

700

1           Premeditation and deliberation may be inferred from

2 any actions of the defendant which show planning or from any

3 other circumstances surrounding the killing. The prosecutor

4 need not prove a motive for the killing, but you may consider

5 evidence of motive in deciding if there was premeditation and

6 deliberation. Motive by itself does not prove premeditation

7 and deliberation.

8           If you find the defendant guilty of murder, you must

9 state in your verdict whether it's murder of the first degree

10 or murder in the second degree.

11           In count three the defendant is charged with the

12 separate crime of possessing a firearm at the time of

13 committing the crime of murder. To prove this charge, the

14 prosecutor must prove each of the following elements beyond a

15 reasonable doubt:

16           First, that the defendant committed the crime of

17 first or second-degree murder which have been defined for you.

18 It's not necessary, however, that the defendant be convicted

19 of either of those crimes; and,

20           Second, that at the time the defendant committed one

21 of those crimes, he knowingly carried and possessed a firearm.

22           In count four the defendant is charged with the

23 crime of armed robbery. To prove this charge, the prosecutor

24 must prove each of the following elements beyond a reasonable

25 doubt:

1     First, that the defendant assaulted
2     Christine Dimmick.  There are two ways to commit an assault.
3     Either the defendant must have attempted or threatened to do
4     immediate injury to Ms. Dimmick and was able to do so, or the
5     defendant must have committed a forceful act that made
6     Ms. Dimmick reasonably afraid of being injured at the time.
7     Second element is that at the time of the assault
8     the defendant was armed with a weapon designed to be dangerous
9     and capable of causing death or serious injury.
10    Third, that at the time of the assault the defendant
11    took money or other property that did not belong to him.  Now
12    it doesn't matter how much money was taken or what
13    property—what the property was worth as long as it was worth
14    something.
15    Fourth, that this money or property was taken from
16    the person of Christine Dimmick or in her presence.  There
17    must be—This must be shown by proof that the defendant used or
18    threatened to use violence to take the money or property away
19    even though the property was not in the same immediate area of
20    Ms. Dimmick.
21    Fifth element is that the money or property was
22    moved.  Any movement is enough.
23    And, sixth, that at the time he took the money or
24    property, the defendant intended to take it away permanently.
25    The crime of armed robbery is—requires a proof of

702

1  specific intent. And what this means is that the prosecution

2  must prove not only that the defendant did certain acts but

3  that he did those acts with the intent to cause a particular

4  result. For the crime of armed robbery, this means that the

5  prosecution must prove that the defendant intended to

6  permanently deprive Minute Market of the money or property.

7  The defendant's intent may be proved by what he

8  said, what he did, how he did it, or by any other facts and

9  circumstances in evidence.

10  The last count or charge in this matter is count

11  five, and in that count he's charged with the separate crime

12  of possessing a firearm at the time he committed the crime of

13  armed robbery. To prove this charge, the prosecutor must

14  prove each of the following elements beyond a reasonable

15  doubt:

16  First, that the defendant committed the crime of

17  armed robbery which have been defined for you. It's not

18  necessary, however, that the defendant be convicted of that

19  crimes.

20  Second, that at the time the defendant

21  committed—committed one—that the defendant committed that

22  crime, he knowingly possessed or carried a firearm.

23  Further, the evidence must convince you beyond a

24  reasonable doubt that—that all these crimes committed or

25  alleged here occurred on or about February 8th, 1991, within

703

the city and county of Kalamazoo.

Now when you go to the jury room you should first select a foreperson. The foreperson should see to it that your discussions are carried on in a businesslike way and that everyone has a fair chance to be heard.

A verdict in a criminal case must be unanimous. In order to return a verdict, it is necessary that each of you agrees on that verdict. In the jury room you will discuss the case among yourselves; but, ultimately, each of you will have to make up your own minds. Any verdict must represent the individual, considered judgment of each juror.

It's your duty as jurors to talk to each other and to make every reasonable effort to reach agreement. Express your opinions and the reasons for them, but keep an open mind as you listen to your fellow jurors. Rethink your opinions and do not hesitate to change your mind if you decide you were wrong. Try your best to work out your differences.

However, although you should try to reach an agreement, none of you should ever give up your honest opinion about the case just because other jurors disagree with you or just for the sake of reaching the verdict. In the end, your vote must be your own, and you must vote honestly and in good conscience.

Now in this case, there are two different crimes that you may consider for both count one and two. When you

704

1     discuss count one, open murder, you must consider the crime of

2     first-degree premeditated murder first. If you all agree that

3     the defendant is guilty of that crime, you should stop your

4     discussions regarding this count. If you believe the

5     defendant is not guilty of first-degree premeditated murder or

6     if you cannot agree about that crime, you should consider the

7     less serious crime of second-degree murder. You decide how

8     long to spend on first-degree premeditated murder before

9     discussing second-degree murder. You can go back to

10     first-degree premeditated murder after discussing

11     second-degree murder if you want to.

12     Now when you discuss count two, first-degree felony

13     murder, you must consider the crime of first-degree felony

14     murder first. If you all agree the defendant is guilty of

15     that crime, you may discuss—you may stop your discussions

16     regarding that count. If you believe the defendant is not

17     guilty of first-degree felony murder or if you cannot agree

18     about that crime, you should consider the less serious crime

19     of second-degree murder. You decide how long to spend on

20     first-degree first-degree felony murder before discussing

21     second-degree murder. You can go back to first-degree—I think

22     there's a typographical error there.—first-degree felony

23     murder after discussing second-degree murder if you want to.

24     Now regarding the murder charges, you should mark

25     your verdict form consistent with your discussions either not

1    guilty or guilty of first-degree premeditated murder alone,

2    first-degree felony murder alone, guilty of both first-degree

3    premeditated murder, and first-degree felony murder, or guilty

4    of second-degree murder.

5              Regarding counts three through five—the felony

6    firearms and armed robbery and felony firearms—if you all

7    agree the defendant is guilty of that crime you may stop your

8    discussion regarding these counts.  If you believe the

9    defendant is not guilty of these crimes you should return a

10   verdict of not guilty consistent with each count, and you

11   should—and must consider each count separately and the

12   evidence as to each count separately.

13             Possible penalties should not influence your

14   decision.  It is the duty of the judge to fix the penalties

15   within the limits provided for by law.

16             If you wish to communicate with the Court while

17   you're in the jury room, please have your foreperson write a

18   note and give it to the court officer.  It's not proper for

19   you to talk directly with myself, the lawyers, or the court

20   officers during your deliberations.

21             As you discuss the case you must not let anyone—even

22   me—know how your voting stands.  Therefore, until you return

23   with a unanimous verdict, do not reveal this to anyone outside

24   of the jury room.

25             The defendant here is charged with five counts; that

1    is, with the crimes of open murder, felony murder, felony

2    firearm, armed robbery, and felony firearms.  These are

3    separate crimes, and the prosecutor is charging that the

4    defendant committed all of them.  You must consider each crime

5    separately in the light of all of the evidence in the case.

6    You may find the defendant guilty of all, any one, or any

7    combination of these crimes, or guilty of the less serious

8    crimes, or not guilty.

9            As I told you when you go to the jury room you're

10   going to be given a written copy of these instructions.  As

11   you discuss the case you should think about all of my

12   instructions together as the law that you're to follow.

13           Also, you will be provided with—if you—with the—all

14   the exhibits that were marked and received into evidence

15   should you wish to examine them during the course of your

16   deliberations.

17           I prepared and had prepared for you a jury verdict

18   form that provides all of the various combinations that you

19   can reach as to counts one through five.  Once a unanimous

20   verdict should be—is reached as to each of those counts

21   that—the foreman should mark the appropriate box.  And then

22   when you have reached verdicts as to all five counts that

23   should be dated and signed by the foreman, you should inform

24   the court officer that you've reached a verdict.  Do not

25   inform her what that verdict is.  You'll be brought back here

1      into the courtroom and in my presence and that of the
2      attorneys and the defendant.

3             The clerk will ask the foreman to stand, and the
4      foreman should then stand; and she'll ask the foreman to
5      announce the verdict publicly at that time, and the foreman
6      should do so as to—as to each count using the jury verdict
7      form.

8             Now there's all 14 of you left, and what we're going
9      to do is determine who the alternates are.  Those two
10     individuals—whoever they are—cannot participate and will not
11     participate in the deliberations nor may their—if they—if
12     those individuals took notes may their notes be used by the
13     rest of the remaining jurors.

14            However, the two persons who are alternates are not
15     released from this case until we've reached—until a verdict
16     has been reached.  And they'll—They'll not participate in the
17     deliberations and they're free to leave the courthouse and go
18     about their own affairs; however, they'll have to be on call
19     in case some unforeseen emergency arises that prohibits one of
20     the—one or more of the remaining 12 people from continuing
21     deliberations, and then they would be called in to—to
22     participate in the deliberations.

23            So we'll now determine who those two are.  And those
24     two, if they've taken notes, will have to leave those notes
25     secured with the court officer.  But—And they can't

                                  708

1   deliberate, but they'll have to make arrangements so that the

2   court officer can keep in contact with them. So we'll

3   determine now who the alternates will be at this time.

4           THE CLERK: Juror in seat number eight,

5   Brian Booth.

6           And jury in seat number nine, Randy Overweg.

7           THE COURT: Since it's quarter to 12:00, why don't

8   we recess for lunch now.

9           Oh, also, I should tell you, Mr. Booth and

10  Mr. Overweg, you can't discuss the case either. You can't

11  talk to anybody until you're released as a juror and the

12  same—you can't have any contact with any of the attorneys or

13  anybody who was involved in the case; and you have to refrain

14  from watching, listening, or viewing any media reports about

15  this until you are released as—as jurors. Okay?

16          We'll recess now for lunch. I'd ask you be back

17  here no later than 1:00 o'clock; and when all 12 of the

18  remaining are assembled, make sure they've got their notes and

19  all of the exhibits and the instructions and the verdict form,

20  and then they can commence their deliberations. And,

21  hopefully, we can start that right promptly at 1:00 o'clock.

22          THE CLERK: You do solemnly swear or affirm that

23  you will to the utmost of your ability keep the persons sworn

24  as jurors on this trial from separating from each other; that

25  you will not suffer any communication to be made to them or

709

1    any of them, orally or otherwise; that you will not

2    communicate with them or any of them, orally or otherwise,

3    except by the order of this Court or to ask them if they have

4    agreed on their verdict until they shall be discharged; and

5    that you will not, before they render their verdict,

6    communicate to any person the state of their deliberation or

7    the verdict they have agreed upon, so help you God?

8              THE BAILIFF:   I do.

9              THE COURT:   All right.  So we'll stand in recess

10   then, members of the jury, till 1:00 o'clock; and we should

11   have everything ready for you when you get back to the jury

12   room at 1:00 o'clock to commence your deliberations in this

13   matter.

14             (At 11:46 a.m., court recessed)

15             (At 5:58 p.m., proceedings reconvened)

16             It's 6:00 o'clock, members of the jury.

17             The record should reflect that the jury is present

18   with the defendant and his counsel and Assistant

19   Prosecutor Brower.

20             And I'm going to release the jury for the weekend.

21   I have to be in court in Allegan all day tomorrow, so it's not

22   possible for me to be here.  So I'm going to release you until

23   Monday morning.  I'd ask you all to be back here at 9:00 a.m.

24             Now you'll have to follow these rules during this

25   recess:

710

1    You are not to discuss this case with each other,
2  with your family, friends, or anyone else during this period
3  of time that you're on recess.

4    You're to have no contact with either of the
5  attorneys, the defendant, or anybody that's been involved in
6  this case.

7    You're not to look at, listen to, watch, or have any
8  contact with any news media reports whether it be TV, radio,
9  or the print media.  It may be if you inadvertently come up
10  across something, just ignore it, don't look at it, don't read
11  it, don't pay any attention to it.

12    And you'll have to follow those restrictions until
13  such time as this matter is resolved one way or the other.

14    And I know it's going to be difficult for you not to
15  discuss the case with your family or friends.  You'll have to
16  make them understand as best you can it's just not
17  permissible.

18    Nor is it permissible for any of you to discuss it
19  until you reconvene here again Monday morning and you're told
20  to commence your deliberations because it's necessary that all
21  jurors be present at the time any discussions go on, and it
22  has to be under the supervision of the Court when you're
23  deliberating.  So from this point forward until you're brought
24  back here Monday and told to commence deliberations, have no
25  further discussions in respect to this matter.

1    So we'll stand in recess for your purposes until

2    Monday morning at 9:00 a.m.

3    Counsel, we need to put something on the record

4    about the instructions—That completely slipped my mind.—that

5    we discussed them and—

6    MR. SVIKIS:   Is this the tape—the question—

7    THE COURT:   No, no, no, no, no.   This reverts back.

8    MR. SVIKIS:   It slips my mind now, too.

9    THE COURT:   Okay.   That's why I want to get it on

10   there so I won't forget it—

11   MR. SVIKIS:   Okay.

12   THE COURT:   —again.   Okay?   So just stay a few

13   minutes after the—

14   MR. SVIKIS:   Yes.

15   THE COURT:   —jurors.

16   MR. SVIKIS:   Okay.

17   THE COURT:   So the jury is in recess now.   Thank

18   you very much.

19   (At 6:01 p.m., jury exits courtroom)

20   What we—What we failed to do is we discussed—all of

21   us discussed the instructions and we all agreed on them, but I

22   didn't put it on the record.

23   MR. SVIKIS:   Okay.

24   THE COURT:   By the court rule I've got to give you

25   an opportunity to put anything you want to put—

712

1             MR. SVIKIS:   Right.

2             THE COURT:   —on the record regarding those.

3             MR. SVIKIS:   Oh, okay.  Now I understand.

4             THE COURT:   So—I know this is a little belated—

5             MR. SVIKIS:   Yeah.

6             THE COURT:   —and we did discuss them prior to

7      closing arguments.

8             But, Mr. Svikis, do you have any objections to

9      charge or any further request of charge?

10            MR. SVIKIS:   I do not.

11            THE COURT:   Mr. Brower?

12            MR. BROWER:   People are satisfied, your Honor.

13            THE COURT:   And do both of you waive the Court

14      presenting a theory and claim?

15            MR. BROWER:   Yes.

16            MR. SVIKIS:   Yes.

17            THE COURT:   Thank you.

18            Now we've got the record complete.

19            MR. BROWER:   Thank you, your Honor.

20            THE COURT:   See you Monday morning.

21            (At 6:02 p.m., proceedings adjourned)

22

23

24

25

713