26|51\

1         STATE OF MICHIGAN

2    9TH CIRCUIT COURT—TRIAL DIVISION

3

4   THE PEOPLE OF THE
    STATE OF MICHIGAN

5
         v                              Files No. C03000897 FC
6
    PATRICK KEVIN MISHALL,
7
              Defendant.
8

9

10            Jury Trial — Volume V of V

11      Before Hon. George R. Corsiglia P12239, Circuit Judge
      (Visiting Judge from 48th Circuit, Presiding by Assignment)
12         Kalamazoo, Michigan—Monday, February 14, 2005

13

14

15   APPEARANCES:

16   For the People:        Scott W. Brower P44951
                            Office of the Prosecuting Attorney
17                          227 West Michigan Avenue
                            Kalamazoo, Michigan 49007
18                          (269) 383-8900

19   For the Defendant:     Andis Svikis P36039
                            1803 Whites Road
20                          Kalamazoo, Michigan 49008
                            (269) 349-7692
21

22   Recorded by:           Video recorded

23   Transcribed by:        Brenda K. Foley CER 4956
                            1400 Gull Road
24                          Kalamazoo, Michigan 49048
                            (269) 385-6001
25                               * * * * *

                           714

FILED

JUN 1 3 2005

9th JUDICIAL CIRCUIT
COUNTY OF KALAMAZOO
KALAMAZOO, MICHIGAN

ENTERED

1                          TABLE OF CONTENTS

2                                                              PAGE

3  Motion regarding replaying of videotape testimony  . . . . . .  716

4  Verdict . . . . . . . . . . . . . . . . . . . . . . . . . .  728

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

(Tape No. C2005-025, 2-14-05, 09:03)

1    Kalamazoo, Michigan

2    Monday, February 14, 2005 - 9:03 a.m.

3         THE CLERK:    . . . (speaker began prior to tape

4    starting) 97 FC.

5         Please state your appearances for the record.

6         MR. BROWER:    May it please the Court, your Honor,

7    Assistant Prosecuting Attorney Scott Brower for the People of

8    the State of Michigan.

9         MR. SVIKIS:    Andis Svikis on behalf of Mr. Mishall.

10        THE COURT:    Mr. Svikis, you brought to the Court's

11   attention this morning a motion objecting to the rereading of

12   testimony requested by the jury.

13        I have had an opportunity to review your—your

14   motion, and the assistant prosecutor did provide me with a

15   Michigan case that addresses some of the issues you raise.

16        Do you wish to—to expand on what you've submitted to

17   the Court in writing orally?

18        MR. SVIKIS:    Thank you, your Honor.

19        Your Honor, by way of background, on late Friday the

20   jurors sent down a request to hear particular testimony with

21   regard to a Bart Munson—not to be confused with

22   Brett Munson—and Tink Askern, who is now Telpely.

23        On—

24        THE COURT:    I think it's just the reverse.  She was

25   Telpely—

1          MR. SVIKIS:    Telpely—

2          THE COURT:    —and now—

3          MR. SVIKIS:    All right.

4          THE COURT:    —is Askern.

5          Go ahead.

6          MR. SVIKIS:    It does get confusing.

7          With regard to those two individuals, on

8   Mr. Munson's testimony we put together an unusual procedure

9   where we read two transcripts—one from a preliminary exam and

10  one from prepared examination of Mr. Munson in the first

11  trial.

12          At the time of that reading I had no objection.  I

13  thought that was the way to handle it because Mr. Munson was

14  unavailable due to a medical condition resulting from a kidney

15  transplant.  And although it was an unusual situation where

16  two transcripts were read, to have that one read again it

17  would amount to having his testimony four times, even though

18  it would be duplicated.

19          And the more—

20          THE COURT:    I guess I don't understand that theory.

21  Why would it be—amount to reading his testimony four times?

22          MR. SVIKIS:    We've read it twice—We've read a

23  complete beginning to end preliminary examination.  We've read

24  beginning to end first trial—That's twice.  And then to do

25  it—to do it again—to replay that testimony now would show

717

1    the—a prosecutor acting the part of Mr. Munson and

2    Prosecutor Brower and myself acting our own parts going

3    through the—going through the transcripts. It would simply

4    just be too much. That's the simple one, I think.

5         With regard to Tina Askern, this is more

6    troublesome. Ms. Askern has testified as to—the way that I

7    see it—two particular issues. She was the individual that

8    closed the store the night before the death of

9    Ms.—Ms. Dimmick.

10        In her first interview with Detective Hatter she

11   made no mention of a weapon that Mr. Mishall had referred to

12   that he had a weapon, could bring it in the store for

13   protection. That only came out on rebuttal when

14   Detective Hatter was put in on the first interview with

15   Ms. Telpely.

16        What the—What Ms. Telpely testified to originally

17   before the jury was that Mr. Mishall talked about owning a

18   gun, bringing in a gun, keeping it behind the store for

19   protection. So if her testimony is read with regard to the

20   weapon issue, there is no—that testimony then is heard two

21   times and the rebuttal testimony is not heard by

22   Detective Hatter. That's one of the issues with regard to

23   Ms. Telpely.

24        The second one is even more troubling. The

25   testimony by Ms. Telpely as regard to a particular locked cash

718

1   or—slash—money box where the key is not secreted in a—in a
2   desk drawer but it's there mixed with, I believe, 50 other
3   keys.  And she testified on direct examination that when she
4   came into the store, the box was locked.  No one would know
5   where the key was and then to relock it again and the money
6   was missing.
7           What we found out when the owner of the
8   store—Mr. Jilek—testified—who entered first with the
9   police—that he, in fact, examined the money, made the count
10  along with his secretary.
11          So when Ms. Telpely came in and was interviewed by
12  Detective Hatter again at a later date, it became apparent
13  that she was unaware that Mr. Jilek had been in, counted the
14  money, and took the money, which would explain why it was
15  missing.
16          So that would be the factual basis of the testimony.
17          Turning to the applicable Michigan law and MCR 6.414
18  that allows the discretion of the court to reread testimony.
19  However, the issue with regard to video replay has not been
20  fully litigated in Michigan.  The case of *People* v *Howe,*
21  392 Mich 640 [*sic*] (1974) allows the court this discretion to
22  allow the rereading of—of testimony, but it does not handle
23  video.  And I think that probably precedes video by
24  maybe—Well, it precedes video in this court by probably
25  12 years.

1    Turning to the video and citing in this particular

2    case other jurisdictions—And I've attached the case of

3    *State* v *Koontz*, 41 P3d 475, Washington.  It simply states that

4    video does not—is not the same thing as—well, actual

5    testimony, of course, and is not the same thing as rereading

6    the transcript.

7    The jurors' attention is more directed to the

8    individual as in this courtroom there are a number of cameras,

9    and it's my recollection that the cameras do shift from

10    question to question and even would point to the defendant.

11    It—And I've also presented to the Court additional

12    citations from other jurisdictions that this video may place

13    an undue emphasis on testimony considered a second time.

14    I will stand on the remaining of the cases that

15    I've—I've cited and ask the Court to not have the video

16    replayed or reread Mr. Munson's testimony.  Thank you, your

17    Honor.

18    THE COURT:   Mr. Brower?

19    MR. BROWER:   One thing, your Honor, it is my

20    understanding that the note requested testimony of

21    Brett Munson also.  There was actually three requests:

22    Bart Munson, Brett Munson, and Tina Askern.  I believe there

23    were three names on that list.

24    THE COURT:   Not to my recollection.

25    MR. BROWER:   Okay.  I may be wrong in that regard.

1    I was operating all weekend under the assumption that it was

2    three people.

3              THE COURT:   You're right.  It was Tina Askern,

4    Brett and Bart Munson.

5              MR. BROWER:   Okay.

6              Regarding replaying the testimony of the reading of

7    the transcripts and whether or not that testimony would,

8    therefore, be brought before the jury four times, the fact

9    that the two transcripts were read together during this

10   trial—meaning the transcript of his testimony at the

11   preliminary examination and at trial number one, I'll call it.

12   That was with the stipulation and agreement of defense

13   counsel.  It was actually a concession on my part that would

14   allow for that testimony to be played together because—

15             MR. SVIKIS:   There's no—no objection, and I would

16   reaffirm the same way it was read.  So that's not—I'm not

17   going there at all.  That balanced.  I have no objection to

18   that from rereading both of those—none whatsoever.

19             MR. BROWER:   But it has to be considered as having

20   been played one time.  They heard the testimony of Bart Munson

21   once.

22             Regarding Tina Askern's testimony and the fact that

23   there was other witnesses that impeached her credibility,

24   prior inconsistent statements, certainly there was.  However,

25   the jury has determined that it was not necessary to hear the

                                721

1    testimony of those other people.  We don't know what part of
2    the testimony of Tina Askern was important.
3            There are three points the defense counsel makes in
4    arguing against replaying the testimony:
5            One, that the videotape does not accurately
6    reproduce the witness' testimony.  Well, of course it is.  It
7    is a verbatim account recorded as it occurred.  And it's
8    certainly much more likely to be accurate, if you will, than a
9    transcript that's typed.
10           Another argument is that the emphasis—that the tape
11   would emphasize views the jurors did not focus on during the
12   testimony.  But how can we say what the juror did or did not
13   focus on during the testimony?
14           Plus, just because a voice-activated camera may
15   alternate views does not mean it is emphasizing the views
16   that's depicted on the screen.
17           We have to give jurors some credit.  They will not
18   be surprised to see a glimpse of defense counsel or prosecutor
19   as they ask a question of the witness.  They already know the
20   other people—the defense counsel and myself—were there.  They
21   saw it before.
22           Finally, it does not duly [sic]—unduly emphasize
23   testimony.  As noted in the Howe court, cited in defense
24   counsel's memo, a court cannot simply refuse to grant the
25   jury's request for fear of placing too much emphasis on the

1    testimony of one or two witnesses.

2            Here, the jury has decided that rehearing the
3    testimony is necessary to—to resolve a disagreement or correct
4    a memory failure, which is the magic language. We—And that is
5    the People or the Court.—are not placing any emphasis or
6    importance on the testimony; they have already determined
7    what's necessary or important for them.

8            I'd ask the Court to deny defendant's objection.

9            MR. SVIKIS:  Your Honor, I would just now—late
10   Friday—It appears that both Brett and Bart were requested, and
11   I would incorporate both of those individuals into my
12   objection.  Thank you.

13           THE COURT:  First of all, the Court would note that
14   the Michigan authority cited predates the supreme court of
15   this state generally approving video recording as the official
16   record of the court.

17           Frankly, you know, it seems to the Court that with
18   any new technology there's always some skepticism, especially
19   in the appellate—the appellate process of the court system.
20   And, frankly, I'm somewhat surprised at the statements made by
21   the appellate courts of other states.

22           Now maybe there is some study to back up the
23   statements they are making, but I don't understand how they
24   can come to those conclusions other than the fact that they're
25   appellate courts and they're the last word in that state.  For

                                 723

1    them to conclude that it unduly emphasizes views that maybe
2    the jury didn't see, to me, that's pure speculation.
3              Maybe the jury wasn't looking at anything.  They may
4    have been looking at their shoes during the testimony, and
5    they may well do that at the time that they hear the testimony
6    the second time.
7              Is the defense's position that the viewing is what
8    creates this problem—
9              MR. SVIKIS:   Yes, your—
10             THE COURT:   —the video?
11             MR. SVIKIS:   Yes, your Honor.
12             THE COURT:   Why can't—Well, isn't it possible just
13   to show it to them—or not show it to them, just to let them
14   hear it?
15             MR. SVIKIS:   Well, that's—that's certainly
16   possible.  As one of the jury instructions states, they're
17   supposed to watch the facial demeanor and then when—
18             THE COURT:   Well, it seems to me you want it both
19   ways now, Mr. Svikis.
20             MR. SVIKIS:   Well, it's the way that I want it on
21   this particular time this particular day, which is quite
22   clear.
23             THE COURT:   Which way do we want it?
24             MR. SVIKIS:   For the purposes of today, I want it
25   as the way my motion is filed for today.

724

1          THE COURT:  Okay.  Can't we solve that problem with
2     just letting them see—or hear it?

3          Do you have any position on that, Mr. Brower?

4          MR. BROWER:  Your Honor, I—It is my position that
5     viewing the tape is as close to reliving that testimony as is
6     humanly possibly.  What they see is what happened.  It's not a
7     Hollywood reproduction that has music in the background and
8     closes in on the facial expressions and so on.  The camera
9     shot is what—what happened here in the courtroom, and accuracy
10    is what we're looking for.  That is an accurate depiction of
11    what testimony took place.

12         THE COURT:  Well, as I was saying, I guess I'm
13    not—I'm not convinced—unless there's some—been some sort of
14    empirical study that I'm totally unaware of—that states that
15    allowing a jury to view a video portion of the trial during
16    their deliberation unduly influences that jury and
17    overemphasizes those witnesses'—or those particular witnesses'
18    testimony any more than just reading their testimony would.

19         However, you know, as I said, I've been given very
20    short notice of this.  I have no ability at this point to—to
21    do any in-depth research.  But I don't think any of those
22    cases are binding on this Court.

23         The jury has asked for the testimony of three very
24    specific witnesses.  It was relatively brief.  The two Munson
25    brothers—one had to do with having been at the defendant's

725

1    residence at the time of the funeral—the day of the funeral.

2            The other's testimony, if I recall correctly, had to

3    do with attempting to have his customary morning coffee with

4    the defendant on the date of the crime.

5            Ms. Telpely Askern testified as to various things.

6    It may well be that if the defendant is correct in their

7    speculation that she may have testified about something she

8    was unaware of.

9            However, we also don't know where Mr. Jilek got the

10   keys to open it up.  Maybe he had his own set.  Maybe he

11   didn't use those in the store.  Maybe he didn't need to.  To

12   speculate on that issue is just that; it's speculation.

13   Nobody asked him that question.

14           So I don't think that it would unduly emphasize any

15   of those three witnesses' testimony.  It seems to me that they

16   presented evidence in respect to—from—you know, as to the

17   background and circumstances of the setting of the crime and

18   what the defendant—at least as to one of the Munson

19   brothers—stated to him about a weapon on the day of the

20   funeral.

21           And it seems to the Court that—I may even be

22   speculating as to that.  Maybe they want it for some entirely

23   different reason other than the weapon issue regarding the one

24   Munson brother.  But it doesn't seem to the Court that it

25   would unduly emphasize or prejudice the—the defendant in this

1    matter.  And so I'm going to deny the motion.

2                 MR. SVIKIS:   Thank you, your Honor.

3                 (At 9:23 a.m., court recessed)

4                 (At 4:11 p.m., proceedings reconvened)

5                 THE COURT:   All right.  We're on the record in the

6    presence of the jury and that of the assistant prosecutor

7    Mr. Scott Brower, and defendant, his counsel Mr. Andis Svikis.

8                 The jury has sent a note to the Court asking a

9    question.  And it relates to the charge of first-degree felony

10   murder.  And the question is as follows:

11                It says to prove the third element of first-degree

12   felony murder does it make a difference if the murder was in

13   the course of the robbery or if the robbery was a cover for

14   the murder?

15                The simple answer to that is yes by the very

16   definition of the third element, which is that when he did the

17   act that caused the death of Ms. Dimmick, the defendant was

18   committing the crime of larceny—that is, the robbery or the

19   stealing.  And for the crime of larceny, then they define what

20   that is.

21                So the answer is in order to prove the third element

22   of first-degree felony murder it must have been in the course

23   of committing the larceny.

24                Now if—if the larceny or the robbery was done merely

25   as a cover, then it would not amount to satisfying that third

727

```
 1        element.
 2                    Okay.  Does that clarify your question?
 3                    (No audible response)
 4                    Okay.  Then we'll stand in recess and you can
 5        continue.
 6                    Just a minute.  I got a signal for—Oh, she's done.
 7                    Go ahead.
 8                    (At 4:13 p.m., jury exits courtroom)
 9                    You can be seated.
10                    Do you have any further request or objections,
11        Mr. Brower?
12                    MR. BROWER:   No, your Honor.
13                    THE COURT:   Mr. Svikis?
14                    MR. SVIKIS:   No, your Honor.
15                    THE COURT:   We'll stand in recess then.
16                    (At 4:13 p.m., court recessed)
17                    (At 5:41 p.m., proceedings reconvened)
18                    I understand that a verdict has been reached.
19                    Would the clerk please inquire.
20                    THE CLERK:   Will the foreperson please rise.
21                    Has the jury agreed upon a verdict?
22                    THE FOREPERSON:   Yes, we have.
23                    THE CLERK:   What is your verdict for counts one and
24        two, murder?
25                    THE FOREPERSON:   We, the jury, find the defendant
```

728

1    Patrick Kevin Mishall guilty of count one, first-degree

2    premeditated murder.

3              THE CLERK:   What is your verdict for count three,

4    felony firearm?

5              THE FOREPERSON:   We, the jury, find the defendant

6    guilty of count three, felony firearm.

7              THE CLERK:   What is your verdict for count four,

8    armed robbery?

9              THE FOREPERSON:   We, the jury, find the defendant

10   guilty of count four, armed robbery.

11             THE CLERK:   What is your verdict for count five,

12   felony firearm?

13             THE FOREPERSON:   We, the jury, find the defendant

14   guilty of count five, felony firearm.

15             THE CLERK:   Members of the jury, listen to your

16   verdict as recorded.   Counts one and two, murder, guilty of

17   count one, first-degree premeditated murder;

18             Count three, felony firearm; guilty of count three,

19   felony firearm;

20             Count four, armed robbery; guilty of count four,

21   armed robbery;

22             Count five, felony firearm; guilty of count five,

23   felony firearm.

24             Is this the verdict as stated by the foreperson?

25             UNIDENTIFIED JURORS:   Yes.

729

1                    THE CLERK:   Is this the verdict of the jury?

2                    THE JURY (in unison):   Yes.

3                    THE COURT:   Do you wish any poll of the jury?

4                    MR. SVIKIS:   Yes, your Honor, please.

5                    THE COURT:   Please poll.

6                    THE CLERK:   Juror in seat one, is this your

7        verdict?

8                    JUROR FOOY:   Yes, it is.

9                    THE CLERK:   Juror in seat two, is this your

10       verdict?

11                   JUROR LEE:   Yes, it is.

12                   THE CLERK:   Juror in seat three, is this your

13       verdict?

14                   JUROR ELWELL:   Yes, it is.

15                   THE CLERK:   Juror in seat four, is this your

16       verdict?

17                   JUROR SCHULTZ:   Yes, it is.

18                   THE CLERK:   Juror in seat five, is this your

19       verdict?

20                   JUROR EVERETT:   Yes, it is.

21                   THE CLERK:   Juror in seat six, is this your

22       verdict?

23                   JUROR MANCHESTER:   Yes, it is.

24                   THE CLERK:   Juror in seat seven, is this your

25       verdict?

1            JUROR STONE:   Yes, it is.

2            THE CLERK:   Juror in seat ten, is this your

3       verdict?

4            JUROR ADAMS:   Yes, it is.

5            THE CLERK:   Juror in seat 11, is this your verdict?

6            JUROR WURFEL:   Yes, it is.

7            THE CLERK:   Juror in seat 12, is this your verdict?

8            JUROR PELTO:   Yes, it is.

9            THE CLERK:   Juror in seat 13, is this your verdict?

10           JUROR WALDSCHLAGER:   Yes, it is.

11           THE CLERK:   Juror in seat 14, is this your verdict?

12           JUROR WELLINGTON:   Yes, it is.

13           THE COURT:   The verdict is received as reported by

14      the foreman and as verified by the poll.

15           Members of the jury, you're hereby discharged from

16      this matter—from any further considerations.  You're free to

17      talk about this case if you wish to.  If you do not wish to,

18      you do not have to.  If somebody attempts to want to discuss

19      the case with you and you don't wish to discuss it with them

20      and they will—they persist, please report that to the court,

21      and we will take such actions as are necessary to—so that they

22      desist from that.  But you are free to discuss the case at

23      this point forward if you wish to with whomever you wish, but

24      you don't have to.  You're hereby discharged.

25           (At 5:44 p.m., jury excused)

                        731

1          Bond in this matter is cancelled, and this matter

2      is—and the defendant's remanded to the custody of the

3      Kalamazoo County sheriff to remain in custody till the date

4      and time of sentence, which is March 7, 2005, at 1:30 p.m.

5              Court will be in recess then.

6              (At 5:45 p.m., proceedings concluded)

7                          *  *  *  *  *

8

9

10

11

12   STATE OF MICHIGAN    )
                          )
13   COUNTY OF KALAMAZOO )

14

15       I certify that this transcript, consisting of pages, is a

     complete, true, and correct transcript **to the best of my ability** of
16
     the proceedings and testimony taken in this case on Monday,
17
     February 7, 2005; Tuesday, February 8, 2005; Wednesday, February 9,
18
     2005; Thursday, February 10, 2005; and Monday, February 14, 2005.
19

20

21

22   June 8, 2005

                        Brenda K. Foley   (CER-4996)
23                      Certified Electronic Recorder
                        1400 Gull Road
24                      Kalamazoo, Michigan  49048

25

                            732