261511

1            STATE OF MICHIGAN

2       9ᵀᴴ CIRCUIT COURT—TRIAL DIVISION

3

4  THE PEOPLE OF THE
   STATE OF MICHIGAN

5
       v                              Files No. C03000897 FC

6
   PATRICK KEVIN MISHALL,

7
            Defendant.

8

9

10                        Volume I of IX

11     Before Hon. George R. Corsiglia P12239, Circuit Judge
       (Visiting Judge from 48ᵗʰ Circuit, Presiding by Assignment)

12            Kalamazoo, Michigan—Monday, June 14, 2004

13

14

   APPEARANCES:
15
   For the People:           Scott W. Brower P44951
16                            Office of the Prosecuting Attorney
                              227 West Michigan Avenue
17                            Kalamazoo, Michigan 49007
                              (269) 383-8900
18
   For the Defendant:        Andis Svikis P36039
19                            1803 Whites Road
                              Kalamazoo, Michigan 49008
20                            (269) 349-7692

21

22  Recorded by:             Video recorded

23  Transcribed by:          Brenda K. Foley CER 4956
                             1400 Gull Road
24                            Kalamazoo, Michigan 49048
                             (269) 385-6001
25                                 * * * * *

                                 1

FILED

JUL 0 1 2005

8th JUDICIAL CIRCUIT
COUNTY OF KALAMAZOO
KALAMAZOO, MICHIGAN

1
                          TABLE OF CONTENTS

2                                                              PAGE

3  Motion *in limine* by Mr. Svikis  . . . . . . . . . . . . . .  3

4  Response to motion by Mr. Brower  . . . . . . . . . . . . . .  5

5  Court's ruling on motion *in limine*  . . . . . . . . . . . .  5

6  Jury panel sworn  . . . . . . . . . . . . . . . . . . . . . .  10

7  Jury sworn  . . . . . . . . . . . . . . . . . . . . . . . . .  180

8  Procedural instructions  . . . . . . . . . . . . . . . . . .  181

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

(Tape No. B2004-033, 6-14-04, 10:02)

1    Kalamazoo, Michigan

2    Monday, June 14, 10:02 a.m.

3    THE CLERK: The court calls the case of People

4    versus Patrick Mishall, file C03-0897 FC.

5    Please state your appearances for the record.

6    MR. BROWER: If it please the Court, your Honor,

7    Assistant Prosecuting Attorney Scott Brower for the People of

8    the State of Michigan.

9    MR. SVIKIS: Andis Svikis on behalf of

10   Patrick Mishall.

11   THE COURT: All right. As I understand it,

12   Mr. Svikis, you had a matter you wanted brought—you want to

13   bring to the Court's attention before we proceed with

14   selection of the jury.

15   MR. SVIKIS: Yes, your Honor. Thank you.

16   Your Honor, this morning I filed a motion *in limine*

17   to allow particular examination of investigating officers

18   regarding failure to investigate or interview particular

19   individuals. It is a motion that we've already discussed in

20   chambers, and there are certain attachments with police

21   reports which I will not go into now.

22   In essence, the—the request is that in order to

23   effectively represent and defend Mr. Mishall I have to inquire

24   into certain areas about certain individuals who, apparently,

25   the names are quite sensitive from the perspective that when

3

1      the names first came up of a former Kalamazoo County circuit

2      court judge every judge in this circuit recused themselves,

3      and that's why we're before the Honorable George Corsiglia at

4      this time.

5      The—The examination would be direct examination and

6      cross-examination of witnesses. In this—In this particular

7      instance it would be the cold case team and to cast and show

8      reasonable doubt of Mr. Mishall's guilt, examination that

9      there were certain leads that are mentioned in the attached

10      motion and filed for the record that would indicate that the

11      investigation was not followed through.

12      In particular, there's mention of physical evidence

13      that was never revealed and is discussed with a Mr. Hess; and

14      that was never followed up as it related to a former judge in

15      this circuit.

16      And we're simply asking, based upon what's in the

17      motion and attached redacted police report that this is

18      information that has not been created by the defense but is

19      simply information that has been provided to defense with no

20      follow-up. And this would—examination of the cold case team

21      would show their particular bias in focusing on—on Mr. Mishall

22      and ignoring all other leads.

23      And for those purposes and what's contained in the

24      motion and the attachments, I'd ask the Court to allow that

25      examination.

4

1    I will also place on the record that this matter has

2    been discussed in detail; and I understand the Court in all

3    likelihood will deny this motion, so I'm not going into any

4    further particular detail but feel satisfied that the record

5    and the attachments and the filing has been made if review is

6    ever required. Thank you.

7    THE COURT: Does the assistant prosecutor wish to

8    respond?

9    MR. BROWER: Yes, your Honor.

10    It is People's position that the information given

11    to police by Mr. Hess regarding the former circuit court judge

12    is so inherently unreliable that to allow inquiry and

13    cross-examination of the police detectives regarding their

14    follow-up there would be so prejudicial that—and it would lead

15    to confusion of the issues and should be precluded from being

16    allowed at this point. And I would ask the Court to so order.

17    THE COURT: Any response, Mr. Svikis?

18    MR. SVIKIS: No, your Honor. Just that the purpose

19    of the cross-examination is—is a primary interest secured by

20    the confrontation clause of the United States Constitution and

21    the Michigan Constitution. Thank you.

22    THE COURT: The Court has reviewed the motion and

23    the attached redacted—Well, actually, I reviewed both the

24    redacted and the unredacted portion of the report that defense

25    relies on.

5

1                Based on the information that this Court has at this

2   time in respect to this case, when it happened, how it

3   happened, those may or may not have been involved. It just

4   seems to this Court that there is a complete failure—at least

5   at this point—as to how this information would be relevant.

6   It would be misleading to the jury.

7                Based on the sequence of the information this Court

8   has in respect to when the former judge that was named was

9   here on the bench and in this area as opposed to when this

10   informant claims to have had this contact with him and to view

11   what he claims he viewed without explanation is just too

12   remote and unreliable to—to present to the jury.

13                It would lead to confusion in this Court's mind. It

14   would possibly give them a very false impression. And,

15   furthermore, it—From what the report indicates the informant

16   could not identify any—any of the individuals he viewed nor

17   did what he claims he viewed comport with what the Court is

18   informed at this point the evidence will show as to how this

19   homicide occurred and where it occurred.

20                That's not to say he didn't see something that he

21   claims he saw, but I don't know how it's relevant to this case

22   at this time. So your motion's denied.

23                Is there anything else in that respect to take care

24   of?

25                MR. SVIKIS:   No, your Honor.

1          THE COURT:   Okay.  Then we'll proceed, then, to

2   commence the trial with the jury selection.

3          We'll take a short recess.

4          MR. BROWER:   One thing, your Honor, regarding

5   stipula—Excuse me.—sequestration of the witnesses.  I've

6   talked with Mr. Svikis, and we agree that all

7   witnesses—prosecution or defense—should be sequestered for

8   voir dire, opening statements, and during the course of the

9   testimony.

10         THE COURT:   Is that correct, Counsel?

11         MR. SVIKIS:   That is correct, your Honor.

12         THE COURT:   All right.  The record may so indicate

13  then.

14         Okay.  We'll take a short recess.

15         (At 10:10 a.m., court recessed)

16         (At 10:36 a.m., proceedings reconvened)

17         This is the time set for trial by jury in the matter

18  of the People of the State of Michigan versus

19  Patrick Kevin Mishall, file number 03-879 FC.

20         Is the state ready to proceed in this matter?

21         MR. BROWER:   The People are ready, your Honor.

22         THE COURT:   Is the defense ready?

23         MR. SVIKIS:   Yes, your Honor.

24         THE COURT:   Okay.  Thank you.

25         Members of the jury panel, I'm Judge

1    George Corsiglia, and it's my pleasure and privilege to
2    welcome you to the circuit court for Kalamazoo.

3        I know that for a great many of you jury duty may be
4    a new experience. Keep in mind that jury duty is one of the
5    most serious duties that members of a free, democratic society
6    are asked to perform. Our system of self-government could not
7    exist without citizens such as yourself.

8        The jury is an extremely important part of the court
9    system. The right to a jury trial is an ancient tradition and
10   part of the heritage of this country. The law provides that
11   both a person who is accused of a crime and the prosecution
12   have the right to a trial, not by one individual, but by a
13   jury of 12 impartial persons.

14       Jurors must be as free as humanly possible from any
15   bias, prejudice, or sympathy for either side. Each side in a
16   trial is entitled to have jurors who keep open minds until the
17   time comes for the case to be decided.

18       We commence the trial with the selection of the
19   jury. The purpose of the jury selection process is to obtain
20   information about you that will help the Court and the
21   attorneys choose a fair and impartial jury to hear the case.

22       During jury selection the lawyers and I will be
23   asking you questions. This part of the trial is what's called
24   the voir dire examination. The questions are meant to find
25   out if you know anything about this case. Also, we need to

8

1    find out if you have any opinions or personal experiences that
2    might influence you for or against the prosecution, the
3    defendant, or any of the witnesses. One or more of these
4    things could cause you to be excused in this particular case,
5    even though you may otherwise be qualified to be jurors.

6         The questions that are asked of you may probe deeply
7    into your attitudes, beliefs, and experiences. They're not
8    meant unreasonably pry into your private lives or to embarrass
9    anyone. The law requires that we ask certain questions so
10   that we can obtain information about you as it relates this
11   specific case so that everyone can be assured of a fair and
12   impartial jury to hear the case.

13        If for any reason you don't hear or understand the
14   questions you should let us know. If you do understand the
15   questions, you are required to answer them truthfully and
16   completely. Bear in mind that we don't want you to hesitate
17   to speak freely about anything that you believe that we ought
18   to know about you, your background, or experiences as it
19   relates to this particular case and you being a juror.

20        Now in cases of this nature where a jury is selected
21   prospective jurors may be excused from serving on jury service
22   in one of two ways. First, jurors may be excused for cause;
23   that is, the Court makes a determination that there's a valid
24   reason why a particular prospective juror cannot or should not
25   serve.

1       Now, in addition to that, a lawyer for either side
2   may excuse prospective jurors without giving a specific
3   reason, and that's limited. This is called the peremptory
4   challenge, and the law gives each side the right to excuse a
5   certain number of jurors in this way. If you are excused for
6   any reason, you shouldn't take it bad or feel it's a bad
7   reflection upon you personally. This is merely a method that
8   has been developed over the course of the years that this
9   country has been in existence and we've had jury trials that
10  allows for a fair and impartial juror to be seated to hear the
11  case.

12      Now in a few moments—after I get done with my
13  comments—the clerk will administer an oath to you. It's the
14  oath for the voir dire examination. And what that requires of
15  you is to answer the questions that are asked of you by the
16  Court and the lawyers truthfully and completely. If any of
17  you have any religious beliefs in respect—that prohibit you to
18  take an oath, it is perfectly permissible for you to affirm
19  rather than to swear.

20      So if you'll now stand, the clerk will administer
21  that oath for the voir dire examination.

22          THE CLERK: Please raise your right hand. Do you
23  solemnly swear or affirm that you will truthfully and
24  completely answer all questions about your qualifications to
25  serve as jurors in this case, so help you God?

10

1    JURY PANEL (in unison):    (Mixed positive responses)

2        THE CLERK:    Thank you.  You may be seated.

3        THE COURT:    Now what I think would be most

4  efficient at this point in the jury selection is to handle the

5  issue of those of you who have been summoned here today for

6  jury service where you being on this jury—because of the

7  length of it—the time that it's going to take to present this

8  case—might be suffering a hardship, and it may be appropriate

9  to excuse you.

10        I would tell you the reason I make these comments is

11  that it's anticipated that this case will go through this week

12  and very likely into next week.  It is anticipated, however,

13  that we should conclude it next week.  But I understand that

14  there may be some of you who have medical or health needs or

15  things of that nature where—that are serious—and that it may

16  be appropriate to excuse you for that purpose.  Or you may

17  have some other commitment that would—this would seriously

18  interfere with.

19        So what I think would be the most efficient way to

20  handle it is if there's any of you who have—or believe you

21  have—such a valid reason to be excused, if you would step

22  forward one at a time so that—to the podium up here in front

23  of me.  I don't know if you can see that or not.  But you'll

24  have to step forward of the bar there and come up to the

25  podium.  If you would state your name, tell me what it is that

11

1    you feel would be an appropriate reason to excuse you because

2    of the length of time.  And then if the attorneys have any

3    further questions that they may wish to ask in that respect we

4    can handle it here so that it isn't a matter that we go

5    through all of the questioning and then find out later that

6    you can't do this.

7                So if you'd do that, please.  Step up.

8                (At 10:46 a.m., off record discussion between Court

9                and clerk)

10               Okay.  Would you please, ma'am, state your name.

11               JUROR HILTON:   Dorothy Hilton.

12               THE COURT:   And do you have a juror number,

13   Ms. Hilton?

14               JUROR HILTON:   Yes, I do.  10644.  I've got to get

15   my glasses out.

16               THE COURT:   10644?

17               JUROR HILTON:   10644, yes.

18               THE COURT:   And why do you think that you should be

19   excused?

20               JUROR HILTON:   My husband starts dialysis tomorrow.

21               THE COURT:   And—

22               JUROR HILTON:   And I am his only transportation.

23               THE COURT:   And is that—How frequently is that?

24               JUROR HILTON:   It will probably—He starts tomorrow,

25   and it'll be three times a week.

                                12

1          THE COURT:    Do you have any questions, Mr. Brower?

2          MR. BROWER:    I have no objection.

3          MR. SVIKIS:    No objection.

4          THE COURT:    All right.  I will excuse you for this

5     case.

6          (At 10:47 a.m., off record discussion between Court

7          and clerk)

8          See, I didn't find this out till Friday, so there

9     was—wasn't anything I could do.

10         (At 10:47 a.m., further off record discussion

11         between Court and clerk)

12         JUROR HILTON:    So this is back up on the fourth

13    floor?

14         THE COURT:    Yes.  Okay.  So we'll excuse you for

15    this case, Ms.—

16         JUROR HILTON:    Thank you.

17         THE COURT:    Okay.  And your name, please, ma'am?

18         JUROR NOLES:    Mary Noles.

19         MR. SVIKIS:    I'm sorry?

20         JUROR NOLES:    Noles, N-o-l-e-s.

21         THE COURT:    M-u—

22         JUROR NOLES:    N-o-l-e-s.

23         THE COURT:    And what's your juror number?

24         JUROR NOLES:    28931.

25         THE COURT:    28931?

13

1              JUROR NOLES:   Yes.

2              THE COURT:   And why do you think you should be

3      excused?

4              JUROR NOLES:   Well, if it's running into next week,

5      I have an appointment at Mayo Clinic.

6              THE COURT:   All right.  Is that—Do you have any—Do

7      you have any objection?

8              MR. BROWER:   No, your Honor.

9              THE COURT:   We'll excuse you for this case because

10     it is—it is going to run into next week.  Well, we think it's

11     going to run into next week.  Okay.

12             JUROR NOLES:   Do I need anything?

13             THE COURT:   Yes, you're excused for—

14             THE CLERK:   For this case.

15             THE COURT:   —for this case.

16             JUROR KMEN:   Hi.  Laurie Kmen.

17             THE COURT:   And your juror number?

18             JUROR KMEN:   1945.

19             THE COURT:   And why do you think you should be

20     excused?

21             JUROR KMEN:   I am the project director for

22     Kalamazoo Public Schools summer school ancillary

23     services—which starts today—which is trying to get 600 kids

24     through dental and mental health services and immunization

25     clinics.  And today's the first day of summer school, and so

                                  14

1    lots of folks are sort of sitting waiting for me to come back.

2    It's only a five-week program, and we have to get kids through

3    that fast.  And this is my third call in since March, so I was

4    sort of figuring I'd be dismissed again and hadn't made a lot

5    of other arrangements with calling in to try to get the date

6    changed.

7              THE COURT:   I don't generally consider employment

8    as a valid excuse.  This obligation surpasses it.  I'm—I'm

9    sorry.  I can't.

10             JUROR KMEN:   Okay.  So as long as—I do have

11   vacation the 24th to the 28th that's been planned for two

12   months, so I guess as long as I'm done by then I'm not—

13             THE COURT:   Well, okay.  You're sort of stacking

14   things on me, ma'am.

15             JUROR KMEN:   Okay.

16             THE COURT:   You know, I'd like to know every reason

17   up front—

18             JUROR KMEN:   Okay.

19             THE COURT:   —rather than to try one and have that

20   rejected and then try another.

21             JUROR KMEN:   Well, summer—our summer school program

22   only runs Monday through Thursday, so that's why I have a

23   vacation from next Friday through that next Monday because I

24   would be—

25             THE COURT:   Oh—

15

1        JUROR KMEN:   —off of work.

2        THE COURT:   Through—You got Monday through when?

3        JUROR KMEN:   Friday, the—or Thursday afternoon, the

4    24th.

5        THE COURT:   Till when?

6        JUROR KMEN:   Till that Monday morning.

7        THE COURT:   Well, we're going to break on—We're

8    going to go Monday—I should say. We're going to go Monday

9    through Thursdays. Okay.

10       JUROR KMEN:   Okay. Then the vacation isn't a

11   problem.

12       THE COURT:   Okay. All right. I'm sorry.

13       JUROR KMEN:   Okay.

14       (At 10:51 a.m., off record discussion between Court

15       and clerk)

16       JUROR BAKER:   Hi. Anna Baker.

17       THE COURT:   Anna Baker?

18       JUROR BAKER:   Uhm-hmm. My number's 138491.

19       THE COURT:   138491?

20       JUROR BAKER:   Yeah.

21       THE COURT:   Okay. Why do you think you should be

22   excused?

23       JUROR BAKER:   I'm moving to a new home this

24   Thursday and Friday. And I also don't think that I can get

25   childcare for my two seven-year-olds for more than a day or

16

1    two.

2              THE COURT:    Friday is—We aren't going to be going

3    on Fridays.

4              JUROR BAKER:    Okay.

5              THE COURT:    This Monday—This case will go Monday

6    through Thursdays on the two weeks we're talking about.

7              JUROR BAKER:    I also don't feel that I can get

8    childcare for that—for a week or two for my twins.

9              THE COURT:    And how long have you realized that

10   this—you had this obligation, ma'am?

11             JUROR BAKER:    We thought we were moving over the

12   weekend.  We couldn't get a truck.  We called a couple weeks

13   ago, and they were all booked up; so we ended up doing it

14   Thursday and Friday.

15             THE COURT:    Where are you moving to?

16             JUROR BAKER:    I'm moving to South 25th Street.

17             THE COURT:    Here in—It's still in—

18             JUROR BAKER:    It's Kalamazoo County still, yes.

19             THE COURT:    Do you gentlemen have any questions?

20             MR. SVIKIS:    I have no questions.

21             THE COURT:    I'm sorry.  I don't feel that that's

22   sufficiently—

23             JUROR BAKER:    Even if you can't get daycare?

24             THE COURT:    Did—Did you—What arrangements have you

25   made regarding daycare?

                              17

1    JUROR BAKER:   My mother has them today, but she

2    owns her own business and can't watch them for extended

3    periods of time.  And my husband works at Pfizer and can't

4    take that much time off work.

5    THE COURT:   Well, I guess at this point I don't

6    feel that that's sufficient enough hardship.  But you'll have

7    to make some arrangements.

8    JUROR BAKER:   Okay.

9    JUROR COX:   William Cox.

10   THE COURT:   Yes, sir?

11   JUROR COX:   The number, I would guess, is 98910.

12   THE COURT:   And why do you think you should—

13   JUROR COX:   My wife had a heart attack about three

14   weeks ago.  She also has COPD—cardio obstructed pulmonary

15   disease.  She's on oxygen 24 hours a day, and I'm her sole

16   caregiver.  My daughter is with her today, but—I thought maybe

17   a day or two would be fine; but when you were talking running

18   into two weeks on a trial, I just don't think I can manage

19   that situation.

20   THE COURT:   You're the sole caregiver—

21   JUROR COX:   Yeah.

22   THE COURT:   —of her at this time?

23   JUROR COX:   Yes.

24   THE COURT:   Do you have any questions?

25   MR. SVIKIS:   No.

18

1       THE COURT:  All right.  I'll excuse you, sir.

2       JUROR COX:  Pardon?

3       THE COURT:  You're excused for this case.

4       JUROR COX:  Thank you, sir.

5       JUROR FLECKENSTEIN:  Cammy Fleckenstein.  It's—

6       THE COURT:  Okay.  And your number?

7       JUROR FLECKENSTEIN:  146535.

8       THE COURT:  Okay.

9       JUROR FLECKENSTEIN:  My issue isn't serving this

10  week; it'd be serving next week.  I had to take next week off

11  because my daycare's closed, and I have no one to watch my

12  son.  I have sole custody.  So next week would be an issue of

13  being here.

14      THE COURT:  Have you made—Have you done anything in

15  an attempt to make an arrangement for that at this point?

16      JUROR FLECKENSTEIN:  Well, my fam—my parents both

17  live out of state; so, I mean, I don't have anyone to watch

18  him.  And that's why I'd taken next week off of work to watch

19  him as a week of vacation.

20      THE COURT:  You don't know anyone that could

21  provide that for you if you're on this jury at this time?

22      JUROR FLECKENSTEIN:  I don't, no, 'cause everyone I

23  know works during the day.

24      THE COURT:  Aren't there—

25      JUROR FLECKENSTEIN:  That's why I'd taken the week

19

1  off was because I didn't have anyone to watch him next week.

2  And his father's unable to watch him. He only gets supervised

3  visitation.

4  THE COURT: Do you gentlemen have any questions?

5  MR. SVIKIS: No, your Honor.

6  MR. BROWER: No, your Honor.

7  THE COURT: Well, it's a close—Have you done

8  anything? There isn't any other daycare providers that you

9  could get to—

10  JUROR FLECKENSTEIN: I—Like I say, I know of

11  nobody; and that's why I'd taken next week off. My problem

12  isn't this week. It's if it goes into next week is where my

13  problem lies.

14  THE COURT: I understand. But, you know, there are

15  day—How old is the child?

16  JUROR FLECKENSTEIN: Twenty months.

17  THE COURT: So he's a toddler.

18  And you and your husband are separated?

19  JUROR FLECKENSTEIN: Yeah. We haven't been

20  together since September, and he has supervised visitation two

21  days a week.

22  THE COURT: All right. I'll excuse you.

23  JUROR FLECKENSTEIN: Thank you.

24  THE COURT: Yes, sir?

25  JUROR PRUIS: My name is Mike Pruis. Do you need

20

1    the number?

2              THE COURT:  Yes, sir.

3              JUROR PRUIS:  9498.

4              THE COURT:  Go ahead.

5              JUROR PRUIS:  My wife had some problem

6    with—Something caused her uterus to prolapse over the weekend,

7    and she has a test at 3:30 this afternoon with possible

8    surgery yet this week.

9              THE COURT:  Do you have any questions?

10             (Mr. Brower shakes head from side to side)

11             THE COURT:  She's going to—This just happened this

12   weekend?

13             JUROR PRUIS:  Yeah, it happened this weekend.

14             THE COURT:  And you're going to—What?  You've got

15   some sort of a medical appointment today?

16             JUROR PRUIS:  Today, yeah, at 3:30.  And then

17   they're going to—I don't know what happens then.

18             THE COURT:  All right.  I'll excuse you, sir.

19             Yes, sir?

20             JUROR DEVRIES:  My name is Howard L. DeVries.

21             THE COURT:  Yes, sir?

22             JUROR DEVRIES:  My bar code number is 132023.

23             THE COURT:  Go ahead.  Yes, sir?

24             JUROR DEVRIES:  I come down with this illness after

25   I filled out this questionnaire.  I have a letter from the

21

1  doctor if you'd like to read it.

2       THE COURT:  Okay.

3       JUROR DEVRIES:  It's a urinary infection that would

4  cause me to have to go to the bathroom at least about every

5  hour or so.  I was at the doctor just Friday.  You can see the

6  date on that.  It's not cleared up yet.  I'm still under

7  medication.

8       THE COURT:  Do you need to see this—

9       MR. BROWER:  No, your Honor.

10      THE COURT:  —either of you gentlemen?

11      JUROR DEVRIES:  I have to drink quite a bit of

12 water with it, also.

13      THE COURT:  Okay.  I guess we—

14      JUROR DEVRIES:  I know you don't allow drinking in

15 the courtroom.

16      THE COURT:  Well, we would—we would allow that for

17 such a situation as this.  But I guess what causes me concern

18 is if you have—

19      JUROR DEVRIES:  It comes up—It comes up real quick

20 like, and I have to—

21      THE COURT:  If you have to leave every hour—Okay.

22 That creates a problem, so I'll excuse you.

23      JUROR DEVRIES:  Okay.  Thank you, your Honor.

24      THE COURT:  Okay.  We're at—What?—six at this

25 point.

22

1          Okay, ma'am?

2          JUROR MEDIRATTA:    Your Honor, my husband who's a

3   physician at Lakeview Hospital, his partner is diagnosed with

4   breast cancer; and so he's unable to take the time off to take

5   the two teenagers we have—16 and 17-year-old—for college

6   visits, and they're dependent on me.  And we have scheduled

7   visits for college.  And she just called in and quit her—She

8   was diagnosed as a terminal breast cancer.

9          THE COURT:    Where do you have—

10         JUROR MEDIRATTA:    Dr. Bouey (phonetic).

11         THE COURT:    No, I don't—Where are these college

12  visits?

13         JUROR MEDIRATTA:    The college visits, my junior is

14  going for University of Phoenix, Arizona; and my senior, who's

15  at U of M, he has classes sign up all scheduled for next week.

16         MR. SVIKIS:    I'm sorry?  What was your name?

17         JUROR MEDIRATTA:    Sangita Mediratta.  It's M-e-d-i-

18  r-a-t-t-a.

19         MR. SVIKIS:    Thank you.

20         JUROR MEDIRATTA:    And he's the only physician

21  psychiatrist at Lakeview Hospital.  And they are looking

22  for—you know, the person they were willing to hire has

23  declined the offer to join, and he was going to join in this

24  week; and so we are in a dilemma.

25         THE COURT:    When is—When is—When is the—the—the

23

1    student who's supposed to be out to Arizona?

2              JUROR MEDIRATTA:   The student, you know, I was

3    supposed to schedule a visit for next week; but my senior

4    is—has classes scheduled this week to take—to sign up for

5    classes.   You know, when they sign up for—

6              THE COURT:   He can—Certainly if he's a senior at

7    the University of Michigan he's fully competent—

8              JUROR MEDIRATTA:   And the—One and a half days is a

9    requirement for them for parents.   It's a scheduled

10   orientation for the parents.   And so—

11             THE COURT:   Where?

12             JUROR MEDIRATTA:   At University of Michigan.

13             THE COURT:   You said he was a senior there.

14             JUROR MEDIRATTA:   Yes.   He's a senior.   He just

15   graduated, and he's going to be going to University of

16   Michigan.

17             MR. BROWER:   Senior from high school.

18             JUROR MEDIRATTA:   Senior from high school.   Sorry.

19             THE COURT:   That's where I—I thought—

20             JUROR MEDIRATTA:   I said—

21             THE COURT:   —he was a senior—

22             JUROR MEDIRATTA:   —16.

23             THE COURT:   —at the University—

24             JUROR MEDIRATTA:   No.

25             THE COURT:   —of Michigan—

24

JUROR MEDIRATTA:  No.

1   THE COURT:   —and I didn't under—

2   JUROR MEDIRATTA:   I have a 16 and 17-year-old

3   senior—16 is a junior, and 17 is a senior, graduated from high

4   school.  And so they are dependent on me as sole parent.

5   And I also work for the Pfizer, you know, research—

6   THE COURT:   That—That can't—You know, everybody

7   could get excused for that.  I can't.

8   JUROR MEDIRATTA:   Dr. Bouey (phonetic) is, you

9   know, she—he cannot just take the time off.  Otherwise, I

10  would have just been here.

11  THE COURT:   Well, can't you reschedule the—the

12  orientation at the University of Michigan?

13  JUROR MEDIRATTA:   This is all paid for, $180.  And

14  there is no time, you know, he's scheduled for the orientation

15  for two day—three days; and one and a half days is a—is a—one

16  or the other parent has to be there for the orientation.

17  THE COURT:   The full time?

18  JUROR MEDIRATTA:   Three day—For the three-day

19  thing, one and a half day is a parent orientation for him.

20  And one and a half day he gets to sign up his classes; so they

21  take them in the dorm, and he stays there.  But for the first

22  one and a half days I have to be there.  And my—My husband was

23  scheduled to go with him, and now he just cannot.  He cannot

24  take the time.  The hospital would not let him out because

25  he's the only person—

25

1    THE COURT:    Have you tried to reschedule that?

2    JUROR MEDIRATTA:    I would definitely check with

3    him; but, you know, if he—

4    THE COURT:    At this point I don't feel that's

5    sufficient hardship.  I'm going to have to deny that.  Try and

6    get it rescheduled.

7    Next—Next matter, please.

8    Yes, sir?

9    JUROR CONNOLLY:    Kent Connolly.  Number's 988.

10    MR. BROWER:    Your last name again?

11    MR. SVIKIS:    Connolly.

12    JUROR CONNOLLY:    Connolly.

13    THE COURT:    And your reason, sir?

14    JUROR CONNOLLY:    Yes, your Honor.  Basically the

15    financial hardship it would be 'cause I'm the only breadwinner

16    in the house, so—

17    THE COURT:    And what do you do, sir?

18    JUROR CONNOLLY:    I'm a carpenter for Powell Custom

19    Homes.  And, basically, for me to take that amount of time

20    off—I thought it'd be like a day or something.  It would be

21    just—I don't have any extra money to—I live from check to

22    check.

23    THE COURT:    And—And you—Are you married?

24    JUROR CONNOLLY:    I prefer to go—No, I'm not—

25    THE COURT:    Are you married?

26

1            JUROR CONNOLLY:   No, I'm not, sir; I'm single.

2            THE COURT:   Do you have any children?

3            JUROR CONNOLLY:   No, sir.

4            THE COURT:   You're not excused, sir.

5            Next case.

6            JUROR HEMLER:   Kevin Hemler, 78600.

7            THE COURT:   Go ahead.

8            JUROR HEMLER:   I have a scheduled business trip

9    next Monday and Tuesday.

10           THE COURT:   And it's for what?

11           JUROR HEMLER:   Pardon?

12           THE COURT:   What kind of business?

13           JUROR HEMLER:   Company I work for here in town.

14           THE COURT:   And that's who?

15           JUROR HEMLER:   Interkal.

16           THE COURT:   And what—what's this trip about?

17           JUROR HEMLER:   A trip to meet with a client out in

18   California—sales related.

19           THE COURT:   Isn't there anyone else in the company

20   that could be involved in that?

21           JUROR HEMLER:   No.   This is a decision—This is at

22   my level, which is—I'm the national sales manager.

23           THE COURT:   Isn't there any way this—this—this trip

24   could be put off or rescheduled so that it would—you know, as

25   I said, we're going to be here Monday through Thursday.   You'd

                                27

1     have Friday, Saturdays and Sundays.

2             JUROR HEMLER:   Well, that's what I say, it's

3     prescheduled.  Just—

4             THE COURT:   When you say it's prescheduled, what do

5     you mean by that?

6             JUROR HEMLER:   I mean it's already scheduled for

7     Monday and Tuesday.

8             THE COURT:   I understand that.  Couldn't it be

9     adjusted or—

10            JUROR HEMLER:   It could possibly be rescheduled.

11    He just wanted me—

12            THE COURT:   I think—

13            JUROR HEMLER:   —to bring everything up.

14            THE COURT:   —that that's not sufficient reason at

15    this point.

16            JUROR HEMLER:   Okay.  Thanks.

17            THE COURT:   Thank you.

18            JUROR MCCORMICK:   Hi.  Jill McCormick.

19            THE COURT:   And you've got a number?

20            JUROR MCCORMICK:   27730.

21            THE COURT:   Go ahead.

22            JUROR MCCORMICK:   I'm ten weeks pregnant, and I

23    have frequent nausea and vomiting; and I feel like I'll be

24    disruptive.

25            THE COURT:   Are you working?

1        JUROR MCCORMICK:  Pardon me?

2        THE COURT:  Do you work?

3        JUROR MCCORMICK:  Yes, sir.

4        THE COURT:  And you can continue your job?

5        JUROR MCCORMICK:  Yes, sir.

6        THE COURT:  What's your job?

7        JUROR MCCORMICK:  I work in a factory.  I sit down

8   all day.  There's a bathroom right next to me.

9        THE COURT:  Okay.  I'll excuse you.

10        JUROR MCCORMICK:  Thank you, sir.

11        THE COURT:  Yes, sir?

12        JUROR MCKEOWN:  John McKeown, 122527.

13        THE COURT:  And why do you think you ought to be

14   excused?

15        JUROR MCKEOWN:  I'm sole breadwinner of the family.

16   Wife has fibromyalgia.  The only reason I'm working now is for

17   the insurance to help pay for the medicine and take care of

18   her.

19        THE COURT:  What do you do, sir?

20        JUROR MCKEOWN:  I'm a laborer in a machine shop.

21   I'm a laborer in a machine shop.  Used to work in a paper mill

22   until they closed them down.

23        THE COURT:  And you say you're the sole breadwinner

24   in your family?

25        JUROR MCKEOWN:  Uhm-hmm.

1       THE COURT:   Do you have any other dependents other

2  than your wife?

3       JUROR MCKEOWN:   No.  The length of time would be

4  too much.

5       THE COURT:   Well, first of all, your—your employer

6  can't in any way punish you for being here; and—and that

7  includes the insurance benefits.  So I don't feel that your

8  request is sufficiently a hardship at this time, so I'm going

9  to have to deny that, Mr. McKeown.

10       JUROR MCKEOWN:   Okay.

11       THE COURT:   Good morning, sir.

12       JUROR SCHIRRIPA:   John Schirripa.

13       THE COURT:   John who?

14       JUROR SCHIRRIPA:   Schirripa.

15       THE COURT:   Go ahead.  Why—You got a number?

16       JUROR SCHIRRIPA:   15437.

17       THE COURT:   And why do you think you should be

18  excused?

19       JUROR SCHIRRIPA:   Well, I'm scheduled to go pick up

20  my mother and father in West Virginia on Thursday—I'd have to

21  leave Wednesday night.—and drive them back home.  She has a

22  doctor's appointment on Friday.  They're down there visiting

23  my sister.  And they're elderly, can't drive.  I picked them

24  up.  I took them down.  I'm supposed to go pick them up.

25       THE COURT:   When is her doctor's appointment?

1    JUROR SCHIRRIPA:  Friday.

2         THE COURT:  And what—what's her condition that

3    requires—

4         JUROR SCHIRRIPA:  She's sick.  She's got throat

5    cancer.  She has a trach in her throat.  She eats through a

6    tube in her stomach.  My dad's 82.  He can't drive her.

7         THE COURT:  Okay.  I'll excuse you for this case.

8         JUROR SCHIRRIPA:  Thank you.

9         THE COURT:  Yes, ma'am?

10        JUROR SHUPE:  Carol Shupe, juror number 93918.

11        THE COURT:  Go ahead.

12        JUROR SHUPE:  I have several—I'm employed by

13   Ship-Pac as a human resources manager, and I have several

14   projects that are quite urgent for the company that are due

15   between now and July 14th.  And this would be just quite a

16   hardship on my employer.

17        THE COURT:  Well, that's one of the duties of

18   citizenship.  Just like when I—when I got drafted, you know.

19   I'm sorry.

20        JUROR SHUPE:  Oh, I'm sure—I'm sure—

21        THE COURT:  I'm sorry.  I can't—

22        JUROR SHUPE:  —my boss would ask me if I tried—

23        THE COURT:  Sure.

24        JUROR SHUPE:  —so I felt—

25        THE COURT:  And that's—

31

1      JUROR SHUPE:   —a duty to—

2      THE COURT:   And I—

3      JUROR SHUPE:   —my employer—

4      THE COURT:   —understand that.

5      JUROR SHUPE:   —to ask.

6      THE COURT:   I understand that.  And you can

7   truthfully and completely say you tried and the judge said no.

8   Okay?

9      JUROR SHUPE:   Thank you for your consideration.

10      THE COURT:   Thank you.

11      Hi.

12      JUROR SCHEFFERS:   I'm Dorene Scheffers,

13   number 20707.

14      THE COURT:   Go ahead.   Why do you think you should

15   be excused?

16      JUROR SCHEFFERS:   I'm under physical therapy right

17   now three times a week for back pain.  It's been creating

18   problems with my left leg—the nerves in my left leg.  And I

19   just started Friday of last week.  It was ordered then for me.

20      And I'm also—I have a doctor's appointment this week

21   Thursday.

22      And I also have one next week with a kidney doctor

23   because there's a problem there, also.  And I'm afraid I

24   might—I can't really put all these things off, I'm afraid.

25      THE COURT:   All right.   I'll excuse you—

32

1        JUROR SCHEFFERS:   Thank you.

2        THE COURT:   —for medical—

3        JUROR SCHEFFERS:   Thank you very much.

4        JUROR GRIFFITHS:   Hi, your Honor.  John Griffiths.

5        THE COURT:   John who?

6        JUROR GRIFFITHS:   John Griffiths.

7        THE COURT:   Okay.

8        JUROR GRIFFITHS:   Code 48725.

9        THE COURT:   Go ahead, John.

10       JUROR GRIFFITHS:   The time of the—The time frame of

11   the court happens to be right in between my two jobs.  The

12   time I punch off at Wayside West and the time I punch in at

13   Sweetwater's.  I punch out at 10:00 o'clock at Wayside West,

14   and I punch in at 11:00 o'clock over at Sweetwater's

15   Donut Mill.

16       Is there like a possibility maybe I can get like a

17   later time in the evening or something—in the afternoon?

18       THE COURT:   We'll be going between 9:00 and 5:00

19   Monday through Thursday, so you'll just have to make

20   arrangements to adjust your time.  I can't—I don't feel that's

21   a sufficient reason at this time, sir.  Your request is

22   denied.

23       JUROR GRIFFITHS:   Okay.

24       (At 11:11 a.m., off record discussion between Court

25       and clerk)

                                33

1          THE COURT:   Okay.  We'll start then with the
2     selection of the jury.  We're going to be selecting a
3     14-person jury.  We'll start at the end closest to myself—the
4     front row of the jury box—and that's that part of the
5     courtroom that you see up ahead of you, and it would be to
6     your left.
7          And as your name is called you should come up, take
8     a seat in the jury box in the order in which your name is
9     called.  And then after we have seated 14 individuals, we'll
10    then commence the voir dire examination.
11         THE CLERK:   Sangita Mediratta for seat number one.
12         (At 11:14 a.m., off record discussion between Court
13         and clerk)
14         James Cook for seat number two.
15         (At 11:14 a.m., off record discussion)
16         Earl Aukes—Aukes.  How do you pro—How do you
17    pronounce that, sir?
18         JUROR AUKES:   Aukes.
19         THE CLERK:   Aukes?
20         JUROR AUKES:   Aukes.
21         THE CLERK:   Aukes.  For seat number three.
22         Judith Dreier for seat number four.
23         Jean Shephard for seat number five.
24         Peggy Thompson for seat number six.
25         Amy Mpofu, for seat number seven.

34

1      Is that pronounced correctly?

2      JUROR MPOFU:    . . . (inaudible)

3      (At 11:16 a.m., off record discussion between Court

4      and clerk)

5      Michelle Budnick for seat number eight.

6      THE COURT:    All the way down to the end.  Yeah.

7  Thank you.

8      THE CLERK:    Geraldine Fletcher for seat number

9  nine.

10      Anna Baker for seat number ten.

11      Heidi Solberg-Viar.

12      Is that pronounced correctly?

13      JUROR SOLBERG-VIAR:    Viar.

14      THE CLERK:    Viar.  That's for seat number 11.

15      MR. SVIKIS:    Excuse me.  Could you spell the last

16  name.

17      THE CLERK:    The last name is S-o-l-b-e-r-g—dash—v,

18  as in Victor—i-a-r.

19      MR. SVIKIS:    Thank you.

20      THE CLERK:    Kent Connolly for seat number 12.

21      Debbie Meisch—or Meisch.

22      How do you pronounce your name, ma'am?

23      JUROR MEISCH:    Meisch.

24      THE CLERK:    Meisch.  You're for seat number 13.

25      And Maria Debottis for seat number 14.

1    Is that pronounced correctly?

2         JUROR DEBOTTIS:   No, it's Maria Debottis.

3         THE CLERK:   Maria Debottis?

4         JUROR DEBOTTIS:   Uhm-hmm.

5         THE CLERK:   Okay.  Thank you.

6         THE COURT:   All right.  The questioning by the

7    Court and later the questioning that the attorneys will be

8    involved in are directed to the 14 people seated in the jury

9    box.  But I'd ask the rest of the jury panel to listen

10   carefully to the questions I ask and later those that the

11   lawyers ask so that if any of these now seated 14 individuals

12   are excused for any reason, you will know the information

13   that's important both to the Court and to the attorneys; and,

14   hopefully, we can speed up any questioning of you who are

15   recalled to replace an excused juror.

16        As I indicated to you, members of the jury, this is

17   a case that's going to go through this week and possibly into

18   next week.  And it's a criminal charge.  There are three

19   actual counts or charges against this defendant, and those

20   charges are as follows:

21        I guess I'd ask the prosecutor, are the charges in

22   count one and two, are you claiming both of them occurred; or

23   are they in the alternative?

24        MR. BROWER:   That they both occurred, your Honor.

25        THE COURT:   Okay.  So there're actually four

36

1  charges?

2           MR. BROWER:  Yes.  Well, there's five.  Two of—Two—

3           THE COURT:  I missed—

4           MR. BROWER:  —felony firearms

5           THE COURT:  Is there something I missed?  I did.  I

6  didn't see the second page.

7        There are two charges that involve murder.  One is

8  called an open charge of murder, and that involves an

9  individual by—the victim being Christine Dimmick.

10        The second charge that involves murder is what's

11  called felony murder.  That, again, involves

12  Christine Dimmick.

13        There are two charges of what are commonly referred

14  to as felony firearm charges.

15        And they're all made against the defendant here.

16  It's the state or the prosecutor's claim that he committed all

17  of those offenses.

18        It's alleged that this matter occurred back on

19  February 8th of 1991 in the city of Kalamazoo, county of

20  Kalamazoo, state of Michigan.

21        The defendant in this case is Patrick Kevin Mishall,

22  spelled M-i-s-h-a-l-1.

23        He is represented by Attorney Andis Svikis, who's

24  now standing.

25           MR. SVIKIS:  Good morning.

37

1          THE COURT:    The state's case will be presented to

2    you by Assistant Prosecuting Attorney Scott Brower, who's now

3    standing.

4          And the people who we believe may call—be called as

5    witnesses in this case are as follows:

6          And I say and will tell you that anytime you have a

7    trial you name everybody that could be possibly a witness.

8    That doesn't necessarily mean that they will, in fact, be

9    called as witnesses.  But the individuals that we know who may

10   be called at this time as witnesses are as follows:

11         A Joe Humphries;

12         A Matt Brinkman;

13         A Bruce Labrie;

14         A Joyce deJong—deJong's spelled with a J.—who's a

15   pathologist;

16         A S. Michael Burritt, who's with the state police

17   crime lab;

18         A Gunars Vaseris;

19         A Robert Petersen;

20         Greg Hatter;

21         Jim Grace;

22         Jim Jilek;

23         Tina Askren;

24         Frank Sila—That's S-i-l-a.

25         Sharon Hitchcock;

1       Debbie Brown;

2       Christine Newburry;

3       A Tracy Rath—I'm not sure now to pronounce that.

4   Rathke?

5       MR. BROWER:    Rathke.

6       THE COURT:    —Rathke;

7       A Carol Sordahl;

8       Bart Munson;

9       James Grubius;

10      Brett Munson;

11      Tina Dahl;

12      Sandra Schulz;

13      Dawn Haller Anderson;

14      Ontario Lowery;

15      A Bernard Wolgoman;

16      Carol Didao;

17      Willie Thompson;

18      Lance Handlogten;

19      Richard—or Rich Mattison—spelled M-a-t-t-i-s-o-n;

20      David Balash—spelled B-a-l-a-s-h;

21      An Elizabeth Block;

22      George Brandon;

23      Cheryl Clemens;

24      Christine Harwood;

25      Warren S.

39

1              Raymond Anthony Lett, also known as Tony Lett;

2              A Craig Mann;

3              Larry Maynard;

4              Amy Mishall;

5              Christine Newburry, also known as Powell;

6              A Josette Phillips;

7              I think I've named everybody that might be called at

8       this point.

9              Now as I indicated, this is a matter that took

10      place—or an incident that took place back a little over

11      13 years ago now.  And I believe—And correct me if I'm wrong,

12      Counsel—either counsel.—that it took place at a convenience

13      store out on Stadium Drive.

14                   MR. BROWER:    That's correct.

15                   THE COURT:    Is that correct?

16                   MR. SVIKIS:    That's correct.

17                   THE COURT:    Okay.

18              Okay.  My first question—and my questions are going

19      to be asked of you, members of the jury, collectively.  You

20      don't need to answer if your answer is no; but if it's yes,

21      please raise your hand or speak up so I know that that's your

22      answer.

23              My first question is do any of you know either

24      Mr. Brower—the assistant prosecutor—or Mr. Svikis?

25              You can put your hand down.  Thank you.

                          40

1          Ms. Shephard?

2          JUROR SHEPHARD:    Yes.

3          THE COURT:    And who do you know, ma'am?

4          JUROR SHEPHARD:    Mr. Svikis from years ago.

5          THE COURT:    How do you happen to know him?  Was he—

6          JUROR SHEPHARD:    I double dated with him years ago.

7          THE COURT:    Okay.

8          JUROR SHEPHARD:    Probably 30 years ago.  I don't

9    know him today.

10         THE COURT:    Okay.  Well, have you had any contact

11   with him in—

12         JUROR SHEPHARD:    No.

13         THE COURT:    —we'll say, the last five or ten years?

14         JUROR SHEPHARD:    No.

15         THE COURT:    Would the fact he's involved in this

16   case and represents the defendant, would that influence you

17   one way or the other in this case?

18         JUROR SHEPHARD:    No.

19         THE COURT:    Does anyone know the defendant?

20         (No audible response)

21         Do any of you—Do any of you recognize the names of

22   any of the people I said might be called as a witness?

23         (No audible response)

24         Have any of you, to the best of your knowledge, read

25   or heard anything about this that you can recall at this time?

41

1      (No audible response)

2              Have any of you now seated in the jury box ever

3      served on a jury in any court anyplace in the world?

4              Okay.  Ms. Thompson?

5              JUROR THOMPSON:   Yes.

6              THE COURT:   Where have you served, ma'am?

7              JUROR THOMPSON:   Jackson County.

8              THE COURT:   Okay.  How long ago?

9              JUROR THOMPSON:   Oh—

10             THE COURT:   Approximately.

11             JUROR THOMPSON:   —I would say at least 15—15 to

12     18 years ago.

13             THE COURT:   Do you now recall what kind of case you

14     heard—or cases?  Civil or criminal?

15             JUROR THOMPSON:   It was a criminal case involving

16     an inmate from Jackson.

17             THE COURT:   Jackson?

18             JUROR THOMPSON:   Uhm-hmm.

19             THE COURT:   Anything about that experience that you

20     feel might cause you to favor or disfavor one side or the

21     other?

22             JUROR THOMPSON:   No, your Honor.

23             THE COURT:   Now as I told you this is a criminal

24     case.  The paper or document used to charge the defendant with

25     a crime is what's called an information.  The information in

42

1    this case charges the defendant Patrick Kevin Mishall with the

2    crimes as I indicated to you: one charge of open murder,

3    another charge of what's called felony murder, a felony

4    firearm violation, and a armed robbery; is that correct?

5            MR. BROWER:    Armed robbery followed by another

6    felony firearm, your Honor.

7            THE COURT:    That's where I'm—Okay.  I keep—I keep

8    missing the last charge.

9            So there's two felony firearm charges, two homicide

10   or murder charges, and an armed robbery charge.  And I'm going

11   to read that for you at this time.

12           The information here charges the defendant

13   Patrick Kevin Mishall as follows:

14           That on or about the 8th day of February in 1991 at

15   the city of Kalamazoo, county of Kalamazoo, state of Michigan,

16   in count one that he did murder Christine Dimmick contrary to

17   the form of the statute and against the peace and dignity of

18   the People of the State of Michigan.

19           In count two that the same defendant at the same

20   date, time, and place did, while in the perpetration or

21   attempted perpetration of a larceny, murder one

22   Christine Dimmick.

23           Count three alleges that at the same date, time, and

24   place that this defendant did carry or have in his or—his

25   possession a firearm, to-wit a handgun, at the time he

                            43

1    committed or attempted to commit a felony, to-wit, murder.

2           Count four is the armed robbery charge; and that

3    again alleges at the same date, time, and place that he did

4    assault a certain person, to-wit, Christine Dimmick, while

5    being armed with a dangerous weapon or an article used or

6    fashioned in a manner to lead the person so assaulted to

7    reasonably believe it to be a dangerous weapon, to-wit, a gun,

8    and did then and there felonious [sic] rob, steal, and take

9    from the person of said victim or in her presence certain

10   property, to-wit, money and/or a videotape, contrary to the

11   form of the statute and against the peace and dignity of the

12   People of the State of Michigan.

13          And the fifth—or last charge—is at the same date,

14   time, and place, that this defendant did carry or have in his

15   or her possession a firearm—handgun—at the time he committed

16   or attempted to commit a felony, to-wit, an armed robbery,

17   contrary to the form of the statute and against the peace and

18   dignity of the People of the State of Michigan.

19          The defendant here has pled not guilty to all these

20   charges, and you should clearly understand that the

21   information that has just been read to you is not evidence.

22   An information is read in every criminal trial so the

23   defendant and the jury can hear the charges.  You must not

24   think that it's evidence of his guilt or that he must be

25   guilty because he has been charged or there's more than one

44

1    charge.

2          In this country every person who's accused of a

3    crime is presumed to be innocent. And what that means is that

4    the jury must start with the presumption that the defendant is

5    innocent. The presumption continues throughout the trial and

6    entitles the defendant to a verdict of not guilty unless the

7    jury is satisfied beyond a reasonable doubt that he is

8    guilty.

9          Every crime is made up of parts called elements.

10   The prosecutor must prove each element of the crime beyond a

11   reasonable doubt. The defendant isn't required to prove his

12   innocence or to do anything. If you find that the prosecutor

13   hasn't proven every element beyond a reasonable doubt, then

14   the jury must find the defendant not guilty.

15         A reasonable doubt is a fair, honest doubt that

16   grows out of the evidence or lack of evidence. It's not

17   merely an imaginary or a possible doubt, but it's a doubt

18   based on reason and common sense. A reasonable doubt is just

19   that: a doubt that's reasonable after a careful and considered

20   examination of the facts and circumstances of this case.

21         Is there anyone now seated in the jury box who feels

22   that they can't accept or wouldn't apply those principles

23   regarding the presumption of innocence, the burden of proof,

24   and proof of guilt beyond a reasonable doubt if they were on

25   this jury?

45

1               (No audible response)

2               I'm going to turn the voir dire over to you,

3       Mr. Brower.

4               MR. BROWER:   Thank you, your Honor.

5               Hello, again.

6               I'm going to call you by name; and if I mess up the

7       name, please correct me right away so I don't continue to do

8       the same thing over and over again.

9               A couple of names were not mentioned previously.

10      One in particular would be my witness coordinator.  You might

11      have seen somebody—dark hair—sitting in the front row earlier.

12      That's Gloria Swinsick—S-w-i-n-s-i-c-k.  Anybody know

13      Ms. Swinsick at all?

14              (No audible response)

15              Now you might have heard some names but not—it

16      didn't click, but when you see a face sometimes you recognize

17      the individual.  Detective Lance Handlogten is seated to my

18      right.  Seeing him, does anybody recall ever seeing him or

19      know him now?

20              (No audible response)

21              Okay.  I want to ask about whether or not any of you

22      have had any contact with—with local police agencies either

23      personally or maybe even somebody close to you.  Some of you

24      might have had relatives that are police officers.  Some of

25      you had a garage broken into.  Somebody who might have had

                              46

1   some other contact with the law.  I saw a couple hands.  Is
2   that correct?
3           JUROR MEISCH:  Yes.
4           Okay.  Starting in the back, ma'am.  Is it Meisch?
5           JUROR MEISCH:  Yes.
6           MR. BROWER:  You had some association with—
7           JUROR MEISCH:  My father-in-law's an
8   ex-police officer.
9           MR. BROWER:  Okay.  And where is that?
10          JUROR MEISCH:  That was in Paw Paw.
11          MR. BROWER:  He's—Ex-police officer.  Is he retired
12  or left for some other employment?
13          JUROR MEISCH:  He—Yes, he left . . . (inaudible)
14          MR. BROWER:  There will be several police officers
15  that testify in a—in this case.  Would the fact that there's
16  going—your father-in-law's a—had been a police officer, would
17  you be able to be fair and impartial in listening to the
18  testimony in light of your familiarity with a former officer?
19          JUROR MEISCH:  . . . (inaudible)
20          MR. BROWER:  I'm sorry?
21          JUROR MEISCH:  . . . (inaudible)
22          MR. BROWER:  Okay.  You don't believe that affects
23  your ability to sit fairly and impartially one way or the
24  other?
25          JUROR MEISCH:  No.

47

1        MR. BROWER:   All right.  Anybody else in the back
2    row did I see a hand?
3        Okay.  Ms. Solberg-Viar?
4        JUROR SOLBERG-VIAR:   Solberg-Viar.
5        MR. BROWER:   Okay.  What is your association with
6    police officers or local departments?
7        JUROR SOLBERG-VIAR:   Well, I was questioned in an
8    investigation by Western Michigan Public Safety regarding some
9    missing . . . (inaudible) in the department of history.
10       MR. BROWER:   I'm sorry?  The last—I didn't hear
11   the—
12       JUROR SOLBERG-VIAR:   The department of history.
13       MR. BROWER:   Okay.
14       JUROR SOLBERG-VIAR:   . . . (inaudible)
15       MR. BROWER:   Okay.  Was that recently?
16       JUROR SOLBERG-VIAR:   It was last year.
17       MR. BROWER:   You were a student at Western?
18       JUROR SOLBERG-VIAR:   Yes, I still am.
19       MR. BROWER:   The way you phrased that I'm wondering
20   whether or not that was a negative experience for you or a
21   positive one.
22       JUROR SOLBERG-VIAR:   It was more a surprise.
23       MR. BROWER:   Did that leave you with any kind of
24   lingering distaste for law enforcement?
25       JUROR SOLBERG-VIAR:   No.

48

1           MR. BROWER:   Do you feel that in light of that you

2      would be able to sit fairly and impartially in listening to

3      police officers and testimony from police officers?

4           JUROR SOLBERG-VIAR:   I believe so.

5           MR. BROWER:   Nobody else in the back row; is that

6      correct?

7           JUROR :   Is there a time frame on this?

8           MR. BROWER:   Well, no, not at this point.

9           UNIDENTIFIED JUROR:   I was a 911 dispatcher in

10     Jackson County, and I also worked at the state police post;

11     but this was in the 70s.

12          MR. BROWER:   All right.  A few years ago.  All

13     right.

14          UNIDENTIFIED JUROR:   It doesn't . . . (inaudible)

15          MR. BROWER:   Okay.  There are several police

16     officers, but at least one that's a Michigan State Police

17     trooper.

18          UNIDENTIFIED JUROR:   Probably everybody I know is

19     already retired.

20          MR. BROWER:   Okay.  You would be able to sit fairly

21     and impartially to—regardless of whether you knew the

22     individual—the fact that they're police officers would be

23     okay?  You could be fair to both the defendant and the People?

24               (No audible response)

25               Is that yes?

49

(Tape No. B2004-033, 6-14-04, 11:40)

1    UNIDENTIFIED JUROR:  . . . (inaudible)

2    MR. BROWER:  Okay.  Ms. Shephard?

3    JUROR SHEPHARD:  I don't know if he's still on the

4    police force or not, but . . . (inaudible).

5    MR. BROWER:  Okay.

6    JUROR SHEPHARD:  I babysat for his children

7    . . . (inaudible)

8    MR. BROWER:  All right.  And he was from Portage, a

9    police officer?

10   JUROR SHEPHARD:  I'm not sure.

11   MR. BROWER:  All right.

12   JUROR SHEPHARD:  I'm not sure.

13   MR. BROWER:  So that's your association with a

14   police officer?

15   JUROR SHEPHARD:  Yes.

16   MR. BROWER:  All right.  And that was the extent of

17   it, you babysat for his kids.

18   JUROR SHEPHARD:  Right.

19   MR. BROWER:  Okay.  Anybody else in the front row?

20   Juror number—or in seat two.  Mr. Cook?

21   JUROR COOK:  . . . (inaudible)

22   MR. BROWER:  Who are those individuals?

23   JUROR COOK:  . . . (inaudible)

24   MR. BROWER:  Okay.

25   JUROR COOK:  . . . (inaudible)

50

1          MR. BROWER:   All right.  See them fairly regularly?

2          JUROR COOK:   . . . (inaudible)

3          MR. BROWER:   All right.

4          JUROR COOK:   . . . (inaudible)

5          MR. BROWER:   Not a frequent social—

6          JUROR COOK:   . . . (inaudible)

7          MR. BROWER:   All right.  Talk about police work

8    sometimes or—

9          JUROR COOK:   . . . (inaudible)

10         MR. BROWER:   None of the individuals you know were

11   connected with this case at all?

12         JUROR COOK:   . . . (inaudible)

13         MR. BROWER:   You're going to see those people

14   again, probably, in all likelihood.  Do you think that

15   prospect of seeing or talking with them—maybe them learning

16   about sitting on the case—that that would cause you some

17   discomfort if your verdict was to be one way or the other?

18         JUROR COOK:   . . . (inaudible)

19         MR. BROWER:   Would this—your association with them

20   affect your ability to sit fairly and impartially to either

21   the defendant or the people of the state?

22         JUROR COOK:   . . . (inaudible)

23         MR. BROWER:   The last part of it, sir?

24         JUROR COOK:   . . . (inaudible)

25         MR. BROWER:   All right.  Okay.

1          Anybody else have any contact with police agencies,
2    you know, that—Oh, I'm sorry.
3          Juror number—in seat number four. Ms. Dreier? Yes?
4          JUROR DREIER:  My ex-son-in-law . . . (inaudible)
5          MR. BROWER:  Okay. And do you see that person yet?
6          JUROR DREIER:  . . . (inaudible)
7          MR. BROWER:  All right. This could be a dangerous
8    question. It's an ex-son-in-law. Does that affect your
9    ability to sit fairly and impartially?
10         JUROR DREIER:  . . . (inaudible)
11         MR. BROWER:  He's not a witness in this case?
12         JUROR DREIER:  He wasn't listed.
13         MR. BROWER:  Wasn't one of the names that came up?
14         JUROR DREIER:  . . . (inaudible)
15         MR. BROWER:  Understanding the motion you feel,
16   does that carry through to people that he may associate with
17   and maybe has worked with on the same department?
18         JUROR DREIER:  I don't think so. My son is an
19   officer at Western.
20         MR. BROWER:  What is his name?
21         MR. SVIKIS:  Excuse me. I can barely hear. I'm
22   sorry.
23         JUROR DREIER:  My son is an officer at
24   Western Michigan University.
25         MR. BROWER:  Well, the—What I guess I'm looking for

1   is some sense from you as to whether or not your feelings

2   about an ex-son-in-law will carry through to Kalamazoo

3   Department of Public Safety officers testifying in this

4   case—or any officer, for that matter.

5           JUROR DREIER:   I don't think so.

6           MR. BROWER:   All right.

7           JUROR DREIER:   I mean . . . (inaudible)

8           MR. BROWER:   Okay.  At this point would you be

9   willing and able to set aside those feelings and evaluate the

10  police officers' testimony the same way that you would anybody

11  else?

12          JUROR DREIER:   . . . (inaudible)

13          MR. BROWER:   Ma'am—Ms. Solberg-Viar—

14          JUROR SOLBERG-VIAR:   Yes?

15          MR. BROWER:   —Viar—

16          JUROR SOLBERG-VIAR:   Viar.

17          MR. BROWER:   Viar.

18          Was Mr.—Officer Dreier somebody that you

19  contacted—that contacted—

20          JUROR SOLBERG-VIAR:   No—

21          MR. BROWER:   —you back then?

22          JUROR SOLBERG-VIAR:   —he didn't.

23          MR. BROWER:   All right.  So the son of another

24  juror isn't somebody that you would be—

25          JUROR SOLBERG-VIAR:   . . . (inaudible)

1          MR. BROWER:  All right.

2          Ms. Fletcher, there's another Fletcher on the jury

3     list.  Would that be somebody that you knew?

4          JUROR GERALDINE FLETCHER:   No.

5          MR. BROWER:  All right.

6          Any other contacts with agencies now, a long time

7     ago, recently you had—

8          Mr. Aukes?

9          JUROR AUKES:    . . . (inaudible)

10          MR. BROWER:  I'm sorry?

11          JUROR AUKES:    . . . (inaudible)

12          MR. BROWER:  Wife is what?

13          JUROR AUKES:  Wife's uncle is retired

14     . . . (inaudible)

15          MR. BROWER:  Locally here?

16          JUROR AUKES:  Portage.

17          MR. BROWER:  Portage.  All right.

18          Would that association affect your ability to sit

19     fairly and impartially when you hear police officers'

20     testimony?

21          JUROR AUKES:    . . . (inaudible)

22          MR. BROWER:  All right.  Anybody here have an

23     experience—got stopped in the car and the officer was, you

24     know, had a real bad attitude and that left you with a bad

25     taste?  Or, you know, your car got broken into and they didn't

54

1    do a thing and, you know, cops are lazy, they're all lying,
2    you know, that kind of thing?
3            Or, conversely, your—You know, they came—Your house
4    got broken into and 14 minutes later they had the guy in jail
5    and got all your property back and, boy, those guys are
6    golden, you know.  Anything like that either way—strong
7    emotion?
8            Yes, ma'am?
9            UNIDENTIFIED JUROR:    .  .  . (inaudible)
10           MR. BROWER:   Took care of the problem then?  All
11   right.
12           That kind of contact, then, was that—you know, a
13   good thing for you regarding police officers or kind of
14   ambivalent one way or the other?
15           UNIDENTIFIED JUROR:    .  .  . (inaudible)
16           MR. BROWER:   All right.
17           UNIDENTIFIED JUROR:    .  .  . (inaudible)
18           MR. BROWER:   Is that experience going to affect
19   your—Or will that experience affect your ability to sit fairly
20   and impartially when you hear police officers' testimony?
21           UNIDENTIFIED JUROR:    .  .  . (inaudible)
22           MR. BROWER:   Any others?  Experiences good or bad,
23   strong feelings about police officers and testimony?
24           (No audible response)
25           Thank you.

55

1    Everybody know what I mean when I say the word *CSI*?
2        (No audible response)
3        Other shows like that—The crime, you know, scenes,
4    go in there with four people and they get all the DNA
5    evidence. It always makes the case and half hour later they
6    know who it is and by the end of the hour he's serving time in
7    prison. Everybody know what I'm talking about?
8        (No audible response)
9        All right. Now as a juror when you come into a
10   criminal case—as a prospective juror, that is—are you
11   expecting there to be forensic evidence and that—that's what I
12   expect, and that's what I better have; otherwise, I'm going to
13   have real problems with this. Anybody feel that way right
14   now?
15       (No audible response)
16       Everybody—Juror number six, Ms. Thompson, you're
17   nodding your head.
18       JUROR THOMPSON:    . . . (inaudible)
19       MR. BROWER:   Okay.
20       JUROR THOMPSON:   —some evidence.
21       MR. BROWER:   Some evidence. Do you understand that
22   evidence can take many forms? Direct evidence—something that
23   you see, touch, smell, hear—or circumstantial evidence.
24   Sometimes evidence can be in the form of scientific evidence,
25   but testimony about what somebody saw is evidence, too; do you

                                56

1    understand that?

2            (No audible response)

3            That circumstantial evidence—The judge will explain,

4    and he'll give that definition of circumstantial evidence

5    but—And the judge will explain to you that circumstantial

6    evidence by itself can be the basis for a conviction; do you

7    understand that?

8            (No audible response)

9            And circumstantial evidence can be testimony about

10   circumstances and so on, eyewitness accounts.  It doesn't have

11   to be scientific evidence by the suspect leaving a DNA sample

12   on the body of the victim of the crime; you understand that?

13           (No audible response)

14           Knowing that the judge will give that kind of

15   instruction and that DNA evidence in *CSI* is a television

16   show—not necessarily reality—are you going to be able to set

17   ask those feelings and impression that you have and evaluate

18   the case for sufficiency without having this preconceived idea

19   that there has to be scientific evidence.

20           JUROR THOMPSON:   Oh, you misunderstood my comment.

21           MR. BROWER:   Okay.

22           JUROR THOMPSON:   It doesn't have to be scientific.

23           MR. BROWER:   Okay.

24           JUROR THOMPSON:   . . . (inaudible)

25           MR. BROWER:   All right.  But if you don't have a

1    DNA match—
2                 JUROR THOMPSON:    . . . (inaudible)
3                 MR. BROWER:   So testimonial evidence, depending on
4         what it is—
5                 JUROR THOMPSON:   Right.  Right.
6                 MR. BROWER:   —could be sufficient for you—
7                 JUROR THOMPSON:   Right.
8                 MR. BROWER:   —depending on circumstances without
9         scientific evidence?
10                JUROR THOMPSON:   Right.
11                MR. BROWER:   All right.
12               Do the rest of you feel the same way that, well, I'm
13        not making this preconceived idea about scientific evidence;
14        if testimonial evidence or the circumstances are sufficient, I
15        can convict without any scientific evidence?  Would all of you
16        agree with that?  Well, let me ask it this way: does anybody
17        think that they would not be able to do that—they would not be
18        able to convict based on circumstantial evidence and testimony
19        alone of witnesses?
20                     (No audible response)
21                Anybody?
22                     (No audible response)
23                All right.
24               One of the things that you as a witness [sic] will
25        have to do is to determine the credibility of the witnesses

1    that take the stand—that sit right there in that chair—from

2    what they say, how they say it, whether what they say is

3    consistent with other testimony and other evidence.  Those are

4    the kinds of things that the judge will instruct you that you,

5    the jurors, should look at.

6            But you know yourself—you know what tendencies you

7    have or don't have, whether or not you have difficulty with

8    determining truthfulness in an individual or the credibility

9    of an individual.  So my question is looking deep within

10   yourself do you feel that you will be able to do that—listen

11   to the witness and make a judgment regarding the witness's

12   credibility?

13            (No audible response)

14            Will everybody be able to do that?

15            (No audible response)

16            Does anybody think that they're going to have

17   difficulty in determining the credibility of a witness based

18   on what is heard here in the courtroom?

19            (No audible response)

20            You—You believe you'll have difficulty with that,

21   Mr. Aukes?

22            JUROR AUKES:    . . . (inaudible)

23            MR. BROWER:    Okay.  If somebody says it, it must be

24   true?

25            JUROR AUKES:    . . . (inaudible)

1           MR. BROWER:   You believe everything you read in the

2    paper?

3           JUROR AUKES:   Just about.

4           MR. BROWER:   Okay.

5           JUROR AUKES:   . . . (inaudible)

6           MR. BROWER:   Okay.  Meaning if you have some

7    personal observation which is different then you're going to

8    question what you're told—

9           JUROR AUKES:   Yes.

10          MR. BROWER:   —but if you don't have any personal

11   observation, you're going to believe it, period?

12          JUROR AUKES:   Yeah.

13          MR. BROWER:   Okay.  In that regard—Without regard

14   to who it is there?

15          JUROR AUKES:   . . . (inaudible)

16          MR. BROWER:   Okay.  What do you do when one person

17   takes the stand and says one thing and another person takes

18   the stand and says something that's directly contradictory to

19   it?  What are you going to do?

20          JUROR AUKES:   I don't know.

21          MR. BROWER:   Okay.  They both can't be accurate,

22   could they?

23          JUROR AUKES:   No.

24          MR. BROWER:   One of the other of them is credible

25   or maybe you'll find them both incredible.  Maybe you find

                              60

1    them both credible, but both versions can't be right. How's

2    that—Is that going to mean automatically reasonable doubt for

3    you? I mean if there's contradictory statements, are you

4    going to be able to convict somebody beyond a reasonable

5    doubt?

6            THE COURT: Counsel, I don't—You're asking somebody

7    who's never been a juror before to project what he might do

8    depending on what's testified to, and I don't think that's

9    appropriate.

10           JUROR AUKES: . . . (inaudible)

11           THE COURT: It's entirely possible there's two

12    conflicting versions and both are credible that

13    . . . (inaudible) proof beyond a reasonable doubt.

14           MR. BROWER: I understand that, your Honor.

15           THE COURT: So I don't want anybody to get the

16    wrong impression.

17           MR. BROWER: You would have difficulty in

18    determining the credibility of witnesses, though?

19           JUROR AUKES: . . . (inaudible)

20           MR. BROWER: One more follow-up question. If one

21    of those two opposing views from the witness stand is

22    consistent with other things that you heard in the courtroom

23    and it makes sense and fits together, would that be something

24    that you think that you would be able to consider in

25    determining whether that person's statement is the credible

61

1    statement?

2              JUROR AUKES:   Yes.

3              MR. BROWER:   Okay.   There may be testimony from a

4    witness that had been in jail or prison testifying as to

5    statements that were made to him in that setting.   Do any of

6    you know anybody that was in jail or prison previously?

7    Several.   Okay.

8              Well, for you and for the others that does not know

9    someone that's been in jail and prison, does that fact—the

10   fact that somebody's in jail or prison—automatically mean for

11   you that I can't believe that person—what they have to say?

12   Would anybody have difficulty—without seeing them on the

13   stand, without hearing the circumstances—already now before

14   that happens have a opinion that that kind of a witness is not

15   credible?   Does anybody feel that way—not credible, jail,

16   prisoner, period?

17             (No audible response)

18             Nobody?   All right.

19             It is expected that there's going to be testimony

20   about witnesses, the victim, and so on, and maybe a lifestyle

21   or circumstances that are so—that are dramatically different

22   from your own, things that you are—would object to morally,

23   religious reasons, or for any other reason and cannot accept

24   and would obviously be opposed to.   But my question now is if

25   you heard testimony about a lifestyle that you are opposed to

1    and would reject and do not condone for anyone else either,
2    would you still be able to set your personal feelings about
3    that lifestyle aside in determining the credibility of the
4    person in the—Well, just leave it at that.—of the witness or
5    about the person to whom it's referred?  Would you be able to
6    set those feelings aside?

7            Let me give an example about living together
8    unmarried and maybe infidelity and seeing other individuals,
9    maybe drinking, maybe drug use—those kinds of specific things.
10   Can a victim that lives that kind of a lifestyle still be a
11   victim in your mind, or would you feel that—Maybe this is a
12   little harsh way to describe it.—what do you expect living
13   that kind of a lifestyle?  Any of you feel that way?

14           (No audible response)

15           The judge has already referred to the—the concept of
16   reasonable doubt or proof beyond a reasonable doubt.  That's
17   called the burden of proof.  Everybody's heard that term
18   probably a thousand times if you watch TV.  It's always—You've
19   heard it, right?  Okay.

20           Who would agree with me that that's a legal concept
21   that applies in a legal setting and that's probably the only
22   place it applies?  Everybody agree with that?

23           UNIDENTIFIED JUROR:  Yes.

24           MR. BROWER:  Okay.  Well, let me ask a couple of
25   questions about that.

63

1                          Maria Debottis?

2                    JUROR DEBOTTIS:  . . . (inaudible)

3                    MR. BROWER:  Do you own a car, ma'am?

4                    JUROR DEBOTTIS:  . . . (inaudible)

5                    MR. BROWER:  Others of you have purchased a car and

6  have a—maybe have a car loan and so on.

7                    What about houses?  How many homeowners do we have

8  here?

9                    (No audible response)

10                    Okay.  I'm going to ask Ms.—Mrs. Fletcher again.

11  More likely than not that home purchase was probably the

12  largest single purchase that you ever committed to in your

13  personal life; is that right?

14                    JUROR GERALDINE FLETCHER:  . . . (inaudible)

15                    MR. BROWER:  Pretty awesome responsibility, right?

16                    JUROR GERALDINE FLETCHER:  . . . (inaudible)

17                    MR. BROWER:  Signing up for tens of thousands of

18  dollars for 25 or 30 years.  Pretty important decision in

19  signing a mortgage, would you agree?

20                    JUROR GERALDINE FLETCHER:  . . . (inaudible)

21                    MR. BROWER:  It was for you?

22                    JUROR GERALDINE FLETCHER:  . . . (inaudible)

23                    MR. BROWER:  Now when you signed that—those

24  mortgage documents, did you know with an absolute certainty

25  that your income was going to continue at the same level, that

1    the economy was not going to nosedive, that there—that you
2    would always and forever be able to make those payments
3    without problem?  Did you know that with absolute certainty?
4         JUROR GERALDINE FLETCHER:  No.
5         MR. BROWER:  But based on the information you had
6    at the time of signing that, the—you felt that beyond any
7    reasonable doubt based on what you knew that was the right
8    decision to make, correct?
9         JUROR GERALDINE FLETCHER:  Yes.
10        MR. BROWER:  Well, you made that important decision
11   after evaluating the facts and applying it to the decision
12   that had to be made.  It was beyond any reasonable doubt the
13   decision to make, correct?
14        JUROR GERALDINE FLETCHER:   . . . (inaudible)
15        MR. BROWER:  Maybe that reasonable doubt kind of
16   thing isn't just a legal concept after all and has been a
17   process that you've applied in making important decisions in
18   your own life in the past; would you agree with that now?
19        JUROR GERALDINE FLETCHER:   . . . (inaudible)
20        MR. BROWER:  It applies—I'm talking about the
21   decision making and evaluating the evidence and applying it to
22   making important decisions in your life that have
23   consequences.  That decision-making process isn't just a legal
24   process, is it?
25        JUROR GERALDINE FLETCHER:   . . . (inaudible)

1          MR. BROWER:   Would the rest of you agree with that

2    that the thought process of evaluating the evidence and

3    applying it to an important decision is a process that you

4    have used in your own life in the past at some point or

5    another?

6          (No audible response)

7          THE COURT:   Guys, it's noon at this time,

8    Mr. Brower, so I think it'd be appropriate for us to recess.

9          Members of the jury panel, you're all required to

10   come back here.  Please be back here at 1:30, and I'll make

11   every effort to get started promptly at that time.

12         Those of you seated in the jury box, remember what

13   seat you're in so when you come back here and we restart

14   you'll be seated in those same seats.

15         So we'll—

16         (At 12:03 p.m., off record discussion between Court

17              and bailiff)

18         You should report to the jury assembly room rather

19   than coming back into the courtroom, and do that prior to 1:30

20   so that you can be brought down here and we can hopefully get

21   started right at 1:30.

22         MR. SVIKIS:   Excuse me.  Your Honor?

23         THE COURT:   Yes, sir?

24         MR. SVIKIS:   Does the Court have a schedule in

25   terms of time-wise, for instance, how late we'll run today,

1    whether there'll be any break in the afternoon or not for

2    time—

3              THE COURT:   I haven't thought about it—

4              MR. SVIKIS:   That—

5              THE COURT:   —Mr. Svikis.

6              MR. SVIKIS:   That's for planning purposes.

7              THE COURT:   You can talk to me between 1:00 and

8    1:30—or between now and 1:30, and I'll let you know.

9              MR. SVIKIS:   Thank you.

10             THE COURT:   I intend to go a full day.

11             MR. SVIKIS:   Yes.

12             THE COURT:   My court days run from 9:00 to 5:00.

13             MR. SVIKIS:   Yes.

14             THE COURT:   And I usually always take a break.

15             MR. SVIKIS:   Thank you.

16             THE COURT:   We'll stand in recess then until 1:30.

17             (At 12:04 p.m., court recessed)

18             (At 1:50 p.m., proceedings reconvened)

19             THE COURT:   You may continue, Mr. Brower.

20             MR. BROWER:   Thank you, your Honor.

21             When we broke for lunch we were talking a little bit

22   about—asking questions about beyond a reasonable doubt

23   standard and whether or not you applied that in your—your

24   personal life before.

25             Mr. Connolly, I want to ask you.  You understood

1  that that was not proof beyond any doubt, correct? That

2  wasn't what the standard is and you understand that?

3          (No audible response)

4          Proof beyond a reasonable doubt doesn't mean proof

5  to an absolute certainty, proof beyond any doubt, proof

6  100 percent. It's none of those other things. You understand

7  that?

8          (No audible response)

9          Now do you think that's an all right standard or

10  this proof beyond a reasonable doubt—something less than

11  absolute 100 percent certainty? Is that okay with you, or

12  would you want to hold me to a higher standard anyway in spite

13  of what the Court says?

14          JUROR CONNOLLY:   . . . (inaudible)

15          MR. BROWER:   I'm sorry? I can't hear you, sir.

16          JUROR CONNOLLY:   . . . (inaudible)

17          MR. BROWER:   You have to have a lot of proof,

18  right. Proof beyond a reasonable doubt is a high standard; it

19  is not proof beyond any doubt, though. So knowing that, would

20  you be able to abide by that lesser than 100 percent certainty

21  standard?

22          JUROR CONNOLLY:   . . . (inaudible)

23          MR. BROWER:   Okay. Would you make me prove

24  absolute certainty to you 100 percent before you would be able

25  to return a verdict of guilty under any circumstances?

68

1    JUROR CONNOLLY:    . . . (inaudible)

2    MR. BROWER:    Ms. Baker, under most circumstances—We

3    can maybe come up with a scenario where it might not be true;

4    but under most circumstances the only time that you are

5    absolutely certain 100 percent exactly what happened is when

6    you are present and witness it with your own eyes in most

7    cases?

8    JUROR BAKER:    . . . (inaudible)

9    MR. BROWER:    Yeah.  Generally true?

10    JUROR BAKER:    Yes.

11    MR. BROWER:    Okay.  Now you weren't one of the

12    names that were—was listed as possible witnesses in this case,

13    right?

14    JUROR BAKER:    Right.

15    MR. BROWER:    You weren't there to see it with your

16    own eyes.

17    JUROR BAKER:    . . . (inaudible)

18    MR. BROWER:    So in order for you to make a decision

19    on this it would have to be based on something less than

20    absolute certainty—certainty based on your presence.  It would

21    have to be less than 100 percent, wouldn't it?

22    JUROR BAKER:    Yes.

23    MR. BROWER:    To hold the prosecution to an absolute

24    certainty 100 percent standard would actually be an impossible

25    burden, wouldn't it?

1    JUROR BAKER:    Yes.

2        MR. BROWER:    Would you hold the people of this

3    state to that impossible burden 100 percent absolute

4    certainty?

5        JUROR BAKER:    . . . (inaudible)

6        MR. BROWER:    All right.  I know from experience in

7    talking with jurors that one of the most difficult things for

8    them often is being placed in a position where they have to

9    sit in judgment on another person and that they would have to

10   decide the fate of that person, if you will; and that is often

11   very difficult for jurors.

12       Now this requires some introspection.  I need for

13   you to think about your life's experiences and experiences

14   that you've been in the past and let me know whether or not

15   you are going to be a person that—that it would be very

16   difficult for you to do that—to sit in judgment of another

17   person.  Looking at yourself now, do any of you say I don't

18   know if I can sit in judgment of another person and find them

19   guilty of any crime based on any standard; I just don't think

20   I can do it?

21       Ms. Mediratta?

22       JUROR MEDIRATTA:    Yes.

23       MR. BROWER:    You feel that you have—

24       JUROR MEDIRATTA:    . . . (inaudible)

25       MR. BROWER:    I'm sorry.  There's noise over here,

70

1    too, so there's a hard time—I have a hard time hearing.

2            JUROR MEDIRATTA:   Yes, probably I think that I

3    would have a hard time deciding—

4            MR. BROWER:   Okay.

5            JUROR MEDIRATTA:   — . . . (inaudible)

6            MR. BROWER:   Certainly you would be very

7    conscientious and you would attempt to do exactly that—Is that

8    what you're saying?—but you—

9            JUROR MEDIRATTA:   No, no, no.   It would be hard

10   with my personality . . . (inaudible) to be able to make a

11   judgment based . . . (inaudible)

12           MR. BROWER:   Okay.   Now this is maybe a difficult

13   question for you, too.   Knowing that you have that reluctance,

14   do you feel that you would be able to set aside that

15   reluctance?

16           JUROR MEDIRATTA:   Probably.

17           MR. BROWER:   Do any of the others of you feel as

18   Mrs. Mediratta did?

19           (No audible response)

20           Ms. Meisch, that is an awesome burden sitting in

21   judgment of another person.   You feel that you would be

22   reluctant to do that and to sit in judgment and render a

23   judgment against a person—

24           MS. MEISCH:   . . . (inaudible)

25           MR. BROWER:   —under any circumstances, period?

71

1                      MS. MEISCH:   . . . (inaudible)

2                      MR. BROWER:   Knowing you have that reluctance

3 inside of you right now, do you feel that you will be able to

4 overcome that reluctance and render a decision based on the

5 evidence whatever the evidence leads you to?

6                      MS. MEISCH:   . . . (inaudible)

7                      MR. BROWER:   Is it something that you're really

8 going to have to struggle with or you feel that you will be

9 able to do that?

10                      MS. MEISCH:   I've never been in a situation

11 . . . (inaudible)

12                      THE COURT:   I think, Mr. Brower, it's important

13 that the jury understand they do not decide what the sentence

14 is. That will be up to the Court. All that the jury—in this

15 state, at least—will decide is whether or not the state has

16 proven their case against the defendant beyond a reasonable

17 doubt. And that determination is made by either them saying

18 guilty or not guilty. The Court then decides what the

19 appropriate sentence is under the law. So the jury does not

20 make the decision as to what is done after a conviction.

21                      MR. BROWER:   Ms. Meisch, does that help at all?

22                      MS. MEISCH:   Yes, it does.

23                      MR. BROWER:   All right. That's the judge's

24 responsibility regarding sentencing, and the functions are

25 separated.

1          Mrs. Mediratta, does that help you as well?
2          JUROR MEDIRATTA:  Yes, it does.
3          MR. BROWER:  All right.
4          JUROR MEDIRATTA:  . . . (inaudible)
5          MR. BROWER:  Finding someone guilty or not guilty—
6          JUROR MEDIRATTA:  Is not my . . . (inaudible)
7          MR. BROWER:  It would be your responsibility as a
8   juror if you were to find someone guilty; sentence belongs to
9   the judge.  Does that assist then in deciding—
10         JUROR MEDIRATTA:  . . . (inaudible)
11         MR. BROWER:  —whether or not you would be able to
12  sit in judgment on someone?
13         JUROR MEDIRATTA:  It does.
14         MR. BROWER:  All right.  If you had some
15  concerns—It sounds like each of you had some concerns, you
16  know, about sentencing.—will you now be able to set that
17  completely aside and base a decision on the evidence, period?
18  Would each of the rest of you be able to do the same thing, or
19  does anybody still have some anxiety about that?
20         Mr. Aukes?
21         JUROR AUKES:  Yes.
22         MR. BROWER:  You still do?
23         JUROR AUKES:  . . . (inaudible)
24         MR. BROWER:  All right.
25         Mr. Connolly, you had expressed some concerns

                          73

1    regarding financial matters and being off for parts of two
2    weeks anyway.   Yes.
3              Is that the concern or the anxiety you feel about
4    that?   Is that something that's likely to be in your mind
5    during the days of trial testimony—something that may be
6    distracting for you?
7              JUROR CONNOLLY:   Yes, sir.
8              MR. BROWER:   Pardon me?
9              JUROR CONNOLLY:   Yes, sir.
10             MR. BROWER:   Would it—Do you feel that it would
11   be—affect your ability to listen to the testimony and make
12   decisions about credibility and then ultimately to sit fairly
13   and impartially if you're distracted and aren't hearing the
14   evidence?
15             JUROR CONNOLLY:   No . . . (inaudible) financial
16   . . . (inaudible)
17             MR. BROWER:   Okay.
18             JUROR CONNOLLY:   . . . (inaudible)
19             MR. BROWER:   I'm sorry?
20             JUROR CONNOLLY:   . . . (inaudible)
21             MR. BROWER:   You understand that the defendant has
22   a right to a fair jury?
23             JUROR CONNOLLY:   . . . (inaudible)
24             MR. BROWER:   Fair and impartial.
25             JUROR CONNOLLY:   . . . (inaudible)

(Tape No. B2004-033, 6-14-04, 14:00)

1      MR. BROWER:   And that requires hearing the evidence

2  and making the determinations regarding credibility and all

3  that.

4      JUROR CONNOLLY:   . . . (inaudible)

5      MR. BROWER:   The people of the state have every bit

6  as much a right to a fair and impartial jury, too.

7      JUROR CONNOLLY:   . . . (inaudible)

8      MR. BROWER:   Would your—

9      JUROR CONNOLLY:   . . . (inaudible)

10     MR. BROWER:   —financial concerns be such that you

11 would not be able to give the attention to the testimony that

12 is required?

13     JUROR CONNOLLY:   . . . (inaudible)

14     MR. BROWER:   Mrs. Mediratta, you had some other

15 concerns not related to finances, but—

16     JUROR MEDIRATTA:   It would . . . (inaudible) my

17 ability to make decisions because I have that in the back of

18 my mind—the responsibility.  Just timing 'cause I would like

19 . . . (inaudible), you know, be part of the jury duty;  but

20 the timing is such that it would—I'm not sure if I would be

21 able to concentrate . . . (inaudible) give myself 100 percent

22 and be able to make the right decisions.

23     MR. BROWER:   Thank you.

24     I have nothing further, your Honor.

25     THE COURT:   I guess there was one area I wanted

75

1    to—before I went any further—tell the jury about.  We had a

2    lot of questions about police officers or law enforcement

3    officers and whether or not you would have a tendency to

4    believe or disbelieve them.

5             I should tell you you're going to get an instruction

6    about that.  And the law is really very clear in respect to

7    anyone's occupation.  It doesn't matter what your occupation

8    is once you come into a court in this country and raise your

9    right hand and take an oath.  So a police officer's testimony

10   isn't entitled to any more weight or less weight than somebody

11   that has some other occupation whether it be a—a doctor,

12   lawyer, or a factory worker or a maintenance person.  You

13   can't judge the truthfulness or untruthfulness or accuracy of

14   one's testimony based on their occupation.  And that's what

15   all of those questions were about.

16            Does anybody have any problem with following that

17   concept?

18            (No audible response)

19            Everybody's treated the same.  We don't give

20   somebody more weight or credit or less weight or credit just

21   because they have a particular occupation, profession, or job.

22            Anybody have any problems with that?

23            (No audible response)

24            Mr. Svikis?

25            MR. SVIKIS:   Thank you, your Honor.

1    When the attorneys—Mr. Brower and myself—try to ask

2    you questions here, you can—you can sense it's a little

3    bit—it's a little bit like pulling teeth.  You don't come into

4    the courtroom without biases and prejudices and all the

5    history that you bring with you.  What we want to find out in

6    getting an exchange going is try to find out what they are as

7    it may relate to this case and then whether you can follow

8    what the judge says.  If you have problems with it, now is the

9    time to tell us.

10    This is a murder case.  We've danced around the idea

11    if anyone can sit in judgment on—I'm going to ask you.—on a

12    murder case.  You can—You can do it by raising your hand or

13    speaking up.  This is not a B&E.  This is not someone charged

14    with taking a baseball bat to a mailbox.

15    Is there anyone here now that says because now that

16    I've heard the charge—In fact, I've heard five charges.—show

17    me hands that thinks they cannot handle sitting in a murder

18    case.

19    (No audible response)

20    Okay.  Fine.  Excellent.  Let's—Is it Ms. Sol—

21    JUROR SOLBERG-VIAR:   Solberg—

22    MR. SVIKIS:   Solberg—

23    JUROR SOLBERG-VIAR:   —Viar.

24    MR. SVIKIS:   Okay.  If you would just share with me

25    what your reservations are we can take it from there.

77

1        JUROR SOLBERG-VIAR:   I had . . . (inaudible) that

2    was killed in a robbery—murdered in a robbery, and

3    . . . (inaudible)

4        MR. SVIKIS:   All right.  Now, you see, it took us

5    about two hours to get to that; and I understand that it's

6    painful and it's something you don't want to talk about

7    probably and—But here we are.  We need to know.

8        Now let me ask you this: if you're sitting where

9    Mr. Mishall is sitting, knowing what you know about robbery

10   and murder—the charges that Mr. Mishall is charged with—how

11   would you feel about that?  Are you with me?

12       JUROR SOLBERG-VIAR:   No, not actually.

13       MR. SVIKIS:   Try it again?

14       JUROR SOLBERG-VIAR:   Yes.

15       MR. SVIKIS:   Okay.  You're over here.  You're

16   sitting here.  You're charged with murder and robbery.

17   Mr. Mishall is where you're sitting, and he tells me that his

18   friend or student or whatever was involved in a murder and

19   robbery and you hear that, do you think you can set that aside

20   and still be a juror in this case; or would you rather have

21   another case?

22       JUROR SOLBERG-VIAR:   I think the emotions would

23   . . . (inaudible)

24       MR. SVIKIS:   Too much?

25       Ms.—

1              JUROR MEDIRATTA:  Mediratta.

2              MR. SVIKIS:  —Mediratta.

3              JUROR MEDIRATTA:  Yes.

4              MR. SVIKIS:  Knowing that this is a murder case and

5      now you know it's a robbery case—and whether you caught it

6      before when the judge mentioned it are your—is your background

7      something similar to here?

8              JUROR MEDIRATTA:  No, not at all.  But it's just—I

9      never ever watch any murder movies or things like that.  I've

10     never been interested.  And that's just not my—That's not what

11     I like to be involved in.

12             MR. SVIKIS:  Okay.

13             JUROR MEDIRATTA:  As much as . . . (inaudible)

14     everybody has a different personality.  I think it would be

15     too emotional.  And I'm not sure I could handle that.  If it's

16     a different case, I would probably . . . (inaudible) but

17     murder is—Robbery's okay, but murder is—

18             MR. SVIKIS:  I know—

19             JUROR MEDIRATTA:  — . . . (inaudible)

20             MR. SVIKIS:  I know what you said.

21             JUROR MEDIRATTA:  Yeah.

22             MR. SVIKIS:  I think I—I think I know—know what you

23     mean.

24             Well, given that—Because the judge will also ask

25     you—And not only from me.  It's a lot more difficult to

                                79

1    respond to a judge than it is to me.  He will ask you in all

2    likelihood, can you follow my instructions to be fair and

3    impartial given your personal feelings of not even viewing

4    those sorts of things as entertainment.  And what would

5    you—What would you tell the judge if he asked you that?

6             JUROR MEDIRATTA:   Would you repeat the question?

7             MR. SVIKIS:   Sure.

8             JUROR MEDIRATTA:   . . . (inaudible)

9             MR. SVIKIS:   It's times like this that I wish the

10   judge would say it in those words, but could you set that

11   aside now that you've—Now you've told us, and now I know what

12   your feelings are and I can make my own decisions as to if I

13   think you would be a juror or not and ask to have you excused

14   or not excused or whatever.  But the judge will ask you.  It's

15   sometimes easier to answer me, well, I'd rather not be here

16   murder—you know, I don't think I can handle it—Robbery's

17   okay.—but he would ask you can you set that aside.  Can you

18   follow his instructions and sit through this and listen to

19   that?

20            JUROR MEDIRATTA:   I'd try to if I had to.  I'd try

21   my best and see—

22            MR. SVIKIS:   Okay.  All right.

23            JUROR MEDIRATTA:   —'cause I've never been in the

24   situation, so I don't know—

25            MR. SVIKIS:   Well—

                              80

1      JUROR MEDIRATTA:    —what it would be like.  As far
2  as watching movies, you know, that you can avoid watching;
3  but, here, you have to listen.
4      MR. SVIKIS:    Okay.
5      Yes, I—Give me a moment, I'll get this right.
6      Ms. Meisch?
7      JUROR MEISCH:    Meisch.
8      MR. SVIKIS:    Meisch.
9      JUROR MEISCH:    Yes.
10      MR. SVIKIS:    You said you might have some personal
11  difficulties with this particular case.  Can you—
12      JUROR MEISCH:    Now that I know that we would not be
13  in judgment of the sentence—
14      MR. SVIKIS:    Yes.
15      JUROR MEISCH:    —that's a relief off of my
16  shoulders—
17      MR. SVIKIS:    Okay.
18      JUROR MEISCH:    —so I feel that I would be able to
19  say guilty or not guilty based on the evidence.
20      MR. SVIKIS:    Okay.  Now—And I'm going to try this
21  with a show of hands.  I know how difficult it is sometimes
22  just to—just to speak up.  And then I can talk to you—talk to
23  you individually, and I'd like to at least to take that step
24  forward if—if you have some problems with this.
25      Is there anyone who hasn't heard the term

1    presumption of innocence?

2                    UNIDENTIFIED JUROR:   . . . (inaudible)

3                    MR. SVIKIS:   You never heard that.   Okay.

4                    UNIDENTIFIED JUROR:   I'm being honest

5    . . . (inaudible)

6                    MR. SVIKIS:   All right. That's exactly—That's

7    exactly what we didn't know.   There's nothing wrong with that,

8    but it is—it is un—it is uncommon.

9                    Let me—Let me ask the rest of you.   The—And the

10   Court will instruct you, also, that Mr. Mishall is presumed to

11   be innocent of these charges as he sits over there.   And

12   everybody can nod their head yes and everybody—Is there

13   anybody doesn't agree with that before I go to the next step?

14                   (No audible response)

15                   Everybody agrees with that except for someone who

16   said otherwise?

17                   (No audible response)

18                   And also there will be instruction that Mr. Mishall

19   does not have to testify.   He absolutely does not have to

20   testify.   So what the presumption of innocence means that

21   unless you hear evidence from the prosecution from that stand

22   your verdict if you had to choose a verdict right now—

23                   I think we've been avoiding you . . . (inaudible)

24                   JUROR MPOFU:   Mpofu.

25                   MR. SVIKIS:   Say it again?

82

1          JUROR MPOFU:   Mpofu.

2          MR. SVIKIS:   Mpofu?

3          JUROR MPOFU:   Mpofu.

4          MR. SVIKIS:   Mpofu.

5          If you had to—If you had to render a verdict right

6     now, what would it be?

7          JUROR MPOFU:   . . . (inaudible)

8          THE COURT:   Well, again, that wouldn't happen.

9          MR. SVIKIS:   Right.

10         THE COURT:   So let's not talk about what won't

11    happen.

12         MR. SVIKIS:   All right.

13         THE COURT:   Because if a verdict came up right now,

14    the Court would take over—

15         MR. SVIKIS:   Okay.

16         THE COURT:   —what would occur and not the jury.

17    It'd be a question of law, Mr. Svikis—

18         MR. SVIKIS:   All right.

19         THE COURT:   —not a question of fact.

20         MR. SVIKIS:   Is there anyone on the panel

21    that's—that has a lawyer in the family, whether it's a

22    prosecutor or otherwise?

23         (No audible response)

24         No?

25         Anyone have a close friend that's a lawyer or a

83

1     prosecutor?

2              (No audible response)

3              Does anyone here have any particular knowledge about

4     firearms?

5              Okay.  Let me just go down the row.

6              Ms. Debottis, do you have any knowledge about a

7     firearm?

8              JUROR DEBOTTIS:   . . . (inaudible)

9              MR. SVIKIS:   Do you know what a—Do you happen to

10    know what a .38 caliber is?

11             JUROR DEBOTTIS:   . . . (inaudible)

12             MR. SVIKIS:   Pardon?

13             JUROR DEBOTTIS:   I know that it's a handgun.

14             MR. SVIKIS:   Okay.  Do you know what a .22 is?

15             JUROR DEBOTTIS:   . . . (inaudible) Sorry.

16             MR. SVIKIS:   No, I mean if you hear—you hear

17    testimony from the stand I want to see what you—what you bring

18    in—what you—what knowledge you bring into the courtroom 'cause

19    there—in all likelihood there's going to be testimony about a

20    .38 or a .357.

21             Ms. Meisch, does that—those terms mean anything to

22    you?

23             JUROR MEISCH:   Just that they're guns.

24             MR. SVIKIS:   Okay.

25             JUROR MEISCH:   . . . (inaudible)

84

1          MR. SVIKIS:  Mr. Connolly, does that mean anything

2     to you?

3          JUROR CONNOLLY:  . . . (inaudible)

4          MR. SVIKIS:  What's that mean to you?

5          JUROR CONNOLLY:  . . . (inaudible)

6          MR. SVIKIS:  They're handguns.

7          Do you know the difference between a .22 and a .38?

8          JUROR CONNOLLY:  . . . (inaudible)

9          MR. SVIKIS:  Ms. Stolberg, what's a .22 or a .38

10    mean to you?

11         JUROR SOLBERG-VIAR:  To me a .22 is

12    . . . (inaudible) my brother used to shoot squirrels.

13         MR. SVIKIS:  I'm sorry?

14         JUROR SOLBERG-VIAR:  I think my brother used to

15    shoot squirrels.

16         MR. SVIKIS:  Okay.  And, Ms. Baker, do you know

17    what a .22 or a .38 is?

18         JUROR BAKER:  . . . (inaudible)

19         MR. SVIKIS:  No.  Okay.

20         Ms. Fletcher, do you know what a .22 or .38 is?

21         JUROR GERALDINE FLETCHER:  I've heard the terms,

22    but I couldn't identify one.

23         MR. SVIKIS:  Okay.

24         Ms. Budnick, do you know what a .22 or .38 is?

25         JUROR BUDNICK:  . . . (inaudible)

1          MR. SVIKIS:   A gun.

2          Ms. Mpofu, do you know?

3          JUROR MPOFU:   I've heard the terms

4     . . . (inaudible)

5          MR. SVIKIS:   Okay.

6          Ms. Thompson—

7          JUROR THOMPSON:   Yeah—

8          MR. SVIKIS:   —what do you—

9          JUROR THOMPSON:   —a .22 they call a Saturday Night

10    Special.

11         MR. SVIKIS:   Okay.  That's your—That's what you

12    know about it, right?

13         JUROR THOMPSON:   Just from—

14         MR. SVIKIS:   Okay.

15         Ms. Shephard, do you have any idea what a .22 is?

16         JUROR SHEPHARD:   . . . (inaudible)

17         MR. SVIKIS:   Ms. Dreier, do you know what a .22 is,

18    .38?

19         MS. DREIER:   . . . (inaudible)

20         MR. SVIKIS:   Okay.

21         And, Mr. Aukes, .22, .38, does that mean anything to

22    you?

23         JUROR AUKES:   It's the diameter of a bullet.

24         MR. SVIKIS:   What?

25         JUROR AUKES:   It's the—It's got—You're using it as

1       the diameter of a bullet.

2                   MR. SVIKIS:    What—

3                   JUROR AUKES:    . . . (inaudible)

4                   MR. SVIKIS:    Well, see that tells me what you may

5       or may not know.

6                   JUROR AUKES:    . . . (inaudible) I know more about

7       . . . (inaudible)

8                   MR. SVIKIS:    Okay.  All right.

9                   Mr. Cook, does a .22 or .38 mean anything to you?

10                  JUROR COOK:    . . . (inaudible)

11                  MR. SVIKIS:    Okay.  . . . (inaudible) Okay.

12                  Now the place where this is to have occurred is on

13      Stadium Drive by Rambling Road in Kalamazoo.  It used to be

14      called a Minute Mart.  I think it's been called a Bronco Mart.

15      And I don't know what it's called today.  Remember, this was

16      13 years ago.  Has anyone been inside—that they can

17      recall—that location by show of hands.

18                  Okay.  Let me just go—When—When was the last time

19      you were there—about?

20                  UNIDENTIFIED JUROR:    Maybe a year.

21                  MR. SVIKIS:    A year ago.  Okay.

22                  You drive by it on occasion or—

23                  UNIDENTIFIED JUROR:    Oh, sometimes.

24                  MR. SVIKIS:    And when—

25                  UNIDENTIFIED JUROR:    It's been quite a while.

1              UNIDENTIFIED JUROR:   A couple years.

2              MR. SVIKIS:   A couple years.

3              UNIDENTIFIED JUROR:    . . . (inaudible)

4              MR. SVIKIS:   Okay.

5              Ms. Debottis, if I use the expression cold case

6       team, does that mean anything to you?

7              JUROR DEBOTTIS:    . . . (inaudible)

8              MR. SVIKIS:   Ms. Meisch, does that mean anything to

9       you—cold case team?

10             JUROR DEBOTTIS:   Just that it happened a long time

11      ago and not been solved . . . (inaudible)

12             MR. SVIKIS:   Mr. Connolly, does that mean anything

13      to you?

14             JUROR CONNOLLY:    . . . (inaudible)

15             MR. SVIKIS:   Does that—

16             UNIDENTIFIED JUROR:    . . . (inaudible)

17             MR. SVIKIS:   Okay.  What's that mean to you?

18             UNIDENTIFIED JUROR:    . . . (inaudible)

19             MR. SVIKIS:   Excuse—

20             UNIDENTIFIED JUROR:   A team . . . (inaudible)

21             MR. SVIKIS:   Ms. Baker, does that mean anything to

22      you?

23             JUROR BAKER:   Yeah.

24             MR. SVIKIS:   What's that mean?

25             JUROR BAKER:   The same as what she said

                                  88

1    . . . (inaudible)

2              MR. SVIKIS:   Okay.

3              JUROR BAKER:   It's a team that comes later long

4    after a case hasn't been solved.

5              MR. SVIKIS:   And I—And I trust for the both of you

6    you know that from TV and not personal experience?

7              JUROR BAKER:   . . . (inaudible)

8              MR. SVIKIS:   Ms. Fletcher, does that—

9              JUROR GERALDINE FLETCHER:   I've seen the program.

10             MR. SVIKIS:   Okay.   The term cold case, does anyone

11   have any personal experience with a cold case team?

12             (No audible response)

13             Let me see what else you bring to the courtroom in

14   your background.

15             Ms. Debottis, your knowledge of motor vehicles—Ford

16   versus a Chevy?

17             JUROR DEBOTTIS:   . . . (inaudible)

18             MR. SVIKIS:   Pay much attention to motor vehicles?

19             JUROR DEBOTTIS:   . . . (inaudible)

20             MR. SVIKIS:   Okay.   You know what a Gremlin is—

21             JUROR DEBOTTIS:   Yes.

22             MR. SVIKIS:   —in the terms of a motor vehicle?

23             JUROR DEBOTTIS:   . . . (inaudible)

24             MR. SVIKIS:   Okay.   All right.

25             Ms. Meisch, do you have any particular knowledge

1        about motor vehicles?

2                JUROR MEISCH:    Not really.

3                MR. SVIKIS:    Okay.

4                Mr. Connolly?

5                JUROR CONNOLLY:    Some.

6                MR. SVIKIS:    Do you know what a Gremlin is?

7                JUROR CONNOLLY:    . . . (inaudible)

8                MR. SVIKIS:    Is it a motor vehicle?

9                JUROR CONNOLLY:    . . . (inaudible)

10               MR. SVIKIS:    All right.

11               Ms. Solberg, do you have any knowledge of motor

12       vehicles?

13               JUROR SOLBERG-VIAR:    . . . (inaudible)

14               MR. SVIKIS:    Okay.

15               Ms. Baker?

16               JUROR BAKER:    . . . (inaudible)

17               MR. SVIKIS:    Ms. Fletcher, a little bit?

18               JUROR GERALDINE FLETCHER:    . . . (inaudible)

19               MR. SVIKIS:    Okay.  No?  None?

20               UNIDENTIFIED JUROR:    . . . (inaudible)

21               MR. SVIKIS:    All right.

22               UNIDENTIFIED JUROR:    Not much.

23               MR. SVIKIS:    Not much.  Okay.

24               UNIDENTIFIED JUROR:    I know they bite.

25               MR. SVIKIS:    Mr. Cook?

                                90

1      JUROR COOK:   I worked on them for 20 years.

2      MR. SVIKIS:   Is that—Is that through your

3   occupation?

4      JUROR COOK:   Yes.

5      MR. SVIKIS:   And that is what?

6      JUROR COOK:   Auto technician.

7      MR. SVIKIS:   Okay.

8      And, Mr. Aukes, your motor vehicle knowledge?

9      JUROR AUKES:   Enough to drive them.

10      MR. SVIKIS:   Enough to drive them.  Okay.

11      Ms. Dreier?

12      JUROR DREIER:   Pretty much what I drive.

13      MR. SVIKIS:   Okay.

14      Ms. Debottis, do you think it's possible for the

15   police to make a mistake?

16      JUROR DEBOTTIS:   . . . (inaudible)

17      MR. SVIKIS:   Pardon?

18      JUROR DEBOTTIS:   I said, sure . . . (inaudible)

19      MR. SVIKIS:   Okay.

20      Do you think, Ms. Debottis, that they can believe

21   they're right and still be wrong?

22      JUROR DEBOTTIS:   It's possible.

23      MR. SVIKIS:   But not probable?

24      JUROR DEBOTTIS:   . . . (inaudible)

25      MR. SVIKIS:   All right.

1    When you walked into the courtroom—And I'm going to
2    go back to the presumption of innocence. When you sat down
3    and you saw Mr. Mishall, you saw the prosecutor, saw who's
4    sitting with the prosecutor, saw the attorneys, saw the
5    deputies, saw the judge, is there anyone here that thought,
6    gee, I wonder what crime he's presumed innocent of? Is there
7    anyone that thought that?
8         (No audible response)
9         Or—Or did you think, boy, I wonder what he did?
10        (No audible response)
11        Did anybody think I wonder what he did?
12        (No audible response)
13        Show of hands. You were just neutral on it? Did
14   you wonder what he did?
15        UNIDENTIFIED JUROR:    . . . (inaudible)
16        MR. SVIKIS:   Okay.  But now you know what he's
17   accused of doing, right?
18        UNIDENTIFIED JUROR:    . . . (inaudible)
19        MR. SVIKIS:   I have no further questions.
20        THE COURT:   Does the state have any challenges for
21   cause?
22        MR. BROWER:   No, your Honor.
23        THE COURT:   Does the defense have any challenges
24   for cause?
25        MR. SVIKIS:   No, your Honor.

92

1    THE COURT:    The peremptories are with the State of

2    Michigan?

3         MR. BROWER:    Your Honor, the People would thank and

4    excuse juror in seat one, Ms. Mediratta.

5         THE COURT:    All right.    You're excused, ma'am.

6    Thank you for coming.

7         Once a juror's excused—I'm not sure what the

8    protocol or custom is.    Do they just leave?

9         THE CLERK:    They're done with this case—

10        THE COURT:    Okay.

11        THE CLERK:    —and they call in.

12        THE COURT:    You have to call in for other cases.

13        THE CLERK:    After 5:00 o'clock.

14        THE COURT:    Okay.    Mr. Svikis, do you have any

15   challenges at this time?

16        MR. SVIKIS:    We'll pass, your Honor, reserving

17   ours.

18        THE COURT:    Fill seat one, please.

19        THE CLERK:    The court calls Jacqueline Weekley for

20   seat number one.

21        THE COURT:    All right.    From this point on there'll

22   be no further general questioning.    Questioning will be

23   limited to those jurors called to replace someone who's been

24   excused.

25        Ms. Weekley, did you hear all the questions that

93

1    were asked?

2              JUROR WEEKLEY:  Yes, your Honor.

3              THE COURT:  Do you know either of the lawyers

4    involved in this case?

5              JUROR WEEKLEY:  No, I do not.

6              THE COURT:  Do you know the defendant?

7              JUROR WEEKLEY:  No, I do not.

8              THE COURT:  Did you recognize the names of any of

9    the witnesses, ma'am?

10             JUROR WEEKLEY:  No, I did not.

11             THE COURT:  Have you read or heard anything about

12   this case before today?

13             JUROR WEEKLEY:  Not to my recollection, no.

14             THE COURT:  Have you ever sat on a jury, ma'am?

15             JUROR WEEKLEY:  No, I have not.

16             THE COURT:  Did you hear me explain the principles

17   regarding the presumption of innocence, the burden of proof

18   that's on the state of Michigan, and the requirement that

19   proof of guilt be established beyond a reasonable doubt?

20             JUROR WEEKLEY:  Yes.

21             THE COURT:  Would you have any difficulty in

22   accepting those rules and following them?

23             JUROR WEEKLEY:  No, I would not.

24             THE COURT:  Did you hear me explain the principles

25   that—the rule that law enforcement officers' testimony is

                              94

1    entitled to no more or no less weight than somebody with some
2    other kind of job?
3                    JUROR WEEKLEY:   Yes, I did.
4                    THE COURT:   Any problem with that?
5                    JUROR WEEKLEY:   No, I have no problem.
6                    THE COURT:   Can you think of anything at all based
7    on anything I've said or either of the attorneys as to why you
8    could not be fair and impartial?
9                    JUROR WEEKLEY:   No.
10                   THE COURT:   Mr. Brower?
11                   MR. BROWER:   Thank you, your Honor.
12                   Good afternoon, ma'am.
13                   JUROR WEEKLEY:   Good afternoon.
14                   THE COURT:   After your name was called I seemed to
15   hear a sigh coming from behind me.  Was that—Was that you?
16                   JUROR WEEKLEY:   It was just unexpected.  I'm at the
17   end of the alphabet, and there was so much letters before me
18   . . . (inaudible)
19                   MR. BROWER:   Okay.
20                   THE COURT:   We don't do this alphabetically.
21                   JUROR WEEKLEY:   . . . (unintelligible)
22                   MR. BROWER:   Let me ask right—Was that an
23   indication that you really don't want to be here today, or
24   just, ah, it's my turn kind of thing?
25                   JUROR WEEKLEY:   No, that was a surprise.  I feel

1    honored and privileged to be here.

2              MR. BROWER:    Okay.

3              Ma'am, you heard the discussions and questions

4    previously about, you know, shows like CSI and CSI Miami where

5    entire cases are made on forensic evidence; you know, that's

6    it—that's the whole case.  You watch shows like that at

7    different times or are at least aware of their existence?

8              JUROR WEEKLEY:    Yes.

9              MR. BROWER:    Do you understand that that's a

10   television show; that isn't reality and, in fact, very few

11   cases have forensic evidence?  Can you accept that when

12   sitting in a case where there's not likely to be forensic

13   evidence?  Is that okay with you?

14             JUROR WEEKLEY:    Yes.

15             MR. BROWER:    I want to ask you about circumstantial

16   evidence.  Do you think that circumstantial evidence—Do you

17   have that sense that that's somehow inferior or less a quality

18   type of evidence?

19             JUROR WEEKLEY:    Circumstantial meaning possibly but

20   not necessarily so?

21             MR. BROWER:    Circumstantial meaning somebody comes

22   into the—to the building with a raincoat on and drops of water

23   on their coat.  That's circumstantial evidence that it had

24   been raining outside—

25             JUROR WEEKLEY:    Right.

                              96

1    MR. BROWER:    —those kind of circumstances.

2    JUROR WEEKLEY:    Correct.

3    MR. BROWER:    Circumstantial evidence, the judge is

4    going to instruct, by itself can be sufficient to—for you to

5    make a decision of someone's guilt beyond a reasonable

6    doubt—circumstances—circumstantial evidence by itself.  Do you

7    understand that that's the law?  That's the instruction that

8    the judge will give.  Is that okay with you, or are you going

9    to require some of that forensic evidence in order for you to

10   ever convict anybody?

11   JUROR WEEKLEY:    No, I don't require forensic

12   evidence.

13   MR. BROWER:    Okay.  Depending on what the witnesses

14   say, if the circumstances regarding their testimony is such

15   that you believe a crime occurred beyond a reasonable doubt?

16   JUROR WEEKLEY:    Correct.

17   MR. BROWER:    Some people have expressed some

18   reluctance or inability to sit and listen to a witness and

19   determine credibility.  Is that something that you feel that

20   you would have difficulty doing as well or—

21   JUROR WEEKLEY:    Judging credibility?

22   MR. BROWER:    Yes.

23   JUROR WEEKLEY:    . . . (inaudible)

24   MR. BROWER:    You probably do that quite often in

25   your daily life, yes?

1    JUROR WEEKLEY:   You either believe them, or you

2    don't believe them.

3        MR. BROWER:   And some of the things you look at in

4    determining credibility is their demeanor on the stand, what

5    they say, whether it fits with what other evidence there might

6    be.   All of those types of things are things that affect

7    credibility; would you agree with that?

8        JUROR WEEKLEY:   Sometimes, yes.

9        MR. BROWER:   Okay.  You don't feel that you would

10   have great difficulty or that it would be impossible for you

11   to determine the credibility of someone?

12       JUROR WEEKLEY:   No, I don't have a problem.

13       MR. BROWER:   What about sitting in judgment on

14   another person?  Do you feel reluctance within yourself to do

15   that or that, yes, it's not an easy thing to do but I will be

16   able to do that?

17       JUROR WEEKLEY:   Due to circumstance of evidence

18   there going to be a judgment that's going to be placed on that

19   person and I'm not setting it myself.

20       MR. BROWER:   Kind of the next step, though.  I mean

21   whether or not you believe the evidence and even if you

22   believe it beyond a reasonable doubt, actually coming in and

23   saying I find you guilty.  That act—coming in and saying those

24   words—is difficult for jurors at times.  Is that a reluctance

25   that you would have looking inside yourself, or do you say

98

1    I'll be able to do that if the evidence proves it

2    sufficiently?

3            JUROR WEEKLEY:    Correct.

4            MR. BROWER:    Okay. Understanding that sentence is

5    something that the judge is involved with, not you.

6            JUROR WEEKLEY:    Correct.

7            MR. BROWER:    Is there anything that you think that

8    I as a prosecutor should know about your life's experience in

9    deciding whether or not you should be a juror in this type of

10   case?

11           JUROR WEEKLEY:    I don't know.

12           MR. BROWER:    Nothing—No suggestions from the

13   questions that were asked previously of the other prospective

14   jurors, you know?

15           JUROR WEEKLEY:    No.

16           MR. BROWER:    Okay. Proving the case beyond a

17   reasonable doubt is the burden that I as the prosecutor have.

18   Defense counsel made some mention about, you know, damaging a

19   mailbox and a B&E and a couple of other things and pointing

20   out that this was a murder case. Do you understand, ma'am,

21   that the burden of proof that I as a prosecutor have doesn't

22   go up because of the nature of the crime; that's the same

23   standard in every criminal trial in this county and this

24   nation?

25           JUROR WEEKLEY:    . . . (inaudible)

(Tape No. B2004-033, 6-14-04, 14:34)

1    MR. BROWER:   You understand that?

2    JUROR WEEKLEY:   Yes.

3    MR. BROWER:   Would you hold me to a higher burden

4    because this is a serious crime as opposed to a minor property

5    offense?

6    JUROR WEEKLEY:   No, the crime . . . (inaudible)

7    MR. BROWER:   The standard remains the same.

8    JUROR WEEKLEY:   Standard remains the same.

9    MR. BROWER:   Thank you.

10    THE COURT:   Mr. Svikis?

11    MR. SVIKIS:   Thank you.

12    Good afternoon, Ms. Weekley.

13    JUROR WEEKLEY:   Good afternoon.

14    MR. SVIKIS:   Are you familiar with the location on

15    Stadium Drive by Rambling Road—used to be called Minute Mart

16    or Bronco Mart?

17    JUROR WEEKLEY:   It is Bronco Mart.  Yes, I am

18    familiar.

19    MR. SVIKIS:   Okay.  Have you been there before?

20    JUROR WEEKLEY:   I go there every month to pay my

21    phone bill.

22    MR. SVIKIS:   In that store?  They take phone—You

23    can pay a phone bill in there?

24    JUROR WEEKLEY:   Yes, sir.

25    MR. SVIKIS:   Oh, okay.  And for how long have you