26|5|1|

1        STATE OF MICHIGAN

2     9TH CIRCUIT COURT—TRIAL DIVISION

3

4   THE PEOPLE OF THE
    STATE OF MICHIGAN
5
        v                              Files No. C03000897 FC
6
    PATRICK KEVIN MISHALL,
7
            Defendant.
8

9

10            Jury Trial — Volume II of IX

11      Before Hon. George R. Corsiglia P12239, Circuit Judge
        (Visiting Judge from 48th Circuit, Presiding by Assignment)
12
            Kalamazoo, Michigan—Tuesday, June 15, 2004
13

14

15  APPEARANCES:

16  For the People:        Scott W. Brower P44951
                           Office of the Prosecuting Attorney
17                         227 West Michigan Avenue
                           Kalamazoo, Michigan 49007
18                         (269) 383-8900

19  For the Defendant:     Andis Svikis P36039
                           1803 Whites Road
20                         Kalamazoo, Michigan 49008
                           (269) 349-7692
21

22  Recorded by:           Video recorded

23  Transcribed by:        Brenda K. Foley CER 4956
                           1400 Gull Road
24                         Kalamazoo, Michigan 49048
                           (269) 385-6001
25                           * * * * *

                              191

FILED

JUL 0 1 2005

9th JUDICIAL CIRCUIT
COUNTY OF KALAMAZOO
KALAMAZOO, MICHIGAN

ENTERED

1                          TABLE OF CONTENTS

2                                                                  PAGE

3    Opening statement by Mr. Brower  . . . . . . . . . . . . .    193

4    Opening statement by Mr. Svikis . . . . . . . . . . . . . .   197

5    WITNESSES: People

6    MATTHEW BRINKMAN

7         Direct examination by Mr. Brower  . . . . . . . . . .    204
          Cross-examination by Mr. Svikis  . . . . . . . . . .    218
8         Redirect examination by Mr. Brower . . . . . . . . . .  224
          Recross-examination by Mr. Svikis  . . . . . . . . .    225
9         Reredirect examination by Mr. Svikis . . . . . . . . .  226

10   JOE HUMPHRIES

11        Direct examination by Mr. Brower . . . . . . . . . . .  226
          Cross-examination by Mr. Svikis  . . . . . . . . . . .  232
12
     BRUCE LABRIE
13
          Direct examination by Mr. Brower . . . . . . . . . . .  233
14        Voir dire examination by Mr. Svikis  . . . . . . . . .  237
          Direct examination (cont.) by Mr. Brower . . . . . . .  239
15        Cross-examination by Mr. Svikis  . . . . . . . . . . .  263
          Redirect examination by Mr. Brower . . . . . . . . . .  267
16
     JOYCE DEJONG
17
          Direct examination by Mr. Brower  . . . . . . . . . .   268
18        Cross-examination by Mr. Svikis  . . . . . . . . . . .  281

19   STUART MICHAEL BURRITT

20        Direct examination by Mr. Brower . . . . . . . . . . .  284
          Direct examination by Mr. Brower . . . . . . . . . . .  296
21        Cross-examination by Mr. Svikis  . . . . . . . . . . .  300
          Redirect examination by Mr. Brower . . . . . . . . . .  306
22        Recross-examination by Mr. Svikis  . . . . . . . . . .  309

23   GUNARS VASERIS

24        Direct examination by Mr. Brower . . . . . . . . . . .  310
          Cross-examination by Mr. Svikis  . . . . . . . . . . .  315
25

                               192

1

TABLE OF CONTENTS (cont.)

2   WITNESSES: People                                                PAGE

3   ROBERT PETERSEN

4        Direct examination by Mr. Brower  . . . . . . . . . . . . 317
         Cross-examination by Mr. Svikis  . . . . . . . . . . . . 324
5
    GREGORY ALAN HATTER
6
         Direct examination by Mr. Brower . . . . . . . . . . . . 325
7        Cross-examination by Mr. Svikis  . . . . . . . . . . . . 342
         Redirect examination by Mr. Brower . . . . . . . . . . . 345
8
    JAMES GRACE
9
         Direct examination by Mr. Brower . . . . . . . . . . . . 346
10       Cross-examination by Mr. Svikis  . . . . . . . . . . . . 359
         Redirect examination by Mr. Brower . . . . . . . . . . . 363
11
    JAMES JILEK
12
         Direct examination by Mr. Brower  . . . . . . . . . . . . 364
13       Cross-examination by Mr. Svikis  . . . . . . . . . . . . 376

14  TINA LOUISE SARAH ASKREN

15       Direct examination by Mr. Brower . . . . . . . . . . . . 378
         Cross-examination by Mr. Svikis  . . . . . . . . . . . . 396
16       Redirect examination by Mr. Brower . . . . . . . . . . . 403
         Recross-examination by Mr. Svikis  . . . . . . . . . . . 404
17
    FRANK SILA
18
         Direct examination by Mr. Brower . . . . . . . . . . . . 405
19
    SHARON LOUISE HITCHCOCK
20
         Direct examination by Mr. Brower . . . . . . . . . . . . 413
21

22

23

24

25

192a

1                    TABLE OF CONTENTS (cont.)

2   EXHIBITS: People                          IDENTIFIED      RECEIVED

3      X1    floor plan of Minute Market store      206          207
       X2    photograph                             242          242
4      X3    photograph                             243          242
       X4    photograph                             243          242
5      X5    photograph                             244          242
       X6    photograph                             244          242
6      X7    photograph                             245          242
       X8    photograph                             245          242
7      X9    photograph                             246          242
       X10   photograph                             246          242
8      X11   photograph                             246          242
       X12   photograph                             247          242
9      X13   photograph                             247          242
       X14   photograph                             247          242
10     X15   photograph                             247          242
       X16   photograph                             248          242
11     X17   photograph                             248          242
       X18   photograph                             249          242
12     X19   photograph                             249          242
       X20   photograph                             249          242
13     X21   photograph                             249          242
       X22   photograph                             250          242
14     X23   photograph                             250          242
       X24   photograph                             250          242
15     X25   photograph                             251          242
       X26   photograph                             251          242
16     X27   photograph                             252          242
       X28   photograph                             252          242
17     X29   photograph                             253          242
       X30   photograph                             254          242
18     X31   photograph                             254          242
       X32   photograph                             254          242
19     X33   photograph                             257          242
       X34   photograph                             257          242
20     X35   photograph                             257          242
       X36   photograph                             257          242
21     X37   photograph                             258          242
       X38   photograph                             258          242
22     X39   photograph                             259          242
       X40   photograph                             259          242
23     X41   photograph                             259          242
       X42   photograph                             214          214
24     X43   photograph                             214          214
       X44   photograph                             214          214
25     X45   photograph                             215          214

                              192b

1                      TABLE OF CONTENTS (cont.)

2   EXHIBITS: People                          IDENTIFIED    RECEIVED
          X46  photograph                        216          214
3         X47  autopsy report                    218          218
          X48  keys                              259          260
4         X49  cash register activation slips    260          260
          X50  clothing                          216          217
5         X51  sweatshirt                        296          300
          X52  T-shirt                           296          300
6         X53  sweatpants                        296          300
          X54  canvas shoes                      296          300
7         X55  fired bullets                     217          218

8

9

10

11  EXHIBITS: Defense
          A    photograph                        305          305
12        B    consent to search form            343          343
          C    consent to search form            343          343
13

14

15

16

17

18

19

20

21

22

23

24

25

192c

(Tape No. B2004-034, 6-15-04, 09:14)

1    Kalamazoo, Michigan

2    Tuesday, June 15, 2004 - 9:14 a.m.

3    THE CLERK:    . . . (clerk began to speak prior to

4    take starting) People of the State of Michigan versus

5    Patrick Mishall, file C03-0897 FC.

6    Please state your names.

7    MR. BROWER:    If it please the Court, your Honor,

8    Assistant Prosecuting Attorney Scott Brower for the People of

9    the State of Michigan .

10   MR. SVIKIS:    Andis Svikis on behalf of

11   Patrick Mishall.

12   THE COURT:    Are you ready to proceed, Mr. Brower?

13   MR. BROWER:    People are ready, your Honor.

14   THE COURT:    Mr. Svikis?

15   MR. SVIKIS:    Ready, your Honor.

16   THE COURT:    All right.    I think we're at the stage

17   for opening statements.

18   Mr. Brower?

19   MR. BROWER:    Thank you.

20   In the early 1990s there were four Minute Markets in

21   Kalamazoo County: Sprinkle Road, Gull Road, South Westnedge,

22   and 2905 Stadium Drive.

23   Christine Dimmick and her live-in boyfriend both

24   worked at the Minute Market stores.    Chris worked on

25   South Westnedge; her boyfriend worked on Stadium Drive.

193

1      An opening came up for a manager's position at

2    Stadium Drive.  Chris got the promotion; the boyfriend did

3    not, and he was unceremoniously transferred to the

4    South Westnedge store from where he had been working on

5    Stadium.

6      Monday, February 4 of 1991 was Chris Dimmick's first

7    day in her new position as store manager.  Her career and her

8    life, however, would come to a tragic end before the week was

9    out.

10      On Friday, February 8, 1991, the store owner

11    received a phone call from a customer.  The Stadium Drive

12    store which Chris was to have opened for business at 7:00 a.m.

13    was still locked and dark.  The owner called the police.

14    Christine Dimmick was found in the back room of the locked

15    building lying face down with two gunshot wounds to her back

16    and two more to the back of her head.

17      At first glance it appeared like a routine armed

18    robbery.  The police began their routine investigation

19    contacting people and asking questions.  The answers to their

20    questions, however, suggested that this was far from a routine

21    armed robbery.  Attention turned to the victim's boyfriend,

22    someone known to have been in the store with Chris that

23    morning before the store was to have opened.

24      Police worked on the case for years, but the case

25    eventually went cold.  The case was no longer actively being

1   investigated. Years went by.

2           Then in 2002 the case was assigned to a group of

3   police detectives from several area police departments, a

4   group known as the cold case homicide team. These detectives

5   treated the case as it if were a fresh case. They recontacted

6   and reinterviewed many of the same witnesses that had been

7   contacted in 1991 and '92. They contacted others that had not

8   been contacted back then, and they looked for new witnesses.

9   In May of 2003 the cold case detectives arrested the defendant

10  Patrick Kevin Mishall, Chris's boyfriend at the time of this

11  murder.

12          This case is about anger, resentment, jealousy, and

13  humiliation that Patrick felt because of Christine Dimmick.

14  Anger, resentment, jealousy, and humiliation which drove him

15  to kill her, taking money and other property from the store in

16  the process.

17          During the course of this trial you will hear that

18  Patrick Mishall had a unique familiarity with the crime scene,

19  equipment, and procedures at the store; that, by his own

20  admission, he was the last one to see the victim alive; that

21  from other witness accounts and from the defendant's own

22  statements he had to have been at the store during the time

23  period in which the murder occurred; that he made conflicting,

24  contradictory statements about his activities that day; that

25  he lied about possessing a gun; that he believed Chris to be

195

1   sexually unfaithful to him; and that he threatened to kill her

2   if he had caught her with someone else; and, finally, that he

3   was upset with Chris for other reasons as well.

4          In summary, you will hear evidence that Mr. Mishall

5   had the means to kill Christine; that he had the motive to

6   kill her; and that he had the opportunity to do so.

7          You're going to hear testimony from police officers

8   who responded to the scene on February—February 8 of 1991,

9   from a forensic pathology that reviewed the autopsy report and

10  photographs, from Minute Market customers or passers-by, from

11  former friends, acquaintances, and coworkers of the defendant

12  to whom he made incriminating statements, and from detectives

13  that spoke with him both in 1991 and more recently.

14         There's an old saying that goes something like this:

15  people give themselves away in small mistakes, it's human

16  nature.  That's what Patrick Mishall did in this case.  He

17  revealed his secret.  He gave himself away in bits and

18  pieces—small mistakes over time to some of the people I just

19  mentioned.

20         When all of the testimony and evidence is in I'll be

21  asking you to return verdicts of guilty for first-degree

22  murder and felony murder, armed robbery, and two counts of

23  felony firearms.  Thank you.

24         THE COURT:  Do you wish to make a statement at this

25  time, Counsel?

196

1        MR. SVIKIS:   Yes.

2        Good morning.

3        UNIDENTIFIED JUROR:   Good morning.

4        MR. SVIKIS:   The purpose of opening statement is

5   for the attorneys to let you know what we intend to prove.  Of

6   course, you know that by now Patrick Mishall does not have to

7   prove a thing.

8        Remember in every case there is always two sides to

9   the story, so I ask you to keep an open mind.  In this case

10  there are more than two sides.

11       The government must carry the burden of proof by

12  proving that Patrick Mishall is guilty beyond a reasonable

13  doubt.

14       The result of this investigation leads to a number

15  of conclusions.  First, keep in mind the total lack of

16  physical evidence—something you can touch, feel, or see—over

17  13 years that connect Patrick Mishall to this homicide.  What

18  evidence would you expect in a robbery/homicide?

19       Well, you'd expect a gun.  You will see no gun.  You

20  will get no gun connected to Patrick Mishall of the nature and

21  quality that caused Chris Dimmick's death.  You will hear

22  testimony that it was a .38 caliber.  You'll hear some

23  tangential conversations about Patrick may have had a .22.

24  Not one individual before 1991 nor after 1991 will they ever

25  place a gun in Patrick Mishall's hands, ownership, or

197

1    possession.

2          There was money taken. It's no secret that working

3    at a Minute Mart isn't the top paying job in the world. There

4    was approximately $3,000 taken. No money was ever found. The

5    money bag was never found. Keys were missing, never found.

6    No fingerprints, no blood evidence.

7          And I'll stop here and tell you why the lack of this

8    is so critical. Because within 45 minutes of the discovery of

9    Chris Dimmick in the back of the store, the usual suspects

10   were rounded up: Patrick Mishall/boyfriend/live-in.

11         They're at his house. They wake him up. They do

12   not find gun, blood on him, gunshot residue. They take his

13   clothing. They take everything out of his house. They take

14   his car. And he cooperates every single step of the way from

15   1991. There's no spending spree.

16         And what else is missing? Prosecutor says it's a

17   robbery. There are video cameras in the store. The machine

18   that runs the tape is gone and never recovered. The tape

19   along with the machine is never recovered.

20         However, I intend to show as this trial progresses

21   that what the government has told you is not necessarily the

22   way things happened. The evidence will show that there are

23   reasonable doubts and that they have not met their burden of

24   proof. I will show you that insufficient evidence beyond a

25   reasonable doubt that did not exist in '91, '92, '93 or any

                              198

1    year until Pat was arrested in Wisconsin in 2003.

2              So what the prosecutor is going to attempt to show

3    you for which there'll be no physical evidence and no

4    reasonable evidence that you could believe of

5    homicide/open murder, homicide/felony murder, felony firearm,

6    armed robbery, and weapon felony firearm.  And that's

7    essentially killing Chris Dimmick—two to the head, two to the

8    back, no struggle.  Found in back of the store, face down,

9    arms like this, two contact wounds in the back, two close shot

10   wounds in the back.

11             Usually the defense centers upon interpretation of

12   the physical evidence.  There is no physical evidence to

13   interpret and none tying it to Patrick Mishall.

14             So now we don't—Now the testimony will bring you

15   forth no physical evidence.  They'll bring forward the .438 or

16   .357 rounds taken from Chris's body.

17             Motive.  Motive.  Motive.  Prosecutor believes this

18   is a domestic violence matter.  With a lack of motive and the

19   method of killing, I believe that the evidence will show this

20   was simply an execution.

21             There'll be no testimony or evidence revealed from

22   the slide show or from the witnesses that I believe will show

23   any heat of passion or that Pat wanted Chris dead, dead, dead,

24   dead.

25             I know what their witnesses are going to say.  I'm

1    not afraid of it.  Pat's not afraid of it.  It's wrong as it

2    relates to Pat's involvement with this crime charged.

3           Pat does not have to testify.  Pat will testify.

4    He'll profess his innocence.  He is not without faults but

5    faults for which he is not on trial for.

6           There will be testimony that Pat's and Chris's

7    relationship was not all hugs and kisses, that they gave as

8    good as they got: pushing, shoving, touching, in your face.

9    No escalation.  No escalation for an execution style killing.

10          On February 8th, 1991, Chris's body was found without

11   evidence of struggle that you would expect or anticipate in a

12   domestic violence struggle.  There was no struggle.  There was

13   no—The facts will show that there was no way that this was a

14   jealousy situation, no confrontation.

15          The investigation report over these 13 years has

16   grown to over 700 pages.  They interviewed individuals and

17   witnesses—plus or minus 425 people.  And what you hear from

18   the witness stand is what they came up with.  They hand picked

19   31.  We'll see it spun around, but you'll never hear the

20   connection to Pat and that death on February 8th, 1991.

21          On this particular day on February 8th, 1991—13 years

22   ago—Pat and Chris lived together.  They worked for the same

23   employer Jim Jilek.  I think he owned three stores, not four

24   stores.  There was one on Westnedge; there was one

25   on—somewhere else—and the one on Stadium Drive.

1    That on this February 8th day of 1991 the early

2    morning hours—You may hear testimony that the sun rose at

3    7:49. It's still dark out.—that Chris and Pat leave their

4    home at 2415 Springmont. That's in the Oakwood area. It's

5    about a little over a mile from their home to the

6    Minute Market on Stadium Drive.

7    At 6:10 a.m. February 8th, 1991, they both arrive at

8    the Minute Mart. They have the one car. He drives a 1985

9    large four—four-door Ford LTD, parks along the side. He goes

10   there to help Chris open a store. And you'll have to wait

11   till you hear the testimony of the back and forth of—of who

12   was working in what store at what time and such from Mr. Jilek

13   at the Minute Market, but I—but I believe the testimony you'll

14   hear will go something like this:

15   Chris ran the Westnedge store. Pat had worked at

16   the Westnedge store. One of them got transferred so they know

17   the operations, and Pat went there to assist her. But at

18   any—Pat will testify—And there's no secret here. From what

19   you'll hear there's nothing clandestine about it. It's clear

20   they both arrive, and there's a keypad that punched in at

21   6:10.

22   Pat will testify that he leaves—brings some

23   newspapers in or helps to set the coffee up. Pat leaves at

24   6:35 a.m. on February 8th, 1991; leaves—the door locks—the

25   doors lock behind him. And what you must decide different

1      than what the prosecutor told you that he's the last person to

2      see her alive, I think you will find that he's the second to

3      last person.

4              So he leaves.  And now the store's supposed to open

5      around 7:00 o'clock.  And you'll hear testimony that around

6      7:00 a.m. that police officer Joe Hampton and John Bravata

7      circle the building and find nothing unusual.

8              And then you'll find a whole host of people around

9      this 7:00 a.m. period rattling the door, looking around.  And

10      out of all the individuals that you hear around this time, the

11      store doesn't open.  And by chance a woman by the name of

12      Susan McFarlane—I don't know if she'll testify to this or

13      not.—but she eventually calls—She happens to know that

14      Jim Jilek owns this store, calls him at like 7:30 in the

15      morning and says your store's not open.

16              Jim Jilek, in turn, calls Wayne Tiller, a manager.

17      And so the clock is still running now.  Remember, Pat leaves

18      at 6:35.  The clock is running.  Police are called back, and I

19      believe it's Police Officer Joe Hampton and Joe Bravata return

20      at 8:20.  So at 8:20 the police return and secure the

21      building.  Nobody goes in.  So the testimony will show that

22      whatever took place took place between 6:35, plus or minus, or

23      before 8:20.

24              So eventually about 9:00—9:00 o'clock a.m., plus or

25      minus, the same day the manager—assistant manager

1   unlocks—unlocks the door, walks in with Mr. Jilek—I think
2   it's—I think it's Wayne Tiller. They go in and walk in and
3   find Chris Dimmick in the back—what they'll refer to as the
4   bottle room. They will testify as long as—as well as anybody
5   else there'll be no evidence of struggle.

6       And now at—within an hour the standard usual
7   suspects—husband, boyfriend, live-in—were at his house.
8   (Knocks three times on podium) Wake up. Comes to the door.
9   What's up? Let's them in, cooperates. They take him down to
10  the police station. They spend the day with Pat at the police
11  station.

12      Pat volunteers, take my car. They kept his car over
13  the weekend. He signed consent search warrants for his house.
14  They went through—They took the clothes he had. They took the
15  clothes in his closet. They took everything—They kept the car
16  for a week. They went through everything. Nothing turned up
17  on Pat. No money, no gun, no VCR—And it's a special VCR
18  that—It's a 24-hour VCR.—no tape.

19      That year—Pat no longer having a reason to stay—puts
20  his house up for sale months later, has family in Wisconsin,
21  moves to Wisconsin, remarries in 1998, has a family. And
22  there he is till 2003 when he's arrested.

23      When you have heard all the testimony and the lack
24  of testimony that you would expect to hear and have had an
25  opportunity to consider it and evaluate it, I will then ask

203

1    you to return a verdict in this case.  I'll ask you to return
2    a verdict based upon the evidence you've heard and, more
3    importantly, what you have failed to hear.  I'll ask you to
4    return a verdict that will be consistent with logic, common
5    sense, and justice.  I'll ask you to return a verdict at the
6    end of not guilty on all counts.  Thank you.
7              THE COURT:  Call your first witness.
8              MR. BROWER:  Your Honor, the People call
9    Sergeant Matt Brinkman to the stand.
10             THE COURT:  Raise your right hand, sir.  You do
11   solemnly swear or affirm the testimony you're about to give
12   shall be the truth, the whole truth, and nothing but the
13   truth?
14             MR. BRINKMAN:  I do.
15             THE COURT:  Take a seat.
16                     MATTHEW BRINKMAN,
17   called at 9:39 a.m., and sworn by the Court, testified:
18                     DIRECT EXAMINATION
19   BY MR. BROWER:
20   Q  Sergeant Brinkman, would you please state your name and spell
21      your last name for the record, please.
22   A  My name is Matthew Brinkman—B-r-i-n-k-m-a-n.
23   Q  You're a sergeant with the Kalamazoo Department of Public
24      Safety; is that correct?
25   A  Yes, I am.

1  Q  How long have you been working with the Kalamazoo Department
2     of Public Safety?
3  A  About 14 years.
4  Q  What was—Your present position is as a road patrol sergeant;
5     is that correct?
6  A  Yes.
7  Q  Back in February of 1991 what was your position?
8  A  I was just strictly an officer.  I'd only been on for about a
9     year at that time.
10 Q  Working in the uniform division?
11 A  Yes.
12 Q  Do you recall being sent to 2905 Stadium Drive in the city and
13    county of Kalamazoo, state of Michigan, on February 8 of 1991?
14 A  Yes, at about 8:20 in the morning I was dispatched there.  The
15    dispatch specifically was that there was a suspicious
16    occurrence there.
17 Q  And that was the reason for your response is to go and check
18    out the nature and—
19 A  Yes.
20 Q  Upon arrival did you speak with anyone there?
21 A  Yes, I met with a Carlton Tiller, who was the manager of the
22    Minute Market that was on South Westnedge at that time.
23 Q  So this was the manager from another store?
24 A  Yes.
25 Q  Where did this contact take place?

205

1   A    At the front of the store, as I recall. At the front door.

2   Q    You're talking about outside, correct?

3   A    Yes, outside the store.

4   Q    All right. Was the building still locked up?

5   A    Yes, it was still locked at that point.

6   Q    And did you make arrangements or attempt to enter the store

7       then?

8   A    We were unable to. The doors were locked.

9   Q    Were—Did someone arrive, or were you eventually able to get

10      in?

11   A    Yes. The owner of the store—of the store chain eventually

12      arrived at about 0840 hours and was able to let us in with a

13      set of keys.

14   Q    You then, along with another officer, entered the building,

15      correct?

16   A    Yes.

17   Q    I'm going to show you what has been marked as People's exhibit

18      one and ask if you can identify this for the record.

19            MR. BROWER: This has been shown to defense counsel

20      previously.

21            THE WITNESS: Yes, that appears to be the floor

22      plan of the store.

23            MR. BROWER: Move for admission of People's exhibit

24      number one, your Honor.

25            THE COURT: Any objection?

```
 1                         MR. SVIKIS:   No objection.
 2                         THE COURT:   Received.
 3   BY MR. BROWER:
 4   Q   Sergeant, if you would please describe—Well, first who was the
 5       other officer with you?
 6   A   Officer John Bravata.
 7   Q   The two of you entered the building together and went to
 8       opposite—and went in opposite directions, correct?
 9   A   Yes.
10   Q   Would you please describe for the jury where Officer Bravata
11       went and what you did once you entered?
12   A   Do you want me to go up—
13   Q   Yes.
14   A   —to the—
15   Q   If—
16   A   Okay.
17                         MR. BROWER:   With the Court's permission?
18                         THE COURT:   That's fine.
19                         MR. BROWER:   Here's a pointer, Officer, to use.
20                         THE WITNESS:   When Mr. Jilek unlocked the doors, we
21       went in through here.
22   BY MR. BROWER:
23   Q   Meaning you and Office Bravata?
24   A   Officer Bravata and I did, yes.
25                         I noticed that there was a set of keys on the—in the
```

207

1  lock on the inside of the doors as we went through.

2  Officer Bravata went south—this way.  I turned immediately to

3  my right and went this way to check the building.

4  As I went down this aisle here, I noted that there

5  was a shopping cart full of pop here in front of one of the

6  pop coolers that appeared to be from someone stocking the pop

7  coolers.  And then continued this way, looked down each of

8  these aisles.  And when I got here, I turned right again, went

9  through these doors to see what was back in here.  This was a

10  storeroom and the coolers and bottles and stuff like that.

11  I noticed that the lights were on and that the door to one of

12  the coolers was standing open.

13  Q  Where was this cooler located in the—

14  A  I don't recall exactly to be honest.

15  Q  The back—Okay.  In that bottle room, however, correct?

16  A  In this bottle room, yes.

17  Q  All right.  Go ahead.

18  A  About that time I heard Officer Bravata call my name, and then

19  I heard him transmit on the radio that he had found a dead

20  body.  I then came down this way and met up with him here,

21  went back here and we saw the body in this area back here.

22  Q  This would be the back room area—

23  A  Yes.

24  Q  —of the store?

25  A  Yeah.

1  Q  An area that's not—

2  A  Not readily accessible to the public.

3  Q  Okay.  There's no product back there for customers to take—

4  A  No.

5  Q  —and bring to purchase?  All right.

6          Thank you.  You can return to your seat, please.

7          What did you observe about the body?

8  A  I observed that it appeared to be a female lying face down.

9     There was a pool of blood about her head and upper torso area.

10    There appeared to be bullet wounds to the back and neck area

11    of her body.

12 Q  Now when you said torso area you're talking about front or

13    back?

14 A  Back.

15 Q  All right.  She was face down?

16 A  She was face down.  She was lying face down on the cement.

17 Q  The injuries you saw then were to her back?  They were visible

18    to you as—

19 A  Yes.

20 Q  What action did you take after that, Sergeant?

21 A  It was readily apparent that she was deceased, so at that

22    point Officer Bravata and I secured the store as a crime

23    scene.

24 Q  And were you given some assignments by responding officers?

25 A  I was specifically assigned to record the name of every person

1       that entered the crime scene at—I was posted at the front

2       door, and I was told by my sergeant at that time to record the

3       name of every person that entered the store.

4   Q   Who was that sergeant?

5   A   Sergeant Mueller.

6   Q   In addition to the sergeant, were there other officers that

7       did arrive to assist with the investigation or were called to

8       investigate?

9   A   Yeah, there were numerous other officers that arrived.

10   Q   Including detectives from Kalamazoo Department of Public

11       Safety detective unit?

12   A   Yes.

13   Q   Were you given assignments by either the detectives or the

14       sergeants on scene regarding a search of the area?

15   A   Yes.  Officer Bravata and I were instructed to search the

16       outlying area around the store for a VCR that was believed to

17       have been taken.

18   Q   The significance of that VCR being what?

19   A   That it was used for surveillance of the store.

20   Q   And—

21   A   And it was believed that there could possibly be video

22       evidence in the—in the VCR.

23   Q   That was missing from the store and you were looking to see if

24       it maybe had been dumped in the area?

25   A   Exactly.  We checked—We checked all the garbage cans and

1        dumpsters in the area. We even checked the Asylum Lake area

2        to see if they had possibly pitched it into the lake.

3  Q  Can you give us a general idea of the extent of the area or

4        different locations where you had been searching dumpsters?

5  A  We checked the—the apartment complexes at the far end of

6        Winchell. We checked all around Asylum Lake. We checked—I've

7        got it in my—in my report here, all the—

8  Q  Would that help—

9  A  —streets that we checked.

10 Q  —refresh your memory regarding those?

11 A  Could—

12 Q  Please—

13 A  Yes, it would.

14 Q  —review that.

15 A  Yeah. We drove slowly from Rambling Road to Springmont

16       checking—

17 Q  Without reading it, Officer—

18 A  Oh, I'm sorry.

19 Q  —if you could. Refresh your memory and then if you can

20       testify—

21 A  Okay.

22 Q  —from memory afterwards.

23                Does that help—

24 A  We checked—

25 Q  —refresh your memory?

211

1  A    Yes.

2  Q    Okay.

3  A    We checked the streets of Applelane, Ferndale [sic], Barnard,

4       and Springmont.  We checked the entire length of Winchell,

5       looking into all dumpsters and garbage cans that were setting

6       out at that time.  And we continued on into that apartment

7       complex at the end and checked all of those dumpsters as well.

8       From that point on, we then went out to Asylum Lake and

9       checked around that area in the swampy area around there to

10      see if we could find it laying out there.

11 Q    And found nothing?

12 A    And found nothing, yes.

13 Q    The next day did you go and witness the autopsy conducted by

14      Dr. Wilkes?

15 A    Yes, I did.

16 Q    Dr. Wilkes was a forensic pathology in Kalamazoo County on

17      that—during that time period, correct?

18 A    Yes.

19 Q    Where was that conducted, do you remember?

20 A    To be—

21 Q    Sheriff's department—

22 A    I believe it was—

23 Q    —morgue?

24 A    —the sheriff's department at that time, but I can't—

25 Q    That no longer—

1  A    —say for sure.

2  Q    —exists, correct?

3  A    Right.  Exactly.  They don't do a lot there, anymore.

4  Q    All right.  Were there other people there to witness the

5       autopsy as well?

6  A    Yes, there were.

7  Q    Including other officers from your department, detective, and

8       so on?

9  A    Yes.

10 Q    Okay.  I'm going to show you what has been marked as People's

11      exhibit number 42 through 46 and ask if you can describe

12      what's depicted in these photographs—if you recognize what's

13      depicted in these photographs.

14 A    Yes.

15 Q    You do?

16 A    Yes.

17 Q    You've reviewed them previously?

18 A    Yes.

19             MR. BROWER:    For the record, I've shown defense

20      counsel these exhibits as well.

21             MR. SVIKIS:    That's true, your Honor.  I'll—This

22      entire slide/tape show, I've no problem with that.

23             MR. BROWER:    All right.

24             Is there a stipulation to admission of these—of the

25      photographs?

                                213

1        MR. SVIKIS:   Yes, if they're on what you presented

2    for me the other day.

3        MR. BROWER:   Okay.

4        Then, your Honor, pursuant to stipulation, I ask

5    that exhibits 42, 43, 44, 45, and 46 be admitted.

6        THE COURT:   Received.

7        MR. SVIKIS:   No objection, your Honor.

8        THE COURT:   All right.  They're received.

9  BY MR. BROWER:

10  Q   For the jury's benefit, Officer, would you please describe

11      exhibit number 42.

12  A   This is a photograph of the entrance wounds to the back area

13      of Ms. Dimmick.

14  Q   These were the wounds that you described as having observed

15      inside the store?

16  A   Yes.

17  Q   Okay.  Exhibit number 43.

18  A   This, again, is another photograph of the pictures [sic] on

19      Mrs. Dimmick's back.

20  Q   Is that a close-up of those two back—

21  A   Close-up.

22  Q   —injuries?

23  A   Yes.

24  Q   Exhibit number 44, please.

25  A   This is a photograph of two bullet wounds to Mrs. Dimmick's, I

214

1     believe, neck area.

2  Q   With her body being—

3  A   These are—

4  Q   —to the bottom of this photograph—

5  A   Yes.

6  Q   —and the top of her head being at the top of the picture; is

7     that correct?

8  A   Right.  These are to like the back of her neck area

9     entrance—wounds.

10  Q   Exhibit number 45.

11  A   I believe this is an X ray that was taken which shows the

12     projectile's—

13  Q   Actually, a photograph of the X ray that was there at the—

14  A   Yes.

15  Q   And the projectiles being the white areas near the top of the

16     head and near the forehead?

17             MR. SVIKIS:   Your Honor—

18             THE WITNESS:   Yes.

19             MR. SVIKIS:   —I'm going to object.  These—I have no

20     objection the admission of these—

21             MR. BROWER:   That's fine.

22             MR. SVIKIS:   —photographs, but—

23             MR. BROWER:   I'll withdraw that question, your

24     Honor

25             THE COURT:   All right.

1              MR. SVIKIS:   —this individual has to—those slugs or

2        whatever they are.

3   BY MR. BROWER:

4   Q   This is a photograph of the X ray that was there at the time

5        of the autopsy?

6   A   Yes.

7   Q   Exhibit number 46, your Honor, or—Excuse me, Officer.

8   A   This is a photograph of the wound on the forehead of

9        Ms. Dimmick.

10  Q   This, you, of course, did not observe at the—at the scene

11       because she was—

12  A   Correct.

13  Q   —laying face down.  All right.  But you observed this injury

14       at the time of the autopsy?

15  A   Yes, I did.

16  Q   Officer, some clothing was taken at the time of the autopsy,

17       was it not—the victim's clothing?

18  A   Yes.

19  Q   I'm going to show you what has been marked as People's

20       exhibit 50 and ask if you can identify this for the record as

21       well.

22  A   This appears to be the shirt and other articles of clothing

23       that was taken from Ms. Dimmick's body—

24  Q   At the time of the autopsy?

25  A   At the time of the autopsy.

                            216

1   Q   The purple garment being the top—

2   A   The—

3   Q   —showing the two holes?

4   A   Yes, the two holes in the shirt that she was wearing.

5   Q   And these holes being consistent with the wounds in the back?

6   A   Yes.

7               MR. BROWER:   Move for exhibit—admission of

8       exhibit number 50, your Honor.

9               THE COURT:   Any objection—

10             MR. SVIKIS:   No, your Honor.

11             THE COURT:   —Mr. Svikis?

12             Received.

13   BY MR. BROWER:

14   Q   Officer, are you also aware that the fired lead bullets

15       recovered from the body of Ms. Dimmick were also recovered and

16       turned over to your department at the time of the autopsy?

17   A   Yes.

18   Q   Along with the lint samples from clothing; is that correct?

19   A   Yes.

20   Q   I'm going to show you what has been marked as People's

21       exhibit 55. If you could just please identify this exhibit

22       for the record.

23   A   Yes. These appear to be the evidence taken from Ms. Dimmick

24       at the time of the autopsy.

25             MR. BROWER:   All right. Thank you.

217

1        Move for admission of People's exhibit number 55,

2    your Honor.

3             MR. SVIKIS:    No objection.

4             THE COURT:    Received.

5             MR. BROWER:    Your Honor, pursuant to the

6    stipulation that we have—It would not be read into the record;

7    there would be a stipulation that includes admission of the

8    autopsy report, and I move for its admission at this time.

9    This would be exhibit number 47.

10            MR. SVIKIS:    No objection.

11            THE COURT:    It's received.

12   BY MR. BROWER:

13   Q   Officer, if you could just for the record describe this

14       document.

15   A   I believe this is the autopsy report that was completed by the

16       forensic pathologist Mr. Wilkes at the time of the—after

17       the—right after the autopsy.

18            MR. BROWER:    All right.    Thank you.

19            I have no further questions of this witness.

20            THE COURT:    Do you have any cross-examination,

21       Mr. Svikis?

22            MR. SVIKIS:    Thank you, your Honor.

23                        CROSS-EXAMINATION

24   BY MR. SVIKIS:

25   Q   Officer Brinkman, you testified that that was a wound.    You

                              218

1    don't know if that was a wound or discoloration from

2    Ms. Dimmick lying face down; isn't that correct?

3 A  It was a wound that was on her—that I observed on her at the

4    time of the autopsy.

5 Q  You don't—You don't know how that was created, do you?

6 A  I don't have direct knowledge of that, no.

7 Q  Okay.  You don't know if it was from hitting the floor with

8    her forehead and that caused the discoloration, correct?

9 A  Right.  I can't testify to that.

10 Q  Now when you arrived at the scene the impression that—that you

11   got this looked like a robbery—Isn't that

12   correct?—robbery/homicide?

13 A  Right.

14 Q  And a Mr. Tiller was also at the scene, wasn't he?

15 A  Yes.

16 Q  And he was not a police officer?

17 A  No, he was not.

18 Q  And he was one of the managers that went into the store,

19   correct?

20 A  Yes.

21 Q  And he went in with Mr. Jilek and with you and your partner;

22   isn't that correct?

23 A  My partner and I went in first.  I believe Mr. Tiller came in

24   behind us—

25 Q  Okay.

219

1  A   —without our knowledge and—while we were busy clearing the

2      store.

3  Q   Okay.  And you also have a recollection that at the time the

4      phone was ringing in the store and Mr. Tiller was the one that

5      answered it, correct?

6  A   Yes.

7  Q   And who was on the line, do you know?

8  A   Susan McFarlane.

9  Q   Susan McFarlane called the store while you were in the store?

10 A   I believe so.

11              MR. BROWER:   Objection, your Honor.  This calls for

12     hearsay.

13              MR. SVIKIS:   I asked if he knew who it was.

14              THE COURT:   You asked what?  What was your

15     question?  I thought you were asking if somebody made a phone

16     call.

17              MR. SVIKIS:   No.  I'll back up as far as I can

18     recall.

19              THE COURT:   All right.

20 BY MR. SVIKIS:

21 Q   Mr. Tiller was in the store?

22 A   Yes.

23 Q   The phone rang?

24 A   Yes.

25 Q   He picked it up?

220

1  A   Yes.

2  Q   Do you know who was on the line?

3  A   I believe it—

4              MR. BROWER:   Do you know—

5              THE WITNESS:   —according to him it was—

6              MR. BROWER:   Objection, your Honor.  If he knows

7      from personal knowledge, he can testify.  He can't speculate—

8              THE COURT:   I—

9              MR. BROWER:   —and he can't refer to other hearsay.

10             MR. SVIKIS:   I'm just asking—

11             THE COURT:   I would sustain the objection on lack

12     of foundation.  And I don't know how anyone would know who's

13     on the other end of a phone if they just heard it ring and

14     somebody picks it up.  So I think—

15             MR. SVIKIS:   Okay.

16             THE COURT:   —there's some merit to the objection.

17             MR. SVIKIS:   Fine.

18 BY MR. SVIKIS:

19 Q   You and Officer Bravata went to look for a video cassette?

20 A   We looked for the entire VCR.

21 Q   And you also believed it contained a video cassette?

22 A   Possibly, yes.

23 Q   Okay.  And during that search you went from Stadium Drive

24     where the Minute Market is all the way to Springmont where

25     Mr. Mishall resides; isn't that correct?

1  A    I don't know anything about where Mr. Mishall resides or—

2  Q    But—Let's say Springmont.  You went all the way to Springmont?

3  A    Yes.

4  Q    Okay.  And did you find anything in that route?

5  A    No, we did not.

6  Q    And you also checked the dumpsters on the way, too; isn't that

7       correct?

8  A    Yes, we did.

9  Q    Did you find anything in any of those dumpsters?

10 A    Not that appeared to be a VCR; no, we did not.

11 Q    Did you find a gun?

12 A    No.

13 Q    Find money?

14 A    No.

15 Q    Find a money bag?

16 A    No, we did not.

17 Q    You also went on Winchell Road and looked in dumpsters; isn't

18      that correct?

19 A    Yes, we did.

20 Q    Did you find a gun in any of those dumpsters?

21 A    No, we did not.

22 Q    Money?

23 A    No.

24 Q    Money bag?

25 A    No.

1   Q   VCR?

2   A   No, we didn't.

3   Q   Videotape?

4   A   No.

5   Q   And you also went to the Winchell Terrace apartments; isn't

6       that correct?

7   A   Yes, we did.

8   Q   Did you find anything there?

9   A   No evidence, no, we did not.

10  Q   You also went to the Woods Lake area, didn't you?

11  A   Yes, I believe that's the Asylum Lake.  We checked around

12      Asylum Lake.

13  Q   Isn't it true that you went to Woods Lake and Asylum Lake?

14  A   Yes.  They're right next to each other.  I'm sure we did.

15  Q   Okay.  And when you went—When you and Officer Bravata went to

16      Woods Lake and Asylum Lake did you find a gun?

17  A   No, we did not.

18  Q   Money bag?

19  A   No.

20  Q   Videotape?

21  A   No.

22  Q   Video?

23  A   No.

24  Q   Then you went on Drake Road; isn't that correct?

25  A   Yes.

223

1  Q  And you searched that area?

2  A  Yes, we did.

3  Q  And you didn't find a gun, videotape, video machine, or

4     anything else, did you?

5  A  No, we did not.

6  Q  You also went to the Oakwood Plaza; isn't that correct?

7  A  I don't—I don't recall that.

8  Q  Okay.  That is on Oakland Drive kitty-corner from Woods Lake;

9     isn't that correct?  You searched behind there in dumpsters?

10  A  May I refer to my report?

11  Q  Certainly.

12  A  Yes, we did.

13  Q  All right.  You found—

14  A  We checked the dumpsters behind Oakwood Plaza as well.

15  Q  And you found nothing there either; isn't that correct?

16  A  We found nothing.

17  Q  Okay.  When you went into the store there was no evidence of

18     struggle or a fight as far as you could tell?

19  A  Not that we could see upon—upon entering the store, no.

20             MR. SVIKIS:  I have no further questions.

21             THE COURT:  Do you have any redirect?

22                REDIRECT EXAMINATION

23  BY MR. BROWER:

24  Q  Officer, as soon as you discovered the body—Well, let me ask

25     this: were Mr. Jilek or Mr. Tiller in that back room with the

(Tape No. B2004-034, 6-15-04, 10:04)

1   two of you, that being yourself and Officer Bravata?

2  A  No, they were not.

3  Q  They were in the store area near the—

4  A  They were up near the entrance where we had come in initially.

5  Q  Just inside the front doors?

6  A  Yes.

7  Q  And once you discovered the body, what action was taken

8     regarding those two individuals?

9  A  They were told to exit the store and then we—we maintained the

10    crime scene.

11            MR. BROWER:   Thank you.

12            I have nothing further.

13            THE COURT:   Recross, Mr. Svikis?

14                    RECROSS-EXAMINATION

15  BY MR. SVIKIS:

16  Q  Is it your testimony that you stuck with Mr. Tiller from the

17    moment he walked in the—into the store and went with him

18    throughout the store and that at no time you were not by his

19    side and he never went in the back bottle room?  Was that

20    your—

21  A  That's not—

22  Q  You said he never went in the back room.

23  A  That's—No, that's not my testimony.

24  Q  Okay.  So you don't know if he went in the back room or not?

25  A  I'm saying I did not allow him into the back room.

225

1  Q    Okay.  He was not allowed; that, I understand.  But you don't
2       know if he went in the back room or if he ever saw Ms. Dimmick
3       laying down; you don't know that, do you?
4  A    I don't know that, no.
5                 MR. SVIKIS:    Okay.  Thank you.
6                 THE COURT:    Anything else, Mr. Brower?
7                         REREDIRECT EXAMINATION
8  BY MR. BROWER:
9  Q    You don't know what happened later after others took control
10      of the scene, right?  I mean other detectives regarding any
11      other individuals once you had your assignments.
12 A    Right.
13                MR. BROWER:    Thank you.
14                THE COURT:    You can step down, sir.
15                Call your next witness.
16                MR. BROWER:    Sergeant Joe Humphries, your Honor.
17                THE COURT:    Raise your right hand.  You do solemnly
18      swear or affirm the testimony you're about to give shall be
19      the truth, the whole truth, and nothing but the truth?
20                MR. HUMPHRIES:    .  .  .  (inaudible)
21                         JOE HUMPHRIES,
22      called at 10:06 a.m., and sworn by the Court, testified:
23                         DIRECT EXAMINATION
24 BY MR. BROWER:
25 Q    Sir, would you please state your full name and spell your last

                                 226

```
 1        name for the record.
 2   A    Sergeant Joe Humphries—H-u-m-p-h-r-i-e-s.
 3   Q    You're a sergeant with the Kalamazoo Department of Public
 4        Safety; is that correct?
 5   A    Correct.
 6   Q    How long have you been so employed?
 7   A    Fifteen years.
 8   Q    Were you working and on duty back in February—specifically
 9        February 8 of 1991?
10   A    Yes, sir.
11   Q    What was your position and responsibility back then?
12   A    I was a patrol officer at that time.
13   Q    Didn't have your stripes back then yet?
14   A    No, sir.
15   Q    All right.  You were obviously working and on duty in the
16        early morning hours approximately between 8:00 or
17        9:00 o'clock?
18   A    Yes, sir.
19   Q    Do you recall being sent to the Minute Market—what was then
20        the Minute Market at 2905 Stadium Drive—
21   A    Yes, I do.
22   Q    —on that date, February 8?
23   A    Yes.
24   Q    What was the nature of your dispatch information?
25   A    The dispatch information was a suspicious occurrence.  The
```

227

1      business should have been open and wasn't.

2  Q  When you arrived were there other offer—offer—Excuse

3      me.—officers already on scene?

4  A  The second time, yes.

5  Q  All right.  Well, let's start with that and work back.

6            You were—You were dispatched to a suspicious

7      occurrence, and that was at what time then?

8  A  That was after 8:00 o'clock.  Somewhere around 8:20 or 8:30 in

9      the morning, I believe.

10 Q  All right.  So that would actually have been the second time

11     that you would have been there that day?

12 A  Correct.

13 Q  All right.  On this second occasion, then, when you were at

14     the store, are there officers already on scene?

15 A  Yes.

16 Q  And that was?

17 A  Officer Bravata and Officer Brinkman.

18 Q  Were you aware that they had already entered the—the store and

19     discovered a body?

20 A  Yes, sir.

21 Q  What responsibilities did you take over or were you assigned

22     after that discovery?

23 A  Sergeant Mueller, who was the supervisor that day, assigned me

24     to a perimeter back corner of the business to keep—search for

25     any possible evidence or anything suspicious and to keep

1    anybody from coming in and out of the crime scene.

2  Q  I'm assuming that there were other officers that had other

3     similar responsibilities around the perimeter, correct?

4  A  Yes, sir.

5  Q  Okay.  Approximately what time was this that you had arrived

6     or was the outside perimeter secured?

7  A  It was sometime after 8:30.

8  Q  Did you conduct any kind of search outside for any evidence?

9  A  Yes, sir.

10 Q  What area was it that you were looking in, or what were you

11    looking for?

12 A  Anything that looked suspicious, any discarded weapons,

13    clothing—anything that could relate to a homicide.

14 Q  All right.  Did you find anything?

15 A  No, sir.

16 Q  Now we've already referred to the fact that this was the

17    second time that you were there at that Minute Market that

18    day.  What time was it that you were there before?

19 A  That was about 7:25 in the morning.  My shift started at

20    7:00 a.m.  I was driving down Stadium Drive, and I want—I

21    don't believe I—orange juice or something, and I knew the

22    store was normally open.  I turned into the parking lot and

23    realized the store was dark and it's normally open.

24 Q  Now had you been working days for some period of time?

25 A  Yes, sir.  I was working 7:00 a.m. to 7:00 p.m. for the first

1      eight years of my career. That would have been the first full

2      year of my career.

3  Q    Okay. Was stopping at the Minute Market after the beginning

4      of your shift something that you would routinely do?

5  A    I'd done it in the past. I wouldn't say I did it on a daily

6      basis; but, you know, once in a while I'd stop if I needed

7      something to drink or something.

8  Q    Often enough then that you were aware that it should have been

9      open already by that time?

10  A    Correct.

11  Q    Were you there often enough, too, to have some familiarity

12      with where employees would park their vehicles?

13  A    Yes.

14  Q    And where was that?

15  A    Usually on the—It would be the east side of the building.

16  Q    And how would the vehicles then be parked? Is there angle

17      parking there, or do you recall?

18  A    That, I don't recall—

19  Q    Okay.

20  A    —no.

21                 MR. BROWER: If you can put up exhibit number one.

22 BY MR. BROWER:

23  Q    Officer, this has been described as a floor plan of the

24      Stadium Drive Minute Market—Stadium Drive being along the

25      bottom, the front entrance as being here. If we say that this

1   was the north side of the building, this would then be the

2   east side of the building; does that make sense?

3 A Correct.

4 Q All right.  There's an indication that Gale's is immediately

5   to the east—the east side of the building.  That would be

6   Gale's Hardware; is that right?

7 A Yes, sir.

8 Q Now when you said that you were familiar with where the

9   employees parked, would you please indicate where that was on

10   this diagram then?

11 A On the east side in the back corner near where you would say

12   office but on the exterior of the building, yes, sir, right—

13 Q In this area—

14 A —where your pointer is.

15 Q —right here?

16 A Yes.

17 Q All right.  Now you're familiar with where the employees

18   normally parked.  After finding the store still locked—Well,

19   let me ask this first.  Did you notice anything about the

20   interior lights?

21 A They were off.

22 Q And that was also unusual for this time?

23 A Yes.

24 Q The door's locked, the lights are off, you know where

25   employees normally parked.  What action, if any, did you take?

231

1  A   I drove my police car along the—which would be that east side

2      of the building—after noticing that the—the lights were off

3      and realized that there was no vehicles there.  If an employee

4      was there, I felt their vehicle would be there; so I didn't

5      think anything other than maybe someone had not arrived to

6      work on time yet.  So I just drove off and left.

7  Q   And, again, this time was approximately what?

8  A   Seven twenty-five, seven thirty in the morning.

9            MR. BROWER:   Thank you.

10           I have nothing further of this witness.

11           THE COURT:   Mr. Svikis?

12                     CROSS-EXAMINATION

13  BY MR. SVIKIS:

14  Q   Officer Humphries, you were to secure the area; is that

15      correct—

16  A   Yes, sir.

17  Q   —or part of it?

18           Okay.  And were you also told to search the area?

19  A   Yes, sir.

20  Q   In that search, what were you looking for?

21  A   Any discarded weapons, clothing, or anything that could be

22      used in a homicide.

23  Q   And you didn't find any?

24  A   No, sir.

25  Q   Were you the officer that found a ten-speed bike by

                              232

1    Congregation of Moses, or was that a partner of yours?  You

2    know nothing?

3 A  No, sir; it was not me.

4 Q  It was not me.  Okay.

5              MR. SVIKIS:   I have no further questions.

6              MR. BROWER:   No redirect.

7              THE COURT:   You can step down.

8              MR. BROWER:   People call Officer Bruce Labrie, your

9    Honor.

10             THE COURT:   Raise your right hand.  You do solemnly

11   swear or affirm the testimony you're about to give shall be

12   the truth, the whole truth, and nothing but the truth, so help

13   you God?

14             MR. LABRIE:   I do.

15                        BRUCE LABRIE,

16   called at 10:14 a.m., and sworn by the Court, testified:

17                     DIRECT EXAMINATION

18 BY MR. BROWER:

19 Q  Sir, would you please state your full name and spell your last

20   name for the record.

21 A  It's Bruce Labrie—L-a-b-r-i-e.

22 Q  Where are you presently employed, sir?

23 A  I'm currently the director of safety and traffic for the road

24   commission in Allegan County, and I'm also an Allegan County

25   sheriff's deputy.

                          233

1 | Q | This is actually a second career for you, is it not?

2 | A | Yes, sir.

3 | Q | Recently retired or—Well, now it's been a couple years, hasn't

4 | | it?

5 | A | Yes, sir.

6 | Q | Retired from the Kalamazoo Department of Public Safety?

7 | A | Yes, sir.

8 | Q | How long had you been working for the Kalamazoo Department of

9 | | Public Safety and in what capacity?

10 | A | I had been there 26 years when I retired. I was a laboratory

11 | | specialist.

12 | Q | Tell us about the responsibilities that you had as a

13 | | laboratory specialist—the general nature of the functions of

14 | | that position.

15 | A | I did controlled substance analysis. I assisted and did crime

16 | | scene investigation on serious crime scenes. I also taught

17 | | evidence and crime scene investigation classes along with

18 | | teaching bloodstain pattern and interpretation classes and

19 | | just a multitude of things that were forensically involved.

20 | Q | You mentioned the term bloodstain interpretation. What

21 | | exactly does that mean?

22 | A | It's a scientific study of blood—different characteristics of

23 | | things that can happen in crime scenes with blood being acted

24 | | upon by things such as gravity, external forces such as force

25 | | with weapons—things like that—gunshots, stabbing. It's

234

1      basically a whole realm of different techniques that have to
2      do with the study of blood and what happens to blood at crime
3      scenes.
4    Q  Is it my understanding from what you said that you may be able
5      to interpret positions of an assailant or victim or the—the
6      direction of blows—that type of thing—just by looking at the
7      blood pattern and the way it's formed on other surfaces; is
8      that right?
9    A  Yes, sir, that is correct.
10   Q  How many crime scenes have you investigated during your
11     26-year career?
12   A  That's a tough one to answer.  I know I've worked over a
13     hundred crime scenes for murder cases, and with other crime
14     scenes probably in the—minimum of three to five thousand.
15   Q  Have you—You've mentioned some teaching that you've done.
16     Could you describe that—

17            MR. SVIKIS:   Your Honor, I'm going to object at
18     this time.  I don't know if the prosecutor's attempting to
19     qualify him as a blood spatter expert or—or what he's doing
20     with relationship to his history of how many crime scenes or
21     murders or such.  I'll object to the direction of his
22     testimony because it's not relevant to this issue unless he's
23     trying to qualify him as an expert—

24            MR. BROWER:   That's exactly—
25            MR. SVIKIS:   —in some field.

                              235

1              MR. BROWER:   —it, your Honor.

2              THE COURT:   If that's what he's attempting to do,

3       it's proper.

4              MR. SVIKIS:   All right.

5  BY MR. BROWER:

6  Q   You've done some teaching, sir?

7  A   Yes, I have.

8  Q   Could you describe the different areas that you've taught?

9  A   I've taught in the area of crime scene investigation,

10      controlled substance analysis, and bloodstain pattern

11      analysis, also.

12 Q   Now crime scene investigation, what are the different

13      components of that kind of training?

14 A   That would go all the way from starting out with photography

15      all the way through mapping and laying a crime scene out so

16      that you can put it right back together on a diagram, and then

17      report writing—just the different facts that would be

18      necessary for a complete investigation.

19 Q   Do you have any particular training in those areas as well?

20 A   Basically a lot—Most of it was on-the-job training over the

21      years and then different schools that I have been sent to

22      throughout the United States on just different techniques and

23      things of that nature.

24 Q   Have you been previously qualified as an expert in the area of

25      crime scene investigation and bloodstain analysis?

                                236

1  A   Yes, sir, I have.

2  Q   And how many times and what different areas—Excuse me.—what

3      different courts?

4  A   The courtrooms on that would be in the circuit courts in

5      Kalamazoo County and in district court in Calhoun County,

6      also; also the district courts in Kalamazoo.

7  Q   How many times have you been qualified and testified as an

8      expert in court?  Do you have an estimate?

9  A   On bloodstain pattern cases, probably 25.

10 Q   And as a crime scene investigation expert?

11 A   Probably close to or in the area of a hundred.

12             MR. BROWER:   Your Honor, the People would move to

13     qualify Officer Labrie as a crime scene investigation and

14     bloodstain analysis expert based on his training,

15     qualifications, and experience.

16             MR. SVIKIS:   May I voir dire, your Honor?

17             THE COURT:   Sure.

18                  VOIR DIRE EXAMINATION

19 BY MR. SVIKIS:

20 Q   All my questions are going to be directed at bloodstain.  Is

21     there a difference between bloodstain expertise that you

22     profess versus blood spatter?

23 A   They're basically the same.  Blood spatter was the term—

24 Q   Let me—Let me stop you.  I'm going to try and ask you some yes

25     and no questions.  Let me try again.  I'm going to say that

                            237

1    answer's unresponsive.

2              Is there a difference between bloodstain and blood

3    spatter expertise?

4  A  No, sir.

5  Q  So if you have one you have the other?

6  A  Yes, sir.

7  Q  And when is the last time you attended a class on either

8    bloodstain or blood spatter?

9  A  2002.

10 Q  And where was that at?

11 A  That was in Battle Creek.

12 Q  And who gave that class?

13 A  I assisted in that class.  That was given by

14   Mike Van Stratton, who's retired from Battle Creek Police

15   Department and now works for the Kansas Bureau of

16   Investigation.

17 Q  So you—you took it—you attended that class as a instructor but

18   not as a student?

19 A  That's correct.

20 Q  When is the last time you attended a class as a student?

21 A  1997.

22 Q  And do you know what luminol regenta [sic] is?

23 A  Yes, sir, I do.

24 Q  And what is that?

25 A  It's a blood detection liquid that is mixed up.

238

1  Q    I didn't hear the last part.

2  A    It's a blood detection liquid that is mixed up and sprayed at

3       crime scenes.

4  Q    And do you know what a hemostatic blood regent [sic] strips

5       are?

6  A    Yes, sir, I do.

7  Q    Those are blood—They're strips for testing different samples

8       to see if they are blood, in fact.

9             MR. SVIKIS:    I have no further questions.

10            THE COURT:    Do you have any objection?  If so,

11       please state it.

12            MR. SVIKIS:    No, your Honor.

13            THE COURT:    He's so recognized, then, as a expert

14       in crime scene investigation and bloodstain/blood spatter

15       analysis.

16                     DIRECT EXAMINATION (cont.)

17  BY MR. BROWER:

18  Q    What title do you go by now, sir?  Shall I call you

19       specialist?

20  A    That would be fine, yes, sir.

21  Q    How about Officer Labrie, will that work?

22  A    That's fine, yes.

23  Q    Okay.  Officer, on February 8 of 1991 were you called to the

24       Minute Market on Stadium Drive to assist in a homicide

25       investigation?

1   A   Yes, sir, I was.

2   Q   Did you arrive with others to assist, or were there others

3       that were involved in that investigation as well?

4   A   Yes, sir, there were.

5   Q   Upon arrival as far as the crime scene investigation is

6       concerned, what action was taken there at the scene?

7   A   First thing that I always do at a crime scene that—is I

8       ascertain if the scene has been secured by the initial

9       officers, and I was advised that it had been.

10          We proceeded—

11          MR. SVIKIS:  Your Honor, I believe that question is

12      unresponsive.  The prosecutor asked what he did at this scene,

13      and the officer's testifying what he normally does.  I'd ask

14      that the officer direct his answer to the question; not what

15      he would normally do, what he did at this scene.  That was the

16      question.

17          MR. BROWER:   I'll ask another question, your Honor.

18          THE COURT:  All right.

19  BY MR. BROWER:

20  Q   Officer—

21          THE COURT:   I really think that objection,

22      Mr. Svikis, is Mr. Brower's objection, not yours; but—

23  BY MR. BROWER:

24  Q   Officer, is there a routine that was followed when you went to

25      a crime scene regarding procedures, protecting the scene, and

1  looking for evidence and that kind of thing?

2  A  Yes, there is.

3  Q  What was the routine procedure that was—that you would have?

4  A  It's to—First, when I was called on the phone regarding this

5     incident in the office that I made sure there was someone at

6     the scene, the scene has been protected, and then who was out

7     there at the scene, get whatever equipment we may need, and

8     then proceed out to the crime scene.

9  Q  Was that procedure followed in this particular instance?

10 A  Yes, sir, it was.

11 Q  When you arrived and made sure that the crime scene was

12    secured and so on, what steps did you follow at that point at

13    2905 Stadium Drive?

14 A  First to interview the detective who was present at the scene

15    and find out any information about—before we did an actual

16    walk-through—to find out any information that he may have and

17    exactly what they did have in the way of a situation there.

18 Q  You mentioned a walk-through.  What do you mean by that?

19 A  After I ascertain as much information as I can, then what'll

20    happen is I'll go into the crime scene and walk through the

21    crime scene to see specifically what is there and what

22    possibly is going to be needed to evaluate and then to go

23    ahead and process the entire scene.

24 Q  You're identifying particular areas or different procedures

25    that might have to—that you might have to use based on what

241

1    you see during this walk-through; is that correct?

2  A   Yes, sir, that's correct.

3  Q   Officer—

4          MR. BROWER:   Well, let me ask the Court, your

5    Honor, if defense counsel is willing to stipulate to

6    photographs numbers two through 41.

7          MR. SVIKIS:   I've stipulated to photographs upon

8    proper foundation . . . (inaudible).  It appears that I have

9    no objection.

10         THE COURT:   Okay.  So that—All those photos—Two

11   through 41?

12         MR. BROWER:   Correct.

13         THE COURT:   You have no objection to; is that

14   right?

15         MR. SVIKIS:   That's correct.

16         THE COURT:   All right.  They're received then.

17 BY MR. BROWER:

18 Q   Officer, I'm going to ask you to describe the interior of the

19   vehicle [sic] through a description of the photographs there

20   and the same photograph then being displayed on the screen so

21   that the jury can see this.

22         Shall we begin with exhibit number two, Officer, and

23   if you could please describe what this is for the jury.

24 A   This is a rear view of the store.

25 Q   Now there's a diagram—the floor plan—up in the left-hand

                          242

1  corner of the slide with a red arrow.  The red arrow is
2  indicative of what, sir?
3  A  That would be of north.
4  Q  Okay.  And that's—The view of that particular photograph the
5  person's standing looking through the viewfinder taking the
6  photograph in the direction of the arrow, correct?
7  A  That is correct, yes.
8          MR. BROWER:  Exhibit number three, please.
9          THE WITNESS:  Okay.  This is the side of the
10  building, which would be more towards the east side of the
11  building as you're coming around.
12  BY MR. BROWER:
13  Q  For ease of description, let's—Actually, Stadium Drive is at a
14  little bit of an angle, is it not?
15  A  That's correct.
16  Q  It doesn't run truly east or west.  Let's, for east of
17  description purposes, call the front of the store which faces
18  Stadium Drive north and then the left side of the diagram
19  would be east and so on.
20  A  That's correct.
21  Q  So this is a view, then, of the east side standing from near
22  the front of the store closest to Stadium Drive?
23  A  That's correct.
24          MR. BROWER:  Exhibit number four, please.
25          THE WITNESS:  This is the—Looking out towards

243

1    Stadium Drive from the east side of the building.

2  BY MR. BROWER:

3  Q    This time standing near the back of the building, correct?

4  A    Correct.

5              MR. BROWER:    Exhibit number five.

6              THE WITNESS:    This would be standing walking from

7        where that last photo was taken, walking in about the same

8        angle up towards the front of the building, shooting out

9        towards Stadium Drive.

10 BY MR. BROWER:

11 Q    Showing a portion of that wraparound sidewalk on that corner,

12       correct?

13 A    Yes, sir.

14             MR. BROWER:    Exhibit number six.

15             THE WITNESS:    This shows the front of the store

16       from the easterly direction.

17 BY MR. BROWER:

18 Q    Standing on the east side looking across the front towards the

19       west, correct?

20 A    Yes, sir.

21 Q    Let's back up just for a second.

22             MR. BROWER:    Exhibit number five, please.    One more

23       yet—exhibit number four.

24 BY MR. BROWER:

25 Q    Now there's obviously a fair amount of pavement east of the

                                  244

1    east wall of this building, correct?

2  A   Yes, sir, that's correct.

3  Q   That's no longer the case today, is it not?  Gale's Hardware

4      actually has been expanded and fills this area, correct?

5  A   That is correct.

6               MR. BROWER:   Exhibit number seven.

7  BY MR. BROWER:

8  Q   Describe what's depicted here, sir.

9  A   This is the front entry doors and with the keys in the front

10     entry door.

11  Q   There's been some previous testimony about that being the case

12     at the time of entry—testimony from Officer Brinkman.   These

13     are the keys that were in the lock of the door from the

14     inside, the door still locked at the time?

15  A   Yes, sir, that's correct.

16              MR. BROWER:   Exhibit number eight.

17  BY MR. BROWER:

18  Q   Could you describe that, sir.

19  A   This would be looking from towards the north from the back of

20     the store near where the cash registers are out towards the

21     front door.

22  Q   The cash register counter being on the right side of this

23     diagram?

24  A   That's correct.

25  Q   Excuse me.   Not the diagram but the photo.

                          245

1  A    The photo, yes.

2              MR. BROWER:   All right.

3              Exhibit number nine, please.

4              THE WITNESS:   Number nine is a view to the—towards

5       the east showing behind the counter and the cash registers.

6  BY MR. BROWER:

7  Q    Basically the north half of that—that cashier's counter?

8  A    Yes, sir.

9  Q    There appear to be two different cash registers, one near the

10      middle of the counter and one towards the north end; is that

11      accurate?

12 A    Yes, sir.

13             MR. BROWER:   Exhibit number ten, please.

14 BY MR. BROWER:

15 Q    Go ahead, sir.

16 A    Now this would be the view to the opposite direction of the

17      last photograph, so this would be showing from the counter

18      back towards the south and back towards the doors that go in

19      towards the back room—or into the back room.

20 Q    Now the doors going into the back room would be these doors

21      right here; is that right?

22 A    Yes, sir, that's correct.

23 Q    The far right edge of the photograph.

24 A    (No audible response)

25             MR. BROWER:   Exhibit number 11.

246

1              THE WITNESS:   This is behind the counter, and this

2        would be looking towards the front of the store.

3    BY MR. BROWER:

4    Q   The—In the center of this photograph—or top center—that's the

5        north wall that faces Stadium Drive; is that correct?

6    A   Yes, sir, that is correct.

7    Q   There appears to be another cash register type device with an

8        orange frame right in the center on the left-hand edge of the

9        photograph.  That's a lottery register; is that correct?

10   A   Yes, sir, that is correct.

11             MR. BROWER:   Exhibit number 12.

12   BY MR. BROWER:

13   Q   Describe that, sir, if you would, please.

14   A   This is behind the counter, and this is a trash can that is

15       partially covering a floor safe.

16             MR. BROWER:   Exhibit 13.

17             THE WITNESS:   This is then the trash can removed

18       and a photo of the safe itself—the cover of the safe.

19             MR. BROWER:   Exhibit 14.

20             THE WITNESS:   That would now be the cover removed

21       from the safe.

22   BY MR. BROWER:

23   Q   Revealing a cover to the safe with a combination lock?

24   A   Yes, sir, that's correct.

25             MR. BROWER:   Exhibit 15.

                          247

1       THE WITNESS:    That's a shot showing the cover of

2    the safe—the combination safe—has been removed and that there

3    is the interior of that compartment.

4       MR. BROWER:    Exhibit 16.

5       THE WITNESS:    Sixteen shows the cash register with

6    a time of—cash register number on it and a time of 6:32.

7  BY MR. BROWER:

8  Q  The significance being the time that that cash register was

9     activated that morning?

10  A  That's what we were told upon—

11  Q  And that's why—

12  A  —questioning.

13  Q  —you took—why this photograph was taken?

14  A  Yes, sir.

15  Q  So this is—Is there a register number on there, too?  Yeah,

16     there's number one on the right-hand margin?

17  A  Yes, sir.

18       MR. BROWER:    Exhibit number 17.

19       THE WITNESS:    This would be cash register number

20    two, the activation slip for that one showing a time of

21    6:31—or 0631.

22  BY MR. BROWER:

23  Q  The two cash registers then being activated just a minute

24     apart?

25  A  Yes, sir.

248

1          MR. BROWER:  Exhibit 18.

2          THE WITNESS:  This is an interior shot of one of

3     the cash registers showing the contents.

4          MR. BROWER:  And exhibit 19.

5          THE WITNESS:  And this would be a view of cash—the

6     other cash register showing the interior of that cash

7     register's drawer, also.

8  BY MR. BROWER:

9  Q   So each of the registers had this—this drawer with this basic

10     setup—similar setup; is that correct?

11  A   Yes, sir.

12          MR. BROWER:  Exhibit number 20, please.

13          THE WITNESS:  This is a shot as you would come in

14     the front doors and would turn to the right.  It would show

15     you down the front hallway—or the front aisleway of the store.

16  BY MR. BROWER:

17  Q   The very first aisleway as you enter the store, the doors

18     being in the lower right-hand corner of this photograph; is

19     that correct?

20  A   Yes, sir.

21          MR. BROWER:  Exhibit 21.

22          THE WITNESS:  This would be the second—As we're

23     coming into the store, this would then be the second

24     hallway—or aisleway, I should say—that you would be looking

25     down.  And we're looking back towards what would be the west.

249

(Tape No. B2004-034, 6-15-04, 10:37)

1    MR. BROWER: Exhibit 23. Or did I miss—skip 22?

2    MS. FRARY: Yes, you did.

3    MR. BROWER: Okay. Twenty-two.

4    THE WITNESS: It's the coffeemaker showing the

5    condition of the—those at the time with liquid in both

6    coffeepots.

7  BY MR. BROWER:

8  Q  One with what appears to be bought or another one that's

9     mostly filled with coffee, correct?

10 A  Yes, sir.

11 Q  And this coffeemaker was where in this store, do you recall,

12    sir?

13 A  If you were standing at the cash register looking out into the

14    store, it would be across from the cash register near the—one

15    of the last aisles—

16 Q  All right.

17 A  —before—farthest away from the doorways.

18    MR. BROWER: Exhibit 23, please.

19    THE WITNESS: This would be the—As we come in, this

20    would be in progression the third aisleway.

21    MR. BROWER: Exhibit 24.

22    THE WITNESS: As you would come into the store—walk

23    in—this would be the last aisleway that would be present in

24    the store with the coolers along the left side.

25

250

1  BY MR. BROWER:

2  Q    There appears to be a cooler with tall—maybe six-foot

3       high—glass doors near the front of the picture on the

4       left-hand side followed by what appears to be a lower display

5       area—maybe a freezer or something of that type; is that your

6       recollection as well?

7  A    Yes, sir.

8  Q    Would that be consistent with the green boxes along that wall

9       dividing the customer area from the back store area?

10 A    Yes, sir, it would be.

11 Q    Just so we're clear, these right here being consistent with

12      this and the freezer here?

13 A    Yes, sir.

14               MR. BROWER:    Twenty-five, please.

15               THE WITNESS:    Twenty-five would be if you were in

16      the last row and you were to turn towards the north and look

17      towards the front of the building, it would be that last

18      aisleway down the back of the store or the west side of the

19      store.

20               MR. BROWER:    Exhibit 26.

21               THE WITNESS:    This would be the bottle room on the

22      back of the store, and this would be looking towards the

23      south.

24 BY MR. BROWER:

25 Q    Towards the back of the store?

                              251

1   A      Yes, sir.

2   Q      There is a—appears to be some sort of cooler with the door

3          standing open back there?

4   A      Yes, sir.

5                   MR. BROWER:   Exhibit 27.

6                   THE WITNESS:   This would be looking from the

7          direction of the last photo and just be 180-degree turn, so

8          you'd be looking out towards the front of the store in that

9          same back room.

10  BY MR. BROWER:

11  Q      There's a steel door there.   That would be a door off the

12         bottle room that actually exits into the front parking lot

13         facing Stadium Drive?

14  A      Yes, sir, that's correct.

15                  MR. BROWER:   Exhibit 28.

16                  THE WITNESS:   This would be a shot looking from the

17         interior of the store through the back doors and out towards

18         the back door of the building.

19  BY MR. BROWER:

20  Q      The very first photograph that we looked at regarding the

21         exterior of the building was a view of that back door.   This

22         is the back door now from the inside?

23  A      Yes, sir, that's correct.

24                  MR. BROWER:   Put exhibit number two up just for a

25         second.

                              252

1  BY MR. BROWER:

2  Q    That door right there—Correct?—right in the center of the

3       picture?

4  A    Yes, sir, that is correct.

5              MR. BROWER:   Back to 28, please.

6              And on to 29.

7              I'm sorry.  I was a little quick there.  Can we go

8       back to 28 just for a second.

9  BY MR. BROWER:

10 Q    There appears to be something on the floor—a light-colored

11      object of some sort just inside the door.  Do you know what

12      that was, sir?

13 A    I can't recall from memory, no.

14             MR. BROWER:   All right.

15             Exhibit number 29.

16             THE WITNESS:   That would be the alarm panel for—

17 BY MR. BROWER:

18 Q    That was—

19             MR. BROWER:   Okay.  Back to 28 just for a second

20      again.

21 BY MR. BROWER:

22 Q    The alarm panel—The next photograph—29—Excuse me.—where is

23      that located on this picture, if you recall?

24 A    I don't recall.

25             MR. BROWER:   All right.

253

1           Exhibit number 30, please.

2                THE WITNESS:   This is the area if you were to come

3     through the swinging doors into the back room and walk past

4     where the ends of the coolers would be and then turn and face

5     towards the west.

6  BY MR. BROWER:

7  Q   There appears to be a light object right in the center of this

8      dark hallway close to the end of the hallway; what is that,

9      sir?

10 A   That is the victim.

11               MR. BROWER:   Exhibit number 31.

12               THE COURT:   Why don't we break here.   I'd—We'll

13    stand in recess then until 10:55.   I want everybody back here

14    at five minutes to 11:00.

15               (At 10:43 a.m., court recessed)

16               (At 11:00 a.m., proceedings reconvened)

17 BY MR. BROWER:

18 Q   Exhibit 31, if you could please describe this.

19 A   This is a view of the victim, and this is looking from the

20    east towards the west.

21 Q   This being now several feet closer to the body, obviously,

22    than the last photograph?

23 A   Yes, sir.

24               MR. BROWER:   Exhibit number 32.

25               THE WITNESS:   Thirty-two is going from the west

                                 254

1   towards the east showing the victim from the other direction.

2   BY MR. BROWER:

3   Q   Stepping around the victim past the body and then turning

4       around with a view towards the head now?

5   A   Yes, sir.

6   Q   The area that appears to be blood around the head area, how

7       would you characterize that blood based on your experience and

8       qualifications as a bloodstain or blood spatter expert?

9   A   That is what is referred to as passive bleeding.  That is

10      someone who is in one position and then is bleeding in that

11      position and not moving.

12  Q   Passive bleeding meaning they bled while they were in that

13      position and that—Well, why don't you describe it.

14  A   Yes, it's passively bleeding.  You're in a position, you're

15      bleeding, and you're not making any movements or anything like

16      that.  You're just in that position and bleeding.

17  Q   The other kinds of bloodstains that you might see have labels

18      as well, correct?  Could you give just a couple of examples.

19  A   Some of—

20                  MR. SVIKIS:   Your Honor, I'm going to object to

21      relevancy to other examples that don't comport with this

22      photograph—that aren't there.

23                  MR. BROWER:   Well, I believe—

24                  THE COURT:   What's its purpose?

25                  MR. BROWER:   Its purpose, your Honor, to explain

1    the difference and to explain why this particular blood
2    pattern fits passive and not the other types of bloodstains.
3                    MR. SVIKIS:    I haven't—
4                    MR. BROWER:    And it helps educate the jury, your
5    Honor, regarding that.
6                    MR. SVIKIS:    I haven't challenged that that isn't
7    passive blood, your Honor.
8                    THE COURT:    To put it in perspective, if you don't
9    use too much time I'll allow it.
10   BY MR. BROWER:
11 Q   There are other types of blood patterns that you have seen and
12       are familiar with, correct?
13 A   Yes, sir.
14 Q   And those types are?
15 A   There's things such as impact, there's cast-off staining, and
16       there's also blood dropping into blood.  That also makes a
17       unique pattern when it—from the liquid dripping into the other
18       liquid.  There are many different types of patterns that can
19       be created with—when it comes to blood.
20 Q   Depending on the type of blood pattern would help you in
21       determining the position of the victim—whether the victim had
22       been standing or—or lying, the direction of the blows—that
23       kind of thing?
24 A   Yes, sir, in some situations you can ascertain those facts.
25 Q   Is that in part why you determined, in your opinion, that this

                                   256

1    is passive bleeding?

2  A    Yes, sir.

3              MR. BROWER:    Exhibit number 33, please.

4              THE WITNESS:    This is a view of the victim's back

5    showing the bullet wounds in the back.

6              MR. BROWER:    Exhibit 34.

7              THE WITNESS:    This shows past the victim and just

8    shows the doorway and some of the mechanical and also the

9    items that were stocked in the back room.

10  BY MR. BROWER:

11  Q    Going through this door and immediate left would put you in

12   the bottle room, correct?

13  A    Yes, sir, it would.

14             MR. BROWER:    Thirty-five, please.

15             THE WITNESS:    If you were to come from the store

16   portion through the swinging back doors, look to your left,

17   that would be the door leading into the office; and that is

18   what is depicted in this shot.

19  BY MR. BROWER:

20  Q    That small, think office area off the right side near the back

21   of the building?

22  A    Yes, sir.

23             MR. BROWER:    Exhibit 36, please.

24             THE WITNESS:    This is a shot of the interior of the

25   office looking from—it would be looking towards the east.

1   BY MR. BROWER:

2   Q    The outside wall?

3   A    Yes, sir.

4   Q    And what appears to be a desk area near the center of the

5        picture?

6   A    Yes, sir.

7              MR. BROWER:    Thirty-seven, please.

8              THE WITNESS:    This is a purse that's on the floor

9        of that office area.

10  BY MR. BROWER:

11  Q    That'd be right at the leg of the desk, correct?

12  A    Yes, sir.

13             MR. BROWER:    Thirty-seven [sic] or—Excuse me.—38.

14             THE WITNESS:    This is another view of that same

15       back office area.

16  BY MR. BROWER:

17  Q    There appears to be some sort of electronic equipment right

18       dead center in this photograph; is that correct?

19  A    Yes, sir.

20  Q    And there are some cords there.    What's the significance of

21       this particular photo?

22  A    Along with showing the office, it also showed something that

23       we learned was missing from the office.

24  Q    Taken from that area?

25  A    Yes, sir.

                            258

1   Q    There appears to be a cord dangling, too, with no end cap or a

2        connector of any type; is that accurate?

3   A    Yes, sir.

4                   MR. BROWER:   Exhibit 39.

5                   THE WITNESS:   And this is just another view of the

6        other wall in the office.

7   BY MR. BROWER:

8   Q    Appear to be cash drawers on that yellow shelf?

9   A    Yes, sir.

10                  MR. BROWER:   Exhibit 40.

11                  THE WITNESS:   This is the floor safe that is in the

12       back office area.

13  BY MR. BROWER:

14  Q    Two floor safes: one behind the cash register and one over

15       here?

16  A    Yes, sir.

17                  MR. BROWER:   Exhibit 41.

18                  THE WITNESS:   And then this is the safe after it

19       was opened, showing the contents.

20  BY MR. BROWER:

21  Q    Officer, previously you discussed and mentioned the keys that

22       where found in the front door.  I show you what has been

23       marked as People's exhibit 48 and ask if you recognize these.

24  A    Yes.   Based on the evidence tag on these, these are the keys

25       that were removed from the door by John Speicher (phonetic) on

259

1    that day.

2            MR. BROWER:    And I move for admission of People's

3    exhibit 48, your Honor.

4            MR. SVIKIS:    No objection.

5            THE COURT:    Received.

6  BY MR. BROWER:

7  Q   Exhibit number 49, Officer, would you please identify it.

8  A   These are the receipts from the cash registers showing what

9      time they had been activated on that day from both cash

10     registers one and two.

11           MR. BROWER:    Move for admission of People's

12   exhibit 49, your Honor.

13           MR. SVIKIS:    No objection.

14           THE COURT:    Received.

15 BY MR. BROWER:

16 Q   Officer, you've described what's depicted in each of these

17     photos.  You have been through all of those areas in that

18     building—or were on that day; is that correct?

19 A   Yes, sir, I was.

20 Q   Each of the aisles and all of the different rooms—back room,

21     bottle room, customer area, and office, correct?

22 A   Yes, sir.

23 Q   How would you describe the floor in that area, I mean as far

24     as cleanliness, debris, and that type of thing?

25 A   It was—It wasn't what you would call dirty; it was neat and

                                260

1    orderly, but it was—I mean it's an older building, and the

2    floors are not in the polished condition that you'd expect to

3    see in, you know, a lot of commercial buildings.

4  Q  Did you—You've already testified about the passive bleeding

5     around the victim's head.  Did you look for evidence of blood

6     in any other area of the building?

7  A  Yes, sir, I did.

8  Q  Including the customer area, I'll call it?

9  A  I did a visual search and—for, you know, any kind of trace

10    evidence that there might be, which would include blood also,

11    yes.

12 Q  Did you find any drops of blood or indication that blood had

13    been present in any other area of that floor?

14 A  No, sir, I did not.

15 Q  Any indication that the floor had been cleaned to wipe away

16    some substance?

17 A  No, sir, not at all.

18 Q  Based on the condition or quality of the—the flooring, do you

19    have an opinion as to whether or not you would have been able

20    to determine whether a particular area had been scrubbed to

21    remove blood?

22 A  It would have been obvious if that had been done, yes, sir.

23 Q  Was there any indication that had taken place?

24 A  No, sir, none whatsoever.

25 Q  Just to be clear, was there any indication in any other area

                              261

1    of the store—office, bottle room, customer area—any indication

2    of any other blood other than around the victim's head where

3    the body was found?

4   A   No, sir.

5   Q   Based on your training and experience, your qualifications as

6    an expert in blood—or in crime scene investigation and blood

7    spatter stain interpretation, do you have an opinion as to

8    whether or not this victim was lying or standing at the time

9    of the injury she sustained?

10   A   Because of the—the patterns on the back of the—on the exhibit

11    where—And you'll notice the bleeding pattern.  That is very

12    consistent with someone laying flat.  Because if you are in a

13    standing position and receive any type of an injury where

14    blood is coming to the surface—Gravity is one of the biggest

15    forces that acts on blood.  This, they're laying—it's laying

16    very flat.  It would have to be—The person would have had to

17    have either been in that position or possibly after the first

18    shot went down very, very quickly.

19   Q   Do you have an opinion as to what area of the building that

20    these injuries were sustained?

21   A   In the area where the victim was found.

22   Q   Right there in the back room?

23   A   Yes, sir.

24   Q   Not in any other part of the building?

25   A   No, sir.

1   Q   Are you indicating, sir, that she was shot exactly where the
2       body was found and in that position?
3   A   Yes, sir.
4               MR. BROWER:   I have no further questions of this
5       witness.
6               THE COURT:   Mr. Svikis?
7                       CROSS-EXAMINATION
8   BY MR. SVIKIS:
9   Q   Officer, in order for that last opinion to be correct, are you
10      saying that all four shots—two to the head and two to the
11      back—had to have been while she was lying down?
12  A   Either lying down or possibly one could have been when—while
13      she was standing, but in that area, yes.
14  Q   All right.   So it's your—it's your testimony that she could
15      have not—she could have not been shot either once in the head
16      or once in the back or twice in the back or three times or
17      four times somewhere else and moved as indicated in—
18              MR. SVIKIS:   Would you put number 32 on, please.
19  BY MR. SVIKIS:
20  Q   —and placed in—and placed in that position?
21  A   No, sir.
22              MR. SVIKIS:   I don't need that slide anymore.
23  BY MR. SVIKIS:
24  Q   So when you made this determination was it before or after
25      your search of the building?

                            263

1    A   After looking at the victim and looking at the evidence that

2        was not present in the victim, then it was—a decision was made

3        at that point based on both those observations—or lack

4        thereof.

5    Q   Now in that last exhibit you'd agree that most any person

6        could come to the conclusion that was blood coming from that

7        person, right?

8    A   Yes, sir.

9    Q   Now blood can also be in droplets?

10   A   Yes, sir.

11   Q   Microscopic?

12   A   Yes, sir.

13   Q   And what you did was a walk-around through the building which

14       would not have discovered any microscopic blood spatters

15       anywhere on the floor or the walls—Isn't that correct?—by—by

16       vision.

17   A   Well, with vision and also using a flashlight and also working

18       on my knees, yes.

19   Q   A regular flashlight that when the power goes out—that kind of

20       a flashlight?

21   A   No, sir, a rechargeable flashlight, which is a 100,000

22       candlepower flashlight.

23   Q   Are there not special lights that would detect fluids,

24       including blood?

25   A   A black light, yes, can in some cases.  It also picks up a

                              264

1     multitude of other substances, also.

2  Q  But in this particular case based on your walk-around you did

3     not go any further with this black light, so to speak, to look

4     anywhere else to shine that around, did you?

5  A  I did not; that's correct.

6  Q  You also picked up a cigarette butt; do you recall?

7  A  I don't recall at this time—

8  Q  Okay.

9  A  —no.

10 Q  You picked up a white plastic cup; do you recall that?

11 A  Specifically, no.

12 Q  Okay.  You were one of the lab techs that went back to the

13    training section—wherever that was—and had Mr. Mishall's

14    '85 four-door Ford; isn't that correct?

15 A  At this time I can't recall if I was or not.

16 Q  Do you have your report with you?  I mean, in other words,

17    you're the lab tech—

18 A  Yes.

19 Q  —right?

20 A  Uhm-hmm.

21 Q  You know they took Mr. Mishall's vehicle, right?

22 A  Yes, sir.

23 Q  Okay.  And does it make sense they would have taken it to you

24    to examine?

25 A  Well, what could have happened is it could have been done by

1    John Speicher (phonetic), also, who was also working—

2 Q  Okay.

3 A  —and I just—I just can't recall back if I had done the vehicle

4    or not.

5 Q  Are you aware that his vehicle was searched?

6 A  Yes, sir.

7 Q  And that Mr. Mishall's clothes were—the ones he was wearing

8    when they brought him to the station, those were taken and

9    searched, also?

10 A  That I'm not—I just can't recall that.

11 Q  Okay.  And you made note of the time and temperature when you

12    arrived that—Is it correct to say that it was cold and clear

13    and the temperatures were in the 30s?

14 A  Yes, sir.

15 Q  Now when you did this walk-around, wasn't there also a

16    walk-around with one of the employees of Minute Market when

17    you're looking at a particular—some old—what you believed to

18    be old damage, wondering if it was a bullet hole or not?  Do

19    you recall anything about that?

20 A  Yes, I do.  That was after the victim had been removed and—I

21    can't remember if he was the former manager, but he was an

22    employee of Minute Market and he advised us that that was a

23    old damage.

24 Q  Okay.  And that's how you—that's how you confirmed it?  You

25    did no independent investigation?

266

1  A    No.  It looked as if old damage, but we still wanted to make

2        sure.

3  Q    So you asked him?

4  A    Yes, sir.

5  Q    Do you recall any indication about any blood in the sink?

6  A    No, sir, I did not find any blood other than around the

7        victim.

8               MR. SVIKIS:   I have no further questions.

9               THE COURT:   Any redirect?

10                      REDIRECT EXAMINATION

11  BY MR. BROWER:

12  Q    Officer, you had no contact with Patrick Mishall personally,

13        correct?

14  A    No, sir, I have not.

15  Q    So whether clothing was taken and so on it had to have been

16        somebody else; it was not you?

17  A    That's correct.

18               MR. BROWER:   All right.

19               Nothing further, your Honor.

20               THE COURT:   Anything else?

21               MR. SVIKIS:   Nothing further.

22               THE COURT:   You can step down, sir.

23               MR. BROWER:   People call Dr. Joyce deJong to the

24        stand.

25               THE COURT:   You do solemnly swear or affirm the

                              267

1    testimony you're about to give shall be the truth, the whole
2    truth, and nothing but the truth, so help you God?
3                    MS. DEJONG:    I do.
4                          JOYCE DEJONG,
5    called at 11:21 a.m., and sworn by the Court, testified:
6                       DIRECT EXAMINATION
7  BY MR. BROWER:
8  Q  Dr. deJong, could you please state your name and spell your
9     last name for the record.
10 A  My name is Joyce deJong.  My last name is spelled d-e-capital
11    j-o-n-g.
12 Q  Ma'am, what is your occupation?
13 A  I'm a forensic pathologist.
14 Q  What is a forensic pathologist?
15 A  A forensic pathologist is, first of all, a physician; so I've
16    gone through undergraduate and medical school and then had
17    additional training in general pathology followed by
18    subspecialty training in the field of forensic pathology.
19         In forensic pathology, primarily, what we do is
20    investigate deaths.  Deaths are reported to the medical
21    examiner that are—Deaths that are sudden and unexpected
22    generally are reported to the medical examiner, and we then in
23    most cases do an autopsy.  That's our major diagnostic tool,
24    but we'll also gather other information in order to determine
25    the cause of death—meaning what is it that actually happened

                              268

1    that caused the person's death and the manner of death.  And
2    the manner of death can be homicide, suicide, accident,
3    natural, or undetermined.
4  Q  Ma'am, in addition to your undergraduate and medical training,
5    is there other training that you undergo in the area of
6    pathology—in particular, forensic pathology?  Are there
7    classes?
8  A  Like I mentioned there is a—after medical school there is a
9    residency—That's a five-year program.—followed by a one year
10   fellowship, which is in addition to a residency in the field
11   of forensic pathology.
12 Q  How long have you been doing forensic pathology work?
13 A  I've been doing it since 1996.  Part of that overlaps with
14   some of my training, but primarily since 1996.  I actually
15   completed all of my training in 1999.
16        I currently serve as the medical director of
17   forensic pathology at Sparrow Hospital in Lansing where we
18   serve about 14 different counties doing the medical examiner
19   autopsies there.
20        I'm the chief medical examiner for Muskegon County
21   and for Allegan County and a deputy medical examiner for
22   Shiawassee County.
23 Q  Ma'am, have you been—previously been qualified as an expert in
24   the area of forensic pathology?
25 A  Yes.

269

1  Q    How many times have you been qualified as testified?

2  A    I don't have an accurate number, but probably somewhere around

3       75 to 100.

4                MR. BROWER:    Your Honor, at this time I'd ask that

5       Dr. deJong be declared an expert in the area of forensic

6       pathology.

7                MR. SVIKIS:    No objection.

8                THE COURT:    So ordered then.

9  BY MR. BROWER:

10 Q    Ma'am, in conducting these autopsies the end result is you're

11      rendering an opinion regarding the cause and manner of death;

12      is that correct?

13 A    Yes.

14 Q    On occasions you are required to render opinions regarding

15      cause and manner of death based on information other than your

16      own autopsies; is that correct?  In particular, I'm talking

17      about reviewing maybe a deceased physician's report, reviewing

18      case photographs, considering all of that information and

19      rendering an opinion?

20 A    That's correct.

21 Q    You've done that particular procedure previously as well,

22      correct?

23 A    In addition to this case, yes.

24 Q    Are you familiar with Dr. Harvey Wilkes?

25 A    Yes.

270

1  Q   Your—Is it your understanding that he was a forensic

2      pathologist here in Kalamazoo County, and are you familiar

3      with his work?

4  A   Yes, I am.

5  Q   I show you, ma'am, exhibit number—if I can find it—

6              MR. BROWER:   Is the autopsy report up here?

7              THE WITNESS:   I have a copy.

8  BY MR. BROWER:

9  Q   You have a copy of the autopsy report?

10 A   Yes.

11 Q   Conducted by Harvey Wilkes on February 9 of 1991; is that

12     correct?

13 A   That is correct.

14 Q   I'm going to also show you—

15             MR. BROWER:   Well, if you could put it up on the

16     screen.   That would be—First exhibits number 42 and then

17     number 43, 44, 45, and 46.

18 BY MR. BROWER:

19 Q   You've seen these photographs previously—Is that

20     correct?—Doctor?

21 A   Yes, sir, I have.

22 Q   Doctor, I'm going to have you please describe the significance

23     of what you found in these particular photographs—42, 43, 44,

24     45, and 46.   You've—Please describe what's depicted in each of

25     the photographs.   They'll be up on the board, too—

                              271

1  A  Certainly.

2  Q  —but if you can take a look at this and please describe for us

3     the significance of this photograph.

4  A  For the record, I'm going to refer to the—

5  Q  All right.  Go ahead.

6  A  —autopsy report, if that's okay.  All right.

7            This is a photograph of the back of

8     Chris—reportedly, of Chris Dimmick.  These were identified to

9     me when I saw them as photographs from the autopsy of

10    Chris Dimmick that occurred on February 9 of 1991.

11           And what we're looking at here—Is there a pointer

12    or—

13 Q  Yes, there is.  I don't have a laser pointer, though.

14 A  Oh, okay.  Well—

15 Q  You may step from the—

16 A  If that's all right.

17 Q  —stand with the Court's permission.

18 A  What we're looking at here are two gunshot wounds of the back.

19    Just for orientation purposes, the head would be up here and

20    the feet down at this end.

21           And there are two gunshot wounds here of the back.

22    This one—just for measurement purposes—which is sort of

23    standard was 17 inches from the top of the head and from here

24    was 21 inches from the top of the head according to

25    Dr. Wilkes.

272

1        And what—The other thing that we're seeing here

2  around both of the entry wounds—which is the darker circle in

3  the center—are rings of soot, which is black smoke.

4        When a gun is fired more than just a bullet comes

5  out of the end of the barrel. Other things like powder and

6  soot—which is a smokey, black residue—also come out of the end

7  of the barrel. And that's one of the ways we can—by using

8  that information—determine how far the end of the barrel was

9  from the person or from whatever it is that was shot. And in

10  this case we used the rim of soot around there.

11        When we see just the soot without the powder—The

12  powder would look like little tiny red dots all over—which are

13  not there in any significance—that gives us an idea of the

14  range of fire in both of these cases to the back as being—as

15  Dr. Wilkes described and, also, as I agree—being close range;

16  and one of them even—I believe that it is the top one

17  here.—was a little—there was a little bit of a muzzle imprint,

18  which means it wasn't the tight contact, but there is—it was

19  right up close to the skin. So we're talking within—within

20  probably less than half an inch of these—these were fired into

21  the—into the body.

22        The top one here as he followed it through it went

23  through the vertebral column—

24  Q  What is that?

25  A  The vertebral column—I'm sorry.—is the backbone. So it went

273

1    through there and through the aorta, which is the major blood
2    vessel that comes from the heart.  It's an artery.  And then
3    the bullet was found lodged in the left lung.
4           The second gunshot wound went through the third
5    lumbar vertebrae—which is, again, part of the backbone—and
6    lodged in a muscle near the back.
7           MR. BROWER:  Exhibit number 43, please.
8           THE WITNESS:  These are just close-ups again.  This
9    is the one—If we're looking at direction would be higher—
10          Could you back up once.
11          MR. BROWER:  Yes.
12          THE WITNESS:  I just want to make sure I'm not
13   speaking wrong.
14          Okay.  Go ahead.
15          This is the one that was higher, and you can
16   actually eye or see this little mark.  That's the—a little bit
17   of a muzzle imprint, meaning that this one was a little bit
18   closer to the skin when this happened.  Because gases blow in,
19   the skin will sort of slap back up against the end of the
20   barrel.  But there is a mark there and there's some of this
21   dark soot.  And this, again, is the other entry wound with the
22   muzzle—no muzzle imprint, just a hole and then some black soot
23   around there.  Both of them, again, indicating that the weapon
24   was very close to the body.
25          MR. BROWER:  Exhibit 44.

274

(Tape No. B2004-034, 6-15-04, 11:30)

1         THE WITNESS:   This is the back of the head where

2   just—The hair has been shaved. All right.  So this is above

3   the hairline right—And I'm pointing to the top of—Think of the

4   nape of your neck on the back of your head—right there.  Some

5   of the hair has been shaved away so that they could be more

6   easily visualized—visualized.

7         And, again, there are two entry wounds here.  One of

8   them was four and a half inches from the top of the head, and

9   the other one five inches from the top of the head.  They—They

10   both, again, also have some of this black sooty material

11   around them and kind of in the superficial or the most close

12   to the surface of the entry wound.

13         In both of these cases they—the bullets went through

14   the skin, through the bone in the back—which is the occipital

15   bone—and one of them ended up in the frontal bone on the left.

16   The frontal bone's basically the forehead.  And the other one

17   was in the brain on the right.

18         MR. BROWER:   Exhibit 45.

19         THE WITNESS:   And this just shows—This is an X ray

20   showing from the side.  You can—You can see teeth there, and

21   that gives you some orientation.  And, basically, what we're

22   seeing here are two bullets—the two bullets that were—that, I

23   believe, have been recovered and handed over to law

24   enforcement—in the head here.

25         MR. BROWER:   Exhibit 46.

275

1    THE WITNESS:    This is the forehead.  And this one

2    would have been—There was a defect or a fracture injury to the

3    frontal bone—which is the forehead.  And there was a lot of

4    bruising but, also, it appears some scraping on the surface

5    here.

6    This—Had the bullet exited, this is where it would

7    have gone; but it didn't exit, it stayed inside the head.  But

8    it creates a mark on the skin there.  That mark isn't

9    commonly—That wouldn't commonly occur if the head wasn't in

10   contact with something.  And in Dr. Wilkes' opinion—And I

11   agree with what he's saying here.—this means that the head was

12   up against a surface—a firm surface when the—when the bullet

13   was fired.  Based on the information that was given with the

14   body when it was found being face down, that was probably the

15   position that the body was in—In my opinion, that was the

16   position the body was in when the—one of the bullets, at

17   least, was fired to the back of the head.

18   Both of the bullets to the head went through the

19   brainstem in the back, which is a very vital part of the—of

20   the brain.   . . . (inaudible) I mean some parts of the brain

21   are more vital than others; but damage to that part of the

22   brain, in essence, causes immediate death.

23   MR. BROWER:    Thank you, Doctor.  You can return to

24   your seat.

25

276

1   BY MR. BROWER:

2   Q    You also observed some crime scene photographs—photographs

3        taken at the crime scene, not photographs simply of the

4        autopsy itself, correct?

5   A    That's correct.

6                  MR. BROWER:   Exhibit number 31, please.

7                  Exhibit number 32.

8                  Exhibit number 33.

9   BY MR. BROWER:

10  Q    These were among the photographs that you witnessed or—Excuse

11       me.—reviewed previously prior to your testimony; is that

12       correct?

13  A    Yes.

14  Q    Do you have—Well, let me get to the bottom line here first.

15       Do you have an opinion as to both the cause and manner of

16       death in this case?

17  A    The cause of death in this case is multiple gunshot wounds.

18  Q    And the manner of death?

19  A    The manner of death is homicide.

20  Q    You've seen the photographs—

21                 MR. BROWER:   Can we go back to 31, please.

22  BY MR. BROWER:

23  Q    —based on your observations and the injuries, do you have an

24       opinion as to where these fatal shots causing her death

25       occurred or in what position she would have been in at the

                                    277

1     time of . . . (inaudible)?

2  A   The injuries—at least one of the gunshot wounds of the head

3      occurred with her face down and, in all likelihood, in the

4      position she's found. Because they're so close I can't say

5      for sure that another one didn't happen and then she fell, but

6      there were no injuries consistent with a fall. We actually

7      wouldn't see a bruise on the forehead like that. There's

8      another pattern of injury that one would sustain. So in my

9      opinion, unless she was helped down and then a second gunshot

10     wound to the head occurred, I think she was face down for both

11     of the gunshot wounds of the head.

12            The gunshot wounds that occurred to the back—She

13     could have been standing up. All I can tell you about those,

14     really, are that she wasn't lying on her back when she

15     received them. She could have been—She could have been

16     standing up; she could have been on all fours. But that area

17     of the body had to be exposed. Those wouldn't be

18     injuries—although they would hurt and she would collapse quite

19     suddenly, especially with the one that goes through the

20     aorta—but they wouldn't cause an immediate drop like they—like

21     the head wounds would.

22 Q   The—

23            MR. BROWER:    Exhibit number—

24 BY MR. BROWER:

25 Q   Well, you can see it on this photograph as well. One of the

                                278

1       back shots—wounds to the back—resulted in severance of which

2       major vessel, did you talk about?

3 A   The aorta.

4 Q   All right. And did that result in copious amounts of blood—

5 A   Yes.

6 Q   —loss?

7 A   That would bleed a great amount. There was a—I hadn't

8       mentioned that before. I believe there was 1500 milliliters

9       of blood in the chest, which that'd be one and a half liters.

10      If you can think of a liter of pop or something, it's one and

11      a half liters of blood in the chest. But there's also—with

12      those, there would be significant external bleeding, also.

13 Q   Do you have an opinion considering all of the circumstances,

14      including the blood flow, the amount of blood—the amount of

15      blood inside the body—and the head injuries as to the timing

16      of these four shots?

17 A   Maybe you could be more specific on that—

18 Q   I'll try.

19 A   —question.

20 Q   Do you have an opinion as to whether the—the shots that you've

21      just described and testified to would have occurred in this

22      vicinity where she—her body was found, or whether it's likely

23      that any of them could have been—occurred in another part of

24      the building only to have been brought into this area?

25 A   The information that I saw that was presented to me was that

1   there wasn't blood anywhere else in the—in the convenience
2   store; that the blood was confined to this area.  It was more
3   of a pooling type—a big pool of blood there.  Because these
4   wounds do bleed—And the head wounds also bleed a great
5   amount.—if she had been moved there would be blood from where
6   the shots occurred to where she ultimately ended up.  So, you
7   know, could someone theoretically have cleaned it—And I don't
8   know all the time factors entirely; but, basically, she's
9   going to bleed where she's shot.

10  Q   A person with these kinds of injuries—I believe it's probably
11      more than obvious, but I'm still going to ask the question.
12      Is there any possibility that somebody with that kind of wound
13      could have walked anywhere, or would she had to have been
14      carried from one spot to another?

15  A   Are we talking about all four of them?

16  Q   Well, yes.

17  A   Okay.  I mean if she's—If she has sustained all four gunshot
18      wounds, she couldn't walk.

19  Q   And many of these injuries—or all of them—would result in
20      blood loss if somebody was being carried—Correct?—

21  A   Yes.

22  Q   —from another area of the store?  There would have been some
23      sort of bleeding—You would expect to have seen some sort of
24      blood loss or sign of blood trail in other areas if she had
25      been moved?

                                280

1  A    There would be, yes, blood.

2            MR. BROWER:    I have nothing further of this

3       witness.

4                      CROSS-EXAMINATION

5  BY MR. SVIKIS:

6  Q    Doctor, you've testified and we've all pretty much seen that

7       there were—that there were four shots, correct?

8  A    Yes, four gunshot wounds.

9  Q    You have no way of telling what the sequence was, do you—one,

10      two, three, four?

11 A    No.

12 Q    However, looking at the gunshot wounds would it be correct to

13      say that three of the four would have been fatal?

14 A    One of the gunshot wounds—when we follow the path—ends up—it

15      goes into the skin, hits the third lumbar vertebrae down in

16      the lower back.  It does not—There's no record of it in the—in

17      the reports of it hitting the spinal cord, so that would—that

18      wouldn't be affected; and it lodges in a muscle.  That's

19      probably the least concerning of all.  Could it potentially be

20      fatal?  At some point with an infection or something like

21      that, certainly.  And that's assuming it didn't hit the spinal

22      cord.

23 Q    And are you—are you saying or not saying that one of the shots

24      that would have resulted in death could not have occurred

25      anywhere else in the store and three occurred when she was

                              281

1      lying down?

2  A  Could one have occurred elsewhere?

3  Q  One of the shots causing—Three could cause death; is—can we

4      establish that or not?

5  A  Yes.

6  Q  Okay.  One of those shots causing death could have been just

7      as likely taken place somewhere else in the store or not based

8      upon what you've seen here?

9  A  Because, in my opinion, if—if it occurred somewhere else in

10     the store, is it possible that she could have been shot

11     elsewhere and moved.  But if—or even moved of her own volition

12     if she just gets one to the back.  Although possible, there

13     would be a blood trail.

14  Q  All right.  But—But upon the contact wound immediately

15     shooting there wouldn't be a blood trail, would there?

16  A  There's immediately some blowback and bleeding's going to

17     occur fairly rapidly.

18  Q  Exactly.  So this blowback would go back to the individual

19     that would have pulled the trigger in all likelihood, correct?

20  A  In general, that's the direction—

21  Q  Okay.

22  A  —that I understand.  I'm just going to clarify that I'm not a

23     firearms expert in those—

24  Q  Okay.

25  A  So if there is firearms testimony, I defer to them.

1  Q  Sure.  We'll let—Okay.

2           But you know from your experience as a—and schooling

3     that on a gunshot wound it can produce droplets of blood.  If

4     it's from a distance it can produce droplets of blood going in

5     other directions.  From here to ten feet or whatever, there

6     could be blood spatter going out or forward.

7  A  It can go in different directions, yes.

8  Q  That's right.

9           And if there's a contact wound—It's the same term

10    that you used a moment ago.—there can be a blowback

11    effect—Isn't that correct?—of the blood?

12 A  There can be, yes.

13 Q  Okay.  And you've reviewed Dr. Wilkes report and you, in

14    essence agree with his findings and conclusions; isn't that

15    correct?

16 A  In general.

17 Q  Yes.  And the conclusion that he arrives at there's no

18    evidence of physical altercation between the victim and the

19    assailant is not noted.  The manner of death is homicide; and

20    you have no quarrel with that, correct?

21 A  Right.  I think what he's getting at—what Dr. Wilkes—if I may

22    interpret—is saying that there was no evidence of a struggle.

23    There were no defense wounds or other injuries to suggest that

24    there was a struggle.

25           MR. SVIKIS:   Thank you very much.

                          283

1              MR. BROWER:    No redirect.

2              THE COURT:    You can step down.  Thank you, ma'am.

3              MR. BROWER:    Next, Michael Burritt, your Honor.

4              THE COURT:    You do solemnly swear or affirm the

5       statements you're about to make shall be the truth, the whole

6       truth, and nothing but the truth, so help you God?

7              MR. BURRITT:    . . . (inaudible)

8                      STUART MICHAEL BURRITT,

9       called at 11:44 a.m., and sworn by the Court, testified:

10                      DIRECT EXAMINATION

11      BY MR. BROWER:

12   Q   Mr. Burritt, would you please state your full name and spell

13      your last name for the record.

14   A   Yes.  My name is Stuart Michael Burritt.  The spelling of my

15      first name is S-t-u-a-r-t.  Last name spelling is B, as in

16      boy—u-r-r-i-t-t.

17   Q   Sir, you're presently retired from the Michigan State Police;

18      is that correct?

19   A   That is correct.

20   Q   What did you do as a Michigan state trooper?

21   A   Well, for the past—I retired in October of 2003.  And prior to

22      that for a little over 22 years I was employed by the state

23      police, specifically assigned to the forensic science

24      division.

25   Q   Where did you operate out of, sir?

                              284

1  A    I worked at a number of different laboratories during my
2       service with the state police, first one being at the
3       Bridgeport laboratory located in the Saginaw area; second
4       laboratory that I worked with was the Grand Rapids laboratory;
5       and the final place that I worked and retired out of was the
6       laboratory located in Lansing, Michigan.
7  Q    What did you do in that position and those locations?
8  A    In all those locations?  With respect to the Bridgeport
9       laboratory, I was a latent fingerprint examiner for
10      approximately four years.  I subsequently transferred to the
11      firearms, toolmark, and explosive unit about—I think it was
12      May of 1985.
13           Shortly after that I transferred to the Grand Rapids
14      laboratory and worked as a firearms examiner until 1997.
15           1997 I took a promotion to—as a unit supervisor to
16      the firearms, toolmark, and explosive unit in the Lansing
17      laboratory.
18           1998 I had another promotion as the firearms
19      coordinator position, which is the leading firearms examiner
20      for the firearms units in the state laboratory system.
21           And then in April of 2003 I had another promotion to
22      the inspector's position, and I was the assistant commander of
23      the forensic science division.
24  Q   Sir, in regard to firearms work that you did what type of
25      examinations were you conducting?

285

1  A   With respect to the firearms portion of my work it was

2      primar—primarily analytical in nature, which means that I

3      compared and examined fired bullets, fired cartridge cases,

4      firearms in general, and made comparisons between

5      firearms-related evidence that was collected at scenes and

6      compared them with test shots from—from firearms that were

7      submitted for analysis.

8          In addition to that another type of analysis that

9      was conducted at the laboratory was to restore serial numbers

10     on firearms that had been—where the number had been

11     obliterated or removed.  That was one of the types of

12     examinations.

13         One of the other types of examination was to analyze

14     gunshot residue that is often found on clothing.

15         And then another aspect of firearms examination was

16     toolmark examinations where toolmarks are left at scenes where

17     we would compare the tool that is recovered to the marks that

18     are left at a crime scene for generally breaking and entering

19     or safe jobs or something of that nature.

20         In addition to that I played a major role in crime

21     scene investigation work, primarily homicide crime scenes;

22     shooting scene reconstruction work.

23         And in addition to that, I also testify in court and

24     write reports as to the results of my analysis in the

25     laboratory.

                                286

1    Q    Have you been previously qualified to testify as a forensic

2       crime scene investigator and firearms forensic evaluations?

3    A    On many occasions.

4    Q    Approximate numbers and in what areas or—Excuse me.—what

5       courts?

6    A    I would say several hundred times I've been—I have testified

7       in court as to the results of analytical work in the

8       laboratory. I probably testified close to 200 times in crime

9       scene reconstruction in shooting-related scenes, probably

10      tested [sic] maybe 50 times on toolmark-related cases both at

11      state and federal courts.

12            MR. BROWER: Your Honor, at this time I'd move to

13      have Mr. Burritt qualified as an expert in forensic crime

14      scene evaluation and firearms evaluation—

15            MR. SVIKIS: No objection.

16            MR. BROWER: —and examination.

17            THE COURT: So recognized.

18 BY MR. BROWER:

19    Q    Sir, in your capacity with the Michigan State Police crime

20       lab, did you become aware of a homicide that had occurred in

21       Kalamazoo County on February 8 of 1991?

22    A    I wouldn't specifically know the date, sir. It would be

23       related to a laboratory report that was close to that date and

24       time, yes.

25    Q    Listing the victim's name?