1  A   That's correct.

2  Q   Chris Dimmick?

3  A   That is correct.  I am aware of that case.

4  Q   Were you asked to conduct a review of some fired lead bullets

5     that were recovered during the autopsy of Ms. Dimmick?

6  A   Yes, that is correct.

7  Q   I show you what has now been admitted as exhibit number 55 and

8     ask if you—if these are the items that you examined at the

9     request of Kalamazoo Department of Public Safety?

10 A   Yes, they do appear to be those items that I examined.

11 Q   What did you determine or what was your conclusion regarding

12    these fired lead bullets?  How would you characterize them or

13    describe them?

14 A   With respect to the fired lead bullets that are contained—

15           This is a proposed exhibit, or is this an exhibit?

16 Q   It's been admitted as an exhibit.

17 A   —People's exhibit number 55, a specific type of analysis

18    was—was requested, primarily for the classification of a fired

19    bullet.  And essentially what that means is to determine what

20    the caliber of weapon these bullets might have been fired in.

21    And that was the type of analysis that I provided with respect

22    to this exhibit.

23 Q   Were you able to determine the caliber of the weapon based on

24    a review of these fired lead bullets?

25 A   Yes, I was.

1  Q  And what was that?

2  A  These fired bullets are characteristic of a .357 or a

3     .38 Special caliber fired lead bullet.

4  Q  Now actually the size of the barrel of a weapon that would

5     fire these bullets is very similar; is that correct?

6  A  Between a .357 and a .38 Special they are the same, yes.

7  Q  What is the difference, then, between a .38 fired round and a

8     .357 fired round?

9  A  When describing the two different rounds or the ammunition,

10    the .38 Special caliber round is a shorter cartridge case.

11    That means the case that contains the bullet, the gunpowder

12    and the primer is—is shorter than the .357. And there's some

13    ballistic differences with the two shells as well.

14 Q  The unfired bullet of a .357 will actually stand taller

15    setting upright?

16 A  That is correct.

17 Q  More powder, bigger casing?

18 A  That is correct.

19 Q  Okay. And you wouldn't be able to determine whether it had

20    been a .38 or a .357 just by looking at the lead that comes

21    out at the end?

22 A  That's correct. Once a bullet has been removed from either a

23    .357 or a .38 Special, they are the same size.

24 Q  When a—the lead bullet—the end of this round—at time of

25    discharge travels through the barrel before it's expelled,

289

1  there are some markings that you would anticipate that could

2  be on this fired lead bullet, markings caused by the inside of

3  the barrel itself; is that correct?

4 A That is correct.

5 Q What are those markings called?

6 A The markings that the prosecutor is referring to are, in our

7  vernacular, called striated marks.  They're microscopic in

8  nature and occur due to the manufacturing process of the

9  barrel.

10 Q There's been a term that's—I've heard before—lands and

11  grooves?

12 A That is correct as well.

13 Q That's the striations that you're talking about?

14 A No.

15 Q No?

16 A Lands and grooves is another aspect of the marks that occur on

17  fired bullets as they travel down a barrel.  During the

18  manufacturing process of a—of a firearm barrel, there's

19  a—there's a lot of tooling or cutting that occurs.  And lands

20  and grooves are—are cuts or depressions—the land being the

21  raised area, the groove being the—the lower grooved area of

22  the barrel.  And metal is removed away from the grooved area

23  of the barrel, if you will.  And these lands and grooves are

24  cut into a barrel because it provides stability for the bullet

25  as it exits and flies down range.  So it's referred to as a

1      rifled barrel, meaning it has lands and grooves.

2  Q   If you were to look down the end of a barrel it appears as

3      though there's a spiral descending down into the gun from the

4      end, correct?

5  A   That is correct.  They're cut in a spiral fashion either right

6      or left directional.

7  Q   Do different manufacturers have different numbers of grooves

8      and lands?

9  A   Yes, they do.

10 Q   And there's a difference you just mentioned about sometimes

11     there are right twists and sometimes there's a left twist?

12 A   That is correct.

13 Q   Is the number of lands and grooves and with a right or left

14     twist something that you would use in determining a make or

15     model of a particular firearm that that fired bullet had come

16     through?

17 A   That is correct.  We use the number of lands and grooves and

18     the direction of twist to help us determine what potential

19     list of firearms may have discharged a bullet if we do not

20     have the firearm.

21 Q   In examining these fired lead bullets were you able to

22     determine the number of lands and grooves or a possible make

23     of weapon that it had been fired from?

24 A   Yes, I did.

25 Q   And what was that?

1  A  My examination revealed that these fired lead bullets in

2  People's exhibit number 55 were six lands and grooves with a

3  left-hand twist.

4  Q  What kinds of manufacturers would that comport with?

5  A  Primarily Colt.

6  Q  Okay.  Now we've all seen on TV comparison microscopes where

7  they put two rounds together and say, oh, yep, they match.

8  What is happening when that occurs and what is the—

9  A  Well, the—

10  Q  —is being depicted?

11  A  —the verbal picture that you drew there, essentially, is the

12  type of examination that is provided in a laboratory setting

13  using a microscope because I said the marks that—that are

14  specific to a firearm are—are microscopic in nature.  That

15  means that you can look at a bullet, you'll see the lands and

16  grooves; but the striated marks which allow us to identify a

17  fired bullet back to a specific firearm are microscopic in

18  nature.

19        So a comparison microscope is used to examine two

20  samples, if you will.  One example or exemplar of a fired

21  bullet is placed on one stage of the microscope; a second one

22  that you want to compare to the first bullet is placed on a

23  second stage on the opposite side, and there's a—a bridge that

24  connects the two sights together, which allows you to examine

25  two fired bullets simultaneously.  And in that process you're

292

1    looking for an agreement between the striated marks on the two
2    bullets.

3         When there's a sufficient agreement between the
4    striated marks on both bullets, then it allows an examiner—one
5    that is trained and experienced—to render an opinion as to
6    whether or not the two bullets were fired either from a common
7    firearm; or, in the case where you have the firearm in hand,
8    you take test shots.  You can compare that the evidence bullet
9    that may be removed from a victim and compare them to the test
10   shots of the—of the firearm that you receive from the
11   investigator and—and deliver an opinion as to whether or not
12   that firearm may have discharged that suspect bullet.

13 Q Were the fired lead bullets that were recovered during the
14   autopsy and that you examined of such a quality that would
15   have permitted that kind of comparison of any weapon obtained
16   in the future?

17 A No.  In my opinion these—these fired lead bullets were very
18   poor condition for comparison purposes.

19 Q And would not have been useful for comparing with a weapon,
20   for instance, that was found in the future?

21 A Well, I don't necessarily like to say it that way.  There's
22   always a possibility that even as poor as these bullets are
23   that it could at some point in time been compared and an
24   identification could have been made, but there was sufficient
25   damage to the surface area of the bullet—which means that's

293

1        the area that comes in contact with the barrel—that they—I

2        could not inner-compare the bullets and identify them as

3        coming from a common firearm.  And so consequently when I

4        can't do that it suggests that they are poor quality, that I

5        may not be able to identify it even if the right firearm was

6        submitted for comparison.

7  Q  Sir, when a weapon is discharged it—certain gases and other

8        substances are expelled from the barrel; is that correct?

9  A  That is correct.

10  Q  And what type of substances are those and why do they occur?

11  A  This is referred to as gunshot residue.  It is very common

12        materials that are found.  Primarily, it's vaporous lead.

13        There would be partially burned particles of gun powder.

14        There will be particulate lead that strips off the bullet.

15        And sometimes there is types of bullet oils or—or greases or

16        lubricants on the bullet that will also be emitted from the

17        barrel as the bullet travels downrange.

18  Q  Now these substances that you've just described would be

19        ejected from the barrel in what direction?

20  A  Generally they're—they're going to travel in the same

21        direction as the bullet.

22  Q  And so you would expect them—gunshot residue, for instance—to

23        be down and away from the end of the barrel?

24  A  That's correct.

25  Q  Would you routinely expect to find any evidence of gunshot

```
 1        residue on the person that's firing the shot?
 2  A     No.  But, again, it would depend on how the person had the
 3        firearm in orientation to their body when they were firing it.
 4  Q     For instance, if they had their hand back and part of their
 5        arm was forward—They shot past their own hand.—you might
 6        expect to see some on their clothing?
 7  A     That's correct.
 8  Q     All right.
 9  A     That would be a condition that you may find some
10        firearm-related evidence.
11  Q     So part of their body would have had to have been forward of
12        the barrel?
13  A     Yes.  And there is some discharge of materials that exit out
14        towards the back side of the weapon as well.
15  Q     Certain items of clothing were forwarded to you for
16        examination as—as well—Is that correct?—as part of this case?
17  A     That is correct.
18              THE COURT:  Why don't we—It's—It's nearly noon
19        or—Depending on which clock you look at it is noon.
20              So I think it would be appropriate before we get
21        into that to—to recess.  Let's all be back here in the
22        courtroom and ready to go by 1:30.
23              MR. BROWER:  Thank you, your Honor.
24              (At 12:01 p.m., court recessed)
25              (At 1:33 p.m., proceedings reconvened)
```

1    MR. BROWER:   Your Honor, the People will recall

2    Michael Burritt.

3              DIRECT EXAMINATION (cont.)

4  BY MR. BROWER:

5  Q   Mr. Burritt, you're still under oath.

6  A   Yes.

7  Q   Mr. Burritt, we last left off talking about the gunshot

8      residue and the gases and substances that are emitted from the

9      end of the weapon at the time of firing. I want to continue

10     on from there and—and show you what have been marked as

11     People's exhibits 51 through 54 and ask if you recognize these

12     items.

13 A   Yes, I can recognize all these items.

14 Q   What are these items, sir?

15 A   Those are the items of clothing that were submitted to the

16     firearms unit in the Grand Rapids laboratory for examination

17     purposes.

18 Q   Exhibit number 51 being a sweatshirt, victim's or—Excuse

19     me.—52 T-shirt, 53 sweatpants, and 54 a pair of canvas shoes;

20     is that correct?

21 A   That is correct.

22 Q   And those were submitted to you by the Kalamazoo Department of

23     Public Safety to check for gunshot residue and other

24     firearms-related damage; is that correct?

25 A   They originated from Kalamazoo, but I—they actually had

                              296

1   entered into the laboratory to another unit which, in turn,

2   after their analysis turned them over to me.

3   Q   And you did inspect this clothing for the types of things I

4       just mentioned—gunshot residue and firearms-related damage; is

5       that right?

6   A   That is correct.

7   Q   Was your understanding that this was a Patrick—clothing

8       belonging to a Patrick Mishall?

9   A   I don't know whose clothing it was, but—And so I can't say

10      whose exactly they were.

11  Q   All right.  The tag on each of these items includes a line

12      described as taken from and there's a name printed there.

13  A   Yes, there is a name.

14  Q   And what is the name?

15  A   Patrick Mishall.

16  Q   Okay.  For the sake of your testimony at this time, assuming

17      that this was the suspected shooter's clothing, would you

18      expect that there had been gunshot residue on the clothing

19      based on your description about the—the direction—

20  A   Generally—

21  Q   —the distances?

22  A   Generally, you would not find gunshot residue on a shooter's

23      clothing.

24  Q   In fact, the—Well, tell us.  After the inspection did you find

25      gunshot residue on any of this clothing?

1  A    No, I did not.

2  Q    Did that surprise you?

3  A    No, it does not.

4  Q    In fact, how would you characterize the likelihood of finding

5       gunshot residue on a shooter's clothing—the frequency or—

6  A    It'd probably be—

7  Q    —the likelihood?

8  A    —very rare to see gunshot residue on the clothing of a

9       shooter.

10 Q    If there is gunshot residue to be found, where would it likely

11      be found or more often than on the clothing?

12 A    More often than not, gunshot residue would potentially be

13      present on the hands of a shooter as opposed to being

14      deposited on the clothing.

15 Q    And that fact would be true simply because what?

16 A    Well, there's a certain amount—As I discussed earlier, there's

17      a certain amount of gunshot residue which—which flows

18      rearward—rearward of the barrel of the weapon as well as

19      there's gunshot residue present on firearms; so if they're

20      handled, oftentimes gunshot residue will be deposited on the

21      hand.

22 Q    There are—Other than the opening in the barrel, there are

23      different openings—maybe in the revolver portion or even on a

24      semiautomatic weapon opening where gases could escape and

25      residue could come out and be deposited on the hands?

1   A   That is correct.

2   Q   But not ejected forcefully as would be maybe ejected from the

3       barrel at the time of firing and going out in the direction of

4       the fired round?

5   A   That would be a way of characterizing it, yes.

6   Q   Now the gunshot residue that might be deposited—potentially so

7       or occasionally—on the hands of a person shooting a weapon, is

8       that something that, you know, would be there for long periods

9       of time, or would it be easily removed?

10   A   One would not expect the deposition of gunshot residue on an

11       individual's hands after they fired a weapon for any long-term

12       periods of time primarily based because it's a—it's a very

13       fine—what is referred to as a trace evidence, which means it's

14       very, very fine particulate matter. Therefore, you wouldn't

15       necessarily expect it after potentially hours—And I mean a

16       couple hours.—after an event that someone shoots.

17             And that's primarily because people do things with

18       their hands; oftentimes, washing them or putting them in

19       contact with other pieces or articles of clothing has

20       tendencies to wipe off this trace-type evidence.

21   Q   You mentioned washing the hands. Taking a shower after

22       shooting a firearm, would that be something that would cause

23       you to believe that there will—there would not be or less

24       likely to be any sign of gunshot residue on the hands?

25   A   Yes, it would be less likely that you would find any—any

(Tape No. B2004-034, 6-15-04, 13:40)

1  residue after washing or taking a shower.

2  MR. BROWER: Your Honor, I'd move for admission of

3  People's exhibits 51 through 54.

4  MR. SVIKIS: No objection.

5  THE COURT: Received.

6  MR. BROWER: Nothing further of this witness.

7  THE COURT: Mr. Svikis?

8  MR. SVIKIS: Thank you.

9  CROSS-EXAMINATION

10  BY MR. SVIKIS:

11  Q  Officer—Is it Burritt?

12  A  That's correct, Burritt.

13  Q  Burritt?

14  A  Yes.

15  Q  Do you have the copies of the tests you conducted on any of

16  those items for gunshot residue?

17  A  I have some notes that I documented on the types of tests,

18  yes.

19  Q  Okay. Have you turned those notes over to the prosecution?

20  A  No, sir, I have not.

21  Q  And do you have those notes with you?

22  A  Yes, sir, I do.

23  MR. SVIKIS: Your Honor, may we approach a minute?

24  THE COURT: Sure.

25  (At 1:42 p.m., bench conference)

1  BY MR. SVIKIS:

2  Q  Officer, what—what tests did you conduct on the—Well, first of

3     all, did you conduct a test on People's exhibit number two

4     [*sic*]?

5  A  Visual examination.

6  Q  Visual.

7  A  Yes.

8  Q  For gunshot residue?

9  A  That is correct.

10  Q  And blowback?

11  A  Primarily what we're looking for in this type of an

12     examination would be gunpowder residue.

13  Q  Okay.  And exhibit—exhibit 54, visual again?

14  A  That's correct.

15  Q  And exhibit—Well, all—All the exhibits that were shown to you

16     by the prosecution, that was—that was visual, correct?

17  A  There was one other step that I did take, sir, and that was

18     what is known as a adhesive lint tape lift of the arms and

19     chest areas of those two remaining articles—

20  Q  All right.  Now the—

21  A  —which, again, would be a visual examination after that.

22  Q  Now the prosecutor, when he was doing a visual and holding out

23     the—holding out a purported weapon that the blowback or the

24     gunshot residue he said something about standing in front of

25     it; is that correct?

301

1  A    That is correct.

2  Q    All right.  Now that would be correct for a—To the extent that

3       that's true, that would be correct for a revolver?

4  A    Probably more likelihood of a revolver, yes.

5  Q    And on an automatic weapon—What's the difference between

6       automatic and revolver?

7  A    A revolver is a weapon that has a—a cylinder which contains

8       the cartridges or bullets; and as a individual attempts to

9       fire a revolver—And there are two types.  There's a double

10      action firing process, and there's a single action.  And

11      essentially what that means is on a single action an

12      individual would have to pull the trigger back and apply

13      active pressure to the—or—Excuse me.—pull the hammer back and

14      then apply active pressure to the trigger of the weapon, which

15      would fire the weapon.

16           In a double action revolver, it just essentially

17      means that a person would only have to pull the trigger in a

18      rearward direction which would, in turn, fire the weapon; and

19      it would continue to fire after each pull of the trigger until

20      the cylinder had been exhausted of the number of shots that

21      were in that particular cylinder.

22           And there can be any number of—of shots to a

23      revolver—five, six.  Some of the smaller calibers I've seen up

24      to ten—ten shots in a revolver.

25           With a semiautomatic pistol it's a completely

                           302

1    different action system and process. Essentially in order to
2    load the weapon, a person must pull the slide, which is the
3    top portion of the firearm, in a rearward direction. There's
4    a magazine that's contained generally in the handle of the
5    weapon, which contains the ammunition. Upon pulling the
6    rear—the slide in a rearward direction the bullet is—is spring
7    fed or pressure fed to the chamber of the weapon. When the
8    slide action is pushed forward or released by the hand, then
9    the weapon is in battery or it is ready to be fired. The
10   individual then just has to pull the trigger in the rearward
11   direction, which, in turn, will fire the weapon.
12              The weapon will continue to fire—
13 Q  Excuse me. Let me interrupt. Let me—
14 A  Sure.
15 Q  —get closer to where I—where I want to be.
16 A  Okay.
17 Q  And let me summarize to this point. On a revolver, what's
18   left—the cartridge or the shell, whatever you call it—stays in
19   the weapon?
20 A  That is correct.
21 Q  All right. And the significant part of the gases escape
22   through the front—through the barrel?
23 A  A significant amount, but there is—
24 Q  Right.
25 A  —some additional escapage.

303

1  Q  Sure.

2        On a semiautomatic the cartridge—You can correct

3     me.—the copper part or cyl—

4  A  Right.

5  Q  —the round is ejected in the back, and there's more gunshot

6     residue going out the rear than the front of a barrel of a

7     revolver, correct?

8  A  That's a really difficult question to answer, sir.

9  Q  All right.  Well, let me put it—

10 A  I guess, in essence, there may be—And it depends on the type

11    of a firearm manufacturer.  So to make a generalized statement

12    about that would be very difficult to make.

13 Q  But there are very significant tests for gunshot residue;

14    isn't that correct?

15 A  That is correct.

16 Q  All right.  And those tests are there because gunshot residue

17    does—does appear and will appear after someone has fired a

18    weapon; isn't that correct?

19 A  On most occasions.

20 Q  Yes.

21        And your analysis is that this is a .38 caliber or

22    .357, correct?

23 A  That would be correct.

24 Q  Let me show you—Let me show you a photograph here, and let me

25    tell you that I believe the smaller round is a .22 and that

304

```
 1      it's probably close to actual size of a .22 round; would that
 2      be correct?
 3  A   You are correct.
 4  Q   And the larger round compared to the .22, by looking at it
 5      could you tell that in all likelihood that's probably a .38?
 6  A   I would say it most closely approximate a .38 or a .357, yes.
 7  Q   And is that—Is that photo a fair depiction of the relative
 8      sizes of the—of the rounds?
 9  A   Yes, it is.
10              MR. SVIKIS:   I'm going to move for introduction of
11      defense exhibit A.
12              MR. BROWER:   No objection, your Honor.
13              THE COURT:   Okay.  It's admitted.
14              MR. SVIKIS:   I would have that marked and—
15              THE COURT:   Has it been marked?
16              MR. SVIKIS:   It has not been marked.
17              THE COURT:   Please have it marked, please.
18              MR. SVIKIS:   Thank you, your Honor.
19              THE COURT:   It's received.
20  BY MR. SVIKIS:
21  Q   You also testified that—Let me get the right term.  The bullet
22      refers to everything, right—or the round?
23  A   The round would be the word you're looking for.
24  Q   The end that's left—that comes off is—What do you call that?
25  A   That would be a fired bullet.
```

305

```
 1 │ Q    The lead part.

 2 │ A    Yes, fired bullet.

 3 │ Q    Fired bullet.  Okay.  That's the fired bullet.

 4 │              You testified earlier that the fired bullet was

 5 │      significantly degraded—

 6 │ A    That is—

 7 │ Q    —or whatever term you used.

 8 │ A    That's correct.

 9 │ Q    Okay.  But it wasn't degraded to such an extent that you

10 │      wouldn't keep the fired bullet or have the ability to compare

11 │      it with other fired bullets or try to match it up with a

12 │      particular automatic weapon or revolver, right?

13 │ A    Correct.

14 │ Q    Okay.  Because you, in fact, tried to do that without success,

15 │      correct?

16 │ A    Yes, I did.

17 │              MR. SVIKIS:   All right.  Thank you.

18 │              I have no further questions.

19 │                    REDIRECT EXAMINATION

20 │ BY MR. BROWER:

21 │ Q    Sir, defense counsel asked about whether or not it was true

22 │      that gunshot residue does appear on most occasions, and I

23 │      believe you said yes; is that correct?

24 │ A    On most occasions it will, yes.

25 │ Q    Does that mean that there will be gunshot residue that's
```

306

1       emitted but that not necessarily on most occasions there would

2       be gunshot residue on the shooter?

3   A   Right.  Part—Part of this—When we say—What I use to explain

4       myself on most occasions it could be dependent on caliber.

5       The defense attorney brought up a very good example with the

6       photograph.  With some of your smaller calibers, just by the

7       mere size you may not have the—obviously, the amount of

8       gunshot residue that you would find with a larger caliber.

9       So, subsequently, you may not have some deposition.

10              In addition to this—We've talked a lot about the

11      deposition of gunshot residue; and, specifically on hands,

12      it's extremely minute.  And the state laboratory system

13      doesn't necessarily test.  There are no tests that are run

14      there.  So, consequently, some very, very technical

15      instrumentation must be used even to find gunshot residue.  So

16      it's practically invisible unless you actually see some type

17      of black sooting on your hands.

18  Q   And so the misnomer that many of us may have been aware of, if

19      you fire a gun there's going to be copious amounts and they

20      can just take a swab, touch it, and say positive for gunshot

21      residue; that's not the case?

22  A   That's not the case.  And, in part, the reason being is that

23      in order to specifically identify a type of a residue or a

24      material on the hand, it has to be a residue that can be

25      eliminated from other sources, if you will.  So gunshot

1  residue on hands, per se, they're looking for several

2  elements: barium and antimony. And those two elements are

3  often found—not always, but often found in the primer mixtures

4  that are used in cartridges.

5  So, consequently, if barium and antimony isn't found

6  on the hands, it doesn't mean that the person didn't shoot the

7  firearm. What it could mean is that the primer that was used

8  in the cartridge didn't contain barium and antimony. And this

9  is one of the problems that has been ongoing with gunshot

10  residue on shooters and on shooters' hands, to be quite frank.

11  Q  Your statement previously about rarely finding gunshot residue

12  on a shooter's clothing still stands?

13  A  Again, when I—when we—when I answered that question, I was

14  referring to the type of residue that is—that is—that we

15  examine residue for at the laboratory; and that is—We examine

16  residue for the purpose of establishing the distance that the

17  muzzle of the barrel was away from an article of clothing.

18  So, consequently, the type of residue that I'm looking for

19  would be different than what someone else may be looking for

20  if it was a shooter. So I say rarely from the standpoint of

21  the types of residue that I would examine for.

22  Q  You are more often than not involved in the analysis of

23  gunshot residue on victims' clothing, then, to determine the

24  distance that the shooter was from the victim at the time of

25  the shooting?

308

1  A    That's correct.  This—This examination for an agency with

2       respect to examining clothing of a shooter is—is something

3       that is very rarely done.  And in this particular case I

4       believe the investigator specifically asked.  And when given a

5       request of that nature, I generally will honor it; but I will

6       explain to the investigator that it's very—very rare.  In all

7       the years that I examined clothing of a shooter—which, again,

8       is not a lot of times—but I've never found any—any residue.

9                    MR. BROWER:    Thank you.

10                   I have nothing further.

11                   THE COURT:    Mr. Svikis, any . . . (inaudible)

12       recross?  Excuse me.

13                         RECROSS-EXAMINATION

14  BY MR. SVIKIS

15  Q    So if I understand your analysis when it comes to gunshot

16       residue, it's—it's for visual to determine distance and the

17       microscopic is not a common practice for you?

18  A    Microscopic examination with respect to clothing that has

19       damage caused by the passage of a projectile?

20  Q    No, through either a electron microscope or by one of the many

21       other methods that you can—that you can detect gunshot residue

22       that isn't related to distance.

23  A    That—That would be correct.  My visual would be just

24       specifically microscopic and not using a scanning electron

25       microscope.

1              MR. SVIKIS:    Thank you.

2              MR. BROWER:    Nothing further.

3              THE COURT:    You can step down, sir.  Thank you.

4              THE WITNESS:    Thank you.

5              MR. BROWER:    People call Gunars Vaseris.

6              THE COURT:    Raise your right hand, sir.  You do

7      solemnly swear or affirm the testimony you're about to give

8      shall be the truth, the whole truth, and nothing but the

9      truth, so help you God?

10             MR. VASERIS:    I do.

11                        GUNARS VASERIS,

12     called at 1:57 p.m., and sworn by the Court, testified:

13                      DIRECT EXAMINATION

14  BY MR. BROWER:

15  Q   Sir, could you please state your full name and spell both the

16      first and the last name for the record.

17  A   Gunars Vaseris—G-u-n-a-r-s; last name V-a-s-e-r-i-s.

18  Q   Mr. Vaseris, where are you employed?

19  A   At Century Buick GMC Truck.

20  Q   What is your position there?

21  A   Manager of the service department.

22  Q   How long have you worked there?

23  A   About 24 years.

24  Q   Were you working and on duty back on February 8 of 1991?

25  A   Yes.

1  Q  You remember that day, sir?

2  A  Yes.

3  Q  What time did you arrive for work normally during that time

4     period back in '91?

5  A  Five, four minutes before 7:00 o'clock, depending on traffic,

6     three minutes.

7  Q  That was your routine—

8  A  Yes.

9  Q  —you leave the house the same time, get to this location by

10     the same time, arrive at that same time?

11  A  Yes.

12  Q  Which route of travel did you take?

13  A  I would be going out Stadium Drive west.

14  Q  Now your place of business is just west of what was back in

15     1991 the Minute Market store; is that correct?

16  A  That's correct.

17  Q  Based on your direction of travel, it appears as though you

18     must have been every day driving by Minute Market on your way

19     to work?

20  A  That's correct.

21  Q  The same was true for that day, February 8 of 1991?

22  A  Yes.

23  Q  When you drove by the store on this day was it also just a few

24     minutes prior to 7:00 o'clock?

25  A  Yes.

311

1    Q   Did you notice anything about the store on that date?

2    A   I noticed the lights were not on.

3    Q   Was that unusual?

4    A   Generally the lights are on, yes; it's open.

5    Q   They opened at 7:00, but the lights became on prior to that?

6    A   Yes.

7    Q   Now you're talking about exterior lights or the interior

8        building lights?

9    A   The interior building was dark.

10   Q   Is that kind of what caught your attention on that day?

11   A   Yes.

12   Q   Did you notice whether there—or not there were any vehicles in

13        the area?

14   A   There was one car parked between the two—between the Minute

15        Market and the hardware store.

16             MR. BROWER:   If you'd put up exhibit number one,

17        please.

18 BY MR. BROWER:

19   Q   Sir, this has been admitted as an exhibit—a diagram of the

20        store with Stadium Drive being along the bottom of this slide

21        and Gale's Hardware—the east side of the building, it's been

22        called—being over here?

23   A   Yes.

24   Q   Which—Which side of the building, now, was it that you saw

25        this vehicle parked?

1   A    It was on the east side.

2   Q    Over here?

3   A    Correct.

4   Q    Okay.  How was it parked?

5   A    The car was facing south.

6   Q    And was it—All right.  When you say facing south, then was it

7        parallel to the side of the building?

8   A    Yes, it was between the two buildings.

9               MR. BROWER:   Okay.

10              Exhibit number four, please.

11  BY MR. BROWER:

12  Q    This has been described as the east side of the building.  Now

13       there's a fairly large—or wide paved area there between the

14       building and where the cruiser is parked on the bottom corner.

15       That is no longer the case, is it?  Not—

16  A    Yes, that's—That's correct.  The building has been expanded.

17  Q    Gale's Hardware takes up all that area and almost—very close

18       to what is now the Bronco Mart?

19  A    Yes.

20  Q    All right.  When you say that it was between the buildings,

21       however—that meaning the car you saw parked along—between the

22       buildings—could it be—it could be anything from parked here

23       where the cruiser is to the middle here or much closer to the

24       building.

25  A    It was closer to the building by the curb there.

1  Q  Closer to the building by this curb in this area?

2  A  Yes.

3  Q  All right.

4  A  I would say in that area.

5  Q  All right.  So parallel to the building back from the front?

6  A  I think it was more towards the front, but I—I don't—

7  Q  All right.

8  A  —recall a hundred percent.

9  Q  But my question is it was not in front of the building—

10 A  I don't think so, no.

11 Q  —it was back from the front?

12 A  Yeah, it was between the two buildings.

13 Q  And you observed this as you're driving by on Stadium Drive?

14 A  Correct.

15 Q  So it would be safe to say that your observations of this

16    vehicle didn't last long?

17 A  No, it didn't.

18 Q  See a car, see the dark windows, and continue on?

19 A  Correct.

20 Q  All right.  Just in summary to make sure that we have this

21    accurate now, there was a vehicle parked between the—between

22    Gale's Hardware and the Minute Market parked parallel and

23    close to the east wall of the Minute Market back from the

24    front of the store; is that accurate?

25 A  Yes.

314

1  Q  Could you tell make or model of the vehicle or even color at

2      that point?

3  A  It was a dark-colored vehicle.  I'd say an older vehicle.

4  Q  Dark-colored older vehicle.  Did you have an impression as to

5      whether it was a compact or a full-size even?

6  A  It was a fairly large car.

7            MR. BROWER:   I have nothing further of this

8      witness.

9            THE COURT:   Mr. Svikis?

10                   CROSS-EXAMINATION

11  BY MR. SVIKIS:

12  Q  Mr. Vaseris, you gave a statement to the police on that exact

13      day, didn't you?

14  A  Yes.

15  Q  All right.  And 13 years ago with regard to observing a—a

16      vehicle without any lights on and in the dark, was it fair to

17      say your memory would be the best what you said back in 1991

18      than it would today?

19  A  I would think so.

20  Q  Okay.  And back in 1991 you did not—Would you be surprised to

21      learn that there's no record of you mentioning that the—that

22      the vehicle was old or large?

23  A  I don't think anybody asked me.

24  Q  Okay.  And you knew something had gone on there, right?

25  A  No, I didn't.

1   Q   Well, how did the police come to interview you?

2   A   They came later in the morning and asked us if we had seen

3       anything.

4   Q   All right.  But you—With the police asking you certain

5       questions you must have given it some importance, right?

6   A   When they came to ask me, yes.

7   Q   And later on you found out that a homicide had taken place

8       there?

9   A   Correct.

10  Q   All right.  And in that 13 years you never went back and told

11      them that, boy, you didn't ask me this question how old the

12      vehicle was, did you?

13  A   No.

14  Q   And you didn't volunteer that information, did you?

15  A   No, I didn't.

16  Q   And then, also, you didn't tell them within this last 13 years

17      that it was a large old vehicle either, did you?

18  A   No.

19              MR. SVIKIS:    Okay.  I have no further questions.

20              MR. BROWER:    Nothing further.

21              THE COURT:    You can step down, sir.  Thank you.

22              MR. BROWER:    Robert Petersen, your Honor.

23              THE COURT:    Raise your right hand, sir.  You do

24      solemnly swear or affirm the testimony you're about to give

25      shall be the truth, the whole truth, and nothing but the

                              316

1    truth?

2                    MR. PETERSEN:   I do.

3                    THE COURT:   Be seated.

4                            ROBERT PETERSEN,

5    called at 2:06 p.m., and sworn by the Court, testified:

6                         DIRECT EXAMINATION

7  BY MR. BROWER:

8  Q   Sir, could you please state your name and spell your last name

9      for the record.

10 A   Robert Petersen—P-e-t-e-r-s-e-n.

11 Q   Mr. Petersen, where are you employed?

12 A   Century Buick GMC.

13 Q   Same place as Gunars Vaseris?

14 A   Yes.

15 Q   How long have you worked there?

16 A   I've been there 36 years.

17 Q   What do you do there, sir?

18 A   I'm in with the new and used cars.

19 Q   Were you working—Is this the Century Buick that's just west of

20     what was the Minute Market store?

21 A   Right.

22 Q   And is that the place you were working on February 8 of 1991?

23 A   Yes.

24 Q   Sir, do you have a routine as far as the time you get up and

25     your travel time and the time of arrival at work?

                              317

1  A    Yes.

2  Q    What was your usual arrival time at Century Buick?

3  A    Seven o'clock.

4  Q    Did you have a routine—something that you routinely did prior

5       to your arrival at work?

6  A    Yes.

7  Q    And what was that?

8  A    I would stop at the Minute Market and get coffee and lottery

9       numbers.

10 Q    Is that like an everyday thing that you were doing?

11 A    Yes.

12 Q    Did you attempt to do that on February 8 of 1991?

13 A    Yes.

14 Q    Were you able to get your coffee and everything else that you—

15 A    No.

16 Q    —just talked about?

17      Why not?

18 A    I pulled up—I seen the lights were on in the back, and then

19      there was a row of lights in the front; went up to the door,

20      and it was locked.

21 Q    Okay.  When you say lights in the back and lights in the

22      front, what exactly do you mean?

23              MR. BROWER:   Put up exhibit number one, please.

24 BY MR. BROWER:

25 Q    Sir, I'm going to put a sketch up on the screen and ask for

                              318

1    you to direct me to the area where you would see lights. Just

2    to help orient you a minute, this has been described as a

3    floor plan of the back room area with sliding doors or—Excuse

4    me.—swinging double doors; the main store area; Stadium Drive,

5    with the front doors being here; Gale's Hardware off here; and

6    your place of business someplace up here, right?

7  A    Right.

8  Q    Off to the right edge of the slide?

9  A    Right.

10  Q    You say that there were lights on in the back area. What do

11    you mean?

12  A    The office area in that—

13  Q    Back here?

14  A    —hall—Yeah, right in there.

15  Q    So this area and the office area is where you saw some lights?

16  A    Right. And then when you come out the swinging doors, the row

17    of lights were on there.

18  Q    Right here?

19  A    Yeah.

20  Q    The rest of the interior store lights were—

21  A    Dark.

22  Q    Pardon me?

23  A    They were off.

24  Q    Was that unusual?

25  A    I figured that they were probably just opening.

1   Q   Okay.  But normally when you arrived—

2   A   They would be on.

3   Q   —they would be on.  These—Did you go to these doors?

4   A   Right.

5   Q   The main double doors—

6   A   The main—

7   Q   —entering the store?

8   A   Right.

9   Q   Were you able to get in?

10  A   No.

11  Q   Why not?

12  A   They were locked.

13  Q   And that, too, was unusual for the doors to be locked that

14      time of the morning?

15  A   No, they were usually open at that time.

16  Q   Let me ask the time that it was that you were there that you

17      tried to pull on the doors but couldn't and saw the black

18      interior—or the lights off.  What time was that?

19  A   It was probably just a few minutes before 7:00.

20  Q   And did you attempt to do anything to determine whether or not

21      the store would be open momentarily or not?

22  A   Yeah, I walked to the side—Between Gale's and the

23      Minute Market there was a drive there, and they usually parked

24      right there.  I went to see if their car was there.

25          MR. BROWER:   Exhibit number four, please.

320

 1 | BY MR. BROWER:

 2 | Q   This is from the back looking towards Stadium Drive with the

 3 |     front of the store being right here.  Is this the area where

 4 |     you were looking then for a vehicle?

 5 | A   Yeah, I left around the corner there.

 6 | Q   Come over in this area right here?

 7 | A   Right.

 8 | Q   Looking down—

 9 | A   Towards—

10 | Q   —the east side of the doors?

11 | A   —towards the back, yeah.

12 | Q   Now you say you did that why?

13 | A   Because they always parked right in the back there—right on

14 |     the back corner of the building.

15 | Q   All right.  They, meaning the store employees that worked in

16 |     the morning, always parked in this area?

17 | A   Yeah—Well, right towards the rear of the building there.

18 | Q   All right.

19 | A   Right in there.

20 | Q   Are you indicating this area in here?

21 | A   Right.

22 | Q   And how did they normally park?  Would they park pulling in

23 |     this way, or they would be parked parallel to the building?

24 | A   Parallel.

25 | Q   Parallel back from the front of the store—

321

1   A   Yeah.

2   Q   —close to the building?

3   A   Right.

4   Q   When you looked around the side, did you see a vehicle there?

5   A   No.

6   Q   Was there a vehicle there?

7   A   No.

8   Q   Again, because you saw the light on in the back of the store

9       you thought maybe somebody was there and it would be opening

10      soon—

11  A   Right.

12  Q   —that's the reason why you were looking for the employee's

13      car?

14  A   Yes.

15  Q   In addition to looking visually around the corner, did you do

16      anything else after that?

17  A   No, I got—I got in my car, and I drove between the two

18      buildings.   There's a service drive in the back that goes up

19      to the dealership.

20              MR. BROWER:   Exhibit number one, please or—Excuse

21      me.—two.

22  BY MR. BROWER:

23  Q   You're talking about that area towards the left-hand edge of

24      the photograph?   There's a—

25  A   Right.

1  Q  —a drive back there?

2  A  Yeah.

3  Q  So initially where had you been parked, or where had you

4     parked your vehicle?

5  A  In the front of the building.

6  Q  Just pull up into one of the spots in front of the building

7     and got out and went up to the front door?

8  A  Yes.

9  Q  When you reentered your vehicle, you drove along that east

10    side of the building when you were looking for the employee's

11    car?

12 A  Right.

13 Q  And then made a right-hand turn into that alley?

14 A  Yeah.

15 Q  Did you find any vehicles back there?

16 A  No.

17 Q  See anybody walking around back there?

18 A  No.

19 Q  Where did you go after taking this route?

20 A  I went up to the dealership.

21 Q  To work?

22 A  Right.

23 Q  Did you ever return to the store?

24 A  I walked back down somewhere near 8:00 o'clock.

25 Q  To get your coffee?

323

```
 1   A    Right.

 2   Q    Okay.

 3   A    And the doors were still locked, and nothing was around.

 4   Q    Nothing, nobody?

 5   A    No, nobody around.  I walked up; it was, you know, like it was

 6        closed.

 7   Q    Same condition as when you had been there earlier?  I mean as

 8        far as the lighting and the doors locked?

 9   A    Yeah.

10                    MR. BROWER:   All right.  Thank you.

11                    I have nothing further

12                    THE COURT:   Mr. Svikis?

13                            CROSS-EXAMINATION

14   BY MR. SVIKIS:

15   Q    I didn't hear if you mentioned a time, but you said you went

16        back to get a cup of coffee.

17   A    Right.

18   Q    Was that around 8:00 o'clock?

19   A    Right around 8:00 o'clock, somewhere in that area.

20   Q    There were no police cars around or no other cars of any kind?

21   A    No.

22                    MR. SVIKIS:   Okay.  No further questions.

23                    MR. BROWER:   Nothing further, your Honor.

24                    THE COURT:   You can step down, sir.

25                    MR. BROWER:   People call Greg Hatter to the stand,
```

(Tape No. B2004-034, 6-15-04, 14:15)

1   your Honor.

2           THE COURT:   You do solemnly swear or affirm the

3   testimony you're about to give shall be the truth, the whole

4   truth, and nothing but the truth?

5           MR. HATTER:   I do.

6                   GREGORY ALAN HATTER,

7   called at 2:15 p.m., and sworn by the Court, testified:

8                   DIRECT EXAMINATION

9   BY MR. BROWER:

10  Q   It's Detective Hatter, is it not, sir?

11  A   Yes.

12  Q   Could you please state your full name and spell your last name

13      for the record.

14  A   It's Gregory Alan H-a-t-t-e-r.

15  Q   Detective, you're a detective with the Kalamazoo Department of

16      Public Safety; is that correct?

17  A   Yes, it is correct.

18  Q   How long have you worked as a detective in the department?

19  A   Since the early part of 1990.

20  Q   And in February of 1991, then, you would have been a detective

21      for approximately a year?

22  A   Yes, that is correct.

23  Q   Did you have prior police experience as well?

24  A   I've been on the department 26½ years total now at this point.

25  Q   Newly a detective at the time of this investigation?

1  A  That is correct.

2  Q  Were you called to the Minute Market store on Stadium Drive to

3     assist in a homicide investigation—a homicide that had

4     occurred at that location?

5  A  Yes.

6  Q  Were you there with other detectives from your unit as well?

7  A  Yes, I was.

8  Q  Who were the other detectives or other officers, if you can

9     . . . (inaudible)

10 A  There was quite a few officers there at the time when I

11    arrived.  I don't recall all of the names.  I recall a

12    Detective Bombich, I believe Detective Vaughan.  There was

13    other detectives called out intermittently at different times

14    for different assignments.  I specifically pretty much worked

15    with Detective Bombich on that date for our assignment.

16 Q  Tell me in a major case—you, being a relatively new

17    detective—was there another detective that was in charge and

18    made assignments to you as well?

19 A  Yes, there was, a Detective Jim Grace was assigned as the lead

20    detective for the case.  And at that time normal procedure was

21    that a detective of senior experience or one that was assigned

22    to the major case squad—which their duties entitle pretty much

23    homicide or robbery or serious assault—assault

24    investigations—would be the lead detective on the case, would

25    make a lot of the decisions on what needed to be done, would

1  |  be the case manager, collect all reports, and somewhat be in

2  |  charge up until the time that the charge was made on any

3  |  suspects involved.

4  Q  |  Now some years later you were also assigned to that unit—the

5  |  major case squad; is that correct?

6  A  |  That is correct.

7  Q  |  And did a stint with the cold case homicide team in

8  |  Kalamazoo County as well?

9  A  |  Yes.  I was a member of the cold case homicide team on its

10  |  inception, and I was there for about a year and a half.  And

11  |  then I chose to come back to my original job, which was in the

12  |  major case squad in the criminal investigations division.  We

13  |  have four detectives primarily assigned to those duties.

14  Q  |  But at the time in '91 you weren't the ones making the

15  |  assignments; you were given the assignments?

16  A  |  That is true.

17  Q  |  During the course of the initial investigation the name

18  |  Patrick Mishall came up, did it not?

19  A  |  Yes, it did.

20  Q  |  And were you given an assignment to contact Mr. Mishall?

21  A  |  Yes, I was.

22  Q  |  Is Patrick Mishall present in the courtroom today?

23  A  |  Yes, he is.  He's seated over at the defendant table wearing a

24  |  green shirt next to the counselor there.

25  |  MR. BROWER:  If the written record can reflect the

327

1    identification of the defendant, your Honor?

2            THE COURT:    It may so indicate.

3    BY MR. BROWER:

4  Q  So you were assigned to locate and interview him, correct?

5  A  Yes.

6  Q  Where did you go to make contact with him?

7  A  To 2415 Springmont Street, which is located in the—what was

8     called the Oakwood neighborhood in Kalamazoo.

9  Q  Approximately how far—Is this in the same general area as

10    Minute Market—or approximately how far away?

11 A  If you were to quadrant off the city in four different

12    quadrants, yes, it would be in that geographical

13    location—southwest location of the city.

14 Q  Not a different side of the city or something?

15 A  No.

16 Q  All right.  About what time of the morning was it that you

17    arrived there at Springmont?

18 A  Approximately 0944 hours, which would be 9:44 a.m.

19 Q  Did you make any observations about vehicles in front of the

20    residence or at the residence?

21 A  It was also brought to our attention to look for a black Ford

22    vehicle with collision damage on the vehicle that, according

23    to the information that I received, belonged to Mr. Mishall.

24 Q  Did you find a vehicle matching that description there?

25 A  Yes, we did.  It was parked at that address at the time of our

328

1    arrival.

2  Q  Did you indicate the model?

3  A  It was an LTD, I believe, if my memory's correct.

4  Q  Would that be characterized as a—this particular vehicle being

5     a dark, larger vehicle?

6  A  Well, I don't believe that year was extremely large; but it

7     was a—

8  Q  It wasn't a mid-size or a compact?

9  A  It was characterized nowadays as a mid-size.  I guess you'd

10    say at that time it might have been considered larger, but—

11 Q  With the corresponding damage that you were looking for?

12 A  Yes, it was.

13 Q  Now when you approached and knocked on the door, did you get

14    an immediate response?

15 A  No, it took approximately three minutes from the time of our

16    knocking before Mr. Mishall did, in fact, answer the door.

17 Q  When he answered the door did you indicate to him why it was

18    that you were there?

19 A  Yes, we indicated that we needed to speak with him and asked

20    if we could come in to talk with him; and he did allow us

21    entry into the house at that time.

22 Q  Us, meaning yourself and Detective Bombich?

23 A  Yes, Detective Bombich was in—in my company at the time.

24 Q  Where was it, then, that you engaged in conversation with

25    Mr. Mishall?  Inside the home?

1  A  If I remember—I don't remember exactly.  I believe it may have
2      been in the kitchen area.
3  Q  What precisely did you tell him about what had occurred at the
4      Minute Market?
5  A  We told him that Chris—who, at that time, was his girlfriend
6      based on information we had received—had been killed at the
7      Minute Market and that we needed to get information that might
8      help us find out who had done this and what had happened
9      there.
10 Q  You used now the word killed—that she had been killed there;
11     is that the word you used with him, too?
12 A  Yes, I believe that was the word that we used.  We didn't tell
13     him the manner of death during our conversation or contact
14     with him.
15 Q  You did not?
16 A  We did not, no.
17 Q  You didn't say she's been shot?
18 A  No, we did not.
19 Q  Did you ask him questions about his activities the evening
20     before or that morning?
21 A  Yes, we did.
22 Q  Now before I go on to those questions about your questions to
23     him about his activities and so on, I want to ask, there was
24     this interview with him at his house.  There was a second
25     interview that you conducted a little bit later at the police

1   department; is that right?

2 A  That is true.

3 Q  All right.  So I just want to make it clear I'm talking about

4   this first interview at his home right now.

5   Did he tell you whether or not he had been working

6   the previous evening or when he had gotten out—when he had

7   gotten out of work?

8 A  Yes, he did.  He said that he got—He punched out of work where

9   he was working at 2:00 a.m. and that he actually left work

10   around 2:15 a.m. on that morning.  And—

11 Q  Go ahead.  Continue.

12 A  And then he went directly home at that time.  And upon his

13   arrival at home he said that Chris—the victim in this

14   matter—was in bed at that time.

15 Q  Did he tell you what he did after his arrival?

16 A  Yes, he said that he watched a movie that he called *Flashback*

17   at that time.  And he explained that Chris and two friends of

18   hers, I believe, had rented the movie.  They were out earlier

19   in the evening prior to his arrival at home is my

20   understanding.  And that he watched that movie until about

21   3:35 a.m., and at that time he went to bed.

22 Q  At some point he—did he tell you that he got up and where, if

23   anyplace, that he went?

24 A  Yes.  He said he got up at 5:30 and that Chris was up in the

25   shower at that time and that he drove her to work from their

331

1    house on Springmont over to the Minute Market.  And he—

2  Q  His purpose for doing that was to what?

3  A  Assist her with opening up the store and transportation for

4    her getting there.

5  Q  Did he tell you when—whether or not there was an alarm system

6    and when the alarm system was deactivated—when he or Chris had

7    deactivated the alarm?

8  A  Yes.  He said that Chris—Well, they entered into the business

9    through the back door and that Chris punched the alarm code at

10    6:05 a.m.

11  Q  What did he say about his activities while inside the

12    building?

13  A  He said he helped Chris open up the safe.  He went and got the

14    newspapers out from in front and counted the newspapers,

15    getting the newspapers ready for dissemination that day and

16    that he—he was in the store for about 20 minutes and then he

17    left the store going directly home and left her there at the

18    store.

19  Q  Did—

20  A  He said prior to leaving he checked the store and found

21    everything in order—nothing out of place, no one around the

22    store, or no other vehicles around the store at the time that

23    he left.

24  Q  He checked the store?

25  A  That's what he told us.

1  Q  He checked the store and what was it that he found?

2  A  Nothing out of—out of the norm, nothing disturbed or anything

3     unusual at all.

4  Q  No body in there?

5  A  No.  No one else mentioned at all.

6  Q  Now you mentioned the newspapers.  Where were the newspapers

7     for this—the Minute Market delivered?

8  A  The delivery of the newspapers was, I believe, out in front of

9     the store outside along the front door entrance.

10 Q  Which would require—If he's inside through the back door he

11    would have to unlock the front doors, bring the bundled papers

12    in?

13 A  Yes.  He said that he got the keys for the front door from

14    Chris, went and opened up the front door to the store and got

15    the papers, counted them and got them ready for the day's

16    business.

17 Q  During this initial interview did he ask any questions about

18    why it was that you came to his house?

19 A  Yeah, he specifically asked us if coming to his house was the

20    first step in our investigation.  He wanted to know why we

21    came to his house first.  And we explained to him that we

22    needed to get information from him that might assist us in the

23    investigation as far as her activities leading up to the time

24    of her death.

25 Q  Did you ask any questions about his ownership of guns?

333

1　A　I believe I did ask him if he owned any guns, and I remember

2　　　him saying no. He said that he was a musician and that he

3　　　played the drums. And he showed us a picture, I believe, of

4　　　him with some drums in the house if I remember right.

5　　　However, we did not see the drums.

6　Q　Did you understand the significance of what he was saying you

7　　　asking for guns and he's talking about being a musician?

8　A　Other than he wanted to divert our attention, maybe, to

9　　　something else. I don't know why—why that was brought up.

10　Q　At this point did you ask whether or not he would be willing

11　　　to go to [sic] you to the police headquarters building?

12　A　Yes, we did. We asked him if he'd be willing to accompany us

13　　　down to the station for a more detailed interview. He readily

14　　　agreed to go downtown with us to the police headquarters. He,

15　　　in fact, rode with us in our vehicle in the front seat of our

16　　　car.

17　　　　　He also agreed to allow us to search his car for

18　　　anything that might be related to this incident and his house,

19　　　also. If I remember right, Detective Bombich got written

20　　　consent from him allowing us to do that. And we also waited

21　　　there at his house until a wrecker came because we wanted to

22　　　have his vehicle impounded and transferred down to our station

23　　　so that there wouldn't be any contamination to the vehicle if,

24　　　in fact, later on something did become relevant to this whole

25　　　situation that was in the vehicle. So we waited there until

1   the wrecker came, and then we followed the wrecker and the car

2   with Mr. Mishall down to our training station, which is—was

3   located across the street from 215 West Lovell where our old

4   department building was; and that's where our lab technicians

5   actually went over the vehicle and processed it.

6  Q  With his consent, then, you did eventually arrive at the

7   headquarter—or at the training building and a interview was

8   conducted there?

9  A  No, actually, when we left his residence I believe the time

10   was 10:42 a.m.  The actual second interview began around

11   11:10 a.m. over at our headquarters building.

12  Q  All right.

13  A  Mr. Mishall and I walked over to the headquarters building and

14   upstairs to our criminal investigation division.  And then we

15   have some—we had some interview rooms there where the

16   interview was actually begun.

17  Q  And during this second interview at headquarters did you go

18   back over some of the sum [sic]—of the same things asked at

19   the residence and then on to other things as well?

20  A  Yes, we did.  In fact, I remember Mr. Mishall wanted some

21   coffee.  It was offered to him.  He had several cups.  He

22   wanted to call his boss, also.  I don't remember if that was

23   done before we actually sat down and talked or—or at a midway

24   point.  But at one point he was provided a phone, and he

25   called a Wayne Tiller, I believe, was the name of the boss and

335

1  conversed with him briefly.  And then—then we started talking

2  and went over the events leading up to Chris coming to work

3  that morning and what he did and any involvement he had with

4  assisting her in the opening of the store and—

5  Q  During this—

6  A  —and it went from there.

7  Q  —interview did he again indicate what time it was that he had

8  gotten out of work?

9  A  Yeah, on this interview he said that he punched out at work at

10  2:15 and then went directly home to his home on Springmont.

11  Q  Watched this movie?

12  A  Watched a movie, drank—He said he drank a quart of Budweiser

13  beer and that he went to bed at 4:05 a.m. on this particular

14  interview.  And then he said the alarm went off at 5:00 a.m.,

15  and he got Chris up to go take a shower to get ready for work,

16  and then at 6:10 he left the house to take her to the

17  Minute Market.

18  Q  Left the house at 6:10, arriving at Minute Market when?

19  A  At 6:17.

20  Q  That being a time that he gave?

21  A  Yes.  All of the times were times that he provided.

22  Q  Did he also relate now on this second interview what he—things

23  he did while there?

24  A  Yes, he said he approached—they approached the store from the

25  back area that's between the hardware that was next to it and

336

1    the Minute Market and parallel parked his vehicle along where

2    the beer coolers are and that Chris had keys to the store,

3    opened up the business, and punched in the alarm code.

4         And then he went to check the—He called them

5    two-sixty-four readings, and I believe those were the cash

6    register readings for the register.  I'm not up on that part

7    of the business enough to know, but that was what he said.

8         And then at that time he got keys from Chris and

9    opened up the front door with those keys to get the newspapers

10   in and counting them.

11        And then he took some empty beer shelves to the back

12   room in the store at that time and checked out the store.

13 Q  Did he indicate whether he relocked the front doors after

14   bringing the—the newspapers in?

15 A  I don't—I don't remember that he said whether he did or not.

16 Q  Regarding the papers, he counted out the papers.  Did he do

17   anything else with regard to those papers or tell you that he

18   did?

19 A  I don't recall exactly other than I remember him saying that

20   he counted the papers.  And I don't know if he counted the old

21   ones from the previous day and then set out the new ones or

22   whether they had to account for them or not.  I don't know.

23 Q  When did he tell you that he left the store?

24 A  At 6:35, I believe it was.

25 Q  Now on your earlier interview you said that he punched in the

337

1    alarm clock at or—Excuse me.—the alarm code or the alarm code

2    was punched in at 6:05 by Chris and that he stayed for

3    20 minutes, meaning he would have left at 6:25 according to

4    him, correct?

5  A    That is correct.

6  Q    And on this occasion you're saying 6:35, so there's just a

7    matter of ten minutes difference there now?

8  A    Yes.

9  Q    All right.  He went directly home.  What did he do there?

10  A    He went home, and I don't recall what he said he did other

11    than went home and—

12  Q    He acknowledged that he had been sleeping when you first

13    arrived; is that right?

14  A    Yes.  I believe he said he was sleeping.

15  Q    Did he make any statements about Chris's promotion?

16  A    If I remember we asked—or I asked him if he was upset about

17    her promotion because it was my understanding from

18    conversation that he had temporarily filled in for the

19    manager's job there at the store because one of the previous

20    managers had quit.  And we asked him if he was upset over her

21    getting the promotion instead of him because he was then

22    transferred down to the Westnedge—I believe it

23    was—South Westnedge Minute Market.  And he said at first he

24    didn't understand, but after a time he—he worked it out in his

25    mind.

1  Q   Did he offer any explanation or theory about how someone could
2      have been inside of the building to shoot Chris?
3  A   We did ask him if he had any suspicions or reasonings of how
4      somebody could have done this or gotten into the business to
5      commit this crime, and he brought up the suggestion that maybe
6      someone had hidden in the bathrooms the entire night from the
7      time that the previous manager closed the store and stayed
8      there until time of opening when he brought Chris there, and
9      if they didn't move that the alarm would not have been set off
10     and that they could have remained there until after he left.
11 Q   Did he mention the clerk or the assistant manager that would
12     have closed early that morning approximately
13     2:00 o'clock—Tina Telpy—and whether or not she would have had
14     reason to check the bathrooms that night—
15 A   He did—
16 Q   —when she closed?
17 A   —say that Ms. Telpy wouldn't have had any reason to check the
18     men's room when she closed. I don't know why that was thrown
19     out to us, but that was a statement that he made.
20 Q   Did you or anyone in your presence ever tell him that
21     Christine Dimmick had been shot?
22 A   No, we did not.
23 Q   Did you ask him whether or not or—Excuse me.—did you ask him
24     what he had been wearing when he brought Chris that morning to
25     the store and what he was wearing as he helped her open the

339

1    store?

2  A   I don't remember what—I know he requested some clothing to be

3      brought to him because at the time he left the house to

4      accompany us to the station, he had a—a dark sweatshirt and

5      sweatpants on, I believe, at the time.  And I do know that

6      there was some clothing brought to him from his house on his

7      request—

8  Q   And you—

9  A   —at a later time.

10 Q   —collected the clothing that he had on and submitted it for

11     evaluation or examination by the Michigan State Police lab

12     eventually; is that correct?

13 A   That would have been done.  I don't recall who actually—

14 Q   You don't—

15 A   —did that.

16 Q   —actually submit it?

17 A   No, I did not—

18 Q   All right.

19 A   —that I remember.

20 Q   But the clothing was collected with the belief that those

21     were, in fact, the clothes that he had worn that day, correct?

22 A   Yes, that would have been normal procedure, yes.

23 Q   And was that because of what he had said?

24 A   Pardon?

25 Q   Your—Your understanding that that was the clothes he was

340

1    wearing was because he had told you that?

2  A  That is correct.

3  Q  All right.  Now you at some point left him there at the police

4     station and then went to his house, correct?

5  A  That is correct.

6  Q  Were you involved in the search of his home then?

7  A  Yes.  We had left—We left an officer there to watch the house

8     while we left the original time coming back to the station to

9     make sure nobody came in or out or removed anything of

10    possible evidentiary value.

11           At the end of my portion of the contact with

12    Mr. Mishall Detective Jim Grace then made contact with

13    Mr. Mishall and talked with him.  And it was about 2:36 p.m.

14    that we arrived back at the house on Springmont.  Myself and a

15    Detective Casey Stellini (phonetic) and Detective Bombich

16    searched the outer area of the house, garage, dumpster, and

17    home; and I didn't locate anything relevant to the case.

18           And then we also then returned from the house back

19    to the training station where we checked the—Well, I remember

20    checking the trunk of his vehicle for anything relevant to

21    this case, and I—we didn't locate anything.

22  Q  Did you later learn that there was a videotape that had been

23    in the house that you subsequently determined had been taken

24    from the store?

25  A  Yes, I believe there was; and I believe Detective Grace dealt

                              341

1    with that issue of the investigation.

2  Q   Going—Backtracking just for a minute, Officer, did he make any

3      statements about what he did regarding the safes while he was

4      there at the store?

5  A   He said he had to help Chris open up the safe because her

6      memory wasn't very good.  I remember him telling us that.

7  Q   So he was the one that physically opened the safes?

8  A   That, I don't remember.  I remember him telling us that he had

9      to help her—

10 Q   All right.

11 A   —because her memory wasn't good.

12 Q   Regarding the cash registers, did he also indicate what it was

13     that he did?

14 A   I remember him saying that he started up, I believe, one of

15     the registers for her to use when the day's business began.

16     Other than that—He called it two-sixty-four readings on the

17     register, and I don't know what those are.

18            MR. BROWER:   Thank you.

19            I have nothing further of this witness.

20            THE COURT:   Mr. Svikis?

21                      CROSS-EXAMINATION

22 BY MR. SVIKIS:

23 Q   When you arrived at Mr. Mishall's home there was full

24     cooperation on his part?

25 A   Yes, there was.

                         342

1   Q   And let me show you what's been marked as defendant's exhibit
2       B and C.   Would you look at those and identify those.
3   A   Yeah, these are consent to search forms for Mr. Mishall's
4       vehicle and for his address; and they are signed by
5       Detective Bombich and myself.
6   Q   All right.   And these are not limited in any way with respect
7       to his home or his car or time limit, are they?
8   A   No.   Not—I mean he's entitled to revoke those at any time that
9       he chooses.
10  Q   He never revoked them?
11  A   Not—
12  Q   To this day?
13  A   Not to my knowledge and to this day, no.
14              MR. SVIKIS:   I move for entry of these.
15              MR. BROWER:   No objection, your Honor.
16              THE COURT:   Which one's B?   What's that?
17              MR. SVIKIS:   B, your Honor, is the consent to
18      search the 1985 Ford LTD.
19              THE COURT:   Okay.
20              MR. SVIKIS:   C is the consent to search
21      2415 Springmont.
22              THE COURT:   All right.   B and C are received.
23  BY MR. SVIKIS:
24  Q   You were not at the scene when the store was first entered
25      around 9:00 o'clock, were you?

1  A    I arrived around—at work that morning about 8:55.  So then I

2        got—I got to the store after that.  I don't remember the exact

3        time of my arrival there; but when I arrived, there were other

4        officers and detectives already there or coming in, I should

5        say.

6  Q    All right.  And so you wouldn't know that Mr. Tiller, an

7        employee or assistant manager/manager of the Minute Mart,

8        entered that store with police officers and Mr. Jilek, the

9        owner?  You would—You weren't there when that took place, were

10       you?

11  A    No.

12  Q    All right.  So when Mr. Mishall requested to make a phone

13        call—and your testimony that he called Mr. Tiller—you don't

14        know what took place in that conversation, do you?

15  A    Not—Not from Mr. Tiller then, no.

16  Q    All right.  And you don't know if Mr. Tiller told Mr. Mishall

17        that his girlfriend had been shot, do you?

18  A    No, I don't.

19  Q    But you know you never told him?

20  A    That is correct.

21  Q    And that's standard police practice?

22  A    Yes.

23  Q    The video that was mentioned toward the end of your testimony,

24        this is a movie video and not any video that has to do with

25        the taping of the security cameras, does it?

344

1  A    That's correct.

2               MR. SVIKIS:   I have no further questions.

3               THE COURT:   Anything further of this witness?

4               MR. BROWER:   Yeah, I should have asked that

5    question.  I'll clarify it.

6                      REDIRECT EXAMINATION

7  BY MR. BROWER:

8  Q    We're talking about a rental video—theatrical production—that

9      you'd watch—

10  A    That is correct.

11  Q    —for entertainment?

12  A    My understanding was that it was a video that the victim and

13      two of her friends had rented previous to his arrival home and

14      that he watched it.

15  Q    That's what he was watching initially—But—when he returned

16      after work.  But the video later on that was taken from the

17      store that you talked about with Mr.—Detective Grace, your

18      understanding is that, too, was a rental video from the store,

19      correct?

20  A    Yes, a rental video from that store—from where the incident

21      took place.

22               MR. BROWER:   Thank you.

23               Nothing further.

24               MR. SVIKIS:   Nothing further.

25               THE COURT:   You can step down.

1             Call your next witness.

2             MR. BROWER:   Your Honor, People call

3     Detective Jim Grace to the stand.

4             THE COURT:   You do solemnly swear or affirm the

5     testimony you're about to give shall be the truth, the whole

6     truth, and nothing but the truth, so help you God?

7             MR. GRACE:   I do.

8                          JAMES GRACE,

9     called at 2:47 p.m., and sworn by the Court, testified:

10                     DIRECT EXAMINATION

11  BY MR. BROWER:

12  Q   Sir, would you please state your full name and spell your last

13      name for the record.

14  A   James Grace—G-r-a-c-e.

15  Q   Sir, you're retired from the Kalamazoo Department of Public

16      Safety; is that correct?

17  A   Yes, I am.

18  Q   How long did you work for them?

19  A   For 27 years.

20  Q   What was your title or position at the time of your

21      retirement?

22  A   I was an inspector.

23  Q   Back in 1991 what was your position?

24  A   In the beginning of 1991 I was a detective.

25  Q   How long had you been in the detective unit at that point in

```
 1      time?
 2  A   Almost 15 years.
 3  Q   Now shortly thereafter you received a promotion, did you not?
 4  A   Yes.
 5  Q   And when was that?
 6  A   I went down as a sergeant—I believe it was in June of 1991.
 7  Q   So about four months after this murder you were promoted to
 8      sergeant and then left the detective bureau?
 9  A   Yes, that's correct.
10  Q   And were working in what division at that point?
11  A   I was on the road working patrol—operations.
12  Q   In—There's been some testimony about a detective—a detective
13      being primary officer or some word to that effect on a crime
14      scene—one that would be responsible for making assignments of
15      other detectives and so on.  Would that have been you back in
16      '91?
17  A   If I were the detective on the scene and in charge and my
18      captain or lieutenant weren't there making—
19  Q   Ah!
20  A   —the decisions, yes, I would be the one making the decisions.
21  Q   Okay.  Chain of command.
22  A   That's correct.
23  Q   All right.  Detective Hatter or Detective Bombich were not
24      those individuals; they were—
25  A   They were fellow—
```

347

1  Q   —less senior detectives?

2  A   They were fellow detectives and with less seniority, that's

3      correct.

4  Q   All right.  On February 8 of 1991 were you called to the

5      Minute Market store on Stadium Drive to assist in a homicide

6      investigation?

7  A   Yes, I was.

8  Q   Were you at the scene?

9  A   I got there at about 8:50 a.m.

10 Q   At some point after that did you return to headquarters and

11     eventually make contact with a Patrick Mishall?

12 A   Yes, I did.

13 Q   Your contact with him, was that initiated by yourself or at

14     somebody else's request?

15 A   At 12:35 p.m., it was requested by Patrick that he talk with

16     the detective in charge of the investigation.  So I went in

17     and had a brief contact with him, explained I didn't have much

18     time but I would come back later and talk with him; that he

19     was free to leave, but if he would be—if he could stick around

20     and cooperate it would be appreciated and to talk with

21     Detective Hatter and Detective Bombich, but I would be back

22     later,

23 Q   They eventually had some other assignments, including the

24     search of a residence and so on; is that right?

25 A   That's correct.

348

1  Q   You eventually did return and speak with him.  What time was
2      that, then?
3  A   That was at 12:56 p.m.
4  Q   Did he make any statements regarding his—what activities he
5      had been involved with that morning?
6  A   Yes.
7  Q   Did he tell you about bringing Chris Dimmick to work that
8      morning?
9  A   Yes.  He said he drove his Ford LTD, I believe it was, and he
10     pulled in on the back side of the Ace Hardware, which would be
11     on the south side.  He parked the car in between the hardware
12     store and the Minute Market, which would be on the east side
13     of the Minute Market back toward the south side of it but
14     along the east side of the Minute Market.
15             MR. BROWER:   Exhibit number one again, please.
16  BY MR. BROWER:
17  Q   You've seen this diagram before, Detective?
18  A   Yes, I do.
19  Q   Gale's Hardware being off to the left-hand side of the slide
20     but then in an east direction from the building?
21  A   As I'm facing it, the left-hand side; that's correct.
22  Q   Is this the area where you're talking about he indicated that
23     he parked his vehicle?
24  A   That's correct.
25  Q   In fact, did he actually draw a diagram of where he had

349

(Tape No. B2004-034, 6-15-04, 14:52)

1    parked?

2  A   Yes, he did.

3  Q   Do you know where that diagram is?

4  A   No, I do not.

5  Q   Your recollection of his statements and memory about his

6      drawing is that he parked his car where now precisely?

7  A   I'm sorry?

8  Q   Your recollection is that what he said and what he drew for

9      you is that he parked his car where?

10  A   Right about where your pointer is right now is where his car

11      would have been parked.

12  Q   Parallel to the building, I believe you said?

13  A   That's correct.

14  Q   What time did he arrive at the Minute Market?

15  A   He said they got there at 6:00 o'clock in the morning, that

16      Chris unlocked the door, he followed her in, she hung her coat

17      up, and then she coded out through Sonatrol.

18  Q   She coded out through Sonatrol, what does that mean?

19  A   It means that she shut the alarm off to the building.

20  Q   All right.  That building was protected by an alarm system

21      that had to be deactivated upon entry or shortly after entry

22      into the building; is that right?

23  A   That's correct.

24  Q   Sonatrol being the name of the security firm?

25  A   That's correct.

350

1  Q  Did he tell you what he did once he was there?

2  A  Once inside and Chris had hung up her coat, she continued

3      walking along the wall; and on the right-hand side the first

4      door would be where the office was. He said that she unlocked

5      the office and she asked—Chris asked Pat to please check the

6      old newspapers and get the newspapers taken care of.

7           He said what he did is he walked behind the cash

8      registers to make sure that they were cashed out from the

9      evening before, that the receipts were taken care of.

10          After he did that, he walked back around the

11     counters, counted out the old newspapers. Then he went and

12     got the keys from Chris, who was in the office still doing

13     paperwork. And he got the keys from her, unlocked part of the

14     front door—which is on the north side—reached down, brought

15     the new papers in, relocked the door leaving the keys in the

16     door. Then he went—

17  Q  I'm sorry? He relocked the doors?

18  A  He said he relocked the door.

19  Q  Okay. Go ahead.

20  A  And he said, also, when he came in that he was the one who

21     closed the doors behind him from the back on the south side,

22     also.

23  Q  All right.

24  A  He relocked the door, put the papers down. He went and made a

25     pot of coffee, came back, counted out and set up the new

1     papers and started doing the paper inventory.

2           When he was done doing the newspaper inventory he

3     said he went back and asked Chris if there's anything else he

4     could do; and why he said that, he said he looked down and

5     there were some bottles that needed to be put into the bottle

6     storage room, so he told her he would take care of that; he

7     did.  He said then he walked in, gave her a kiss, and said

8     goodbye; and then he said he left.

9  Q  Did you—Did he ask you what happened?

10  A  The first time I was in—in the interview room he asked what

11     happened, and I said at the moment I was still investigating;

12     that I would have much more information later when I could

13     come back and talk with him if he'd just give me a little more

14     time.

15  Q  Did he offer a theory then as to what it was—how this could

16     have occurred?

17  A  I'm not sure if it was at that time.  I thought it was later

18     around the 12:56 time—

19  Q  All right.

20  A  —where he thought someone else might have hidden in the

21     Minute Market and when he left then whatever happened could

22     have happened then.

23  Q  Did he make a statement about what it was that he did after

24     leaving and returning to his home?

25  A  When he said he left from the Minute Market I asked him

1   originally how he left and if he'd been out front, and he
2   said, no, he had not been out front of the store at all other
3   than to reach down and pick up the papers.
4              And he said when he drove away he drove away slowly.
5              I told him that I had someone who stated, no, that
6   they had seen him, in fact, out front and if we had a
7   photographic lineup would he be picked out, in which case he
8   said, yes, I probably would be picked out because I was in
9   front of the store.
10             And I says, what were you doing out in the front of
11  the store.
12             And he said that when he was in the store he took a
13  video—a VCR-type video of—I think it was *Celebrity Stars* or
14  *Celebrity Sluts*.  I don't remember the exact name.—and he put
15  it out on the woodpile.  And after he said goodbye to Chris he
16  went around to the front, grabbed that off the woodpile, got
17  in the car, and left.
18             I told him that this same person also said that the
19  car left at a rapid speed and you had told me you'd gone
20  slowly.  He said maybe that he had driven rapidly and not
21  slowly.
22             MR. BROWER:    Please put up exhibit number six.
23  BY MR. BROWER:
24  Q    There appears to be a pile of wood, I guess, off in this area
25       right here at the edge—to the left of the double doors; is

353

1         that accurate?

2   A   That's correct.

3   Q   All right. Now when you testified about his not being—or

4         being seen at the front of the store you're talking about this

5         area out here, correct?

6   A   I'm talking about being out—

7   Q   Yes.

8   A   —physically, not just his arm reaching down. I mean getting

9         out physically in front of the store.

10   Q   And not on the occasion where he opened the front door to grab

11         the bundle of newspapers and bring them in—something other

12         than that?

13   A   This person was seen running to the front of the store and

14         then running back to the car, getting in, and speeding off.

15   Q   That's what you communicated to him?

16   A   That's correct.

17   Q   And his response was an acknowledgment that, yes, I did that?

18   A   Yes.

19   Q   An acknowledgment that he did that after initially denying

20         ever being at the front of the store?

21   A   Initially he was not at the front other than to pick up the

22         newspapers from inside when he reached down.

23   Q   Did he tell you what he did once he arrived back home?

24   A   Originally he said that he wanted to go home 'cause he was

25         going to take a shower. Later in the interview he said he

1  went home, had a couple bowls of cereal, watched TV, and then

2  went to sleep, and then the detectives showed up at the house.

3  Q  So at one point he tells you that he was going home for the

4     purpose of taking a shower?

5  A  That's correct.

6  Q  Did you ask any questions about his feelings regarding Chris's

7     promotion?

8  A  We talked about the promotion and also an accident that

9     occurred.  On the promotion, I asked how he felt about Chris

10    being promoted when she wasn't at the store before; and he

11    expressed concern that he had not only worked at the store but

12    had been the manager of the store for a couple weeks and she

13    hadn't and, therefore, he felt he should have gotten the job.

14         He acknowledged that due to seniority rules or

15    rights—whatever the company had—that that's why she got it,

16    but he still felt it was unfair.

17 Q  Did he feel—Did he say or indicate whether he was upset about

18    that?

19 A  Oh, he was mad; but he said that he got mad but he got over it

20    and went on.

21 Q  Now there was some damage to his vehicle that he addressed as

22    well, correct?

23 A  That's correct.

24 Q  What did he say about that?

25 A  He was extremely upset about the accident.  Chris had been in

355

1    an accident with a gentleman—John—I think it was Postawa—P-o-

2    s-t-a-w-a, I think it is. And they got into a very—he said

3    very big argument over the accident and the fact that this

4    gentleman was there.

5           He said that two weeks before this occurred he was

6    at the Sugar Bowl. He'd had six or seven draft beers. He

7    went home, and Chris got upset with him because he had been

8    out drinking.

9           And he said they argued for about a half hour; and,

10   toward the end of that, he basically said to her you can go

11   out—I don't know are you having sex with this guy, what's

12   really going on. And he says if I knew that you were with

13   another guy I could probably kill you.

14 Q  Did he make any statements about the significance of that

15   threat and any effect that it would have regarding his being

16   suspected of her murder?

17 A  When I talked with him on a couple occasions, he asked as to

18   did he have the right to leave; and I said, most certainly,

19   you have the right to leave anytime you wanted.

20          He said, do you think I'm a suspect; and I said,

21   yes, I believe you shot Chris.

22          And he says, so—

23          And I says if you'd like to leave you can; why do

24   you want to leave.

25          He said he was nervous, and he asked if he could

356

1    have some coffee and cigarettes.  So we said, sure.  So we got

2    him some coffee and cigarettes.

3         I explained—He asked—He said, well, the door's

4    locked.  And I said we have to have the door locked up here in

5    the interrogation room because we have weapons available in

6    the detectives' desks that aren't all locked up so we don't

7    have people walking around.

8         I said—Again, I think I said about three or four

9    times you can leave.  He said, no, I'll stay here, and I want

10   to cooperate with you.

11   Q   Did you ask any questions about whether or not he owns guns—

12   A   Yes.

13   Q   —or owned guns?

14   A   He said he did not own a gun; and if we found a gun, his

15   fingerprints would not be on it.

16   Q   Did he reveal whether or not—or give some indication that he

17   knew how Christine Dimmick had died—the mechanism of injury?

18   A   Yes.  I had talked with him for some time; and all of a sudden

19   he said, well, Chris was shot.  And it took me off—in surprise

20   'cause I had not mentioned how she had died at all.  And—

21   Q   Did you ask him how he knew?

22   A   I asked him how he knew, and he said he was told by the—by

23   Detective Hatter and Detective Bombich.  He didn't know which

24   one, but they were the ones that told him.

25   Q   Not to Mr. Tiller, he's attributing this to the detectives?

1  A   He was attributing that to the detectives, that's correct.  He

2       had said that Mr. Tiller told him the place was robbed, but he

3       did not say that Mr. Tiller mentioned anything about the

4       method of death.

5  Q   How would you characterize Mr. Mishall's demeanor when he was

6       relating information about him [sic] seeing someone

7       else—Excuse me.—Chris seeing another man or seeing someone

8       else?

9  A   His demeanor during our conversations?

10  Q   Yes.  Did he acknowledge his emotional state when he

11      was—suspected that that may have occurred?

12  A   He acknowledged that he can get upset and that when he does he

13      gets physical, and that's why he leaves.  When arguments get

14      going, he tends to walk away.

15  Q   I apologize, Detective.  I don't know if I asked this.  Did—I

16      believe I did.  Did he say about owning a gun?

17  A   Yes, you asked that—

18  Q   All right.

19  A   —and he said he did not own one.

20  Q   Wrecking the car and John Postawa in the car, was he upsetting

21      he was upset about the damage or upset about him [sic] being

22      with John—her, meaning Chris, being with John Postawa, or

23      both?

24  A   It was cumulative.  He was upset over the car being damaged,

25      over the fact she'd been drinking, and he didn't want her

1     driving the car when she was drunk, and over the fact of John

2     being there—and/or any man—'cause he didn't want her stepping

3     out.

4  Q   The person that you—we've been calling Patrick Mishall, is

5     that Patrick Mishall present in the courtroom today?

6  A   Yes, he is.

7  Q   And please describe where he's sitting, what he's wearing.

8  A   He's sitting there.  He has a—looks like—almost like a olive

9     green-type top on right now.

10          MR. BROWER:   If the written record can reflect the

11     identification of the defendant, your Honor?

12          THE COURT:   It may so indicate.

13          MR. BROWER:   I have nothing further of this

14     witness.

15          THE COURT:   Let's take a recess.  I'd ask—Let's

16     return here at 3:20.

17          (At 3:05 p.m., court recessed)

18          (At 3:24 p.m., proceeding reconvened)

19                CROSS-EXAMINATION

20  BY MR. SVIKIS:

21  Q   Officer Grace, how long after discovery of Chris Dimmick were

22     you having your interview with Mr. Mishall?

23  A   From the time I first saw her or the time she was first

24     discovered?

25  Q   From the time that you were first having the interview that

1    you testified to with Mr. Mishall?

2  A  You're asking from what time I saw—From the time I was called

3    to the scene until the first interview?

4  Q  Well, let me make it easier.  It was the same day, right?

5  A  Yes, it was.

6  Q  Okay.  That's—

7  A  Yes.

8  Q  All right.  So on the same day that you're interviewing

9    Mr. Mishall you had not found a purported murder weapon, did

10    you?

11  A  No, we did not.

12  Q  And you—And you knew they were searching his car and his

13    house?

14  A  He gave a consent to search—

15  Q  Right.

16  A  —his residence—

17  Q  Okay.

18  A  —and the car, correct.

19  Q  And the—There was no security video or video machine was

20    found; isn't that correct?

21  A  That was taken from the store; but, correct, we—

22  Q  Right.

23  A  —did not find that.

24  Q  Okay.  And $3,000, plus or minus, wasn't found on Mr. Mishall

25    either on that day, was it?

360

1  A  The cash that—

2  Q  . . . (unintelligible)

3  A  —whatever cash was taken was not found there, correct.

4  Q  Right.  Okay.  So with this total lack of any evidence to

5     Mr. Mishall you accuse him of killing Chris Dimmick, correct?

6  A  No, I did not accuse him; I stated that I felt he was a

7     suspect.

8  Q  Oh.  I thought your testimony earlier was that—when the

9     prosecutor finished with you—that you told him that he shot

10    her.  You didn't say that?

11 A  Yes, I did.  I said that you are a suspect; and I believe that

12    you did do that, correct.

13 Q  Okay.  All right.

14 A  I didn't want any false impressions to—during our interview.

15 Q  Okay.  And when you made that statement that he had just shot

16    and killed his live-in girlfriend he got nervous after being

17    accused of killing her, right?

18 A  I don't know if it was before or after.  Yes—

19 Q  Okay.

20 A  —I would have gotten nervous.

21 Q  All right.  And then he talked about wanting to leave; isn't

22    that correct?

23 A  Yes.

24 Q  Okay.  But he never left, did he?

25 A  No, he did not.

1 Q Okay. And he continued to answer all your questions?

2 A Yes, he stayed until approximately 4:00 o'clock that

3 afternoon.

4 Q All right. Now you indicated to the prosecutor that you told

5 Mr. Mishall that he—that someone was seen running by the

6 store; is that—is that correct?

7 A That's correct.

8 Q All right. And did your investigation reveal that Mr. Mishall

9 has a right fused hip?

10 A No.

11 Q Okay. With regard to the promotions you discussed, was money

12 ever discussed?

13 A Promotions?

14 Q Right.

15 A And money?

16 Q The promotion that he did not get for the store, was there any

17 discussion with him about how much she was going to make or

18 how much he was going to make?

19 A No, that was not a part of the discussion.

20 Q But eventually he indicated to you that he understood that her

21 getting the promotion was the right thing?

22 A That it went with whatever company policy was.

23 MR. SVIKIS: Okay.

24 I have no further questions.

25 THE COURT: Any redirect?

1                              REDIRECT EXAMINATION

2    BY MR. BROWER:

3    Q    You became aware of several items that were taken from the

4         store that morning, including money and a surveillance tape

5         and recorder as well as the movie *Celebrity* something or

6         another that you mentioned before, right?

7    A    That's correct.

8    Q    And the only item that was eventually recovered was that

9         rental movie that he eventually acknowledged taking from the

10        store, going to the front of the store to retrieve, and

11        running back to his car and leaving quickly?

12   A    That's correct.  And he said he had taken it that day.

13        Because I asked, I said that could be an alibi if you took it,

14        say, three weeks ago, you could say you just used that today

15        and that's why you were at the front of the store.  He said,

16        no, I got that today, so that was taken that day.

17   Q    That morning?

18   A    That morning, correct.

19                     MR. BROWER:    Nothing further.

20                     MR. SVIKIS:    No further questions.

21                     THE COURT:    You can step down, sir.  Thank you.

22                     THE WITNESS:    Thank you.

23                     MR. BROWER:    People call Jim Jilek to the stand.

24                     THE COURT:    You do solemnly swear or affirm the

25        testimony you're about to give shall be the truth, the whole

                                    363

1    truth, and nothing but the truth, so help you God?

2              MR. JILEK:   I do.

3              THE COURT:   You may be seated.

4                        JAMES JILEK,

5    called at 3:30 p.m., and sworn by the Court, testified:

6                      DIRECT EXAMINATION

7  BY MR. BROWER:

8  Q   Mr. Jilek, will you please state your full name for the record

9      and spell your last name.

10 A   James Jilek—J-i-l-e-k.

11 Q   Mr. Jilek, back in 1991 you owned several Minute—of the

12     Minute Market stores or were part owner of those stores; is

13     that correct?

14 A   Yes, sir.

15 Q   And how many stores were there at that time?

16 A   Four.

17 Q   Where were they located?

18 A   Sprinkle Road, Stadium Drive, South Westnedge, and Gull Road.

19 Q   Are you familiar with one of the employees by the name of

20     Christine Dimmick?

21 A   Yes.

22 Q   Prior to the first week in February, thereabouts, February 4,

23     where had Chris Dimmick been working?

24 A   She was assistant manager at our South Westnedge store.

25 Q   And Patrick Mishall was another employee?

1   A   Yes.

2   Q   Were you aware that they had been dating?

3   A   Yes.

4   Q   Were they working in the same store together?

5   A   No.

6   Q   Why not?

7   A   We preferred that spouses or people with—that were going out

8       work in different stores.

9   Q   Where was Patrick Mishall working then prior to

10      February—February 4, 1991?

11  A   Stadium Drive.

12  Q   The—There's an assistant manager and there's a manager for

13      every store location; is that correct?

14  A   That's correct.

15  Q   The manager—store manager—would work what—typically what shift

16      or during what period of the day?

17  A   Typically the manager would work during the day, and the

18      assistant manager would work during the night and close the

19      store.

20  Q   Early in February or late January—whenever it was—did a

21      manager's position come up at the Stadium Drive store?

22  A   Yes.

23  Q   Who had been the previous manager there?

24  A   George Brandon.

25  Q   That left a possibility of a promotion to manager from amongst

1    your remaining employees; is that right?

2  A  Yes.

3  Q  And who got that position?

4  A  Christine Dimmick.

5  Q  February 4 of 1991 was her first day as manager at the

6     Stadium Drive, correct?

7  A  Yes.

8  Q  So not only did she change her position on that day, she

9     changed the hours of her work and the store location?

10 A  Yes.

11 Q  Changing managers or changing personnel at stores, I would

12    assume, is not an uncommon occurrence with your stores?

13 A  No, it is not.

14 Q  Was there a procedure that you went through with a change in

15    personnel, and particularly managers or assistant managers,

16    that had keys to the building?

17 A  Yes, we would relock the—the locks—or change the locks, and we

18    would have Sonatrol assign a new access code for the burglar

19    and fire alarm to the new manager and then remove the other

20    manager from that access code.

21 Q  Let's talk about that a little bit.  First with the keys, when

22    you change the locks, meaning literally that a key that used

23    to work will no longer work?

24 A  That is correct.

25 Q  That prevents somebody that is no longer employed from taking

366

1    an old key and accessing the store?

2  A    That's correct.

3  Q    And as far as the access codes that you referred to with

4    Sonatrol, can you describe exactly what you mean by that?

5  A    To enter or to leave the store properly, one would need an

6    access code, which would be their own personnel PIN number, so

7    to speak.  And they had a certain amount of time to punch in

8    their—their access code when entering and leaving the

9    building.

10               MR. BROWER:   Exhibit 29, please.

11  BY MR. BROWER:

12  Q    Is this the back—or the control panel that you're referring to

13    or one like that?

14  A    One—Yes, one like that.

15  Q    All right.  That was your standard procedure.  Did you follow

16    that standard procedure with this change in personnel with the

17    old manager leaving and Chris coming in?

18  A    Yes, we did.

19  Q    You changed the locks on the Stadium Drive store?

20  A    That is correct.

21  Q    What is involved as far as changing the access codes, then,

22    for—with Sonatrol—for this location—the Stadium Drive

23    location?

24  A    Simply call Sonatrol—their office—and they take care of it

25    from there and assign a new number.

1  Q   Okay.  For example, if Chris Dimmick was added you would give
2      her a specific or unique number that she would punch in which
3      would identify her as an authorized user?
4  A   Yes.
5  Q   And the person who had a number previously, that number was
6      deleted and would no longer work?
7  A   Yes.
8  Q   Now Patrick Mishall had been an employee at that
9      store—Stadium Drive—prior to February 4—
10 A   Right.
11 Q   —was his name then changed so he no longer was an authorized
12     user?
13 A   I'm sorry, I can't remember if that was done or not.
14 Q   All right.  As an assistant manager he would have had access,
15     though, correct?
16 A   Yes.
17 Q   Sir, would reviewing a letter from your company and
18     yourself—authored by you—to Sonatrol refresh your recollection
19     about the changes for Patrick Mishall?
20 A   I would assume so.
21 Q   Would that be of assistance?
22 A   Yes.
23 Q   Is your memory refreshed now, sir?
24 A   Yes.
25 Q   Did you request that Patrick Mishall be taken off

1    Stadium Drive and then added to his new place of employment—or

2    the new building, anyway, on South Westnedge?

3  A  Yes.

4  Q  When was the store on Stadium Drive to have opened?   When was

5    the normal opening time?

6  A  Seven a.m.

7  Q  At some point did you receive a call that the store had not,

8    in fact, opened?

9  A  Yes.

10 Q  Do you remember approximately what time of the morning it was

11   that you received that call?

12 A  Approximately 7:30 a.m.

13 Q  Where were you when you received this call?

14 A  At our office on Sprinkle Road.

15 Q  That's where the company's main office was located?

16 A  Yes.

17 Q  What action did you take after that call?

18 A  I called the Stadium Drive a number of times and received no

19   answer.

20 Q  You're trying to make contact with some—with Chris?

21 A  That's correct.

22 Q  How many times did you call approximately; do you remember?

23 A  Three, four—

24 Q  On numerous times?

25 A  —three, four, five times 'cause she could have been busy or

369

1    something like that.

2  Q  All right.

3  A  But we received—I mean I received no answer.

4  Q  And after these numerous attempts to call there yourself,

5    what, if anything, did you do after that?

6  A  Called Sonatrol and—

7  Q  What was your purpose in contacting Sonatrol?

8  A  To find out if the alarm had been deactivated and, if so, what

9    time?

10  Q  Pardon me?

11  A  And, if so, what time it had been deactivated.

12  Q  All right.  Did you learn that it had, in fact, been

13    deactivated?

14  A  Yes.

15  Q  Now just so we're clear, when you talk about deactivating that

16    means somebody that had come in—the employee preparing to open

17    the business coming in, punching in the key code which turns

18    the alarm off?

19  A  Yes.

20  Q  And it had been deactivated; is that correct?

21  A  Yes.

22  Q  The fact that it had been deactivated caused you to believe

23    what?

24  A  That something was amiss.

25  Q  There should have been somebody there?

370

1  A  Should have been somebody there answering the phone.

2  Q  All right. What did you do at that point?

3  A  I called the Kalamazoo police—city police—and I also called

4     Wayne Tiller, who is our manager at Westnedge; and those

5     stores are in close—in close proximity and asked him to go

6     over there and check. And then I got in my car and headed

7     over to the store.

8  Q  Wayne Tiller was a manager closest to the scene—or closest to

9     Westnedge or—Excuse me.—Stadium Drive?

10 A  Yes.

11 Q  Did you then eventually make it to Stadium Drive?

12 A  Yes.

13 Q  Who did you find there when you arrived?

14 A  Found Wayne there and a—I believe there was one Kalamazoo

15    police officer there.

16 Q  Going back just for a second to the alarm system that—This was

17    an alarm system that would protect against what types of—

18 A  Fire, break-in or burglary, and panic alarm or robbery.

19 Q  Now with the police officer there and Mr. Tiller there, what

20    did you do?

21 A  Well, we tried the door—doors—and they were both locked.

22 Q  Doors—Okay. You tried the doors.

23 A  Tried the doors.

24 Q  All right.

25 A  Then finding them locked—I had the key.—opened the door, went

1    in, and Wayne and I and the police officer went in and the—We

2    were looking around, and the police officer went in the back

3    room and said there had been a robbery and told Wayne and I to

4    get out; so we exited the building.

5  Q    Then other officers eventually came to the scene as well, and—

6  A    Yes.

7  Q    —you remained there at the scene in the area?

8  A    Yes.

9  Q    Did someone eventually come to get you to help in identifying

10   the body?

11 A    Yes.

12 Q    Did you reenter with that officer?

13 A    Yes, I did.

14 Q    Who was the officer, do you recall?

15 A    I do not know.

16 Q    All right.   And the—Were you able to identify the body that

17   was in the back room?

18 A    Yes.

19 Q    Who was that?

20 A    Christine Dimmick.

21 Q    Let's talk about the lights that would normally be left on

22   inside the—the business after closing.   Is there standard

23   procedure as to which lights would be left on and which lights

24   would be turned off?

25 A    Yes.   Some of the lights had switches which were blocked with

1      tape so they—they couldn't be turned off.

2  Q   Okay.

3  A   And those would not be turned off.  The rest would be turned

4      off.

5  Q   Office light left on or off, do you know?

6  A   I can't remember if that was left on or off.

7  Q   You don't have to close up the businesses; you've got

8      assistant managers for that.

9  A   Yes.

10 Q   All right.  Were you able to determine whether or not anything

11     was missing from the store?

12 A   Yes.

13 Q   What were those items?

14 A   Items missing were money—cash and coin—and the surveillance

15     VCR from the office.

16 Q   As well as the tape that would have been recording the

17     interior—any activity in the interior of the store, right?

18 A   That's correct.

19 Q   Did you eventually learn that there was another rental or

20     VHS tape *Celebrity Sluts* that was taken from the store as

21     well?

22 A   Yes.

23 Q   The amount of money that was missing or—Excuse me.—the money

24     that you're referring to as missing would have been the

25     previous day's receipts; is that correct?

373

1  A   That's correct.  As well as money that was held back for
2      lottery payouts and general change.
3  Q   Now change meaning there's an area in the office where rolled
4      coin is kept to make change for the cash registers?
5  A   Yes.
6  Q   And the person that would be best able to testify regarding
7      the amount of the previous night's receipts was the person
8      that had taken in the money the previous night and closed,
9      that being Tina Telpy?
10 A   That's correct.
11 Q   The taping system that's part of the security system, could
12     you please tell us what happened with those tapes—what
13     routinely would happen with those tapes?
14 A   Yes.  The system ran 24 hours a day, and every 48 to 72 hours
15     the manager would take the tape out of the VCR and send it to
16     the office in case we needed to view something and then
17     replace that and start the—the VCR again.
18 Q   The tapes are never thrown away, they would always be
19     forwarded on to the main office eventually; is that correct?
20 A   Yes.
21 Q   You said they were 48-hour tapes?
22 A   Forty-eight to 72 hours.
23 Q   All right.  The tape would have been—If a new tape was needed
24     it would be placed in during the early morning hours of a
25     particular day as opposed to midday or in the evening; is that

374

(Tape No. B2004-034, 6-15-04, 15:47)

1     correct?

2  A   That's correct.

3  Q   All right. Now in addition to the tape that would have been

4     in the machine and recording whatever occurred inside the

5     store on—at 6:00 o'clock or 7:00 or 8:00 o'clock on

6     February 8, did you discover that other tapes for prior days

7     were also missing?

8  A   Yes. The one previous that should have been taken out on that

9     Friday and a new one put in that Friday morning and then the

10    one that was from Wednesday—Yeah, that would be Wednesday

11    through Friday.

12  Q   Wednesday through Friday was missing?

13  A   Right.

14  Q   You eventually were able to discover a tape at your office, I

15    believe, regarding Mr. Mishall being at the store on Monday

16    morning, the 4th; is that right?

17  A   That's correct.

18  Q   All right. That would have been the end of the tape and

19    another tape would have been placed in on Monday morning for

20    the rest of the week; is that right?

21  A   For Monday through—Monday and Tuesday and late night or—Excuse

22    me.—early morning on Wednesday, that's correct.

23  Q   The one that showed Patrick Mishall assisting with the opening

24    on Monday, the 4th, was the last tape that you had?

25  A   Yes.

1   Q   For the rest of that week they're all gone?

2   A   I believe so.  I believe that is correct.

3   Q   Never made it to the main store?

4   A   No.

5   Q   And were not at the store at the time the police were there

6       investigating the murder?

7   A   No, they were not.

8   Q   And have never showed up since?

9   A   No.

10              MR. BROWER:   I have nothing further of this

11       witness.

12                     CROSS-EXAMINATION

13  BY MR. SVIKIS:

14  Q   Mr. Jilek, so after a manager is moved out or discharged and

15       there's a new person you change the security code—

16  A   Yes.

17  Q   —immediately?

18  A   Well, we try to do it—get everything set up beforehand if we

19       knew they were leaving.  If there was some—something

20       unforeseen happened, we'd have to call the People at Sonatrol;

21       and they would take care of it from there.

22  Q   And you rekeyed the locks, also?

23  A   Yes.

24  Q   And after February 8th—on the date that Chris Dimmick was

25       robbed and murdered—you changed the codes?

                              376

1    A    I'm not sure what we did at that point. I believe we—

2    Q    That would—

3    A    We would do that.

4    Q    —have been your procedure?

5    A    That would be our procedure.

6    Q    All right. And also the locks—

7    A    Yes.

8    Q    —rekeyed the locks?

9        The promotions that Ms. Dimmick got over

10    Mr. Mishall, is one a manager and one assistant manager; or do

11    you have a number of managers and a number of assistants?

12    A    Typically one manager per store and one or two assistant

13    managers per store.

14    Q    So was Patrick Mishall on Stadium Drive an assistant manager?

15    A    Yes, I believe so.

16    Q    And Christine Dimmick was a assistant manager on Westnedge and

17    then promoted and transferred to Stadium; is that how that

18    worked?

19    A    Yes.

20    Q    All right. And the best of your recollection, what would have

21    been the range of the hourly pay?

22    A    I can't remember. I honestly can't remember.

23    Q    All right. Do you know what the—the best of your recollection

24    what the disparity between manager and assistant manager by

25    percentage would be?

1 | A | I would say 33 percent.

2 | MR. SVIKIS:  Thank you.

3 | I have no further questions.

4 | MR. BROWER:  Nothing further.

5 | THE COURT:  Nothing further?

6 | You may step down, sir.

7 | MR. BROWER:  People call Tina Askren to the stand.

8 | THE COURT:  Raise your right hand.  You do solemnly

9 | swear or affirm the testimony you're about to give shall be

10 | the truth, the whole truth, and nothing but the truth?

11 | MS. Askren:  I do.

12 | THE COURT:  Be seated.

13 | TINA LOUISE SARAH ASKREN,

14 | called at 3:52 p.m., and sworn by the Court, testified:

15 | DIRECT EXAMINATION

16 | BY MR. BROWER:

17 | Q | Ma'am, could you please state your full name and spell your

18 | last name for the record.

19 | A | Tina Louise Sarah Askren—A-s-k-r-e-n.

20 | Q | Back in 1991 you had a different last name?

21 | A | Telpy—T-l-T-e-l-p-y.

22 | Q | Ma'am, in February of 1991, where were you employed?

23 | A | At the Minute Market on Stadium Drive.

24 | Q | What was your position there?

25 | A | Night manager.

378

1  Q  Responsible for close-up procedures and locking the building

2     up in early morning hours—

3  A  That's correct.

4  Q  —sometime after midnight?

5  A  Till about 2:00 a.m.

6  Q  All right.  That was when the store closed—locked—the doors

7     locked?

8  A  Correct.

9  Q  Tell me about your close-up procedure, what you did in

10    preparation or after the doors locked.

11 A  About midnight I'd start counting customers to watch who went

12    in and who went out.  I'd walk down the corridors, make sure

13    that nobody was in the store; clean the restrooms, put away

14    the bottles, get ready for cash—cashing out the night.

15 Q  You said clean the—clean the restrooms?

16 A  Correct.

17 Q  Okay.

18 A  It was responsibility for me to clean the restrooms at night.

19              MR. BROWER:  All right.

20              Exhibit number one, please.

21 BY MR. BROWER:

22 Q  This is an exhibit that has been admitted, ma'am, of the floor

23    plan.  Is that approximately accurate to the best of your

24    knowledge?

25 A  Yes.

379

1    Q    All right.  You say you would walk up and down the aisles.  Do

2        you mean literally would go and check the aisles?

3    A    I would start on the north wall and—No, further down at the

4        beginning of the building.

5    Q    All right.

6    A    Stadium Drive.

7    Q    . . . (inaudible)

8    A    Yeah.  I would walk down that corridor.  There were camera—not

9        cameras but mirrors—

10    Q    I'm sorry?

11    A    —in the corner—Mirrors.

12    Q    Right.

13    A    —so that you were able to see the different parts of the

14        building without having to feel, you know, blind spot—

15    Q    Uh-huh.

16    A    —proceed down towards the bottle room, verifying that there

17        was still nobody in the store; open the bottle room doors to

18        make sure there's nobody in there; proceeded to look in the

19        corner where the bathrooms are and look down the corridor and

20        then proceeded towards the office and back to the counter and

21        do that several times a night.

22    Q    Okay.  Especially the later it got and the closer—

23    A    Yeah.

24    Q    —to closing?

25        Now would you do anything in particular regarding

1    the bathrooms and the doors?

2  A  The bathroom doors were always left open once they were

3    cleaned.

4  Q  Literally standing open?

5  A  Yeah, they were propped open, yes.

6  Q  Okay.  Once the doors were locked at 2:00 a.m., what did you

7    have to do?

8  A  Take care of the nightly deposit and then punch out.

9  Q  What's involved with taking care of the nightly deposit?

10 A  Take the cash register drawer out of the cash register and the

11   cash register drawer out of the lottery machine and any money

12   that might be in the front safe that I've dropped periodically

13   through the night, bring it to the back office, proceed to put

14   it—count it, make sure my drawer balanced out to $100—the

15   loose change, food stamps, plus whatever cash would make

16   $100—and then put the deposit bag and the lottery receipt

17   stuff in a deposit bag and put it in the floor safe.

18            MR. BROWER:   Exhibit number 15, please.

19 BY MR. BROWER:

20 Q  This has been described as being the floor safe in the—behind

21   the front counter—It's obviously empty.—the one by the cash

22   registers.

23 A  I couldn't tell you if that—

24 Q  All right.

25 A  I mean if you say—

                          381

1  Q    From—

2  A    —that's what it is, that's what it looks like.

3  Q    That—

4  A    They looked almost identical.

5              MR. BROWER:   Sure.

6              Fourteen, please.  I did the wrong way.

7              And then 13, 12.

8  BY MR. BROWER:

9  Q    Does that help give you—orient you a little bit?

10 A    Yeah.

11 Q    All right.  That front safe being empty would be consistent

12      with your procedure in taking it and putting it into the back

13      safe?

14 A    Correct.

15             MR. BROWER:   All right.

16             Exhibit numbers 18, please; and then 19.

17 BY MR. BROWER:

18 Q    It's been described as being the drawers in the two cash

19      registers.  With what you see there, would that be consistent

20      with the hundred dollar start-up money being in there?

21 A    That looks about right, yes.

22 Q    The money that you had taken—that day's receipts and so

23      on—what specifically do you do with that money?

24 A    That went in the floor safe in the back office.

25 Q    Is it all loose?

1  A    No, it's in a deposit bag.

2  Q    All right.  And you would put that money in the deposit bag,

3       put it in a similar floor safe that's in the back room?

4  A    Correct.

5  Q    All right.  Approximately how much money was there on this

6       date that you had put into that back floor safe?

7  A    I don't know the exact amount.  It was between two and—2,000

8       and $2500.

9  Q    Now we have no way of knowing, is that a particularly large

10      amount for a day's sales?

11 A    I don't recall.

12 Q    All right.  Had you ever called Chris—the day

13      manager—to—Excuse me.—on this morning?  Did you call Chris to

14      tell her that there was a large amount of money here just to

15      let her know in advance?

16 A    No.

17 Q    You did not call Chris to warn her about—

18 A    No.

19 Q    At some point did the detectives ask you to come to the—into

20      the store and to assist with determining what was taken?

21 A    Yes, they did.

22 Q    Go into the back office area?

23 A    Correct.

24 Q    Did you look for the money that you had deposited on that day?

25 A    Correct.

1          MR. BROWER:   Exhibit number 40, please.

2          Maybe go back one.

3    BY MR. BROWER:

4    Q    Now there is what appears to be cash drawers on this

5         Canada Dry shelf; is that right?

6    A    That's correct.

7    Q    Could you tell us what significance that has?

8    A    There were four start-up drawers.  There—We have a total of

9         eight, but we only used four.  They all had loose change in

10        them up to $100, the Canada Dry boxes—or whatever the—the

11        boxes sitting on top to cover them.  They were always kept

12        closed, and only the one that was, you know, taken out to use

13        was moved at the time, so—

14   Q    And at the base of this is the floor safe, correct?

15   A    Correct.

16         MR. BROWER:   Exhibit 40.

17         THE WITNESS:   Yeah.

18   BY MR. BROWER:

19   Q    Right there?

20   A    Uhm-hmm.

21         MR. BROWER:   Exhibit 41.

22   BY MR. BROWER:

23   Q    Did you review the contents to see whether your deposit

24        or—Excuse me.—the receipts from the—Well, when you put it in

25        there sometime after 2:00 o'clock, right?

384

1   A   Correct.

2   Q   The same day that you were back there looking—

3   A   Correct.

4   Q   —to assist them?

5           The money was not in there?

6   A   No.

7   Q   Did you check whether or not it was on the counter or the desk

8       there or—

9   A   I did not see it.

10  Q   It was gone?

11  A   Correct.

12  Q   Now there's a box or—I don't know if it's called a safe.—or

13      some other storage unit for change; is that right?

14  A   Correct.

15  Q   Describe that type of—What did you call it?

16  A   A coin box—

17  Q   Okay.

18  A   —where we exchanged our coins for.

19  Q   Okay.  Your—The—

20  A   I think that's what it was.

21  Q   —coin box?

22  A   Yeah.

23  Q   Where was that kept?

24  A   I think on the right side of the desk in the corner.  It's not

25      something you could pick up.  It's a couple hundred pounds.

1  Q    Okay.

2  A    It was extremely heavy, especially when it had coins in it.

3       That even made it even—not something that could move.

4                 MR. BROWER:   Exhibit number 36, please.

5  BY MR. BROWER:

6  Q    Is that coin box in this photograph, or is it outside the

7       view?

8  A    It would be near where the red item is located on the

9       screen—middle of the item is the—it would be over there.  I'm

10      not sure if it's exactly in that picture or not.

11  Q   All right.  Now the red item that you're referring to is

12      where?

13  A   Right there?

14  Q   This?

15  A   Yeah.  The coin box would—I think was on top of it, but I'm

16      not certain if that was it or not.

17  Q   Somewhere in this area—

18  A   Correct.

19  Q   — . . . (inaudible)

20  A   It was just on the other side, yeah.

21  Q   To the right of the desk?

22  A   I do believe so, yes.

23  Q   And that was, you say, a pretty heavy item.

24  A   Yes.

25  Q   Is that because of the contents as well?

386

1  A   I think even with the contents out—

2  Q   All right.

3  A   —when we've counted the coins it was heavy.

4  Q   Okay.  Now you had worked that shift.  Was there—Were there

5      coin in that?

6  A   There were coins and cash in there 'cause during the day when

7      we make—we have to make change, we have a ten dollars, we need

8      $10 in quarters.  We'll put a ten-dollar in and take quarters

9      out.

10 Q   All right.  So there always should be the same amount of money

11     in—

12 A   Correct.

13 Q   —in that safe?

14 A   Correct.

15 Q   Did you—When you came to check—or to assist the police

16     department in determining if there was money taken, did you

17     check that safe—that coin safe?

18 A   Yes, I did.

19 Q   What did you find?

20 A   There was just—I think rolls of pennies, I think.  There

21     wasn't anything in it.

22 Q   It was all gone?

23 A   Yeah.  Yes.

24 Q   Was this coin safe—Well, let me ask this first.  Did this coin

25     box have a lock?

                            387

1   A   Yes, it did.

2   Q   When you went to inspect it was the coin box locked?

3   A   Yes, it was.

4   Q   How do you get into that coin safe?

5   A   The desk drawer by the chair down there—

6   Q   Yes?

7   A   —there's a drawer in there, and inside is a large ring of

8       keys.  None of them are labeled.  You reach in, you grab the

9       right key, and you go and unlock the cash—the coin box, and

10      then you get which coins you want out, you set them on the

11      counter, and then you lock it back up and close it and you

12      throw the keys back in the drawer.

13  Q   There would be no reason for the coin box to remain unlocked—

14  A   No.

15  Q   —all the time?

16  A   No, it was only when we were counting to cash out for the

17      night—the deposits—our drawers—and making sure that the coins

18      needed to be replenished.

19  Q   So the only way to get into that coin box is with that key?

20  A   Correct.

21  Q   And that was on a ring in the drawer of the desk along with

22      many other keys?

23  A   Yes, correct.

24  Q   When you checked that coin box, how did you gain entry?

25  A   Through the key in the drawer.

388

1  Q  That key was, in fact, still on the ring and in the drawer?

2  A  Correct.

3  Q  But the contents were empty yet the key was still back in the

4     drawer?

5  A  Correct.

6  Q  Prior to closing the door—Excuse me.—locking the—the entrance

7     doors on this occasion in the early morning hours of

8     February 8, did you check all the hallways, back rooms,

9     bathrooms—

10  A  Yes, I did.

11  Q  —and every nook and cranny to make sure there wasn't anybody

12     there?

13  A  Yes, I did.

14  Q  Why did you do that?

15  A  For my safety.  I'm not going to be locked in a building with

16     somebody.

17  Q  And is that something that was on your mind frequently—as a

18     matter of fact, all the time?

19  A  All the time, yes.

20  Q  This counting customers—making sure one in, one out—is that

21     something that you always did and did on this occasion, too?

22  A  Always did it and did it on that occasion.

23  Q  When you closed the store was there anybody in that—

24  A  There was nobody in the store.

25  Q  Any possibility that somebody could have been in there hiding

389

1   somewhere?

2   A   No.

3   Q   You were the night manager and Chris was the newly promoted
4       day manager; is that right?

5   A   Correct.

6   Q   Did you know her and Patrick both prior to February 4, 1991?

7   A   I'd met her before at an employee meeting, and Patrick and I
8       worked probably for a year in the store together.  She had
9       been hired before, and that's why she got promoted.

10  Q   Now you became aware of Christine's promotion prior to her
11      first day as day shift manager, yes?

12  A   Yes.

13  Q   Did you have contact with Patrick Mishall after that
14      announcement that she got the promotion?

15  A   Yeah.

16  Q   What was his reaction as to Christine's getting the promotion?

17  A   He was very angry and upset that he didn't get the promotion.

18  Q   You said—

19  A   He didn't understand.

20  Q   —very angry.  What did—What did you observe about his
21      demeanor—what he said—that caused you to say he was very
22      angry?

23  A   He didn't show up for a couple days.  He said he didn't feel
24      like coming in.  And just—He seemed very hostile.  It wasn't—I
25      didn't feel comfortable being in the same room or the same

                            390

1   area with him.

2  Q  So it wasn't just the fact that he wasn't at work, but it was

3     interaction between the two of you at some point as well?

4  A  He just wasn't—He was not happy.

5  Q  Was there discussion regarding Patrick getting Christine's

6     work key?

7  A  Once on the phone and once in the back. There's no doors

8     between the counter area and the back room. He had asked for

9     a key to the store, and she said he didn't need one.

10 Q  Okay. You're overhearing this conversation?

11 A  Yeah.

12 Q  It wasn't with you as a participant?

13 A  No, they were standing there talking rather loudly about it.

14 Q  All right. Now—

15 A  And—

16 Q  —this was at what store?

17 A  Stadium Drive store.

18 Q  And this was after Chris's promotion?

19 A  Correct. Probably a couple days.

20 Q  And Patrick was there, and there was this argument.

21 A  Correct.

22 Q  Now you were at what part of the store, and they were at what

23     part of the store?

24 A  Around the—behind the counter area waiting on customers.

25 Q  And they were where?

391

1  A    By the office door right—I mean real close to—between the

2       two—the main floor and the back room.

3               MR. BROWER:  Exhibit number 28, please.

4  BY MR. BROWER:

5  Q    That's been described as a view from the end of the cash

6       register or counter looking through the double doors into the

7       back room; is that right?

8  A    Yes, correct.

9  Q    And they were somewhere in the—

10  A    This side of the cart.

11  Q    Okay.  Within just ten or 15 feet of the—

12  A    Our distance away.

13  Q    All right.  Tell me what you heard regarding their discussion

14       again.

15  A    He wanted a key for the store, and she said he didn't need a

16       key.  There were only—They redid the keys; so there was Jim,

17       I, and Christine that had a key to the store, and that was all

18       that needed—There was no need for him to have a key.

19  Q    Was this a cordial conversation?

20  A    No, it was—As I said, it was heated 'cause you could hear it.

21  Q    All right.

22  A    It wasn't, you know, quiet by any means.

23  Q    She wouldn't give it to him?

24  A    No, she did not feel he needed a key; and she was pretty stern

25       on that.

1   Q   Were there other fights that you were aware of between

2        Patrick Mishall and—and Christine Dimmick as well?

3   A   They argued on the phone whether it was her on the phone or

4        him on the phone. I only heard one side of the conversation

5        either way. They weren't—They argued sometimes when they came

6        in the store.

7   Q   Was there ever any discussion between you and

8        Patrick regarding a gun?

9   A   Yes.

10   Q   Tell us about that discussion.

11   A   Jim—At that time there were lots of different robberies going

12        on, and we were discussing—

13   Q   Meaning Jim—

14   A   Jilek—

15   Q   All right.

16   A   —the owner. There were different—You know, he had said

17        something previous, and we got to talking; and he'd always

18        told us to give the guy his money and let him go, your life

19        isn't worth it. And he said he had a gun, and he knew how to

20        use it.

21   Q   He said?

22   A   Patrick said he knew—He had a gun and he knew how to use it.

23        And he said he'd put it underneath the counter, you know. And

24        I told him he can't do that, you know—

25   Q   When was—

1  A    —you just got to give it to him.

2  Q    —this discussion?

3  A    I don't know exactly when.  It was prior to—I think just

4       before Christine got there or in that frame.

5  Q    All right.  Before Christine transferred—

6  A    To—

7  Q    —into—

8  A    Yes.

9  Q    —this position?

10            Patrick acknowledged that he had a gun?

11 A    Right.

12 Q    Did he give any indication about what kind of gun it was?

13 A    Not that I recall.

14 Q    Let's talk a minute—little bit about the lighting after

15      close-up—

16 A    Okay.

17 Q    —the lighting situation either inside or outside the store.

18 A    Okay.

19 Q    What lights are left on?

20 A    The outside perimeter lights, the light behind the counter

21      where the cash registers are, and the office light.

22 Q    There's a light inside the office—

23 A    Uhm-hmm.

24 Q    —and a light behind the counter?

25 A    And a light behind the counter, yes.

1 Q    Those are always left on?

2 A    Correct.

3 Q    When you arrived at the store at the request of the police

4      department, was that light behind the counter on?

5 A    No, it was off.

6 Q    Did you find that very unusual?

7 A    Yes, it's never gone off.

8 Q    Never been off, period?

9 A    No.

10 Q    Do you know—Where's the light switch for that?

11 A    At the very end of the counter.

12 Q    Against the north wall?

13 A    Correct.  The wall next to the Stadium Drive.  It's all the

14      way there.

15              MR. BROWER:   Exhibit number 11, please.

16 BY MR. BROWER:

17 Q    This is a view from the open end—

18 A    The fire extinguisher, and then just left of that is some

19      film, and just left of that is a wall switch.  On the—On the

20      left of it is something white.  I don't remember what it was.

21 Q    What'd you say?

22 A    There's something white there.  I can't tell what it is.

23 Q    All right.

24 A    More film packaging, maybe an instant camera.  That was where

25      the instant stuff—But the switch is between there.

                              395

1   Q   So in order for that light to be off somebody obviously had to

2       go down there and—

3   A   You have to walk all the way behind the counter 'cause there's

4       no way to reach it from the other side of the counter unless

5       you're climbing on top of it.

6   Q   The Patrick Mishall that you've been talking about, is he

7       present in the courtroom today?

8   A   Yes, he is.

9   Q   Where is he sitting, and what is he wearing?

10  A   He's sitting over on the left in a—I believe it's green shirt.

11  Q   Sitting at the table marked defendant?

12  A   Yes.

13              MR. BROWER:    If the written record can reflect the

14      identification of the defendant, your Honor?

15              THE COURT:    It may so indicate.

16              MR. BROWER:    No further questions.

17              THE COURT:    Mr. Svikis?

18              MR. SVIKIS:    Thank you.

19                      CROSS-EXAMINATION

20  BY MR. SVIKIS:

21  Q   This conversation about a gun, that was mentioned one time?

22  A   Yes.

23  Q   Okay.  But he never brought in a gun, did he?

24  A   Not that I know of.

25  Q   Well, you would have known, wouldn't you?

                        396

1  A  Not necessarily.

2  Q  You think he would of hid—What?—he have hidden it somewhere?

3  A  I would not know that.

4  Q  Okay. So if I understand this correctly, he told you that he

5     could bring in a gun for protection, but he would bring it in,

6     if he did, and he would hide it; is that correct?

7  A  That's what he said.

8  Q  But he said that he would hide the gun?

9  A  He said he could put it underneath the counter and nobody'd

10    know it was there.

11 Q  Nobody meaning someone coming in the store?

12 A  I would not assume what he meant.

13 Q  Okay. And I trust you didn't take it this was bragging or

14    anything, right?

15 A  He sounded pretty serious.

16 Q  Did you call Mr. Jilek and tell Mr. Jilek that Patrick Mishall

17    was thinking of bringing in a gun?

18 A  I don't recall if I called him, but I might have mentioned it

19    to him when I saw him; but I don't—

20 Q  Okay. You have no recollection of calling Mr. Jilek—

21 A  No.

22 Q  —about Pat threatening to bring in a gun; is that correct?

23 A  Correct.

24 Q  Okay. And a gun is a pretty serious thing, right?

25 A  Yes.

1   Q   Okay.  And if you would have seen a gun you would have called

2       Mr. Jilek, right?

3   A   That's correct.

4   Q   Now I'm not real clear on all the safes, the cash drawers, and

5       everything.  And let me start with this: when you left at

6       about 2:00 a.m. the night before—

7   A   Correct.

8   Q   —what would have been the total amount—plus or minor—your best

9       estimate of all the cash in the store?

10  A   I don't recall the exact amount, but I do believe—

11  Q   I didn't say—

12  A   —it's between 2,000 and 2500.

13  Q   How much?

14  A   Two thousand and 2500.

15  Q   And that would be distributed between how many safes?

16  A   It would be one and the cash deposit.

17  Q   And another—And that would be a floor safe?

18  A   That's correct.

19  Q   And there would be another floor safe, also?

20  A   There's one in the office and one out front, and the one out

21      front is empty behind the counter.

22  Q   And that's always empty?

23  A   At night, yes.

24  Q   Now there are how many cash registers?

25  A   Two registers and one lottery machine register.

398

1  Q  All right.  And those are left open or closed when you leave

2      so they don't—so someone doesn't trash the machine if they

3      break in; is that correct?

4  A  They're left open, and no drawer is in it.

5  Q  And no drawer is in it?

6  A  Correct.

7  Q  Out of either of the three?

8  A  That's correct.

9  Q  And those three are put back in the Canada Dry shelf?

10  A  That's correct.

11  Q  Okay.  And when those drawers are placed back in the

12      Canada Dry shelf, is there any makeup money in those drawers,

13      or are those completely empty, also?

14  A  The change plus the cash and the food stamps—about $100

15      start-up.

16  Q  So each of those drawers contains $100, so that would be $300

17      contained in those three drawers—or is it four?

18  A  I think—

19  Q  Plus or minus?

20  A  Yeah, plus or minus, yeah.

21  Q  All right.  And then we also have what you referred to as a

22      coin box?

23  A  Correct.

24  Q  Was that in one of the slides that you—

25  A  It was just outside of the slide, I do believe.

(Tape No. B2004-034, 6-15-04, 16:19)

1  Q  All right. Is the coin box something that you could pick up

2     the whole coin box?

3  A  No.

4  Q  Describe that for me. Did you see it in any of the slides?

5  A  I don't recall seeing it, but it might have been there and I

6     didn't see it.

7  Q  Tell me what you recall about the size of the coin box and

8     where it was.

9  A  Only think I can think of is like a World War II big box—a

10    metal box.

11 Q  Ammo box?

12 A  Type—Yeah, that type of box. And it had a key in it, and you

13    unlocked it and opened it that way.

14 Q  And it's affixed to something?

15 A  I don't know if it's affixed to the counter or not. I don't

16    recall.

17 Q  And during operations how much money would be in that coin

18    box?

19 A  I don't recall the amount.

20 Q  I mean are we talking like $50 to make change or dollar bills

21    and everything else.

22 A  Ones, fives, tens, quarters, and dimes, nickels—that type of

23    thing. Probably a couple hundred bucks in there.

24 Q  All right. And then in the evening whatever was in there

25    during the day was still in there at night?

1  A  Correct.

2  Q  All right.  So any other location where money could have been?

3  A  No.

4  Q  So when you came in the next day, the cash—the three cash

5     drawers on the Canada Dry shelves, did those still have the

6     money in it, or was it gone?

7  A  Change in it and the food stamps.

8  Q  So the folding money was gone?

9  A  Correct.

10 Q  All right.  The money that was put into one of the floor

11    safes, that was gone?

12 A  Correct.

13 Q  And the cash drawer, what was—

14 A  I think the only thing I remember seeing was pennies left in

15    there; everything else was gone.

16 Q  All right.  So as far as you know, all the folding money—

17 A  Was gone.

18 Q  —was gone.

19         Now did you work together with Patrick Mishall at

20    the same time?

21 A  Occasionally.

22 Q  Okay.  Prior to February 8th how many times had you worked

23    together?

24 A  I would not know.

25 Q  So both of you were—Were you an assistant manager?

1   A   After he left, yes.

2   Q   He never went—As far as you know, he never went back after

3       February 8th, isn't that correct?

4   A   I would not know.

5   Q   Okay.  Did you go back after February 8th to work?

6   A   Yes, I did.

7   Q   Did you ever see him again after February 8th working at the

8       store?

9   A   Working, no.

10  Q   Okay.  And do you recall if you were promoted over

11      Chris Dimmick?

12  A   No, I don't understand the question.

13  Q   You were never at—You were never both assistants and she got

14      promoted and you didn't or—

15  A   I—

16  Q   You don't recall that?

17  A   She wasn't working at the store.  I was working at the

18      Stadium Drive store; she was working at another store.

19  Q   Okay.  How long had you been working at the Stadium Drive

20      store?

21  A   A couple years.

22  Q   And when the promotion came down for—Let me back up.  To your

23      recollection how long had Pat been working at the

24      Stadium Drive store?

25  A   Maybe a year; I'm not sure.

1  Q  Okay. And you never asked to be transferred out or Pat

2      transferred out because you felt uncomfortable with Pat during

3      that time period, did you?

4  A  No, I did not ask for a transfer.

5  Q  Okay. So this hostility that you felt with Patrick did not

6      cause you to request any changes or have him change or call

7      Mr. Jilek to have something changed about, isn't that correct?

8  A  Restate—I don't understand the question. I'm sorry.

9  Q  All right. You testified that you felt hostile around or you

10     felt hostility around him?

11  A  I said he was hostile with Christine.

12  Q  Oh, hostile with Christine. But you felt fine with him?

13  A  As long as he stayed on one side of the store and I stayed on

14     the other, yeah. We—He did his job, and I did mine.

15  Q  All right. And then Christine gets promoted and moved into

16     your store as the manager; is that correct?

17  A  That's correct.

18  Q  And who was the manager before that?

19  A  I don't remember his last name; first name was George.

20             MR. SVIKIS:  Okay.

21                I have no further questions.

22               REDIRECT EXAMINATION

23  BY MR. BROWER:

24  Q  Ma'am, Patrick Mishall had worked as a temporary or a fill-in

25      manager during the day prior to Chris's promotion; is that

1    right?

2  A   Correct.

3  Q   As such would he have been familiar with the coin box and the

4     location of the key to access that?

5  A   Yes.

6              MR. BROWER:    Thank you.

7                    RECROSS-EXAMINATION

8  BY MR. SVIKIS:

9  Q   While you—We know you're familiar with the access to that,

10    right?

11 A   Correct.

12 Q   And Mr. Jilek told you that if someone came in to rob you to

13    give him all the money, right?

14 A   That's correct.

15 Q   And you wouldn't fool around, you'd give him all the money,

16    right?

17 A   Yeah.

18 Q   Safe, coin box, three cash drawers—the works, right?

19 A   Whatever he wanted.

20 Q   Give me the money, you'd give him everything.  You didn't

21    say—You wouldn't ask the person, do you want this cash drawer

22    and that cash drawer, would you; you'd give him everything

23    pursuant to instructions, right?

24 A   According to what he told me, yes.

25 Q   Okay.  And that's instructions you got from management, right?

                    404

1    Correct?

2  A    Correct.

3              MR. SVIKIS:    Thank you.

4              MR. BROWER:    Nothing further, your Honor.

5              THE COURT:    You can step down.

6              MR. BROWER:    Frank Sila, your Honor.

7              THE COURT:    Raise your right hand, sir.  You do

8    solemnly swear or affirm the testimony you're about to give

9    shall be the truth, the whole truth, and nothing but the

10   truth?

11             MR. SILA:    Yes.

12             THE COURT:    Be seated.

13                         FRANK SILA,

14   called at 4:27 p.m., and sworn by the Court, testified:

15                    DIRECT EXAMINATION

16  BY MR. BROWER:

17  Q    Sir, could you please state your full name and spell your last

18       name for the record.

19  A    Frank Sila—S-i-l-a.

20  Q    Mr. Sila, where are you presently employed?

21  A    I'm employed with SEG out of Tennessee and contracted to the

22       Department of Homeland Security, Federal Protective Services.

23  Q    Back in 1991 where were you working?

24  A    Sonatrol Security Systems.

25  Q    That business is now known as EPS; is that right?

405

1  A    That is correct.

2  Q    In 1991—What was the name of the title you said again?

3  A    I'm sorry?

4  Q    What was your title back in '91 with—

5  A    Operations manager.

6  Q    Operations manager.

7        What does the operations manager do?

8  A    I was responsible for the technical aspect of the company:

9        training—recruiting and training of installation service

10       personnel, central station staff.

11 Q    You supervised the dispatch center?

12 A    That is correct.

13 Q    And monitoring of operators?

14 A    That is correct.

15 Q    Meaning the people that are seated at the desk watching the

16       alarm panels and listening to the audible signal from the

17       different stores and the units that you would protect,

18       correct?

19 A    That is correct.

20 Q    Are you familiar with the system installed at the—what was

21       then the Minute Market store on Stadium Drive—2905?

22 A    I am.

23 Q    Could you describe the system that was installed in that

24       location?

25 A    The system was an audio based detection system that consisted

                              406

1  of multiple microphones throughout the facility, and they were
2  installed based on the premise that you cannot break into a
3  building with a pillow but it takes some type of physical
4  instrument to come through a barrier of glass, a roof, a
5  wall—what have you.

6           And when an intrusion would actually occur those
7  microphones would pick up those sounds and they would be
8  retransmitted back into our central station monitoring
9  facility whereupon a dispatcher would respond accordingly by
10 notifying the police department.

11 Q  Now there's an audio based system—

12 A  Yes.

13 Q  —but there were other means of monitoring and different
14 devices installed to protect against different types of—of
15 dangers; is that right?

16 A  That is correct.

17 Q  Okay.  For instance, there—Excuse me.—this store was equipped
18 with door contacts?

19 A  That is correct.

20 Q  Tell us a little bit about how that particular system would
21 work.

22 A  The door contacts provided what we referred to as a perimeter
23 protection system.  The doors, obviously, were on the
24 perimeter of the building.  Each door opening had a magnetic
25 sensor that would tell us the status of the door, whether it

407

1    was open or closed. And, obviously, if a door were to open

2    during a closed armed period, that was treated as an alarm and

3    responded to accordingly.

4  Q  Different doors at different locations would have different

5    types of door contacts, would they not—some that would be

6    armed all the time and some that would be—have a delay of some

7    sort or another?

8  A  There is what is referred to as a delay door that upon coming

9    through that designated set of doors the alarm system would

10   give you time to come in and disarm the system at the

11   touch pad.

12 Q  Other doors would be—would activate an alarm regardless of

13   the—the time or day that it was—that it was opened unless it

14   was intentionally deactivated?

15 A  That is correct. Obviously, the public entrance doors—though

16   they had magnetic contacts on them—they would generate at the

17   touch pad a chime indicating that that door had opened, but it

18   would not transmit an alarm into our central station.

19           MR. BROWER:  Exhibit 28, please.

20 BY MR. BROWER:

21 Q  Sir, this has been described as being a photograph of the back

22   door on the—what would be the south side of the—the building.

23   There appears to be a white rectangular object near the upper

24   right-hand corner of that door. Would that have been the

25   metal [sic]—magnetic contact that you're referring to?

408

1  A    In all probability—

2  Q    It's hard to tell from that photograph?

3  A    It's hard to tell. I think there's actually a gray magnetic

4       contact at the very top of that door.

5  Q    Okay. There appears to be—Well, let me point it

6       out.—something protruding from the wall right here.

7               MR. BROWER:  You can go to the next exhibit,

8       exhibit 29.

9  BY MR. BROWER:

10 Q    That would be the touch pad that you're talking about?

11 A    That is correct.

12 Q    Now this back door would have a delay before the alarm would

13      activate; is that right?

14 A    That is correct.

15 Q    Someone entering through the back door would have to enter a

16      code into this touch pad within a certain period of time or

17      the alarm would be activated—or the alarm would go off,

18      correct?

19 A    That is correct.

20 Q    Now the process of entering this code and the alarm system

21      being deactivated at the time of opening the store—the

22      store—is that information recorded with—at Sonatrol?

23 A    Yes.

24 Q    Conversely, when the store is closed for the evening and the

25      employee that's leaving wishes to activate the alarm, is that

1    also then recorded at Sonatrol?

2  A  Yes.

3  Q  At the request of police—Well, do you know based on a review

4    of your records what time the alarm was activated in the early

5    morning hours of February 8?

6  A  My records show that the system was armed at 2:15 in the

7    morning of the 8th.

8  Q  And reviewing those same records would it indicate when the

9    alarm was deactivated—that is, when the opening employee would

10    have entered—punched in her code—to disarm the alarm?

11  A  I show the system as having been disarmed at 6:25 in the

12    morning.

13  Q  Six twenty-five a.m.?

14  A  Correct.

15  Q  Now there's the audio portion that you've already testified to

16    briefly about that literally picks up any noise inside the

17    store and transmits to the dispatch center at Sonatrol; is

18    that right?

19  A  That is correct.

20  Q  Now there are persons that are sitting—called operators that

21    are sitting at this dispatch center—

22  A  That is—

23  Q  —literally listening for sounds at various locations?

24  A  That is correct.

25  Q  Do they also have other things that they're looking for other

1 than listening for the audio—an audio signal from the

2 different stores?

3 A They are also using a CRT screen—a computer screen, so that

4 upon receipt of an alarm in addition to the audio that is

5 augmented with a description by name of the account, the

6 account number, and it will even identify which microphones

7 are—are bringing the audio in.

8 Q Who was the operator that was working during that time

9 period—you know, including 2:15 a.m. and 6:25 a.m.?

10 A That would have been Sharon Hitchcock.

11 Q If the operator is sitting and hears a noise after alarm

12 activation—you know, after the system is armed and it's

13 supposed—the building's supposed to be empty. If there's

14 noise detected, does that automatically create some sort of

15 response by Sonatrol?

16 A No. The operator makes a decision based upon the nature of

17 sounds that they're hearing. Normal environmental sound, a—a

18 refrigeration cooler motor running, is identifiable for what

19 it is and is—it does not sound like an intrusion into the

20 facility. So the normal environmental sounds would be

21 disregarded.

22 Q Compressor kicking on—

23 A Correct.

24 Q —ice dropping in the ice machine—something like that?

25 A Correct.

1  Q  So it really requires a human element, also, to recognize that

2      it is—whether or not it's a hostile sound or not?

3  A  That is correct.

4  Q  Was this system recently calibrated and checked for whether or

5      not it was working and in good operating procedure—or

6      condition?

7  A  Yes.

8  Q  When was that?

9  A  I show that that was completed on December 12th of 1990.

10  Q  And it was working properly—

11  A  That is correct.

12  Q  —at that time?

13         Now in addition to the audio-based system and the

14      door contacts, there was also holdup alarms—panic alarms

15      inside the—that facility?

16  A  I believe that to be the case, yes.

17  Q  And fire detection devices as well?

18  A  I can confirm that.

19         That is correct.

20  Q  And cameras, correct?

21  A  Pardon?

22  Q  Were cameras located inside this building?

23  A  I don't believe—If there were, I don't believe that they were

24      installed by our company.

25  Q  All right. You're not aware of any cameras—They were not

1    Sonatrol cameras?

2 A   That's correct.

3         MR. BROWER:   I have nothing further of this

4    witness, your Honor.

5         THE COURT:   Mr. Svikis?

6         MR. SVIKIS:   No questions, your Honor.

7         THE COURT:   You can step down.

8         MR. BROWER:   People call Sharon Hitchcock to the

9    stand.

10         THE COURT:   You do solemnly swear or affirm the

11    testimony you're about to give shall be the truth, the whole

12    truth, and nothing but the truth, so help you God?

13         MS. HITCHCOCK:   I do.

14         THE COURT:   You may be seated.

15               SHARON LOUISE HITCHCOCK,

16    called at 4:41 p.m., and sworn by the Court, testified:

17                 DIRECT EXAMINATION

18 BY MR. BROWER:

19 Q   Ma'am, would you please state your full name and spell your

20    last name for the record.

21 A   Sharon Louise Hitchcock; last name is spelled H-i-t-c-h-c-o-c-

22    k.

23 Q   Ma'am, back in 1991 where were you employed?

24 A   Sonatrol Security or Kalamazoo Security.

25 Q   What was your position there?

                          413

1  A    Dispatcher—police dispatcher.

2  Q    And tell us what you did—what that position required.

3  A    Monitored alarms, kept close attention to openings and

4       closings at different businesses.  We basically monitored the

5       business while they were closed and for openings and closing

6       and anything that would go off like a furnace alarm and take

7       the proper action afterwards, like if it needed a call to a

8       contact person we would notify them of the alarm and what was

9       going on.  If it needed police dispatch, we would notify the

10      police department, tell them what was going on and make sure a

11      responding party would also respond.

12 Q    What shift did you work back in February of that year?

13 A    Third shift, midnight to 8:00 in the morning.

14 Q    So you would have been—Were you working on February 8?

15 A    Yes, I was.

16 Q    You would have been on then during the period including

17      2:15 a.m. and 6:25 a.m.?

18 A    Yes, I was.

19 Q    Were you working when the alarm—Were you aware of the alarm

20      activation at the Minute Market on Stadium Drive at 2:15 a.m.?

21 A    There was an audio activation at different times during the

22      night, but there was not a definite alarm there.

23 Q    All right.  Let me rephrase it.  I think I used the wrong

24      words.

25           When the employee left and armed the system at 2:15

414

1       were you working on that occasion?

2    A  Definitely.

3    Q  All right.

4    A  I received the closing.  I know exactly when they left.

5    Q  Okay.  And you were still on and were you aware then of the

6       employee that had armed the system at 6:25?

7    A  Yes, disarmed.

8    Q  During those intervening hours between 2:15 and 6:25 a.m.,

9       you're at a desk and literally can listen for any sounds or

10      monitor any other type of alarms that come in, including fire

11      alarms or anything like that—

12   A  Correct.

13   Q  —right?

14   A  Uhm-hmm.  Fire, freezer, door alarms, any entry into the

15      building; that's correct.

16   Q  Do you recall specifically the audio portion of the alarm or

17      the system at that Minute Market, familiar with the kinds of

18      noises that are heard during—

19   A  Yeah, they had—

20   Q  —the early—

21   A  —a compressor that kicked on—a compressor.

22   Q  Pardon me?

23   A  A compressor.  They had freezers that would kick on.  They had

24      different noises that would come on automatically during the

25      evening such as a clock ticking.  Just would come on at

                                  415

1    different intervals, and you get used to their machinery

2    sounds, and it's a lot different than if someone would be

3    inside.  You would hear movement, scuffing.

4  Q  As a matter of fact, there was one occasion at that store

5    where you heard what—

6  A  A pop.

7  Q  —was described as a soft pop, yes?

8  A  That's correct.  And when I called the contact and he went

9    down there, he told me that someone that was shopping in the

10   store put a wine bottle or wine inside the cooler and

11   exploded—it froze and exploded.

12 Q  But that was then a sound that was not consistent—

13 A  Normal—

14 Q  —with the normal—

15 A  Right.

16 Q  —sounds; is that—

17 A  I've also had a—the register itself go off.  It goes just a

18   soft beep.  And not knowing what it was, I sent the contact

19   down there to find out the register was open and the girls

20   didn't turn it off all the way or—but the register was

21   beeping.

22 Q  So you have experience with identifying and then resolving—

23 A  Right.

24 Q  —unusual sounds?

25 A  Right.

416

1  Q  Were there any unusual sounds other than the expected

2     mechanical sounds—

3  A  No.

4  Q  —that you've described?

5  A  No, there was not that evening.  No contact was called nor

6     police were dispatched.  If I hear anything at all, I do call

7     someone.

8  Q  Tell me about the sensitivity of that particular location and

9     the audio portion, particularly in regard to human sounds.

10 A  It picks up people coughing.  It'll start—Even a battery.  The

11    battery when it goes low in the smoke detector it'll go beep.

12    It'll pick up that soft of a sound, and it'll just keep

13    sending it to you.  It won't let you reset it.  If you did

14    happen to reset it, it comes right back.  You would hear

15    movement, any cough, any talking, any noise whatsoever—even

16    footsteps.  You can actually hear them walk across the floor

17    as they're leaving.  Okay.

18         The sensitivity does go down and lets them go out

19    for three minutes, and then the sensitivity goes back up to

20    the highest point at that time.  We could hear them actually

21    slam their car doors, their motor start, and then pull away.

22 Q  Meaning slamming the car doors—

23 A  As they were leaving.

24 Q  —outside—

25 A  Yeah.  That's correct.

417

1    Q    Hear—Be able to hear somebody turning a faucet on?

2    A    You sure could. It could even—

3    Q    Toilet flush?

4    A    Uhm-hmm. Toilet flush, yes, you could.

5    Q    Were there any sounds other than the normal mechanical sounds

6       on that day?

7    A    None.

8    Q    Was there anyone inside that resi—that building between 2:15

9       and 6:25?

10   A    There was not anyone inside.

11   Q    Do you have experience with having people locked inside

12       before?

13   A    Many times. Many times I've had lock-ins. Many times at

14       different places, at different bars with the same type of

15       control system. I've even had them—not actually locked in

16       there but where they stayed too long. They punched in their

17       numbers and they thought, oh, I've got this to do yet and

18       where they've stayed inside. Then I could hear them hustling

19       and rustling around on the inside. I knew at that time that

20       they didn't leave because I never got a door alarm. Okay. So

21       then I would call the premise back and say, are you leaving;

22       and they'd say, oh, we just forget. And then they'd code it

23       back in and out and leave.

24            But I've had many experience with just regular

25       lock-ins. And they do have—did have a motion detector in the

1  back of the store, too, that would be picked up if someone

2  would walk through it.

3  Q  Thank you.

4  A  It did not activate.

5  MR. BROWER:  Thank you.

6  I have nothing further of this witness.

7  MR. SVIKIS:  No questions for this witness.

8  THE COURT:  Okay.  You can step down.

9  It's about ten to 5:00.  Have you got somebody

10  short, or do you think you've got somebody that's going to—

11  MR. BROWER:  I—

12  THE COURT:  —take longer than that?

13  MR. BROWER:  I can't guarantee that it would be

14  short, your Honor.

15  THE COURT:  Okay.  I mean—Never mind.

16  We'll stand in recess.  Please be back here tomorrow

17  morning so that we can hopefully get started very promptly at

18  9:00 a.m.

19  Keep in mind what I've told you about discussing the

20  case, watching any news media, or reading any news media

21  reports—anything of that nature or discussing it with anyone.

22  You just can't do it.  So—And make them understand as best you

23  can.

24  But other than that, then, we'll be back here

25  tomorrow and continue at that time.

419

1                    (At 4:49 p.m., proceedings adjourned)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25