261511

1          STATE OF MICHIGAN

2     9TH CIRCUIT COURT—TRIAL DIVISION

3

4   THE PEOPLE OF THE
    STATE OF MICHIGAN
5

6        v                         Files No.  C03000897 FC

    PATRICK KEVIN MISHALL,
7

8            Defendant.

9

10           Jury Trial — Volume III of IX

11     Before Hon. George R. Corsiglia P12239, Circuit Judge
       (Visiting Judge from 48th Circuit, Presiding by Assignment)
12
         Kalamazoo, Michigan—Wednesday, June 16, 2004
13

14
    APPEARANCES:
15
    For the People:          Scott W. Brower P44951
16                           Office of the Prosecuting Attorney
                             227 West Michigan Avenue
17                           Kalamazoo, Michigan 49007
                             (269) 383-8900
18
    For the Defendant:       Andis Svikis P36039
19                           1803 Whites Road
                             Kalamazoo, Michigan 49008
20                           (269) 349-7692

21

22  Recorded by:             Video recorded

23  Transcribed by:          Brenda K. Foley CER 4956
                             1400 Gull Road
24                           Kalamazoo, Michigan 49048
                             (269) 385-6001
25                              *  *  *  *  *

                                421

FILED

JUL 0 1 2005

9th JUDICIAL CIRCUIT
COUNTY OF KALAMAZOO
KALAMAZOO, MICHIG.

ENTERED

TABLE OF CONTENTS

WITNESSES: People                                                    PAGE

CHRISTINE NEWBURRY

     Direct examination by Mr. Brower . . . . . . . . . . . . 424
     Cross-examination by Mr. Svikis  . . . . . . . . . . . . 429
     Redirect examination by Mr. Brower . . . . . . . . . . . 437
     Recross-examination by Mr. Svikis  . . . . . . . . . . . 438

BART A. MUNSON

     Direct examination by Mr. Brower . . . . . . . . . . . . 439
     Cross-examination by Mr. Svikis  . . . . . . . . . . . . 445
     Redirect examination by Mr. Brower . . . . . . . . . . . 449

JAMES D. GRUBIUS

     Direct examination by Mr. Brower . . . . . . . . . . . . 450
     Cross-examination by Mr. Svikis  . . . . . . . . . . . . 456

BRETT MUNSON

     Direct examination by Mr. Brower . . . . . . . . . . . . 460
     Cross-examination by Mr. Svikis  . . . . . . . . . . . . 465
     Redirect examination by Mr. Brower . . . . . . . . . . . 467
     Recross-examination by Mr. Svikis  . . . . . . . . . . . 468

DEBBIE BROWN

     Direct examination by Mr. Brower . . . . . . . . . . . . 469
     Direct examination (cont.) by Mr. Brower . . . . . . . . 476
     Cross-examination by Mr. Svikis  . . . . . . . . . . . . 473
     Redirect examination by Mr. Brower . . . . . . . . . . . 475

JAMES JILEK (recalled)

     Direct examination by Mr. Brower . . . . . . . . . . . . 477

TRACY LYNN RATHKE

     Direct examination by Mr. Brower . . . . . . . . . . . . 479
     Cross-examination by Mr. Svikis  . . . . . . . . . . . . 483
     Redirect examination by Mr. Brower . . . . . . . . . . . 484
     Recross-examination by Mr. Svikis  . . . . . . . . . . . 486

1                        TABLE OF CONTENTS (cont.)

2       WITNESSES: <u>People</u>                                                PAGE

3       CAROL JEAN SORDAHL

4            Direct examination by Mr. Brower . . . . . . . . . . . 487
             Cross-examination by Mr. Svikis  . . . . . . . . . . . 490
5
        TINA MARIE DAHL
6
             Direct examination by Mr. Brower . . . . . . . . . . . 491
7
        SANDRA KAY SCHULZ
8
             Direct examination by Mr. Brower . . . . . . . . . . . 499
9            Cross-examination by Mr. Svikis  . . . . . . . . . . . 505
             Redirect examination by Mr. Brower . . . . . . . . . . 508
10
        DAWN ANN ANDERSON
11
             Direct examination by Mr. Brower . . . . . . . . . . . 509
12           Cross-examination by Mr. Svikis  . . . . . . . . . . . 515

13

14

15

16

17

18

19

20

21

22

23

24

25

                                422a

(Tape No. B2004-035, 6-16-04, 09:06)

1    Kalamazoo, Michigan

2    Wednesday, June 16, 2004 - 9:06 a.m.

3         THE CLERK:   The court calls the case of People

4    versus Patrick Mishall—

5         Please state—

6         —file C03-0987 FC.

7         Please state your appearances for the court.

8         MR. BROWER:   If it please the Court, your Honor,

9    Assistant Prosecuting Attorney Scott Brower for the People of

10   the State of Michigan.

11        MR. SVIKIS:   Andis Svikis on behalf of Mr. Mishall.

12        THE COURT:   You gentlemen ready to proceed?

13        MR. BROWER:   People are ready, your Honor.

14        MR. SVIKIS:   Yes, your Honor.

15        THE COURT:   Call your next witness, Mr. Brower.

16        MR. BROWER:   Your Honor, the People call

17   Christine Newburry to the stand.

18        THE COURT:   You do solemnly swear or affirm the

19   testimony you're about to give shall be the truth, the whole

20   truth, and nothing but the truth, so help you God?

21        MS. NEWBURRY:   I do.

22        THE COURT:   You may be seated.

23

24

25

423

1              CHRISTINE NEWBURRY,

2      called at 9:07 a.m., and sworn by the Court, testified:

3                    DIRECT EXAMINATION

4  BY MR. BROWER:

5  Q   Ma'am, would you please state your name and spell your last

6      name for the record.

7  A   Christine Newburry—N-e-w-b-u-r-r-y.

8  Q   Ms. Newburry, are you familiar with a person by the name of

9      Christine Dimmick and a Patrick Mishall?

10 A   Yes, I am.

11 Q   How long had you known them?

12 A   Since '91—late '90/'91.

13 Q   You're familiar with the death of Christine Newburry [sic] on

14     February 8 of 1991?

15 A   Christine Dimmick?

16 Q   I'm sorry.  Christine Dimmick.

17 A   Yes, I am.

18 Q   Did you know them as a couple or each of them from different

19     parts of your life or—

20 A   I knew them as a couple.

21 Q   Okay.  Had you, in fact, been at their house together?

22 A   Pardon?

23 Q   Had you ever been at their home—

24 A   Yes.

25 Q   —while they were living together?

                          424

(Tape No. B2004-035, 6-16-04, 09:08)

1   A   Uhm-hmm.  Yes.

2   Q   Is Patrick Mishall present in the courtroom today?

3   A   Yep.

4   Q   Where is he?

5   A   I think that's him.

6   Q   Sitting at the table marked defendant?

7   A   In the green shirt.

8   Q   In the green shirt.  All right.

9              MR. BROWER:   If the record can reflect the

10       identification of the defendant, your Honor?

11             THE COURT:   It may so indicate.

12   BY MR. BROWER:

13   Q   At some—Well, describe the nature of your relationship with

14       Christine and Patrick prior to February 8?

15   A   I knew Patrick prior with some friends from the past.  I met

16       Christine, knew her a couple months.

17   Q   Are you talking about prior to her death?

18   A   Of course, yes.

19   Q   Okay.  So the immediate two months prior to her death?

20   A   Correct.

21   Q   Go ahead.  How did you become aware of her death or when, if

22       you remember?

23   A   I heard from Sissy Block (phonetic) that she had been

24       murdered.

25   Q   On the day of or soon thereafter?

425

1    A    Yeah, it was within a couple days.

2    Q    Sissy Block (phonetic) was another mutual acquaintance/friend?

3    A    Yes.

4    Q    At some point after that date—after Chris's death—did you

5         develop a closer relationship with Patrick Mishall?

6    A    A physical relationship.

7    Q    You were not living with him?

8    A    No.

9    Q    When did that develop?

10   A    It was the air show of 1991—around that time.  I believe June—

11   Q    Now you're about the Kalamazoo air show that was a regular

12        event several years ago?

13   A    Correct.  It would have been June or July, I believe.

14   Q    During that air show period in 1991 were you with

15        Patrick Mishall and others?

16   A    Yes.

17   Q    Where was that?

18   A    At—At the air show?

19   Q    Where—Well, you were at the air show.  Did you go someplace—

20   A    Yes, we worked—

21   Q    —else afterwards?

22   A    —the air show for Daane's.

23   Q    Uh-huh.

24   A    And then we went to a bar afterwards.

25   Q    Was there a disturbance of some sort at that bar?

1   A   Yes, there was.

2   Q   Between whom?

3   A   Patrick and myself.

4   Q   You had an argument?

5   A   Yes, we did.

6   Q   Based on—Well, exactly what did you observe about him or his

7       demeanor at that time?

8   A   Very different.  Something just wasn't right.  So I started

9       questioning in regard to Chris's death.

10  Q   Specifically what did you ask him?

11  A   Did he kill Chris.

12  Q   You asked him this at the bar?

13  A   Uhm-hmm.

14  Q   Did he give you an answer at that time?

15  A   No, he did not.  He got mad.

16  Q   And then what happened?

17  A   An argument occurred, the police were called, and he was taken

18      by the police—I believe they took him home.

19  Q   Did you see him again later that same evening?

20  A   Yes, I did.

21  Q   How did that occur?

22  A   I still wanted to ask him the question did he kill Chris and

23      went down to his house.

24  Q   Was he there?

25  A   Yes, he was.

1    Q    Was anybody else there at that time?

2    A    I'm not sure if anyone was in the other bedroom or not.

3    Q    All right.  But there wasn't anybody there with—

4    A    Not that I recall.

5    Q    —you when you were talking with him?

6    A    Not that I recall.

7    Q    You went there for the specific purpose about confronting him

8         regarding this?

9    A    Yes, I did.

10   Q    What specifically did you ask him again?

11   A    Did you kill Chris.

12   Q    How did he respond?

13   A    Took me by the throat, threw me up against the door, and said

14        I should do to you what I did to Chris.

15   Q    Did he say that in the same manner that you just expressed it

16        here in the courtroom?

17   A    No, it was a lot meaner.

18   Q    What about the tone of his voice or the volume?

19   A    Deep and mean.  I should do to you what I did to Chris—in that

20        manner.

21   Q    Did he appear to you to be angry at that time?

22   A    Very angry.

23   Q    How'd this cause you to feel?

24   A    Very scared.  My left hand was grabbing for the doorknob so I

25        could get out of there.

428

```
 1   Q    Were you able to escape?

 2   A    Yes, I was.

 3   Q    Did you call the police?

 4   A    I sure did, yes.

 5   Q    And you called the police because of what?

 6   A    I wanted them to know what he had just said to me and what had

 7        happened.

 8   Q    Did you feel frightened for your own safety at that time?

 9   A    I was very scared, yes.

10                  MR. BROWER:    Thank you.

11                  I have nothing further of this witness.

12                  THE COURT:    Mr. Svikis?

13                  MR. SVIKIS:    Thank you.

14                       CROSS-EXAMINATION

15   BY MR. SVIKIS:

16   Q    Ms. Newburry, the first time you asked if he killed Chris he

17        gave no answer, right?

18   A    Correct.

19   Q    And the second time, again, he gave no answer, right?

20   A    Correct.

21   Q    Okay.  So, in essence, you're accusing him of killing

22        Chris Dimmick, aren't you?

23   A    I wouldn't say that.  I was questioning him whether he did it

24        or not.

25   Q    And he did deny it twice?
```

1  A    He never said anything.  He didn't deny it or say that he did.

2  Q    All right.  And you weren't afraid of him after the first time

3       you asked him, were you?

4  A    Ummm—

5  Q    You went back with him, right?

6  A    I went back to his house that evening to inquire further.

7  Q    Sure.  And at this time you were both drinking?

8  A    Uhm-hmm.

9  Q    Is that yes?

10 A    Yes.  Yes.

11 Q    And doing drugs?

12 A    No.

13 Q    On any of those occasions you weren't doing any drugs?

14 A    Once in a while we smoked marijuana.

15 Q    Okay.  Anything else?

16 A    Not myself.

17 Q    And when is the first time you met Mr. Mishall?

18 A    Late 90s/early '91.

19 Q    While he was dating Chris Dimmick?

20 A    Yes.

21 Q    And they had a rocky relationship, didn't they?

22 A    Yes, they did.

23 Q    They fought?

24 A    Yes, they did.

25 Q    They pushed?

430

```
 1 │ A   I'm not sure.  I never witnessed that.
 2 │ Q   Okay.  So you—You know they fought, but you never witnessed
 3 │     any of it?
 4 │ A   Correct.
 5 │ Q   And then this third time that you're asking him if he killed
 6 │     Chris he blew up at you, right?
 7 │ A   The second time I asked him.  I asked him once at the bar—
 8 │ Q   Okay.
 9 │ A   —and then I went back to his home later that evening—
10 │ Q   Yes?
11 │ A   —and that's when—
12 │ Q   Okay.
13 │ A   —the occurrence took place.
14 │ Q   And this is at the air show after a day of drinking?
15 │ A   After the air show and we were drinking, yes.
16 │ Q   All right.  And based upon what you know about their
17 │     relationship if he said what you're saying that he said about
18 │     I should do to you what he did to Chris, wasn't he referring
19 │     to just kicking your ass?
20 │             MR. BROWER:   Objection.  Calls for speculation.
21 │             THE COURT:   I—Overruled.  I think that it's proper
22 │     cross-examination.
23 │ BY MR. SVIKIS:
24 │ Q   Isn't—
25 │             THE COURT:    Go ahead.
```

431

1  BY MR. SVIKIS:

2  Q   Isn't that what he was referring to, the fights that they were

3      having?

4  A   I'm not sure.  I—I'm not sure.

5  Q   So on what day was this that he made these statements to you?

6  A   On what day?

7  Q   Yes.

8  A   I'm not sure.

9  Q   The year?

10 A   '91—1991.

11 Q   Do you remember the month?

12 A   June or July, the night of the air show that we worked.

13 Q   And you worked—You said you worked together at the air show?

14 A   Yes, we did.

15 Q   What job did you have there?

16 A   We did volunteer work for—No, actually, we were paid.—to work

17     for Daane's Catering.

18 Q   Okay.  And so after that time when he—when you say he made

19     these statements to you, you haven't seen Mr. Mishall since

20     today; isn't that correct?

21 A   Correct.

22 Q   And who did you call at the police department?

23 A   Pardon?

24 Q   Who did you call at—Who did you talk to at the police

25     department?

1   A   Kalamazoo County.

2   Q   And who did you talk to?

3   A   I'm not sure what officer it was.

4   Q   It was all on the phone?

5   A   When I called—

6   Q   Yes.

7   A   When I went to his home?

8   Q   After you say he made these statements to you—

9   A   Right.

10  Q   —what time of the day or night was that?

11  A   When I called the officer?

12  Q   No.   When he made the statements to you, around what time was

13      it?

14  A   Oh, probably in between 1:00 and 2:00 in the morning.

15  Q   Okay.   So right after he made these statements to you, you

16      called the police?

17  A   Correct.

18  Q   Around what time was that?

19  A   It'd have to be after that, so 2:00—2:00 or after.

20  Q   Okay.   And after that you were—you went to the police station

21      to make a statement?

22  A   No, I made the statement in the officer's car.

23  Q   The officer came by that night?

24  A   Yes.

25  Q   Over to—Where were you staying?

1  A   If I recall, he picked me up at Pat's house or close to there,

2      took me back down to my home, and we talked.

3  Q   Okay.  The officer came to where you were with Pat, right?

4  A   I believe so.

5  Q   But you don't remember?

6  A   I'm almost positive.  I believe I was sitting on the curb

7      waiting for the officer to get there because I wanted him to

8      know we were at Pat's house and what exactly had happened.

9  Q   Okay.  So you—So the officer—You went with the officer in the

10     car?

11  A   Uhm-hmm.

12  Q   Is that—

13  A   Yes.

14  Q   —yes?

15  A   Yes.

16  Q   He took you home?

17  A   Yes.

18  Q   Okay.  Did he take you down to the police station?

19  A   No.

20  Q   Okay.  Did you sign a statement?

21  A   I can't recall.  I don't know.

22  Q   Have you ever seen a statement that you made?

23  A   Recently, yes.

24  Q   You have?  Do you have a copy of it?

25  A   Yes.

434

1   Q   Can I see it?

2   A   I don't have it with me.

3   Q   Where is it?

4   A   At my home.

5   Q   Have you given it to the prosecutor?

6   A   It was sent—It was sent to me.  No, I have not given it to the

7       prosecutor.

8   Q   Okay.  So let me make sure I understand this.  The prosecutor

9       sent you information regarding your interview about what you

10      have alleged to have told the police officer; is that correct?

11              MR. BROWER:   Your Honor, if I could clarify for the

12      record so we don't walk down the wrong path.

13              MR. SVIKIS:   Okay.

14              MR. BROWER:   We're talking about a different

15      complaint.

16              MR. SVIKIS:   Okay.  All right.

17  BY MR. SVIKIS:

18  Q   So this—this allegation there is no record of as far as you

19      know of a statement that you signed alleging what Pat said to

20      you, correct?

21  A   Could you rephrase that?

22  Q   Sure.  You're in the police officer's car having a

23      conversation with a police officer?

24  A   Correct.

25  Q   There is no record of any statement that you wrote out that

435

1      night about what you're testifying here today—Is that

2      correct?—that you signed?

3  A    The officer wrote everything down.

4  Q    Right.  But you never signed anything?

5  A    Not that I recall.

6  Q    Okay.  Well, you would recall something as important as that,

7      wouldn't you?

8  A    That was 13 years ago, sir.

9  Q    Well, aren't you inferring that Pat said to you that he killed

10     Chris?  Isn't that what—Isn't that what you're saying here?

11  A    No, sir.  I told you that he threatened me by choking me,

12     throwing me up against the door—

13  Q    Okay.

14  A    —and telling me I should do to you what I did to Chris.

15  Q    So you don't—You don't think that—that in any way he's—he's

16     confessing that he—that he killed Chris, right?

17  A    In my opinion, yes.

18  Q    Okay.  But after making these statements to the police, you

19     don't have that clear a recollection of whether you made a

20     statement or not that you signed?

21  A    The officer wrote down everything that I had told him.

22  Q    All right.  As far as you know did they go out and arrest Pat

23     that night?

24  A    I don't know.

25  Q    Did you ever see Pat anywhere again?

1   A   Nope.

2                MR. SVIKIS:   All right.   I have no further

3       questions.

4                THE COURT:   Any redirect?

5                      REDIRECT EXAMINATION

6   BY MR. BROWER:

7   Q   Ma'am, the defense counsel asked about the relationship, and

8       you made a statement that you were aware that they fought,

9       correct?

10  A   Correct.

11  Q   And then he asked some questions about pushing and shoving and

12      stuff but that you never witnessed that, correct?

13  A   Correct.

14  Q   The fighting that you referred to previously, are you

15      referring to something other than a physical confrontation

16      that you witnessed then?

17  A   Between him and Chris?

18  Q   Yes.

19  A   I was told by Chris.

20  Q   All right.   Were you also present during their verbal

21      arguments?

22  A   A couple times.

23  Q   In regard to his statement to you, you asked him two different

24      times did he kill Chris and he made no statement?

25  A   Correct.

| | | |
|---|---|---|
| 1 | Q | He didn't verbally deny it or admit it? |
| 2 | A | Just a dirty look. |
| 3 | Q | The second time you asked he responded physically and then |
| 4 | | made that statement, I ought to do to you what I did to Chris? |
| 5 | A | Yes. |
| 6 | Q | Did you believe that was an answer to your question? |
| 7 | A | I believe so— |
| 8 | Q | Do you believe— |
| 9 | A | —yes. |
| 10 | Q | —that was, in effect, yes? |
| 11 | A | Yes, I took it that way. |
| 12 | Q | Did you kill Chris, or you killed her—whatever way you phrased |
| 13 | | it— |
| 14 | A | I asked him did you kill Chris; and that's when he took me by |
| 15 | | the throat, threw me against the door and said I should do to |
| 16 | | you what I did to Chris. |
| 17 | | MR. BROWER:   Thank you. |
| 18 | | I have nothing further. |
| 19 | | THE COURT:   Any recross? |
| 20 | | RECROSS-EXAMINATION |
| 21 | BY MR. SVIKIS: | |
| 22 | Q | Ms. Newberry, so you were having a sexual relationship with |
| 23 | | Mr. Mishall at the same time that you're friends with |
| 24 | | Chris Dimmick, correct? |
| 25 | A | No, sir. |

1  Q    It wasn't happening at the same time?

2  A    No, sir.

3  Q    He wasn't dating Chris Dimmick at this time?

4  A    Chris was dead.

5  Q    This was after the fact?

6  A    Exactly, yes.

7              MR. SVIKIS:   I have no further questions.

8              MR. BROWER:   Nothing further.

9              THE COURT:   You can step down, ma'am.  Thank you.

10             THE WITNESS:   Thank you.

11             MR. BROWER:   Your Honor, the People call

12     Bart Munson to the stand.

13             THE COURT:   Raise your right hand, sir.  You do

14     solemnly swear or affirm the testimony you're about to give

15     shall be the truth, the whole truth, and nothing but the

16     truth, so help you God?

17             MR. BART MUNSON:   I do.

18             THE COURT:   You may be seated.

19                        BART A. MUNSON,

20     called at 9:26 a.m., and sworn by the Court, testified:

21                     DIRECT EXAMINATION

22 BY MR. BROWER:

23 Q    Mr. Munson, could you please state your full name and spell

24     your last name for the record.

25 A    Bart A. Munson.  Last name is M-u-n-s-o-n.

                            439

1   Q   Mr. Munson, are you familiar with Patrick Mishall?

2   A   Yes.

3   Q   How did you know him?

4   A   Friend in the neighborhood.

5   Q   Do you know where he was living back in 1991?

6   A   He lived in Oakwood.

7   Q   That's a neighborhood?

8   A   That's the name of the neighborhood, yes.

9   Q   All right.  He lived in the same neighborhood as you did?

10  A   Yes.

11  Q   Did you know who he was living with back in early 1991 in

12      February area—January, February?

13  A   Christine Dimmick.

14  Q   Approximately how far away did you live from where Patrick and

15      Chris were living?

16  A   Three to five blocks.

17  Q   Did you have a job back then?

18  A   No, I didn't.

19  Q   How old would you have been back early '91 approximately?

20  A   About 22, 23 years old.

21  Q   Do you know what kind of vehicle Patrick drove?

22  A   At that time he had a black Ford LTD.

23  Q   Do you see Patrick Mishall in the courtroom today?

24  A   Yes, I do.

25  Q   Where is he seated?

1  A    Off to my left.

2  Q    And what is he wearing?

3  A    A greenish-colored shirt.

4  Q    Sitting at the table marked defendant; is that correct?

5  A    Yes, sir.

6              MR. BROWER:   If the written record can reflect the

7         identification of the defendant?

8              THE COURT:   It may so indicate.

9  BY MR. BROWER:

10  Q   Did you have an early morning practice—a routine that you

11        followed back then in early '91?

12  A   Yeah, I used to go to his house off and on for coffee every

13        now and then.

14  Q   All right.   What time of the morning would you do that?   What

15        was your routine like?

16  A   Around 7:00 o'clock or so, give or take a few minutes.

17  Q   You'd get up in the morning, get ready, and then—

18  A   Yes.

19  Q   —go over to his house for coffee?

20  A   Yes.

21  Q   When you talked about around 7:00 o'clock either way, you're

22        talking about that's the time that you would normally be at

23        his house?

24  A   Yes.

25  Q   How often did you do that?   Well, let me first ask this: at

441

1   the time of the—Well, on February 8 or immediately thereafter,

2   did you learn that Christine Dimmick had been murdered?

3 A   Yes, I did.

4 Q   This going to Pat's house for coffee in the morning, was that

5   something that you had been doing prior to the murder?

6 A   Probably ten or 15 different times prior to that.

7 Q   Was it—At that time was it an everyday thing?

8 A   No.

9 Q   Did this practice increase with frequency, though, after the

10   murder?

11 A   Yes.

12 Q   What would routinely happen when you arrived at his house in

13   the morning right around 7:00 o'clock?

14 A   He'd let me in, he'd have coffee made.  Then he'd get around

15   and get dressed and all that, and we'd sit down and have a

16   talk—we'd talk just about whatever, you know, and have our

17   coffee.  And then he'd go on about his business of his daily

18   routine stuff—whatever he did then—and I'd go about my

19   business.  We'd probably have coffee for maybe an hour.

20 Q   He had a job, but you didn't at that point?

21 A   Correct.

22 Q   All right.  On the morning of February 8 did you go to Chris's

23   house for coffee as you had done?

24 A   Yes.

25 Q   Did you have your coffee that day there?

442

1   A   No.

2   Q   Why not?

3   A   There was no answer at the door, and his car wasn't there that

4       morning.

5   Q   Was that unusual?

6   A   I'm not going to say it was unusual because—

7   Q   There are other times where he wasn't there?

8   A   There was other times that he wasn't at home at that point in

9       time either—

10   Q   All right.

11   A   —so it didn't really surprise me that he wasn't home.

12   Q   When the car's gone, he's gone?

13   A   Correct.

14   Q   When you walked up to the house, was the car there?

15   A   No.

16   Q   But in spite of that you still went to the door anyway?

17   A   Yes.

18   Q   Any response at the door?

19   A   No.

20   Q   At some point later did you have a conversation with Patrick

21       about the murder and what he had done that day?

22   A   He had mentioned to me that he'd taken Christine to work that

23       morning and helped her get the coffee going and set newspapers

24       out like he usually did, and so that wasn't anything unusual,

25       you know.

1   Q   Did he mention a VHS rental tape or anything?

2   A   He said he had a tape that he wanted to trade in for some

3       other tape.

4   Q   That's his explanation, that he had a tape that he wanted to

5       exchange?

6   A   Yes.

7   Q   All right.  After the murder there was a period of time when

8       actually—where you actually moved in with Patrick, was there

9       not?

10   A   For a short period of time, yes.

11   Q   When was that?

12   A   (No audible response)

13   Q   Well, let me ask it this way: was it days, weeks, or months

14       after the murder?

15   A   It was probably, I'm going to say, a couple months after that,

16       probably around April.

17   Q   You needed a place to stay because you got—you and your

18       girlfriend had separated for a short time?

19   A   No, she wasn't my girlfriend—

20   Q   All right.

21   A   —we were just friends.

22   Q   All right.

23   A   But, yeah, she asked me to leave, so Patrick let me come and

24       stay with him for a little while.

25             MR. BROWER:   I have nothing further of this

```
 1        witness.
 2                 THE COURT:   Cross-examination.
 3                       CROSS-EXAMINATION
 4   BY MR. SVIKIS:
 5   Q    Mr. Munson, you were aware of Christine's murder at the
 6        Minute Mart, isn't that correct?
 7   A    Pardon me?
 8   Q    Were you aware of Christine's murder at the Minute Mart?
 9   A    Later that—that day of the murder, yes.
10   Q    What time—When did you become aware of that?
11   A    I can't be for sure exactly what time it was.  I don't
12        remember that far back.
13   Q    So you—Are you saying you don't remember anything from
14        February—
15   A    No, I just can't recall the exact time.
16   Q    Okay.  But how did you learn about it; do you recall that?
17   A    It—A gal I was staying with, her sister called the house and
18        told her sister that Christine had been found dead at the
19        Minute Market, and that's how I found out.
20   Q    Okay.  And how long did you know Mr. Mishall
21        before—before—before February 8th?
22   A    About a year.
23   Q    And at anytime did you ever live with Mr. Mishall?
24   A    Just shortly after the murder had taken place?
25   Q    And you—And you moved in with him?
```

445

1 A  Pardon me?

2 Q  And you moved in with him?

3 A  Yes.

4 Q  And at—At no time he never—he never told you that he killed

5    Christine, did he?

6 A  No.

7 Q  And then at some point Mr. Mishall moves out and moves to

8    Wisconsin, isn't that correct?

9 A  Yes.

10 Q  And then where did you go?

11 A  I went back with Stacy Roberts.

12 Q  Is that who you were living with at the time?

13 A  Yes.

14 Q  Now how far away did you live from Mr. Mishall on this

15    particular morning that you said you walked to his house?

16 A  Three to five blocks.

17 Q  All right. And what time—And what month was this?

18 A  February.

19 Q  All right. And so it's winter?

20 A  There was no snow on the ground; but, yes.

21 Q  It was cold?

22 A  Yeah.

23 Q  All right. And what time would you leave to go to his house

24    from your house?

25 A  Oh, about a quarter, ten to 7:00.

446

1    Q    So it's dark out?

2    A    Yes.

3    Q    And you're going over to his house because you know that he's

4         awake at this time?

5    A    Yes.

6    Q    And you do this every day?

7    A    Not every day.

8    Q    But you remember this particular day?

9    A    Yes.

10   Q    Okay.  And you don't know if he was sleeping or not when you

11        knocked on the door, right?

12   A    That's correct.

13   Q    And then you turned around and—and went back home, right?

14   A    That's correct.

15   Q    Now also at this particular time you were on a medication;

16        isn't that correct?

17   A    At what particular time?

18   Q    February 8th.

19   A    No.

20   Q    You're not on any medication?

21   A    Not at that time, no.

22   Q    The day before?

23   A    No.

24   Q    Day after?

25   A    No.

447

1  Q  Where were you working in—on February 8th?

2  A  I wasn't working; I had no job at that time.

3  Q  Are you on any medication now?

4  A  Yes, sir.

5  Q  What medications are you on now?

6  A  Quite a few, to be honest with you.  And I don't recall all

7     the names of them.  It's for a kidney transplant.

8  Q  What are the medications you're on now?

9  A  Some of—

10        MR. BROWER:   Objection, your Honor.  Relevance.

11        MR. SVIKIS:   Your Honor, I'm testing what—This

12     individual has testified before that he's on 47 different

13     pills, and I want to be able to find out what he's on and how

14     it affects his memory 'cause he also testified before that he

15     doesn't recall—remember a whole lot from 12 years ago.

16        THE COURT:   He answered you he couldn't recall all

17     of the medicines he took.  I'm not going to let you keep—If

18     that's his answer, I don't think it's appropriate for you to—

19        MR. SVIKIS:   Well, can I ask—

20        THE COURT:   —keep asking him the same question over

21     and over.

22        MR. SVIKIS:   Well, I can ask—I can ask him what

23     medications he does recall taking, can't I?

24        THE COURT:   You didn't ask that question.

25        MR. SVIKIS:   Well, I'll ask him that question.

1              THE COURT:   All right.   That's fine.

2   BY MR. SVIKIS:

3   Q    What medications are you taking that you can recall?

4   A    I take Neoral, which is an antirejection and a steroid.

5              I take Prednisone, which is an antirejection and a

6        steroid.

7              CellCept, that's an antirejection and a steroid.

8              Bactrim, that's an antibiotic.

9              And I don't remember the rest of the names of them.

10       I've got quite a few others that I take right now, too.

11  Q    And before testifying today, did you review anything?

12  A    No.

13             MR. SVIKIS:   I have no further questions.

14             THE COURT:   Any redirect?

15                     REDIRECT EXAMINATION

16  BY MR. BROWER:

17  Q    Sir, was your testimony that when Patrick's car was gone

18       Patrick was gone, he wasn't there?

19  A    That was the case most of the time, yes.

20  Q    And you got no response there at the door and that was unusual

21       well [sic], but it was consistent with what you knew about his

22       car being gone, right?

23  A    Yes, sir.

24             MR. BROWER:   Thank you.

25             I have nothing further.

                           449

(Tape No. B2004-035, 6-16-04, 09:42)

1    MR. SVIKIS:  Nothing further.

2    THE COURT:  Do you have any other questions?

3    MR. SVIKIS:  No, your Honor.

4    THE COURT:  You can step down, sir.  Thank you.

5    THE WITNESS:  Thank you.

6    MR. BROWER:  James Grubius.

7    THE COURT:  Raise your right hand, sir.  You do

8    solemnly swear or affirm the statements you are about to make

9    or the testimony you're about to give shall be the truth, the

10   whole truth, and nothing but the truth, so help you God?

11   MR. GRUBIUS:  Yes, sir.

12   THE COURT:  Be seated.

13                   JAMES D. GRUBIUS,

14   called at 9:43 a.m., and sworn by the Court, testified:

15                  DIRECT EXAMINATION

16   BY MR. BROWER:

17   Q   Mr. Grubius, would you please state your full name and spell

18       your last name for the record.

19   A   James D. Grubius—G-r-u-b-i-u-s.

20   Q   Mr. Grubius, are you familiar with Patrick Mishall?

21   A   Yes, sir.

22   Q   How do you know him?

23   A   I used to play lottery quite at bit at the gas station on

24       Parkview that he worked at.

25   Q   That'd be the Total gas?

                            450

1   A   Yes, sir.

2   Q   Were you aware that he had a job—or had worked for—for

3       Minute Market as well?

4   A   Yes, sir.

5   Q   But you knew him from Total gas?

6   A   Yes.

7   Q   Is the Patrick Mishall you know, is he present in the

8       courtroom today?

9   A   Yes, sir.

10  Q   Could you please describe where he's sitting and what he's

11      wearing?

12  A   The gentleman sitting over at the—next to the defense attorney

13      with the green shirt on.

14          MR. BROWER:   If the written record can reflect the

15      identification of the defendant, your Honor?

16          THE COURT:   It may so indicate.

17  BY MR. BROWER:

18  Q   How often would you see or stop and talk with Patrick Mishall?

19  A   Minimum of three to four times a week if he was at the

20      station.   I was at the station about three to four times a

21      week in the early afternoon, and that was his shift.   If he

22      was on, then I would see him then.

23  Q   You would be considered a regular customer?

24  A   Lottery customer, yes, sir.

25  Q   All right.

                                451

1  A   I didn't go through that much gas.

2  Q   Did you develop a familiarity then with the employees and

3      engage in conversation because—

4  A   Yes, sir.

5  Q   —of the frequency?  All right.

6          Did you also know a Christine Dimmick?

7  A   Yes, she worked at the Minute Market on South Westnedge?

8  Q   Tell us about your frequency—your patronage there at that

9      store?

10 A   Quite a bit.  Being a lottery player and superstitious, you

11     would play certain numbers at one place and certain numbers at

12     the other place; and I had about three different places, and

13     South Westnedge and Total gas station was two to three that I

14     played frequently.

15 Q   Were you aware that Patrick Mishall and Christine Dimmick were

16     boyfriend/girlfriend and living together?

17 A   He mentioned it a couple times.  And then during the course of

18     our conversations I stated that I played at South Westnedge

19     and then I knew her.  And it was just conversation, customer

20     to worker.  We wasn't friends.  You know, you would just talk

21     just like you would if you went into a restaurant every day.

22 Q   You learned things—

23 A   Right.

24 Q   —about them and their relationship?

25 A   Right.

1  Q  Did you become aware of the murder of Christine Dimmick on
2     February 8 of 1991?

3  A  Yes.

4  Q  After learning of the murder did you recall some specific
5     conversations that you'd had with Patrick Mishall in the weeks
6     before the murder?

7  A  Yes, sir.  Patrick used to mention him and Christine were—

8  Q  I'm sorry?  I didn't catch the first part.

9  A  He—He mentioned a few times that Christine and him was
10    boyfriend and girlfriend.  And during a couple of these
11    conversations he asked me if I ever seen when I was down at
12    Westnedge any guys hanging around or knew if she had another
13    boyfriend 'cause he thought she had another boyfriend.

14 Q  I'm sorry?  He was indicating to you that he suspected that
15    she had another boyfriend—was seeing somebody else?

16 A  Right.

17 Q  All right.

18 A  Messing around on him.

19 Q  Okay.  Go ahead.

20 A  During one of these conversations he got a little irate, and
21    he said—he just made a comment that if I ever catch them I'm
22    going to kill them.

23 Q  Referring to?

24 A  Christina [*sic*] and whoever she was going out with at that
25    time.

```
 1              Then it was a few weeks later—And I'm not sure on
 2       the times, sir.
 3    Q  This is prior to the—
 4    A  Right.
 5    Q  —murder, however; but can you say days or weeks or years?
 6    A  No—
 7    Q  All right.
 8    A  —it was maybe three weeks—
 9    Q  Okay.
10    A  —two weeks.  I'm not absolutely sure.  It was a short time
11       period.
12    Q  Prior to the murder?
13    A  Prior to the murder.
14    Q  Go ahead.
15    A  I went in there one day and playing numbers, and he was very
16       agitated at Christine; kind of walking around the—The little
17       area that—that he had to work in was probably like a
18       seven-by-five foot area; and he kept walking back, and he's
19       talking to me very irated [sic] about Christine of something
20       happened.  And he kind of looked like a—
21    Q  He was irate about what?
22    A  He was very irated [sic] or upset about something that
23       happened between him and Christine the night before.  He kind
24       of acted like a animal in a cage.  He just kept walking back
25       and forth.  And he made the comment, he says—he says, if she's
```

454

1    messing around on me I'm going to kill her.  And that—that

2    one—the look in his eyes and the whole—whole thing just kind

3    of—I wasn't sure if he was real serious, but it looked like he

4    was serious.  I—I probably made a mistake by not bringing it

5    to somebody's attention, but it was later on hindsight he was

6    serious in my opinion.

7  Q  At the time that he made this statement you were also on

8     probation; is that right?

9  A  Yes, sir.

10 Q  And was that also a consideration as to why you did not

11    immediately run—

12 A  Yes—

13 Q  —to the police?

14 A  —I was on a felony embezzlement charge, and I was on

15    probation; and one of your probation things is no contact with

16    the police.

17 Q  And you were concerned that even you initiating the call would

18    somehow affect that?

19 A  Right.

20 Q  Still, Mr. Grubius, you know when you're talking about a

21    threat like that—You still didn't go and talk with the police

22    though?

23 A  I thought I mentioned it to an officer, but it's been so long

24    ago I can't honestly swear that I did.

25 Q  When you learned of the murder did the importance of that

                              455

1     statement come to you—

2  A   Yes.

3  Q   —immediately?

4  A   I'm sorry, sir?

5  Q   When you learned of the murder, did you then recall that

6     statement?

7  A   Oh, yes, sir.

8  Q   And was it because of the demeanor and the way he said it that

9     you are able to recall that specifically so many years later?

10  A   Oh, yes.  I still remember it.

11            MR. BROWER:    Thank you.

12            THE WITNESS:   Yes, sir.

13            MR. BROWER:    Nothing further.

14            THE COURT:    Cross?

15                 CROSS-EXAMINATION

16  BY MR. SVIKIS:

17  Q   Mr. Grubius, so when did you go to the police?

18  A   It was a few years afterwards.

19  Q   A couple of years?

20  A   Yes, sir.

21  Q   But at—But at the time that this statement was made, this is a

22     statement that you've heard before as a common

23     expression—Isn't it?—I'm going to kill somebody if they do

24     this or do that?

25  A   Yes, sir.

1  Q   You've heard that statement before?

2  A   Yes, sir, many times.

3  Q   Oh, many times, right.

4          And when you heard that statement from Mr. Mishall

5      you took it as one of those statements, right?

6  A   The first one, not the second one.

7  Q   Okay.  On the second one did you go to the police and say I

8      just talked to Patrick Mishall and he's threatened to kill

9      Chris Dimmick?

10 A   No, sir, I did not.

11 Q   All right.  And Chris Dimmick was someone you knew?

12 A   Yes, sir.

13 Q   And you saw her often?

14 A   Yes, for short times.

15 Q   How many times?

16 A   I said for a few minutes—a few—three or four times a week

17     going and just play lottery, yes.

18 Q   For over how long a period of time this few minutes three or

19     four times?

20 A   Probably at least eight, nine months.

21 Q   All right.  You never pulled Chris aside and said, Chris, your

22     boyfriend's going to kill you, did you?

23 A   I made that statement that—to her that he had said that.

24 Q   Okay.  Did you ever make that statement to the police?

25 A   No, sir.

1   Q   All right.   So this is the first time you're making that

2       statement after 13 years, right?

3   A   That I recall.   I'm not absolutely sure.   I might have

4       mentioned it before that—before the murder, but I can't swear

5       to it.

6   Q   All right.   Well, you're under oath, so you can't recall,

7       right?

8   A   At this time, no.

9   Q   Okay.   And you can't recall whether you mentioned to this

10      officer—that you may have mentioned it to an officer either,

11      can you; is that correct?

12  A   I believe so.

13  Q   All right.   So the net result of all these conversations or

14      what—the many you had—or two you've had with Pat and the

15      numerous ones that your friend Chris Dimmick, the way that it

16      was said and the time that it was said it was just another

17      expression that you've heard numerous times I'm going to kill

18      somebody if they do such and such, right?

19  A   No, sir.

20  Q   I mean that was—That's how—

21  A   The second one was not.   I just made a mistake by not going to

22      the police.

23  Q   All right.   But you had to process that statement for how many

24      years before you came forward?

25  A   At least a year to two years.

458

| | | |
|---|---|---|
| 1 | Q | All right. So you mentioned to the prosecutor that you |
| 2 | | were—that you were also on probation at this time— |
| 3 | A | Yes, sir. |
| 4 | Q | —and you were afraid to call the probation officer to tell him |
| 5 | | that you may be aware of a crime being committed; is |
| 6 | | that—that— |
| 7 | A | That is correct. |
| 8 | Q | All right. And that's because you were doing a citizen's duty |
| 9 | | you felt that would cause you problems; is that—is that right? |
| 10 | A | I guess you could put it that way. You don't know the |
| 11 | | probation— |
| 12 | Q | Pardon? |
| 13 | A | If you were on probation and trying to get things straight, |
| 14 | | you try to go by the rules. And, yeah, I think you're right |
| 15 | | on that— |
| 16 | Q | All right. |
| 17 | A | —yes, sir. |
| 18 | Q | So you thought that wouldn't come as a—You thought that'd be a |
| 19 | | minus on your—against you as opposed to a plus trying to |
| 20 | | prevent a murder, right? |
| 21 | A | You know, at that time, sir, I was on a probation violation. |
| 22 | | I—Just prior to Christine's murder I was put in jail on a |
| 23 | | probation violation, and I did not at that time want to say |
| 24 | | something to add more days to—or—I guess I was more concerned |
| 25 | | about me than I was her. |

1        MR. SVIKIS:   All right.

2        I have no further questions.

3        MR. BROWER:   No redirect.

4        THE COURT:   You can step down, sir.   Thank you.

5        MR. BROWER:   People call Brett Munson to the stand.

6        THE COURT:   You do solemnly swear or affirm the

7    testimony you're about to give shall be the truth, the whole

8    truth, and nothing but the truth, so help you God?

9        MR. BRETT MUNSON:   Yes.

10        THE COURT:   You may be seated.

11                        BRETT MUNSON,

12    called at 9:57 a.m., and sworn by the Court, testified:

13                      DIRECT EXAMINATION

14   BY MR. BROWER:

15   Q   Mr. Munson, could you please state your full name and spell

16       your last name for the record.

17   A   Yes.   It's Brett—B-r-e-t-t—Munson—M-u-n-s-o-n.

18   Q   Bart Munson is your brother, correct?

19   A   Yes.

20   Q   Are you acquainted with a person by the name of

21       Patrick Mishall?

22   A   I know who he is, yes.

23   Q   You were—How is it that you knew him?

24   A   I just knew him from the neighborhood that I grew up in.   My

25       brother and his friends hung around with him, so I just knew

                              460

1   who he was.

2 Q   So he's around, you see him with your brother different times

3   and in the neighborhood?

4 A   Yeah—Yes.

5 Q   Okay.  Were you also familiar with a person by the name of

6   Christine Dimmick.

7 A   I just knew who she was.  I didn't know her personally.

8 Q   But you could recognize the—the face and put it with the name?

9 A   Yes.

10 Q   Is Patrick Mishall in the courtroom today?

11 A   Yes, he's right there.

12 Q   Tell us where he's sitting and what he's wearing.

13 A   He's wearing a green shirt, sitting to the left of me at the

14   defendant table.

15         MR. BROWER:   If the written record can reflect the

16   identification of the defendant, your Honor?

17         THE COURT:   It may so indicate.

18 BY MR. BROWER:

19 Q   Were you aware that Christine Dimmick and Patrick Mishall were

20   living together?

21 A   Yes.

22 Q   You—Did you know what house it was or on what street they were

23   living?

24 A   Yes, they lived on Springmont.

25 Q   Is that the Oakwood neighborhood?

461

1  A  Yes.

2  Q  Did you learn about Christine Dimmick's murder on February 8

3     of 1991?

4  A  I don't recall the date. I remember hearing about it, though.

5  Q  Okay. The murder was on that date. You became aware at some

6     point either then or afterwards—

7  A  Yes.

8  Q  —of the murder?

9         Did you have contact with Patrick Mishall—personal

10    contact—with Patrick Mishall in the days after the murder?

11 A  Yes.

12 Q  All right. And, in fact, the day of Christine's funeral; is

13    that right?

14 A  That's correct.

15 Q  Where did you meet him or talk with him?

16 A  At his house.

17 Q  How did you come to be at his home on that day?

18 A  I just was happening to walk—be walking down the street in the

19    neighborhood that day and a couple friends of mine were

20    driving over to his house and stopped me and asked me if I

21    wanted to go over there.

22 Q  This was sometime shortly after the funeral itself?

23 A  Yes. They were on their way back from the funeral.

24 Q  And they extended this invitation. Did you, in fact, then go

25    as a result of that to Patrick's house?

                                462

1  A    Yes.

2  Q    What was going on there?

3  A    They were just going over there to hang out and party after

4       the funeral.

5  Q    Were there other people around, too?

6  A    Yeah, there was a few people.  I don't recall who all was

7       there, but there were other people there.

8  Q    You're talking like three or four others or 30 or 50?

9  A    It wasn't no 30 or 50.  There was a handful of people.

10 Q    Okay.  At some point did you and Patrick have a conversation

11      that was separate or away from others?

12 A    Yes.

13 Q    Where at his house did that conversation occur?

14 A    It was out in the front yard.

15 Q    How is it that you wound up in that location?  I mean—

16 A    People were just—

17 Q    —did you just happen to run into each other there, or did he

18      pull you aside or—

19 A    No, people were just in and out; and I was outside, and he

20      approached me.

21 Q    While you were outside?

22 A    Yeah.

23 Q    And there wasn't anybody around at that time?

24 A    Not around us.  I mean there were other people outside, but

25      they weren't right around us.

463

1  Q  Okay. Did Patrick ask you anything while—when he approached

2     you and came to where you were?

3  A  Yes, he asked me if I'd do him a favor.

4  Q  What was your response?

5  A  I asked him what the favor was.

6  Q  Did he then give—

7  A  Yes.

8  Q  What'd he say?

9  A  He asked me if I would get rid of a gun for him.

10 Q  He asked you if he—if you would get rid of a gun for him?

11 A  That's right.

12 Q  Did he say anything about the type of gun?

13 A  No, he did not.

14 Q  Did he—Did you see a gun?

15 A  No.

16 Q  When you heard this—When he asked you this question—made this

17    request of you, what did you say?

18 A  I asked—I told him—He'd asked me if I'd get rid of the gun

19    because he was afraid he was going to hurt himself with it,

20    and I told him I wasn't going to do it; that he should give it

21    to the police if he was worried about something like that

22    happening. And he said, you're right, just forget that I ever

23    said anything. And then we went our separate ways.

24 Q  Forget I ever said it?

25 A  Yes.

1   Q   At that point were you under the belief that he was asking you

2       to do this as a favor to protect himself from harming himself?

3   A   Correct.

4               MR. BROWER:   Thank you.

5               I have nothing further of this witness.

6               THE COURT:   Cross?

7                      CROSS-EXAMINATION

8   BY MR. SVIKIS:

9   Q   The information that you're testifying to today, when is the

10      first time you brought that to the attention of the police?

11  A   Last April, I believe it was, when the cold case detectives

12      come to my house.

13  Q   That's in—about 13 years after the fact?

14  A   Approximately, yes.

15  Q   And you remember these conversations from 13 years earlier?

16  A   Yes.

17  Q   And the reason you remember that is—Was Pat your friend at

18      that time?

19  A   He was not my friend; I just knew who he was.

20  Q   So you were strangers?

21  A   We were—I knew who he was through my brother and the people

22      that he hung out with; that's it.

23  Q   Did you find it unusual that he was picking someone he didn't

24      know to talk about a gun?

25  A   The only reason I didn't was because of the rumor around the

465

1   neighborhood was that he was—

2 Q  This may—Stop.  The question was did you find it unusual that

3   he would select you—someone you didn't know and that he didn't

4   know—and talk about a gun.  Did you find that unusual?

5 A  Yes, I guess—

6 Q  Okay.

7 A  —yes.

8 Q  All right.  And at the—And at the time this was the day of the

9   funeral or day after the funeral?

10 A  It was the day of the funeral.

11 Q  All right.  And Mr. Mishall was distraught?

12 A  Pardon me?  I didn't hear.

13 Q  He was distraught and upset at the funeral?

14 A  I was not at the funeral.  He was upset afterwards at his

15   house, yes—

16 Q  Right.

17 A  —when he was grieving.

18 Q  And you felt that he thought he was going to kill himself,

19   right?

20 A  I didn't know what he was going to do.

21 Q  All right.

22 A  That's what he said he was—

23 Q  Well, you told the prosecutor that he told you he wanted the

24   gun removed so he wouldn't hurt himself, right?

25 A  Right.  Up to that point, I had no idea what his capa—

1  Q  But at that point it was suicide, right?

2  A  Yes.

3  Q  And after that for the next 13 years you never gave it much

4     thought?

5  A  No.

6              MR. SVIKIS:   I have no further questions.

7              THE COURT:   Any redirect?

8              MR. BROWER:   Yes, your Honor.

9                       REDIRECT EXAMINATION

10  BY MR. BROWER:

11  Q  Defense counsel asked about you didn't know him and defendant

12     didn't know you, well, that's not necessarily accurate, is it,

13     sir, that—You did know each other?

14  A  I knew of him.  I didn't know him personally.  I just knew of

15     him and knew who he was, yes.

16  Q  You just didn't socialize?

17  A  Right.  I didn't know his character or anything like that.

18  Q  But you were familiar with him because he hung around, was

19     there with your brother, he was in the neighborhood and

20     because of those things he would literally have been able to

21     know you as well?

22  A  Correct.

23  Q  You were not a stranger to him?

24  A  No.

25  Q  When he asked—he, meaning the defense attorney—asked about you

                              467

1      not knowing what he was going to do, you know what he said—

2  A    Right.

3  Q    —you don't know if that was accurate or not?

4  A    No, I don't.

5  Q    You don't know if he was really concerned about harming

6      himself?

7  A    No.

8  Q    And you don't know if he was truly trying to get rid of a

9      murder weapon?

10 A    Correct.

11                   MR. BROWER:   Thank you.

12                   I have nothing further.

13                   RECROSS-EXAMINATION

14 BY MR. SVIKIS:

15 Q    When the prosecutor first asked you a question did you say you

16     knew his character or did not know his character?

17 A    I did not know his character.

18                   MR. SVIKIS:   All right.   Thank you.

19                   THE COURT:   You can step down, sir.

20                   MR. BROWER:   Tracy Rathke.

21                   Your Honor, if I could have a minute to talk with my

22     witness coordinator?   Just a second.

23                   THE COURT:   How long do you—

24                   MR. BROWER:   About—

25                   (At 10:08 a.m., off record discussion between

```
 1                        Mr. Brower and Ms. Swinsick)
 2                   I need no time, your Honor.
 3                   THE COURT:   Okay.
 4                   MR. BROWER:   Debbie Brown.
 5                   THE COURT:   Debbie Brown.   Okay.
 6                   THE COURT:   You do solemnly swear or affirm the
 7          testimony you're about to give shall be the truth, the whole
 8          truth, and nothing but the truth, so help you God?
 9                   MS. BROWN:   I do.
10                   THE COURT:   Be seated in the witness chair.
11                            DEBBIE BROWN,
12          called at 10:09 a.m., and sworn by the Court, testified:
13                         DIRECT EXAMINATION
14   BY MR. BROWER:
15   Q   Ma'am, would you please state your name for the record.   Go
16       ahead.
17   A   Debbie—Debbie Brown.
18   Q   And that's B-r-o-w-n?   Just common spelling?
19   A   Yeah, color brown.
20   Q   Sir [sic], are you or—Excuse me.—ma'am, are you familiar with
21       a person by the name of Patrick Mishall.
22   A   Yes, I am.
23   Q   How did you know him?
24   A   We just met.
25   Q   All right.   This was back in the early 90s; is that correct?
```

1    A    (No audible response)

2    Q    You have to speak verbally.

3    A    Yes.  I'm sorry.

4    Q    All right.  What kind—What was the nature of your relationship

5         with him?

6    A    It really wasn't nothing.  We drank a lot together.

7    Q    Drank a lot together?

8    A    Yes.

9    Q    All right.  Were you familiar with where he worked?

10   A    Yes.

11   Q    Where was that?

12   A    The Minute Market on Stadium Drive.

13   Q    Did you at some point learn that the person he had been living

14        with—a Christine Dimmick—had been murdered?

15   A    Could you repeat that, please.

16   Q    Did you learn that Christine Dimmick had been murdered?

17   A    Yes.

18   Q    Did you know Mr. Mishall before that murder?

19   A    Yes.

20   Q    Did you have contact with him after the murder as well?

21   A    Yes.

22   Q    And the before and after contacts would have involved meeting

23        and drinking like you testified before?

24   A    Yes.

25   Q    During one of these contacts that you had with Patrick after

470

1     the murder, did he mention the murder or say anything about

2     Christine Dimmick?

3   A Yes.

4   Q Do you remember approximately how long after the murder that

5     this conversation occurred?

6   A I want to say two days, but I really don't know.

7   Q All right.  Not really sure about when it was?

8   A (No audible response)

9   Q Is that yes?

10  A Yes.

11  Q Meaning—Just so we're clear.—you do not know when it was after

12    the murder?

13  A I can't say for sure.

14  Q What did he tell you about the murder?

15  A He killed her.

16  Q Did he tell you how this occurred or where or any of the

17    circumstances?

18  A No, he just told me he killed her.

19  Q Did he say anything about where the murder had occurred or—Go

20    ahead.  I'll ask that first.  Where the murder occurred, did

21    you become aware of that?

22  A No.

23  Q Did he say anything about bringing her to work; do you

24    remember?

25  A I don't recall.

471

1  Q  Okay. When he made that statement was it just completely out

2     of the blue, or had you been—there been some discussion about

3     it before that statement came up?

4  A  It's been so long ago I can't recall, but I do know that he

5     told me he killed her.

6  Q  What happened—Or what, if anything, did he do after he made

7     that statement?

8  A  I don't recall.

9  Q  Was there any kind of physical altercation between yourself

10    and Mr. Mishall afterwards?

11  A  Yes.

12  Q  Okay. Tell me what happened.

13  A  He put his hands around my neck.

14  Q  He put his hands around your neck?

15  A  Yes.

16  Q  Was that in a gentle fashion, or was it—

17  A  There was nothing gentle about that.

18  Q  Did he say anything?

19  A  I don't remember.

20  Q  All right. Was there any conversation about what he would do

21    if you told?

22  A  (No audible response)

23  Q  Do you understand my question?

24  A  (No audible response)

25  Q  Did he—Are you thinking, or do you need to—need me to rephrase

1        the question?

2    A    I don't recall.

3    Q    All right.  Did he make any threats to you afterwards?

4    A    I don't recall.

5               MR. BROWER:    Thank you.

6               I have no further questions of this witness.

7               THE COURT:    Mr. Svikis?

8               MR. BROWER:    Well, before you begin can I ask one

9        more thing?

10              MR. SVIKIS:    Sure.

11              MR. BROWER:    I'm sorry.

12                   DIRECT EXAMINATION (cont.)

13   BY MR. BROWER:

14   Q    Do you see Patrick Mishall in the courtroom today?

15   A    I'm not looking for him.

16   Q    I know.  Can you do that, ma'am?

17   A    I'm sorry, I can't.  It's been 13 years.

18              MR. BROWER:    Thank you.

19              THE COURT:    Mr. Svikis?

20                   CROSS-EXAMINATION

21   BY MR. SVIKIS:

22   Q    Ms. Brown, in 19—back in 1991 do you recall contacting

23       Officer Berglin (phonetic)?

24   A    Yes.

25   Q    And did you tell Officer Berglin (phonetic) that they should

                              473

1      talk to a subject named James—Jim Pitman?

2  A    Yes.

3  Q    Okay.  And did you tell them that Jim Pitman was in the

4      Van Buren County jail?

5  A    Yes, 'cause I had him put there.

6  Q    Because you put him there, right?

7  A    (No audible response)

8  Q    And you told Officer Berglin (phonetic) that—about a week

9      earlier—And we're back in 1991.—that he should talk to

10     Chris Dimmick's boyfriend Pat Mishall, correct?

11  A   I don't recall saying that, but okay.

12  Q   Okay.  And then after 1991 you make no further statements to

13     the police in either '91—And stop me if I'm wrong.—you don't

14     make—you make no statement in 1992, in 1993, in 1994, in 1995,

15     1996, 1997, 1998, 1999, 2000, 2001, 2002; but on April of

16     2003, after you read a newspaper article, you call—about the

17     murder and Patrick Mishall—you call the police, right?

18  A   Yes, I did.

19  Q   Okay.  And when you called them you refused to give your name,

20     right?

21  A   Right.

22  Q   And you told the police you had been up all night drinking?

23  A   I was in my house.  I have that right.

24  Q   Is that true you told them you'd been up all night drinking?

25  A   I don't recall saying that, but—

(Tape No. B2004-035, 6-16-04, 10:19)

1   Q   So the information that you're testifying from today is as a

2       result of reading a newspaper article; isn't that correct?

3   A   No. I know what he told me.

4   Q   But after he, in your opinion, he confess—That was—Was that—Do

5       you consider that to be a confession?

6   A   Excuse me?

7   Q   Do you consider that to be a confession?

8   A   I'm saying what he told me.

9   Q   All right. Did you go to the police after that?

10   A   No.

11               MR. SVIKIS: I have no further questions.

12               THE COURT: Do you have any redirect, Mr. Brower?

13                   REDIRECT EXAMINATION

14 BY MR. BROWER:

15   Q   Ma'am, when you called in April of 2003 seeing that article,

16       did reading that article bring it all back for you—that

17       statement—and that cause you to rethink the decision back so

18       many years before?

19   A   It upset me really bad because I met Chris, and she was a very

20       nice lady. And after I read that article, I want her to rest

21       in peace.

22   Q   Still, even after giving the information, you were still

23       reluctant to give your name and reluctant to talk with

24       officers and really reluctant to even be here today, were you

25       not?

1  A    I was scared to.

2  Q    But are coming forward anyway?

3  A    I feel better now.

4  Q    The drinking with Patrick and the fact that the relationship

5        revolved around drinking, was that part of your—the reluctance

6        in coming forward and talking about that part of your personal

7        life in an open courtroom?  Is that a consideration?

8  A    Yes.

9                  MR. BROWER:   Thank you.

10                 I have nothing further.

11                 THE COURT:   Anything else, Mr. Svikis?

12                 MR. SVIKIS:   No, your Honor.

13                 THE COURT:   Why don't we take a recess.  Let's plan

14       to be back here by 10:35 on the clock in the back of the

15       courtroom.

16                 MR. BROWER:   May the witness be excused first—

17                 THE COURT:   Oh—

18                 MR. BROWER:   —before the—

19                 THE COURT:   —you're excused.

20                 MR. BROWER:   —jury, please.

21                 THE COURT:   Thank you.

22                 MR. BROWER:   All right.

23                 THE COURT:   You don't need to stay there.

24                 (At 10:22 a.m., court recessed)

25                 (At 10:42 a.m., proceedings reconvened)

                              476

1     THE COURT: Call your next witness, please.

2     MR. BROWER: People recall James Jilek to the

3  stand.

4     THE COURT: You're still under obligation of the

5  oath that I gave you yesterday, Mr. Jilek.

6     MR. JILEK: Yes, sir.

7     MR. BROWER: Thank you, Mr. Jilek, for coming back.

8        JAMES JILEK,

9  recalled at 10:42 a.m., and previously sworn by the

10  Court, testified:

11       DIRECT EXAMINATION

12 BY MR. BROWER:

13 Q A couple of questions that I did not ask you yesterday that

14  I'm recalling you for today, and that is regard to the

15  surveillance cameras in the Minute Market store there on

16  Stadium Drive.

17 A Yes.

18 Q Are you familiar with the placement of the surveillance

19  cameras—the cameras that recorded the activity within the

20  building?

21 A Yes, I am.

22 Q Where were those cameras located or—Excuse me.—where—or in

23  what parts of the building were they located?

24 A In the retail area.

25     MR. BROWER: Can we put up photograph number one—or

1       exhibit number one.

2    BY MR. BROWER:

3    Q    For clarification purposes you're referring to this area of

4         the store; is that correct?

5    A    Yes.

6    Q    Anything in the bottle room or in the back room or office?

7    A    No.

8    Q    These cameras recorded activity 24 hours a day but only in the

9         area you just described?

10   A    Yes.

11                  MR. BROWER:    Thank you.

12                  I have nothing further.

13                  THE COURT:    Do you have any—

14                  MR. SVIKIS:    No questions.

15                  THE COURT:    Okay.  You can step down, sir.  Thanks.

16                  MR. BROWER:    Your Honor, the People now call

17        Tracy Rathke to the stand.

18                  THE COURT:    You do solemnly swear or affirm the

19        testimony you're about to give shall be the truth, the whole

20        truth, and nothing but the truth, so help you God?

21                  MS. RATHKE:    Yes, I do.

22                  THE COURT:    Be seated.

23

24

25

478

1           TRACY LYNN RATHKE,

2      called at 10:44 a.m., and sworn by the Court, testified:

3                     DIRECT EXAMINATION

4   BY MR. BROWER:

5   Q    Ma'am, could you please state your full name and spell your

6        last name for us.

7   A    Tracy Lynn Rathke; last name R-a-t-h-k-e.

8   Q    Ma'am, are you familiar with a person by the name of

9        Patrick Mishall?

10  A    Yes, I am.

11  Q    How do you know him?

12  A    I used to date him.

13  Q    When was that?

14  A    Late '91/'92.

15  Q    Where did you meet him?  You're not from Michigan?

16  A    Unh-unh.

17  Q    All right.

18  A    I met him on French Island.

19  Q    And where is that?

20  A    That's in La Crosse, Wisconsin.

21  Q    After you had been dating for a while did you learn about a

22       murder of someone—of Patrick Mishall's girlfriend in

23       Kalamazoo, Michigan?

24  A    Yes, I did.

25  Q    Over the—the course of time and as you began to know him

                              479

```
 1        better, did he tell you more and more about the—that murder?
 2   A    Yes.  Yes, he did.
 3   Q    After dating him there came a point where the two of you were
 4        living together; is that correct?
 5   A    Kind of.
 6   Q    Okay.
 7   A    We each had our own places.
 8   Q    I'm sorry?
 9   A    We each had our own residences—
10   Q    All right.
11   A    —but we stayed together a lot.
12   Q    At each other's—
13   A    At each other's homes.
14   Q    —home?  All right.
15   A    Yeah.
16   Q    At one point after having a conversation about the murder, did
17        you hear him make any statements or comments in his sleep?
18   A    Yes, I did.
19   Q    And what—
20   A    He—
21   Q    —did he say?
22   A    He stated that he did not—Or he told her not to go out with
23        them niggers that night.
24   Q    The night before?
25   A    Yeah.
```

1  Q  Meaning the night before the murder?

2  A  Right.  The night before the murder.

3  Q  And the her, referring to Chris?

4  A  Yeah, referring to Christina [*sic*].

5  Q  To the girlfriend.

6  A  (No audible response)

7  Q  Was that a yes?

8  A  Yes.  Sorry.

9  Q  Okay.  Do you remember when that was approximately after your

10    relationship began?  Can you put a month or a year on it?

11 A  It was in '92, I believe; but as far as a month, it's been a

12    while and I really don't remember.

13 Q  After hearing that statement in his sleep, did you have an

14    argument with him?

15 A  Yes, we did—Yes, I did.

16 Q  Did you wind up telling him that you didn't want to see him

17    anymore?

18 A  Correct.

19 Q  Did you wind up at the same house anyway in spite of that

20    attempt to separate from him?

21 A  Correct.  I went there to get some of my belongings.

22 Q  So the two of you were together.  Did you then continue to

23    have an argument?

24 A  Yes, we did.

25 Q  Did you ask him any question specifically about Christine's

481

1  death?

2 A At one point I said you did kill Christina [*sic*], didn't you.

3 Q Did he deny it?

4 A No, he didn't deny it.

5 Q Did he say anything?

6 A No.

7 Q Could you see—Were you close enough to see the look on his

8  face and his expression?

9 A Yeah, and I hadn't ever seen that look on somebody—on his face

10  before.

11 Q Did that cause you alarm?

12 A Yeah—Yes, it did.

13 Q Would you tell us about the look that you saw.

14 A Well, his eyes had kind of a glossed over look, and he looked

15  extremely mad.  He didn't look like the guy that I knew.

16 Q Did that cause you concern?

17 A Yes, it did.

18 Q And what did you do?

19 A I got scared, and I attempted to leave the apartment.

20 Q Were you able to leave?

21 A Not right away.

22 Q When you did leave—When you were able to get away what did you

23  do?

24 A I ran out the door and to my car.

25 Q Were you calling for help at the same time?

1   A    Yes, I was yelling for help.

2   Q    Is Patrick Mishall in the courtroom today?

3   A    Yes, he is.

4   Q    Will you tell us where he's seated and what he's wearing.

5   A    He's seated at the tend of the—or at that table wearing a

6        green shirt.

7   Q    At the table marked defendant?

8   A    Yeah.

9              MR. BROWER:   If the record could reflect the

10       identification of the defendant, your Honor.

11             THE COURT:   It may indicate.

12             MR. BROWER:   Nothing further of this witness.

13             THE COURT:   Mr. Svikis?

14                  CROSS-EXAMINATION

15  BY MR. SVIKIS:

16   Q    Your testimony today is based on what you say Pat said in his

17        sleep; is that correct?

18   A    He was half asleep.

19   Q    Is that correct?

20   A    Yes, it is.

21   Q    Okay.  And he never told you that he killed Christine Dimmick,

22        did he?

23   A    No, he didn't.

24   Q    And, in fact, he left—He, in fact, left you and married Amy,

25        his present wife, right?

1   A   No.

2   Q   He's not married to Amy?

3   A   Well, yeah, I heard that he's married, but—

4   Q   Okay.  And you weren't—You weren't afraid of Pat, were you?

5   A   Excuse me?

6   Q   You were not afraid of Pat, were you?

7   A   Not up until that point.

8   Q   But after he was married you continued to call him at his

9       house when he was married, didn't you?

10  A   No, I didn't.

11  Q   So if his wife says that you did, that would be wrong?

12  A   I bumped into him one time—

13  Q   Excuse me.  If his wife—If Amy Mishall were to make that

14      statement that would be wrong?

15  A   I believe so.

16          MR. SVIKIS:   Okay.  Thank you.

17          I have no further questions.

18          THE COURT:   Any other questions, Mr. Brower?

19                  REDIRECT EXAMINATION

20  BY MR. BROWER:

21  Q   Ma'am, the statement made in his sleep, I believe in

22      cross-examination you said that he was half asleep.  What do

23      you mean by that?

24  A   Well, he was—I was kind of waking him up, and he was kind of

25      there—You know, when you're kind of starting to fall asleep.

                        484

1  And so he was kind of awake to carry on a conversation with

2  me, but he wasn't fully awake.

3  Q  And it was soon after having a discussion about the murder?

4  A  Right.

5  Q  Defense asked you a question about he never told you he did

6  it. That means he never said it to you verbally; is that

7  right?

8  A  Right.

9  Q  When you asked him that question—The question again was what

10  about Christine's death?

11  A  When I what? I'm sorry?

12  Q  Your question to him was what?

13  A  Oh, you did kill Christina [sic], didn't you.

14  Q  He didn't give a verbal response?

15  A  No.

16  Q  Did you consider his demeanor and lack of a verbal response

17  under those circumstances actually to be a response?

18  A  Yeah, I considered it to.

19  Q  And you considered that to be what?

20  A  I considered that he must—that he had done it from his

21  reaction.

22  Q  After you were no longer together—were no longer dating, at

23  some point you became aware that he remarried [sic] somebody?

24  A  Yep, I had heard it from somebody else.

25  Q  All right. I'm not real clear on whether or not you might

485

1    have called his house at some point after that.

2  A   Well, I just remembered when he was questioning me I bumped

3      into him when I was working at Wal-Mart one time, and he was

4      acting friendly towards me and just basically was telling me

5      he wanted to be friends.  And he did give me his phone number;

6      and I don't remember if I did, but I may have called him just

7      to say hi.  He wasn't home.

8  Q   All right.

9  A   So that's why I started to explain that to him.

10                  MR. BROWER:   Okay.  Thank you.

11                  I have nothing further.

12                  THE COURT:   Anything else, Mr. Svikis?

13                       RECROSS-EXAMINATION

14  BY MR. SVIKIS:

15  Q   Now you had one interpretation of Patrick's failure to

16     respond.  Do you think that it's possible that some questions

17     are so preposterous and out of line that they don't deserve an

18     answer?

19  A   Not when I'm getting choked, I don't.  I thought that that

20     right there answered my question.

21  Q   So if—It's your thought that if you make a claim against Pat

22     and he doesn't answer that always means I did it, right?

23  A   No.

24  Q   Okay.  So it could also mean the fact that it's so

25     preposterous it doesn't deserve an answer, also; isn't that

1    correct?

2  A    Under circumstances, I would suppose.

3              MR. SVIKIS:    Yeah.

4              I have no further questions.

5              THE COURT:    Anything else?

6              MR. BROWER:    No, sir.

7              THE COURT:    You can step down.    Thank you.

8              MR. BROWER:    Carol Sordahl.

9              THE COURT:    You do solemnly swear or affirm the

10   testimony you're about to give shall be the truth, the whole

11   truth, and nothing but the truth, so help you God?

12             MS. SORDAHL:    Yes, sir.

13             THE COURT:    You may be seated.

14                      CAROL JEAN SORDAHL,

15   called at 10:56 a.m., and sworn by the Court, testified:

16                      DIRECT EXAMINATION

17  BY MR. BROWER:

18  Q    Ma'am, could you please state your full name and spell your

19       last name for the record.

20  A    Carol Jean Sordahl—S-o-r-d-a-h-l.

21  Q    Ma'am, you're not from Michigan; is that correct?

22  A    That's correct.

23  Q    Are you familiar with Patrick Mishall?

24  A    Yes.

25  Q    How did you know him?

                        487

1  A    Met him where I'm from.

2  Q    All right.  Was that Wisconsin or Minnesota; is that correct?

3  A    Yes.

4  Q    All right.  When did you know him?

5  A    In '91.

6  Q    Are you aware that Patrick had been from Michigan and recently

7       moved to Wisconsin?

8  A    Yes, sir.

9  Q    What was the nature of your relationship in '91?

10 A    Like a girlfriend.

11 Q    You dated?

12 A    Yes.

13 Q    Did he mention that he had a gun?

14 A    Yes.

15 Q    And the context of that discussion when that was mentioned is

16      when he had wanted something from you; is that correct?

17 A    Yes.

18 Q    And you told him no?

19 A    Yes.

20 Q    After that conversation—he asked, you declined—he mentioned a

21      gun, what happened with the relationship?

22 A    I broke it off.

23 Q    During the course—Well, how long was it that the two of you

24      had—had this rela—dating relationship?

25 A    About two months.

1   Q   Did he mention during that time period his—the murder of his

2       girlfriend in Kalamazoo, Michigan?

3   A   Yes.

4   Q   What did he tell you about the murder?

5   A   That his girlfriend and him had a set of twins and she was at

6       work at a convenience store and she got shot.

7   Q   And did he state whether or not someone had been caught for

8       the murder?

9   A   Yes.

10  Q   Did he describe who this person was that had been caught for

11      the murder?

12  A   Some—Some guy that she used to date.

13  Q   Somebody that she used to date?

14  A   Yes, before him.

15              MR. BROWER:   Nothing further, your Honor.

16              Well, I'm sorry.

17  BY MR. BROWER:

18  Q   Patrick Mishall in the courtroom today?

19  A   Yes.

20  Q   Where is he sitting, and what is he wearing?

21  A   Over there.

22  Q   And wearing what?

23  A   Huh?

24  Q   What is he wearing?

25  A   A green shirt.

1    Q    That's at the table marked defendant here?

2    A    Yes.

3            MR. BROWER:    If the written record can reflect the

4    identification of the defendant, your Honor?

5            THE COURT:    It may indicate.

6            MR. BROWER:    No questions.

7                  CROSS-EXAMINATION

8   BY MR. SVIKIS:

9    Q    Ms. Sordahl, you lived with Patrick Mishall for a couple of

10    months?

11    A    I didn't live with him.

12    Q    You stayed with him?

13    A    No.

14    Q    Dated him?

15    A    Just dated him.

16    Q    All right. Ever see a gun?

17    A    No.

18            MR. SVIKIS:    I have no further questions.

19            MR. BROWER:    No redirect.

20            THE COURT:    You may step down.   Thank you.

21            THE WITNESS:    Thank you.

22            (Witness trips stepping out of witness box)

23            I'm sorry.   . . . (unintelligible) I'm sorry.

24            THE COURT:    Are you okay?

25            THE WITNESS:    Yes.   I'm fine.

1          MR. BROWER:   Tina Dahl, your Honor.

2          THE COURT:   You do solemnly swear or affirm the

3     testimony you're about to give shall be the truth, the whole

4     truth, and nothing but the truth, so help you God?

5          MS. DAHL:   Yes, I do.

6          THE COURT:   Take a seat in the witness chair.

7                        TINA MARIE DAHL,

8     called at 11:01 a.m., and sworn by the Court, testified:

9                        DIRECT EXAMINATION

10    BY MR. BROWER:

11    Q    Ma'am, could you please state your full name and then spell

12         your last name for the record.

13    A    Tina Marie Dahl—D-a-h-l.

14    Q    Ma'am, where are you from?

15    A    La Crosse, Wisconsin.

16    Q    Are you familiar with a person by the name of Patrick Mishall?

17    A    Yes.

18    Q    Is Patrick Mishall in the courtroom today?

19    A    No.

20    Q    Do you need to stand up to look around?

21    A    No.

22    Q    You don't see Patrick Mishall in the courtroom today, ma'am?

23    A    Yes, I do.

24    Q    All right.

25    A    Well, he's changed.  It's been a long time.

1   Q   In what way, ma'am?

2   A   I'm sorry.  His hair's shorter now.  It used to be more

3       fuller.

4   Q   Okay.  Where is Patrick Mishall?

5   A   In the green shirt sitting over there to the—

6   Q   Next to—

7   A   —the left—

8   Q   —the attorney—

9   A   Next to the attorney—

10   Q   —at the table marked—

11   A   —with the red tie on.

12              MR. BROWER:  All right.  If the written record can

13       reflect the identification of the defendant, your Honor.

14              THE COURT:  It may so indicate.

15  BY MR. BROWER:

16   Q   Where did you meet Patrick Mishall?

17   A   Through my ex-husband and my mother.  He worked at La Crosse

18       Civic Center—

19   Q   And when—

20   A   —and that—

21   Q   —was this?

22   A   Probably—I would say like '92 or '93.

23   Q   Early 90s?

24   A   Right.

25   Q   Would there be times when you would—because of that

1         association with—What'd you say?—your ex-husband?

2   A   Correct.

3   Q   —that you would have conversations with Patrick?

4   A   Yeah, they would have work parties; and we would all be

5         together, and we would hang out.

6   Q   And did this kind of situation occur more than once?

7   A   Yes.

8   Q   So you had relatively frequent contact with Patrick Mishall

9         over the course of time?

10   A   Three or four times a week we would see each other probably.

11   Q   Okay. At different times did Patrick Mishall talk about his

12         girlfriend being killed in Michigan?

13   A   Yes.

14   Q   As a matter of fact, there was at least three different times;

15         is that right?

16   A   Yes.

17   Q   We'll call this incident number one.

18   A   Okay.

19   Q   This—Did he talk to you and give an account of the

20         circumstances that—around the girlfriend's death? Tell you

21         where it occurred, for instance, or what he had done on that

22         day?

23   A   Where it occurred? At a convenience store that she worked at.

24   Q   Did he tell you who it was that had discovered the murder?

25   A   I was under the impression that it was him when he went to

1    pick her up from work at 10:30 that night.

2  Q  And that he then discovered her body?

3  A  Correct.

4  Q  After that description or account of the murder was there a

5     time where you were then at his apartment?

6  A  Yeah, for an after bar party.

7  Q  Did you see photographs of children at his apartment?

8  A  Twins, they were on the wall.  Two eight-by-ten twins.

9  Q  Did he tell you the significance of that photograph in

10    relation to the victim of the murder?

11 A  That they belonged to him and the girl that was—his girlfriend

12    that was killed—that they were their children together.

13 Q  Him and the girlfriend?

14 A  Right.

15 Q  Was there another account—I'll call this account number

16    two.—about the circumstances regarding the death—the murder?

17 A  That—That he was notified by the police; that he—

18 Q  Well, let me ask this question, ma'am.  Did he at some point

19    make a statement about the—whether or not he was still seeing

20    this girlfriend—

21 A  When—

22 Q  —at the time of the murder?

23 A  No, he—He said that they had breaken [sic] up because she was

24    having an affair with another woman.

25 Q  So he indicated that at the time of the girlfriend's murder—

494

1  A   Right.

2  Q   —they broke up because she was seeing another woman?

3  A   Right.

4  Q   Then did he offer an explanation as to why he had gone to the

5      store if they had broken up?

6  A   To talk about the children.

7  Q   Referring to the twins he said—

8  A   The twins.

9  Q   —were hers.

10 A   Their—Yeah.

11 Q   Okay.  And who on this occasion discovered the bodies [sic]

12     then?

13 A   At that time the police did.

14 Q   Did you ask him more questions about the murder during these

15     conversations?

16 A   I did, and I know there were other people in the room that

17     did.

18 Q   And what was Mr. Mishall's reaction?

19 A   He would get angry.  He got angry about it.  He asked some of

20     the people to leave his apartment.

21 Q   And—All right.  So he kicked people out?

22 A   Right.

23 Q   Was there—Was it that occasion or another occasion that he

24     talked about his feelings that Chris Dimmick was a lesbian?

25 A   It was at that time—Well, with me only then.

495

1   Q   Tell me about as he related this feeling that he had about the

2       murder victim what you observed about his attitude and

3       demeanor as he's relating this.

4   A   It was almost like she was still around—still alive—angry. He

5       was very angry when he talked about it. His voice would

6       raise. He seemed to sweat. He seemed pissed off, basically.

7   Q   What about the speed with which he was speaking and so on?

8   A   He would—His voice was fast. He would talk faster.

9   Q   And that's when—in relating his suspicions about her with

10      another woman?

11  A   Yeah, right.

12  Q   Did you ever see him with a gun?

13  A   I—I seen one on his dresser.

14  Q   When—Do you remember when that was—time period?

15  A   It was one time at his house. I'm not for sure.

16  Q   Okay. How is it that you were able to see this weapon in a—a

17      bedroom, I'm assuming?

18  A   It was in his bedroom.

19  Q   All right.

20  A   He—We went back to his bedroom. He wanted to talk to me.

21      There was other people still out in the living room, and—and

22      it was laying there on top of the dresser.

23  Q   Could you describe this weapon. Was—Well, let me ask this:

24      you know the difference between a handgun and a rifle or a

25      shotgun?

```
 1   A    Yes.

 2   Q    Was this a handgun?

 3   A    It was a handgun, but it was bigger than my palm.

 4   Q    It was bigger than your palm?

 5   A    Yes.  Length-wise, I should say.

 6   Q    Was it a—a lightweight thin thing, or did it have a heavy

 7        frame?

 8             MR. SVIKIS:   I'm going to object.  I don't know if

 9        this witness touched the gun.  She said she just saw it.  I

10        don't know how she'd know if it was heavy or lightweight.

11             MR. BROWER:   Well, I can clarify that, your Honor.

12   BY MR. BROWER:

13   Q    Was—

14             THE COURT:   All right.  .  .  .  (inaudible)

15   BY MR. BROWER:

16   Q    Was this a thin and small thing—a dainty thing—or did it have

17        a bigger, bulkier frame?

18   A    I would say by looking at it it would be more of a heavier,

19        bulkier gun.

20   Q    But you don't know the caliber of the weapon or anything like

21        that?

22   A    No, I don't.

23   Q    Do you know the difference between a revolver or a

24        semiautomatic?

25   A    No, I don't.
```

1  Q    Handgun, big?

2  A    Yeah.  I know—I know the difference between a handgun and a

3       rifle.

4  Q    All right.  Did he make any statements about the gun?

5  A    He said he had it for protection from people from Michigan,

6       and that was all that was said.

7  Q    Did he give any indication or you were able to reach a

8       conclusion about when—when it was or how long he had had this

9       weapon?

10 A    I—I got the impression that he had it before he got here just

11      'cause when he got here he stayed at a hotel that his aunt and

12      uncle owned, and I know the maid—Or he had told me a story

13      that the maid found it there, and he became irate with the

14      maid.  When she found the gun, his aunt and uncle had kicked

15      him out of the motel then.

16 Q    And he had moved into his uncle's motel after coming directly

17      from Michigan, correct?

18 A    Right.

19             MR. BROWER:    Thank you.

20             I have nothing further of this witness.

21             THE COURT:    Mr. Svikis?

22             MR. SVIKIS:   No questions.

23             THE COURT:    You can step down.  Watch your step

24      when you step down.

25             MR. BROWER:    Sandra Schulz.

                              498

 1                    THE COURT:   You do solemnly swear or affirm the

 2          testimony you're about to give shall be the truth, the whole

 3          truth, and nothing but the truth, so help you God?

 4                    MS. SCHULTZ:   I do

 5                    THE COURT:   Have a seat in the witness chair.

 6                              SANDRA KAY SCHULZ,

 7          called at 11:12 a.m., and sworn by the Court, testified:

 8                             DIRECT EXAMINATION

 9   BY MR. BROWER:

10   Q    Ma'am, could you please state your full name and spell your

11        last name for the record.

12   A    Sandra Kay Schulz—S-c-h-u-l-z.

13   Q    Ma'am, you're a former employer of Patrick Mishall from

14        Wisconsin; is that correct?

15   A    Yes.

16   Q    Do you remember what period of time you were acquainted with

17        Patrick Mishall?

18   A    Yes, I do.

19   Q    And what was that?

20   A    The year 1991.  The exact month, I don't know.

21   Q    All right.

22   A    And I'd been acquainted with him since up until about five

23        years ago—six years ago I had seen him last.

24   Q    Do you see Patrick Mishall in the courtroom today?

25   A    Yes, I do.

(Tape No. B2004-035, 6-16-04, 11:13)

1  Q  Where is he sitting, and what is he wearing?

2  A  A green shirt.

3  Q  Sitting at the table marked defendant?

4  A  Yes.

5        MR. BROWER:  If the written record can reflect the

6     identification of the defendant, your Honor.

7        THE COURT:  It may.

8  BY MR. BROWER:

9  Q  Now you were the employer for him; where was this?

10  A  The Mug Tavern.

11  Q  As his employer, did you have occasion to speak with him

12     frequently over the course of time?

13  A  Yes, I did.

14  Q  Did you at some point learn that his girlfriend had been

15     murdered in the state of Michigan?

16  A  Yes, I did.

17  Q  Did he offer any accounts of this girlfriend's murder?

18  A  Yes, he did.

19  Q  Multiple times?

20  A  Yes.

21  Q  And all of them consistent or contradictory?

22  A  Three different versions.

23  Q  Let's talk about version one.  Did he tell you what he

24     and—Well, let me ask this first.  Did he—Did you know the name

25     or did he give the name of this girlfriend?  Are you aware of

```
 1        the name of the girlfriend?
 2  A     I only know he told me his girlfriend in Michigan.
 3  Q     Okay.
 4  A     I could not clarify the name.
 5  Q     Did he say where the—what he and the girlfriend did back in
 6        Michigan?
 7  A     Yes.
 8  Q     What was that?
 9  A     He told me they ran a video store—each one of them had a video
10        shop.
11  Q     Had a video what?
12  A     Ran a video store to rent movies.
13  A     All right.  A rental place?
14  Q     Correct.  They each had one meaning, literally, two separate
15        businesses?
16  A     Two separate stores they ran.
17  Q     Did he tell you what he in this first version did on the day
18        that she was murdered?
19  A     Yes, he did.
20  Q     What was that?
21  A     They had left to go to the video shops.  He dropped her off at
22        work, and then he went to his job.  When he got to his store,
23        he recalled that he had to tell her something so he called the
24        store and she did not answer and he became nervous, so he took
25        the keys and ran over to her store, opened the store, found
```

1   her sitting in a chair bound by the legs and arms dead and

2   shot.

3  Q   Did he make any statements about what his usual practice was

4      as—as far as helping her with opening the store?

5  A   He usually told me he helped her open the store.

6  Q   Except for that day?

7  A   Except for that day.

8  Q   Account number two: did he on this account drop her off again?

9  A   On that day—the number two account—he said that they both took

10      separate cars and went to their jobs and when he was at his

11      job he got a call by the detectives that she was dead at her

12      store.

13  Q   Did you confront him with this apparent inconsistency?

14  A   Yes, I did.

15  Q   And what was his response?

16  A   He told me I misunderstood his first version.

17  Q   Version three: would this—This account came after you had

18      learned about his having some video or stereo equipment; is

19      that not accurate?

20  A   Correct.

21  Q   All right.  Did your learning that he had some expensive video

22      or stereo equipment cause you to—to go to him or to ask him

23      any questions?

24  A   Yes, because he had a financial problem.  He was very broke

25      most of the time, and I could not understand how he had all

1    this video equipment.

2  Q  And did you literally confront him regarding that?

3  A  Yes, I did.

4  Q  Did he offer an explanation as to where this equipment had

5     come from?

6  A  Yes, he did.

7  Q  And what was that?

8  A  He told me that the store that he worked at—a stereo

9     equipment/video store—was going out of business so he—any

10    employees that worked there could buy the equipment under a

11    cut-rate price or cheap, and that's what he did.

12 Q  Now a video or equipment store, that's not the same as a

13    rental store then for VHS tapes or the like?

14 A  Correct.

15 Q  Did you recognize that?

16 A  Yes, I did.

17 Q  And what did you say to him about that, if anything?

18 A  I told him when he first came—came to La Crosse he told me

19    that his girl and him ran video rental stores; and, again, I

20    was told that I misunderstood the story, it was video

21    equipment store.

22 Q  Did he go on to talk about how it was that his girlfriend

23    wound up being murdered at that store?

24 A  Yes.

25 Q  What'd he say about that?

1   A   He said that he had complained to or—Excuse me.—that Kalamazoo
2       at that time was being robbed—stores were—and that the police
3       here were not doing anything about it, and he felt that they
4       should have been doing more about the robberies and that a
5       robber had come into the store—They must have been waiting for
6       her.—and they killed her then.
7   Q   Waiting inside the store?
8   A   Waiting inside the store—
9   Q   So he's—
10  A   —for her.
11  Q   He's offering this theory that there was someone inside the
12      store when she opened up?
13  A   Correct.
14  Q   And in the early 90s officers from Kalamazoo had actually gone
15      to La Crosse and were talking with people out in La Crosse; is
16      that right?  Are you familiar with that?
17  A   Correct.
18  Q   Did Patrick Mishall ask you any questions about whether the
19      police had contacted you or not?
20  A   Yes, he did.
21  Q   Did he make any statements about why they were there?
22  A   Yes, he did.
23  Q   And what was that?
24  A   He told me that the police—I never told him they were there.
25      He had asked me and told me to make sure to say that he was a

1    good guy.  And then I asked him why they were asking about

2    him, and he told me that they had been to his other job and

3    that they were trying to get information out of him to ask

4    about the guys that were—people that were in the store—if

5    there was any information he had on that at the time of his

6    girlfriend's death.

7  Q  They were looking for ideas about who might have done it?

8  A  Correct.

9  Q  And wanted his help in that regard?

10 A  Correct.

11          MR. BROWER:   I have nothing further of this

12    witness.

13          THE COURT:   Mr. Svikis?

14          THE WITNESS:   Your Honor, may I just move in the

15    chair?  I've had back surgery, and I've just got to move a

16    little bit in the chair.

17          THE COURT:   Sure.

18          THE WITNESS:   Thank you.

19          THE COURT:   She needs to move around.

20          THE WITNESS:   I just need to move.

21          MR. SVIKIS:   That's okay.

22          THE WITNESS:   Okay.

23                    CROSS-EXAMINATION

24 BY MR. SVIKIS:

25 Q  Ms. Schulz, you were interviewed by the police from Kalamazoo

                              505

1        a number of times, right?  More than once?

2  A  Correct.

3  Q  And you were interviewed in 1992, correct?

4  A  I can't recall that date.

5  Q  By Detective Hatter and—Well, you were—You recall the

6        interview, right?

7  A  Correct.  The date, I can't recall.

8  Q  Okay.  And in that interview isn't it true that you told the

9        police that Patrick had a girlfriend and had—and left

10       Kalamazoo because the police thought he had killed a

11       girlfriend and he had to leave?

12 A  It—

13 Q  That's a—I mean you had three versions that you told the

14       prosecutor, but there's a fourth version that you told the

15       police back in '92, a year after the crime; isn't that

16       correct?

17 A  I don't understand the question.  If you—

18 Q  Certainly.

19 A  —could repeat that to me again.

20 Q  Sure.  The testimony you relayed today is as a result of being

21       interviewed by the cold case team in—well, about a year ago

22       today—those three versions; that came from that interview,

23       right?

24 A  Correct.

25 Q  Okay.  In 1992—a year after Christine Dimmick's death, the

1     police also interviewed you and in that version isn't it true

2     that Patrick stated that his girlfriend was killed and he—and

3     he left Michigan and he was very sad and emotionally

4     distressed over the loss of his girlfriend; isn't that true?

5  A    True, he had told me that before.

6  Q    Okay.  And that's all he told you?

7  A    Pardon me?

8  Q    He didn't tell you anything else, and that's what you told the

9     police, right?

10  A    He had told me that he was very—he felt very sad that his

11     girlfriend left.  And when I had asked him why he also left

12     Kalamazoo he told me he got upset with his boss at the job,

13     and that's why he left Kalamazoo.  That was his one story.

14  Q    Okay.  And that was the—That was the story you relayed in

15     1992—a year after the death—correct?

16  A    Which story?

17  Q    There are four—There are four versions, right?  You told—

18  A    He told me many stories—

19  Q    All right.

20  A    —and I tried to remember them to my best knowledge.

21  Q    All right.

22  A    Pee Wee told me many stories.

23  Q    And he was—And that's his nickname Pee Wee?

24  A    Correct.

25  Q    Is that 'cause he was kind of a goof?

1   A   He imitated Pee Wee Herman.

2   Q   Okay.  So the one—So he told you no story outside of the fact

3       that his girlfriend was killed and he had to—and he had to

4       leave Michigan in '92, but in '90—but in 2003—almost ten years

5       later—that's when you come up with these other versions,

6       correct?

7   A   I cannot recall what I told the detectives in 1992 at this

8       time.  I cannot recall what I put on a statement.

9   Q   Okay.

10  A   So I'm not going to guess.

11              MR. SVIKIS:   Thank you.

12              THE COURT:   Do you have any other questions,

13      Mr. Brower?

14                      REDIRECT EXAMINATION

15  BY MR. BROWER:

16  Q   Ma'am, over what period of time did you—did these

17      conversations occur?  Can you—Do you recall?

18  A   When Pee Wee come—Excuse me.—Patrick come to La Crosse, he was

19      involved with The Mug from when he reached La Crosse for over,

20      I would say at least six years.

21  Q   So it is very well possible that the statements that you've

22      talked about today could, in fact, have been after the police

23      were there in '92?

24  A   Correct.

25              MR. BROWER:   Thank you.

```
 1                    Nothing further.

 2                    MR. SVIKIS:   I have no further questions.

 3                    THE COURT:   You can step down, but watch your step

 4          when you're doing that.

 5                    THE WITNESS:   Thank you.

 6                    MR. BROWER:   People call Dawn Haller to the stand.

 7                    THE COURT:   You do solemnly swear or affirm the

 8          testimony you're about to give shall be the truth, the whole

 9          truth, and nothing but the truth, so help you God?

10                    MS. ANDERSON:   I do.

11                    THE COURT:   Have a seat.

12                              DAWN ANN ANDERSON,

13          called at 11:25 a.m., and sworn by the Court, testified:

14                            DIRECT EXAMINATION

15    BY MR. BROWER:

16    Q     Ma'am, could you please state your full name and spell your

17          last name.

18    A     Dawn Ann Anderson—A-n-d-e-r-s-o-n.

19    Q     Ma'am, are you familiar with a person by the name of

20          Patrick Mishall?

21    A     Yes, I am.

22    Q     Do you see Patrick Mishall in the courtroom today?   You can

23          stand up if you—

24    A     I don't believe so.

25    Q     All right.
```

1   A   Not from what I remember him.

2   Q   Okay. Go ahead. Sit down.

3       How long has it been since you saw Patrick Mishall?

4   A   Eleven years.

5   Q   What was his physical appearance like then as far as length of

6     hair and that type of thing?

7   A   He was average to tall in build.

8   Q   All right. But as far as hair—length of hair and so on.

9   A   Hair was kind of—was curly. It was kind of out a little

10    further.

11   Q   You remember if he had any difficulty walking or—

12   A   Uhm-hmm. He had a limp.

13   Q   He had a limp?

14   A   Well, because—Yeah, like his legs weren't the same—

15   Q   All right. And this person that you knew as Patrick Mishall,

16    did he—do you know where he had come from—where he used to

17    live—

18   A   Yes, he lived in—

19   Q   —prior to—

20   A   —Kalamazoo.

21   Q   Here in Michigan?

22   A   Prior to Michigan?

23   Q   Kalamazoo, Michigan.

24   A   Right.

25   Q   And then at some point he left Kalamazoo and went to—

1    A    La Crosse.  He lived—

2    Q    La Crosse, Wisconsin.

3    A    —in La Crosse when I knew him.

4    Q    All right.  So when was it that you first met him?

5    A    It was middle to end of April of 1991.

6    Q    Where was he staying at that time?

7    A    He was staying at his aunt and uncle's hotel.

8    Q    Where was that?

9    A    Road Star Inn in La Crosse.

10   Q    In La Crosse, Wisconsin?

11   A    Yes.

12   Q    Soon after he moved there did you begin to date?

13   A    (No audible response)

14   Q    Well, let—

15   A    He moved there—Well, I didn't know him—

16   Q    Okay.

17   A    I mean I knew he was already at the Road Star, so—

18   Q    All right.

19   A    —is that what you mean?

20   Q    Yes.

21   A    Or once he actually moved in there?

22   Q    Well, let me just ask it this way: at some point did you begin

23        to date?

24   A    Yes.

25   Q    And when—how soon either after his first move to Wisconsin or

                                  511

1   A   La Crosse.  He lived—

2   Q   La Crosse, Wisconsin.

3   A   —in La Crosse when I knew him.

4   Q   All right.  So when was it that you first met him?

5   A   It was middle to end of April of 1991.

6   Q   Where was he staying at that time?

7   A   He was staying at his aunt and uncle's hotel.

8   Q   Where was that?

9   A   Road Star Inn in La Crosse.

10  Q   In La Crosse, Wisconsin?

11  A   Yes.

12  Q   Soon after he moved there did you begin to date?

13  A   (No audible response)

14  Q   Well, let—

15  A   He moved there—Well, I didn't know him—

16  Q   Okay.

17  A   I mean I knew he was already at the Road Star, so—

18  Q   All right.

19  A   —is that what you mean?

20  Q   Yes.

21  A   Or once he actually moved in there?

22  Q   Well, let me just ask it this way: at some point did you begin

23      to date?

24  A   Yes.

25  Q   And when—how soon either after his first move to Wisconsin or

1       you had first met him did that occur?

2   A   I met him and about two weeks later we—

3   Q   Okay.

4   A   —I guess you might say started dating.

5   Q   And that—Was that late April '91?

6   A   It would have been probably—Yeah, early May—

7   Q   Okay.

8   A   —late April or early May.

9   Q   And how long did you see him?

10  A   (No audible response)

11  Q   Let me be more precise.  How long did you—

12  A   About a year and a half.

13  Q   —date?  Was there a brief period where you were actually

14      living together?

15  A   Yes.

16  Q   Was that early on in the relationship or later on?

17  A   Right off the bat kind of.  Yeah, he—Yeah.

18  Q   Did he ever speak to you about the murder?  Well, let me—

19  A   I mean I knew that she—

20  Q   I need to ask a—

21  A   Okay.

22  Q   —initial question, I guess, first,.

23  A   Okay.

24  Q   At some point did you learn that a girlfriend from Kalamazoo

25      had been murdered?

512

1   A   Right.

2   Q   Did he make any statements to you about that murder?

3   A   Yes.

4   Q   Did he tell you how he learned that she had been murdered?

5   A   Yes.

6   Q   What'd he say?

7   A   He told me that he went in to work—He told me he worked at the

8       same place as she worked, and he went in to see her; and when

9       he went in, that she was dead.

10  Q   And it was who that discovered her body?

11  A   Patrick went in to visit her at work.

12  Q   Do you know if he was in possession of any video equipment

13      during that time period when you were with him?  I mean VCR,

14      that kind of thing?

15  A   Yes, he had a VCR.

16  Q   All right.  How would you characterize his interest in that

17      equipment?

18  A   Very protective of it.

19  Q   Do you know anything about the equipment?  Can you describe it

20      at all?

21  A   I don't remember too much about it.

22  Q   Didn't attempt—

23  A   I just remember he was very protective of it.

24  Q   All right.  Do you remember him ever being in possession of a

25      gun?

1  A   Yes.

2  Q   How did you discover that he had a gun?

3  A   Well, I saw the gun in our apartment.

4  Q   This is while you were living together?

5  A   Right.

6  Q   Do you remember which room it was that he had this?

7  A   In the bedroom.

8  Q   Did you ask him about the gun, why he had it?

9  A   Yes.

10  Q   What'd he say?

11  A   He told me it was, like, for protection.  I mean in Kalamazoo

12      that's what you had and, you know, for protection.

13  Q   Do you remember this gun at all, what it looked like?

14  A   It was like a—

15  Q   I'm sorry?

16  A   I'm sorry.  I remember black and like a handgun.  I mean it

17      wasn't like a long gun.  It was just—

18  Q   All right.

19  A   —not small, just regular—I don't know.

20  Q   Not a small gun; is—

21  A   Not—

22  Q   —that what you said?

23  A   Not something like little, but just like—

24  Q   All right.

25  A   I don't know my guns.  I'm sorry.

1   Q   Thank you.

2              This was sometime in '91, would it have to be?

3   A   Uhm-hmm.   Right.

4   Q   Towards the—

5   A   We—

6   Q   —mid or late '91?

7   A   No, well, we only lived together till about August or

8       September—

9   Q   Okay.

10  A   —and then I moved out.

11  Q   It was during that time period?

12  A   So it would have been from maybe end of May till like August

13      or beginning of June till August.  It was only a couple

14      months' time period there.

15              MR. BROWER:   Thank you.

16              No further questions, your Honor.

17              THE COURT:   Any questions, Mr. Svikis?

18              MR. SVIKIS:   Yes.   Thank you, your Honor.

19                      CROSS-EXAMINATION

20  BY MR. SVIKIS:

21  Q   Ms. Haller [sic], you were interviewed by the police back in

22      1992; isn't that correct?  On or about—somewhere in 19—

23  A   Right—

24  Q   Okay.

25  A   —somewhere at that time, right.

                        515

1   Q   All right.  And you stated that you knew Patrick Mishall?

2   A   Pardon?

3   Q   You stated that you knew Patrick Mishall?

4   A   Right.  Correct.

5   Q   All right.  And you were also aware that he had a girlfriend

6       that was killed in Michigan?

7   A   Uhm-hmm.

8   Q   Is that a yes?

9   A   Oh, yes.  I'm sorry.

10   Q   Okay.  And isn't it true that while you were in Mr. Mishall's

11       room you actually saw a picture of Ms. Dimmick, right?

12   A   Yes, that's correct.

13   Q   He kept the picture, right?  Okay.

14            And that's when he told you that that was his

15       girlfriend who was killed in 1991 or thereabouts; isn't that

16       correct?

17   A   Correct.

18   Q   Okay.  And also that he was saddened by her death; isn't that

19       correct?

20   A   Yes.

21   Q   And that in—And that in the very near future he had to go back

22       to Kalamazoo and sell his house because of his friends and

23       particular lifestyle; isn't that correct?

24   A   To do what?

25   Q   He had to go back to Michigan and sell his house because of

1   his friends and their lifestyle that he didn't care for; isn't

2   that correct?

3   A   I don't know the reason.

4   Q   Okay.

5   A   But I do know—

6   Q   He—

7   A   —yes, he had—

8   Q   Didn't he tell you—

9   A   —to go back.

10  Q   Didn't he tell you—Didn't he tell you that was the reason, or

11      you don't recall?

12  A   I don't recall him telling me a reason.

13  Q   Okay.

14  A   He just said he wanted to move.

15  Q   Also in that first interview in 1992 isn't it true that you

16      told the officers that you never observed Mr. Mishall with a

17      handgun?  Could you have told that to them?

18  A   I don't remember.

19  Q   Okay.  And that you had never seen him with one nor did he

20      ever mention one?  Do you recall mentioning that to the

21      officers in 1992?

22  A   I—I really don't remember that meeting so well.  I'm sorry.

23  Q   What's that?

24  A   I don't remember that meeting.  I mean I remember that.  I

25      meant—

1    Q    Yes.

2    A    —I really don't remember what we—

3    Q    Okay.

4    A    —talked about.  I'm sorry.

5                     MR. SVIKIS:    I have nothing further.

6                     THE COURT:    Anything else?

7                     MR. BROWER:    No redirect, your Honor.

8                     THE COURT:    You can step down.  Watch your step,

9         please, ma'am.

10                    THE WITNESS:    Thank you.

11                    MR. BROWER:    Your Honor?  We're at that point.

12                    THE COURT:    Oh, you're not—Okay.

13                    All right.  We're going to recess at this point,

14        members of the jury.

15                    As I understand it the next witness that we have in

16        this matter is out of state and he's not here yet.  So it

17        appears that we'll go through that witness tomorrow, and we

18        may complete the prosecutor's—I think he had one other witness

19        after that.  So we should complete that phase of the case by

20        tomorrow—and possibly even in the morning.  I don't know for

21        sure.

22                    But we don't have any witnesses to go forward with

23        today, so we're going to recess.  I'm going to ask you all to

24        be back here tomorrow morning at 9:00 o'clock.

25                    Keep in mind what I've told you previously.  Don't

                                    518

1    discuss the case amongst yourselves or with anyone else—And

2    that includes your family and friends and acquaintances.—or

3    have any contact with either the lawyers, defendant, any of

4    the witnesses, or anybody who's in any way involved in this

5    case.

6         Don't—Be careful not to read or have any contact

7    with news media coverage of this—of this trial.  If it should

8    come up and catch you unaware, just remove yourself from—from

9    being exposed to it as quickly as possible.

10        So we'll stand in recess then until tomorrow morning

11   at 9:00 o'clock.

12        Okay.  I'm told you're supposed to report to

13   room 428.

14             UNIDENTIFIED JUROR:   . . . (inaudible)

15             THE COURT:   Is that where you were this morning?  I

16   don't know.

17             UNIDENTIFIED JUROR:   Yes.

18             THE COURT:   Okay.

19             (At 11:38 a.m., proceedings adjourned)

20

21

22

23

24

25

519