2615 11

1              STATE OF MICHIGAN

2         9TH CIRCUIT COURT—TRIAL DIVISION

3

4   THE PEOPLE OF THE
    STATE OF MICHIGAN
5
        v                              Files No. C03000897 FC
6
    PATRICK KEVIN MISHALL,
7
            Defendant.
8

9

10              Jury Trial — Volume IV of IX

11      Before Hon. George R. Corsiglia P12239, Circuit Judge
        (Visiting Judge from 48th Circuit, Presiding by Assignment)
12
            Kalamazoo, Michigan—Thursday, June 17, 2004
13

14
    APPEARANCES:
15
    For the People:              Scott W. Brower P44951
16                               Office of the Prosecuting Attorney
                                 227 West Michigan Avenue
17                               Kalamazoo, Michigan 49007
                                 (269) 383-8900
18
    For the Defendant:           Andis Svikis P36039
19                               1803 Whites Road
                                 Kalamazoo, Michigan 49008
20                               (269) 349-7692

21

22  Recorded by:                 Video recorded

23  Transcribed by:              Brenda K. Foley CER 4956
                                 1400 Gull Road
24                               Kalamazoo, Michigan 49048
                                 (269) 385-6001
25                                  * * * * *

                    520



FILED
JUL 0 1 2005
9th JUDICIAL CIRCUIT
COUNTY OF KALAMAZOO
KALAMAZOO, MICHIGAN

ENTERED

TABLE OF CONTENTS

WITNESSES: <u>People</u>                                                    PAGE

LANCE ELLIOTT HANDLOGTEN

    Direct examination by Mr. Brower . . . . . . . . . . . . . 523
    Cross-examination by Mr. Svikis  . . . . . . . . . . . . . 545
    Redirect examination by Mr. Brower . . . . . . . . . . . . 560
    Recross-examination by Mr. Svikis . . . . . . . . . . . . 564

People rest . . . . . . . . . . . . . . . . . . . . . . . . . 568

Motion for directed verdict by Mr. Svikis   . . . . . . . . . 569

Response by Mr. Brower  . . . . . . . . . . . . . . . . . . . 569

Court's ruling on motion for directed verdict   . . . . . . . 570

WITNESSES: <u>Defense</u>

JOSETTE PHILLIPS

    Direct examination by Mr. Svikis . . . . . . . . . . . . . 574
    Cross-examination by Mr. Brower  . . . . . . . . . . . . . 575

| EXHIBITS: People | | IDENTIFIED | RECEIVED |
|---|---|---|---|
| X56 | diagram | 539 | 539 |
| X57 | printout of exhibits | 568 | 568 |

(Tape No. B2004-036, 6-17-04, 09:15)

1      Kalamazoo, Michigan

2      Thursday, June 17, 2004 - 9:15 a.m.

3      THE CLERK:   . . . (speaker began prior to tape

4      starting) Patrick Mishall, file C03-0897 FC.

5      Please state your appearances for the record.

6      MR. BROWER:   If it please the Court, your Honor,

7      Assistant Prosecuting Attorney Scott Brower for the People of

8      the State of Michigan.

9      MR. SVIKIS:   Andis Svikis on behalf of Mr. Mishall.

10     THE COURT:   Are you ready to proceed, gentlemen?

11     MR. SVIKIS:   Yes, your Honor.

12     MR. BROWER:   I am, your Honor.

13     THE COURT:   You want to call your next witness,

14     please.

15     MR. BROWER:   Your Honor, the People call

16     Detective Lance Handlogten to the stand.

17     THE COURT:   You do solemnly swear or affirm the

18     testimony you're about to give shall be the truth, the whole

19     truth, and nothing but the truth?

20     MR. HANDLOGTEN:   I do.

21     THE COURT:   You may be seated.

22

23

24

25

522

1        LANCE ELLIOTT HANDLOGTEN,

2    called at 9:15 a.m., and sworn by the Court, testified:

3              DIRECT EXAMINATION

4  BY MR. BROWER:

5  Q    Detective, would you please state your full name and spell

6       your last name for the record.

7  A    Lance Elliott Handlogten—H-a-n-d-l-o-g-t-e-n.

8  Q    Detective Handlogten, where are you employed?

9  A    Kalamazoo public safety.

10 Q    And what is your present position, detective, yes?

11 A    Detective.

12 Q    What unit are you assigned to?

13 A    Cold case homicide team.

14 Q    How much police experience do you have, sir?

15 A    A little over 11 years now.

16 Q    Starting as a patrol officer then detective?

17 A    Yes, sir.  I spent some time doing routine patrol.  I then

18      moved into our tactical response unit.  From there I was

19      promoted to detective.

20 Q    And when was that?

21 A    Five, six years ago now, I guess.

22 Q    Could you tell us a little bit about the cold case team.  What

23      is the unit comprised of—or who?

24 A    The unit involves several jurisdictions within

25      Kalamazoo County.  Right now we have a detective from

                              523

1       Kalamazoo public safety, obviously.  Our supervisor is also a

2       public safety sergeant.  We have a detective sergeant from

3       Kalamazoo County, Portage—

4   Q   Meaning sheriff's department?

5   A   Yes, sir.

6               A Portage detective, a Western Michigan University

7       detective, and an MSP investigator.

8   Q   Michigan State Police?

9   A   Yes, sir.

10  Q   What is the function of that unit?

11  A   Basically we're charged with taking unsolved homicides—all

12      unsolved homicides that are—have been, I guess you'd say,

13      sitting for a while—hence, cold case—and reviewing those and

14      then picking up ones to reinvestigate and, hopefully, bring to

15      a conclusion.

16  Q   Now generally in detective units within various departments, a

17      detective may have numerous different cases that he's working

18      on all at the same time?

19  A   That's correct.

20  Q   Is the same true for the cold case homicide team?

21  A   Although we have all the cases, we typically don't work more

22      than one, sometimes two at a time; but the general focus is

23      one case at a time.  We might branch off and look at some

24      other stuff on another case just to make sure that we're, you

25      know, keep working.  But generally it's one case at a time.

                              524

(Tape No. B2004-036, 6-17-04, 09:18)

1   Q   When you say we, do you mean the entire team is working on

2       that one case then?

3   A   Yes, sir. We divvy up responsibilities and work—

4   Q   And is that—

5   A   —on one case.

6   Q   —unique in law enforcement in reality?

7   A   Well, I can say for sure that it's unique in Kalamazoo County.

8       Typically a department—For instance, our department we have—I

9       don't know.—three or four detectives assigned to like a major

10      case unit. But they're not only responsible for homicides but

11      also assaults—you know, major assaults and stuff like that.

12      Any type of major case they would catch. So they might be

13      working, you know, five, six more cases all at the same time;

14      and they just—they can't come together as a group like that

15      except for maybe the first day or so of a homicide.

16  Q   When a case is brought to the cold case homicide team and a

17      decision is made to investigate that case, what kind of

18      process is conducted as far as review of that report and

19      decisions on action and so on?

20  A   The typical sort of way we operate would be we try and ensure

21      that we have all the information from the case, including, you

22      know, information from the prior investigators. We'd review

23      what evidence may have been submitted during the prior portion

24      of the investigation. We would all sit down and read the case

25      individually, form our own thoughts about where the case

1   should go and what should be investigated and—and that.

2           From there we would talk to—actually physically sit

3   down and talk to the initial investigators to find out what

4   their thoughts are.

5           At that point we would then sit down collectively as

6   a group—meaning the cold case team with our sergeant—and

7   develop some sort of a investigative plan for how we were

8   going to go about investigating the case.

9  Q   Did you go through that process with the murder investigation

10     of Christine Dimmick?

11 A   Yes, sir, we did.

12 Q   Now there's been some testimony about the initial

13     investigation and Detective Grace being the senior detective

14     and being in charge of the investigation, if you would, at

15     least at that time.

16 A   Yes, sir.

17 Q   Are you the detective in charge of this Christine Dimmick

18     death investigation—

19 A   No—

20 Q   —from the point that you—

21 A   No, sir, that's not really how we work.  And there's not

22     really one person that's—I mean there's people that are

23     responsible.  Obviously, we have supervisors; and,

24     theoretically, they're responsible for everything we do.  But

25     it truly is a team effort.  There's no one person that's in

1    charge of a specific case.

2            We maybe have someone that does, you know,

3    keeps—keeps the, you know, a case copy always up to date or

4    something like that; but they're not in charge of the case as

5    a whole.

6  Q  The sergeant reviews all the—the investigation reports and so

7    on from each of the various detectives, and he is the one that

8    makes assignments then; is that correct?

9  A  Ultimately that's correct.  I mean it's a little more

10   democratic than that, but—but ultimately that's true.  He is

11   responsible for making the assignments.

12 Q  Now oftentimes reports on the types of cases that you're

13   investigating become extremely massive; is that correct?

14 A  Yes, sir.

15 Q  Is it realistic that any one detective actually would be aware

16   of everything that was already done, the results of other

17   detectives' work, and to be apprised and up-to-date on every

18   detail?

19 A  That's—No, it's just not realistic.  I mean some of our cases,

20   I mean the report—just the report itself might end up being,

21   you know, five, 600 pages; and that doesn't even include all

22   the other investigative information that we're going through.

23   So for one person to know everything about a case, that's just

24   not realistic.

25 Q  The cold case homicide team investigates cases—unsolved

1     homicide cases throughout the county; is that right?

2  A  Yes, sir.

3  Q  You've talked about officers that make up this group coming

4     from various agencies not just within the city of Kalamazoo

5     but also county, city of Portage, and elsewhere?

6  A  Yes, sir.

7  Q  Have you had an informal practice as to which detective would

8     be given the responsibility or be included on a team to

9     contact and interview a particular suspect if one was

10    developed?

11  A  I mean it's not really a formal policy or anything like that;

12    but, generally, you know, we feel like that the agency that

13    brought the case to the team will probably more or less take

14    the lead as far as the major suspect interviews and stuff like

15    that.

16  Q  And were you part of the contact team that interviewed

17    Patrick Mishall?

18  A  Yes, sir, it was.

19  Q  You interviewed him at what location and when was that?

20  A  It was at his home in Onalaska, Wisconsin.  I think the date

21    we interviewed him was May 20th, 2003.

22  Q  So just over a year ago?

23  A  Yes, sir.

24  Q  Who was with you at that time?

25  A  Sergeant Amerigo Marcelletti, who is my direct supervisor—the

1    cold case team commander—and an investigator Marion Byerson

2    (phonetic) from La Cross, Wisconsin, PD.   There was vari [*sic*]

3    other—various other officers around, but we were the only

4    three that made contact.

5  Q  When you made contact with him this was at his home—

6  A  Yes.

7  Q  —with the three of you, yes?

8  A  That's correct.

9  Q  Were you in street clothes or in uniform?

10 A  Street clothes.

11 Q  Weapon displayed?

12 A  No, sir, it's our policy not to have that.

13 Q  All right.   So wearing something similar to what you have on

14   or even more casual?

15 A  Actually, I think I had jeans and a loose-fitting shirt on.

16 Q  All right.   Did you—The person that you went to contact and

17   identified as Patrick Mishall, is Mr. Mishall present in the

18   courtroom today?

19 A  Yes, sir, he is.

20 Q  Where is he?

21 A  He's sitting at the defendant's table next to Mr. Svikis in a

22   white shirt.

23         MR. BROWER:   If the written record can reflect

24   identification of the defendant, your Honor?

25         THE COURT:   It may so indicate.

1  BY MR. BROWER:

2  Q  Did you inform him that you would like his cooperation in

3     talking about the murder of Christine Dimmick?

4  A  Yes, sir, we did.

5  Q  Did you place him under arrest?

6  A  No, sir.

7  Q  Did you restrict his freedom of movement in any way?

8  A  No, sir.

9  Q  Did you ask him whether or not he would be willing to

10    accompany you to another location for this interview?

11 A  Yes, sir.

12 Q  Where was that?

13 A  Down to the La Crosse—I guess it's also La Crosse County in

14    the city of La Crosse.—their district attorney's office, which

15    would be akin to the prosecuting—prosecuting attorney's office

16    here in Kalamazoo.

17 Q  Did he make any requests before deciding whether he wished to

18    do that as far as phone calls or anything of that nature?

19 A  He said that he had to call his wife and let her know what was

20    going on, which he did; got himself dressed; asked to get some

21    cigarettes out of his car—some little things like that.

22 Q  And then did he agree to do that?

23 A  Yes, sir.

24 Q  Did you or anyone with you compel him in any way?

25 A  No, sir, we made it very clear that this was his decision.

530

1  Q  Did he then accompany you voluntarily with the intent to talk
2     to you about the murder?
3  A  Yes, sir.
4  Q  Was it at that time then you drove to the district attorney's
5     office for purposes of conducting the interest?
6  A  Yes, sir.
7  Q  Was there additional discussion there about his willingness to
8     cooperate and to give a statement, to talk to you about the
9     circumstances surrounding the murder?
10 A  Yes, sir.
11 Q  At some point he expressed some interest in making
12    arrangements for a daughter; is that right?
13 A  Yes, he did.
14 Q  Was he allowed to make those arrangements?
15 A  He was allowed to call his wife.  In fact, he was offered a
16    phone whenever he needed to use it.
17 Q  Did he take advantage of that as well?
18 A  Yes, sir, he did.
19        As far as arrangements with his daughter, ultimately
20    we ended up making arrangements with Mr. Mishall's wife to
21    make sure that she was—the daughter was picked up and taken
22    care of like she was supposed to be.
23 Q  And you assisted him in that endeavor?
24 A  That's correct.
25 Q  At that point did you ask him questions about the homicide of

1      Christine Dimmick?

2  A   Yes, sir, we did.

3  Q   Did he offer a theory about how it was that someone would have

4      been in a position to be able to shoot Chris Dimmick inside of

5      the store?

6  A   He actually gave us two sort of scenarios, one being that

7      somebody had been hiding in the store all night and,

8      therefore, committed the homicide and the robbery after he had

9      left.  The second theory was that after he had left somebody

10     had knocked on the door and she had allowed them entry into

11     the store and then it had occurred after that.

12 Q   Now there would have been two doors that would have been used

13     at the facility—the glass doors in the entrance of this—the

14     main entrance of the store and the employee door at the back

15     corner of the building; is that right?

16 A   Yes, sir.

17 Q   Did he make any statements about those doors?  Let's start

18     with the glass entry doors.  Did he tell you whether or not he

19     was aware that those doors were locked?

20 A   Yes.  He had told us that he had gone out to get the papers

21     that morning that were waiting outside and that the front

22     doors were unlocked—unlocked for that.  He brought the papers

23     in and had locked the door himself.  In fact, he said

24     something about if you check the door my fingerprints are on

25     it because I was the last one—I was the last one to lock it or

1      something to that effect.

2  Q   Did he make a statement about the back door and his knowledge

3      as to whether or not that door would have been locked when he

4      left?

5  A   Well, he said that when he left the store, he left through the

6      back door and that he knows that the door was closed because

7      he had heard—

8  Q   Closed and locked?

9  A   Closed and locked because he had heard Christine—I think he

10     said threw the deadbolt or something like, but had locked it.

11 Q   There was a discussion about where someone—if someone had been

12     inside the building where that person may have been; is that

13     right?

14 A   Yes, sir.

15 Q   Did he give any indication—Were you aware that he had said

16     that he had been through the building or he had checked the

17     building initially upon his arrival?

18 A   Yes, sir.

19 Q   Did he limit that search, if you will, as he spoke with

20     you—tell you what areas he'd been into or what areas he had

21     not been into?

22 A   He said that he had been all the way through the customer area

23     of the store; that he had been through the hallway that lead

24     from the back door—

25              MR. BROWER:    Exhibit number one.

533

1             THE WITNESS:   —to the customer area but had not

2    gone in the back hallway, which ran along the coolers and

3    ended up at the other side of the store with the bathrooms.

4  BY MR. BROWER:

5  Q  He's indicating to you that he had been through the entire

6    customer area—That means this area.—and to—Did you say—And you

7    said the bottle room or the back room . . . (inaudible)

8  A  I didn't say that, but he also indicated that he had put some

9    bottle—or some—some racks or something away in the bottle

10    room.

11  Q  In this area?

12  A  Yes, sir.

13  Q  But he had not gone into which area?

14  A  The back hallway that's on the south side of the building

15    extending from the back door back to where the wall meets

16    the—the bottle room wall meets the bathrooms.

17  Q  This entire area here?

18  A  Yes, sir.  What he said was he hadn't gone in that back

19    hallway.

20  Q  Okay.  He had come in through this door, checked the customer

21    area and admitted being in the bottle area but denied being in

22    the back hallway at all—

23  A  Yes, sir.

24  Q  —or checking that for anybody hiding inside?

25  A  Right.  That's what he initially said.

534

1  Q   Did he later say anything which cast doubt on that assertion?

2  A   Yes, sir.

3  Q   And what was that?

4  A   We were having a conversation about what he had done there

5      that morning as far as in the store itself.  He had said that

6      he had made coffee—got the coffee ready for the store.  We

7      asked him where he got the water from, and he said that he had

8      gotten it out of the slop sink and—

9  Q   The—

10 A   —the sink that he described being a slop sink was located

11     directly next to the bathrooms just to the left—the small

12     green rectangular area there.

13 Q   This area right here?

14 A   Yes, sir.

15 Q   So now he had been through this area, been in the bottle room,

16     had come through this area and was here to get water?

17 A   Yes, sir.

18 Q   Basically amounts to the whole building back there?

19 A   Except for—I don't know.—20 square feet.  I don't know.  I

20     mean it wasn't—wasn't very big.

21 Q   Did he indicate to you how long he had been in the store with

22     Chris before he left?

23 A   He said that he was pretty sure he was in there about

24     45 minutes.

25 Q   Did you press him on this—this length of time?

535

1  A   We asked him several times to clarify that, and he was adamant

2      that he had been there approximately 45 minutes.

3  Q   What time did he say that he had gotten to the store and

4      followed up with when he then left to go back home or arrived

5      back home?

6  A   Originally he had said that he'd gotten the store—gotten to

7      the store, I think it was like somewhere between 3:00 and

8      4:00 a.m. and that he thought he'd been home by 5:00 a.m.

9      None of that really matched what we knew the time frame to be.

10 Q   Meaning the—specifically the alarm deactivation at 6:25?

11 A   Right.  I mean we knew that the store opened at 7:00 o'clock

12     and the alarm had been deactivated right around 6:25, so that

13     didn't really match.  So we asked him about that, and he said

14     he was under the impression the store had opened at 6:00.  And

15     there wasn't a real good—He didn't give a real good account

16     about when he had gotten there, but he was very firm on the

17     45 minutes.

18 Q   Did you ask him specifically why he had been so early though

19     if the store opened so much later?

20 A   Well, he said that Christine had gotten a call either late in

21     the evening on the 7th or the very early morning hours of the

22     8th from the person who had closed the store.  He was assuming

23     it was from the person that closed the store the previous—

24 Q   Did he describe that caller—male or female?

25 A   He believed it was a female.

536

1  Q   All right.  Go ahead.

2  A   And this person advised that there was a large amount of

3     lottery proceeds and associated paperwork and that it would be

4     a good idea for them to get to the store early because that

5     would take longer to process that morning before they could

6     open the store.

7  Q   That was his explanation for going to the store early and for

8     being there to assist her, it was going to take more time to

9     open up that day?

10 A   Yes, sir.  That's correct.

11 Q   What did—if anything—did he tell you about how often he had

12    gone to the store to help Chris open up?

13 A   He said he'd been there one other time to help her open the

14    store, and that was—I think he said—a couple days prior to her

15    murder.

16 Q   And you know that her first day being Monday, February 4?

17 A   That's correct.

18 Q   He didn't say that he had been here [sic]—there every day that

19    week with her?

20 A   I'm sorry?  What was your question?

21 Q   Did he say whether or not he had been there any other day that

22    week?

23 A   No, sir.  He just said that he'd been there that one time

24    before and that it was a couple days before her murder.

25 Q   And, again, did he say why it was that he decided to go there

1  that particular day?

2  A  I don't think he ever gave like a specific explanation that I
3  decided to do it because of this.  He just said that the
4  person had called and the information he had was there was a
5  large amount of lottery stuff.  That's why they'd gone in a
6  little early, and then he'd helped her set up the store.

7  Q  What'd he say about how they were—they got to the store from
8  the residence?

9  A  He drove both of them in his vehicle.

10  Q  Which was a?

11  A  I can't remember the year, but it was a black Ford LTD-LX or
12  something like that.

13  Q  Okay.  Did he say where he parked upon arrival at the store?

14  A  He said he parked towards the rear of the store near the
15  office area in the small throughway that went between the
16  Minute Mart and the hardware store that was directly next
17  door.

18  Q  You're referring to this area on the left side there?

19  A  Yes, sir.

20  Q  You actually drew a diagram—a sketch on a piece of scratch
21  paper—which he then marked on to show the spot where it was
22  that he had parked; is that correct?

23  A  Yes, sir.  We both drew some diagrams on the same sheet of
24  paper.

25  Q  All right.  I'm going to show you what has been marked as

538

1     People's exhibit 56 and ask if you recognize this item.

2  A   Yes, I do.

3  Q   Is this the diagram that you and he completed during that

4     interview showing the location of his vehicle?

5  A   Yes, sir, it is.

6              MR. BROWER:   Move for admission of People's

7     exhibit 56, your Honor.

8              THE COURT:   Any objection?

9              MR. SVIKIS:   No objection.

10             THE COURT:   It's received.

11             MR. BROWER:   Please put 56 on.

12             With the Court's permission, Detective Handlogten,

13    would you please step from the stand and take this pointer and

14    please help describe that for us.

15             THE WITNESS:   This is the sketch that we started

16    out with.  This was drawn, I think, primarily by Mr. Mishall.

17    I wasn't real clear what the diagram itself was.  So in the

18    upper right-hand corner you can see that there's two squares

19    drawn, one indicating Minute Mart, the other indicating the

20    hardware store.  This here—This line here indicating the back

21    sort of service drive that runs from Rambling Road on this

22    side all the way up to the car dealerships.

23

24 BY MR. BROWER:

25 Q   And where would Stadium Drive be then?

539

1  A   Stadium Drive would have been up towards the top of the paper.

2  Q   All right.

3  A   And so I drew those in, and this—these two little slash marks

4      here—being the back door to the Minute Mart, which is sort of

5      the employee entrance.  And I asked him to show me on this

6      portion of the diagram where he parked the car.  Mr. Mishall

7      then drew this arrow in here next to the spot where he had

8      parked his vehicle on that morning, which is right next to the

9      Minute Mart closer to the back door.

10 Q   Thank you.

11              As he arrived did he indicate whether there were any

12     other vehicles in the area?

13 A   He said there were no other vehicles, and he didn't see

14     anybody when he—when they arrived.

15 Q   Who opened the door?

16 A   Christine opened the door.

17 Q   Meaning the back door into the building?

18 A   Yes, sir.

19 Q   Did he say whether or not he made sure the door locked as he

20     entered?

21 A   He said that Christine went in first, he went in after.  The

22     door was secured, and then she punched in the alarm codes.

23 Q   Was there a discussion about the floor safes inside the

24     building?

25 A   Yes, sir, there was.

                              540

1  Q  Both the one behind the counter and the one inside the office
2     area, yes?
3  A  Yes, sir.
4  Q  What'd he say about his familiarity with the safes?
5  A  Well, he was kind of wishy-washy about that whole issue.  He
6     said that he wasn't real familiar with some of the safes that
7     were in the store, he'd only been in the back room a couple of
8     times.
9  Q  He'd only been in the back room a couple of times?
10 A  That's correct.
11 Q  Were you aware that he had been the assistant manager there—in
12    fact, acting manager for a period of time filling a vacancy
13    prior to Chris's promotion.
14 A  Yes, sir, I was.
15 Q  But yet he said that he wasn't familiar with the safes and had
16    only been in the back room a couple times?
17 A  That's correct.
18 Q  Did you ask him questions about the security system?
19 A  Yes, I did.
20 Q  What did he say about that?
21 A  Well, once again he claimed to be somewhat unfamiliar with the
22    security system.  But then he went on to describe that there
23    were some cameras that covered the interior of the
24    store—meaning the customer area and the counter area.  And he
25    also went on to describe the videotape system itself—how long

541

1       he thought the tapes went for, how to—you know, when they were
2       changed, all that kind of stuff.
3    Q  Did he make any statements about regular customers and when
4       they would start arriving at the business?
5    A  Yes, he did.
6    Q  What'd he say to that?
7    A  He said that, you know, it was common to have regular
8       customers stopping by in the morning and sometimes they would
9       be there early.  I mean right at the time the store was
10      opening to come in or just prior to that.
11   Q  Did you ask him a specific question about whether it would be
12      likely that Chris would have opened the door—the locked
13      door—to allow entry for someone that she did not know?
14   A  It was his opinion that she would definitely not do that.
15   Q  You did ask that question?
16   A  Oh, yes.
17   Q  And his response was?
18   A  That she wouldn't open the door for anybody she didn't know.
19   Q  In fact, she had told him something or instructed him
20      something in that regard as well; is that right?
21   A  Right.  He basically said that Christine had trained him and
22      that that's how she had trained him to behave also: don't open
23      the doors when you're closed unless it's somebody that you
24      know.
25   Q  He mentioned something else regarding to training and the

                                   542

1    newspapers; is that right?

2  A  Yes, sir.

3  Q  What'd he say about that?

4  A  He said that the way he was trained—again, by Christine—was

5     that the newspapers should be brought in approximately

6     15 minutes before the store opens: go out, get them, come back

7     in, lock the door and take care of what you needed to do with

8     the newspapers.

9  Q  Did you ask him questions about whether or not he ever owned,

10    possessed, borrowed, or had ever come in contact with a gun?

11 A  Yes, we did.

12 Q  What was his response?

13 A  I'm not trying to make light of the interview itself, but it

14    almost became—almost became funny because we—we must have

15    asked him 20 different ways whether he had come in contact

16    with a gun, had ever owned a gun, had ever had a gun—any way

17    we could think of to ask him about it—in both Michigan and

18    Wisconsin; and he denied having any contact whatsoever with

19    any guns.  The only thing he said he might have had one time

20    was a BB gun.

21 Q  Did you ask him questions about his awareness that

22    Chris Dimmick was seeing someone else—was having affairs?

23 A  Yes, sir.

24 Q  What'd he say to this?

25 A  He said he knew about one gentleman by the name of Dan Block,

543

1     I believe it was, but wasn't aware of any other affairs that

2     she was having at the time that they were seeing each other.

3  Q  By the time you conducted this interview you were aware of a

4     statement that Mr. Mishall had made to someone else regarding

5     what he felt to be Chris's involvement with another woman; is

6     that right?

7  A  Yes, sir.

8  Q  Did you ask him about that?

9  A  Yes, sir.

10  Q  And what did he say?

11  A  He said he had no knowledge of that.

12  Q  At the end of your interview you did, in fact, arrest him; is

13     that right?

14  A  Yes, sir, we did.

15  Q  And took him to the La Crosse County jail?

16  A  That's correct.

17  Q  The fact is that you had actually gone to Wisconsin armed with

18     an arrest warrant; is that correct?

19  A  (No audible response)

20  Q  Or aware that one—

21  A  I can't remember if we had one when we went or if we got it

22     when we were there. The fact is we had an arrest warrant

23     issued by the time we made contact with Mr. Mishall.

24  Q  All right. And actually intended to make an arrest after the

25     interview?

544

1  A   Yes, sir, unless something startling happened during the
2      interview that would negate that.
3  Q   You certainly didn't reveal that to the defendant when you
4      asked him if he wanted to have an interview?
5  A   No, sir.
6  Q   You deceived him in that regard?
7  A   Yes, sir.
8              MR. BROWER:   I have no further questions of this
9      witness.
10             THE COURT:   Mr. Svikis?
11             MR. SVIKIS:   Thank you.
12                       CROSS-EXAMINATION
13 BY MR. SVIKIS:
14 Q   On what date was this case turned over to the cold case
15     team—on or about?
16 A   Honestly, I don't remember.  I mean we'd been working on it
17     for several months.
18 Q   Oh, okay.  Not years, months.
19 A   No.  Right.
20 Q   Okay.
21 A   No, we hadn't been working on it for years.
22 Q   Okay.  And that would have been in 2000—2003 sometime?
23 A   Let's see, it was May when we went out there to Wisconsin.
24     Our cases typically—seems like they've run right around six
25     months generally.  So I guess it was probably right around the

                              545

1    first of the year—maybe the end of the prior year.

2  Q  Okay.  So and then there were how many members on the team?

3  A  Six of us?

4  Q  Yes.

5  A  That's correct—

6  Q  Okay.

7  A  —six of us at the time.

8  Q  And you—Each of you sat down and—and read—Well, you've been

9     leaning on this one.  I've got another one over there.

10 A  Yes, sir.

11 Q  And a significant portion of that was what was collected

12    before the case was turned over to you, right?

13 A  Yeah, I don't know how many pages it was; but—I mean there's

14    obviously been a significant amount added since then—

15 Q  Right.

16 A  —but it was rather large.

17 Q  So after the six of you sit down and read it and review it, in

18    your opinion there's not enough to go out and get an arrest

19    warrant, is there?

20 A  No, sir.

21 Q  And as a—And as a cold case team essentially you have the

22    authority and the finances and the wherewithal to leave no

23    stone unturned; isn't that correct?

24 A  Well, we—we definitely have more freedom, I think, than

25    is—than is general.  It's not unlimited.

546

1  Q   But it's a twenty—What we'd refer to as 24/7 type of

2      dedication to the job that you can put into it, right?

3  A   Yes, sir.

4  Q   All right.  And you can go wherever you think a lead may be;

5      isn't that correct?

6  A   I can say that we haven't been turned down yet.

7  Q   All right.  And in your interview with Pat you told him you

8      could go to the Virgin Islands if you had to?

9  A   Yes, I did.

10 Q   All right.  So it's kind of a no holds barred sort of a

11     protocol you're operating under once the information is turned

12     over to the cold case team; would that be accurate?

13 A   We certainly have a great deal of freedom.  I haven't reached

14     the limits of that yet is all I can tell you.

15 Q   And how long have you been on the cold case team?

16 A   I think a little over three years now.

17 Q   And between the six of you you have over—I think you told

18     Pat—200 years of combined experience in police work?

19 A   It's probably something like that.  I mean I've had 11 years

20     on the department—I mean—and I'm definitely the baby of the

21     group.  So—And there's officers that have 25 plus years on.

22 Q   All right.  And you also indicated to Pat that you kind of

23     keep track of your—of your wins, right?

24 A   Sure.

25 Q   And you're ten for ten now, right?

547

1  A   At least ten for ten.

2  Q   And you have more than just a passing interest to make sure

3      that the fruits of your labors are successful in a conviction,

4      do you not?

5  A   Well, of course.  I mean our whole goal is to solve the

6      homicides and bring closure to the case for the family.  So,

7      yeah, we certainly want to see the cases resolved.

8  Q   And resolved is just another way of saying convicted, isn't

9      it?

10  A   Right.  I mean the end result, obviously, is a successful—

11  Q   Right.

12  A   —prosecution.  That would be what we'd want.

13  Q   Okay.  Now going back to 1991, this is Stadium Drive in

14      Kalamazoo, and that's a fairly busy thoroughfare at

15      7:00 o'clock in the morning?

16  A   Yes, sir, I would say that.

17  Q   Heavy traffic, fair enough?

18  A   It's—I mean I'd—I guess I'd say it's picking up by

19      7:00 o'clock; but, obviously, it gets more towards the

20      8:00 o'clock hour.

21  Q   And you had a significant amount of response to requesting for

22      tips on that particular morning, didn't you—people that went

23      by the store?

24  A   As far as the cold case team goes or during the—

25  Q   No.  In your—

1  A   —initial investigation?

2  Q   In your review after the six of you sat down and reviewed the

3      existing information, you were aware that there were—that

4      there were a number of individuals who came forward with

5      information?

6  A   Yes, sir.

7  Q   All right.  Do you recall whether that was more than a dozen

8      people?

9  A   I have no idea.

10 Q   But it was a fair amount?

11 A   Yeah, there were several people that indicated they'd been

12     near the store at that time.

13 Q   All right.  And the day after a team even went out to observe

14     the traffic going by people pulling in to see if they may have

15     recalled something the day before; isn't that correct?

16 A   Right.  I believe they actually tried to interview people

17     coming in thinking they'd maybe been regular customers or

18     something.

19 Q   And when you went to Wisconsin you had the arrest warrant in

20     your back pocket, correct?

21 A   Like I said, I can't remember if we got it before or when we

22     were there; but we had an arrest warrant when we went to talk

23     to Mr. Mishall.

24 Q   When you went to Pat's home—I guess it's a manufactured home

25     or mobile home, right?

(Tape No. B2004-036, 6-17-04, 09:55)

1    A    Yes, sir.

2    Q    Okay.—you didn't tell him we got an arrest warrant for you,

3         did you?

4    A    No, sir.

5    Q    Okay.  You talked to him and you told him you were working on

6         Christine Dimmick's murder and you wanted his cooperation

7         again?

8    A    Yes, sir.

9    Q    And he went with you?

10   A    Yes, sir, he did.

11   Q    Okay.  And his only concerns were contacting his wife and his

12        daughter—getting her taken care of for her daycare or

13        something?

14   A    That was some of his concerns, that's correct.

15   Q    And he went with you to the interview?

16   A    Yes, sir, he did.

17   Q    Now when Mr.—When Pat was helping set up the store and

18        Ms. Dimmick was helping set up the store she, of course, would

19        let people in that she didn't know when she turned the key and

20        opened the front door, correct?

21   A    I'm sorry?

22   Q    Okay.

23   A    People that she did or didn't know?

24   Q    All right.  You were making a point that she would not open

25        the door for someone she didn't know, correct?

550

```
 1   A   Well, that's what we were told—

 2   Q   All right.

 3   A   —that's correct.

 4   Q   So at some point it could—7:00 o'clock could come—

 5   A   Yes, sir.

 6   Q   —the store has to open—

 7   A   Yes, sir.

 8   Q   —she goes to this door, unlocks it—

 9   A   Yes, sir.

10   Q   —someone comes in that she doesn't know other than Pat—

11   A   Yes, sir.

12   Q   —locks the door, pulls out a gun, robs her, goes out the back

13       door?  Now I know you don't believe that scenario is likely,

14       right?

15   A   That's correct.

16   Q   Okay.  But that's a simple enough—unlock the door, come in,

17       lock the door, and—

18                    MR. BROWER:   Objection.

19   BY MR. SVIKIS:

20   Q   —go out the back—

21                    MR. BROWER:   Argumentative.

22                    THE COURT:   Overruled.

23   BY MR. SVIKIS:

24   Q   That's a scenario, I mean—Right?  'Cause you found the doors

25       were locked when—when you went in, right?
```

1  A   The initial responding officers found—

2  Q   Right.

3  A   —they were locked—

4  Q   Right.

5  A   —right, that's correct.

6  Q   Sometimes when I—I understand what you're clarifying there.

7        So on the times that Mr. Mishall in your review of

8      the report and talking to Mr. Mishall, it's always consistent

9      where he—that he was there; he never denies that he wasn't

10     there, correct?

11 A   No, he never denied that.

12 Q   Tells you where he was parked out in the open?

13 A   That's correct.

14 Q   Goes in, makes a point of telling you the doors were locked,

15     right?

16 A   That's correct.

17 Q   Okay.  And we know that the store's supposed to open at

18     7:00 o'clock?

19 A   Yes, sir.

20 Q   And so there's a certain amount of time between when

21     Mr. Mishall says he leaves and the store's supposed to open

22     plus or minus 15 or 20 minutes or some amount of time,

23     correct?

24 A   (No audible response)

25 Q   Some amount of time.

552

1  A  You're talking about a time period between when he left the

2     store to supposedly go home—

3  Q  And—

4  A  —and when the store was going to open?

5  Q  Yes.  I mean he didn't leave after 7:00?

6  A  No, he never said he left—Well, this is what he said.  He said

7     he was there for 45 minutes.

8  Q  Okay.

9  A  So if you're asking me was there a time period in between when

10    he left the store and 7:00 o'clock, based on the time that

11    they coded in, no, there wouldn't have been.

12 Q  All right.  So let's set that aside for a moment.  But we knew

13    the—We knew—We know the coding in time, correct?

14 A  Yes, sir.

15 Q  And on—And on the first time Mr. Mishall's interviewed after

16    police arrive at his house within an hour and a half or so

17    of—of the store not opening and finding Chris in the back

18    room, he knows what the times are and he tells you what time

19    he left and what time he—what time—He didn't say 4:00 o'clock

20    or 5:00 o'clock or 3:00 a.m. at that time, did he?

21 A  No, sir.

22 Q  All right.  And that's what comports with the punching in

23    time, right?

24 A  That's correct.

25 Q  All right.  So now we know that—I think it was Officer

553

1    Humphries drove by, saw nothing unusual and the store is still
2    locked.
3  A   That's not entirely true.  Far as—
4  Q   Did I have the wrong officer?
5  A   Far as it being unusual?
6  Q   They don't—Let me put it another way.  They don't see anything
7    suspicious that would prompt them to get out of their vehicle
8    after 7:00 and check the store, correct?  The—
9  A   That's correct.
10 Q   That's right.
11 A   That is correct—
12 Q   Okay.
13 A   —yes.
14 Q   And then a passer-by by—Ms. McFarlane just happens to know
15   Mr. Jilek, calls him at his office?
16 A   That's correct.
17 Q   And the clock is running?
18 A   Yes, sir.
19 Q   The store is locked?
20 A   Yes, sir.
21 Q   It's not secure?  I mean there's no one guarding the store.
22 A   There's no one guarding the store, that's correct.
23 Q   That's correct.
24       So now we know we go past 7:00 because someone
25   rattled the door.  After 7:00 we have no idea who's in the

554

1  store except we do know that Ms. Dimmick will be found there,

2  correct?

3  　　　　　MR. BROWER:  Objection, your Honor.  This officer

4  can't know anything.  He can speculate—

5  　　　　　MR. SVIKIS:  Oh.

6  　　　　　MR. BROWER:  —if that's what he wants him to do.

7  　　　　　MR. SVIKIS:  I said—

8  　　　　　MR. BROWER:  But that'd be improper.  If he wasn't

9  there, he can't know who else was there.  He can have some

10  suspicions, he can have a theory, he can have a belief; but he

11  doesn't have personal knowledge.

12  　　　　　THE COURT:  What was your—What were you asking,

13  specifically?

14  BY MR. SVIKIS:

15  Q  That all we know is that after 7:00 o'clock Ms. Dimmick

16  was—was there.  I mean we have no reason—Right?  I mean she

17  was—she was found there.

18  A  I certainly have no reason to believe otherwise.

19  Q  All right.  Okay.

20  　　　　　THE COURT:  That's a proper question.  Go ahead.

21  　　　　　MR. SVIKIS:  All right.

22  BY MR. SVIKIS:

23  Q  So now the phone calls are made to Mr. Jilek and the police

24  officers are sent back and they actually secure without going

25  in at 8:20; is that correct?

555

1  A     They secure?

2  Q     Yeah, in other words by—Let me walk through it again.  We know

3        that a number of people rattled the door, look around, store

4        is closed.  We know it's closed at 7:00.  The doors are—No one

5        can get in through the front door.

6              MR. BROWER:  Your Honor, I'm going to continue my

7        objection.  This officer wasn't there in 1991.  He can't know

8        anything about—questions about what happened there at that

9        time during that period on February 8 of 1991.

10             THE COURT:  Well, I think as investigative officer

11       in this case that he can at least relate what his knowledge

12       is.  I think that's—

13             MR. SVIKIS:  All right.

14             THE COURT:  —cross-examination for this particular

15       witness.

16             Go ahead.

17 BY MR. SVIKIS:

18 Q     Well, there's a reason to call Mr. Jilek because the store's

19       not open at 7:00?

20 A     Yes, sir.

21 Q     All right.  And your—your investigation reveals that the

22       store—the officers are called back to the store, correct?

23 A     Yes, sir.

24 Q     All right.  And they arrive at 8:20?

25 A     Thereabouts, that's correct.

1  Q    Thereabouts.  Okay.

2            And they wait until someone can let them in, which

3       happens at 9:00 or so?

4            MR. BROWER:  Your Honor, I'm going to renew my

5       objection.  The form of the questions is for the clear and

6       express intent of attempting to introduce this as substantive

7       fact which this officer cannot do.  If he's attempting to ask

8       a question about his awareness and ask a follow-up question to

9       explain the officer's actions, that would be proper.  But

10      simply to use this officer answering questions about something

11      he has no personal knowledge with—about, it is a clear attempt

12      to introduce that as substantive evidence, which he cannot do.

13           THE COURT:  I understand that.  But it seems to the

14      Court this has already been testified to in great part.  I

15      will sustain it based on the form of the question.

16           MR. SVIKIS:   . . . (inaudible)

17           THE COURT:  Rephrase your question.

18 BY MR. SVIKIS:

19 Q    Officer, from your investigation you have no reason to believe

20      that anyone could enter or leave the store after

21      8:20—Right?—or thereabouts?

22 A    Yeah, I don't—I mean I don't have any reason to believe that,

23      but I would certainly have to defer to somebody that was

24      there.

25 Q    All right.  On these floor safes, in your investigation in

557

1   reviewing the file you never found any fingerprints of anyone,

2   did you?

3   A   Not that I know of.

4   Q   You'd know, wouldn't you?

5   A   I would certainly hope so.

6   Q   Okay.  And that goes for the keys, the front door, the safes,

7   or the drawers?

8   A   That would be correct.

9   Q   And as far as you know there's no record of any fingerprints

10  taken at the scene; isn't that correct?

11  A   (No audible response)

12  Q   You can look at the book if you want.

13  A   I know the attempts were made.  I know that there was nothing

14  found of evidentiary value.  Whether there was some smudged

15  prints or something that could never be identified were found

16  or not, I'm not—I'm not sure, but there was nothing that could

17  be identified.

18  Q   But in your—in your book there, there's no—there's no record

19  of a print being taken and saying it's smudged, is there?

20          MR. BROWER:   Your Honor, I have to renew my

21  objection.  If he wants to call someone that was there and—and

22  inquire as to whether or not prints were taken—which we

23  already had, Officer Labrie—in talking about what was done

24  there.  But there is no other purpose for asking this officer

25  who wasn't there to give an opinion based on other people's

1    statements as to whether or not he thinks something happened

2    or not. That is classic hearsay.

3              MR. SVIKIS: Your Honor, the question that I asked

4    him was—

5              MR. BROWER: Reading somebody else and then

6    testifying—

7              I'm sorry. I didn't mean to interrupt.

8              MR. SVIKIS: Go ahead.

9              MR. BROWER: Reading someone other's account and

10   then testifying in court is hearsay.

11             MR. SVIKIS: Your Honor, my last question before

12   the—before the objection was that—that in his book is there—is

13   there any fingerprint record—fingerprint card. Is there a

14   fingerprint card of any kind from the scene in your book?

15             THE COURT: Why is that hearsay?

16             MR. BROWER: In the context of the entire line of

17   questioning what he's doing is—is asking this officer to

18   testify. It isn't just that question; it's the entire line

19   which he continues to . . . (inaudible)

20             THE COURT: Hearsay is to prove the truth of the

21   matter asserted one way or the other—

22             MR. BROWER: Right. And he's—

23             THE COURT: —and I don't—I don't perceive it that

24   way. Your objection's overruled.

25

559

1  BY MR. SVIKIS:

2  Q   So in that exchange—

3      Did you answer that? There's no fingerprint card in

4      there?

5  A   I don't think I did.

6  Q   Oh.

7  A   Not that I'm aware of. I don't know of any.

8  Q   Okay. You'd be aware of it if one was in there, wouldn't

9      you?

10 A   Like I said, I would hope so. But you have 700 pages of stuff

11     in there. I've been concentrating on the interviews, so.

12 Q   All right. You want to look through there?

13 A   Not particularly.

14             MR. SVIKIS: Okay.

15             I have no other questions.

16             THE COURT: Any redirect?

17                  REDIRECT EXAMINATION

18 BY MR. BROWER:

19 Q   Defense counsel used the phrase cold case team having a

20     no holds barred protocol. And you answered you had a—you

21     certainly had a degree of freedom.

22 A   Yes, sir, that's correct.

23 Q   Meaning freedom from other caseload, that kind of freedom?

24 A   Right. I mean, you know, we have a—we have a specifically

25     dedicated job; and that's to review and investigate homicides

                           560

1    within the county of Kalamazoo that have not been previously

2    solved and have been inactive for a period of time.  In doing

3    that, we're given a fair amount of investigative freedom.

4  Q  And not something that has a negative connotation about doing

5    something illegal or immoral or unethical—that kind of

6    no holds barred statement?

7  A  No.  I didn't mean to indicate that whatsoever.  When I say

8    that or when—when I say we were given investigative freedom,

9    it's more of a freedom from having other cases as you—as you

10    mentioned.  Also, you know, we're allowed to travel as needed

11    if it's deemed to be necessary—stuff like that.  I mean, you

12    know, we can flex our hours.  We can do stuff like that that

13    would—that would assist in the investigation itself.

14  Q  Defense counsel asked about whether or not you or the team had

15    more than a passing interest in solving cases.  I believe your

16    answer was—Well, what was your answer then?  How did you say

17    . . . (inaudible)

18  A  I don't remember specifically what I said; but, of course.  I

19    mean—

20  Q  Your intent is—

21  A  you know, this is—

22  Q  —to solve the case?

23  A  This is what we do.  I mean we take a great amount of pride

24    and we have a—We dedicate ourselves to this endeavor, I guess,

25    is what I'm going to say.  I mean we spend months and

561

1    countless hours investigating these cases.  I mean, you know,
2    we talk to these victims' families.  I mean we're very
3    involved in the investigations.  We certainly want to see them
4    come to a successful conclusion.  Not—

5  Q  Does that mean—

6  A  Not to the—

7         I'm sorry.  Go ahead.

8  Q  Does that mean those types of interests and concerns,
9    motivations, would lead to picking someone and making a case
10   to try to prove it by any means necessary whether the person
11   did it or not simply because you could then say the case was
12   resolved?

13  A  No, sir.  I mean the last thing any of us want is to prosecute
14   somebody that—that's not deserving of it.  I mean when I say a
15   successful conclusion, that means that the truth is found, not
16   that that one specific person is—is prosecuted or—or whatever.
17   I mean we're out to find out what the truth is, not to just
18   prosecute Patrick Mishall or any other individual.  It's our
19   job to find out to the—as best we can what actually happened.
20   And where that leads us is where it leads us.

21  Q  In regard to the questions about opening the door for someone
22   she didn't know, was that in the context of letting someone in
23   while the store was still closed?

24  A  Yes, sir, of course.  I mean, obviously, the doors have to be
25   open when the business is open.

1    Q    And then strangers enter?

2    A    Right.

3    Q    To follow that logic through, opening the door for the first

4        time she'd be voluntarily letting strangers in all day long?

5    A    Well, the business wouldn't last very long if she didn't, I

6        guess.

7    Q    Defense counsel asked about times that Mr. Mishall had

8        indicated that he had arrived at the store—statements that he

9        made to Detectives Hatter and Grace.

10    A    Yes, sir.

11    Q    I believe that you acknowledged in response to the way it was

12        phrased by defense counsel that that does—those times did

13        comport with the alarm deactivation time; do you recall that

14        scenario?

15    A    Yes.  Are you talking about the times during the initial

16        interviews or when—

17    Q    During the initial interviews, yes.  Is that what you meant to

18        say?

19    A    (No audible response)

20    Q    Well, let me ask this question: are you aware that his—his

21        stated arrival times at the building were various but included

22        6:05 and 6:17 a.m.?

23    A    Yes, sir.

24    Q    And that the actual deactivation time was 6:25?

25    A    Yes, sir, that's correct.

1   Q   So while those times are closer to the actual alarm

2        deactivation than what he told you years later—

3   A   That's correct.

4   Q   —they are not the same time, are they?

5   A   No, sir.

6   Q   Defense counsel asked you whether or not from your

7        investigation you had any reason to believe that anyone other

8        could have entered or left the store after 8:20; remember that

9        question?

10  A   Yes, sir.

11  Q   I ask you this: from your investigation do you have reason to

12       believe that anyone other than the defendant could have

13       entered or left the building after he did?

14  A   No, sir.

15                   MR. BROWER:    I have nothing further

16                       RECROSS-EXAMINATION

17 BY MR. SVIKIS:

18  Q   Officer, you—in response to the prosecutor's question you said

19       you wouldn't do anything illegal or unethical or immoral; is

20       that correct?

21  A   That's correct.

22  Q   All right.   When you went to Mr. Mishall's house in Wisconsin

23       with the warrant in your—in your back pocket and he asked you

24       whether—whether he should drive down to the station or not,

25       you assured him that wouldn't be necessary 'cause you would

1    bring him back; isn't that correct?

2 A  We told him he could drive if he wanted to or we would give

3    him a ride and then we can give him a ride back home.

4 Q  All right. But throughout the interview you reassured him

5    that he'd get back home. In other words, during this—during

6    this last interview with a warrant in your back pocket as a

7    part of police procedure—And you got to call it what it

8    is.—you can lie to him?

9 A  Yes, sir.

10 Q  Okay. And in that context lying to your suspect is not either

11    immoral or unethical, right?

12 A  That's correct.

13 Q  Okay. Even though it still is a lie?

14 A  Yes, sir.

15 Q  That's okay?

16 A  Yes, sir.

17 Q  All right. And then so you—so when you say you wouldn't do

18    anything unethical or immoral that if—that if you were to lie

19    in your day-to-day affairs that may be unethical or immoral,

20    correct?

21 A  If I were to lie—you mean, in my personal life?

22 Q  Yeah.

23 A  That's correct.

24 Q  All right. So, in essence, when it comes to someone you've

25    focused in on—And I think the expression is—And I've forgotten

565

1    what I used.—you basically take the gloves off, you get to

2    pick and choose when to lie to him and when not to lie to him?

3  A No, sir, that's not correct. I mean—

4  Q Who chooses then?

5  A —we honestly operate under legal guidelines, and we have to—

6  Q I'm not talk—

7  A —follow those guidelines.

8  Q I'm not talking legal because if you lie on the stand we know

9    all about that.

10 A Right.

11 Q All right.

12 A Well, what I'm—I'm specifically talking about when we're

13   talking to a suspect, you know, there's things we can and

14   can't do under the law.

15 Q You can't beat them, right?

16 A That's correct.

17 Q You can't put women's underwear on his head and chain him to

18   the other guys in the cell, right?

19 A That's correct.

20 Q But you can lie to him?

21 A Yes, sir.

22 Q All right. And that's to extract a confession if you can get

23   it, right?

24 A That's correct.

25 Q That's why you do it?

```
 1  A     Sure.
 2              MR. SVIKIS:   All right.
 3              I have no further questions.
 4              MR. BROWER:   No redirect.
 5              THE COURT:   You can step down, sir.  Thank you.
 6              Anything further?
 7              MR. BROWER:   Your Honor, if I could verify that all
 8       exhibits—People's exhibits one through 56 have now been
 9       admitted?
10              MR. SVIKIS:   I can just huddle with you and agree
11       to that in a moment here.
12              Your Honor, if you'll just let us confer a moment I
13       think you can—
14              (At 10:21 a.m., off record discussion between
15              Mr. Brower and Mr. Svikis)
16              THE COURT:   Looks like it to me.
17              MR. SVIKIS:   If it's on that list, it's in.
18              THE COURT:   Pardon?
19              MR. SVIKIS:   If it's on the exhibit list prepared
20       for the videotape record and log, it's in; and I—and I think
21       defense has two or three—has two search warrants and—
22              THE COURT:   You've got exhibits A, B, and C, which
23       my records show A being a photo of .357—
24              MR. SVIKIS:   Rounds.
25              THE COURT:   —rounds compared to .22.  And then the
```

567

1    two consents to search, one being for the auto and one for the

2    home.

3                    MR. SVIKIS:    That's correct, your Honor.

4                    THE COURT:    That's what I show.

5                    MR. SVIKIS:    Yes, that's fine.    That's accurate.

6                    MR. BROWER:    I have one additional, your Honor, and

7    that would be exhibit 57, which I'd ask would be then admitted

8    and given to the jury for their assistance in deliberations at

9    the appropriate point, and that would simply be a printout of

10   the—

11                   MR. SVIKIS:    I have no objection.

12                   MR. BROWER:    —exhibits that I have already

13   admitted, but in slide format similar to what was displayed on

14   the screen—just a demonstrative exhibit, your Honor, to assist

15   them.

16                   THE COURT:    You have no objection?

17                   MR. SVIKIS:    I have no objection.

18                   THE COURT:    Received then.

19                   MR. BROWER:    With that, your Honor, the People

20   would rest.

21                   THE DEFENDANT:    And with that, your Honor, the

22   defense has a motion.

23                   THE COURT:    You want to please excuse the jury.

24                   (At 10:23 a.m., jury exits courtroom)

25                   Be seated.

1          Go ahead, Mr. Svikis.

2          MR. SVIKIS:    Thank you, your Honor.

3          At this time I'd like to bring a directed—motion for

4     directed verdict of acquittal in favor of Patrick Mishall.

5          Your Honor, the evidence presented is insufficient

6     to warrant a conviction even taking the evidence in a light

7     most favorable to the prosecution because there is simply no

8     physical evidence from which a jury could find or infer the

9     requisite elements and, accordingly, the accused Mr. Mishall

10    would be entitled to a directed verdict of acquittal.

11         In sum, when we're reviewing the—I've got them as

12    the first-degree premeditated murder, first-degree felony

13    murder, armed robbery, felony firearm, that the Court has sat

14    through the trial and there is simply not one shred of

15    physical evidence that ties Mr. Mishall in to these crimes;

16    and for those reasons I'd ask the Court to find in favor of

17    the accused and dismiss the charges.   Thank you.

18         THE COURT:    Mr. Brower?

19         MR. BROWER:    Your Honor, the People would ask the

20    Court to deny defendant's motion and argue that there is

21    sufficient evidence when applying the applicable standard as

22    to each of the five counts, including evidence of

23    premeditation and deliberation for a first-degree murder

24    consideration in the open murder count.

25         Regarding premeditation and deliberation the number

1      of injuries and the location of the gunshots in Chris Dimmick

2      by itself would allow for that presumption as to that element.

3               Your Honor, I believe that—I think additional

4      commentary would be unnecessary in light of the testimony and

5      would ask that the Court deny the defendant—defendant's motion

6      as to each of the charges.

7               MR. SVIKIS:    Nothing further, your Honor.

8               THE COURT:    When ruling on a motion for a directed

9      verdict, this Court must consider the evidence in the light

10     most favorable to the prosecution and determine whether a

11     rational trier of fact could find that the essential elements

12     of the charged crimes were shown beyond a reasonable doubt.

13              While it's true, as the defense has pointed out,

14     there isn't any physical evidence that directly relates to

15     this defendant; however, when you look at the fact that he had

16     intimate knowledge of the layout of the scene at the homicide

17     having worked there for quite some time and in a managerial

18     capacity so that he, in that capacity would know the various

19     security setups, where money was kept, where the safes

20     were—things of that nature—and having a—a conjugal, so-to-

21     speak, relationship with the—the deceased, having lived with

22     her for some period of time and she being the manager in

23     addition to his having a relationship to that particular site.

24              Then you look at that and compare the things that he

25     said to other witnesses—specifically, Mr. Grubius—that, I

                              570

1   guess for want of a better explanation, what he said, the way

2   he said it, and his demeanor and his look to the Court is a

3   classic case of non—nonverbal communication that we—that's

4   most often discussed when we're talking about hearsay. But it

5   was to this Court a very classic case of that in respect to

6   what his intent and what his feelings were towards the—the

7   deceased.

8          Then you look at the other statements that were made

9   to Christine Newburry and how he acted in that instance; and,

10  again, Debbie Brown; and possibly, to a lesser extent,

11  Tracy Rathke.

12         Also his statements and denials. And I understand

13  that—that you wouldn't necessarily have to—And that, in and of

14  itself, isn't sufficient—his denials about having guns. But

15  the fact of the matter is that he had a gun—at least people

16  saw it at or about this time—and his denial about that.

17         And his statements to Brett Munson. However Brett

18  happened to interpret what he said really isn't all that

19  important at this juncture when you piece all these other

20  statements together, when you piece in the facts of his

21  intimate knowledge of the layout of the scene of the homicide.

22         And—And then the conflicting stories that—that he

23  gave. I was going to say concocted. I don't know, maybe in

24  his own mind he didn't do that, he didn't concoct them. Maybe

25  he believes some of the things he said at that point. I don't

571

1   know.

2           But certainly I think if you look and piece all

3   these things together that were engaged in and said by this

4   defendant at or near, just prior to, at the time of, and

5   subsequent to, could lead a rational trier of fact to conclude

6   beyond a reasonable doubt that—that he, in fact, committed

7   this homicide and this robbery; that it was premeditated.

8           As the prosecutor pointed out, I guess if I were

9   asked to describe how it occurred it would look to me if I

10   were to—to just try and describe it in one word, it was an

11   execution: shot in the back of the head twice and in the back.

12           Based on what the forensic pathologist told the

13   Court the victim was probably on her knees—maybe made to get

14   there on her hands and knees—which certainly shows that

15   somebody thought this out before they executed the person.

16   Because that's what it was as far as I can see.

17           You look at all of these things along with the money

18   and then this sophisticated video equipment that later this

19   defendant had, all points to that we have a premeditated

20   first-degree murder; we have a felony murder; we have an armed

21   robbery; and two violations of the felony firearms statute.

22   And for those reasons the evidence, in this Court's opinion,

23   is sufficient for any rational trier of fact to come to that

24   conclusion if they so look at the evidence in that light.

25   That will be up to the jury.

1          But for purposes of this motion when I look at it in

2      the light most favorable to the prosecution I'm satisfied that

3      the motions should be denied and are.

4          Let's take a brief recess.

5          MR. BROWER:   Thank you, your Honor.

6          UNIDENTIFIED PERSON:   . . . (inaudible)

7          THE COURT:   Let's take our midmorning break at this

8      point.   Why don't we come back at—by that clock—a quarter to

9      11:00.   Okay?

10         MR. BROWER:   Thank you, your Honor.

11         (At 10:33 a.m., court recessed)

12         (At 10:51 a.m., proceedings reconvened)

13         THE COURT:   Mr. Svikis?

14         MR. SVIKIS:   Thank you, your Honor.

15         At this time I'd like to call Josette Phillips.

16         THE COURT:   Raise your right hand, please.   You do

17     solemnly swear or affirm the testimony you're about to give

18     shall be the truth, the whole truth, and nothing but the

19     truth, go help you God?

20         MS. PHILLIPS:   I do.

21         THE COURT:   You may be seated.

22

23

24

25

1                          JOSETTE PHILLIPS,

2        called at 10:51 a.m., and sworn by the Court, testified:

3                          DIRECT EXAMINATION

4    BY MR. SVIKIS:

5    Q    Good morning, Ms. Phillips.

6    A    Good morning.

7    Q    Would you state your complete name and spell it for the

8         record, please.

9    A    It's Josette Phillips—J-o-s-e-t-t-e P-h-I-l-l-I-p-s.

10   Q    And where do you live?

11   A    Paw Paw, Michigan.

12   Q    And how long have you lived in this area?

13   A    All my life.

14   Q    All right.  And do you know Patrick Mishall?

15   A    Yes, I do.

16   Q    Is he in the courtroom today?

17   A    Yes, he is.

18   Q    And how do you know Patrick Mishall?

19   A    He's my brother.

20   Q    And did you two grow up together?

21   A    Yes, we did.

22   Q    All right.  And at some point did Patrick move to Wisconsin?

23   A    Yes, he did.

24   Q    All right.  And do you recall about what year that was?

25   A    It was in '91.

                              574

(Tape No. B2004-036, 6-17-04, 10:53)

1  Q  And so you knew Patrick and lived with him off and on up to

2     1991; is that correct?

3  A  Yes.

4  Q  All right.  Have you visited much with Pat since—since 1991?

5  A  All the time.

6  Q  All right.  And over that entire period did you ever know

7     Patrick to own a gun?

8  A  No, sir.

9  Q  Possess a gun?

10 A  No, sir.

11 Q  Buy a gun?

12 A  No, sir.

13 Q  Did he ever show you a gun?

14 A  No, sir.

15 Q  And every time I used the word gun I meant a handgun.

16 A  No.

17 Q  All right.  Throughout that period of time did you ever find

18    any bullets or rounds anywhere where you lived?

19 A  No, I did not.

20          MR. SVIKIS:  I have no further questions.

21                    CROSS-EXAMINATION

22 BY MR. BROWER:

23 Q  Ma'am, are—you are aware that your brother has a—an injury to

24    the hip that results in a limp; is that correct?

25 A  Yes, I am.

575

1  Q   You've indicated that you don't know—you have never seen him
2      in possession of a gun, never seen him—known him to own a gun,
3      but you don't know—you don't live with him?
4  A   No, I didn't; but I was frequently with him.
5  Q   And he—You don't know whether or not he might have had a gun
6      that you were unaware of?  You don't know that.  You can't
7      know that.
8  A   No.
9  Q   You live in Michigan; he's in Wisconsin.  When—Back in '91
10     where were you living?
11 A   Pardon me?
12 Q   In '91 were you in Paw Paw yet?
13 A   I was in Kalamazoo.
14 Q   You were in Kalamazoo, too?  Okay.
15                 Living in separate houses?
16 A   Yes.
17                 MR. BROWER:   I have nothing further.
18                 MR. SVIKIS:   I have no further questions, your
19     Honor.
20                 THE COURT:   You can step down.  Watch your step.
21                 MR. SVIKIS:   Your Honor, that would conclude our
22     witnesses for today.
23                 THE COURT:   As I understand it, members of the
24     jury, the defense has two other witnesses; is that correct?
25                 MR. SVIKIS:   Traveling witnesses, yes.

1          THE COURT:    And they're going to be traveling from

2     out of state, but they will—They're not here.  And so to give

3     the defense an opportunity—Because as you can see, we're

4     moving faster than was anticipated.  It was originally thought

5     that this case would go over three weeks, and it looks to me

6     like with any kind of luck we're going to be done sometime

7     Monday.

8          So in deference to Mr. Svikis getting—and the

9     defendant getting their witnesses here, I'm going to adjourn

10    this matter until tomorrow—or not tomorrow—until Monday—Monday

11    morning.  And I'll expect the defense to have everybody ready

12    to proceed at that time so that we can at least wrap up the

13    testimony, I hope, sometime Monday and then get the case to

14    you either Monday afternoon or Tuesday.  So that—that looks

15    like where we're going at this point and how we're going to

16    proceed.

17         So I'm going to recess, then, this case until Monday

18    morning at 9:00 o'clock.

19         Keep in mind what I've told you about discussing the

20    case amongst yourselves or with anyone else.

21         Don't look, read, or view any media reports if there

22    are any.  I don't know if there are.  But if there are, stay

23    away from them.

24         Don't have any contact with anybody who's been

25    involved in this case—either the attorneys, witnesses, family,

1       anybody of that nature of anybody involved.

2                   And we'll then continue Monday morning at

3       9:00 o'clock.

4                   Thank you very much.

5                   We'll stand in recess now.

6                   Could I see counsel in chambers when we're done

7       here.

8                   (At 10:57 a.m., proceedings adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25