26|5|1

1               STATE OF MICHIGAN

2          9TH CIRCUIT COURT—TRIAL DIVISION

3

4   THE PEOPLE OF THE
    STATE OF MICHIGAN
5
         v                              Files No. C03000897 FC
6
    PATRICK KEVIN MISHALL,
7
              Defendant.
8

9

10               Jury Trial — Volume V of IX

11      Before Hon. George R. Corsiglia P12239, Circuit Judge
        (Visiting Judge from 48th Circuit, Presiding by Assignment)
12
            Kalamazoo, Michigan—Monday, June 21, 2004
13

14
    APPEARANCES:
15
    For the People:           Scott W. Brower P44951
16                            Office of the Prosecuting Attorney
                              227 West Michigan Avenue
17                            Kalamazoo, Michigan 49007
                              (269) 383-8900
18
    For the Defendant:        Andis Svikis P36039
19                            1803 Whites Road
                              Kalamazoo, Michigan 49008
20                            (269) 349-7692

21

22   Recorded by:            Video recorded

23   Transcribed by:         Brenda K. Foley CER 4956
                             1400 Gull Road
24                           Kalamazoo, Michigan 49048
                             (269) 385-6001
25                               * * * * *



579



FILED

JUL 0 1 2005

9TH JUDICIAL CIRCUIT
COUNTY OF KALAMAZOO
KALAMAZOO, MICHIGAN

ENTERED

1                          TABLE OF CONTENTS

2   WITNESSES: Defense                                        PAGE

3   CHRISTINE HARWOOD

4        Direct examination by Mr. Svikis . . . . . . . . . . . 581
         Cross-examination by Mr. Brower  . . . . . . . . . . . 584
5
    AMY LYNN MISHALL
6
         Direct examination by Mr. Svikis . . . . . . . . . . . 587
7        Cross-examination by Mr. Brower  . . . . . . . . . . . 590

8   PATRICK KEVIN MISHALL

9        Direct examination by Mr. Svikis  . . . . . . . . . . 592
         Cross-examination by Mr. Brower  . . . . . . . . . . . 599
10
    Defense rests . . . . . . . . . . . . . . . . . . . . . . 617
11
    Closing argument by Mr. Brower  . . . . . . . . . . . . . 621
12
    Closing argument by Mr. Svikis  . . . . . . . . . . . . . 634
13
    Rebuttal argument by Mr. Brower . . . . . . . . . . . . . 648
14
    Instructions  . . . . . . . . . . . . . . . . . . . . . . 655
15
16

17

18

19

20

21  EXHIBITS: People                        IDENTIFIED    RECEIVED

22       X58  photograph

23

24

25

(Tape No. B2004-037, 6-21-04, 09:17)

1       Kalamazoo, Michigan

2       Monday, June 21, 2004 - 9:17 a.m.

3               THE COURT:   Counsel want to identify themselves for

4       the record, please.

5               MR. BROWER:   If it please the Court, your Honor,

6       Assistant Prosecuting Attorney Scott Brower for the People of

7       the State of Michigan.

8               MR. SVIKIS:   Good morning, your Honor.

9       Andis Svikis on behalf of Patrick Mishall.

10              THE COURT:   Are you ready to proceed, gentlemen?

11              MR. BROWER:   Yes, your Honor.

12              MR. SVIKIS:   Yes, your Honor.

13              I will bring my first witness.

14              THE COURT:   Raise your right hand, please.  You do

15      solemnly swear or affirm the testimony which you are about to

16      give shall be the truth, the whole truth, and nothing but the

17      truth, so help you God?

18              MS. HARWOOD:   I do.

19              THE COURT:   You may be seated.

20                      CHRISTINE HARWOOD,

21      called at 9:18 a.m., and sworn by the Court, testified:

22                      DIRECT EXAMINATION

23  BY MR. SVIKIS:

24  Q   Good morning.

25  A   Good morning.

581

1  Q  Would you please state your name again and spell it for the

2      record.

3  A  Christine Harwood—C-h-r-i-s-t-i-n-e H-a-r-w-o-o-d.

4  Q  Ms. Harwood, do you know Patrick Miscall?

5  A  Yes, I did.

6  Q  Do you see him in the courtroom today?

7  A  He's right there.

8  Q  And how long have you known Mr. Miscall?

9  A  Since I was 13 years old.

10  Q  And did you have a physical relationship with Mr. Mishall?

11  A  Yes, I did.

12  Q  And what was that?

13  A  I'm his ex and the mother of his twin children.

14  Q  During all the times that you've known Mr. Mishall and lived

15      with him, have you ever known him to own a gun?

16  A  Never.

17  Q  Possess a gun?

18  A  Never.

19  Q  Talk about a gun?

20  A  Never.

21  Q  And has he ever been physically abusive to you?

22  A  Never.

23  Q  And how old are you today?

24  A  Thirty-five.

25  Q  Oh, okay.  So from 14 [sic] to 35 is the length of time you've

1      known Mr. Mishall?

2   A  About 13 to 45 [*sic*]—or 35.

3   Q  Thirty-five.  Okay.

4             And are you aware that he moved to Wisconsin at some

5      point?

6   A  Yes, I am.

7   Q  And do you recall what year that was?

8   A  It would have been in 1991.

9   Q  Okay.

10  A  August.

11  Q  And also before 1991 are you aware of any physical infirmities

12     that Mr. Mishall may have?

13  A  He has—He had a staph infection and which gives him great

14     limitations to his hip and his leg; and one of his legs was

15     shortened, so he is not able to run very fast or—He's always

16     in a lot of pain.

17  Q  Would you call it running even?

18  A  No—No, it would be more like a gimpy limp run—like a jump on

19     one side.

20  Q  Are you old enough to remember the old *Gunsmoke* show?

21  A  Yeah, kind of like Festus.

22  Q  Is that who it was?

23  A  I don't know.  I believe that's what his name was.

24  Q  The one that limped?

25  A  Yes.

1          MR. SVIKIS:   All right.  I have no further

2    questions.

3          THE COURT:   Mr. Brower, do you have any questions?

4                    CROSS-EXAMINATION

5  BY MR. BROWER:

6  Q   Ma'am, during what years was it that you knew and had lived

7      with Patrick Mishall?

8  A   Well, I've known him since I was 13 years old.  And when I

9      moved in with him, I would have been—

10 Q   What year would that have been?

11 A   It would have been in 1988.

12 Q   And you—

13 A   No—I'm sorry.—it was 1989.

14 Q   When was the separation?

15 A   It was in 1989.  I believe it would have been around October

16     of '89.

17 Q   Did you see him between October of '89 and February of '91?

18 A   Yes, I did, because I'm the mother of his children so I would

19     bring the children to visit him.

20 Q   Where were you living during that period of time, did you say?

21 A   In Gobles.

22 Q   All right.  Is the physical appearance somewhat different now

23     than back then?  He had longer, dark curly hair, right?

24 A   To me, he looks exactly the same.  Yeah, he does—he does have

25     curly hair if his hair's longer; but his facial structure is

                              584

1  exactly 100 percent the same.

2 Q Are you familiar with Christine Gimmick?

3 A Yes, I am.

4 Q I'll show you what's been marked as People's exhibit 58 and

5  ask if you recognize who's shown here in these photographs.

6 A Yes, I do.  Patrick Mishall and Christine Gimmick.

7 Q Patrick has long, dark curly hair, doesn't he?

8 A Yes, he does; but his—

9 Q And a mustache as well, yes?

10 A Yeah, but his facial structure is still the same.

11 Q Ma'am, you said you never knew him to have, possess, or own a

12  gun; that your last contact with him when you would have been

13  in and around his house would have been October '89, right?

14 A No, it would have been in December of 1990 because that was

15  right before I moved to California.

16 Q Were you—

17 A December 31st.

18 Q —living with him in December of 1990?

19 A No, I was not; but I brought my children by to visit him.

20 Q All right.  So you stopped by the house to drop off the kids;

21  that's the extent of your—

22 A I would stay and—

23 Q —famil—

24 A I would stay and visit for a while, too—

25 Q Uhm-hmm.

1  A   —and he'd have to make sure they have—

2  Q   Did you have access to his house and to the closets and to

3      the—and go through and then—

4  A   Yes.

5  Q   —review every nook and cranny of his house or car and garage

6      during that period when you dropped off the kids for a visit?

7  A   No, that would have been between August and October, and

8      October was when I moved out.

9  Q   Of '89?

10  A   Of 1989.

11  Q   Defense counsel asked if he was every physically abusive to

12      you; and your answer was no, correct?

13  A   Never.

14  Q   Now you know that he was physically abusive to other women,

15      don't you?  Is that a yes or no, ma'am?

16  A   If I—That would be hearsay.  I never physically saw anything.

17  Q   Did you tell the detectives when they interviewed you in March

18      of 2003 that Patrick admitted to you that he had been

19      physically abusive to other women in the past?

20  A   He said—He did not use those exact words.

21  Q   Did you tell detectives in March of 2003 that Patrick admitted

22      to you that he had been physically abusive to women in the

23      past; yes or no?

24  A   It was—It just was not in those exact words, so I don't know

25      how to answer that.  I'm sorry.

586

1          MR. BROWER:    I have nothing further of this

2     witness, your Honor.

3          THE COURT:    Any redirect?

4          MR. SVIKIS:    I have no further questions, your

5     Honor.

6          THE COURT:    You may step down.  Watch your step,

7     please.

8          THE WITNESS:    Thank you.

9          MR. SVIKIS:    I have another witness to call, your

10    Honor.

11         THE COURT:    All right.

12         Raise your right hand, please.  You do solemnly

13    swear or affirm the testimony you're about to give shall be

14    the truth, the whole truth, and nothing but the truth, so help

15    you God?

16         MS. MISHALL:    I do.

17         THE COURT:    You may be seated.

18                    AMY LYNN MISHALL,

19    called at 9:27 a.m., and sworn by the Court, testified:

20                    DIRECT EXAMINATION

21    BY MR. SVIKIS:

22    Q    Good morning.

23    A    Good morning.

24    Q    Would you please state your name for the record and spell it.

25    A    My full name or just the last name spelled?

1  Q  The whole thing.

2  A  Okay.  Amy Lynn Mishall—A-m-y L-y-n-n M-i-s-h-a-l-l.

3  Q  Do you know Patrick Miscall?

4  A  Yes, I do.

5  Q  Do you see him in the courtroom today?

6  A  Yes, I do.

7  Q  And how do you know him?

8  A  I met him down in La Crosse, Wisconsin, working at the

9     Civic Center approximately ten years ago.

10  Q  Okay.  And are you married to him?

11  A  Yes, I am.

12  Q  And you've been married how long?

13  A  Married back in September 1998.

14  Q  Okay.  Before coming here today—You live where?

15  A  We—I moved to Weston, Wisconsin, in October of last year.

16  Q  Is that where you and Patrick reside?

17  A  Yes.

18  Q  So you've known him for about ten years, been married for how

19     many?

20  A  Almost six years we've been married come September.

21  Q  During that time have you ever known Patrick to own a gun?

22  A  No, I have not.

23  Q  And ever hear him say that he ever possessed a gun?

24  A  No, I have not.

25  Q  Would a conversation ever come up about using a gun with

1     Patrick?

2  A  No. I've asked him if he hunted 'cause my family hunts; and

3     he said, no, he doesn't like to hunt 'cause he hates guns.

4  Q  So I—Your family—You come from a line of hunters?

5  A  Yes.

6  Q  And have you heard the name Christine Dimmick?

7  A  Yes, I've heard her name.

8  Q  And did you hear that name from Pat?

9  A  Yes.

10 Q  Okay. And how did that conversation some about?

11 A  The conversation came about when he heard that the

12    investigation had been reopened, and he told me the story of

13    how he knew her and dated her.

14 Q  And isn't it true that he even had a picture of her?

15 A  That is correct.

16 Q  And that's in your house?

17 A  That is correct.

18 Q  And you're aware of that, right?

19 A  Yes, it's packed away with his sentimental value.

20 Q  It's what?

21 A  It's packed away with sentimental value.

22 Q  Okay. And as you look at Patrick now, when was the last time

23    you saw him?

24 A  May 19th, 2003.

25 Q  Okay. And does he look any different to you now than back in

589

1    Wisconsin?

2  A   Just his hair is shorter.

3          MR. SVIKIS:   I have no further questions.

4          THE COURT:   Mr. Brower?

5                     CROSS-EXAMINATION

6  BY MR. BROWER:

7  Q   Ma'am, detectives came and talked with you in May of 2003; do

8      you recall that?

9  A   Yes.

10 Q   They engaged in a conversation with you about the murder of

11     Christine Dimmick?

12 A   Yes.

13 Q   They asked about any conversations that you had had with him

14     regarding that murder, correct?

15 A   Yes.

16 Q   Did you tell them everything that you had known about the

17     murder through Patrick?

18 A   Yes.

19 Q   Was there anything that you had blocked out or kept from

20     telling or kept—

21 A   No.

22 Q   —from thinking about?

23 A   No, I did not.

24 Q   Did you tell the detectives that there might have been

25     something that you blocked out?

1   A   I was devastated at the time.  And after they left, I did not

2       miss anything that he had told me about Christine Dimmick.

3   Q   Is the answer a yes, then, ma'am, you did tell them that there

4       might be something that you blocked out?

5   A   I did, yes.

6   Q   What year was it when you first met Patrick?

7   A   It was around '94 or '95.

8   Q   Prior to first meeting him you would have no idea—Well, if you

9       had not yet met him you wouldn't have any personal

10      knowledge—personal meaning because you were there and

11      witnessed it or observed it or heard it—you wouldn't have any

12      personal knowledge about anything he said or did before that,

13      would you?

14  A   Correct.

15  Q   So any statements he made, any actions he took, you can't say

16      one way or the other because you weren't there, correct?

17  A   Correct.

18              MR. BROWER:    Thank you.

19              MR. SVIKIS:    I have no further questions.

20              THE COURT:    You may step down, ma'am.  Watch your

21      step, please.

22              At this time I'd like to call Patrick Mishall to the

23      stand.

24              THE COURT:    Raise your right hand, sir.  You do

25      solemnly swear or affirm the testimony you're about to give

                             591

1       shall be the truth, the whole truth, and nothing but the

2       truth, so help you God?

3                 THE DEFENDANT:  I do.

4                 THE COURT:  You may be seated.

5                   PATRICK KEVIN MISHALL,

6       called at 9:33 a.m., and sworn by the Court, testified:

7                   DIRECT EXAMINATION

8 BY MR. SVIKIS:

9   Q   Good morning, Patrick.

10   A   Good morning.

11   Q   You've sat here for the last week and heard all the testimony,

12       correct?

13   A   (No audible response)

14   Q   You have to speak up.

15   A   Yes.

16   Q   Okay.  All that testimony leads to the fact that you're

17       responsible for Chris Dimmick's death, and so let me ask you

18       this question: did you kill Chris Gimmick?

19   A   No, I did not.

20   Q   Did you rob the Minute Market?

21   A   No, I did not.

22   Q   Patrick, have you ever owned a gun?

23   A   No, I have not.  I was issued an M16 when I was in the

24       military of the United States Army, but that's it.

25   Q   What was your job in the army?

1  A   I was a cook, 94B10.

2  Q   Did you ever borrow a gun from anybody?

3  A   No, sir, I haven't. I particularly don't care for firearms.

4  Q   In—Back in 1991, where were you employed?

5  A   Minute Market.

6  Q   And who'd you work for?

7  A   Jim Jilek.

8  Q   And which Minute Market did you start working at?

9  A   I was initially trained at the one on South Westnedge—

10 Q   And—

11 A   —and I was asked to fill in at the Stadium Drive store until

12     they found a manager.

13 Q   You do know Chris Dimmick, though, right?

14 A   Yes, I did.

15 Q   Okay. And how'd you come to know Chris Dimmick?

16 A   My father resided at the Sugar Bowl Tavern periodically, and I

17     met her one day through him at the Sugar Bowl.

18 Q   And did there come a time when she moved in with you?

19 A   Yes.

20 Q   And where was that at?

21 A   2415 Springmont.

22 Q   And that's a house that you owned?

23 A   Yes.

24 Q   When she moved in with you, Patrick, where was she working?

25 A   At the time, she didn't have a job.

593

1  Q  Okay.  But eventually she worked at the Minute Market?

2  A  Yes.

3  Q  And how would you describe your relationship with

4     Chris Gimmick?

5  A  I was in love with her.

6  Q  Were there plans to get married?

7  A  Yes, there were.

8  Q  When the two of you were living together was your financial

9     situation in order?  In other words, you didn't have to go rob

10    somebody to pay your bills?

11 A  No.  No.

12 Q  Did you owe any money to anybody?

13 A  No.  I've always paid my bills on time.  I never had a problem

14    with that financially.

15 Q  You always worked?

16 A  Yes, I have.

17 Q  Now there's been testimony regarding your limp.  How did that

18    come about?

19 A  1987 I worked for the State of Michigan.  I was on my way to

20    work.  I walked periodically when I didn't ride a bike.  And a

21    gentleman that was standing on Burdock Street asked me for a

22    cigarette—which he'd done a lot the last couple weeks I'd been

23    walking to work—and I told him—I turned around and looked at

24    him, and I said if you had a job you wouldn't have to borrow

25    cigarettes all the time.

1           At that time when I turned my back on him, he
2    grabbed me around by the neck and stabbed me in the back with
3    a pair of needle nose pliers, which were rusty and old and
4    dirty. And I learned a couple weeks after that from that
5    wound I developed staph infection in my blood.

6  Q  Okay. Patrick, let's go back to February 8th of 1991. On that
7    particular morning were you and Chris together?

8  A  Yes, we were.

9  Q  Okay. And that's 'cause you lived together over on
10   Springmont?

11 A  Yes, we did.

12 Q  All right. And describe what—what you did that morning on
13   your—when you went to work.

14 A  It's been a long time. From when to when? Start at the
15   beginning or—

16 Q  Yes, start at the beginning.

17 A  I'd worked and closed the Westnedge store, and I had come home
18   and was relaxing, took a little bit of a nap. The alarm went
19   off at 5:00 o'clock so I could get her up and get her in the
20   shower 'cause she had to open up the store on Stadium Drive.

21         Put on the clothes that I had on. She got dressed.
22   Went out and started the car up, drove with her down to the
23   Minute Market on Stadium Drive, parked where I always park on
24   the east side of the building—Was it?—that they said?

25 Q  Well, wherever you parked.

595

1  A    Always right on the side of the building there.

2              She unlocked the back door.  We went in.  She hung

3      her coat up.  She coded in first.  You have to code in.  As

4      soon as you go in, you have to code in.  I'm not too sure on

5      the time.  I know we were running a little late.

6              After she coded in she hung her coat up.  She

7      immediately went into the office.  She said she had to get

8      stuff ready, and I asked her if there was anything I could do

9      to help her get the store opened up, which were the things

10     that they said.  I brought the newspapers in.  I don't

11     remember particularly what order I was doing this in.  I

12     brought the newspapers in from the front, bundled up the old

13     newspapers, made coffee.

14             She had the registers ready—the cash registers ready

15     to go in the register.  I got them in, got them logged on all

16     ready to go, got the lottery machine ready to go.  And I took

17     care of some empty bottles that were in the front from the

18     previous night.

19             And the store was pretty well squared away.  I swept

20     up a little bit behind the counter.  And I said everything was

21     ready to go; and she said, fine.  And we said our goodbyes at

22     the back door.  I give her a kiss, and she let me out the back

23     door.  And I heard the door slam with the deadbolt, and I got

24     in my car, and I drove off to home—drove home.

25  Q   Did you go back to sleep then?

1  A   Not right away; but, yes, I did eventually.

2  Q   All right.  And then the police showed up, right?

3  A   Yes.  I remember a loud knocking at my back door, yes—

4  Q   Okay.  And you let—

5  A   —and I was, like, who's knocking at my back door so loud, you

6      know.

7  Q   And you let them in?

8  A   Yes, I did.

9  Q   And they wanted you to go down to the station with them?

10 A   Yes, they did.

11 Q   And you cooperated with them?

12 A   Yes, I did.

13 Q   And they wanted to search your home, right?

14 A   Yeah, they asked me that downtown; but I wasn't quite sure

15     what for.

16 Q   Okay.  And—But you let them?

17 A   Yes, I did.

18 Q   Okay.  And they wanted to take your car and keep that for a

19     while, too, right?

20 A   Yes, that comes sometime after they wanted to search the

21     house.

22 Q   Okay.  And that's the car you—There was only one car between

23     you two, right?

24 A   Yes.

25 Q   And that's the car you drove to the Minute Market?

1  A    Yes.

2  Q    And that's the car you drove back home?

3  A    Yes.

4  Q    And there came a time that funeral arrangements were made?

5  A    Yes.

6  Q    And you went to the funeral?

7  A    Yes, I did.

8  Q    And then you stayed in Kalamazoo for a while longer.  Do you

9       remember how long?

10  A    (No audible response)

11  Q    About?

12  A    I believe I have paperwork stating that I actually arrived in

13       Wisconsin in October.  I didn't leave till early/middle month

14       of October.

15  Q    And did you have some family in Wisconsin?

16  A    Yes, I did.

17  Q    All right.  Then you had occasion to come back to Michigan to

18       sell your house; is that correct?

19  A    Yes, I did.

20  Q    And then when you returned to Wisconsin you eventually married

21       Amy?

22  A    Yes, I did.

23  Q    And that's who testified a few moments ago?

24  A    My wife, yes.

25  Q    Okay.  And you're still married to her?

1   A    Yes, I am.

2   Q    And in Wisconsin about a—a little over a year ago now you were

3        arrested, right?

4   A    Yes, I was.

5   Q    Did anybody call you in advance and tell you we're coming to

6        arrest you?

7   A    No, they did not.

8   Q    Okay.  And you had no objection to the police searching your

9        house in Wisconsin?

10  A    No, I did not.  I knew they were coming.

11             MR. SVIKIS:   I have no further questions.

12                      CROSS-EXAMINATION

13  BY MR. BROWER:

14  Q    Sir, back in late 1990 and early 1991 you and Chris Dimmick

15       were living together, correct?

16  A    Yes, we were.

17  Q    Your appearance back then was quite a bit different, in fact,

18       wasn't it?  Didn't you have dark, curly, and long hair?  Now

19       you have short and graying hair, yes?

20  A    That's what you say, yes.

21  Q    Well, what do you say?

22  A    I didn't want to have long hair in jail.  That's why I had my

23       hair cut.

24  Q    This photograph accurately depicts your looks back then,

25       doesn't it?

                          599

1  A   Yes, I did.

2  Q   You indicated that you had plans to get married with Chris,

3      yes?

4  A   Yes.

5  Q   So when you found out that she was seeing other people, that

6      must have made you other—very angry?

7  A   I would think it would make anyone upset, yes.

8  Q   So the answer is, yes, you were very angry finding she was

9      with other people?

10 A   I was upset, yes.

11 Q   'Cause you had caught her with other people before—with other

12     men?

13 A   No, not actually physically, no.

14 Q   But you learned the truth that she was seeing—

15 A   She had told me the truth, yes.

16 Q   It happened more than once, didn't it?

17 A   It was the same person; but, yes, it happened more than once.

18 Q   The fact that it happened again compounded your feelings of

19     anger, true?

20 A   I don't quite understand the question.

21 Q   Just kept getting more and more angry that it happened time

22     and time again?

23 A   The last time that it happened she was in dire straits, so I

24     helped her again.  I kept—

25 Q   Did you—

1  A  —taking her back.  I was in love with her.

2  Q  The fact that it continued to happen time and time again—

3  A  It only—

4  Q  —make you—

5  A  —happened twice.

6  Q  You have to listen to my question, sir.—did it make you

7     increasingly angry that it happened again?

8  A  I was no more angrier the second time than I was the first

9     time, which was upset.  I was upset, yes.

10  Q  At some point you came to believe that she had been with

11     another woman, in fact, right?

12  A  This, I don't know where it comes into play.  I have no reason

13     or—I don't understand why they would say that—

14  Q  That—

15  A  —put me in that position.  I have no recollect of her ever

16     being with a women, ever.  This is the first I heard of it

17     since this investigation.

18  Q  Something like that would have made you extremely furious,

19     would it not?

20  A  I—Like I said, it never happened; so I had no feelings toward

21     it.  That, I know for sure.

22  Q  Did you threaten to kill her because of that?

23  A  Because of what, sir?

24  Q  Seeing—Being with other people?

25  A  No, I never did.

601

1  Q   There was a period in early 1991 where you were acting manager
2      at the Stadium Drive store, correct?
3  A   The highest position I was ever was assistant manager, and
4      that wasn't my official title at the Minute Market on
5      Stadium Drive, no.  I was just a fill-in.
6  Q   When the manager was gone—whatever your title was—you were
7      doing the responsibilities of that manager for a period of
8      time, were you not?
9  A   A few days, apparently, yes.
10 Q   Or a couple weeks while he was on vacation?
11 A   I was never officially given the title; but, apparently, yes,
12     I was.
13 Q   So you were doing the job of the manager while he was on
14     vacation, weren't you?
15 A   Supposedly, I guess.  I was never really given the title or
16     told my responsibilities.  I was told my job, and that's what
17     I did.
18 Q   You believed that you did a good job doing the work of the
19     manager while he was gone?
20 A   I did my job while I was there.
21 Q   Is that a yes then?  You believe you were doing a good job
22     while he—filling in while he was gone?
23 A   I thought I was doing a good job, yes.
24 Q   You thought you deserved the promotion that Chris got?
25 A   No, that's not true.  She had worked for Minute Market longer

602

(Tape No. B2004-037, 6-21-04, 09:50)

1    than I have. She deserved the promotion.

2  Q  Didn't you just say on direct examination that Chris started

3    at Minute Market after you did?

4  A  No, she started working at Minute Market first; then I got

5    hired after she had been hired first.

6  Q  Having done the same work that a manager would do and feeling

7    that you had done a good job, were you angry at the business

8    for not giving it to you?

9  A  No, I was not. I was told that I would become the assistant

10   manager at the store on South Westnedge, so I was happy with

11   that. I was honored that I was even considered for the

12   manager's job; but I didn't think I would get it anyway, so.

13  Q  You heard testimony from others that talked about your being

14   angry and upset that you didn't get the promotion; you heard

15   that testimony?

16  A  Yes, I did.

17  Q  But your testimony is is that's not the way you felt; you

18   were, in fact, pleased and happy that you were transferred to

19   another store?

20  A  Initially, yes; but I was—I was hurt that I didn't—I was—I was

21   happy that I was even thought of for the position; but then

22   when I found out that I wouldn't get the position, yes, I was

23   hurt.

24  Q  And because you were hurt you wanted to get back at the store

25   somehow, didn't you?

603

1  A    No, I did not.

2  Q    In fact, isn't that why you wanted the key from Chris, you

3       wanted access to the store?

4  A    No, I did not.

5  Q    Chris wouldn't cooperate with you about gaining access to the

6       store, and she refused to give you a key, didn't she?

7  A    It was an argument about certain key rings.  I didn't know

8       which key ring she wanted that actual key to the store on.

9       Because I had certain key rings; she had certain key rings,

10      and we sort of traded once in a while at home.  So that's what

11      that argument was about was about what key ring she wanted the

12      key on to that store.

13 Q    She wasn't very—

14 A    And I said, why don't we just have two keys so it wouldn't

15      cause a conflict or a problem—

16 Q    She—

17 A    —and she didn't agree with that, so.

18 Q    She wasn't cooperative with you, was she?

19 A    I don't—I don't understand.  About that situation or about

20      everything?

21 Q    Well, let's talk about that situation.  You wanted something

22      and she said no.  She told you no about the keys.

23 A    I was offering an alternative.

24 Q    Yes or no, sir.  She didn't cooperate with you about the keys,

25      did she?

604

1  A    No.

2  Q    Did she catch you stealing that day?

3  A    No, she did not.

4  Q    Did you have an argument inside the store?

5  A    The morning of the 8th?

6  Q    The morning of the murder.

7  A    No, we did not.

8  Q    Were the two of you in the front of the store having an

9       argument?

10  A    No, we were not.

11  Q    You're aware of the video security system at the store, are

12       you not?

13  A    Yes, I was.

14  Q    And you're aware that there's cameras in the customer area and

15       no cameras in the back of the store, right?

16  A    (No audible response)

17  Q    Is that a yes?

18  A    Yes.

19  Q    Is that why you had to take the security tape 'cause it showed

20       that you were in the front of the store too close to the time

21       of the murder?

22  A    I never took a security tape.  I was never in the back office

23       that day where the security tapes were.  I was never back

24       there.  Christine was the only one back there.  She never left

25       the office that morning.

1  Q  Did you have a gun in the store that day like you suggested

2     you might do to Tina Telpy?

3  A  No, I did not.

4  Q  Did you bring a gun with you to the store?

5  A  I've never owned a gun in my life, sir.  No, I did not.

6  Q  You owned a large, dark car back in '91, didn't you?

7  A  Yes, I did.

8  Q  Ford LTD?

9  A  1985 four-door Ford LTD, black.

10  Q  You parked along the east side of the building?

11  A  Yes, I did.

12  Q  When you first talked with Detective Hatter at your house you

13     said you got there as early as 6:05 and left 20 minutes later,

14     didn't you?

15  A  I—Yes.  That's about the right times.

16  Q  That—

17  A  I was at the store around 20 minutes or so, yes—

18  Q  That—

19  A  —25 minutes.

20  Q  That couldn't be, though, could it, Mr. Mishall?

21  A  I don't understand.

22  Q  When the alarm deactivation time is at 6:25, you could not

23     have been there and in the store at 6:05 and left already at

24     6:25, could you?

25  A  Those were the times that I remember as far as I can recall.

1  Q  You weren't aware that Sonatrol kept those kinds of meticulous
2     records, were you?

3  A  Yes, I was.

4  Q  Giving the times to Detective Hatter that you did, that would
5     certainly put some distance between you and the time of the
6     murder, wouldn't it?

7  A  Can you ask the question again?  Can you ask the question
8     again?

9  Q  If you claim to have left much earlier, that would have left a
10    far greater time for somebody else to have committed this
11    crime, yes?

12 A  Yes.

13 Q  So it would be to your advantage to place yourself away from
14    the store as soon as possible, wouldn't it?

15 A  I was trying to give the times that I was there at the store
16    and when I left.

17 Q  Is that a yes, then, sir?

18 A  I was trying to give the times that as far as I can remember.
19    This was a long time ago.

20 Q  Did you go straight home after leaving the store?

21 A  Yes, I did.

22 Q  Did you make any stops anywhere?

23 A  No, I did not except for stop signs.

24 Q  You lived about one and a half miles away from the store,
25    didn't you?

607

1  A   Approximately.

2  Q   That'd take—At 25 miles an hour, that'd take about four or

3       five minutes to get home, wouldn't it?

4  A   I couldn't say.

5  Q   You told every detective you've ever spoken to that you left

6       the store well before 7:00 o'clock, right?

7  A   Yes.

8  Q   But then you would have been home, also, well before

9       7:00 a.m., wouldn't you?

10  A   Yes.

11  Q   But you weren't home at 7:00 o'clock, were you?

12  A   Yes, I was.

13  Q   Bart Munson was there at 7:00 o'clock, but you didn't see

14       Bart Munson, did you?

15  A   No, I did not because Bart Munson never came to my house that

16       morning.

17  Q   You told Detective Grace something about taking a shower.  Did

18       you go home and take a shower?

19  A   I don't recall if I took a shower or not.

20  Q   Might of?

21  A   I—I believe I had a cup of coffee, relaxed for a little bit,

22       watched a little TV, and then went to bed.  I had to be to

23       work at the store on Stadium—South Westnedge that morning.

24  Q   Did you—

25  A   I don't believe I took a shower, no, I don't.

1  Q  Why did you talk to Detective Grace about a shower then?

2  A  I don't remember the part of the conversation with the

3     detective about showering.  I don't remember.

4  Q  Taking a shower would be an opportunity to get rid of any

5     evidence that might be on you, though, wouldn't it?

6  A  It would, yes.

7  Q  And after the shower you put on the same clothes that you had

8     put on before?

9  A  When the detectives come?

10 Q  Yes.

11 A  Yes, I did.

12 Q  Did you tell Jim Grubius you would kill Chris if you caught

13    her with someone else?

14 A  No, I did not.

15 Q  But you knew she was seeing someone else, didn't you?

16 A  I had my suspicions about her being with a particular

17    individual, but I was not sure.

18 Q  The fact that that was happening again must have again made

19    you angry, didn't it?

20 A  The fact that that was happening again?

21 Q  Yes.

22 A  I don't understand the question.

23 Q  Her with somebody else.

24 A  Are you saying she was with this Jim guy, or are you saying

25    that she was with the person that she was initially with.

1  Q  Listen carefully—

2  A  I don't understand.

3  Q  —sir. The fact that you suspected that she was again with
4      somebody else as you're telling Mr. Grubius this must have
5      made you angry again.

6  A  No.

7  Q  So when you were talking with Mr. Grubius you were not angry?

8  A  The particular gentleman you're talking about hung around the
9      store a lot, and I wasn't happy with the way he was trying to
10     have a friendship with Christine.

11  Q  All right. So now you're suspicious of Grubius?

12  A  Like I said, I didn't particularly like the way he hung around
13     the store a lot when she was working.

14  Q  I heard what you said. My question is whether you were
15     suspecting Mr. Grubius as well.

16  A  No, I was not.

17  Q  Did you tell Tina Dahl you were separated from Chris at the
18     time of the murder because you caught her with another woman?

19  A  No, I did not.

20  Q  So if you hadn't have said it you couldn't have been enraged
21     and agitated while you were relating it?

22  A  No.

23  Q  Isn't it a fact, sir, that you did say that; you did suspect
24     Chris being with another woman and that ultimately was the
25     straw that broke the camel's back for you?

1  A  No.

2  Q  You told the detectives back in '91 and every opportunity

3     thereafter that you never owned, possessed—for that matter

4     other than a BB gun when you were a child or in the

5     military—never even touched a gun; is that right?

6  A  No, sir

7  Q  You didn't say that, or you did say that?

8  A  I did say that.  No, I haven't.

9  Q  But you had also told both Detective Hatter and

10    Detective Grace that on the morning of the murder you had not

11    been out at the front of the store other than to retrieve the

12    papers and bring them back in.  You said that to the

13    detectives then, didn't you?

14 A  I told them I went out front to get the papers and bring them

15    in, yes, I did.  I said that.

16 Q  And you told them other than that you had never been out to

17    the front of the store that morning; you told them that,

18    didn't you?

19 A  I told them I was out the front of the store when I got the

20    newspapers and brought them in.

21 Q  Do you understand the question, sir?

22 A  No, I do not.

23 Q  Other than the paper incident did you tell them that you had

24    not gone to the front of the store?

25 A  I don't remember if I told them if I was out there otherwise

611

1    for getting the papers or not.

2  Q  In fact, you told them that was the only time you went to the

3     front of the store was to get the papers and you did not go

4     out there any other time; that's what you told the detectives,

5     didn't you?

6  A  I don't recall if that's what I told them.

7  Q  You heard the testimony?

8  A  Yes.

9  Q  You heard the testimony that that was what you had said?

10 A  Yes.

11 Q  You don't recall now saying that?

12 A  What I told the detectives back then, I told them I went out

13    front to get the newspapers, yes.

14 Q  Do you later recall talking to the detectives

15    and—Detective Grace and admitting that you had lied about

16    that; that you had, in fact, gone to the front of the store?

17 A  Again?

18 Q  Yes.

19 A  Yes.

20 Q  So you remember that part?

21 A  Yes.

22 Q  You remember telling him that you lied about going out to the

23    front of the store again?

24 A  I went out to the front of the store again to put the tape

25    that I had borrowed from the store out to my car—

1  Q   Now—

2  A   —which was a rental tape.

3  Q   Now let's—

4  A   That's what you're getting at.  I know that's what he's

5      getting at.

6  Q   Now let's back up again.  I'll start over again.  Do you

7      recall initially telling detectives other than to get the

8      papers you had not gone out to the front of the store at all?

9  A   I—

10 Q   Yes or no?

11 A   No.  I don't remember if I told him about that or not.  I

12     don't remember.

13 Q   But you remembered telling the—

14 A   Later—

15 Q   —detective that—

16 A   —I told him.

17 Q   —you lied about that?

18 A   Well, later I had told him that I was out in front of the

19     store again, yes.

20 Q   And you only acknowledged the lie after the detective gave you

21     the store about someone seeing you out front?

22 A   He did say someone saw me—

23 Q   Is that a—

24 A   —out front.

25 Q   —yes or a no, sir?

1  A  Yes.

2  Q  Only when you thought that you had been caught cold on that

3     point did you finally admit your lie, yes?

4  A  No.

5  Q  Did you ask Brett Munson to get rid of a gun for you?

6  A  No, I did not.

7  Q  Was that the murder weapon?

8  A  I don't understand the question.

9  Q  You don't understand that question?

10 A  No.  If I—

11 Q  Did you—

12 A  —didn't ask him to get rid of a weapon for me, how could it be

13    the murder weapon?  I don't understand the question.

14 Q  Did you tell Tina Teply that you had a gun and knew how to use

15    it?

16 A  No, I did not.

17 Q  Were you talking—

18 A  I might have said to her that I know how to operate a weapon—

19 Q  Hmm.

20 A  —which I learned in the military.  Other than that, I don't

21    recall that discussion, no.

22 Q  Did you tell Carol Sordahl you had a gun?

23 A  No, I did not.

24 Q  You know Carol Sordahl, don't you?

25 A  Yes, I do.

1  Q  But you didn't tell her you had a gun?

2  A  No, I did not.

3  Q  Do you know Tina Dahl?

4  A  Yes, I do.

5  Q  Did Tina Dahl see you with a gun at your home?

6  A  No, she did not.

7  Q  You heard her testimony regarding it being a largish handgun

8     and the circumstances, yes?

9  A  Yes.

10 Q  Large handgun like a .38 or a .357?

11 A  Large handgun was all I heard.

12 Q  But you were familiar with guns. You know that that wouldn't

13    be a small hand-held, hide in your pocket type gun then, would

14    it?

15 A  Apparently not, no.

16 Q  You had a conversation with her about the maid at the motel

17    finding it just afer you moved to Wisconsin from Michigan,

18    didn't you?

19 A  No, I did not.

20 Q  After you moved from Michigan you did live with your

21    uncle's—at your uncle's hotel in Wisconsin, didn't you?

22 A  Yes, for a little period of time; yes, I did.

23 Q  You know Dawn Anderson?

24 A  Yes, I do.

25 Q  She saw you with a gun, too, didn't she?

1  A  No, she did not.

2  Q  Did you tell Debbie Brown you killed Chris and then grab her

3      by the neck?

4  A  No, I did not.  I don't even know Debbie Brown.

5  Q  You told Chris Newburry when she confronted you about Chris's

6      death, yes?

7  A  Told her what, sir?

8  Q  That I ought to do to you what I did to Chris.

9  A  That frame, I don't know why she would put me in that position

10     like that.  I only meant to fight with her like Christine and

11     I fought.  Physically fight, that's what I was talking about

12     there.

13  Q  Okay.  So—

14  A  I don't know why she would put me in that position like that.

15  Q  She says—She asks you—She confronts you, you did kill Chris;

16     and you responded by grabbing her by the neck and thinking I

17     ought to physically fight with you like I did with Chris?

18  A  The reason why I got upset—

19  Q  Is that a yes—

20  A  —and did that—

21  Q  —or a no, sir?

22  A  No.

23  Q  Tracy Rathke confronted you in a very similar manner as

24     Christine Newburry, didn't she?

25  A  Yes.

1  Q   You didn't deny it then either, did you?

2  A   I never answered her question.

3  Q   You just scared her right out of the house, you?

4  A   No, we argued.  I asked her to leave, yes.

5  Q   Is that a yes or a no, sir?

6  A   No.

7              MR. BROWER:   I have nothing further, your Honor.

8              THE COURT:   Any redirect?

9              MR. SVIKIS:   No further questions, your Honor.

10             THE COURT:   You may step down, sir.  Watch your

11     step.

12             MR. SVIKIS:   Defense rests.

13             THE COURT:   Any rebuttal?

14             MR. BROWER:   No, your Honor.

15             THE COURT:   All right.  All proofs are closed then,

16     members of the jury.

17             It's necessary for the lawyers and I to review the

18     instructions that I will give you regarding the law before

19     closing arguments, so we'll do that at this time.  We'll take

20     a brief recess to—to do that at this time.  And, hopefully,

21     that won't take us too much time.  And then after that, we can

22     hear closing arguments yet this morning.

23             (At 10:08 a.m., court recessed)

24             (At 10:53 a.m., proceedings reconvened)

25             The record should reflect that counsel and I have

617

1    discussed the instructions.

2              And I believe that we're ready to proceed with

3    closings.

4              Does the prosecution have any further request or

5    objections to the charge that the Court has indicated it will

6    give?

7              MR. BROWER:   No, your Honor.

8              THE COURT:   Defense?

9              MR. SVIKIS:   No, your Honor.

10             THE COURT:   I didn't notice that either side

11   presented a theory and claim.   Is that waived?

12             MR. BROWER:   Yes, your Honor.

13             MR. SVIKIS:   Yes, your Honor.

14             THE COURT:   Okay.   So we're ready to proceed then

15   with the closing; is that correct?

16             MR. BROWER:   Yes, we are, your Honor.

17             MR. SVIKIS:   That's correct.

18             THE COURT:   It looks like with the time parameters

19   we're going to be—By the time you get done with your closing

20   it will be close to noon.   So I think we'll probably have to

21   instruct this afternoon.

22             MR. BROWER:   All right.

23             THE COURT:   So you want to—As soon as the court

24   officer comes with the jury—

25             Indicate to her to bring them in.

618

1        And I—It probably would be best to choose the

2   alternates after I instruct.  In fact, I think that's required

3   by rule.

4        Before I forget, you had a stipulation that was

5   going to be read into the record in front of the jury.  We've

6   not done that yet—

7             MR. SVIKIS:   Right.

8             THE COURT:   —so that—

9             MR. SVIKIS:   Mr. Brower—

10            THE COURT:   —ought to be done before closing.

11            MR. SVIKIS:   —the stipulation.

12            THE COURT:   The stipulation.

13            (At 10:57 a.m., jury returns to courtroom)

14        All right.  Before we proceed—We have now reviewed

15   all of the instructions of the law that the Court is going to

16   give.  And as I told you, members of the jury, I'm going to

17   provide you with a written copy or a printed copy of these

18   instructions so you'll have them with you in the jury room

19   when you deliberate.

20        We have one last thing to take care of before we

21   proceed to hear the arguments, and that is a stipulation that

22   is going to be read into the record; or, in other words, it's

23   a statement that—of facts that the attorneys and the parties

24   have agreed to.  And so you may regard those facts as true;

25   however, you don't have to.

1     Mr. Brower—

2     Which of you two is going to read that into the

3 record?

4     MR. BROWER: I can, your Honor.

5     THE COURT: That's fine.

6     MR. BROWER: The parties stipulate to the following

7 facts:

8     Christine Dimmick was murdered at the Minute Market,

9 2905 Stadium Drive in the city and county of Kalamazoo,

10 Michigan, on Friday, February 8, 1991.

11     Her body was transported from the scene to the

12 county morgue by Mall City Ambulance personnel and secured at

13 that location.

14     Dr. Harvey S. Wilkes, forensic pathologist,

15 conducted an autopsy on the body of Ms. Dimmick on February 9,

16 1991.  He determined that she died as a result of four gunshot

17 wounds and ruled the death a homicide.

18     The chain of custody on the body was properly

19 maintained from the time the body was taken from the scene

20 until the time of the autopsy by Dr. Wilkes.

21     The fired lead bullets or fragments recovered from

22 the body of Ms. Dimmick were taken by police at the time of

23 the autopsy, secured as evidence, and later taken to the

24 Michigan State Police laboratory for examination.  The chain

25 of custody on the bullets and fragments was properly

1      maintained from the time they were recovered at the autopsy
2      until the time of the examination at the Michigan State Police
3      lab and at all times thereafter.

4              Clothing turned over to detectives by the defendant
5      was secured as evidence and later taken to the Michigan State
6      Police laboratory for examination.  The chain of custody of
7      the clothing was properly maintained from the time the
8      clothing was collected until the time of the examination at
9      the time of the Michigan State Police lab and at all times
10     thereafter.

11             The chain of custody for any additional items
12     collected by the police as described in the police report was
13     properly maintained from the time the items were collected
14     until they were presented in court, whether offered as
15     evidence by the People or the defendant.

16             The parties agree to admission of the following:
17             Autopsy report from February 9, 1991, by
18     Dr. Harvey S. Wilkes.

19             THE COURT:  One other thing.  Would counsel
20     approach.

21             (At 11:01 a.m., bench conference)
22             All right.  Are you ready to proceed, Mr. Brower?
23             MR. BROWER:  Yes, your Honor.
24             Beyond any reasonable doubt Patrick Kevin Mishall is
25     guilty of the crimes he's charged with.  The evidence—the

1      testimony you heard in the courtroom—tells us that.

2           As you may have expected from the questions during

3      jury selection, there is a great deal of circumstantial

4      evidence.  But it is not inferior evidence because it is

5      circumstantial, it is compelling evidence that happens to be

6      circumstantial.

7           Let's take a closer look at the testimony and the

8      reasonable inferences that you can make from that testimony

9      and the logical conclusions.

10          I've broken the testimony down into six different

11     areas:

12          Facts which show Patrick Mishall's opportunity to

13     commit the crime;

14          Facts showing that entry into the business was given

15     voluntarily;

16          Facts showing that Mishall's familiarity with the

17     crime scene equipment and procedures was unique;

18          That Mishall had the means to commit the crime;

19          That Mishall had the motive to commit the crime;

20          And, finally, other actions and statements by

21     Patrick Mishall which, together, prove his guilt.

22          First, Mishall's opportunity to commit the crime.

23     Here's the evidence:

24          This business opened at 7:00 a.m. every day.

25     Regular customers were coming by at 7:00 a.m.  For the

1    perpetrator of this crime the chance of being seen after

2    7:00 a.m. was greatly increased.  This crime was not an

3    in-progress crime after 7:00 a.m.; it was over with by

4    7:00 a.m.

5        Stealing the security tapes and recorder, stealing

6    the money—that is, the coins and the deposit—and the murder of

7    Chris Dimmick took some time.  How long we don't know for

8    sure, but it had to have taken some time.  It didn't happen in

9    the blink of an eye, that's for sure.  So if it was all over

10   with by 7:00 a.m., the incident must have begun well before

11   7:00 a.m.

12       Taking all of this bulky stuff—the VCR, the money,

13   the coins, and the tapes—the perpetrator could not have been

14   on foot.  He must have had a vehicle nearby.

15       Another point: Minute Market employees parked their

16   cars along the side of the store.  We've heard that from

17   several witnesses.  A large dark vehicle was parked parallel

18   to the east side of the store approximately five minutes

19   before 7:00 a.m. and gone minutes later.

20       Patrick Mishall drove a black Ford LTD.  He admits

21   he parked along the east side of the building.  He was not

22   home as he should have been if he'd left when he said he did

23   and went straight home as he said he did—less than a mile and

24   a half from the store.

25       Finally, the start-up tasks were not completed

1    before 7:00 a.m.  The officer talked about seeing a pop cart
2    still in the aisle as if somebody was restocking it.  There
3    was a paper bundle still on the floor in the middle of the
4    walk area where customers would stand and go to the counter.
5    The cash drawers were still standing open.  No, the start-up
6    time [sic]—tasks were not completed before 7:00 a.m.
7         That evidence leads to these conclusions:
8         Before 7:00 a.m. something happened that kept Chris
9    from completing those start-up tasks.  The robbery/murder was
10   committed before 7:00 a.m.
11        The person responsible had a vehicle nearby.  It was
12   Patrick Mishall that was parked parallel to the side of the
13   building minutes before 7:00 a.m.  Patrick Mishall's car was
14   there when the robbery/murder was occurring and so, too, was
15   Patrick Mishall.
16        Take a look at the time line.
17        Seven a.m. on this end of the slide.  First story to
18   Detective Hatter he got there at 6:05 and left 20 minutes
19   later.  Between when he left and 7:00 a.m. was the opportunity
20   for someone else to commit the crime.
21        Second statement to Detective Hatter: got there at
22   6:17 and left at 6:35.  Again, from then until 7:00 a.m. an
23   opportunity for someone else to commit the crime.
24        And, finally, to Detective Grace, I got there at
25   6:00 o'clock.  He didn't tell Detective Grace when he left.

1    But if it's consistent with the approximate time frames for

2    the other detective—20 minutes—a greater period of opportunity

3    for someone else to commit the crime before 7:00 o'clock.

4            But we know because of the Sonatrol testimony that

5    people entered the store and un—and deactivated the alarm at

6    6:25.  Not I left the store at 6:25, but he arrived at the

7    store at 6:25 and began his—as he claims—attempt to help her

8    open the store.

9            Remember his testimony to Detective Handlogten in

10   2003?  How long did he say he was there?  He was pretty sure

11   he was there for 45 minutes.

12           If we know that he came there at 6:25 and entered

13   the store, we know that he was still there at 7:00 o'clock.

14   There was no other opportunity for anyone else to be there.

15   He was there himself.

16           Next area of testimony: entry into the store was

17   given voluntarily by Chris.  Here is the evidence:

18           Chris Dimmick was found murdered inside a secure and

19   locked building prior to the building opening for business.

20   Just how did the perpetrator get in?  There was no sign of

21   forced entry.  The assailant did not accost the victim as she

22   walked up to the building, force her to unlock the door, force

23   her to enter the store, force her to deactivate the alarm, or

24   force her to unlock the floor safe.  You know all this because

25   of what the defendant himself has said.

1       The murderer didn't get in that way.  Before the

2   store opened, Chris would not have let anyone she didn't know

3   into the building—into the store before it opened.  And,

4   again, this fact came from Patrick Mishall himself.  He told

5   Detective Handlogten that Chris taught him not to let anyone

6   in that she didn't know.  So that scenario was out, too.

7       What does that leave?  Well, we know the assailant

8   was not hiding inside the building overnight either.  The

9   testimony of Frank Sila and Sharon Hitchcock from Sonatrol and

10  Tina Askren—the night clerk—are very clear about that.

11      From that evidence you can reach these conclusions:

12      The robbery/murder was an inside job by someone that

13  was not a stranger to the store, someone that Chris Dimmick

14  knew and was comfortable with, someone she would let into the

15  building voluntarily, someone like Patrick Mishall.

16      Let me back up to the someone was hiding inside the

17  building idea.  It makes absolutely no sense.  Why would a

18  stranger intent on robbery conceal himself in the store, by

19  him [sic]—bypass the opportunity to rob the night clerk after

20  she locked the door at 2:00 a.m. when there were no customers

21  expected and with little chance of being seen and instead wait

22  silently through the night to rob the day clerk after she

23  entered but before she unlocked the doors when the streets

24  were coming to life and the chance of being seen was far

25  greater?  It doesn't make sense.  Yet Patrick Mishall offered

1    this illogical someone must have been hiding inside scenario
2    time and time again over the years as an alternative to the
3    only logical conclusion that he was the perpetrator.

4         Next category: Mishall's familiarity with the crime
5    scene equipment and procedures.

6         There might have been many things that you could
7    pick out from the testimony point to Mishall's involvement in
8    the robbery and murder because of his familiarity with the
9    crime scene equipment and procedures. I'm going to point out
10   just one. Here it is:

11        The coin box was locked but empty when the police
12   arrived that morning. It had not been empty, however, when
13   Tina Askren closed at 2:15 a.m. The coin box key was kept on
14   a ring in the desk drawer. The key was back in the desk
15   drawer when the police got there after the murder was
16   discovered.

17        What does that tell you? The person who stole the
18   coin—the money from the coin box had to be an insider. This
19   person knew where the key was, opened the coin box, removed
20   the money and coins, relocked the box and replaced the key.
21   Patrick Mishall would have had knowledge of the coin box and
22   key location.

23        It is not reasonable to think that Chris would have
24   unlocked the box for some unknown robber at his direction,
25   then relocked the empty box and put the key away. It is

                              627

(Tape No. B2004-037, 6-21-04, 11:16)

1    reasonable, however, to believe that Patrick Mishall wasn't at

2    the store to help Chris at all. Instead, angry and upset with

3    the company owners and decision makers for passing him over

4    for a promotion he felt he deserved, he was trying to get back

5    at them using Chris to gain access to the building.

6         He had to use Chris. Remember his access code was

7    changed when they changed personnel. The key locks were

8    changed. He didn't have a key to get in anymore. He had to

9    use Chris, but he needed her cooperation; and Chris wasn't

10   cooperating. She refused to give him his own key.

11        From the evidence it's reasonable to believe that he

12   was trying to steal from his employer right under Chris's nose

13   only to get caught by Chris with his hand in the coin box—or

14   rental tapes—which led to a confrontation, to an immediate

15   escalation; and, ultimately, because of all the other issues

16   Patrick Mishall had with Chris Dimmick which were unrelated to

17   the company business, to murder.

18        It's also reasonable to believe that after shooting

19   Chris to death he went back and took the rest of the deposit

20   money and the surveillance tape recorder. While he would have

21   known that the murder itself could not have been on tape—There

22   were no cameras in the back area.—whatever may have occurred

23   in the customer area would have been on tape, like an animated

24   confrontation near the front doors or maybe merely the

25   presence—his presence—documented on tape at a time later than

628

1    he would tell the police if asked.  That evidence had to go.

2                Fourth area: Mishall had the means to commit this

3    crime.

4                Chris was killed with a .38 or .357 handgun—a large

5    caliber weapon.  Time and time again over several years to

6    Detectives Hatter, Grace and Handlogten, Mishall denied ever

7    owning or possessing a gun of any type.  They pressed him on

8    it.

9                Yet before the murder he told a coworker Tina Askren

10   he had a gun and knew how to use it.  Just days after the

11   murder he asked Brett Munson to get rid of a gun for him.  And

12   within months after the murder he spoke about having a gun

13   with Carol Sordahl.  And, also, within months after the murder

14   Dawn Anderson saw him with a handgun—saw him with a handgun as

15   did Tina Dahl a year or two later.  And when she saw that

16   weapon he told her the story about the maid at the motel

17   finding the gun in with his effects and resulting in him

18   getting kicked out—finding him with a gun while he was staying

19   at his uncle's motel, which is where he went to stay after he

20   moved from Michigan to Wisconsin.

21               From that evidence you can reach these conclusions:

22               Contrary to his repeated denials, Mishall did own a

23   large handgun at the time of the murder, and that is extremely

24   significant.  He did have the means to commit this crime.

25               People, his denials that he ever had a gun and his

1   attempt to have someone get rid of a gun so soon after the
2   murder is evidence of a consciousness of guilt.  It makes no
3   sense for an innocent man to choose not to turn over a gun
4   that he knew was not the murder weapon.  But he knew he
5   couldn't admit owning a gun.  He'd be pressed by police to
6   turn it over.

7        The ability of police to do ballistics comparisons
8   is commonly known.  If he turned his gun over, he knew it
9   would convict him.  He had to lie.  Wherever it was that he
10  hid the gun and property after the murder but before he
11  returned to his home, he couldn't take the chance of going to
12  the location and permanently disposing of it himself.  He
13  couldn't take the chance of getting caught with it, so he
14  approached Brett Munson.

15       But more and more days went by.  Nothing developed
16  with the case that he could see.  Days turned into weeks and
17  weeks into months—nothing.  The police left him alone.  No
18  arrest—nothing.

19       Eventually he packs up and moves to Wisconsin,
20  taking his gun with him; abandoning his home in Kalamazoo,
21  only returning months later to sell it.

22       With all of this compelling evidence summarized so
23  far, still there is more: Mishall's motive to commit the
24  crime.

25       Here's the evidence:

630

1        Mishall was angry about Chris recently wrecking his
2    car with another man in the car.  The testimony was
3    John Postawa was in there.  He admitted to the detectives that
4    he was angry about that.

5        He was angry about the promotion.  He argued with
6    Chris about her refusal to give him a key to the building
7    after her promotion and then this: to Detective Grace he
8    admitted threatening to kill Chris if he caught her with
9    someone else, and he did suspect her of being with someone
10   else.  He told Grace he knew she was seeing someone else.

11       And this to James Grubius: within weeks before the
12   murder he twice said he would kill her if he caught her
13   messing around, once saying this while in such an agitated
14   state and so irate he was described as pacing like an animal
15   in a cage.

16       To Tina Dahl, he spoke about finding his girlfriend
17   Chris Dimmick with another woman.  She described him as being
18   very angry, sweating, voice raised, and talking fast.  Again,
19   very agitated; and, obviously, the idea that that could have
20   occurred infuriated him.

21       The conclusion is this: Patrick Mishall did have
22   motive to kill Chris Dimmick.

23       You may have difficulty making sense of it.  How
24   could anyone kill someone for no reason?  For any reason?  Or
25   Patrick Mishall for these reasons?  But you'll never be able

1    to make sense of it because it's senseless.  But you don't

2    have to understand why he did it to know that he did.

3            Finally, his other actions and statements.  Consider

4    these facts:

5            In accounts to detectives in 1991 Mishall gave

6    different times for when he arrived at the store with Chris:

7    6:00 o'clock, 6:05, and 6:17.  He gives different times for

8    leaving the store to return home: 6:25 and 6:35.  Yet he told

9    Detective Handlogten he was pretty sure he was there for

10    45 minutes before heading.  Sonatrol shows an alarm

11    deactivation time of 6:25, and the cash registers are

12    consistent with that being activated at 6:31 and 6:32.

13            What does this evidence tell you?  By giving those

14    early arrival and departure times he was intentionally

15    attempting to distance himself from the crime and increase the

16    window of opportunity for someone else to have committed this

17    crime after he left but before the store opened.

18            And, finally—last but certainly not least—his

19    statements to Debbie Brown, Chris Newburry, and Tracy Rathke

20    both verbally and nonverbally—statements with striking

21    similarities.

22            Debbie Brown testified he said he killed her, and

23    Mishall with his hands to her throat.

24            When Chris Newburry asked if he killed Chris he

25    responded I ought to do to you what I did to Chris, and

1    Mishall with his hands to her throat.

2         Tracy Rathke asked, you did kill Christine, didn't

3    you. No verbal reply from Patrick Mishall, just silence where

4    you would expect a denial from an innocent person and a look

5    she had never seen before—a look that scared her—and Mishall

6    with his hand to her throat. Sound familiar?

7         The conclusion is this: Patrick Kevin Mishall's

8    statements are nothing less than confessions—multiple

9    confessions to the murder of Christine Dimmick. He threatened

10   to kill her, he killed her, and he told people he killed her.

11        In my opening statement I quoted the saying people

12   give themselves away in small mistakes; it's human nature.

13   Here's another one: outward actions are a clue to hidden

14   secrets. Well, that's what Patrick Mishall has done in the

15   days, weeks, and months, finally years, since the murder. He

16   has been giving himself away, giving his secret away in bits

17   and pieces, small mistakes over time by what he said and what

18   he did.

19        Now go back and deliberate. Take as long as you

20   need to understand the significance of the evidence you've

21   heard over the last few days. If you take the time you will

22   understand the significance.

23        To paraphrase Andrew Jackson: take time to

24   deliberate, but when the time for action arrives stop thinking

25   and do it. Come back into the courtroom. Look

                               633

1    Patrick Mishall in the face and tell him that he is guilty of

2    first-degree premeditated murder in count one.  Nothing can be

3    more deliberate, more premeditated than this cold-blooded

4    execution.

5            Tell him that he is guilty, too, of first-degree

6    felony murder for killing Chris during the commission of a

7    larceny.

8            Tell him that he is guilty of armed robbery and

9    felony firearms.  Tell him.  Thank you.

10           THE COURT:  Mr. Svikis?

11           MR. SVIKIS:  Thank you, your Honor.

12           Good morning.  Thank you for your patience and

13   attentiveness during this trial.

14           This is a class case of rushing to judgment.  How is

15   that possible, you might say.  Is it not 13 years of

16   investigation concluding with six cold case members working

17   24/7, as they said, with over 200 years combined experience?

18           I offer up to you that it's, in fact, one year's

19   worth of investigation simply mulled over 13 times.  The facts

20   never change from 1991.  Or, in this case, there—there is

21   insufficient evidence to support Mr. Mishall's conviction for

22   killing his fiancée.

23           In 1991 there are no direct admissions, no physical

24   evidence inculpating Mr. Mishall and no witnesses of the

25   killing.  Isn't it reasonable that after all this time to ask

634

1    for some corroboration from the prosecution's witnesses,

2    especially those who can't recognize him in the courtroom?

3    This case never rises above the level of conjecture.

4            There are two facts that can't be resolved that are

5    necessary to point to Pat: motive and a death by execution

6    which lacks the passion, confrontation that you would expect

7    if you believe the prosecutor about the humiliation,

8    embarrassment, rage, loss of job or not getting a promotion.

9    But it does match robbery without the recovery of the money or

10   the weapon.

11           The prosecutor wants you to believe that the motive

12   is anger, but anger without a conflict with Chris Dimmick.

13   You haven't heard any of that. There is no heat of passion.

14   And if you're—have the motives that the prosecutor wants to

15   attribute, it would be a crime of passion; it would be

16   confrontation, but it's not. This is robbery, homicide; it's

17   not Pat.

18           Motive that the prosecution is talking about would

19   have to be that kind of emotion, that desire, that

20   psychological need or impulse to cause you to act. Where is

21   it? After making coffee, bringing in the newspapers?

22           The judge will instruct you that you may consider

23   whether Patrick Mishall had a reason to commit this crime.

24   There is no reason.

25           You know that on February 8th, 1991,

1    Christine Dimmick was executed: shot at close range four
2    times, two times in the back of the head at contact range in
3    the back without evidence of struggle that you would expect
4    with someone seething with anger in a domestic violence
5    setting. It's not there. There's no evidence of
6    confrontation, conflict, or disagreement on February 8th, 1991,
7    or before.

8         The crime is committed. You expect evidence to be
9    removed and evidence to remain. Evidence that's removed is
10   from a robbery. The evidence that remains would point to the
11   robber.

12        These crimes are robbery driven and occurred after
13   Pat left within that following hour or hour and a half—however
14   you do the calculations. But we know the building is not
15   secured until 8:20 when the police returned to the building.
16   Thousands of dollars are missing. The money bag is missing.
17   Keys are missing. No .38 caliber, no .357 murder weapon is
18   ever found. No 24-hour video machine is found or tape or
19   security cameras. With that same information that they had in
20   1991, they arrest Pat in 2003.

21        The police report, testimony has shown, has grown to
22   over hundreds and hundreds and hundreds of pages. Individuals
23   were questioned. I believe they exceeded 400 and less than 23
24   presented to you—That's their best shot.—hand picked. Still
25   missing, where are the motive witnesses? For that simple fact

636

1    that there aren't any motive witnesses, there was no motive.

2    The investigator Grace, after Pat is brought to the

3    police station, within an hour or so says I know you killed

4    her. That's the commitment the investigators made within the

5    first hour and continued for the next 13 years. But when

6    asked of investigator Handlogten after they powwowed the six

7    cold case investigators, went through the information, asked

8    them was there enough to arrest, not enough to arrest. That

9    should be enough to acquit right there.

10   But let's look at the investigation. Does it look

11   like any domestic violence confrontation that you would be

12   familiar with? The search—The outdoor search included

13   everything from physical evidence from dumpsters from the

14   Minute Market to the Oakwood Plaza, Woods Lake, Asylum

15   Lake—nothing. Nothing, because they went with the robber.

16   It's robbery/homicide, not homicide and a robbery.

17   And then we look at the inside

18   search—Officer Labrie, Kalamazoo CSI guy. This is the officer

19   with the flashlight—He tried to make it out more than it

20   is.—and the naked eye—the walk around. That's what it is. No

21   prints were taken or attempted, not even the safe, the money

22   drawers or the coin box.

23   From your own experience you may or may not have the

24   knowledge that convenience safes are not always locked.

25   Change has to be made. The employee, of course, will testify

637

1       always locked—coin box always locked and the keys. It's just

2       as credible that that coin box for convenience of making

3       change was never locked.

4               You will see the box of evidence that's been

5       admitted. Nothing there. Am I criticizing the police,

6       pointing out the deficiency of the investigation? Well, not

7       everything police officers do can rightfully or accurately be

8       called an investigation—a true investigation. Like a

9       scientific experiment is neutral, it searches in all

10      directions collecting as much information as possible before

11      drawing the conclusion. The conclusion was drawn within an

12      hour.

13              The pathologist that testified and the autopsy

14      report and the manner of death, you'll have it; you'll read

15      it. No evidence of physical altercation.

16              And she testified about blowback of blood from a

17      contact wound. It's not there. The manner of death is simply

18      inconsistent with the anger, the jealousy, resentment or

19      humiliation.

20              And the body position—You'll see the photographs.

21      They're not—They're not pleasant.—is consistent with robbery.

22              The case you have to build against Patrick Mishall

23      as opposed to door unlocked, walks in, first customer. Is

24      that a stretch? Locked, pulls out a gun. Isn't that the

25      simplest explanation that fits the known facts?

1        So we would have these two competing views: a

2   stranger pulls a gun, give me the money, threatens you—It's

3   Jim Jilek's money, not the employee's money.—ordered to lay

4   down, you will follow the instructions.  It's about the money,

5   it's not about you.  You have not fought, struggled, resisted,

6   or ran.  Just do what you're told, lay face down.  The floor

7   is concrete.  You cross your arms in front of you for the last

8   time.

9        The prosecutor's version, friend, acquaintance, or

10  fiancée.  Now it's someone you know.  You'll be in shock.

11  You'll defend.  You know it's not about the money; it's you.

12  That's common sense analysis being confronted by someone you

13  know, and it makes no sense that you would simply lie down,

14  cross your arms, and die.  Because you have a defense

15  mechanism.  You have the defense mechanism of knowing the

16  person.  You have the ability to speak, reason, and logic and

17  defend.  It's a face-to-face confrontation.  It's personal.

18  The last challenge.

19        If you buy the prosecutor's theory without any

20  physical evidence in 13 years, then there is no moment for

21  confrontation.  If you've made that decision and your anger is

22  seething after you made the coffee and brought in the papers,

23  hidden the gun from the home—which has never turned up.

24  There's no gun ahead of time.  To preplan I want to make sure

25  no one ever sees this gun.  There was no face-to-face.

1     They send the clothing up to the state police. He

2 eyeballs it for blood, didn't see it—nothing.

3     But everyone wants to help the police. Mr. Vaseris,

4 this is the first car guy—works literally next door. He's

5 interviewed in 1991— . . . (unintelligible) the same day. I

6 think he testifies he's either 15 or 20 years been working

7 with vehicles. And what's he say the first time? Dark

8 vehicle. That's it. That's it.

9     But this is telling after they've been visited with

10 by the police, come in to testify, want to assist and want to

11 help. Makes no statements for the next 13 years. But in here

12 I simply asked him when he says it was a old, large—And now he

13 knows—has more information. He says, well, they never asked

14 me. Well, he knows there was a homicide. He knows there was

15 a robbery. He's rounding the corner. He's trying to help.

16     Then there's some testimony of one of the witnesses

17 seeing someone running. You've heard the testimony from Pat,

18 the mother of his children—his wife. You've seen him. He's

19 got a fused hip. There's no running.

20     Jim Jilek, the owner, tells you where the cameras

21 are. So a robber would not know that, but he would see the

22 cameras; and, in all likelihood, he may see them from the

23 door. But apply some common sense. You have to give certain

24 attributes to Pat that are inconsistent with Pat. You have to

25 give the kind of preplanning that has a double think to it.

1     In other words, there's no cameras in back. If I'm Pat and I

2     know that—But a robber wouldn't know that.—so I better take

3     the cameras so it doesn't look like me. But where are the

4     cameras—I'm sorry.—the video? Where's the video?

5     It's not logical. It's contradictory to attribute

6     this cool, calm and collected Mr. Mishall one second and then

7     have him seething with jealousy, humiliation, and resentment

8     at the last opportunity; and holding it all in check without

9     confrontation, that's the execution.

10     The gun, the clothes. Did he toss the money away,

11     too? Not found with any money. And this gun—this mysterious

12     gun that just—that never reappears in materiality before 1991.

13     The prosecutor wants you to believe he's hidden it. Now he

14     digs it up and takes it to Wisconsin. Doesn't make sense.

15     When you have more than one answer to a question of

16     who executed Chris, you don't have the answer, you've got

17     reasonable doubt. When you have two answers, you have an

18     incomplete investigation.

19     At any time—At any time in 13 years or any witness

20     produced to you, did you hear Pat belittle, speak

21     unflatteringly, or in a derogatory manner about Chris Dimmick?

22     One bad comment about her? No, he even has her picture from

23     one of the women they want you to believe talked about a gun

24     that they either had or saw—They may or may not have been able

25     to identify him in the courtroom.—that he kept on his dresser,

1    and he still has the photograph in his marital home.

2              Consider the obvious possibility.  Reasonable doubt.

3    He never had a gun.  Pat is not the person who executed Chris,

4    who silenced her.  Why?  Set the gun aside for a moment.

5    Let's say you could go out and buy a gun anywhere.  Now you

6    have it.  Find the moment.  You can't simply create a motive

7    as easily as you can buy a gun.  The emotion, desire, some

8    psychological need or impulse that you have to act upon.

9              But, remember, now he has to be cool, calm, and

10   collected to take all the physical evidence with him and

11   destroy it and never be found.  So now this same logic that

12   you want to attribute to Pat, he picks the perfect place.

13   Take her to work.  They won't be at my house for minutes to an

14   hour.

15             This manner of killing resembles more a gangland hit

16   or a Chinese execution that would in minutes lead to his

17   house.  And you have to attribute to him now the ability to

18   make all physical evidence disappear and count on the fact the

19   investigators are never going to pull a scientific test.  Not

20   even a fingerprint off the lid of the three safes or the

21   drawers.  Why?  Because they know it's a robbery/homicide, not

22   a homicide/robbery.

23             If you believe Pat is guilty, it's not from the

24   testimony and exhibits in this trial because you're giving him

25   characteristics he does not possess: that of outsmarting the

                              642

1   Kalamazoo investigators, the CSI, that they're going to look
2   for blood with a flashlight.

3       Now after 13 years the prosecutor wants it both
4   ways. They want you to wrap it up; they couldn't wrap it up.

5       Think about it this way: what if you don't believe
6   what Pat says about guns? Say he had a gun. Where did he get
7   it? Isn't it just important to find out he came to have a gun
8   after interviewing 400 persons over a 13-year period?

9       Okay. He could hide it anywhere—anyplace. Well,
10  try to fit this one in. They went to his house in Wisconsin.
11  Women said he had a gun. And let's say he keeps it a secret
12  from his wife. They showed up with a warrant in their back
13  pocket. He went down and talked to them. They searched the
14  house in Wisconsin—nothing. A robbery/murder leaves a trail.

15      Where is the trail? Where's any scrap of physical
16  evidence? I'll tell you where it is: it's with the person who
17  went into the Minute Market after Pat left—before 8:20 in that
18  one hour, one hour and a half to rob the Minute Market.
19  Locked the door behind him, keys in the door, out the back.
20  Videotape, money, everything goes.

21      One more thing—Well, unfortunately, four more
22  things. If you've got him cool, calm, and collected, now
23  whoever does this throws caution to the wind. We know how
24  Chris is found. A shot rings out. No one hears it. Maybe
25  it's silenced, maybe it's not. Another shot rings out. No

1    one hears it.   More dumb luck for the robber?   No one hears
2    it.   Another shot rings out.   No one hears it.

3            Out the door, down the road, gun, money, money bag,
4    recorder and tape inside.   That took 13 seconds to solve, not
5    13 years.   That's reasonable doubt.   That's not guilty.

6            The prosecutor is the only party that has the burden
7    of proving the evidence.   Patrick Mishall is not required to
8    prove his innocence.   As natural as that may seem, you have to
9    follow the instructions from the Court.   Patrick Mishall did
10   not have to call a single witness, present any evidence, or
11   even testify.   He doesn't have to prove anything.   The
12   prosecution must meet its burden.   And there are two separate
13   burdens.   By proving each and every element of the charged
14   offense beyond a reasonable doubt, they can't meet that
15   burden.

16           This is not a popularity contest.   It's not about
17   which side you believe the most.   If you allow the prosecutor
18   to turn this into a credibility contest, you allow him to
19   lower the standard of proof.   That's a civil standard: more
20   likely than not.   This standard—the oath that you took—is
21   beyond a reasonable doubt.

22           The real test today is not merely whether you can
23   believe some of the evidence, the real question is whether you
24   can rely on the evidence you have been presented so much that
25   you have no reasonable doubt.

1    The prosecutor's burden is enormously high.  There's

2    no other court in the land that requires that much proof.

3    Because the proof is so high, the prosecutor gets to go first

4    and gets several opportunities to talk to you that I do not

5    have.  When I'm done, he'll speak again.  You won't hear from

6    me again.

7    You've heard the term reasonable doubt mentioned

8    many times throughout the course of the trial.  The judge will

9    charge you on reasonable doubt.  However, at this juncture I'm

10   sure you'll all appreciate and agree that one single, solitary

11   reasonable doubt must result in an acquittal.  And that's not

12   a doubt whether it was 6:05 or 6:25.  That's a doubt that goes

13   to the heart of the matter.

14   Motive, manner of death, execution to silence

15   someone, not to confront them.  We talk about circumstantial

16   evidence and any fair inference available cuts both ways.

17   Innocence is as easily inferred as any other conclusion.

18   Remember the judge will read you instructions regarding

19   circumstantial evidence.  Be careful what you do with it.

20   We've all been around long enough to know that things aren't

21   always what they appear to be.  Do not rush to the first

22   conclusion you're presented with.

23   If circumstantial evidence is subject to two

24   reasonable interpretations—one consistent with guilt and one

25   with innocence—you must use the interpretation consistent with

645

1   innocence.   That's your oath.   The reason for this is the

2   presumption of innocence.

3           Police officers have testified.   And you've heard

4   testimony from various police officers in this case.   Don't

5   let anybody lead you to believe that police officers are not

6   interested in this case; they're interested witnesses.   They

7   are.   And you'll be instructed to take a look at this in your

8   considerations.   The judge will instruct you does the witness

9   have any bias or prejudice or personal interest in how this

10   case is decided.   In general, does the witness have any

11   special reason to tell the truth or any special reason to lie?

12           They're interested in a conviction.   They're

13   interested in seeing that an end product—conviction—will

14   result from the work they put in.   They're interested because

15   they work hand in hand with the prosecuting attorney who asks

16   you for a conviction in this case.   They're interested because

17   their work, by their own admission, was gathering evidence

18   against Mr. Mishall.

19           The search for truth.   That's what

20   Officer Handlogten said.

21           The Court will tell you that being presumed innocent

22   means that those who sit in judgment—you—are to believe that

23   Pat Mishall is innocent throughout the case and that belief of

24   innocence of Pat Mishall is to remain unless removed by the

25   prosecution that's so reliable that no reasonable doubt can

646

1    remain.  In other words, you don't start with a clean slate.
2    Presumption of innocence.

3            Reasonable doubt, ladies and gentlemen, is not a
4    question of whom you believe.  As the prosecutor may attempt
5    to indicate, you may listen to the prosecutor's witness and,
6    having heard him, say—say to yourself, well, they sound
7    believable and logical.  Then you may hear Patrick Mishall—his
8    testimony—and say to yourself, why his version sounds
9    believable and logical.  I don't know whom to believe.  If
10   that's the case you have reasonable doubt, and you must
11   acquit.

12           You cannot convict because of conjecture or
13   speculation.  Don't do the police officers' work for them.
14   Don't do the investigators' work for them.  Don't do the cold
15   case team's work for them.  If there is a doubt based on your
16   common sense reasoning power, you must acquit.

17           You may find that reasonable doubt exists from the
18   lack of evidence as well as from conflicting evidence.  But
19   after hearing all the evidence you cannot agree that the
20   prosecution has proven all the elements of the charge beyond
21   every reasonable doubt, Patrick Mishall is not guilty.

22           Motive, manner of death, not consistent with the
23   prosecutor's theory, not consistent with homicide/robbery,
24   consistent with robbery/homicide.

25           I ask you to return a verdict of not guilty on all

647

1    the counts. Thank you.

2              THE COURT: State have rebuttal?

3              MR. BROWER: Yes, your Honor.

4              Defense counsel argues that this was an execution,

5    but it wasn't a domestic violence murder. I'd ask you to

6    consider a few things.

7              First, consider the number of shots. Not just one

8    to the forehead but four shots, three of them that would have

9    been immediately fatal and a fourth potentially so. That's

10   classic overkill. What do your life experiences tell you

11   about the kinds of relationship where you see overkill?

12             Consider also where she was shot. All of them in

13   the back and the back of the head. In the back and the back

14   of the head, not in the front, as if the assailant couldn't

15   bear to look the victim in the face. What do your life

16   experiences tell you about that? Patrick Mishall and

17   Christine Dimmick had a domestic relationship. This was a

18   domestic violence related homicide.

19             Defense counsel encourages you to adopt the simplest

20   explanation, that she may have let the first customer in and

21   then the door locked behind them with other customers coming

22   up to the door, coming to get their 7:00 a.m. coffee and so

23   on. But he says the simplest explanation is the one you

24   should adopt.

25             Well, what he, in effect, did was to advocate a

                                648

1    principle that's applied in science: where there're complete
2    [*sic*]—complete [*sic*]—Excuse me.—competing theories, the
3    simplest theory is the preferred theory. Actually that
4    principle is described in various ways; but, in general, the
5    rule is interpreted to mean that the simplest of two or more
6    competing theories is the preferable one.

7            Let me give you an example of the application of
8    that theory in a real life event. Crop circles began to
9    appear in the 1970s. Two interpretations were made of those
10   circles of matted grass. One was that flying saucers made the
11   imprints; the other was that some human had used some sort of
12   instruments to matt the grass down.

13           The theory—Excuse me. The principle that they talk
14   about—the simplest theory—would say that given the lack of
15   evidence for flying saucers and the complexity of getting UFOs
16   from distant galaxies to arrive on earth unseen and traveling
17   faster than the speed of light, the second interpretation—the
18   human one—was, in fact, the simplest and, therefore, the
19   preferred theory.

20           As it turned out, the principle was right. In the
21   1990s two people came forward and admitted that they had made
22   the crop circles that led to the—all the media attention.

23           But what does that have to do with this case?
24   Defense counsel would have you believe that the simplest
25   theory argument should be applied here to find the defendant

649

1    not guilty. But even if you choose to follow that scientific

2    theory during your deliberations—which I argue you should

3    not—his argument fails. The simplest of two competing

4    theories is the one that is supported by the evidence. Given

5    the lack of evidence for an unknown intruder who did not break

6    in, who did not accost the victim and force her inside and was

7    not let in voluntarily and was not hiding in the building all

8    night; and, in light of the evidence it is not the simplest

9    theory just as was the case with the flying saucer theory.

10    On the other hand, there is ample evidence that

11    Patrick Mishall is the killer, having both opportunity,

12    motive, means, and the confessions—everything I highlighted in

13    my initial closing. The fact is, there was a lot of evidence.

14    The fact that there was a lot of evidence doesn't make this

15    theory a complicated theory. On the contrary, it supports a

16    conclusion that it was the simplest theory and, therefore, the

17    preferred theory because it is supported by the evidence.

18    Defendant's speculative theory is unsupported by the evidence.

19    Samuel Johnson once said when speculation has done

20    its worst, two and two still make four. In this case, two and

21    two still equals Patrick Mishall.

22    Defense counsel mentioned that a couple of the

23    witnesses had difficulty identifying the defendant in court.

24    But consider the testimony about how significantly the

25    defendant's physical appearance has changed over the last

1    13 years: hair color, length, curly, so on. But consider,

2    too, the details that the witnesses had about Mishall: his

3    life and work in Wisconsin and Michigan and the murder of

4    Chris Dimmick. Finally, the defendant's own acknowledgments

5    about knowing all but one of those people.

6         Do you really think that they—those witnesses—were

7    talking about someone else or are part of some conspiracy to

8    railroad him?

9         Remember that what I say or what defense counsel

10   says is not evidence. Evidence comes from the witness stand,

11   not from the attorneys. We are only arguing what we believe

12   the evidence to be and what the evidence shows.

13        Reflect on the testimony. Is the statement that

14   there is no evidence of motive consistent with what you heard?

15   Did you hear any testimony about keys missing? Did you hear

16   someone say that there were no prints taken or that the box

17   was never locked? Did you hear someone testify that they saw

18   the defendant running, or did you hear the detective say I

19   told him I talked with somebody that saw him running—the story

20   the detective gave which compelled the defendant to admit that

21   het had lied. If either of us is mistaken about what actually

22   was said from the stand, please disregard what we say and

23   apply what you recall the testimony to have been.

24        Finally, defense counsel points out that

25   Detective Handlogten reviewed the report and no action was

1    taken. They didn't submit it as it was to the police

2    department, somehow inferring, I guess, that the evidence that

3    was known at that point is somehow diminished because they—it

4    hadn't resulted in charges, that it has no value for your

5    consideration now.

6          Some of the things you heard about during this trial

7    were known to the detectives back in 1991, but many of the

8    things you heard about during this trial were not known to

9    them. In many instances this was because the witness was

10   unknown to the police at the time of the original

11   investigation or the defendant hadn't made the statements to

12   that witness yet.

13         But even if you choose to believe that the police

14   had ignored certain evidence or taken no action on that

15   evidence back then, it does not diminish the value of that

16   evidence today.

17         Huxley said this: facts do not cease to exist

18   because they are ignored. Facts are facts whether they became

19   known in 1991, 1994, or 2003; and the facts show

20   Patrick Mishall is guilty. Thank you.

21         THE COURT: It's after noon, members of the jury,

22   so I believe it to be appropriate for us to recess at this

23   time. What remains to be done in this case is for me to give

24   you the final instructions as to the law and then for you to

25   deliberate and decide upon a verdict.

                            652

(Tape No. B2004-037, 6-21-04, 12:11)

1    So what I'm going to do—And it's going to take
2    probably at least a half hour for me to give you the
3    instructions. So I think it'd be appropriate to recess now;
4    and then once we come back from lunch, I'll give you the
5    instructions and then you can go directly after my
6    instructions to the jury room to deliberate.

7    But before we recess I want, again, to remind you
8    that you are not to discuss this case with anyone—not even
9    with each other.

10   You are not to have any contact with anybody who's
11   been involved in this case in any way or shape or form.

12   You're not to discuss the case with any—with anyone
13   other than yourselves either, so you just—The rule is that you
14   can't discuss the case amongst yourselves or with anyone else,
15   period. The first time it will become appropriate for you to
16   discuss the case is when you're sent to the jury room after my
17   final instructions to commence your deliberations.

18   I'd ask you to be back here at 1:30, and we'll get
19   started with the instructions shortly after that or as soon as
20   I'm satisfied that you're all back here and I have the
21   defendant and both attorneys present to be here in the
22   courtroom when I give you those instructions.

23   Mr. Brower, you indicated there might be a short
24   delay; but—We'll try to accommodate that. But make every
25   effort to get here as soon as you can after that

653

1     . . . (inaudible).

2           MR. BROWER:   Yes, your Honor.  Thank you.

3           THE COURT:   We'll stand—So we'll stand in recess

4     then for the purposes of the jury until 1:30.

5           (At 12:13 p.m., court recessed)

6           (At 1:54 p.m., proceedings reconvened)

7           I want to ask this one last time.  We went over

8     these instructions just before we came in here.  Are they—Do

9     you feel they're appropriate at this point?

10          MR. SVIKIS:   Yes, your Honor.

11          MR. BROWER:   Yes, your Honor.

12          THE COURT:   All right.

13          All right.  What remains to be done, members of the

14     jury, is for me to give you these instructions.  And as I told

15     you, we've had several duplicate copies made up so that you

16     can have them with you in the jury room when you deliberate.

17          Then after we get done with the instructions we'll

18     determine who the alternates will be, and we'll do that by

19     withdrawing two names at random.  It could be any one of the

20     14 of you.

21          However, those two people will—Once their name is

22     announced, that doesn't necessarily mean your service is—in

23     this case is ended.  I want you to take a seat in the back of

24     the courtroom once that's done, and then we'll give you some

25     further details as to what should occur in respect to those

1   two people.

2         Members of the jury, the evidence and arguments in
3   this case are finished, and I will now instruct you on the
4   law.  That is, I will explain the law that applies to this
5   case.

6         Remember that you've taken an oath to return a true
7   and just verdict that's based only on the evidence and my
8   instructions on the law.  You must not let sympathy or
9   prejudice influence your decision.

10        As jurors, you must decide what the facts of this
11  case are.  This is your job, and nobody else's.  You must
12  think about all of the evidence and the testimony and then
13  decide what each piece of evidence means and how important you
14  think that it is.  This includes whether you believe what each
15  of the witnesses said.  What you decide about any fact in this
16  case is final.

17        It's my duty to instruct you on the law.  You must
18  take the law as I give it to you.  If a lawyer said something
19  different about the law, follow what I say.  At various times,
20  I have already given you some instructions about the law.  You
21  must take all of my instructions together as the law that
22  you're to follow.  You should not pay attention to some
23  instructions and ignore others.

24        To sum up, it's your job to decide what the facts of
25  the case are, to apply the law as I give it to you, and, in

655

1    that way, decide the case.

2        A person accused of a crime is presumed to be
3    innocent.  This means that you must start with the presumption
4    that the defendant is innocent.  This presumption continues
5    throughout the trial and entitles the defendant to a verdict
6    of not guilty unless you are satisfied beyond a reasonable
7    doubt that he is guilty.

8        Every crime is made up of parts called elements.
9    The prosecutor must prove each element of the crime beyond a
10   reasonable doubt.  The defendant isn't required to prove his
11   innocence or to do anything.  If you find that the prosecutor
12   has not proven every element beyond a reasonable doubt, then
13   you must find the defendant not guilty.

14       A reasonable doubt is a fair, honest doubt growing
15   out of the evidence or lack of evidence.  It's not merely an
16   imaginary or possible doubt, but a doubt that's based on
17   reason and common sense.  A reasonable doubt is just that—a
18   doubt that is reasonable after a careful and considered
19   examination of the facts and circumstances of this case.

20       When you discuss the case and decide on your
21   verdict, you may only consider the evidence that has been
22   properly admitted in this case.  Therefore, it's important for
23   you to understand what is evidence and what is not—and what is
24   not evidence.

25       Evidence includes only the sworn testimony of

656

1    witnesses, the exhibits admitted into evidence, and anything
2    else I told you to consider as evidence.

3         Many things are not evidence, and you must be
4    careful not to consider them as such. I will now describe
5    some of the things that are not evidence.

6         The fact that the defendant is charged with a crime
7    and is on trial is not evidence. Likewise, the fact that he
8    is charged with more than one crime is not evidence.

9         The lawyers' statements and arguments are not
10   evidence. They're only meant to help you understand the
11   evidence and each side's legal theories. The lawyers'
12   questions to witnesses are also not evidence. You should
13   consider these questions only as they give meaning to the
14   witnesses' answers. You should only accept things the lawyers
15   say that are supported by the evidence or by your own common
16   sense and general knowledge.

17        My comments, rulings, questions, and instructions
18   are also not evidence. It is my duty to see that a trial is
19   conducted according to the law and to tell you the law that
20   applies to this case. However, when I make a comment or give
21   an instruction I'm not trying to influence your vote or
22   express a personal opinion about the case. If you believe I
23   have an opinion about how you should decide this case, you
24   must pay no attention to that opinion. You are the only
25   judges of the facts, and you should decide this case from the

1    evidence.

2          At times during the trial I've excluded evidence

3    that was offered or stricken testimony that was heard. Do not

4    consider those things in deciding this case. Make your

5    decision only on the evidence that I let in and nothing more.

6          Your decision should be based on all of the evidence

7    regardless of which party produced it.

8          You should use your own common sense and general

9    knowledge in weighing and judging the evidence, but you should

10    not use any personal knowledge that you may have about a

11    place, person, or event. To repeat once more, you must decide

12    this case based only on the evidence I admitted during this

13    trial.

14          The prosecutor has introduced evidence of a

15    statement that it claims the defendant made. Before you may

16    consider such out-of-court statements against the defendant

17    you must first find that the defendant actually made the

18    statement as it was given to you.

19          If you find that the defendant did make the

20    statement, you may give the statement whatever weight you

21    think it deserves. In deciding this, you should think about

22    how and when the statement was made and about all the other

23    evidence in the case. You may consider the statement in

24    deciding the facts of the case and in deciding if you believe

25    the defendant's testimony here in court.

1    Facts can be proved by direct evidence from a

2  witness or an exhibit. Direct evidence is evidence about what

3  we actually see or hear. For example, if you look outside and

4  see that rain is falling, that's direct evidence that it's

5  raining.

6    Facts can also be proved by indirect or

7  circumstantial evidence. Circumstantial evidence is evidence

8  that normally or reasonably leads to other facts. So, for

9  example, if you see a person come in from the outside wearing

10  a raincoat covered with small drops of water that would be

11  circumstantial evidence that it is rain.

12    You may consider circumstantial evidence.

13  Circumstantial evidence by itself, or a combination of

14  circumstantial evidence and direct evidence, can be used to

15  prove the elements of the crime. In other words, you should

16  consider all the evidence that you believe.

17    You may consider whether the defendant had a reason

18  to commit the alleged crime, but a reason, by itself, is not

19  enough to find a person guilty of a crime.

20    The prosecutor doesn't have to prove that the

21  defendant had a reason to commit the alleged crime. He has to

22  show, however, that the defendant actually committed the

23  crime.

24    Now you've heard evidence in this case that shows

25  this defendant committed crimes or improper acts for which

659

1     he's not on trial. If you believe this evidence, you must be

2     very careful only to consider it for certain purposes. You

3     may only think about whether this evidence tends to show the

4     circumstances surrounding the alleged admission—admissions

5     made to certain witnesses by the defendant.

6             You must not consider this evidence for any other

7     purpose. For example, you must not decide that it shows that

8     the defendant is a bad person or that he is likely to commit

9     crimes. You must not convict the defendant here because you

10    think he is guilty of other bad conduct. All the evidence

11    must convince you beyond a reasonable doubt that the defendant

12    committed the alleged crime, or you must find the defendant—or

13    you must find him not guilty.

14            When the lawyers agree on a statement of facts,

15    these are called stipulated facts. You may regard such

16    stipulated facts as true, but you're not required to do so.

17            As I have said before, it's your job to decide what

18    the facts of this case are. You must decide which witnesses

19    you believe and how important you think their testimony is.

20    You do not have to accept or reject everything a witness said.

21    You are free to believe all, none, or part of any person's

22    testimony.

23            In deciding which testimony you believe, you should

24    rely on your own common sense and everyday experience.

25    However, in deciding whether you believe a witness's

1    testimony, you must set aside any bias or prejudice that you

2    may have that's based on the race, gender, or national origin

3    of the witness.

4         There is no fixed set of rules for judging whether

5    you believe a witness, but it may help you to think about

6    these questions:

7         Was the witness able to see or hear clearly?  How

8    long was the witness watching or listening?  Was anything else

9    going on that might have distracted the witness?

10        Did the witness seem to have a good memory?

11        How did the witness look and act while testifying?

12   Did the witness seem to be making an honest effort to tell you

13   the truth, or did the witness seem to evade the questions or

14   argue with the lawyers?

15        Does the witness's age and maturity affect how you

16   judge his or her testimony?

17        Does the witness have any bias, prejudice, or

18   personal interest in how this case is decided?

19        Have there been any promises, threats, suggestions,

20   or other influences that affected how the witness testified?

21        In general, does the witness have any special reason

22   to tell you the truth or any special reason to lie?

23        All in all, how reasonable does the witness's

24   testimony seem when you think about all of the other evidence

25   in the case?

1    Now sometimes the testimony of different witnesses
2    will not agree, and you must decide which testimony you
3    accept.  You should think about whether the disagreement
4    involves something important or not, and whether you think
5    someone is lying or is simply mistaken. People see and hear
6    things differently, and witnesses may testify honestly but
7    simply be wrong about what they thought they saw or remember.
8    It's also a good idea to think about which testimony agrees
9    best with the other evidence in the case.

10   However, you may conclude that a witness
11   deliberately lied about something that is important to how you
12   decide the case.  If so, you may choose not to accept anything
13   that witness said.  On the other hand, you may think that the
14   witness lied about some things and told you the truth about
15   others.  You may simply accept the part that you think is true
16   and ignore the rest.

17   Now you should not decide this case based on which
18   side presented more witnesses.  Instead, you should think
19   about each witness and each piece of evidence and whether you
20   believe them.  Then you must decide whether the testimony and
21   evidence you believe proves beyond a reasonable doubt that the
22   defendant is guilty.

23   You have heard testimony from a
24   witnesses—Dr. Joyce deJong, who gave you—or has given you her
25   opinion as an expert in the field of forensic pathology and

662

1    also Specialist Bruce Labrie, who has given you his opinion in

2    the area of crime scene investigation and blood spatter

3    evidence.  Experts are allowed to give opinions in courts

4    about matters they are expert on.  However, you do not have to

5    believe the wit—the expert's opinion.  Instead, you should

6    decide whether you believe it and how important you think that

7    it is.

8         When you decide whether you believe an expert's

9    opinion think carefully about the reasons and facts that they

10    gave you as a basis for their opinion and whether those facts

11    are true.  You should think—You should also think about the

12    expert's qualifications and whether the expert's opinion makes

13    sense when you think about the other evidence in the case.

14         You heard testimony from witnesses who are police

15    officers.  That testimony is to be judged by the same

16    standards you use to evaluate the testimony of other

17    witnesses.

18         In count one, the defendant is charged with the

19    crime of open murder.  Thus, you will be instructed on the

20    elements of both first-degree premeditated murder and

21    second-degree murder.

22         To prove the first-degree premeditated murder

23    alternative, the prosecutor must prove each of the following

24    elements beyond a reasonable doubt:

25         First, that the defendant caused the death of

1    Christine Dimmick; that is that Ms. Dimmick died as a result
2    of gunshot wounds to the head and back.

3            Second, that the defendant intended to kill
4    Ms. Gimmick.

5            Third, that this intent to kill was premeditated;
6    that is, thought out beforehand.

7            Fourth, that the killing was deliberate, which means
8    that the defendant considered the pros and cons of the killing
9    and thought about—thought about and chose his actions before
10   he did it.  There must have been real and substantial
11   reflection for long enough to give a reasonable person a
12   chance to think twice about the intent to kill.  Now the law
13   doesn't say how much time is needed.  It is for you to decide
14   if enough time passed under the circumstances of this case.
15   The killing cannot be the result of sudden impulse without
16   thought or reflection.

17           The crime of first-degree premeditated murder
18   requires proof of a specific intent.  What that means is that
19   the prosecution must prove not only that the defendant did
20   certain acts, but he did those acts with intent to cause a
21   particular result.

22           For the crime of first-degree premeditated murder
23   this means that the prosecution must prove that the defendant
24   intended to kill Ms. Dimmick.

25           The defendant's intent may be proved by what he

664

1    said, what he did, how he did it, or by any other facts and

2    circumstances in evidence.

3         In count two, the defendant is charged with

4    first-degree felony murder.  To prove this charge, the

5    prosecutor must prove each of the following elements beyond a

6    reasonable doubt:

7         First, that the defendant caused the death of

8    Chris Dimmick; that is, that Ms. Dimmick died as a result of a

9    gunshot wound to the head and back.

10        Second, that the defendant had one of these three

11   states of mind, and those are that he intended to kill, or he

12   intended to do great bodily harm to Ms. Dimmick, or he

13   knowingly created a very high risk of death or great bodily

14   harm knowing that death or such harm would be the likely

15   result of his action.

16        Third, that when he did the act that caused the

17   death of Ms. Dimmick the defendant was committing the crime of

18   larceny.  For the crime of larceny the prosecutor must prove

19   the following elements beyond a reasonable doubt:

20        First, that the defendant took someone else's

21   property.

22        Second, that the property was taken without consent.

23        Third, that the property was taken in a store.

24        Fourthly, that there was some movement of the

25   property.  It doesn't matter whether the defendant actually

1    kept the property or whether the property was taken off the

2    premises.

3        Next, that the property was worth something at the

4    time it was taken.

5        And, last, that the property—or that at the time the

6    property was taken the defendant intended to permanently

7    deprive the owner of that property.

8        Now in respect to the counts or charges of

9    first-degree premeditated murder or first-degree felony

10   murder, you may also consider the lesser charge of

11   second-degree murder.  To prove this charge, the prosecutor

12   must prove each of the following elements beyond a reasonable

13   doubt:

14       First, that the defendant caused the death of

15   Chris Dimmick; that is, that Ms. Dimmick died as a result of

16   gunshot wounds to the head and back.

17       Second, that the defendant had one of these three

18   states of mind, and that is:

19           (A), that he intended to kill her, or

20           (B), he intended to do great bodily harm to

21   Ms. Dimmick or to have someone he procured to do great bodily

22   harm to Ms. Gimmick.

23       We need to make a change there.

24       Or he knowingly created a very high risk of death or

25   great bodily harm knowing that death or such harm would be the

1    likely result of his actions.

2           You must think about all of the evidence in deciding
3    what the defendant's state of mind was at the time of the
4    alleged killing. The defendant's state of mind may be
5    inferred from the kind of weapon used, the type of wounds
6    inflicted, the acts and words of the defendant and any other
7    circumstances surrounding the alleged killing. You may infer
8    that the defendant intended to kill if he or someone he
9    procured used a dangerous weapon in a way that was likely to
10   cause death. Likewise, you may infer that the defendant
11   intended the usual—usual results that follow from the use of a
12   dangerous weapon.

13          A gun is a dangerous weapon.

14          Premeditation and deliberation may be inferred from
15   any actions of the defendant which show planning or from any
16   other circumstances surrounding the killing. The prosecutor
17   need not prove the motive for the killing, but you may
18   consider evidence of motive in deciding whether there was
19   premeditation and deliberation. Motive by itself does not
20   prove premeditation and deliberation.

21          If you find the defendant guilty of murder, you must
22   state in your verdict whether it is murder in the first degree
23   or murder in the second degree.

24          In count three the defendant is charged with the
25   separate crime of possessing a firearm at the time he

                              667

1    committed the crime of murder. To prove this charge the
2    prosecutor must prove each of the following elements beyond a
3    reasonable doubt:

4    First, that the defendant committed the crime of
5    first or second-degree murder, which have been defined for
6    you. It is not necessary, however, that the defendant be
7    convicted of either of those crimes.

8    Second, that at the time the defendant committed one
9    of those crimes, he knowingly carried or possessed a firearm.

10   In count four the defendant is charged with the
11   crime of armed robbery. To prove this charge, the prosecutor
12   must prove each of the following elements beyond a reasonable
13   doubt:

14   First, that the defendant assaulted
15   Christine Dimmick. There are two ways to commit an assault.
16   Either the defendant must have attempted or threatened to do
17   immediate injury to Ms. Dimmick and was able to do so or the
18   defendant must have committed a forceful act that made Ms.
19   Dimmick reasonably afraid of being injured at the time.

20   Second, that at the time of the assault, the
21   defendant was armed with a weapon designed to be dangerous and
22   capable of causing death or serious injury.

23   Third, that at the time of the assault the defendant
24   took money or other property that did not belong to him. It
25   doesn't matter how much money was taken or what the property

1   was worth as long as it was worth something.

2           Fourth, that this money or property was taken from

3   the person of Christine Dimmick or in her presence.  This must

4   be shown by proof that defendant used or threatened to use

5   violence to take the property or money away even though the

6   property was not in the same immediate area as Ms. Dimmick.

7           Fifth, that the money or property was moved.  Any

8   movement is enough.

9           And, six, that at the time he took the money or

10  property the defendant intended to take it away permanently.

11          The crime of armed robbery requires specific intent.

12  This means that the prosecutor must prove not only that

13  defendant did certain acts, but he did those acts with the

14  intent to cause a particular result.

15          For the crime of armed robbery this means that the

16  prosecutor must prove that the defendant intended to

17  permanently deprive Minute Market of the money or property.

18  Defendant's intent may be proved by what he said, what he did,

19  how he did it, or any other facts and circumstances in

20  evidence.

21          Again in count four there is a separate charge of

22  felony firearm at the time he was committing the armed

23  robbery.  In respect to that fourth count, to prove the charge

24  the prosecutor must prove the following elements beyond a

25  reasonable doubt:

669

1          That, first, that the defendant committed the crime

2     of armed robbery, which has been defined for you.   It is not

3     necessary, however, that the defendant be convicted of—be

4     convicted of either of—either of that crime.

5          Second, that at the time the defendant committed one

6     that—crime he knowingly carried or possessed a firearm.

7          Furthermore, the evidence in this case must convince

8     you beyond a reasonable doubt that the crime occurred on or

9     about February 8th, 1991, in Kalamazoo County.

10         When you go to the jury room, you should first

11    choose a foreperson.  The foreperson should see to it that

12    your discussions are carried on in a businesslike way and that

13    everyone has a fair chance to be heard.

14         A verdict in a criminal case must be unanimous.   In

15    order to return a verdict, it's necessary that each of you

16    agrees on that verdict.  In the jury room you will discuss the

17    case amongst yourselves; but, ultimately, each of you will

18    have to make up your own mind.  Any verdict must represent the

19    individual, considered judgment of each juror.

20         It is your duty as jurors to talk to each other and

21    to make every reasonable effort to reach agreement.  Express

22    your opinions and the reasons for them, but keep an open mind

23    as you listen to your fellow jurors.  Rethink your opinion,

24    and don't hesitate to change your mind if you decide you were

25    wrong.  Try your best to work out your differences.

670

1    However, although you should try to reach an

2    agreement, none of you should ever give up your honest opinion

3    about the facts of this case just because other jurors agree

4    [sic]—disagree with you or just for the sake of reaching a

5    verdict.  In the end, your vote must be your own, and you must

6    vote honestly and in good conscience.

7    In this case, there are two different crimes that

8    you may consider for both counts one and two.  When you

9    discuss count one—that is, the charge of open murder—you must

10   consider the crime of first-degree premeditated murder first.

11   If you all agree that the defendant is guilty of that crime,

12   you may stop your discussions regarding this count.

13   If you believe that the defendant is not guilty of

14   first-degree premeditated murder or if you cannot agree about

15   that crime, you should consider the less serious crime of

16   second-degree murder.  You decide how long to spend on

17   first-degree premeditated murder before discussing

18   second-degree murder.  You can go back to first-degree

19   premeditated murder after discussing second-degree if you want

20   to.

21   Now when you discuss count two, first-degree felony

22   murder, you must consider the crime of first-degree felony

23   murder first.  If you all agree the defendant is guilty of

24   that crime, you may stop your discussions regarding this

25   count.

671

1            If you believe that the defendant is not guilty of

2   first-degree felony murder or if you cannot agree about that

3   crime, you should consider the less serious crime of

4   second-degree murder. You decide how long to spend on

5   first-degree felony murder before discussing

6   second-degree murder. You can go back to the first-degree

7   felony charge after discussing second-degree if you want to.

8            Do you agree that should be changed to felony?

9            MR. BROWER: Yes.

10           THE COURT: However many times we discuss these,

11  there seems to be a slipup.

12           Regarding the murder charges, you should mark your

13  verdict form consistent with your discussions; and that is

14  either not guilty, guilty of first-degree premeditated murder

15  alone, first-degree felony murder alone, guilty of both

16  first-degree felony murder—first-degree premeditated murder

17  and first-degree felony murder, or guilty of

18  second-degree murder. All of these options are on the verdict

19  form. You'll have them in printed form right in front of you.

20           As you can tell by what I've been telling you,

21  you've got several options in respect to the first two counts.

22           Regarding counts three and four, felony firearms,

23  armed robbery, and felony firearms, if you all agree that

24  defendant's guilty of that crime, you may stop your

25  discussions regarding these counts. If you believe the

672

1   defendant is not guilty of those charges, you can return a

2   verdict of not guilty. So your options as to counts three,

3   four, and five are either guilty as charged or not guilty.

4   Again, you've got the verdict form; it'll be there.

5         Now in your deliberations possible penalty should

6   not influence your decision. It is the duty of the judge to

7   fix the penalties within the limits provided for by law.

8         If you want to communicate with me while you're

9   deliberating, please have your foreperson write a note and

10   give it to the bailiff or court officer. It's not proper for

11   you to talk directly with myself, the lawyers, or anyone else

12   involved in this case while you're deliberating.

13         As you discuss the case, you must not let anyone—not

14   even myself—know how your—how your voting stands. Therefore,

15   until you return a unanimous verdict, do not reveal this to

16   anyone outside of the jury room.

17         In this case the defendant is charged with five

18   counts; that is, with the crimes of open murder, felony

19   murder, felony firearms, armed robbery, and felony firearms.

20   These are all separate crimes, and the prosecutor is charging

21   that the defendant committed all of them. You must consider

22   each crime separately in the light of all of the evidence in

23   the case.

24         You may find the defendant guilty of all of them,

25   any one of them, or any combination of these crimes, guilty of

673

1    the less serious crimes, or not guilty.

2           Now as I told you before and I'm telling you again,

3    you're going to get a printed or written copy of the

4    instructions I just gave you. As you discuss this case, you

5    should think about all of my instructions, both those that I

6    gave you orally and those that you have with you in the jury

7    room as the law that you're to follow.

8           Okay. At this point we'll determine who the

9    alternates will be. If those—And so the clerk will withdraw

10   two names at random. And if those two people will remove

11   themselves from the jury box and take a seat in the back of

12   the courtroom. But try and seat yourself so you're not

13   amongst anybody who may be involved in this case or a

14   spectator.

15          If you've taken notes, you're to take your notes

16   with you because only those remaining 12 jurors who have taken

17   notes—only those notes are the ones that you may consider—that

18   the remaining 12 may consider while they're deliberating.

19          So if you'll determine now, madam clerk, who the

20   alternates will be.

21               THE CLERK:   The court excuses juror number ten—

22               THE COURT:   Is that in seat ten?

23               THE CLERK:   Seat ten.

24               THE COURT:   Okay. That would—

25               THE CLERK:   I'm sorry.—Judith Cronin.

674

1          THE COURT:   Ms. Cronin.

2          THE CLERK:   And the court excuses juror in seat

3   number seven, Gail Hoover.

4          THE COURT:   We're going to have to make a

5   small—small change on one of the instructions as it is.

6          Oh, I didn't see you sit.

7          (At 2:34 p.m., off record discussion between Court

8          and bailiff)

9          One other thing, we're going to—

10         Have you got all of the exhibits?

11         MR. BROWER:   They're right here, your Honor.

12         THE COURT:   Are they all assembled?

13         The exhibits that were offered and received will be

14  provided you while you're in the jury room so that if any of

15  you feel that you wish to review them for any reason

16  whatsoever you'll have them with you in the jury room while

17  you deliberate.

18         (At 2:35 p.m., further off record discussion between

19         Court and bailiff)

20         You want to swear the court officer, then, and the

21  jury.   Then go with her to commence deliberations.

22         THE CLERK:   You do solemnly swear or affirm that

23  you will to the utmost of your ability keep the persons sworn

24  as jurors on this trial from separating from each other; that

25  you will not suffer any communication to be made to them or

675

1  any of them, orally or otherwise; that you will not
2  communicate with them or any of them, orally or otherwise,
3  except by the order of this court or to ask them if they have
4  agreed on their verdict until they shall be discharged; and
5  that you will not, before they render their verdict,
6  communicate to any person the state of their deliberation or
7  the verdict they have agreed upon, so help you God?
8      THE BAILIFF:  I will.
9      (At 2:37 p.m., jury exits to begin deliberations)
10      THE COURT:  All right.  Will the two alternate
11  jurors come back up and take a seat in the jury box, please.
12      UNIDENTIFIED JUROR:  . . . (inaudible)
13      THE COURT:  Wherever's convenient.  It doesn't
14  matter at this point.  I just have some further instructions
15  to give you.
16      Just because it was determined, ladies, that you are
17  alternates doesn't discharge you from the jury at this point.
18  You're not discharged technically from the jury until a
19  verdict has been reached.  And the reason for that is if some
20  emergency arose that made it impossible for the 12 that remain
21  after your exclusion to continue, you could be called upon to
22  sit with that jury—the remaining members—and deliberate and
23  decide on a verdict.
24      So what's necessary is, number one, you not discuss
25  the case with anyone.

676

1     Number two, that you don't—the same restrictions

2  that I put on before that you're not to look at any media or

3  reports or listen to any media reports, have any discussions

4  with anybody; and you should keep whatever notes that you have

5  secure so that they not—before a decision is reached, they not

6  fall into the hands of somebody other than yourselves.

7     And you shouldn't have any contact with anyone who's

8  been involved in this case in any way or discuss—and, as I

9  said, or discuss it with anyone.

10     So what we need to do is when the young lady comes

11  back—the court bailiff for the jury—you're going to be free to

12  go, but you got to give her a phone number so that, if for

13  some reason we needed to get you back here, we could get a

14  hold of you.

15     Any questions about that?

16     (No audible response)

17     And we'll let you know as soon as your—If nothing

18  happens so that you're not needed, we'll let you know

19  immediately that you're released and you can then go about

20  your business, talk—talk about the case with whomever you

21  please or anything of that nature.

22     Any questions?

23     (No audible response)

24     Could you then just wait until the young lady comes

25  back and you'll give her the information you need—or she

677

(Tape No. B2004-037, 6-21-04, 14:41)

1    needs—so that if she has to she can contact you and, in any

2    event, contact you when a verdict is reached if you're not

3    needed.  So if you'd just remain there until she gets back we

4    can take care of that.

5          Once that is done then, Counsel, we'll need to come

6    back here in case you have anything—Could I see you in

7    chambers a minute.

8          (At 2:41 p.m., proceedings adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25